IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

RECEIVED
2005 NOV 28 P 2:50
DEBRA P. HACKETT, CLK
U.S. DISTRICT COURT
MIDDLE DISTRICT ALA

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | CR NO. 2:05-cr-119-F |
| v. ) | |
| ) | |
| DON EUGENE SIEGELMAN, et al ) | |
| ) | |
| Defendant. ) | |

## MOTION FOR RECONSIDERATION
## OF MAGISTRATES'S ORDER ON RECUSAL

COMES NOW Don Eugene Siegelman, by and through his undersigned attorneys, and hereby files this Motion for Reconsideration of the Magistrate's Order on Recusal denying Defendants' previously-filed motions for recusal. As grounds in support thereof Defendant states as follows:

### I.      Procedural background

1.      On October 28, 2005 United States Magistrate Judge Charles S. Coody ("Judge Coody") orally informed defendants and counsel of certain facts which could raise a basis of recusal, and directed defendants to file a motion within seven days if defendants contended that recusal was necessary. (Transcript of Proceedings, October 28, 2005 at 7-9).

2.      On November 3, 2005, Codefendant Don E. Siegelman filed a Motion for Recusal (Doc 33). Also on this date, Codefendant Gary Mack Roberts filed a "Motion for Recusal" (Doc. 32). On November 4, 2005, Defendant Scrushy filed "Defendant Richard

M. Scrushy's Motion to Recuse Pursuant to 28 U.S.C. §§ 455(a) and (b)(5)(iii)." (Doc. 34).

3. On November 9, 2005, the Government filed its "United States' Response to Defendants' Motions for Recusal." (Doc 38).

4. On the next day, November 10, 2005, Judge Coody filed a 20-page "Order and Memorandum Opinion on Recusal" ("Order"). (Doc 41)

5. In that Order, Judge Coody denied Defendants' Motions to recuse under both 28 U.S.C. §§ 455(a) and (b)(5)(iii). (Order at 11, 19). Additionally, in that Order Judge Coody stated, "I have subsequently learned that my oldest daughter and her husband, by virtue of their ownership of stock in Healthsouth Corporation, are members of the putative plaintiff *In re Healthsouth Corporation Securities Litigation*, 2:03-cv-01500-KOB (N.D. Ala.) in which Richard Scrushy is a named defendant." (Order at 2) (footnote omitted). Defendant had not previously raised this ground for recusal because until the filing on Judge Coody's Order denying his motion to recuse, Defendant was unaware of this fact.

6. November 16, 2005, a status conference was held with the Court and the parties. At that time the issue of the Magistrate's Order on Recusal was discussed in chambers. The transcript of the conference is sealed. During said conference the Court directed any party wishing to file a Motion to Reconsider the Magistrate's Order to do so under seal and within ten (10) days.

## II.   The HealthSouth Issue

7. Defendant Richard M. Scrushy has previously filed a Motion for Reconsideration which fully sets forth the facts, issues and argument supporting

2

Scrushy's request for recusal. Rather than simply being redundant, Defendant Siegelman hereby adopts the arguments and requests made in Defendant Scrushy's Motion for Reconsideration. Specifically, Defendant Siegelman adopts the following:

a. The need for an evidentiary hearing before the district court or another magistrate.

b. The arguments and authorities supporting recusal based on the matters pertaining to Healthsouth.

c. The evidentiary submissions submitted with such Motion.

### III.   The Marcato Issue

8.   As noted in the Magistrate's Order on Recusal, during an in-chambers conference the Magistrate made the following disclosures regarding a key witness for the prosecution:

> For a number of years, my wife was the debate coach at Saint James High School. Two of her students, Jennifer Marcato and Emily Marcato, are daughters of the Marcato who is named in the indictment as one of the persons from whom a bribe was obtained. I worked with her students, helped her with her students when I could. And those two young ladies at various times would, in casual conversation about family life, describe difficulties that her father had with the Alabama Department of Transportation. It was things like griping about I didn't get a contract, they won't pay any attention to my striping. You know, I always—well, I never thought much of it except to think that it was just the typical kind of things that a child will repeat from having heard their parents about difficulties with the business. But I make that disclosure. I don't know how it relates to whatever this is.

Magistrate's Order on Recusal p.2.

9.   Although the Magistrate's Order is approximately twenty (20) pages in length, the issue concerning Mr. Marcato is summarily dismissed as not implicating the

3

statute for recusal due to an appearance of impropriety with only the following discussion:

> In the same vein, my association with the children of Forrest "Mac" Marcato would not lead to an objective, fully informed lay observer to reasonably question my impartiality. The tenor of Marcato's children's comments were that their father experienced problems or difficulties with getting the Alabama Department of Transportation to use a road striping product which would improve safety during rainy weather at night. No mention of any particular official was made. I considered then and now that these comments were simply complaints about decisions by a government agency to which Marcato was attempting to market a product. If a judge were required to disqualify himself in a case involving a public figure or entity because he knew or was associated with persons who complained about decisions, only judges who resided in caves or monasteries could ever sit on a case. In this country complaints about actions of public officials are the norm, and awareness of those complaints does not implicate the statute requiring recusal for an appearance of impropriety.

Magistrate's Order on Recusal, p. 14

10. Despite the Magistrate's description of this issue, the case before the Court does not involve the magistrate's association with an individual who has merely "complained about decisions" of a public figure. In this case, Mr. Marcato is not just a witness, he is alleged to be a victim of the federal crime of extortion and thus is a critical witness for the prosecution on a number of charges in the indictment. While it may have been easy to dismiss the statements of Mr. Marcato's daughters at the time they were made, the indictment in this case alone adds greater significance to such statements today.

11. As with the Healthsouth issue discussed in Defendant Scrushy's motion, the Magistrate's Order also raises more questions than it answers regarding the Marcato issue. For instance, in the Order the Magistrate revealed for the first time that the road striping product "would improve safety during rainy weather and at night." No such

product information was initially disclosed by the Magistrate leading to the conclusion that more was discussed than has been revealed. In fact, the Magistrate's initial disclosures suggest as much when he revealed that Mr. Marcato's daughters had discussed the family business "at various times." See Magistrate's Order on Recusal, p. 2. Defendant Siegelman respectfully suggests that all details of the relevant conversations should be set forth on the record. Defendant respectfully submits that it is certainly out of the norm for teenagers to chat with adult acquaintances about the problems that their parents are experiencing in the business world, unless of course the teenagers believe that there is something about the professional role of the particular adult acquaintance that makes the conversation relevant as a request for assistance or advice. Further explanation of the timing, contents and context of the discussions with Mr. Marcato's daughters would shed light on whether those conversations constitute personal knowledge on disputed factual matters in this case, or otherwise create questions about impartiality.

  12. Since the initial disclosures by the Magistrate were made in the in chambers conference, the Government has provided the defense with copies of relevant witness statements and summaries of statements, including the FBI summary of the statement of Mr. Marcato, a copy of which is attached as Exhibit A. Any fair reading of the summary of this interview clearly reveals that the comments made by Mr. Marcato's daughters go to the very heart of numerous allegations and charges contained in the indictment in this case. For instance:

    a. One of Mr. Marcato's daughters, Jennifer, was mentioned by name by the Magistrate and is specifically mentioned in the FBI interview as

5

        having been involved in his initial meeting with Jim Allen, another key prosecution witness who has received immunity from prosecution.

   b.    The business relationship with the State of Alabama and the very road striping product discussed with the Magistrate are the specific factual issues of several allegations and charges in the indictment.

   c.    Mr. Marcato clearly attempts to tie his business relationship with the State of Alabama to his political contributions to Governor Siegelman and others. It appears from the indictment that the Government's theory may be that political contributions would have cured the alleged "problems" that Mr. Marcato's daughters discussed with the Magistrate. Or, on the contrary, further details on these conversations may tend to show that Mr. Marcato's "problems" substantially pre-dated, and had nothing to do with, any interaction with Siegelman. These are some of the ways in which the very existence of such "complaints" by Mr. Marcato's daughters could become relevant to disputed factual issues in this case.

13.    Should the Magistrate not recuse at this time, an evidentiary hearing on this issue, as well as the Healthsouth issue, will be necessary. It is not sufficient for the Magistrate to simply conclude that his conversations, which thus far have been provided in only summary form, do not create an appearance of impropriety. More information is needed to understand the context and timing of the conversations between the magistrate and Mr. Marcato's daughters. Depending on the details and timing of those conversations and the further course of this case, those conversations themselves may

constitute some personal knowledge by the magistrate of disputed facts. Certainly, the timing and substance of the conversations could tend to confirm or refute aspects of Marcato's testimony.

### IV.   Conclusion

At this stage of the proceedings, no one can say with any certainty what motions and issues the Magistrate assigned this case will be called on to hear. There is no doubt, however, that all parties desire to move this case as expeditiously as possible. Likewise, there is a strong public policy interest in having this case resolved expeditiously by judicial officers free from any hint of bias whatsoever. If the Magistrate proceeds with this case, there is at least a substantial chance that – as further developments make it more clear what the Magistrate will be called upon to do in this case, and more clear what the crucial factual issues are – the arguments for recusal will have to be revisited in the future. That in itself would be problematic, as it would unnecessarily disrupt the progress of this case towards a speedy trial; it would, at the very least, be better for the Magistrate to recuse now in order to avoid potential problems later in the case. But in fact, given the nature of the allegations in this case and the Magistrate's association and knowledge on both the Healthsouth and Marcato issues, Defendant Siegelman submits that recusal is necessary and n the public interest at this stage of the litigation. In that view, it is respectfully submitted that unlike the Magistrate's conclusion, "an objective, fully informed lay observer" would most certainly question the Magistrate's impartiality. At least, further information should be provided regarding the details of the relevant matters. Accordingly, Defendant Siegelman hereby moves the Court to reconsider its earlier Order

and recuse from future proceedings. In the alternative, the matter of recusal should be referred to another magistrate for an evidentiary hearing.

Respectfully submitted,

*G. Douglas Jones*
G. Douglas Jones

OF COUNSEL:
Whatley Drake, LLC
2323 2nd Avenue North
Birmingham, AL 35203
Phone: (205) 328-9576

## CERTIFICATE OF SERVICE

I hereby certify that on this the 28th day of November 2005, the foregoing document was filed with the Court under seal via hand delivery and a copy of the same was duly served via US Mail on:

**Charles Redding Pitt**
John D Saxon PC
2119 Third Avenue North
Suite 100
Birmingham, AL 35203

**Arthur W. Leach**
2310 Marin Drive
Birmingham, AL 35243

**Henry Lewis Gillis**
**Christopher Kyle Whitehead**
Thomas Means Gillis & Seay PC
PO Drawer 5058
Montgomery, AL 36103-5058

**James Kenneth Jenkins**
Maloy & Jenkins
75 Fourteenth St NW
25th Floor
Atlanta, GA 30309

**Leslie Vernon Moore**
Moore & Associates LLC
4000 Eagle Point Corp. Drive
Birmingham, AL 35242

**W. Bruce Maloy**
Maloy & Jenkins
75 Fourteenth Street, 25th FloorAtlanta, GA 30309

**Joel Evan Dillard**
**Stewart Davidson McKnight, III**
**William Joseph Baxley**
Baxley, Dillard, Dauphin & McKnight
2008 Third Avenue South
Birmingham, AL 35233

**Mark D. McKnight**
2000 1st Avenue North
Suite 901
Birmingham, AL 35203-4125

**Ronald Wayne Wise**
Law Office of Ronald W. Wise
2000 Interstate Park Drive
Suite 105
Montgomery, AL 36109

**James B. Perrine**
U.S. Attorney's Office
PO Box 197
Montgomery, AL 36101-0197

**Joseph L. Fitzpatrick, Jr.**
Attorney General's Office
Public Corruption & White Collar
Alabama State House
11 South Union Street
Montgomery, AL 36130

**Louis V. Franklin, Sr.**
U.S. Attorney's Office
PO Box 197
Montgomery, AL 36101-0197

**Stephen P. Feaga**
U.S. Attorney's Office
PO Box 197
Montgomery, AL 36101-0197

_____
OF COUNSEL

FD-302 (Rev. 10-6-95)

-1-

## FEDERAL BUREAU OF INVESTIGATION

Date of transcription    12/13/2004

    On December 6, 2004, FORREST "MAC" MARCATO, President, Rainline Corporation, Post Office Box 210818, Montgomery, Alabama 36121, 334/277-0237, was interviewed. The interview was conducted at the law office of Capell & Howard in Montgomery, Alabama. MARCATO was accompanied by Attorneys JEFFREY C. DUFFEY, 334/834-4100, and DAVID BYRNE of Capell & Howard. Investigators assigned to the interview were SA JAMES K. MURRAY of the FBI and Chief Investigator JOHN E. BRENNAN of the Alabama Attorney General's Office. After being advised of the identities of the interviewing Agents and the purpose of the interview, MARCATO provided the following information:

    MARCATO explained that he primarily considered himself an inventor. MARCATO explained that he had formed the Marcato & Son traffic striping business in the early 1980s. MARCATO advised the he had been working on a concept of a high visibility traffic stripe which would be easily seen in wet weather conditions for several years. MARCATO stated that he filed for a U. S. patent regarding a high profile traffic stripe known as Rainline. He stated that the patent application was on file in 1993 and that the patent was issued in 1995 or 1996. MARCATO explained that he has four patents regarding the high profile traffic stripe at this time. MARCATO stated that in 1993, he took a product to the Alabama Department of Transportation (ALDOT) New Products Evaluation Board which met monthly at ALDOT. MARCATO stated that he has worked hard to extol the benefits of his products to ALDOT and the he conducted a demonstration in Troy, Alabama in 1993 for ALDOT officials. Following a demonstration, a project was let on U. S. Highway 431, south of Phenix City, using he Rainline product. MARCATO also became involved in building striping truckers through an entity known as Mac Stripers.

    As MARCATO was demonstrating the superiority of Rainline in regards to wet visibility in the mid-1990s, stated that other stripers started to become afraid that the product might put them out of business. MARCATO state that he has no solid proof but he believed that other traditional striping companies were putting pressure on the ALDOT to block the utilization of Rainline. During the administration of Alabama Governor FOB JAMES, MARCATO hired Montgomery Consultant FRANK EVANS to attempt to advance his product with ALDOT. MARCATO stated that EVANS had claimed that he was well

Investigation on  12/6/04    at  Montgomery, Alabama

File #  194A-MO-42984    Date dictated  12/6/04

by  SA JAMES K. MURRAY  JKM

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

United States v. Richard M. Scrushy
2:05cr119-F
Exhibit C

FD-302a (Rev. 10-6-95)

194A-MO-42984

Continuation of FD-302 of ___FORREST "MAC" MARCATO___, On _12/6/04_, Page _2_

connected to Alabama Governor FOB JAMES and ALDOT Director JIMMY BUTTS. MARCATO drew up a contract with EVANS which included Alabama Lobbyist JOHN TEAGUE.

While JAMES was governor, MARCATO advised that he met JIM ALLEN at a social function in Montgomery. MARCATO explained that his daughter, JENNIFER, was a close friend of ALLEN's daughter. MARCATO commented that when ALLEN found out that MARCATO was the owner of the Rainline Company he became very interested in forming a business venture with MARCATO. Following the chance meeting with ALLEN, MARCATO was visited at his office a few days later by ALLEN. At the accompanying visit, ALLEN was joined by MACK ROBERTS and CRUM FOSHEE. MARCATO advised that he had known MACK ROBERTS since the 1980s when he was a division engineer in Birmingham, Alabama. MARCATO had also related that MACK ROBERTS was a former director of ALDOT during the FOLSOM administration. MARCATO stated that he learned that MACK ROBERTS had met JIM ALLEN while ROBERTS worked at ALDOT and ALLEN was building bridges. MACK ROBERTS left his ALDOT position at the inauguration of the JAMES administration. ROBERTS then joined ALLEN's toll bridge building company. MARCATO commented that he had not met CRUM FOSHEE before the meeting. At the meeting, MARCATO stated that he showed the trio a video regarding Rainline and they seemed excited at the business prospects of the product. MARCATO stated that ALLEN told him that he had checked at ALDOT and he knew there were people interested in the Rainline striping product. MARCATO also mentioned at the time there was a national initiative to improve high visibility. MARCATO also recalled at the meeting ALLEN told him that there were many people at ALDOT who did not like MARCATO, but ALLEN and FOSHEE were viewed in a more favorable light there.

Approximately two months after the initial meeting, MARCATO stated that ALLEN returned and put on a "full court press." ALLEN wanted to be the national distributor for the Rainline product. ALLEN told MARCATO that he was a member of the national lobbying group with contacts all over the country. MARCATO stated that negotiations were ongoing in the spring of 1998. MARCATO recalled that MAX ROBERTS returned with ALLEN at this meeting. While ALLEN was negotiating for national distribution rights for Rainline, in April, ALDOT published a specification for inverted profile (which was the generic term for Rainline) traffic stripe. In May of 1998, ALDOT Director JIMMY BUTTS wrote a letter approving the Rainline product. MARCATO did not speak to BUTTS directly and JIM ALLEN took credit for the progress being made on Rainline at ALDOT. Soon after ROBERTS and ALLEN made their pitch to be the

FD-302a (Rev. 10-6-95)

194A-MO-42984

Continuation of FD-302 of __FORREST "MAC" MARCATO__ , On __12/6/04__ , Page __3__

Rainline national distributors, BILL CARR, owner of Ozark Striping Company (OSC), started pressing MARCATO to sell the Rainline striping equipment to him. MARCATO had long believed that BILL CARR and LEE GROSS of OSC had been major opponents to Rainline. OSC did a majority of the striping work for the state and had been upset over the prospect of the Rainline product or Marcato & Sons taking business away from them. MARCATO stated that his family needed the money so he decided to sell the Marcato & Sons striping business to OSC.

MARCATO advised that he sold his striping business to OSC in the summer of 1998. MARCATO held meetings with BILL CARR and LEE GROSS regarding the sale of the company. MARCATO estimated that it received $500,000 to $700,000 plus a $50,000 a year non-compete clause. MARCATO advised that OSC took over the jobs that Marcato & Sons Striping had on the books and bought most of the striping equipment owned by Marcato & Sons. MARCATO advised that he knew that OSC had an inside track while watching television the night before the 1998 gubernatorial election in Alabama. MARCATO advised that he recalled watching a film of Governor FOB JAMES flying around with BILL CARR of OSC on his aircraft. He also recalled that his son, MICHAEL MARCATO, was dining in Montgomery and observed LEE GROSS of OSC eating lunch with ALDOT Director JIMMY BUTTS while JAMES was in office. MARCATO stated that the decision to sell was a practical one based upon OSC's solid position. As part of the deal, LEE GROSS was to receive $150 per ton of Rainline used in Alabama as a "sales consultant".

Soon after OSC acquired Marcato & Sons Striping, the state decided to have another official test. MARCATO was told by ALLEN that he and MACK ROBERTS had successfully pushed the demonstration to ALDOT and federal highway officials. Soon after the test, a job on Taylor Road in Montgomery went to OSC. MARCATO explained that he actually supervised the striping job with Marcato & Sons equipment and joked that "while BILL CARR got the money, we did the work." Another project that received a change order for Rainline at the time was the access roads to JIM ALLEN's Alabama River toll bridge. Following a few small projects in the spring of 1998, negotiations with JIM ALLEN from National Distributorship broke down. MARCATO noted that when negotiations with ALLEN broke down Rainline projects dried up.

MARCATO met with MACK ROBERTS at the Sports Palace Restaurant in Montgomery. ROBERTS stated that he was sorry that MARCATO and ALLEN had not been able to come to an agreement on

FD-302a (Rev. 10-6-95)

194A-MO-42984

Continuation of FD-302 of ____FORREST "MAC" MARCATO____ , On _12/6/04_ , Page __4__

Rainline. Shortly thereafter, MARCATO began speaking to ALLEN again. MARCATO explained that he attended the First Assembly of God church on Bell Road with ALLEN and after a church supper one evening they talked about reinstalling negotiations of Rainline. MARCATO advised that ALLEN finally yielded on several key points of negotiation and that he agreed to a contract in principal a few days later. Once again the agreement lingered in various contractual disputes. MARCATO recalled that the pressure for him to come to an agreement became very intense following the election of DONALD SEIGELMAN. He stated that JIM ALLEN began to press him daily. MARCATO also learned that ALLEN's associate MACK ROBERTS was going to be the director of ALDOT. MARCATO finally conceded to allow ALLEN to have a distributorship for Rainline in four states. One of the conditions of the deal written up by ALLEN was that CRUM FOSHEE would be paid $50 per ton for products sold in Alabama. MARCATO explained that under the terms of the contract with ALLEN, MARCATO was to receive approximately 60% and ALLEN was to receive approximately 40% of the Rainline business with the state. Under other terms of the agreement, once ALLEN had made his first million dollars of work with the state, his percentage would increase to 50/50 with MARCATO. Another provision was that CRUM FOSHEE's $50 per ton was to come off the top. JIM ALLEN's bookkeeper, JOHN BAXLEY, kept a report of the amount of money owed to ALLEN and would check on the payment monthly.

MARCATO recalled that after the agreement was signed, Rainline began to get more jobs. JIM ALLEN met with him at a Waffle House in Montgomery. ALLEN claimed that CRUM FOSHEE wanted more money for his part of the contract. MARCATO decided to increase FOSHEE's cut from $50 to $100 a ton for product used in Alabama. MARCATO explained that all monies went to JIM ALLEN and it was ALLEN who eventually paid CRUM. MARCATO stated that he later spoke to CRUM FOSHEE and FOSHEE told him that he was still receiving $50 per ton well after ALLEN had claimed to be paying him $100 a ton. MARCATO was asked what CRUM FOSHEE did for his cut of the money. MARCATO stated that he was told by JIM ALLEN that FOSHEE had the necessary contacts at ALDOT to advance the use of Rainline. ALLEN insisted that FOSHEE'S cut must be part of the deal.

After MACK ROBERTS became highway director, MARCATO recalled setting up a demonstration for the division engineers statewide one evening on Taylor Road outside of Montgomery. ALDOT Director MACK ROBERTS and Federal Highway Department Administrator JOE WILKERSON were present at the demonstration. Soon after,

FD-302a (Rev. 10-6-95)

194A-MO-42984

Continuation of FD-302 of   FORREST "MAC" MARCATO   , On 12/6/04   , Page   5

contracts for Rainline increased. Guidelines were posted at ALDOT which set the Average Daily Traffic (ADT) count on roads intended for Rainline use at 1,500 vehicles. Later this ADT was moved up to 5,000 vehicles. In 2001, ALDOT Director MAC ROBERTS resigned. Also in 2001 the ALDOT specification was reissued to allow another type of profiled road striping besides Rainline.

MARCATO provided estimates to DAVID BYRNE which reflected the approximate amount of money paid to ALLEN and FOSHEE as part of their contract cut. MARCATO estimated that in 1999 MARCATO paid JIM ALLEN $243,800 and CRUM FOSHEE $53,800. In 2000, MARCATO paid ALLEN $650,000 and paid $230,000 to CRUM FOSHEE. In the year 2001, MARCATO paid $784,000 to JIM ALLEN and $285,000 to CRUM FOSHEE. In the year 2002, MARCATO paid $1,069,000 to ALLEN and $356,000 to CRUM FOSHEE. In 2003, MARCATO paid CRUM FOSHEE approximately $145,000.

MARCATO explained that in the summer of 2002 following an ongoing dispute with ALLEN, he decided to terminate ALLEN's distributorship agreement. MARCATO advised that ALLEN had written the agreement so that it was extremely difficult to terminate his services. MARCATO explained that his decision to terminate ALLEN's agreement was a purely economic one as he did not believe ALLEN was promoting enough of his effort to advance Rainline. MARCATO explained that even though he terminated ALLEN in the summer of 2002, ALLEN's negotiations "rocked on" until approximately December 2002. ALLEN insisted that MARCATO buy a specialized go-cart for ALLEN's paraplegic son which coast MARCATO $14,000. He also requested that MARCATO build his bridge building company two expensive automated saws. MARCATO advised that he also made the decision to keep paying CRUM FOSHEE for FOSHEE's efforts at ALDOT.

MARCATO stated that ALLEN had not threatened to ruin his company's chances of doing business with ALDOT via MACK ROBERTS. MARCATO did recall ALLEN telling him that he had gotten MACK ROBERTS "set up" in a house on Emerald mountain. MARCATO also recalled seeing MACK ROBERTS driving his green Montero sport utility vehicle six to eight months after he had stopped working for JIM ALLEN. MARCATO advised that he believed the vehicle belonged to ALLEN's company. MARCATO also stated that a neighbor had told him that JIM ALLEN had recently acquired a premiere lot overlooking the golf course at Emerald mountain. MARCATO advised that a builder with ties to JIM ALLEN had constructed MACK ROBERTS' new house on the lot. MARCATO stated that when ROBERTS left his

FD-302a (Rev. 10-6-95)

194A-MO-42984

Continuation of FD-302 of __FORREST "MAC" MARCATO__ , On __12/6/04__ , Page __6__

position as director of ALDOT, he then went to work for a company which made asphalt derivatives.

MARCATO was asked about political donations which may have been requested of him. MARCATO advised that he gave two approximate $10,000 donations to the DON SEIGELMAN campaign through Lobbyist CRUM FOSHEE. During the 2002 gubernatorial election, MARCATO wrote three checks to different Political Action Committees (PACs) at the instruction of CRUM FOSHEE and gave FOSHEE the checks. MARCATO then made a decision to make another $10,000 donation. In this instance MARCATO advised some advice that an uncle had told him once. MARCATO stated that his uncle told him to always deliver the money to the politician himself so that the politician would know where the money came from. MARCATO then made the decision to deliver the money personally. MARCATO contacted CRUM FOSHEE and asked him to set up a meeting with Governor SEIGELMAN. FOSHEE picked MARCATO up and the two drove together to a house on Perry Street across the street from the governor's mansion in Montgomery. MARCATO recalled walking to the back of the small house and going up wooden steps into the kitchen. There MARCATO waited approximately 15 minutes until SEIGELMAN showed up. At that time MARCATO met with SEIGELMAN and advised that he had brought him a donation. MARCATO advised that he spoke for a few moments with SEIGELMAN and was then instructed to write three checks to three separate PACs. MARCATO advised that either CRUM FOSHEE or an associate of SEIGELMAN told him which PACs to write the checks to. After writing the checks MARCATO left the house on Perry Street. MARCATO recalled that CRUM FOSHEE had spoken to SEIGELMAN when SEIGELMAN first showed up at the house and explained who MARCATO was.

MARCATO recalled approximately two weeks later receiving a personal telephone call from SEIGELMAN. MARCATO stated that SEIGELMAN told him that he knew the nature of MARCATO's business and explained to him that like a business, his election required money. SEIGELMAN mentioned that he was about to go to an important meeting about Rainline but did not go into specific details. SEIGELMAN then asked MARCATO for a $250,000 donation. SEIGELMAN told MARCATO that he knew he was "good for the money." MARCATO balked at the $250,000 figure and SEIGELMAN suggested $100,000 instead. MARCATO told SEIGELMAN that he would think about making the donation. MARCATO advised that he decided not to make the donation in view of the fact that he had already given $20,000. MARCATO also recalled a conversation with BILL CARR in which CARR related that SEIGELMAN frequently pressed companies doing business

FD-302a (Rev. 10-6-95)

194A-MO-42984

Continuation of FD-302 of __FORREST "MAC" MARCATO__ , On __12/6/04__ , Page __7__

with the state for campaign money. MARCATO advised that he had also given $45,000 to the successful gubernatorial campaign of BOB RILEY who defeated republican gubernatorial candidate DON SEIGELMAN in the 2002 statewide election. MARCATO advised that as an owner of aircraft he had also provided air transportation for the candidate BOB RILEY along with candidate BILL ARMISTEAD and Alabama Attorney General BILL PRYOR. MARCATO advised that during the tenure of RILEY's ALDOT Director JOE McINNIS, use of Rainline had stopped. MARCATO took issue with a study done by the University of Alabama that questioned the overall worth of Rainline.

MARCATO was asked to list other state departments of transportation which had approved the use of Rainline and which states the product was currently being used. MARCATO advised that the Rainline product is currently approved and being utilized in California, Oregon, Washington, New Jersey, and Florida. MARCATO stated that he has a licensee in Louisiana that has six states in the southeast currently utilizing Rainline, to include Louisiana, Mississippi, Arkansas, and Texas. In addition, the product is approved for usage in certain provinces in Canada and in Puerto Rico. Additionally, the product is being considered for use in Europe. MARCATO showed a brief video which extolled the safety virtues of the Rainline product. He explained that the product is more expensive than regular traffic striping due to the amount of material utilized, the superiority of the material utilized, and the high technology equipment which puts down the profile markings. MARCATO stated that Alabama actually pays much less for its profile striping than other states. He stated the profile markings continue to grow in popularity because of the high reflective values and durability of the product.