Bailey, Nick - 6-21-04.txt

1

1    IN THE UNITED STATES DISTRICT COURT
2    FOR THE MIDDLE DISTRICT OF ALABAMA
3            NORTHERN DIVISION
4              GRAND JURY
5
6
7
8  IN RE:
9  GRAND JURY INVESTIGATION         CRC 03-0233
10
11
12
13            * * * * * * * * * * *
14
15       BE IT KNOWN that on Monday, June 21, 2004,
16  the testimony of NICK BAILEY was taken before the
17  Grand Jury of the United States District Court for the
18  Middle District of Alabama, Northern Division, in the
19  Grand Jury Room, United States Courthouse, One Church
20  Street, Montgomery, Alabama; MR. STEPHEN P. FEAGA,
21  MR. LOUIS V. FRANKLIN, MR. J. B. PERRINE, and
22  MR. JOHN GIBBS interrogating.
23
24            * * * * * * * * * * *
25

2

1                NICK BAILEY
2       The witness, having first been duly sworn to
3  speak the truth, the whole truth and nothing but the
4  truth, testified as follows:

Page 1

Bailey, Nick - 6-21-04.txt

20  Q. Okay. Now, if you would -- I mean, each of
21 us have a title and then in lay terms we can tell
22 people, hey, this is what I did in my job. You know,
23 not a long version, but could you just give them a
24 short, sort of lay version, here's what my job was in
25 the governor's office, these are the kinds of things I

6

1 did?
2  A. I dealt with a staff of 69 employees at the
3 governor's office and managed day-to-day activities,
4 staff meetings. And I worked with the schedule,
5 worked with the governor's secretaries and worked with
6 guests that we had come by.
7  Q. Did you ever -- during the course of the time
8 that you were working in the governor's office, did
9 you ever at the governor's request take actions and
10 inform people of information that he wanted
11 disseminated to them?
12  A. Yes, sir.
13  Q. Okay. And these were things that were part
14 of your normal duties and responsibilities, to do that
15 as well?
16  A. That's right.
17  Q. Okay. During the time that you were working
18 in the Office of the Governor, did there come a time
19 or an occasion when Governor Siegelman had a meeting
20 with an individual named Richard Scrushy?
21  A. Yes, sir.
22  Q. And do you know who Richard Scrushy is?
23  A. Yes, sir. I believe he is the former CEO of
24 HealthSouth.

Page 5

Bailey, Nick - 6-21-04.txt

25  Q.  Former CEO of HealthSouth?

7

1   A.  Right.
2   Q.  At the time that this meeting took place
3 between Mr. Scrushy and Governor Siegelman, was
4 Mr. Scrushy at that time, to your knowledge, the chief
5 executive officer of HealthSouth Corporation?
6   A.  Yes.
7   Q.  Would you just describe for the ladies and
8 gentlemen of the jury -- do you know exactly when that
9 meeting took place?
10  A.  It was -- I believe it was in June of '99.
11  Q.  Okay.  Could it have possibly been in July of
12 '99?
13  A.  Yes, sir.
14  Q.  Okay.  So it was sometime in the summer of
15 '99?
16  A.  That's right.
17  Q.  Okay.  Where did the meeting take place?
18  A.  In -- at the state capitol in the governor's
19 office.
20  Q.  And would you tell the ladies and gentlemen
21 of the grand jury to the best you recall kind of what
22 happened in terms of your becoming aware that
23 Mr. Scrushy was there.  Were there other people with
24 him?
25  A.  There were other people with him.  I think he

8

1 had one security agent with him, Jim Goodrow, and I
2 believe his secretary/attorney Loree Skelton was also
3 with him.

Page 6

Bailey, Nick - 6-21-04.txt

4   Q.   That would be secretary/attorney?
5   A.   That's right.
6   Q.   Loree Skelton was there, you think?
7   A.   Yes.
8   Q.   What about a fellow Eric Hanson?
9   A.   I believe Eric was there.
10  Q.   Do you know whether or not someone named Jabo
11 Waggoner was there?
12  A.   I can't remember if Senator Waggoner was
13 there.  Possibly.
14  Q.   Okay.  Now, did all of y'all go in and have a
15 meeting?  What happened?
16  A.   Richard Scrushy and -- Loree actually left
17 and -- the meeting and went downstairs to meet with
18 some other folks downstairs, and Richard and the
19 governor met privately in the governor's meeting room.
20  Q.   About how long did their meeting, their
21 private meeting, take place?
22  A.   I would say it was an hour.
23  Q.   Okay.  No more than that?
24  A.   No more than that.
25  Q.   Okay.  Now, what if anything happened to let

9

1 you know that the meeting was over?
2  A.   The governor's secretary let me know the
3 meeting was over.
4  Q.   And who was the governor's secretary?
5  A.   Marilyn Rowe.
6  Q.   Okay.  And did you see Mr. Scrushy leave?
7  A.   I did.  Mr. Scrushy and his security left.
8 And maybe there were two or three other people there.

Page 7

Bailey, Nick - 6-21-04.txt

9   I believe Eric Hanson was there, and again, I'm not
10  sure about Jabo Waggoner.
11      Q.  Okay.  Loree Skelton you think was there?
12      A.  Absolutely.
13      Q.  Now, who would have been downstairs that she
14  might have been meeting with?  Do you know?
15      A.  The chief of staff's office was downstairs.
16      Q.  And who was that?
17      A.  Paul Hamrick.
18      Q.  Now, did you approach the governor after
19  Mr. Scrushy left?
20      A.  I did, and asked him how the meeting went.
21      Q.  Okay.  Do you remember what if anything he
22  said to you?
23      A.  I recall him saying, he's halfway there, and
24  showed me a check that he had made as a contribution
25  to our lottery campaign.

                                                              10

1       Q.  Okay. And did you, upon seeing the check,
2   ask him the question, what did we have to do to get
3   this?
4       A.  Actually, I believe what I said was, what in
5   the world is he going to want for this.  What in the
6   world is he going to want for that.  I think the
7   governor's response was, the CON Board.
8       Q.  And what if anything happened after that?
9       A.  You mean as far as --
10      Q.  Yeah.  I mean, what -- was any more said at
11  that point?
12      A.  And the governor said, I wouldn't think so,
13  and I gave him --

Page 8

Bailey, Nick - 6-21-04.txt

14  Q.  The governor said I wouldn't think so in
15  response to what?
16  A.  When I asked him what in the world is he
17  going to want for that, and he said the CON Board.
18  And I said, well, that shouldn't be a problem, should
19  it? And he said, I wouldn't think so.
20  Q.  Okay. Now, did you or -- what happened to
21  the check after he showed it to you that day?
22  A.  He gave it to me. And I'm not sure exactly
23  how we transmitted it to our campaign finance office;
24  but that's ultimately where it went, to the lottery
25  campaign finance office.

                                                        11

1  Q.  And you're saying it ultimately went to the
2  lottery campaign finance office?
3  A.  That's right.
4  Q.  Okay. Now, after this meeting took place,
5  was there a subsequent meeting wherein Mr. Siegelman
6  made decisions about who he was going to appoint to
7  something called the Certificate of Need Board?
8  A.  Right. We had routinely had appointments
9  meetings, meaning appointments to boards and
10 commissions.
11 Q.  Okay. Were you present at a meeting where
12 discussions were had about who was going to be
13 appointed to the Certificate of Need Board?
14 A.  Yes.
15 Q.  Okay. Who else do you remember being
16 present?
17 A.  I remember Paul Hamrick and I believe -- in
18 addition to the governor. And I believe his

Page 9

Bailey, Nick - 6-21-04.txt

19  appointment secretary at that time was Raymond Bell.
20     Q.  Did Mr. Siegelman at that time bring up the
21  name of Richard Scrushy?
22     A.  He did.
23     Q.  Okay.  In what context?
24     A.  That Richard had individuals that he wanted
25  appointed to the CON Board, Certificate of Need Board,

12

1  and also wanted to serve in a leadership position on
2  that board.
3     Q.  Okay.  And did the governor at that time make
4  that happen during that meeting?  Did he make a
5  decision to make those appointments?
6     A.  I don't recall exactly what the ultimate
7  outcome of the meeting was, but the governor's
8  argument was to support the candidates for the CON
9  Board that Scrushy was for and to -- and to put him in
10  the -- in a leadership position on that board.
11     Q.  Okay.  And was anyone there -- did anyone
12  there voice any opposition to that?
13     A.  They did.  Paul Hamrick encouraged the
14  governor to be careful about putting too many of
15  Scrushy's appointments on the CON Board or putting
16  Scrushy in a leadership position because of the
17  concern of it alienating or aggravating the Nursing
18  Home Association.
19     Q.  And why would Paul Hamrick have been
20  concerned about aggravating the Nursing Home
21  Association?
22     A.  The Nursing Home Association is very active
23  politically.

Page 10

Bailey, Nick - 6-21-04.txt

24   Q.   Had they supported Governor Siegelman in his
25   race for governor in '98?

13

1    A.   I know they did.  I don't know to what
2    extent.
3    Q.   Okay.  Was Mr. Scrushy a supporter of the
4    governor in his efforts to get elected in 1998?
5    A.   No, sir.
6    Q.   Was the governor aware of that fact?
7    A.   He was.
8    Q.   Okay.  In fact, prior to this meeting that
9    Mr. Scrushy came down to where the conversation was
10   had between you and the governor after that meeting
11   about the check, were you present at a meeting -- do
12   you know a fellow named Eric Hanson?
13   A.   I do.
14   Q.   Okay.  Were you present at a meeting between
15   Eric Hanson and the governor that predates, that
16   occurred before, the meeting where Mr. Scrushy showed
17   up with that check?
18   A.   Yes.
19   Q.   Would you tell the ladies and gentlemen of
20   the grand jury what happened at that meeting with
21   Mr. Hanson and the governor that you were present at?
22   A.   Eric Hanson was, in an effort to mend the
23   relationship between the governor and Eric -- I mean,
24   excuse me, between the governor and Scrushy, Eric was
25   asking the governor what he could do to make things

14

1    right between the governor and Richard.

Page 11

Bailey, Nick - 6-21-04.txt

2  Q. Okay. And what if anything did the governor
3  say back to him?
4  A. It was his -- it was his estimate that
5  Richard Scrushy had given some $350,000 to Fob James'
6  campaign, and Eric asked what could he do to help
7  Richard make up for that. And Siegelman told him that
8  350,000 plus interest and they'd -- 500,000, they'd
9  just call it even.
10 Q. Okay.
11 A. He wanted 500,000 for the lottery campaign.
12 Q. Now, at some point in time after you sent the
13 check, you're not sure exactly how, but it wound up
14 out at the campaign finances offices for the lottery
15 foundation, right?
16 A. Right.
17 Q. An entity had been set up to pursue or to
18 help fund-raise and to push efforts to further the
19 governor's agenda to get an education -- excuse me, a
20 lottery passed, ostensibly the purposes of which would
21 be to further education; is that right?
22 A. That's correct.
23 Q. And they formed a foundation called AELF,
24 Alabama Education Lottery Foundation; is that right?
25 A. Right.

15

1  Q. The individuals that were involved in forming
2  that and in furthering the business of that, would you
3  say that included the governor and yourself?
4  A. Yes.
5  Q. Would there also have been others involved in
6  helping further the businesses of that entity?

Page 12

Bailey, Nick - 6-21-04.txt

7   A.   Yes.
8   Q.   Incorporating it and fund-raising for it; is
9 that right?
10  A.   That's right.
11  Q.   Did the name Darin Cline -- is he somebody
12 that would have been involved in that effort?
13  A.   Yes, sir.
14  Q.   How about Jack Miller and Giles Perkins?  Are
15 they representatives or affiliated in any way with the
16 Alabama Democratic Party?
17  A.   Yes, sir, they were.
18  Q.   Was the Alabama Democratic Party -- more
19 specifically, Mr. Perkins and Mr. Miller, were they a
20 part of the effort to help raise funds to get this
21 referendum passed?
22  A.   Yes.
23  Q.   Okay.  After this check wound up out at the
24 offices, the campaign offices, for the AELF -- which,
25 by the way, where were they?

                                                       16

1   A.   Where was the campaign office?
2   Q.   Yes.
3   A.   It was on Perry Street.  13 -- it's near the
4 mansion on Perry Street.
5   Q.   Okay.  Now, you said the check wound up out
6 there.  Was there a bank account where the Alabama
7 Education Lottery Foundation did its business; you
8 know, put the funds that it was raising?
9   A.   Yes.  I'm sure there was.
10  Q.   Okay.  At some point in time after this
11 meeting between the governor and Mr. Scrushy that

Page 13

Bailey, Nick - 6-21-04.txt

12  you've testified about and you said you saw this check
13  again -- what occasioned you to see the check again?
14  What happened? Did you get the check back?
15      A.   (No response)
16      Q.   Let me see if I can ask it this way. Did
17  you -- at some point in time, did the voters of
18  Alabama defeat at the polls the effort to pass a
19  lottery for the state of Alabama?
20      A.   That's correct. They did.
21      Q.   If I suggest a date to you, October the 12th,
22  1999, as the date that that occurred, would you
23  quarrel with that date?
24      A.   No.
25      Q.   Okay. At some point in time after that, did

                                                              17

1   you have occasion to travel to Birmingham, Alabama, to
2   open an account called the Alabama Education
3   Foundation account, without the word "lottery" in it?
4       A.   That's right.
5       Q.   And were you the signatory on that account?
6       A.   I was.
7       Q.   This check that Mr. Siegelman had shown you
8   that was delivered by Mr. Scrushy during that meeting
9   that you testified about, you said you saw that check
10  again. Did you in fact deposit that check into this
11  newly opened account, the Alabama Education Foundation
12  account?
13      A.   That's right. And I believe that was at
14  First Commercial Bank.
15      Q.   First Commercial Bank in Birmingham?
16      A.   That's right.

                         Page 14

Bailey, Nick - 6-21-04.txt

17  Q. Okay. And this was an account that you were
18 the signatory on?
19  A. I believe that's right.
20  Q. Okay. Do you know whether or not additional
21 checks ultimately got deposited into that account?
22 We'll call it the AEF account.
23  A. There were additional checks. I don't
24 remember the names and amounts, but yeah.
25  Q. I understand. Do you recall at some point in

18

1 time after -- you said Mr. Siegelman was arguing in
2 favor of -- I'm paraphrasing your words -- putting
3 Mr. Scrushy and/or appointees of his on the
4 Certificate of Need Board?
5  A. That's right.
6  Q. At some point in time after that, were you
7 instructed by Mr. Siegelman to call any member of the
8 board that -- the governor appoints the chairman, does
9 he not?
10  A. I believe that's correct.
11  Q. Did you receive any instructions from
12 Mr. Siegelman about contacting his appointed chairman
13 of that board relative to Mr. Scrushy?
14  A. Yes, sir. And I believe that was Margie
15 Sellers.
16  Q. Okay. Tell the ladies and gentlemen of
17 the -- you're saying the chairman of the CON Board was
18 Margie Sellers?
19  A. I believe that's correct.
20  Q. And Mr. Siegelman instructed you to contact
21 her?

Page 15

Bailey, Nick - 6-21-04.txt

22   A.   I think that's correct. Yes, sir.
23   Q.   What did he tell you to do?
24   A.   That he wanted Richard Scrushy to serve as
25 vice-chairman.

19

1   Q.   Okay. He wanted you to communicate that to
2 Ms. Sellers?
3   A.   That's right.
4   Q.   Okay. And you did that?
5   A.   I did.
6   Q.   Okay. Do you know whether or not, subsequent
7 to that or after that conversation, at some point in
8 time Mr. Scrushy was in fact made the vice-chair of
9 the CON Board?
10   A.   I believe he was.
11   Q.   Now, during the time that Mr. Siegelman was
12 running for governor of the state of Alabama, did you
13 have occasion to be put on the payroll of an
14 individual known to you as Lanny Young?
15   A.   Yes, sir.
16   Q.   Okay. Was he like paying you a salary while
17 you were working on the campaign?
18   A.   Yes, sir.
19   Q.   After Mr. Siegelman became governor, was
20 there ever an occasion when you contacted any member
21 of the Alabama Revenue Department on behalf of -- or
22 wherein any conversation took place concerning Lanny
23 Young?
24   A.   Yes, sir.
25   Q.   And tell the ladies and gentlemen of the

20

Bailey, Nick - 6-21-04.txt

1  grand jury about that.
2     A.   Lanny Young had brought to my office what
3  appeared to be a report showing if the Department of
4  Revenue -- state Department of Revenue would lower the
5  dumping fee or tipping fee at Emelle for nontoxic
6  waste, that more waste companies would use it and
7  therefore increase revenue for the state.  But at the
8  same time, it would increase revenue for Waste
9  Management, because they'd be paying less to dump
10 there.  And he was representing Waste Management and
11 asked me if I would get him an audience with the
12 Department of Revenue so that he could make that
13 argument.
14    Q.   Did you get him an audience with the
15 Department of Revenue?
16    A.   I did.
17    Q.   Did you call the newly appointed commissioner
18 of the Department of Revenue and ask him if he would
19 meet with Mr. Young?
20    A.   I did.
21    Q.   Okay.  And that individual's name was --
22    A.   Jim Hayes.
23    Q.   Jim Hayes.  Okay.
24         MR. FEAGA:  Any further questions?
25    Q.   You mentioned earlier that Mr. Siegelman had

                                                      21

1  told you during this meeting right after Mr. Scrushy
2  left that Mr. Scrushy is halfway there.  You said he's
3  halfway there.  That was the governor's words to you?
4     A.   Right.
5     Q.   Do you know what he meant by that?
                        Page 17

Bailey, Nick - 6-21-04.txt

6   A.   He was referring to the $500,000 campaign
7  contribution commitment that Eric Hanson and Richard
8  Scrushy had made.
9   Q.   Okay. And did, subsequent to that date,
10 after that date at some time, did HealthSouth
11 Corporation contribute an additional $250,000 to --
12 did they write a check for $250,000 to an entity
13 called the Alabama Education --
14  A.   Foundation.
15  Q.   Foundation.
16  A.   Yes, sir.
17  Q.   Okay. And do you know what happened to that
18 check?
19  A.   That check was -- that check was used to pay
20 down a debt at First Commercial. Specifically, I
21 don't know which debt, but yeah.
22  Q.   So the -- then Mr. Scrushy delivered one
23 check for $250,000 and then HealthSouth contributed
24 another $250,000?
25  A.   Yes, sir.

22

1       GRAND JUROR: So both of the checks ended up
2  in that account that you made in Birmingham? There
3  was two different checks. Did both of them end up in
4  the same account?
5       THE WITNESS: Actually, I can't say for sure
6  about the second check. It was used to pay down the
7  debt. Whether or not it actually --
8       GRAND JUROR: Oh. That's right. That's
9  right. That's right. You said it helped to pay --
10 okay. What was that account for?

Page 18

Bailey, Nick - 6-21-04.txt

11   THE WITNESS: It was the same account and I'm
12 assuming the same debt, but I can't say for sure what
13 the debt was. I don't know what made up the debt that
14 the 250,000 was used to reduce.
15   Q. Mr. Bailey, you're here testifying today
16 pursuant to an agreement with the United States
17 government; is that right?
18   A. Yes, sir.
19   Q. In fact, you have already pled guilty to a
20 criminal offense, a felony offense, in the United
21 States District Court here in the Middle District of
22 Alabama; is that right?
23   A. That's right.
24   Q. And that offense has to do with you having
25 taken things of value from whom?

23

1   A. From Lanny Young and from Curtis Kirsh.
2   Q. And you're pending sentencing right now; is
3 that right?
4   A. Yes, sir.
5   Q. Okay. So you're here testifying today as
6 part of an agreement with the United States wherein
7 you will agree to provide truthful testimony when
8 called on to do so by the United States in the hopes
9 that it will help you or benefit you at the time that
10 you're sentenced; is that right?
11   A. Yes, sir.
12   Q. But there's been no specific agreement
13 entered into about how much time you'll be facing
14 other than the fact that the government will evaluate
15 your cooperation, your substantial assistance, your