Cline, Darin 06-21-04.txt

1

1   IN THE UNITED STATES DISTRICT COURT
2   FOR THE MIDDLE DISTRICT OF ALABAMA
3   NORTHERN DIVISION
4   GRAND JURY
5
6
7
8   IN RE:
9   GRAND JURY INVESTIGATION          CRC 03-0233
10
11
12
13           * * * * * * * * * * *
14
15           BE IT KNOWN that on Monday, June 21, 2004,
16   the testimony of DARIN CLINE was taken before the
17   Grand Jury of the United States District Court for the
18   Middle District of Alabama, Northern Division, in the
19   Grand Jury Room, United States Courthouse, One Church
20   Street, Montgomery, Alabama; MR. STEPHEN P. FEAGA,
21   MR. LOUIS V. FRANKLIN, MR. J. B. PERRINE, and
22   MR. JOHN GIBBS interrogating.
23
24           * * * * * * * * * * *
25

2

1                   DARIN CLINE
2       The witness, having first been duly sworn to
3   speak the truth, the whole truth and nothing but the
4   truth, testified as follows:

Page 1

Cline, Darin 06-21-04.txt
20  would be, in addition to getting it paid for, is it
21  also gets it done in a fashion that is not at public
22  expense.
23     A.   Exactly.  Exactly.
24     Q.   Now, let me focus away from that into this
25  thing that you called the lottery foundation.  What

6

1   was the formal name of the lottery foundation?
2      A.   It was the Alabama Education Lottery
3   Foundation.
4      Q.   Can we call that AELF for purposes of the
5   rest of our discussion?
6      A.   Sure.
7      Q.   Or the lottery foundation.  We'll use those
8   terms generically.  But we're talking about AELF when
9   we talk about that.  Okay?
10     A.   You got it.
11     Q.   All right. Did you -- and when I say you,
12  again, you and your company.  You had an official role
13  in that?
14     A.   Yes.  We were hired to oversee and do the
15  fund-raising.  And when I say oversee and do it, we
16  had employees of our company on the ground in the
17  campaign.
18     Q.   And who hired you to do that?
19     A.   The foundation, which I believe at that time
20  was headed by John Hall; but I'm not sure.  I'd have
21  to go back and look at the articles of incorporation,
22  because we set up a (c)(4) to do this entity.  And I
23  know --
24     Q.   This would be a --

Page 5

Cline, Darin 06-21-04.txt
25    A.    -- it's complicated, but you set up a

7

1  (c)(4) to go out and be able to advocate on a
2  political level; because anytime you advocate in
3  politics, the -- there is a worry that somebody that
4  is a (c)(3) entity will try to write off whatever
5  money they give, you know, because they think you can
6  write it off on your taxes or something. And a (c)(4)
7  is set up so that people specifically cannot write it
8  off on their taxes. And it is an entity that is going
9  to go out and politically communicate.
10     I'm sure I garbled that, but it's an important
11  distinction.
12     Q.    All, setting up the (c)(4), does that also
13  put you in a posture where no -- that the corporations
14  can perhaps give more than they're otherwise
15  authorized to give for a political campaign?
16     A.    Well, it's -- see, but it's not a political
17  campaign. It's political advocacy. It's actually --
18  you're talking -- you're advocating for a political
19  side, but it's not a political campaign where the
20  campaign finance laws would apply. I'm not an
21  attorney.
22     Q.    I understand.
23     A.    So what we did is we hired attorneys that
24  said, okay, if we can set up a (c)(4) instead of a
25  (c)(6) or a (c)(3) and that kind of stuff, we'll set

8

1  up a (c)(4) so that we can raise money in unlimited
2  amounts from anybody we want to. Am I -- so we can
3  raise unlimited amounts from corporations that they

Cline, Darin 06-21-04.txt

4  specifically cannot write off, that it is just stuff
5  that they're doing to advocate for a certain position
6  on a referendum campaign.
7     A referendum campaign, it's just different than a
8  traditional political campaign. A traditional
9  political campaign, you have these limits on corporate
10 money. You have certain personal limits in some
11 states. I know Alabama you don't, but the important
12 thing is that we set up an entity where
13 corporations -- where we didn't have to fall under all
14 of the elements of the Alabama campaign --
15    Q.   Fair Campaign Practices Act?
16    A.   Fair Campaign Practices Act, yes.
17    Q.   Now, when you talk about (c)(3) and (c)(4),
18 you're talking about provisions of the United States
19 Internal Revenue Code; is that right?
20    A.   Yes, sir.
21    Q.   A traditional 501(c)(3) charity is a charity
22 that somebody can contribute money to and it's tax
23 deductible to the person that makes the donation?
24    A.   Correct.
25    Q.   Like a church?

9

1   A.   Yep. You got it.
2   Q.   Like Boy Scouts?
3   A.   Exactly.
4   Q.   You give -- like United Way?
5   A.   Like United Way.
6   Q.   Okay. That's a 501(c)(3). A 501(c)(4),
7  contributions to that entity are not tax deductible --
8   A.   Correct.

Page 7

Cline, Darin 06-21-04.txt

9   Q.   -- by the person who makes the contribution?
10  A.   By the person who makes it.
11  Q.   You indicated that you were familiar, but not
12 a lawyer, with a law called the Fair Campaign
13 Practices Act.
14  A.   Right.
15  Q.   Did the AELF have any responsibilities about
16 reporting money that it took in under the Alabama Fair
17 Campaign Practices Act?
18  A.   Yes. Because it is advocating, from what I
19 understood from our attorneys, we had to -- we had to
20 put what I can best term as PAC status on this
21 foundation. And that is, it became a political action
22 committee so that it could go out and expressly
23 advocate for people to vote for this referendum. By
24 having this PAC status, we had to disclose anything
25 that we brought in and anything that we spent money

10

1 on.
2   Q.   And whom did you have to disclose that to?
3   A.   To the Secretary of State is where we have to
4 do it here.
5   Q.   During the time that you worked on behalf of
6 Governor Siegelman and Candidate Siegelman, did you
7 become familiar with him on a more than a casual way?
8 In other words, did you guys become friends or more
9 than casual acquaintances?
10  A.   More than casual acquaintances is fair.
11  Q.   So do you know anything about his
12 background? In other words, do you know what other
13 political offices he's held in the past?

Page 8

Cline, Darin 06-21-04.txt

14   A.   Oh, yeah. I know his biography, so I know
15 pretty much.
16   Q.   Okay. Has he ever been -- now, this Fair
17 Campaign Practices Act and the filings that you made,
18 you said they had to be made to the Secretary of
19 State.
20   A.   From what I understand. We had an accountant
21 that took care of that. So all I had to do was
22 whenever money came in, I gave that to the
23 accountant. He did the report. Whatever money was
24 spent, somebody else in the campaign was responsible
25 for that, the campaign manager, Carter Wells. Carter

                                                      11
1 Wells then gave that to Kassouf, which was our
2 accountant; and then the accountant made the proper
3 disclosure.
4   Q.   So pursuant to your instructions, money that
5 came in for the Alabama Education Lottery Foundation
6 and its efforts would be given by you or people under
7 your supervision, ultimately copies of it and
8 accountings for it, to an accountant?
9   A.   You got it.
10   Q.   Is that David Kassouf?
11   A.   David Kassouf, correct.
12   Q.   And it was your instruction that any and all
13 money that came in should be reported to that account?
14   A.   Correct.
15   Q.   Isn't that correct? If your instructions
16 were being followed, that would have happened?
17   A.   Yes.
18   Q.   And that was so that you could keep track of
Page 9

Cline, Darin 06-21-04.txt

19   it and accurately report it under the Fair Campaign
20   Practices Act, correct?
21        A.   That's correct.  Correct.
22        Q.   And know how much money you have?
23        A.   Correct.
24        Q.   Okay.  Has Governor Siegelman ever served in
25   the capacity of Secretary of State in the state of

                                                              12

1    Alabama?
2         A.   Yeah.  He was there from '78 to '86.
3         Q.   Okay.  So he served two terms as Secretary of
4    State?
5         A.   Correct.
6         Q.   And that's the office that manages and takes
7    in reports under the Fair Campaign Practices Act?
8         A.   Correct.
9         Q.   Did you ever become aware of a -- the
10   existence of a check in the amount of $250,000 that
11   was drawn on the account of an outfit named Integrated
12   Health Services?  Did you ever see that check or
13   become aware of it?
14        A.   Yes.  I was given that check.
15        Q.   Okay.  If a fellow named Mr. Nick Bailey said
16   that he had the check delivered out to the campaign
17   offices for the AELF, would you dispute that?
18        A.   No, I would not dispute that.
19        Q.   You actually saw that check?
20        A.   Yes.  I had that check for a while.
21        Q.   What, if anything, did you do with that
22   check?
23        A.   A lot of times when you get large checks like

Page 10

Cline, Darin 06-21-04.txt

24  that, you're not sure exactly what to do with them,
25  because it's $250,000 check. So at the request of

13

1   Governor Siegelman and Nick Bailey, I held on to that
2   check until they could decide if they were going to
3   take the money or not.
4       Q.   Okay. Did you actually talk to Governor
5   Siegelman about that check?
6       A.   Yes.
7       Q.   He told you to hold that check?
8       A.   Uh-huh.
9       Q.   What did you do in response to his decision
10  to hold that check? What did you do with it?
11      A.   Well, every once in a while, you're told
12  maybe -- you know, maybe we need to check out a
13  background or something like that. So I have a little
14  lockbox at my apartment. I put it in the lockbox in
15  my apartment.
16      Q.   And held it?
17      A.   And held it.
18      Q.   Did Governor Siegelman ever contact you and
19  tell you to hold any other check that came in besides
20  that one for the Alabama Education Lottery Foundation
21  effort?
22      A.   Not that I can recall.
23      Q.   Okay. And did anyone acting on his behalf
24  ever come to you and tell you to hold any other check?
25      A.   Probably. And I say probably just because

14

1   there were -- there were a couple of checks that were

Page 11

Cline, Darin 06-21-04.txt

2 probably ultimately held, but not as long as this
3 check was held. This check was held for an inordinate
4 amount of time.
5    Q.   All right. And did you ever direct your
6 subordinates to take that check, as you had all the
7 other checks, ultimately -- even the ones that were
8 held for a while ultimately got deposited; is that
9 right?
10   A.   Right.
11   Q.   This one -- did it ever get deposited in the
12 Alabama Education Lottery Foundation account, to your
13 knowledge?
14   A.   No, not that I know of.
15   Q.   What, if anything, happened to that check you
16 said you had kept in a lockbox?
17   A.   I had -- I had the check. I kept asking
18 folks what I needed to do with this check, because I
19 was holding on to it. And ultimately, Governor
20 Siegelman and Nick Bailey told me to give it back to
21 them, that they would take care of it. And they said
22 more specifically that they weren't going to deposit
23 the check, that they were going to return it.
24   Q.   Okay. And when you say they, did Governor
25 Siegelman tell you that?

                                                          15

1    A.   Yes. Governor Siegelman and Nick Bailey.
2    Q.   Okay. Do you know -- did you give them the
3 check back?
4    A.   Yes.
5    Q.   Do you know what happened to that check after
6 you gave it back to them?

Page 12

Cline, Darin 06-21-04.txt

7   A.   I had no clue what happened to that check
8   until I was, obviously, told by the agents that called
9   me.
10   Q.   Okay. Now, did you become aware -- let me
11   ask you -- the lottery did not pass. October the
12   12th, 1998, is the date we're being given. Does that
13   sound right to you?
14   A.   Oh, that's -- yeah. That's a bad day.
15   Q.   Okay. Did your company continue -- did you
16   continue to engage in business efforts in the state of
17   Alabama after that?
18   A.   Well, in the state of Alabama, yeah. We
19   still did the Alabama Democratic Party. We also did a
20   finish-up contract on the Alabama Education Lottery
21   Foundation, where we cleaned up the books; we put
22   focus sheets together. They're cost sheets that we
23   call people off of. We call them focus sheets. So we
24   have information on everybody that we've called on
25   these sheets. We reorganize these sheets into what we

16

1   call the master database and just got all that
2   information together so that we could give everything
3   back to Governor Siegelman. At the end of all our
4   projects, any information we create, any files we
5   create, we give directly back to him; because that is
6   his property. We don't keep anything.
7   Q.   I understand. Now, as part of your effort to
8   fully account under the Fair Campaign Practices Act
9   for the activities of the AELF, did you arrange to
10   have filed on behalf of the Alabama Education Lottery
11   Foundation any final report at the Secretary of

Page 13

Cline, Darin 06-21-04.txt

12  State's office?
13     A.    I didn't arrange for any final report. We
14  had a meeting about the final reports, and we had
15  talked about what was going on with the foundation and
16  that kind of stuff. And it was at that report -- it
17  was at that kind of meeting we had that I was pretty
18  much told not to worry about it.
19     Q.    Who told you not to worry about it?
20     A.    Nick Bailey.
21     Q.    Okay. Where did this meeting take place? Do
22  you recall?
23     A.    I think it was at the Capitol.
24     Q.    Was the Governor there?
25     A.    No, the Governor was not there.

                                                        17

1      Q.    Okay. Was this after the lottery had failed?
2      A.    This was after the lottery had failed.
3      Q.    And you were intent at that time or engaged
4   in an effort to get a final accounting?
5      A.    Yeah. We wanted to make sure that they had
6   everything that had come in. We still had received
7   some checks --
8      Q.    They being?
9      A.    We -- yeah, let me clarify. We still -- the
10  Alabama Education Lottery Foundation had still
11  received some checks because -- as of the day of the
12  campaign and a couple days after the campaign, because
13  the mail is not the most efficient in the world. So
14  we still had some of those checks. We still made
15  copies of those things. We still deposited those
16  checks. We gave all that to the accountant and was

                    Page 14