Pickett, Charles Taylor 06-21-04.txt

1     IN THE UNITED STATES DISTRICT COURT
2     FOR THE MIDDLE DISTRICT OF ALABAMA
3              NORTHERN DIVISION
4                GRAND JURY
5
6
7
8  IN RE:
9  GRAND JURY INVESTIGATION              CRC 03-0233
10
11
12
13          * * * * * * * * * * *
14
15      BE IT KNOWN that on Monday, June 21, 2004,
16  the testimony of CHARLES TAYLOR PICKETT, JR., was
17  taken before the Grand Jury of the United States
18  District Court for the Middle District of Alabama,
19  Northern Division, in the Grand Jury Room, United
20  States Courthouse, One Church Street, Montgomery,
21  Alabama; MR. STEPHEN P. FEAGA, MR. LOUIS V. FRANKLIN,
22  MR. J. B. PERRINE, and MR. JOHN GIBBS interrogating.
23
24          * * * * * * * * * * *
25

1       CHARLES TAYLOR PICKETT, JR.
2       The witness, having first been duly sworn to
3  speak the truth, the whole truth and nothing but the
4  truth, testified as follows:

Page 1

Pickett, Charles Taylor 06-21-04.txt
10    A.    February of 2000.
11    Q.    Now, I want to direct your attention back to
12 a time frame in 1999, the first half of 1999 up
13 through maybe the end of July, somewhere in there.
14 And I'll be asking you to pinpoint as best you can for
15 us.
16    A.    Sure.
17    Q.    Do you recall getting a phone call from a
18 fellow named McGahan?
19    A.    Bill McGahan?
20    Q.    Okay.
21    A.    Yes.
22    Q.    Who is Bill McGahan?
23    A.    Bill McGahan was an investment banker with a
24 company called UBS Warburg.
25    Q.    And where were you working at the time that

4

1 you got this phone call from Mr. McGahan?
2    A.    I was working for Integrated Health Services.
3    Q.    And what was your function with Integrated
4 Health Services?
5    A.    At that time, I was the chief financial
6 officer.
7    Q.    And your duties and responsibilities
8 generally would be what?
9    A.    All financial reporting, financial systems,
10 accounting, cash, treasury, acquisitions, everything
11 related to the balance sheet of the business.
12    Q.    And what -- what's your background and
13 training in that area?  Are you educated in any
14 particular way to do that sort of work?

Page 3

Pickett, Charles Taylor 06-21-04.txt
15   A.   I graduated as an accountant.  I'm a CPA,
16 inactive CPA.  I passed the exam.  And I'm also an
17 attorney.
18   Q.   In Maryland?
19   A.   Yes.  A nonpracticing attorney, but I'm a
20 member of the Bar.
21   Q.   Okay.  Now, what was it that Mr. McGahan
22 discussed with you at that time?  And do you remember
23 about when that was?
24   A.   I believe it was June 1999.  Bill called me
25 and asked me if I could do him a favor.  And I said,

5

1 okay, what's the favor.  And he said, well, I've been
2 asked to make a contribution to -- a charitable
3 contribution.  And I said okay.  And he -- so, you
4 know, tell me what it's about.  He said, well, I've
5 been asked to -- I'm getting some pressure to make a
6 $250,000 contribution to a charity.  And my response
7 to that -- and I can't remember exactly how it went.
8 Either with a gap of long silence or the fact that I
9 said, you know, Bill, 250 grand, this just is not
10 happening.
11   Q.   That's a lot of money, isn't it?
12   A.   That's a lot of money.
13   Q.   Was it -- ever have kind of -- did you know
14 Mr. McGahan before this happened?
15   A.   Sure.  I dealt with him a number of times
16 through the years.
17   Q.   Had you ever had any kind of conversation
18 with him, anything like this before?
19   A.   Never.

Page 4

Pickett, Charles Taylor 06-21-04.txt

20    Q.    Okay. Did this shock you and surprise you?

21    A.    I didn't under -- it's -- yeah, it was an
22 unusual call to receive.

23    Q.    Not the kind of thing that happens every day
24 in your life as a CFO at Integrated Health Systems?

25    A.    Absolutely an unusual call.

                                                                                          6

1    Q.    It never had happened before and never has
2 happened since?

3    A.    Yeah, that's correct.

4    Q.    So did he tell you who he was getting
5 pressure from?

6    A.    I don't believe he did on that call. He said
7 it was -- actually, he said it was a contribution to
8 an Alabama not-for-profit. I don't know that in that
9 telephone call, he mentioned where the pressure was
10 coming from.

11    Q.    Did he at some point mention where the
12 pressure was coming from in a later conversation?

13    A.    I can't say for sure whether he ever
14 mentioned it; but later on when actually I got the
15 name and address of the not-for-profit, it came from
16 HealthSouth.

17    Q.    The pressure came from HealthSouth?

18    A.    Well, the details.

19    Q.    Okay. You got the information about
20 where to -- how did that happen? Tell us -- tell us
21 about that. This is after your conversation with
22 Mr. McGahan?

23    A.    Right. Well, there are a couple of
24 components to that. I told Bill there was no way,

Page 5

```
                      Pickett, Charles Taylor 06-21-04.txt
25  given where Integrated Health Services was, that we
```

7

```
 1  could make that kind of a contribution.  And --
 2      Q.   When you say given where you were, what did
 3  you mean?
 4      A.   We were having cash difficulties.  A very
 5  large company, $3 billion of assets.  We had a lot of
 6  leverage, and we were managing cash almost daily.  And
 7  he --
 8      Q.   You were what-ing cash?
 9      A.   Managing.  Managing.  Just making sure we
10  understood what was coming in and what was going out.
11  And he quickly responded that he would knock off an
12  equivalent amount off of a fee that was outstanding
13  due to UBS Warburg.
14      Q.   Due from IHS to UBS Warburg?
15      A.   That's correct.
16      Q.   In other words, he would forgive an
17  indebtedness IHS owed them?
18      A.   Yeah.  We had an outstanding bill for about
19  $2 million; and yeah, he would credit against that.
20      Q.   Was there any chance that that two million
21  might not get paid anyway at that time?
22      A.   No chance at all.
23      Q.   It was going to get paid?
24      A.   It was going to get paid.
25      Q.   Okay.  Go ahead.  So he said, I'm going to
```

8

```
 1  credit a bill that IHS -- or, in other words, your
 2  company -- owed to them for the amount of it if y'all
 3  would make it?
```

Page 6

Pickett, Charles Taylor 06-21-04.txt

4    A.    Right.  So subsequent to that conversation, I
5 told Bill I need to think about it.  And I didn't tell
6 him this; but I wanted to talk with my boss, the chief
7 executive officer, about it.  And --
8    Q.    Not the kind of thing you were going to do
9 without checking with someone.
10    A.    I needed -- yeah, exactly.  And then to
11 answer specifically your question about how did the
12 facts come about, I don't recall exactly how it came
13 about.  You know, I'm sure I called Bill back later
14 after I determined that we would do this and told him
15 that.  I said, you've got to tell me -- you know, I
16 need some details.  And so I don't recall specifically
17 whether I even had a conversation with Leif Murphy,
18 the individual from HealthSouth that sent the fax, or
19 not; but that's who the fax came from.
20    Q.    Did you know Leif Murphy?
21    A.    I did deal with Leif in a transaction that
22 Integrated Health Services did with HealthSouth.  In
23 late '97, I met Leif.
24    Q.    And do you know just generally what he did
25 for a living?

                                                              9

1    A.    I know Leif reported to the chief financial
2 officer of HealthSouth.  And he handled, at least in
3 this case, treasury and acquisition activities.
4    Q.    And who was the chief financial officer of
5 HealthSouth?
6    A.    At that time, I believe it was Mike Martin.
7    Q.    Okay.  Now -- so you talked to Leif after
8 this conversation with Mr. McGahan, after talking to

Page 7

Pickett, Charles Taylor 06-21-04.txt

9  your CEO. And then you had -- did you have any
10 further -- and you had some additional conversations
11 with Mr. McGahan?
12     A.   I just don't recall if I had any specific
13 follow-up conversation of any consequence other than,
14 you know, we would go ahead and process this.
15     Q.   You would have had to have had at least two
16 with McGahan, the first one where he asked you, the
17 second where you said can't do it. And, okay, he came
18 back and said, well, we'll forgive a bill; and you
19 said, let me check the issue and had to get back with
20 him?
21     A.   Well, no. The first conversation is where
22 he --
23     Q.   All of that happened?
24     A.   Where that happened. The second conversation
25 was that I, you know, kind of run the traps and we

                                                      10

1  were okay with that transaction.
2      Q.   You would do it?
3      A.   Yeah.
4      Q.   Okay. And then how did you know to get ahold
5  of Leif Murphy?
6      A.   That's what I'm not -- I'm not 100 percent
7  sure if Leif's correspondence just came to me via fax,
8  which is possible, or if Leif and I actually talked.
9  I cannot recall whether we would have talked to
10 coordinate a fax that had that information.
11     Q.   But you do remember getting a fax from him?
12     A.   Yes.
13     Q.   And if we wanted to know when you had that

Page 8

Pickett, Charles Taylor 06-21-04.txt

14 communication with Leif, the date on that fax would be
15 consistent with the time frame that you had this --
16   A.   Absolutely. Yes.
17   Q.   Okay. Now, your check is dated July the
18 19th, 1999.
19   A.   That -- that sounds right.
20   Q.   Would you have generated the check after
21 getting the fax with the instructions from Leif about
22 what to put on it and that sort of thing?
23   A.   Yes. That would -- that would be
24 documentation for the check to be processed.
25   Q.   And you would not have -- you didn't do

11

1 anything -- in fact, can you affirmatively tell this
2 grand jury we didn't -- we didn't -- we didn't bogus
3 up the date on that check; the date that's on that
4 check is the date that we cut it?
5   A.   It would have been processed through our
6 normal system.
7   Q.   Okay. So if we want to know when that check
8 got cut, we can look on the date on that check; and
9 that's when it got cut?
10   A.   Yes.
11   Q.   Okay. And you would have had these
12 instructions from Mr. Murphy shortly before that so
13 you would know what to put on it?
14   A.   Yes.
15   Q.   Is that right?
16   A.   Yes.
17   Q.   I think the dates -- and the documents will
18 speak for themselves -- are like the 16th of July, the

Page 9

Pickett, Charles Taylor 06-21-04.txt

19  fax from Mr. Murphy; and then this 19th of July is the
20  date on the check?
21     A.   That --
22     Q.   Is that consistent with your recollection?
23     A.   That would make sense, sure.
24     Q.   Now, what did you do with the check?  What
25  did you do with the check?

                                                              12

1      A.   The check was mailed to HealthSouth.
2      Q.   To the address Mr. Murphy gave you?
3      A.   That's correct.
4      Q.   And do you know what happened with it after
5  that?
6      A.   I -- I have -- no.
7      Q.   If that check had still been outstanding when
8  IHS entered bankruptcy in February of 2000 --
9      A.   Yes.
10     Q.   -- could that have caused problems for
11 anybody trying to negotiate that check?
12     A.   I'm not a bankruptcy expert, but perhaps it
13 could have.  I don't have that expertise to know for
14 sure.
15          GRAND JUROR:  That fax you received, what was
16 on it?  Who was' --
17          THE WITNESS:  It was a fax from --
18          GRAND JUROR:  What information was on it?
19          THE WITNESS:  It was a fax from Leif Murphy
20 that had -- I think it had just the payee information,
21 I believe.
22          GRAND JUROR:  You said it was going to
23 Health --
                         Page 10

Pickett, Charles Taylor 06-21-04.txt

24          THE WITNESS:  No.  It had HealthSouth's
25 address, but the payee information was the Alabama --

                                                            13

1 I can never remember the exact name.  The Alabama
2 Lottery Education.
3          GRAND JUROR:  But you knew it was going to
4 the lottery?
5          THE WITNESS:  Yes.  Well, the check was made
6 out to them.
7     Q.   Sir, let me show you a series of documents
8 which I'm not going to mark as an exhibit at this
9 time, but I will show them to you.  First of all, let
10 me show you this page of this document that says at
11 the top of it, HealthSouth, to Taylor Pickett from
12 Leif Murphy, date 7/16.  The fax date shows on it July
13 16th, 1999, Friday at 2:47 p.m.  Have you seen that
14 before?
15     A.   I have.
16     Q.   Okay.  Is that the fax you're talking about
17 getting?
18     A.   Yes, it is.
19     Q.   Okay.  And a note down here where it says
20 home address, 1039 Oak Meadow Road, Birmingham,
21 Alabama.  35242 is the zip.  And it has a phone number
22 980-0557.  That's kind of lined through.  And then it
23 says, office address in handwriting.  And then circled
24 is One HealthSouth Parkway, Birmingham, Alabama,
25 35243; and the note, send check here.

                                                            14

1     A.   Yes.

```
                         Pickett, Charles Taylor 06-21-04.txt
 2    Q.   Is that your handwriting?
 3    A.   This is -- this and this are my handwriting.
 4    Q.   Okay.  And this at the bottom says, send
 5  check here?
 6    A.   Yes.
 7    Q.   And it points to the HealthSouth address?
 8    A.   Yes.
 9    Q.   This up here, what does this say?
10    A.   It says Bob S., which is Bob Stevenson, who
11  was my treasurer at the time, see page for address.
12    Q.   Now, there's another document attached to
13  this that says, Accounts Payable Voucher, vendor name,
14  the Alabama Education Lottery.  Do you recognize that
15  document?
16    A.   I -- this would be a typical accounts payable
17  voucher within Integrated Health Services, so it's a
18  part of our paperwork flow.
19    Q.   Okay.  And it shows $250,000?
20    A.   Right.
21    Q.   Okay.  Now --
22         MR. FEAGA:  Does anyone have any questions
23  for Mr. Taylor Pickett?  Is that correct?  Taylor
24  Pickett?
25         THE WITNESS:  That's correct.
                                                              15
 1                        EXAMINATION
 2  BY MR. GIBBS:
 3    Q.   What kind of bankruptcy did IHS go into?  Was
 4  it reorganization?
 5    A.   It was a Chapter 11 reorganization.
 6         MR. FEAGA:  Okay.  If there are no other
                            Page 12
```

Pickett, Charles Taylor 06-21-04.txt

7  questions for Mr. Taylor Pickett, you are excused,
8  sir.
9           * * * * * * * * * *
10              END OF PROCEEDINGS
11          * * * * * * * * * *
12
13
14
15
16
17
18
19
20
21
22
23
24
25

16

1              REPORTER'S CERTIFICATE
2  STATE OF ALABAMA
3  MONTGOMERY COUNTY
4           I, Greta H. Duckett, Registered Professional
5  Reporter and Commissioner for the State of Alabama at
6  Large, hereby certify that on Monday, June 21, 2004, I
7  reported the GRAND JURY PROCEEDINGS in the matter of
8  the foregoing cause, and that pages 2 through 15
9  contain a true and accurate transcription of the said
10 proceedings.
11          I further certify that I am neither kin nor

Page 13