IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
Northern Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| vs. | ) | No. 2:05-CR-119-F |
| | ) | |
| DON EUGENE SIEGELMAN, et al. | ) | |

## GOVERNOR SIEGELMAN'S MOTION FOR BILL OF PARTICULARS

Governor Don Siegelman hereby moves for a bill of particulars, as set out in more detail below. The particulars sought herein are necessary and appropriate in order to give Governor Siegelman "full knowledge" of the charges against him, so that he has a fair chance to defend himself; to avoid unfair surprise at trial; and to avoid any potential double jeopardy problems. *See U.S. v. Mackey*, 551 F.2d 967, 970 (5th Cir. 1977) (noting these purposes of a bill of particulars, including the "full knowledge" purpose).

The relevant official commentary to Fed. R. Crim. P. 7(f) notes that the purpose of the existing version of the rule regarding bills of particulars is to "encourage a more liberal attitude by the courts toward bills of particulars without taking away the discretion which courts must have in dealing with such motions in individual cases." *See* Advisory Committee Comments on 1966 Revision (emphasis supplied). Consistent with that governing "liberal attitude," the Advisory Committee singled out one reported decision as exemplifying the proper approach towards bills of particulars: *U.S. v. Smith*, 16 F.R.D. 372 (W.D.Mo. 1954). Because of the prominence and uniqueness of that citation of

*Smith*, certain aspects of that decision are worthy of comment in this context.

First, the court in *Smith* recognized the crucial principle about bills of particulars: the concept of a bill of particulars exists precisely in order to give *more* information and detail than even a *properly-detailed* indictment gives. *Smith*, 16 F.R.D. at 374-75 ("Rule 7(f) necessarily presupposes an indictment or information good against a motion to quash or a demurrer. Its proper office 'is to furnish to the defendant further information respecting the charge stated in the indictment when necessary to the preparation of his defense, and to avoid prejudicial surprise at the trial' ...").

That is, it is settled that an indictment itself must contain specifics and particulars at least to a significant degree; if it does not, then it is subject to dismissal. *See, e.g.*, *Russell v. U.S.*, 369 U.S. 749 (1962) ("It is an elementary principle of criminal pleading, that where the definition of an offence, whether it be at common law or by statute, 'includes generic terms, it is not sufficient that the indictment shall charge the offence in the same generic terms as in the definition; but it must state the species, -- it must descend to particulars.'"), *quoting United States v. Cruikshank*, 92 U.S. 542, 558 (1876). "[E]very ingredient of which the offence is composed must be accurately and clearly alleged." *Cruikshank*, 92 U.S. at 558. (citation omitted). "Undoubtedly the language of the statute may be used in the general description of an offence, but it must be accompanied with such a statement of the facts and circumstances as will inform the accused of the specific offence, coming under the general description, with which he is charged." *Russell*, 369 U.S. at 765.

So, consideration of a bill of particulars should be approached with the

2

understanding that the indictment *already* must give the Constitutionally-required level of detail – and the very reason why the law provides for bills of particulars is to go *beyond* that, to provide *more* detail. This does not, of course, mean that bills of particulars are a luxury to be granted only occasionally; on the contrary, as noted above, governing law adopts a "liberal" approach to bills of particulars, *favoring* the production of more detail than may already be constitutionally required.

The court in *Smith* exemplified the proper approach to bills of particulars, and the opinion shows that a bill of particulars should be ordered to provide a rather high level of detail about the charges. The case, in *Smith*, was in two counts: one for transferring a certain quantity of heroin in Kansas City on a specified day, the other for transferring a marijuana cigarette in the same city on the following day. Now this was already a pretty good degree of specificity in the charges, just from the indictment. But the court required much more, through a bill of particulars. The court required not only the name(s) of the person(s) to whom the drugs were allegedly provided, not only the times of day on which the transactions allegedly occurred, and not only the "exact" places in Kansas City where these things allegedly occurred. Beyond those details (which one might perhaps have said was enough to allow the defendant to be ready for trial), the court also required the Government to say (1) whether the person(s) to whom the drugs were transferred was, or were, directly or indirectly within the government's employ; (2) whether the person(s) was, or were, acting at the government's instance, and (3) whether the person to whom Smith alleged transferred the marijuana had, or had not, first transferred it to Smith himself. The point of recounting this, again, is to demonstrate what the official

3

commentary to Rule 7(f) commends as the proper approach: an approach that gives a great deal of information so that the defendant has "full knowledge" of the charges against him. *Mackey*, 551 F.2d at 970.

Governor Siegelman further notes that the Government has no legitimate interest in refusing to provide this information. The Government might hope to avoid pinning itself down to a theory of the case, hoping to be able to shift theories on the fly depending on what the evidence turns out to be at trial; but this is *not* a legitimate goal for the Government. As the Eleventh Circuit has recognized, the potential for unfairness that is already inherent in every "conspiracy" charge is magnified when the Government tries to keep its options open, to change theories as it goes along. "This roaming theory of the prosecution can produce trial error of constitutional proportions. See Russell v. United States, 369 U.S. 749, 768, 82 S.Ct. 1038 (1962) (ill-defined charges leave 'the prosecution free to roam at large -- to shift its theory of criminality so as to take advantage of each passing vicissitude of the trial and appeal')." *U.S. v. Chandler*, 388 F.3d 796, 798 (11th Cir. 2004). And the Government might simply think that its chances of convicting Governor Siegelman are better in a trial-by-ambush; but this, too, is *not* a legitimate goal of the Government; the Government's legitimate goal is not to convict but to do justice, and justice is accomplished through a *fair* trial, not a trial in which the goal is to increase the likelihood of conviction. In short, there is every reason to require the Government to provide the information requested herein, and no good reason to deny this request.

With this introduction, Governor Siegelman requests that the Government be

ordered to provide a bill of particulars with the following information. All paragraph references are to the Second Superceding Indictment. Governor Siegelman further notes that he retains the full right to object to any attempt, by the Government, to *expand* the charges through a bill of particulars, beyond the charges that are set forth with the requisite detail in the indictment itself. *See Russell, supra* (bill of particulars cannot be used to supply detail that should have been included in the indictment itself).

As will be seen below – but is stated here at the outset for emphasis – one most crucial thing that Governor Siegelman seeks, in a bill of particulars, is the names of any and all persons whom he is alleged to have conspired with, or who is alleged to have aided or abetted him or the other defendants in any of the things alleged in the indictment. The indictment is replete with allegations with regard to unnamed persons as alleged conspirators or abettors; Governor Siegelman needs to know who those persons are alleged to be, if he is to have a fair chance of defending himself against the Government's allegations.

In addition, Governor Siegelman seeks the following information:

A. Which of the agencies or entities listed in paragraph 1(b), as being part of the Executive Department of the State of Alabama, and which "other ... department agencies or authorities" mentioned though not named therein, is or are asserted by the Government to be relevant to the charges against Governor Siegelman? What reason if any did the Government have for listing ones that are not relevant to the charges?

B. Where, in regard to paragraph 4, does the Government allege that Governor Siegelman "conspired" as charged therein? The indictment suggests only that this

5

occurred "within the Middle District of Alabama and elsewhere." As shown in *Smith, supra,* a bill of particulars is appropriate to apprise the defendant of the precise location where he is alleged to have committed a crime. Therefore, Governor Siegelman seeks a list of any and all addresses at which he is alleged to have reached an agreement (i.e., conspired) as charged in paragraph 4.

C. When, in regard to paragraph 4, does the Government allege that Governor Siegelman "conspired" as charged therein? The indictment alleges that this took places over a period of years. As shown in *Smith,* a defendant should be apprised of the time he is alleged to have committed a crime. Therefore, Governor Siegelman seeks a list of all dates and times at which he is alleged to have reached an agreement (i.e., conspired) as charged in paragraph 4.

D. With whom, in regard to paragraph 4, does the Government contend that Governor Siegeman "conspired" as charged therein? The indictment suggests that, in addition to the named persons, there were in fact other persons known to the Grand Jury who conspired as well – and that the Grand Jury knew that there were other persons who conspired as well, though the Grand Jury did not know their names. It is well-settled that a bill of particulars is appropriate to notify the defendant of whom he is alleged to have conspired with. *See, e.g., Mackey,* 551 F.2d at 970 ("Informing the defendant of the names of alleged unindicted coconspirators has been held a proper use of a bill of particulars."). Therefore, Governor Siegelman seeks a list of all alleged conspirators.

E. In regard to the final sentence of paragraph 4, with whom and where and when (at the same level of detail discussed above) does the Government allege that Governor

Siegelman "agreed that a conspirator would commit at least two acts of racketerring activity"? And what alleged acts of racketeering activity does the Government contend that Governor Siegelman *agreed* with some other alleged "conspirator" would be committed?

F. With regard to paragraphs 5(a) and (b) and (c), does the Government contend that there was any alleged agreement on a purpose to do any things within those subparagraphs – i.e., to give or withhold governmental acts or influence or threaten to do so, or to deprive the State of Alabama of its right to honest services, or to conceal and protect the alleged conspiracy – *beyond* such things as are alleged with particularity in Count Two? If so, Governor Siegelman requests a full list of any such contentions with all relevant detail as to who allegedly made such an agreement and when and where.

G. With regards to paragraphs 6 through 10, who are the alleged coconspirators alluded to in each such paragraph?

H. With regard to paragraph 10, Governor Siegelman seeks details as to what (if anything) the Government contends is encompassed therein beyond what is set forth with adequate specificity in Count Two; notably, this paragraph unlike the preceding paragraphs 6 through 9 does *not* end with "as more fully described in Count Two," thus raising the spectre that the Government will attempt to allege and prove a variety of charges that are not set forth in the indictment itself.

I. With regard to paragraph 15, does the Government contend that there was an express *quid pro quo* agreement between Governor Siegelman and Richard M. Scrushy relative to the allegations set forth therein? If so, Governor Siegelman seeks to know

where and when (according to the Government's allegations) he is supposed to have reached such an agreement, and what terms he supposedly expressly agreed to.

J.  With regard to paragraph 16, does the Government contend that there was an express *quid pro quo* agreement between Governor Siegelman and Richard M. Scrushy relative to the allegations set forth therein?  If so, Governor Siegelman seeks to know where and when (according to the Government's allegations) he is supposed to have reached such an agreement, and what terms he supposedly expressly agreed to. Furthermore, given this paragraph's allegation that Governor Siegelman agreed to "accept a pecuniary benefit," what (if any) pecuniary benefit to himself individually does the Government allege that he agreed to accept?

K.  With regard to paragraph 17, who are the persons "known and unknown to the Grand Jury" whom the Government alleges aided and abetted the devising of the alleged "scheme" set out therein?

L.  With regard to paragraph 18, who are the "others" who allegedly shared the "purpose" alleged therein?

M.  With regard to paragraph 19(e), what does the Government claim that Governor Siegelman allegedly *did* to "*orchestrate* Richard M. Scrushy's replacement on the CON Board"? (emphasis supplied).

N.  With regard to paragraph 20, who are the "others known and unknown to the Grand Jury" who are alleged to have "aided and abetted" Governor Siegelman in regard to the allegations of that paragraph?

O. With regard to paragraph 22, does the Government contend that Governor

8

Siegelman "transmitted" or "caused to be transmitted" the fax transmission identified therein? If the Government alleges that Governor Siegelman "caused" it rather than using the Healthsouth fax machine himself, Governor Siegelman seeks to know what acts he is alleged to have done that allegedly "caused" someone to send that fax from Healthsouth, and whether he is alleged to have known that the fax would be sent.

P. With regard to paragraph 23, who are the "others known and unknown to the Grand Jury" who are alleged to have "aided and abetted" Governor Siegelman in regard to the allegations of that paragraph?

Q. With regard to paragraph 24, who are the "others known and unknown to the Grand Jury" who are alleged to have "aided and abetted" Governor Siegelman in regard to the allegations of that paragraph? In further regard to this paragraph, what does the Government allege that Governor Siegelman did, so as to "cause" the check in question to be deposited into the account in question?

R. With regard to paragraph 26's allegation of a conspiracy: (i) Where and when is Governor Siegelman alleged to have reached an agreement (i.e., conspiracy) with Clayton "Lanny" Young and others, with the degree of particularity that has been discussed above? (ii) Who are the "others known and unknown to the grand jury" with whom Governor Siegelman is alleged to have conspired? (iii) Is it alleged that there was an agreement that Governor Siegelman would take specific actions or use "influence" in some way? If so, what allegedly were those actions and/or ways?

S. With regard to paragraph 27, what money is Governor Siegelman alleged to have "solicited, accepted, and agreed to accept" in this paragraph? And what "official

acts" was he allegedly "influenced" in?

T. With regard to paragraph 28, who were the "others known and unknown to the grand jury" who allegedly aided and abetted Governor Siegelman in devising the "scheme" that is alleged in this paragraph?

U. Is it the Government's contention, in paragraph 30(a), that there was an actual verbal agreement to the effect alleged therein? If the Government's contention is instead that there was some "constructive" agreement arising out of an alleged "course of conduct" (the phrase that the Government uses), was there allegedly any "conduct" allegedly reflecting such an agreement beyond the conduct alleged in the remainder of paragraph 30?

V. On what date(s) did Young allegedly give "valuable private airplane transportation" to Governor Siegelman or to defendant Hamrick as alleged in paragraph 30(b)?

W. What are the "other items" referred to in paragraph 30(c) that Governor Siegelman allegedly received? *See U.S. v. Ganim*, 225 F.Supp.2d 145, 155-56 (D.Conn. 2002) (public official was entitled to a bill of particulars setting out what benefits he allegedly received). When and where did Young allegedly give him such things? Which things were given "directly," and which "indirectly" (as stated in this paragraph) – and by what means were the latter given?

X. On what dates, and in what places, and by what means, is Young alleged to have given Governor Siegelman the money referred to in paragraph 30(d)? Was the money cash, or checks (if so, from whom to whom), or some other form? What was

1

allegedly given "directly," and what "indirectly"? With respect to the latter, how was the money given?

Y. On what dates, and in what places, and by what means, is Young alleged to have given Nicholas Bailey the money referred to in paragraph 30(e)? Was the money cash, or checks (if so, from whom to whom), or some other form? What was allegedly given "directly," and what "indirectly"? With respect to the latter, how was the money given?

Z. On what dates, and in what places, and by what means, is Young alleged to have given defendant Hamrick the money referred to in paragraph 30(f)? Was the money cash, or checks (if so, from whom to whom), or some other form? What was allegedly given "directly," and what "indirectly"? With respect to the latter, how was the money given?

AA. Given the allegation in paragraph 30(g) that Governor Siegelman and Hamrick allegedly assisted Young in ways "including" those set forth in that paragraph's chart, Governor Siegelman seeks to know what if anything he is alleged to have done in this regard beyond what is alleged in the chart. Furthermore, Governor Siegelman seeks to know, with respect to this paragraph, what he is alleged to have done to "[i]nfluenc[e]" each of the matters referenced in that chart. Without knowing what acts he is alleged to have done, Governor Siegelman cannot fairly defend himself. Governor Siegelman further seeks to know what defendant Hamrick is alleged to have done in these respects, and whether the Government contends that Hamrick did such things at the direction of or with the knowledge of Governor Siegelman. In further reference to the chart in

1

paragraph 30(g), Governor Siegelman seeks to know: (1) How, and where, and when in specific, did Governor Siegelman allegedly "influence" the passage of legislation referred to in the first row of the chart? (2) How, and when, and were, did Governor Siegelman allegedly "influence" the Cherokee County Commission, and what "business interests" are referred to, in the second row of the chart? (3) How, and when, and where, did Governor Siegelman allegedly "influence" the matters referred to in the third row of the chart? What "regulation" is referred to therein? (4) Who was the "de facto Director" referred to in the fourth row of the chart, in what sense was that person the "de facto Director," what does it mean to be the "de facto Director," and how and when and where did Governor Siegelman allegedly "influence" that person? (5) How and when and where did Governor Siegelman allegedly "influence" the award of the contract referred to in the fifth row of the chart?

BB. What are the "businesses" referred to in paragraph 30(h), from which Governor Siegelman allegedly solicited and obtained money and property? What money and property? When did this allegedly occur, and where?

CC. With regard to paragraph 31, who were the "others known and unknown to the Grand Jury" who allegedly aided and abetted the acts in question?

DD. With regard to paragraph 33, who were the "others known and unknown to the Grand Jury" who allegedly aided and abetted the acts in question? By and from whom was each of the alleged wire transfers designated as Acts 2(h) and 2(i) sent, and to whom? What facts demonstrate that those alleged wire transfers were "concerning Cherokee County Landfill" (that is, without further information it is impossible to

1

understand what it means to allege that certain money "concerns" a landfill.) With regard to alleged Acts 2(j) through 2(o), by and from whom and to whom was each document allegedly sent? With regard to each alleged Act, what did Governor Siegelman allegedly do to "transmit" or to "cause" the wire transfers or documents to be sent?

EE. With regard to paragraph 34, who is the "other person" towards whom Hamrick is alleged to have engaged in misleading conduct?

FF. With regard to paragraph 36, where is Governor Siegelman alleged to have taken the acts in question? Who are the others who allegedly aided and abetted him? Whom did he attempt to persuade? Towards whom did he engage in misleading conduct? What did Governor Siegelman allegedly do to "cause" Bailey to do the acts attributed to Bailey in this paragraph?

GG. With regard to paragraph 37, where is Governor Siegelman alleged to have taken the acts in question? Who are the others who allegedly aided and abetted him? Whom did he attempt to persuade? Towards whom did he engage in misleading conduct? What did Governor Siegelman allegedly do to "cause" Bailey to do the acts attributed to Bailey in this paragraph?

HH. With regard to paragraph 39, where "in the Middle District," and where "elsewhere," is Governor Siegelman alleged to have done the things attributed to him? When and where did he allegedly "demand[] $100,000 and obtain[] $40,000"? How did Governor Siegelman allegedly "threaten" Jimmy Lynn Allen as alleged in this paragraph? What (if anything) did he allegedly threaten as to how, specifically, he would act or use his influence? What specific things, if any, did he allegedly promise to do and

1

to influence?

II. With regard to paragraph 40, where "in the Middle District," and where "elsewhere," is Governor Siegelman alleged to have done the things attributed to him? When and where did he allegedly reach the agreement and understanding suggested in this paragraph? Is it the Government's theory that there was an explicit agreement of a quid pro quo nature? Is it the Government's theory that this alleged agreement and understanding was ever stated by anyone? If so, by whom and where and when? What specific things, if any, did Governor Siegelman allegedly promise to do?

JJ. With regard to paragraph 41, where "in the Middle District," and where "elsewhere," is Governor Siegelman alleged to have done the things attributed to him? When and where did he allegedly make the demand in question? How did he allegedly "threaten" Marcato as alleged in this paragraph? What specific acts and influence, if any, did he purportedly threaten to use?

KK. With regard to paragraph 42, is it the Government's theory that Governor Siegelman solicited a pecuniary benefit to himself, in the acts alleged? Where and when did he allegedly solicit the funds in question? Is it the Government's theory that the purported "agreement and understanding" was explicit? Who, if anyone, is alleged to have stated it? What were its specific terms, if any? What official action and influence was allegedly agreed upon?

LL. With regard to paragraph 43, again – where and when was the scheme alleged devised? Aided and abetted by whom, unnamed in the indictment?

MM. With regard to paragraph 44, is Governor Siegelman alleged to have had the

1

purpose of engaging in any acts beyond those alleged in paragraphs 45 and 46?  If so, what?

NN.  With regard to paragraph 45(a), what money and property is Governor Siegelman alleged to have demanded, and how, and when and where?  Is Governor Siegelman or anyone else alleged to have said anything about "official protection from economic harm" -- and, if so, who said what in that regard?  What "business interests" other than the alleged $20 million investment were allegedly to be protected?  What if anything was purportedly said in that regard?  Is it alleged that there was an explicit agreement of a quid pro quo nature in regard to the matters alleged in this paragraph?  If so, who stated the terms and what did that person state?

OO.  With regard to paragraph 45(b), what money and property is Governor Siegelman alleged to have demanded, and how, and when and where?  Is it alleged that there was an explicit agreement of a quid pro quo nature in regard to the matters alleged in this paragraph?  If so, who stated the terms and what did that person state?

PP.  With regard to paragraphs 45(c) through (e), when and where did these things allegedly take place, and by what means?

QQ.  With regard to paragraph 45(h), what action and influence is Roberts alleged to have taken or used?

RR.  With regard to paragraph 45(i), how and when and where did Governor Siegelman allegedly "demonstrate" his alleged awareness as set forth in that paragraph?

SS.  With regard to paragraph 45(j), when and where did this allegedly take place?  Is it alleged that there was an explicit agreement of a quid pro quo nature in regard to the

1

matters alleged in this paragraph? If so, who stated the terms and what did that person state?

TT. With regard to paragraph 46, who are the unnamed aiders and abettors? With regard to each of the documents and things set out in the chart therein, what is Governor Siegelman alleged to have done to "cause" them to be placed in the mail? With regard to each of Acts 5(o) through (kk), who are the contractors in question from whom the checks were sent?

UU. With regard to paragraph 47, what did Governor Siegelman allegedly do to "cause" the deposits of each of the checks in question? As to each check, of what unlawful activity specifically – not merely citation of statute, but explanation of the underlying factual allegations – was it allegedly the proceeds? Does the Government contend that any such check represented the proceeds of a quid pro quo agreement? If so, when and where and by whom was such agreement allegedly reach? Did anyone state its terms? If so, what terms did such person state? From whom was the transaction designed to conceal and disguise, as stated in this paragraph? What was allegedly concealed, or sought to be concealed, with regard to each of the following, as stated in this paragraph: the nature, location, source, ownership and control of the funds? (That is, in regard to this last question, the paragraph contends that Governor Siegelman sought to conceal and disguise each and every one of those characteristics of the funds in question; we are seeking information about what he allegedly sought to conceal and disguise in regard to each of them.).

VV. With regard to paragraph 49, who were the others who allegedly aided and

1

abetted? Where in the Middle District of Alabama, and where "elsewhere," did the alleged actions supposedly take place? When, specifically, did the actions alleged take place?

WW. With regard to paragraph 51, who were the others who allegedly aided and abetted? Where in the Middle District of Alabama, and where "elsewhere," did the alleged actions supposedly take place? When, specifically, did the actions alleged take place?

XX. With regard to paragraph 53, where and when – with the specificity that has been discussed above – did Governor Siegelman allegedly reach an agreement ("conspiracy") alleged therein? Who were the other participants in the alleged conspiracy, who are said to exist but who are not named in the indictment? Who are the other members of the CON Board referred to in this paragraph, of whose honest and faithful services the State would supposedly be defrauded?

YY. With regard to paragraph 54, who are the "others" referred to therein?

ZZ. With regard to paragraph 55, is it the Government's contention that $500,000 was paid to Governor Siegelman himself? With regard to paragraph 55(e), who are the "others," what are the "things of value," and who was the other CON Board member? With regard to paragraph 55(e), is it the Government's contention that Governor Siegelman knew and agreed that this would occur? With regard to paragraph 55(f), what did Governor Siegelman allegedly do to "orchestrate" Scrushy's replacement on the Board? With regard to paragraph 55(g), what did Governor Siegelman allegedly do to "cause" the referenced letters to be mailed?

AAA.  With regard to paragraph 56, which if any of the things in the chart does the Government contend that Governor Siegelman "caused" or "committed"?  If "caused," by what means did he allegedly cause it?

BBB.  With regard to paragraph 57, where in the Middle District, and where "elsewhere," was the purported scheme allegedly devised?  Who were the unnamed others who allegedly aided and abetted the devising of the scheme?  Who are the other members of the Board referred to therein, of whose honest and faithful services the State would supposedly be defrauded?

CCC.  With regard to paragraph 58, who are the "others" referred to?

DDD.  With regard to paragraph 59, is it the Government's contention that $500,000 was paid to Governor Siegelman himself?  With regard to paragraph 59(e), who are the "others," what are the "things of value," and who was the other CON Board member?  With regard to paragraph 59(e), is it the Government's contention that Governor Siegelman knew and agreed that this would occur?  With regard to paragraph 59(f), what did Governor Siegelman allegedly do to "orchestrate" Scrushy's replacement on the Board?  With regard to paragraph 59(g), what did Governor Siegelman allegedly do to "cause" the referenced letters to be mailed?

EEE.  With regard to paragraph 60, once again – when and where, and aided and abetted by whom, did Governor Siegelman allegedly "place[]" the referenced things in the mail or "cause[]" them to be placed?  If the allegation is that he "caused" them to be mailed, how did he allegedly "cause" that?

FFF.  With regard to paragraph 61, where in the Middle District, and where

1

"elsewhere," did Governor Siegelman allegedly devise the supposed scheme? When did he allegedly devise it? Who are the others who allegedly aided and abetted in devising the scheme?

GGG. With regard to paragraph 63, who are the others who allegedly aided and abetted? As to each of the items in the chart in this paragraph, is Governor Siegelman alleged to have "placed" each in the mail, or "caused" it to be placed? If "caused," how precisely is he alleged to have caused it?

HHH. With regard to paragraph 65, who are the others who allegedly aided and abetted? With respect to each wire transmission in the chart in this paragraph, is Governor Siegelman alleged to have "transmitted" it, or to have "caused" it to be transmitted? If "caused," how precisely is he alleged to have caused it?

III. With regard to paragraph 67, who were the others who allegedly aided and abetted? Towards whom did Governor Siegelman allegedly engage in misleading conduct? Whom did he allegedly "persuade," and of what, and by what means? What did Governor Siegelman allegedly do to "cause" Bailey to write the check in question? What did he allegedly do to "cause" Bailey to make the notation on the check? Where and by what means did Young allegedly give Governor Siegelman $9,200? What specifically – meaning not merely citation of statute, but with specifics regarding the alleged underlying facts – were the supposed "federal offenses" relating to that $9,200?

JJJ. With regard to paragraph 68, who were the others who allegedly aided and abetted? Towards whom did Governor Siegelman allegedly engage in misleading conduct? Whom did he allegedly "persuade," and of what, and by what means? What

1

did Governor Siegelman allegedly do to "cause" Bailey to write the check in question? What did he allegedly do to "cause" Bailey to make the notation on the check? Where and by what means did Young allegedly give Governor Siegelman $9,200? What specifically – meaning not merely citation of statute, but with specifics regarding the alleged underlying facts – were the supposed "federal offenses" relating to that $9,200?

KKK. With regard to paragraph 69, where in the Middle District, and where "elsewhere," was the supposed scheme allegedly devised? When was it supposedly devised, specifically? Who were the unnamed others who aided and abetted in the devising of the scheme?

LLL. With regard to paragraph 71, who were the aiders and abettors? With regard to each document or thing in the chart in this paragraph, what did Governor Siegelman allegedly do to "place[]" such thing in the mail or "cause[]" it to be placed? Who were the contractors referred to in the various cells of that chart?

MMM. With regard to paragraph 72, what specific words or actions allegedly induced Marcato to fear economic harm? By what specific words or actions was a "threat" supposedly conveyed to Marcato? What, if anything, was threatened specifically with regard to actions or influence that would be used?

Governor Siegelman points out that meaningful and complete answers to the questions above are necessary in order to allow him a fair opportunity to defend himself. Without such answers, the indictment is a hodgepodge of vagueness, full of allusions to unknown persons and unspecified actions. It is completely unclear as to when Governor Siegelman is alleged to have reached a specific quid pro quo agreement, and when by

2

contrast the Government seeks to convict him without proof of any such agreement. It is

often unclear whether the Government knows, or cares, about the difference between

campaign funds and a government official personally. The indictment, without further

clarification, leaves Governor Siegelman in the position of defending his integrity as a

general matter, rather than defending himself against specifically-understood allegations

of crimes. A bill of particulars would help in this regard.

Respectfully submitted this the    20th    day of February 2006.

                                        Respectfully submitted,

                                        /s/ G. Douglas Jones_____
                                        G. Douglas Jones

**OF COUNSEL:**
WHATLEY DRAKE, LLC
2323 2nd Avenue North
Birmingham, AL 35203
Phone: (205) 328-9576
Fax: (205) 328-9669

Charles Redding Pitt
John D. Saxon. PC
2119 Third Avenue North
Birmingham, AL 35203
(205) 324-0223
Fax:205-323-1583

David Allen McDonald
Kilborn, Roebuck & McDonald
203 South Warren Street
Post Office Box 832
Mobile, AL 36602
251-434-0045
Fax:251-434-0047

Vincent F. Kilborn, III
Kilborn, Roebuck & McDonald
1810 Old Government Street
P. O. Box 66710
Mobile, AL 36606
(334) 479-9010
Fax: 251-479-6747

## CERTIFICATE OF SERVICE

I hereby certify that on the 20th day of February, 2006, I electronically filed the

foregoing " Governor Siegelman's Motion for Bill of Particulars" with the Clerk of the Court

using the CM/ECF system which will send notification of such to counsel of record .


 /s/ G. Douglas Jones
OF COUNSEL

2