## IN THE UNITED STATES DISTRICT COURT FOR
## THE MIDDLE DISTRICT OF ALABAMA
## NORTHERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| v. ) | **CRIMINAL NO. 2:05-CR-119-F** |
| ) | |
| DON EUGENE SIEGELMAN, ) | |
| PAUL MICHAEL HAMRICK, ) | |
| GARY MACK ROBERTS, and ) | |
| RICHARD M. SCRUSHY ) | |

### UNITED STATES' RESPONSE TO DEFENDANTS' SECOND MOTIONS FOR DISCOVERY OF JURY RECORDS

COMES NOW the United States of America, by and through Louis V. Franklin, Sr., Acting United States Attorney for the Middle District of Alabama, and Andrew C. Lourie, Acting Chief of the Public Integrity Section of the Criminal Division of the United States Department of Justice, and hereby files its Response to Defendants' Second Motions for Discovery of Jury Records (hereinafter, the "Motions"). This Court should deny the Motions. First, Defendants cannot establish their prima facie case to prove a violation of the Jury Selection and Service Act (JSSA), Sixth Amendment, and Due Process and Equal Protection Clauses of the Fifth Amendment and are thus not entitled to any further discovery. Second, to the extent Defendants' Equal Protection Clause claim is still viable, the requested discovery is not necessary for Defendants to attempt to establish a prima facie case. As grounds for its position, the United States submits the following:

**I.    Defendants Have Failed to Establish a Prima Facie Case under the JSSA, Sixth Amendment and Due Process and Equal Protection Clauses of the Fifth Amendment**

    **A.    Defendants Have Failed to Meet the Ten Percent Absolute Disparity Requirement**

Defendants seek further discovery to support their claims arising out of this Court's alleged improper implementation of its Plan for the Random Selection of Grand and Petit Jurors (hereinafter,

the "Plan"). As this Court has noted in this and other cases, see Exh. A at 5-8 (transcript of hearing,

August 11, 2005, in United States v. Carmichael, et. al., No. 2:03-cr-259-T) (Boyd, J.) (attached),

and the United States discussed in its earlier Response to Defendant Scrushy's original Motion to

Dismiss and Motion for Discovery, Doc. #114 (hereinafter, the "Original Response" and

incorporated herein by reference),[1] for Defendants to succeed on their JSSA, Sixth Amendment, and

Fifth Amendment Due Process and Equal Protection claims, they must show an absolute disparity

of greater than ten percent between the percentage of African Americans "among the population

eligible for jury service and the percentage of the distinctive group on the Qualified Jury Wheel."

United States v. Grisham, 63 F.3d 1074, 1078 (11th Cir. 1995), cert. denied, 516 U.S. 1084 (1996);

United States v. Tuttle, 729 F.2d 1325, 1327 n.2 (11th Cir. 1984) ("The prima facie case under the

equal protection clause is 'virtually identical' to that under the sixth amendment and this court has

often treated the threshold disparity requirement the same under both types of challenge.") (quoting

Machetti v. Linahan, 679 F.2d 236, 241 n.6 (11th Cir. 1982), cert. denied, 459 U.S. 1127 (1983)),

cert. denied, 469 U.S. 1192 (1985).

　　　　As this Court has stated in Carmichael, et. al., No. 2:03-cr-259-T, see Exh. A at 5-8, and with

which the United States agrees, see Original Response at 8; Exh. D at 4-6 (affidavit of Stephen

Elmore, government's expert) (attached), the absolute disparity is measured by the difference

between the percentage of African Americans on the voter registration lists which this Court certified

under the Plan, as recorded in the Office of the Secretary of State for the State of Alabama, and the

---

[1]Though the United States' position is that this Court should deny Defendants' Motions, if the Court grants relief to Defendants, the government once again respectfully asks this Court not to disclose any personal or identifying information (e.g., name, address) about the grand jurors who returned the indictments in this case and any potential juror in this case.

percentage of African Americans on the Qualified Jury Wheel (QJW). A review of the proper data shows that Defendants cannot meet the absolute disparity requirement of greater than ten percent to establish their prima facie case with regards to the 2001 and 2005 QJW. See Exh. D at 7.

Defendants mistakenly rely on the 2000 census data of African Americans over the age of 18 to make their absolute disparity calculation. This measure is incorrect because not all African Americans over the age of 18 are eligible to serve as jurors. See United States v. Artero, 121 F.3d 1256, 1262 (9th Cir. 1997) (rejecting the defendant's argument that the court should look to the total voting age population of Hispanics because not all such persons are eligible to serve as jurors), cert. denied, 522 U.S. 1133 (1998). However, even assuming arguendo that the census data is the correct figure to use, Defendants admittedly, Scrushy Mot. at 5, have still failed to cross the absolute disparity threshold of greater than ten percent as to the 2001 and 2005 QJWs. The ten percent absolute disparity rule is a bright line rule which is fatal to Defendants' claims under the JSSA, and the Sixth and Fifth Amendments. Grisham, 63 F.3d at 1078; Tuttle, 729 F.2d at 1327 n.2. Though Defendants want to label the Court's Plan "barely legal" (a term of art with which the United States is not familiar), the Court's Plan is legal nonetheless. Consequently, Defendants are not entitled to any further discovery because they cannot establish a prima facie case under the JSSA, or Fifth and Sixth Amendments.[2]

Defendants, knowing their failure to meet the absolute disparity rule, attempt to resurrect their claims by arguing that the QJWs, though legal when created, became illegal over time. Defendants cite to no authority to support their novel argument, nor can they since the United States

_____

[2]The United States does not object to this Court's giving Defendants the information disclosed in the Carmichael case since he already has access to it. Scrushy Mot. at 3.

Supreme Court and this and other Circuits have already considered Defendants' position and rejected

it. In particular, the Supreme Court in <u>Hamling v. United States</u>, 418 U.S. 87 (1974), provided:

> Congress could reasonably adopt procedures which, while designed to assure than an
> impartial jury is drawn from a cross-section of the community, at the same time take
> into account practical problems in judicial administration. Unless we were to require
> the daily refilling of the jury wheel, Congress may necessarily conclude that some
> periodic delay in updating the wheel is reasonable to permit the orderly
> administration of justice. Invariably of course, as time goes on, the jury wheel will
> be more and more out of date, especially near the end of the statutorily prescribed
> time period for updating the wheel. But if the jury wheel is not discriminatory when
> <u>completely updated at the time of each refilling</u>, a prohibited purposeful
> discrimination does not arise near the end of the period simply because the young and
> other persons have belatedly become eligible for jury service by becoming registered
> voters.

<u>Id</u>. at 137 (emphasis added). <u>See</u> <u>United States v. Gometz,</u> 730 F.2d 475, 479 (7th Cir.) ("'The act

. . . does not require that at any stage beyond the initial source list the selection process shall produce

groups that accurately mirror community makeup. Thus, no challenge lies on that basis.'") (quoting

S. Rep. No. 891, 90th Cong., 1st Sess. 10, U.S. Code Cong. & Admin. News 1968, p. 1792 (1967))

(en banc) (Posner, J.), <u>cert</u>. <u>denied</u>, 469 U.S. 845 (1984); <u>United States v. Rodriguez</u>, 588 F.2d 1003,

1008 (5th Cir. 1979) (rejecting the defendant's attack on the jury selection plan because it did not

account for the influx of Spanish speaking persons into the population after the jury wheel was

compiled from the voter registration lists) (citing <u>Hamling</u>); <u>United States v. Hill</u>, 500 F.2d 733, 738-

39 (5th Cir.) (rejecting the defendant's attack on the jury selection plan because it did not include

younger persons who became eligible to vote during the life of the jury wheel) (citing <u>Hamling</u>), <u>cert</u>.

<u>denied</u>, 503 U.S. 1403 (1974); <u>United States v. Blair</u>, 470 F.2d 331, 336 (5th Cir. 1972) ("Congress

necessarily contemplated that for a substantial period of time the Master Wheel would be static. This

meant that during this period persons becoming potentially eligible for jury service would be

excluded."), cert. denied, 411 U.S. 908 (1973); United States v. Jones, No. Crim. A. 05-231, 2006 WL 278248 at *3 (E.D. La. Feb. 3, 2006) (rejecting the defendant's Sixth Amendment and JSSA claims because any underrepresentation in African Americans "was caused by external forces, i.e., a natural disaster (Hurricane Katrina) and not by any systematic flaw or defect in [the court's] jury plan"); United States v. Purdy, 946 F. Supp. 1094, 1103-05 (D. Conn. 1996) (holding that neither the Sixth Amendment nor the JSSA imposes "an affirmative obligation on the courts to counteract such private sector influences such as voting patterns, demographic trends, and cultural differences"), aff'd, 144 F.3d 241 (2d Cir.), cert. denied, 525 U.S. 1020 (1998).

Thus, well-settled precedent teaches that once the QJW is properly compiled, its validity remains intact throughout its life until the QJW is once again "completely updated at the time of each refilling." Hamling, 418 U.S. at 137. Defendants admit that they cannot cross the absolute disparity threshold for both the 2001 and 2005 QJWs at the time they were created. Scrushy Mot. at 5. Subsequent changes in demographics in the District, including the movement of African Americans into or out of the District or to different locations and addresses in the District, are irrelevant for purposes of analyzing Defendants' statutory and constitutional claims. Id. Consequently, Defendants' claims under the JSSA, and the Fifth and Sixth Amendments fail.

**B.    At Most, Defendants are Entitled to Further Discovery Solely on an Equal Protection Claim under the Fifth Amendment Regarding Intentional Discrimination by Court Personnel**

The only possible arguable claim Defendants may have remaining (and the United States in no way concedes that Defendants have such a viable claim) is a violation of the Equal Protection Clause of the Fifth Amendment. In addition to establishing the required absolute disparity, to demonstrate a prima facie case for an Equal Protection claim, Defendants must show "intentional

discrimination in the selection of venires." United States v. Williams, 264 F.3d 561, 569 (5th Cir. 2001). Hence, assuming arguendo that Defendants may continue to pursue an Equal Protection claim, many of Defendants's discovery requests (e.g., including the pool selection reports for all the grand juries selected using the 2001 QJW, the data on the mailing and follow-up to all the juror qualification questionnaires, the reasons for disqualification of a person based on his answer to the juror qualification questionnaire (e.g., failure to live in the District for more than one year), and the voter registration lists from which the 2005 Master Jury Wheel was created) are irrelevant. None of these requests relates to showing intentional discrimination by court personnel. Rather, they are discovery requests relating to the absolute disparity comparison. As this Court has already stated, the information required to make this comparison is very simple – the percentage of African Americans on the voter registration lists provided by the Secretary of State, and the percentage of African Americans on the QJW. See Exh. A at 5-8.

Defendants have failed to establish a prima facie showing of intentional discrimination by court personnel in the jury selection process. Defendants seek further discovery to attempt to make such a showing. In particular, Defendants make broad requests for information pertaining to pools, grand juries, questionnaires, mailings, addresses, and trial venires, etc., Scrushy Mot. at 3-7, for the purpose of determining the Court's practices regarding excused and deferred jurors. Defendants want this information ostensibly to divine whether the Court's practices present an opportunity for discrimination. Scrushy Mot. at 5. The United States contends that since Defendants must establish intentional discrimination on the part of Court personnel, the most efficient and effective means to accomplish such a task is to ask the Court personnel about the Court's practices regarding excused and deferred jurors, rather than trying to extrapolate the Court's practices from sterile data. See H.R.

Rep. No. 1076, 90th Cong. 2d Sess. (1968) ("The bill (the JSSA) does not guarantee that each venire or each jury will mirror the structure of the community. It guarantees only that appropriate selection procedures have been used."). In fact, the United States anticipates that answers to Defendants' questions regarding the processing of excused and deferred jurors will be given at the hearing scheduled in Carmichael for April 26, 2006. Carmichael, No. 2:03-cr-259-T, Order, Doc. # 641 (Feb. 22, 2006). Since Defendants' expert is the expert for the defense in Carmichael, Defendants have noted that they are fully aware of the merits of that proceeding. Providing Defendants with further discovery that at best tangentially touches on the intentional discrimination element of their Equal Protection claim will do nothing more than waste this Court's scarce resources and drag out the ultimate resolution of their claim.

Defendants' discovery requests pertaining to obligations on the Court to follow up addresses and the residency status of citizens in the District are especially specious. Neither the JSSA, nor the Sixth and Fifth Amendments place such a burden on the Court or give such a right to Defendants. The Gometz court extensively considered and then rejected a defendant's argument that the JSSA requires the clerk to follow up unreturned questionnaires, regardless of the percentage of unreturned questionnaires, unless the absolute number of returned questionnaires was too low to generate enough names for the QJW.

> Those procedures include no requirement that the district court clerk take measures to correct a low response rate, so long as it is high enough to generate enough names for the qualified jury wheel to enable staffing the required number of juries. The Act empowers – not requires – the clerk to pursue those who fail to return their juror qualification forms. . . . Most district court clerks lack the resources to issue thousands of summonses every year to persons who do not return juror qualification forms, and then to follow up on all the summonses that are ignored. . . . Congress did not want to put court clerks under a duty to require that jury questionnaires be completed and returned.

Gometz, 730 F.2d at 480, 481.  See United States v. Royal, 174 F.3d 1, 11 (1st Cir. 1999) (noting that

a violation of the JSSA is not found where the clerk did not follow up on unreturned qualification

questionnaires) (citing Gometz);  United States v. Rioux, 97 F.3d 648, 658 (2d Cir. 1996) (rejecting

the defendant's Sixth Amendment claim because "[t]he inability to serve juror questionnaires

because they were returned as undeliverable is not due to the system itself, but to outside forces, such

as demographic changes"); United States v. Orange, 364 F. Supp. 2d 1288, 1296-97 (W.D. Okla.

2005) (rejecting the defendant's Fifth Amendment Equal Protection claim based on the argument

that "the district systematically excludes a disproportionate number of prospective African-

Americans jurors because it fails to update addresses and to follow-up on delivered but unreturned

questionnaires"); Purdy, 946 F. Supp. at 1104-05 (holding that neither the Sixth Amendment nor the

JSSA requires "mailing follow up questionnaires to persons who fail to respond to the initial

questionnaire").

Defendants have not claimed, nor can they, that this Court did not receive enough names

from the returned questionnaires to compile the 2001 and 2005 QJWs.  Consequently, Defendants'

requests for the clerk to update addresses or to follow up the residency status of citizens in the

District must be denied.

## II.    Conclusion

Defendants seek further discovery to pursue their claims under the JSSA, and Sixth and Fifth

Amendments challenging  this Court's implementation of the Plan.  Defendants are not entitled to

any further discovery because they have failed to establish a prima facie case for any of their claims.

Further, to the extent Defendants have a valid remaining Equal Protection claim, discovery sufficient

for the resolution of that claim has already been ordered in Carmichael.  Providing additional

discovery to Defendants would only be duplicative and wasteful.  Therefore, this Court should deny the Motions.

Respectfully submitted this the 1st day of March, 2006


LOUIS V. FRANKLIN, SR.
ACTING UNITED STATES ATTORNEY

/s/ Louis V. Franklin, Sr.
Acting United States Attorney
One Court Square, Suite 201
Montgomery, AL 36104
Phone: (334)223-7280
Fax:    (334)223-7560
Email: louis.franklin@usdoj.gov

/s/ J.B. Perrine
Assistant United States Attorney
One Court Square, Suite 201
Montgomery, AL 36104
Phone: (334)223-7280
Fax:    (334)223-7135
Email: jb.perrine@usdoj.gov
ASB-9077-E31J

/s/ Jennifer Garrett
Special Assistant United States Attorney
Assistant Attorney General
Office the Attorney General
11 S. Union
Montgomery, AL 36130
Phone: (334)353-8494
Fax:    (334)242-4890
Email: jgarrett@ago.state.al.us
ASB-4600-T77J

/s/ Stephen P. Feaga
Assistant United States Attorney
One Court Square, Suite 201
Montgomery, AL 36104
Phone: (334)223-7280
Fax:    (334)223-7560
Email: steve.feaga@usdoj.gov
ASB-7374A60S

ANDREW C. LOURIE
ACTING CHIEF, PUBLIC INTEGRITY
SECTION

/s/Richard C. Pilger
Department of Justice, Criminal Division
Public Integrity Section
10th & Constitution Ave, NW
Bond Building - 12th Floor
Washington, DC 20530
Phone: (202)514-1412
Fax:    (202)514-3003
Email: richard.pilger@usdoj.gov

/s/ Joseph L. Fitzpatrick, Jr. Special Assistant
United States Attorney
Assistant Attorney General
Office of the Attorney General
11 S. Union
Montgomery, AL 36130
Phone: (334)353-4839
Fax:    (334)242-4890
Email: j.fitzpatrick@ago.al.state.us

**IN THE UNITED STATES DISTRICT COURT FOR
THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | **)** | |
| | **)** | |
| **v.** | **)** | |
| | **)** | **CRIMINAL NO. 2:05-CR-119-F** |
| **DON EUGENE SIEGELMAN,** | **)** | |
| **PAUL MICHAEL HAMRICK,** | **)** | |
| **GARY MACK ROBERTS, and** | **)** | |
| **RICHARD M. SCRUSHY** | **)** | |

**CERTIFICATE OF SERVICE**

     I hereby certify that on March 1, 2006, I electronically filed the foregoing with the Clerk of the Court  using the CM/ECF system which will send notification of such filing to all counsel of record.

                            Respectfully submitted,

                            LOUIS V. FRANKLIN, SR.
                            ACTING  UNITED STATES ATTORNEY

                            /s/ J.B. Perrine
                            Assistant United States Attorney
                            One Court Square, Suite 201
                            Montgomery, AL 36104
                            Phone: (334)223-7280
                            Fax:    (334)223-7135
                            Email: jb.perrine@usdoj.gov
                            ASB-9077-E31J

# Exhibit A

EXHIBIT A

Resume'

Of

Stephen A. Elmore, Sr.
Certified Public Accountant

**STEPHEN A. ELMORE, SR., C.P.A., C.B.A**

115 Shady Brooke Walk
Fairburn, Georgia 30213

## EDUCATION:

CUM LAUDE graduate of Morehouse College,
     Atlanta, Georgia
Bachelor of Arts Degree in Economics
     with a concentration in Accounting

## PROFESSIONAL CERTIFICATIONS:

1977 – Certified Public Accountant
     State of Georgia, Certificate No. 3923

1985 – Certified Bank Auditor
     Certificate No. 1653

## PROFESSIONAL ASSOCIATIONS:

American College of Forensic Examiners Institute
American Institute of Certified Public Accountants
Georgia Society of Certified Public Accountants
National Society of Certified Bank Auditors
National Association of Black Accountants, Inc.

## PROFESSIONAL LITIGATION SUPPORT EXPERIENCE:

April, 2004 – Present:    **SMILEY-SMITH & BRIGHT**
                              Certified Public Accountants
                              (*Practice Limited to Forensic Accounting& Litigation Consulting,*

**SMILEY-SMITH & BRIGHT,** Certified Public Accountants offers expert witness testimony in civil and criminal litigation proceedings on the gamut of financial and accounting issues and quantifications.  Building on over three (3) decades of experience as financial expert witnesses in litigated utility regulatory proceedings, the Firm performs the detailed analyses and quantifications necessary to present expert testimony on financial, accounting and economic issues, including, but not limited to:

STEPHEN A. ELMORE, SR., C.P.A., C.B.A

- **Damage evaluations and quantifications**
- **Financial analyses and assessments**
- **Audit and investigatory examinations**
- **Numeric compilations and findings**
- **Economic capacity loss calculations**
- **Inflation adjusted, present value quantifications**
- **Punitive damage assessments and quantifications**

## MR. ELMORE'S PARTICIPATION AS EXPERT WITNESS IN CRIMINAL LITIGATION PROCEEDINGS:

**2005:** **IN THE UNITED STATES DISTRICT COURT FOR THE MIDDLE DISTRICT OF ALABAMA; CASE NO. 2:05-CR-129-A <u>THE UNITED STATES OF AMERICA</u>, Plaintiff vs. TERESO RODRIQUEZ LOPEZ, Defendant.**

> **Defendant's vehicle was stopped for a traffic violation and Defendant was arrested after a search of his vehicle. Defendant alleges violation of the Equal Protection Clause based on racial profiling; violation of the Fifth Amendment by interrogating under the guise of routine questioning; and, no Fourth Amendment justification for the subsequent search of his vehicle.**

**2004:** **IN THE CIRCUIT COURT OF MONTGOMERY COUNTY, ALABAMA; October Term, 2004, CRIMINAL INDICTMENT against TERRY HARRIS, Defendant. Prosecuted by <u>THE ALABAMA SECURITIES COMMISSION.</u>**

> **Indictment alleges the offer and/or sale of nonregistered securities; non registration as an agent or broker; and non registration as an investment advisor.**

**2004:** **IN THE CIRCUIT COURT OF JEFFERSON COUNTY, ALABAMA; April Term, 2004, CRIMINAL INDICTMENT against TERRY HARRIS, Defendant. Prosecuted by <u>THE ALABAMA SECURITIES COMMISSION.</u>**

> **Indictment alleges the offer and/or sale of nonregistered securities; non registration as an agent or broker; non registration as an investment advisor; providing false statements to investors; receiving consideration from investors for advising as to the purchase or sale of securities; and employing a scheme to defraud investors.**

STEPHEN A. ELMORE, SR., C.P.A., C.B.A

**MR. ELMORE'S PARTICIPATION AS CUSTODIAN APPOINTED BY THE COURT:**

**2005:  IN THE CIRCUIT COURT OF MONTGOMERY COUNTY, ALABAMA; CASE NO. CV 2005-913, SLEEP CENTER OF MONTGOMERY, INC. and DENIZ AYRAL, Plaintiffs vs. CHRISTOPHER S. HOLLIS, ET AL, Defendants.**

> **Determine the financial status of the corporation (assets, liabilities, etc.), and provide a report to the Court with a recommendation as to disposition of litigation proceedings.**

**MR. ELMORE'S PARTICIPATION AS EXPERT WITNESS IN CIVIL LITIGATION PROCEEDINGS:**

**2004:  IN THE COMMON PLEAS COURT OF HURON COUNTY, OHIO; CASE NO. CVE 2002-432, JOHN L. MAENLE, ET AL, Plaintiffs vs. FIRST UNION NATIONAL BANK OF DELAWARE, ET AL, Defendants.**

> **Suit alleges damages due to fraudulent and illegal loan underwriting practices, inadequate consideration received, and willful, reckless, malicious and negligent conduct.**

**2004:  IN THE CIRCUIT COURT OF GREENE COUNTY, ALABAMA; CASE NO. CV-98-094, McCLUNG CONTRACTING COMPANY, Plaintiffs vs. CTX MORTGAGE COMPANY, ET AL, Defendants.**

> **Suit alleges damages due to nonpayment for services rendered in constructing a house, negligence in exercising due care regarding permanent lender guidelines, intentional concealment, and false representation.**

**2004:  IN THE UNITED STATES DISTRICT COURT, SOUTHERN DISTRICT OF MISSISSIPPI, JACKSON DIVISION: CASE NO 3:03CV335WS, DELPHI AUTOMOTIVE SYSTEMS, LLC, Plaintiff vs. LEXTRON CORPORATION, Defendant.**

> **Suit seeks Replevin and declaratory judgment for recovery of property, and alleges damages for wrongful detention and breach of contract.**

STEPHEN A. ELMORE, SR., C.P.A., C.B.A

2004: IN THE CIRCUIT COURT OF SHARKEY COUNTY, MISSISSIPPI: CASE NO. 03-083, THOMAS LEE PARKER AND RUBYE C. PARKER, Plaintiffs vs. <u>HORACE MANN LIFE INSURANCE COMPANY, HORACE MANN EDUCATORS CORPORATION, ET AL</u>, Defendants.

> Suit alleging damages due to fraud, breach of contract, negligent misrepresentation, conspiracy, suppression/omission, and unfair trade practices involving the sale of insurance policies.

2004: IN THE CIRCUIT COURT OF SHARKEY COUNTY, MISSISSIPPI: CASE NO. 03-084, LAURETTA WARREN, Plaintiff vs. <u>HORACE MANN LIFE INSURANCE COMPANY, HORACE MANN EDUCATORS CORPORATION, ET AL</u>, Defendants

> Suit alleging damages due to fraud, breach of contract, negligent misrepresentation, conspiracy, suppression/omission, and unfair trade practices involving the sale of insurance policies.

2004: IN THE CIRCUIT COURT OF SHARKEY COUNTY, MISSISSIPPI: CASE NO. 04-009, PAMELA EVANS, Plaintiff vs. <u>HORACE MANN LIFE INSURANCE COMPANY, HORACE MANN EDUCATORS CORPORATION, ET AL</u>, Defendants

> Suit alleging damages due to fraud, breach of contract, negligent misrepresentation, conspiracy, suppression/omission, and unfair trade practices involving the sale of insurance policies.

2004: IN THE CIRCUIT COURT OF SHARKEY COUNTY, MISSISSIPPI: CASE NO. 04-0044, DeELLA WATTS, Plaintiff vs. <u>HORACE MANN LIFE INSURANCE COMPANY, HORACE MANN EDUCATORS CORPORATION, ET AL</u>, Defendants

> Suit alleging damages due to fraud, breach of contract, negligent misrepresentation, conspiracy, suppression/omission, and unfair trade practices involving the sale of insurance policies.

2004: IN THE CIRCUIT COURT OF HOLMES COUNTY, MISSISSIPPI: CASE NO. 03-137, MARIE WILLIAMS, Plaintiff vs. <u>HORACE MANN LIFE INSURANCE COMPANY, HORACE MANN EDUCATORS CORPORATION, ET AL</u>, Defendants

> Suit alleging damages due to fraud, breach of contract, negligent misrepresentation, conspiracy, suppression/omission, and unfair trade practices involving the sale of insurance policies

- 4 -

S<small>TEPHEN</small> A. E<small>LMORE</small>, S<small>R</small>., C.P.A., C.B.A

**2004:  IN THE CIRCUIT COURT OF HOLMES COUNTY, MISSISSIPPI: CASE NO. 03-138, MERDIS ANDERSON, Plaintiff vs. <u>HORACE MANN LIFE INSURANCE COMPANY, HORACE MANN EDUCATORS CORPORATION, ET AL</u>, Defendants**

> **Suit alleging damages due to fraud, breach of contract, negligent misrepresentation regarding rate of return and vanishing premium, conspiracy, suppression/omission, and unfair trade practices involving the sale of insurance policies.**

**2004:  IN THE CIRCUIT COURT OF HOLMES COUNTY, MISSISSIPPI: CASE NO. 03-464, WILLY AND EMMA WHEELER, Plaintiffs vs. <u>HORACE MANN LIFE INSURANCE COMPANY, HORACE MANN EDUCATORS CORPORATION, ET AL</u>, Defendants**

> **Suit alleging damages due to fraud, breach of contract, negligent misrepresentation, conspiracy, suppression/omission, and unfair trade practices involving the sale of insurance policies.**

**2004:  IN THE CIRCUIT COURT OF HUMPHREYS COUNTY, MISSISSIPPI: CASE NO. 04-0024, BETTY NUNALEY, Plaintiffs vs. <u>HORACE MANN LIFE INSURANCE COMPANY, HORACE MANN EDUCATORS CORPORATION, ET AL</u>, Defendants**

> **Suit alleging damages due to fraud, breach of contract, negligent misrepresentation, conspiracy, suppression/omission, and unfair trade practices involving the sale of insurance policies.**

**2004:  IN THE CIRCUIT COURT OF SUNFLOWER COUNTY, MISSISSIPPI: CASE NO. 04-0432-CI, JEANETTE AND AUTREY BOLDEN, Plaintiffs vs. <u>HORACE MANN LIFE INSURANCE COMPANY, HORACE MANN EDUCATORS CORPORATION, ET AL</u>, Defendants**

> **Suit alleging damages due to fraud, breach of contract, negligent misrepresentation, conspiracy, suppression/omission, and unfair trade practices involving the sale of insurance policies.**

Stephen A. Elmore, Sr., C.P.A., C.B.A

2004:  IN THE CIRCUIT COURT OF JEFFERSON COUNTY (moved from
Holmes County), MISSISSIPPI: CASE NO. 04-0024, ARVIN AND
BARBARA TENNER, Plaintiffs vs. <u>HORACE MANN LIFE INSURANCE
COMPANY, HORACE MANN EDUCATORS CORPORATION, ET AL</u>,
Defendants

Suit alleging damages due to fraud, breach of contract, negligent
misrepresentation, conspiracy, suppression/omission, and unfair trade
practices involving the sale of insurance policies.

<u>MR. ELMORE HAS ASSISTED VIA ANALYSES IN THE PREPARATION OF
TESTIMONY IN THE FOLLOWING CIVIL LITIGATION CASES:</u>

2003:  IN THE CIRCUIT COURT OF HOLMES COUNTY, MISSISSIPPI: CIVIL
ACTION NO. 2002-292, MARK HODGES, ET AL, Plaintiffs, vs. <u>GREATER
CANTON FORD MERCURY, INC., FORD MOTOR COMPANY, RAY L.
FAYNE, KATRINA FAYNE</u>, Defendants.

Suit alleging damages due to fraud, negligent misrepresentation,
breach of contract, emotional distress, and civil conspiracy in
connection with employment contracts governing commissions on
sales, etc.

2003:  IN THE CIRCUIT COURT OF THE FIRST JUDICIAL DISTRICT OF
BOLIVAR COUNTY, MISSISSIPPI: CIVIL ACTION NO. 2000-1, DELTA
AND PINE LAND COMPANY, Plaintiff, vs. <u>MONSANTO COMPANY (now
known as PHARMACIA CORPORATION)</u>, Defendant.

Suit alleging damages due to breach of contract, and tortuous
interference with prospective business relations as a result of a failed
merger.

2003:  IN THE CIRCUIT COURT OF HUMPHREYS COUNTY, MISSISSIPPI:
CASE NO. 02-0201, ABRAHAM GATES, Plaintiff vs. <u>THE PROGRESSIVE
CORPORATION, PROGRESSIVE CASUALTY INSURANCE COMPANY,
ET AL</u>, Defendants.

Suit alleging damages due to breach of contract, misrepresentation,
emotional distress, and consumer fraud involving the sale of
insurance policies.

STEPHEN A. ELMORE, SR., C.P.A., C.B.A

**2002:** **IN THE CIRCUIT COURT OF JONES COUNTY, MISSISSIPPI, SECOND JUDICIAL DISTRICT: CIVIL ACTION NO. 2002-163-CV5, JERRY ROSE AND TERESA ANN BOWMAN, Plaintiffs vs. <u>STERLING LIFE INSURANCE COMPANY, OLYMPIC HEALTH MANAGEMENT SERVICES, INC., OLYMPIC HEALTH MANAGEMENT SYSTEMS, INC., AND AON CORPORATION</u>, Defendants.**

**Suit alleging damages due to fraud, breach of fiduciary relationship, and breach of contract involving the sale of insurance policies.**

---

\*      **The Firm's client is designated by underlining, and dates shown reflect the date retained.**

STEPHEN A. ELMORE, SR., C.P.A., C.B.A

## OTHER PROFESSIONAL EXPERIENCE:

2003 – Present  **STEPHEN A. ELMORE, SR., CPA, CBA**
*Business and Financial Consulting*

Conduct training for community banks in auditing, risk assessment, financial statement analysis, and regulatory compliance. Also provide management and financial consulting to small businesses, to include cash flow projections, financial analyses, debt restructurings, and analyses of operations to improve profitability.

2001 – 2003  **GEORGIA ENVIRONMENTAL FACILITIES AUTHORITY**
*Finance Director*

Managed all financial matters of the Authority, including the accounting and financial reporting, budgeting and financial planning, investment activities, credit underwriting and financial analysis of potential borrowers, debt administration, and maintenance of the application systems' databases. The Authority had a loan portfolio of over $700 million and total assets in excess of $1 Billion.

1987 – 2001  **WACHOVIA CORPORATION**
*SVP and Deputy General Auditor of Wachovia Corp. (1987 – 2000)*
*General Auditor of Wachovia Bank of Georgia, N.A. (1987 – 1997)*

As a member of senior audit management, responsible for managing the department's infrastructure, including preparation and monitoring of a $6 million budget and annual audit plan of 100,000 man-hours, training and professional development, preparation of board materials for quarterly Audit Committee meetings, and quality assurance reviews.

1980 – 1987  **FIRST ATLANTA CORPORATION**
*General Auditor (1983 – 1987)*
*Deputy General Auditor (1980 – 1983)*

As a member of senior management, directed a staff of professional accountants in executing a risk-based audit plan designed to monitor enterprise risks while facilitating accomplishment of the corporate goals and objectives. Performed financial analyses of acquisition targets, and served as a consultant on steering committees for new products and services. Managed the relationship with the regulators and external auditors to achieve examination efficiencies

STEPHEN A. ELMORE, SR., C.P.A., C.B.A

1973 – 1980          **ARTHUR ANDERSEN & CO.**
*Audit and Assurance Manager*
*Real Estate and Financial Services Division*

Provided accounting, financial reporting, and audit services to clients in numerous industries, including insurance, banking, brokerage, mortgage banking, real estate, and not-for-profit organizations. Assisted clients in complying with generally accepted accounting principles, and the reporting requirements of the SEC and other regulatory agencies

**SELECTED CAREER ACCOMPLISHMENTS:**

- As Chairman of the Audit Committee of a publicly-held bank holding company, work with the internal and external auditors to ensure on-going compliance with the Sarbanes-Oxley Act.
- Successfully developed a finance department responsible for all accounting, budgeting, financial analysis, financial reporting, investments, cash management, credit underwriting, debt administration, third party contract administration, banking and external audit relationships, project administration and database maintenance.
- Researched and identified for a client company a list of "target" companies for acquisition or merger based on financial analyses.
- Assisted in the securitization of a $150 million portfolio of credit card receivables.
- Assisted a client in affecting a quasi-reorganization and conversion to corporate form, after operating as a "debtor-in-possession" under Chapter XI of the Federal Bankruptcy Laws.
- Served as the risk management consultant on a project team to establish a "Section 20" investment company to underwrite equities and corporate debt.

**OTHER PROFESSIONAL AFFILIATIONS**

**---Present---**
Citizens Bancshares Corporation, Director and Audit Committee Chairman
One Hundred Black Men of Atlanta, Inc., Member
University Community Development Corporation, Director and Treasurer
Leadership Atlanta Alumnus, Class of 1996
Morehouse College Business Department, Executive Mentor

**----Past----**
One Hundred Black Men of Atlanta, Inc., Treasurer and Vice President of Finance
Atlanta-Fulton County Zoo, Inc., Founding Board Member and Treasurer
American Diabetes Assoc., Georgia Affiliate, Board Member
National Assoc. for the Advancement of Colored People, Atlanta Chapter, Board Member

# Exhibit B

STATE OF ALABAMA REGISTERED VOTER TOTALS
reported as of 1/31/02

| COUNTY | WHITE | BLACK | OTHER | TOTAL ACTIVE | VOTING AGE POPULATION | TOTAL INACTIVES |
|---|---|---|---|---|---|---|
| Autauga | 18,813 | 4,128 | 254 | 23,195 | 31,177 | 3,057 |
| Barbour | 8,352 | 5,750 | 53 | 14,155 | 21,655 | 2,173 |
| Bullock | 1,702 | 3,890 | 9 | 5,601 | 8,656 | 1,741 |
| Butler | 7,133 | 4,271 | 40 | 11,444 | 15,645 | 2,326 |
| Chambers | 12,411 | 6,378 | 26 | 18,815 | 27,566 | 2,940 |
| Chilton | 18,539 | 2,346 | 41 | 20,926 | 29,428 | 1,964 |
| Coffee | 16,633 | 3,230 | 635 | 20,498 | 32,809 | 3,324 |
| Coosa | 4,266 | 2,082 | 24 | 6,372 | 9,311 | 853 |
| Covington | 15,974 | 1,841 | 93 | 17,908 | 28,771 | 3,577 |
| Crenshaw | 5,751 | 1,710 | 10 | 7,471 | 10,293 | 962 |
| Dale | 17,208 | 3,471 | 482 | 21,161 | 36,082 | 4,093 |
| Elmore | 24,185 | 4,491 | 262 | 28,938 | 48,950 | 4,036 |
| Geneva | 10,680 | 1,161 | 57 | 11,898 | 19,581 | 3,119 |
| Henry | 6,319 | 3,134 | 30 | 9,483 | 12,385 | 1,193 |
| Houston | 32,839 | 8,016 | 452 | 41,307 | 65,801 | 7,099 |
| Lee | 52,829 | 12,743 | 1,803 | 67,375 | 88,290 | 4,763 |
| Lowndes | 2,395 | 6,349 | 19 | 8,763 | 9,405 | 1,265 |
| Macon | 1,700 | 10,710 | 86 | 12,496 | 18,024 | 3,178 |
| Montgomery | 60,166 | 46,197 | 1,124 | 107,487 | 165,864 | 11,980 |
| Pike | 10,173 | 5,263 | 98 | 15,534 | 22,394 | 665 |
| Randolph | 9,581 | 2,179 | 79 | 11,839 | 16,760 | 2,195 |
| Russell | 12,957 | 8,853 | 861 | 22,671 | 36,562 | 4,021 |
| Tallapoosa | 17,730 | 5,395 | 124 | 23,249 | 31,438 | 3,569 |
| **Total** | **368,336** | **153,588** | **6,662** | **528,586** | **786,847** | **74,093** |

% of Blacks to total active & inactive     153588 / (528,586 + 74093) =          0.25484213

Exhibit C

Exhibit C

STATE OF ALABAMA REGISTERED VOTER TOTALS
reported as of    1-Feb-06

| COUNTY | WHITE | BLACK | OTHER | TOTAL ACTIVE | VOTING AGE POPULATION** | TOTAL INACTIVES | TOTAL VOTERS |
|--------|-------|-------|-------|--------------|-------------------------|-----------------|--------------|
| AUTAUGA | 20,708 | 4,428 | 409 | 25,545 | 34,944 | 3,718 | 29,263 |
| BARBOUR | 7,886 | 5,980 | 71 | 13,937 | 21,687 | 1,995 | 15,932 |
| BULLOCK | 1,781 | 4,205 | 16 | 6,002 | 8,530 | 1,193 | 7,195 |
| BUTLER | 6,902 | 4,029 | 52 | 10,983 | 15,684 | 2,222 | 13,205 |
| CHAMBERS | 11,164 | 6,135 | 52 | 17,351 | 27,125 | 4,138 | 21,489 |
| CHILTON | 19,348 | 2,288 | 97 | 21,733 | 31,359 | 2,027 | 23,760 |
| COFFEE | 17,719 | 3,352 | 847 | 21,918 | 34,471 | 2,444 | 24,362 |
| COOSA | 4,906 | 2,488 | 38 | 7,432 | 8,822 | 48 | 7,480 |
| COVINGTON | 16,326 | 1,854 | 100 | 18,280 | 28,641 | 1,299 | 19,579 |
| CRENSHAW | 5,839 | 1,768 | 24 | 7,631 | 10,428 | 591 | 8,222 |
| DALE | 16,951 | 3,597 | 614 | 21,162 | 36,149 | 5,110 | 26,272 |
| ELMORE | 28,831 | 5,100 | 417 | 34,348 | 54,454 | 2,510 | 36,858 |
| GENEVA | 11,363 | 1,084 | 104 | 12,551 | 19,870 | 1,611 | 14,162 |
| HENRY | 6,560 | 2,855 | 41 | 9,456 | 12,871 | 1,045 | 10,501 |
| HOUSTON | 34,770 | 9,267 | 596 | 44,633 | 69,912 | 6,929 | 51,562 |
| LEE | 51,447 | 14,970 | 3,087 | 69,504 | 94,403 | 181 | 69,685 |
| LOWNDES | 2,259 | 6,538 | 27 | 8,824 | 9,544 | 1,055 | 9,879 |
| MACON | 1,785 | 10,510 | 110 | 12,405 | 17,786 | 3,541 | 15,946 |
| MONTGOMERY | 62,078 | 58,244 | 1,883 | 122,205 | 165,693 | 3,932 | 126,137 |
| PIKE | 10,336 | 5,627 | 147 | 16,110 | 22,465 | 738 | 16,848 |
| RANDOLPH | 9,901 | 2,376 | 77 | 12,354 | 17,154 | 2,345 | 14,699 |
| RUSSELL | 13,242 | 9,493 | 830 | 23,565 | 36,690 | 3,904 | 27,469 |
| TALLAPOOSA | 17,313 | 5,280 | 137 | 22,730 | 31,477 | 2,954 | 25,684 |
| **TOTAL:** | **379,415** | **171,468** | **9,776** | **560,659** | **810,159** | **55,530** | **616,189** |

Total Active & Inactive:        616,189

% of Blacks to total active & inactive        171,468 / (560,659 + 55,530) =        0.278271764

Exhibit D

# IN THE UNITED STATES DISTRICT COURT FOR
# THE MIDDLE DISTRICT OF ALABAMA
# NORTHERN DIVISION

|                              |    |                    |
|------------------------------|----|--------------------|
| UNITED STATES OF AMERICA,    | )  |                    |
|                              | )  |                    |
| vs.                          | )  | CR. NO. 05-119-f   |
|                              | )  |                    |
| DON EUGENE SIEGELMAN,        | )  |                    |
| PAUL MICHAEL HAMRICK,        | )  |                    |
| GARY MACK ROBERTS, and       | )  |                    |
| RICHARD M. SCRUSHY           | )  |                    |

### AFFIDAVIT Of
### Stephen A. Elmore, Sr., CPA, CBA

**STATE OF ALABAMA**          )
                              )
**COUNTY OF MONTGOMERY**   )

Before me the undersigned notary public, on this day personally appeared Stephen A. Elmore, Sr. (Affiant), who being first duly sworn by me according to law, on his oath states and deposes as follows:

1. Affiant is a citizen of the United States, and a resident of the City of Fairburn, Georgia. Affiant is over the age of twenty-one years, is competent to make this affidavit, and has personal knowledge of the matters contained herein.

2. Affiant is a 1973 *cum laude* graduate of Morehouse College in Atlanta, Georgia, where he earned a Bachelor of Arts degree in Economics with a minor in Accounting.

3. Affiant is a Certified Public Accountant, having attained that professional licensure in Georgia in 1977. Affiant is also a Certified Bank Auditor, having attained that national licensure in 1985.

1

4.  Professionally, for the last 33 years, Affiant has performed the gamut of accounting, auditing and consulting services for companies in many different industries.  Affiant has extensive knowledge of and experience with statistical sampling techniques and evaluation of sampling results, generally accepted auditing standards, generally accepted accounting principles, and detailed financial analyses.  Affiant spent the first 7 years of his career with an international accounting firm providing auditing services to clients in the financial services industry.  When Affiant left the international accounting firm as an audit manager in 1980, he spent the next 22 years directing a corporate internal audit and consulting division of over 100 people for a Fortune 200 multi-national corporation.  He also spent 2 years as the Director of Finance for an agency of the State of Georgia that provided financing to cities and counties throughout the state for water, sewer, and energy projects.  In this position, Affiant managed a $1 Billion loan portfolio, the function that performed financial analyses of borrowers' financial statements, the function responsible for the Agency's debt administration, and the Agency's accounting, financial planning and budgeting functions. A curriculum vitae outlining Mr. Elmore's experience is attached as Exhibit A.

5.  Affiant has been retained to give expert opinions and testimony, if necessary, in the above-styled and numbered case with regard to certain matters previously designated and disclosed in pleadings filed with this Court.

6.  Specifically, Affiant was retained to analyze the composition of the 2001 Qualified Jury Wheel and the 2005 Qualified Jury Wheel to provide an independent opinion as to whether or not the two wheels represent a "fair cross section of the community" in the Middle District of Alabama, as required by the Jury Selection and Service Act of 1968, as amended ("JSSA" or "the Act"), and The United States District Court, Middle District of Alabama, Plan for the Random Selection of Grand and Petit Jurors.

7.  Affiant has read the following Court documents in this case:

    - The Defendants' Preliminary Motion to Dismiss and Challenge to the Composition of Petit Jury Pools in the Middle District of Alabama dated January 23, 2006.

2

- The United States' Response to The Defendants' Preliminary Motion to Dismiss and Challenge to the Composition of Petit Jury Pools in the Middle District of Alabama dated February 1, 2006.
- The transcript of the Scheduling Conference proceedings as heard before the Honorable Delores R. Boyd on August 11, 2005.
- The transcript of the Status Teleconference on the motions concerning the challenge to the jury composition as heard before the Honorable Charles S. Coody on February 23, 2006.

8. In order to provide expert opinions relative to the composition of the 2001 and 2005 Qualified Jury Wheels for the Middle District of Alabama, it was necessary for Affiant and his Staff, under his direct supervision and control, to review, examine and analyze the following additional documents:

- The JSSA;
- The United States District Court, Middle District of Alabama, Plan for the Random Selection of Grand and Petit Jurors;
- Relevant registered voter information from the Elections Division of the Alabama Office of the Secretary of State for the counties of the Middle District;
- Available Jury Wheel data for the 2001 and 2005 Master Jury Wheels and Qualified Jury Wheels from the Office of the Clerk of the Court;
- The following Precedent case law:
  - United States vs. Aguero, 248 F. Supp. 2d 1150
  - United States vs. Holstick, 875 F. Supp. 795
  - United States vs. Johnson, 790 F. Supp. 269
  - United States vs. Green, 742 F. 2d 609
  - Swain vs. State of Alabama, 380 U.S. 202

Thus, Affiant is familiar with the jury selection requirements, as well as the allegations and claims raised by the Defendants in the above styled and numbered case.

**THE ABSOLUTE DISPARITY THRESHOLD 10% TEST:**

1) Our Firm was asked to determine if the alleged disparity on its face exceeded the "absolute disparity threshold 10% Test" (hereinafter, the 10% Test).   We conducted extensive research to define the parameters needed to evaluate this seminal issue.   We derived the appropriate parameters to employ from our reference to relevant case law.

2) To apply the 10% Test, the relevant comparison is the difference between the percentage of the distinctive group among the population eligible for jury service and the percentage of the distinctive group on the qualified wheel.   U.S. v. Rodriguez, 776F2d 1509, 1511 (11th Circuit 1985) (citing U.S. v. Pepe 747F2d 632 649)

3) Having determined the parameters for the 10% Test, we undertook to perform the calculations necessary to measure the difference between the percentage of the distinctive group (African Americans) on the qualified wheel and the percentage of the group (African Americans) among the population eligible for jury service in the District.

**CALCULATION OF THE 10% TEST:**

4) The two standards of measurement that must be derived are the (a) percentage of the distinctive group found on the Qualified Jury Wheel; and, (b) the percentage of the distinctive group that are eligible for jury service.

5) The "distinctive group eligible for jury service" is best extracted from the voter registration lists of the counties that comprise the District.  See United States District Court, Middle District of AL: Plan for the Random Selection of Grand and Petit Jurors at Section 5; Section 9.

6) The legislative history of the JSSA explains the preference for the use of the Voter Registration lists as opposed to Census data.  House Report No. 90-1076 ("the Report") details the purpose and history of the Bill that ultimately became the Jury Selection and Service Act of 1968 (""JSSA" or "the Act").  The purpose of the Act is to provide for a selection process for Federal grand and petit juries without discrimination.  The House Report acknowledges voter

4

lists as an important element for the selection of potential jurors and also notes voter lists as a way to provide the best procedure for getting jury lists that represent a fair cross section of the community.  The JSSA clearly sets forth that voter lists are to be the basic source of juror names and that other sources may not be used in place of voter lists.  Following are several reasons cited in the Report for the preferred use of voter lists.[1]

- Voter lists easily provide a large number of potential juror names.
- Voter lists insure that potential juror names are selected regardless of race, wealth or other discriminating criteria that are unlawful.
- Voter lists provide the largest cross section of the community of any list available.
- Voter lists have built-in "screening" criteria that help eliminate people who are not qualified to vote, and therefore not qualified to serve on a jury.

7) The "distinctive group's representation on the wheel" is measured best by the Clerk of the Court who is responsible for the creation of the Master Jury Wheel (MJW) and the Qualified Jury Wheel (QJW).  The Clerk of the Court provided to Affiant a copy of a "JS-12 Report" for the 2001 Qualified Jury Wheel as of January 12, 2002.  This report shows the composition of the QJW, by race and sex, at the inception of the use of 2001 QJW.

For the 2005 QJW, the Clerk of the Court was only able to provide a "Qualified List" report as of February 23, 2006.  This report shows the composition of the QJW, by race and sex.  However, it differs from the JS-12 Report in that this report includes <u>ALL Qualified Jurors</u> added to the QJW over the life of the Wheel, whereas the JS-12 Report shows only the qualified jurors available for service at a point in time.  Therefore, Affiant determined the composition of the 2005 QJW, by race and sex, as of February 2006.  We did not have a JS-12 Report as of the inception of the 2005 QJW.  However, Affiant was able to review an "Entire Source List" report which represented the 2005 MJW composition, by race and sex, which we used to determine the reasonableness of the QJW composition percentages as of February 2006.

In accordance with the Jury Plan for the Middle District of Alabama, the Jury Selection and Service Act of 1968, various court precedents and Congressional intent, Affiant and his Staff,

---

[1] Along with the reasons given for the use of voter lists in the jury selection process, the House Report also states that census data is not appropriate as a source of potential jurors, citing one reason for this as the quick tendency for census data to become outdated.  Also noteworthy is the fact that census data does not have distinguishing criteria built in, as voter lists do, to "weed out" those persons unqualified to vote or serve on juries.

under his direct supervision and control, have used voter registration data to calculate the percentage of African Americans in the relevant eligible voter population for comparison with the percentage of African American representation on the 2001 and 2005 QJWs.

The voter registration lists used were made available through the Elections Division of the Alabama Office of the Secretary of State. The data is broken down by county and includes numbers for White, Black, Other, Total Active, Total Inactive and Voting Age Population. According to the Secretary of State's office, the Total Voting Population includes all persons of voting age (age 18) but has no other specifying criteria.[2] That makes the Total Voting Population akin to census data, which is not the correct basis for measurement. Total Active and Inactive includes those persons who are <u>eligible</u> to vote, which means they encompass certain criteria set out by statute as to their qualifications to vote. These criteria also enable those persons to be eligible to serve on juries. Those persons designated as Black are verified by the Secretary of State's Office to be Active voters.

Using the 23 counties specific to the Middle District of Alabama, Affiant and his Staff made calculations for the percentage of Active Black Voters to Total Active and Inactive Voters. The number of Active Black Voters was divided by the combined Total Active and Inactive Voters from the Voter Registration Reports as of the relevant time periods. (See Exhibits B and C). The resulting percentages were then compared with percentages provided by the Office of Clerk of the Court.

The Table below shows the percentages of African Americans, based on voter registration data, as calculated by the Affiant and his Staff compared with the percentages of African Americans provided by the Office of the Clerk for the 2001 and 2005 QJWs.

---

[2] In the "Recommendation of Magistrate Judge" for <u>United States  vs. Clay</u>, Judge Charles Coody lists qualifications for jury service, which are the same or similar to those used as qualifications for registration of voters:  (1) U.S. citizen age 18 or older who has resided for one year within judicial district; (2) able to read, write and understand English language satisfactorily; (3) able to speak English; (4) without physical or mental infirmity to satisfactorily be involved in jury service; and (5)no felony convictions.  See Recommendation at p. 4.

**2001 Wheel:**

At January 2002

Office of Clerk             20.74%
% using Voter Data          25.48%
 Difference            -4.74%

**2005 Wheel:**

At February 2006

Office of Clerk             21.18%
% using Voter Data          27.83%
 Difference            -6.65%


This table shows the percentage of African Americans on the 2001 QJW as 20.74% at January 12, 2002. The African American percentage on the 2005 QJW is 21.18% as of February 2006.

As is apparent from above, the differences between the percentages of African Americans on the Wheels at the relevant time periods and the percentages of _eligible_ (active and inactive voters combined) voters at the same time periods show absolute disparities of less than 10%. For the 2001 Wheel, the disparity at January 2002 is 4.74%. For the 2005 Wheel, the disparity is 6.65% at February 2006.

Clearly, the absolute disparities are in line with standards set by court precedents. There is no showing of any legal violation as to under-representation of African Americans in the jury selection process for the Middle District of Alabama for the 2001 or 2005 QJW.

Further the Affiant says not.

AFFIANT

STEPHEN A. ELMORE SR., CPA, CBA

Sworn to and subscribed before me this ___1st___ day of ___March___, 2006.

NOTARY PUBLIC

My Commission Expires:

_____

CALVIN C. PRYOR
Notary Public
State of Alabama at Large
My commission expires 10/30/2006