# washingtonpost.com

# The DeLay-Abramoff Money Trail

Nonprofit Group Linked to Lawmaker Was Funded Mostly by Clients of Lobbyist

By R. Jeffrey Smith
Washington Post Staff Writer
Saturday, December 31, 2005; A01

The U.S. Family Network, a public advocacy group that operated in the 1990s with close ties to Rep. Tom DeLay and claimed to be a nationwide grass-roots organization, was funded almost entirely by corporations linked to embattled lobbyist Jack Abramoff, according to tax records and former associates of the group.

During its five-year existence, the U.S. Family Network raised $2.5 million but kept its donor list secret. The list, obtained by The Washington Post, shows that $1 million of its revenue came in a single 1998 check from a now-defunct London law firm whose former partners would not identify the money's origins.

Two former associates of Edwin A. Buckham, the congressman's former chief of staff and the organizer of the U.S. Family Network, said Buckham told them the funds came from Russian oil and gas executives. Abramoff had been working closely with two such Russian energy executives on their Washington agenda, and the lobbyist and Buckham had helped organize a 1997 Moscow visit by DeLay (R-Tex.).

The former president of the U.S. Family Network said Buckham told him that Russians contributed $1 million to the group in 1998 specifically to influence DeLay's vote on legislation the International Monetary Fund needed to finance a bailout of the collapsing Russian economy.

A spokesman for DeLay, who is fighting in a Texas state court unrelated charges of illegal fundraising, denied that the contributions influenced the former House majority leader's political activities. The Russian energy executives who worked with Abramoff denied yesterday knowing anything about the million-dollar London transaction described in tax documents.

Whatever the real motive for the contribution of $1 million -- a sum not prohibited by law but extraordinary for a small, nonprofit group -- the steady stream of corporate payments detailed on the donor list makes it clear that Abramoff's long-standing alliance with DeLay was sealed by a much more extensive web of financial ties than previously known.

Records and interviews also illuminate the mixture of influence and illusion that surrounded the U.S. Family Network. Despite the group's avowed purpose, records show it did little to promote conservative ideas through grass-roots advocacy. The money it raised came from businesses with no demonstrated interest in the conservative "moral fitness" agenda that was the group's professed aim.

In addition to the million-dollar payment involving the London law firm, for example, half a million dollars was donated to the U.S. Family Network by the owners of textile companies in the Mariana Islands in the Pacific, according to the tax records. The textile owners -- with Abramoff's help -- solicited and received DeLay's public commitment to block legislation that would boost their labor costs, according to Abramoff associates, one of the owners and a DeLay speech in 1997.

A quarter of a million dollars was donated over two years by the Mississippi Band of Choctaw Indians, Abramoff's largest lobbying client, which counted DeLay as an ally in fighting legislation allowing the taxation of its gambling revenue.

The records, other documents and interviews call into question the very purpose of the U.S. Family Network, which functioned mostly by collecting funds from domestic and foreign businesses whose interests coincided with DeLay's activities while he was serving as House majority whip from 1995 to 2002, and as majority leader from 2002 until the end of September.

After the group was formed in 1996, its director told the Internal Revenue Service that its goal was to advocate policies favorable for "economic growth and prosperity, social improvement, moral fitness, and the general well-being of the United States." DeLay, in a 1999 fundraising letter, called the group "a powerful nationwide organization dedicated to restoring our government to citizen control" by

mobilizing grass-roots citizen support.

But the records show that the tiny U.S. Family Network, which never had more than one full-time staff member, spent comparatively little money on public advocacy or education projects. Although established as a nonprofit organization, it paid hundreds of thousands of dollars in fees to Buckham and his lobbying firm, Alexander Strategy Group.

There is no evidence DeLay received a direct financial benefit, but Buckham's firm employed DeLay's wife, Christine, and paid her a salary of at least $3,200 each month for three of the years the group existed. Richard Cullen, DeLay's attorney, has said that the pay was compensation for lists Christine DeLay supplied to Buckham of lawmakers' favorite charities, and that it was appropriate under House rules and election law.

Some of the U.S. Family Network's revenue was used to pay for radio ads attacking vulnerable Democratic lawmakers in 1999; other funds were used to finance the cash purchase of a townhouse three blocks from DeLay's congressional office. DeLay's associates at the time called it "the Safe House."

DeLay made his own fundraising telephone pitches from the townhouse's second-floor master suite every few weeks, according to two former associates. Other rooms in the townhouse were used by Alexander Strategy Group, Buckham's newly formed lobbying firm, and Americans for a Republican Majority (ARMPAC), DeLay's leadership committee.

They paid modest rent to the U.S. Family Network, which occupied a single small room in the back.

**'Red Flags' on Tax Returns**

Nine months before the June 25, 1998, payment of $1 million by the London law firm James & Sarch Co., as recorded in the tax forms, Buckham and DeLay were the dinner guests in Moscow of Marina Nevskaya and Alexander Koulakovsky of the oil firm Naftasib, which in promotional literature counted as its principal clients the Ministry of Defense and the Ministry of Interior.

Buckham, a graduate of the University of Tennessee, had worked for DeLay since 1995, after serving in other congressional offices and then as executive director of the Republican Study Committee, a group of fiscally conservative House members.

Their other dining companions were Abramoff and Washington lawyer Julius "Jay" Kaplan, whose lobbying firms collected $440,000 in 1997 and 1998 from an obscure Bahamian firm that helped organize and indirectly pay for the DeLay trip, in conjunction with the Russians. In disclosure forms, the stated purpose of the lobbying was to promote the policies of the Russian government.

Kaplan and British lawyer David Sarch had worked together previously. (Sarch died a month before the $1 million was paid.) Buckham's trip with DeLay was his second to Moscow that year for meetings with Nevskaya and Koulakovsky; on the earlier one, the DeLay aide attracted media attention by returning through Paris aboard the Concorde, a $5,500 flight.

Former Abramoff associates and documents in the hands of federal prosecutors state that Nevskaya and Koulakovsky sought Abramoff's help at the time in securing various favors from the U.S. government, including congressional earmarks or federal grants for their modular-home construction firm near Moscow and the construction of a fossil-fuel plant in Israel. None appears to have been obtained by their firm.

Former DeLay employees say Koulakovsky and Nevskaya met with him on multiple occasions. The Russians also frequently used Abramoff's skyboxes at local sports stadiums -- as did Kaplan, according to sources and a 2001 e-mail Abramoff wrote to another client.

Three sources familiar with Abramoff's activities on their behalf say that the two Russians -- who knew the head of the Russian energy giant Gazprom and had invested heavily in that firm -- partly wanted just to be seen with a prominent American politician as a way of bolstering their credibility with the Russian government and their safety on Moscow's streets. The Russian oil and gas business at the time had a Wild West character, and its executives worried about extortion and kidnapping threats. The anxieties of Nevskaya and Koulakovsky were not hidden; like many other business people, they traveled in Moscow with guards armed with machine guns.

During the DeLays' visit on Aug. 5 to 11, 1997, the congressman met with Nevskaya and was escorted around Moscow by Koulakovsky, Naftasib's general manager. DeLay told the House clerk that the trip's sponsor was the National Center for Public Policy Research, but multiple sources told The Post that his expenses were indirectly reimbursed by the Russian-connected Bahamian company.

DeLay spokesman Kevin Madden said the principal reason for his Moscow trip was "to meet with religious leaders there." Nevskaya, in a letter this spring, said Naftasib's involvement in such trips was meant "to foster better understanding between our country and the United States" and denied that the firm was seeking protection through its U.S. contacts.

Nevskaya added in an e-mail yesterday that Naftasib and its officials were not representing the ministries of defense and interior or any other government agencies "in connection with meetings or other lobbying activities in Washington D.C. or Moscow."

A former Abramoff associate said the two executives "wanted to contribute to DeLay" and clearly had the resources to do it. At one point, Koulakovsky asked during a dinner in Moscow "what would happen if the DeLays woke up one morning" and found a luxury car in their front driveway, the former associate said. They were told the DeLays "would go to jail and you would go to jail."

The tax form states that the $1 million came by check on June 25, 1998, from "Nations Corp, James & Sarch co." The Washington Post checked with the listed executives of Texas and Florida firms that have names similar to Nations Corp, and they said they had no connection to any such payment.

James & Sarch Co. was dissolved in May 2000, but two former partners said they recalled hearing the names of the Russians at their office. Asked if the firm represented them, former partner Philip McGuirk at first said "it may ring a bell," but later he faxed a statement that he could say no more because confidentiality practices prevent him "from disclosing any information regarding the affairs of a client (or former client)."

Nevskaya said in the e-mail yesterday, however, that "neither Naftasib nor the principals you mentioned have ever been represented by a London law firm that you name as James & Sarch Co." She also said that Naftasib and its principals did not pay $1 million to the firm, and denied knowing about the transaction.

Two former Buckham associates said that he told them years ago not only that the $1 million donation was solicited from Russian oil and gas executives, but also that the initial plan was for the donation to be made via a delivery of cash to be picked up at a Washington area airport.

One of the former associates, a Frederick, Md., pastor named Christopher Geeslin who served as the U.S. Family Network's director or president from 1998 to 2001, said Buckham further told him in 1999 that the payment was meant to influence DeLay's vote in 1998 on legislation that helped make it possible for the IMF to bail out the faltering Russian economy and the wealthy investors there.

"Ed told me, 'This is the way things work in Washington,' " Geeslin said. "He said the Russians wanted to give the money first in cash." Buckham, he said, orchestrated all the group's fundraising and spending and rarely informed the board about the details. Buckham and his attorney, Laura Miller, did not reply to repeated requests for comment on this article.

The IMF funding legislation was a contentious issue in 1998. The Russian stock market fell steeply in April and May, and the government in Moscow announced on June 18 -- just a week before the $1 million check was sent by the London law firm -- that it needed $10 billion to $15 billion in new international loans.

House Republican leaders had expressed opposition through that spring to giving the IMF the money it could use for new bailouts, decrying what they described as previous destabilizing loans to other countries. The IMF and its Western funders, meanwhile, were pressing Moscow, as a condition of any loan, to increase taxes on major domestic oil companies such as Gazprom, which had earlier defaulted on billions of dollars in tax payments.

On Aug. 18, 1998, the Russian government devalued the ruble and defaulted on its treasury bills. But DeLay, appearing on "Fox News Sunday" on Aug. 30 of that year, criticized the IMF financing bill, calling the replenishment of its funds "unfortunate" because the IMF was wrongly insisting on a Russian tax increase. "They are trying to force Russia to raise taxes at a time when they ought to be cutting taxes in order to get a loan from the IMF. That's just outrageous," DeLay said.

In the end, the Russian legislature refused to raise taxes, the IMF agreed to lend the money anyway, and DeLay voted on Sept. 17, 1998, for a foreign aid bill containing new funds to replenish the IMF account. DeLay's spokesman said the lawmaker "makes decisions and sets legislative priorities based on good policy and what is best for his constituents and the country." He added: "Mr. DeLay has very firm beliefs, and he fights very hard for them."

Kaplan did not respond to repeated messages, and through a spokesman for lawyer Abbe Lowell, Abramoff declined to comment.

No legal bar exists to a $1 million donation by a foreign entity to a group such as the U.S. Family Network, according to Marcus Owens, a Washington lawyer who directed the IRS's office of tax-exempt organizations from 1990 to 2000 and who reviewed, at The Post's request, the tax returns filed by the U.S. Family Network.

But "a million dollars is a staggering amount of money to come from a foreign source" because such a donor would not be entitled to claim the tax deduction allowed for U.S. citizens, Owens said. "Giving large donations to an organization whose purposes are as ambiguous as these . . . is extraordinary. I haven't seen that before. It suggests something else is going on.

"There are any number of red flags on these returns."

**Hailing Indian Tribe's Hiring of Lobbyists**

Buckham and Tony Rudy were the first DeLay staff members to visit the Choctaw Reservation near Meridian, Miss., where the tribe built a 500-room hotel and a 90,000-square-foot gambling casino. Their trip from March 25 to 27, 1997, cost the Choctaws $3,000, according to statements filed with the House clerk.

DeLay, his wife and Susan Hirschman -- Buckham's successor in 1998 as chief of staff -- were the next to go. Their trip from July 31 to Aug. 2, 1998, was described on House disclosure forms as a "site review and reservation tour for charitable event," and the forms said it cost the Choctaws $6,935.

Buckham, who was then a lobbyist, arranged DeLay's trip, which included a visit to the tribe's golf course to assess it as a possible location for the lawmaker's annual charity tournament, according to a tribal source. Abramoff told the tribe he could not accompany DeLay because of a prior commitment, the source said.

One day after the DeLays departed for Washington, the U.S. Family Network registered an initial $150,000 payment made by the Choctaws, according to its tax return. The tribe made additional payments to the group totaling $100,000 on "various" dates the following year, the returns state. The Choctaws separately paid Abramoff $4.5 million for his lobbying work on their behalf in 1998 and 1999. Abramoff and his wife contributed $22,000 to DeLay's political campaigns from 1997 to 2000, according to public records.

A former Abramoff associate who is aware of the payments, and who spoke on the condition of anonymity to protect his clients, said the tribe made contributions to entities associated with DeLay because DeLay was crucial to the tribe's continuing fight against legislation to allow the taxation of Indians' gambling revenue.

An attorney for the tribe, Bryant Rogers, said the funds were meant not only to "get the message out" about the adverse tax law proposals but also to finance a campaign by Buckham's group within "the conservative base" against legislation to strip tribes of their control over Indian adoptions. "This was a group connected to the right-wing Christian movement," Rogers said. "This is Ed Buckham's connection."

In March 1999, after the tribe had paid a substantial sum directly to the U.S. Family Network, Buckham expressed his general gratitude to Abramoff in an e-mail. "I really appreciate you going to bat for us. Remember it is the first bit of money that is always the hardest, but means the most," Buckham said, according to a copy. He added: "Pray for God's wisdom. I really believe this is supposed to be what we are doing to save our team."

During this period, a fundraising letter on the U.S. Family Network stationery was sent to residents of Alabama, announcing a petition drive to promote a cause of interest to Abramoff's Indian gambling clients in Mississippi and Louisiana, including the Choctaw casino that drew many customers from Alabama: the blocking of a rival casino proposed by the Poarch Creek Indians on their land in Alabama.

"The American family is under attack from all sides: crime, drugs, pornography, and one of the least talked about but equally as destructive -- gambling," said the group's letter, which was signed by then-Rep. Bob Riley (R), now the Alabama governor. "We need your help today . . . to prevent the Poarch Creek Indians from building casinos in Alabama."

Asked about the letter, Rogers said "none of us have seen" it and "the tribe's contributions have nothing to do with it." A spokesman for Riley said that he could not recall the circumstances behind the letter, but that he has long opposed any expansion of gambling in Alabama.

DeLay, meanwhile, saluted Choctaw chief Philip Martin in the Congressional Record on Jan. 3, 2001, citing "all he has done to further the cause of freedom." DeLay also attached to his remarks an editorial that hailed the tribe's gambling income and its "hiring [of] quality

lobbyists."

Throughout this period, the U.S. Family Network was paying a monthly fee of at least $10,000 to Buckham and Alexander Strategy Group for general "consulting," according to a former Buckham associate and a copy of the contract. While DeLay's wife drew a monthly salary from the lobbying firm, she did not work at its offices in the townhouse on Capitol Hill, according to former Buckham associates.

Neither the House nor the Federal Election Commission bars the payment of corporate funds to spouses through consulting firms or political action committees, but the spouses must perform real work for reasonable wages.

"Anytime you [as a congressman] hire your child or spouse, it raises questions as to whether this is a throwback to the time when people used campaigns and government jobs to enrich their families," said Larry Noble, executive director of the Center for Responsive Politics, a nonpartisan watchdog group, and a former general counsel of the FEC.

*Research editor Lucy Shackelford; researchers Alice Crites, Madonna Lebling, Karl Evanzz and Meg Smith; and research database editor Derek Willis contributed to this report.*

© 2006 The Washington Post Company

**Ads by Google**

**Accept Secure Donations**
Free setup, no monthly fees No contracts, be up in 5 minutes
www.ClickandPledge.com

**Fundraising Software**
Fundraising Software for Nonprofits Easy to review, learn, and use!
www.MissionResearch.com/GiftWorks

**Free Grant Search**
Instantly qualify for up to $3100! Grants never have to be paid back.
www.FreeGrantSearch.com