# Attachment A

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>    Plaintiff | )<br>)<br>) |
| vs. | )    Case No. 2:05-cr-119-MEF<br>) |
| DON EUGENE SIEGELMAN,<br>RICHARD M. SCRUSHY, and<br>PAUL MICHAEL HAMRICK<br>    Defendants | )<br>)<br>)<br>) |

**AFFIDAVIT Of**
**Stephen A. Elmore, Sr., CPA, CBA**

**STATE OF ALABAMA**        )
                            )
**COUNTY OF MONTGOMERY**    )


Stephen A. Elmore, Sr., under penalty of perjury, states the following:

1. Affiant is a citizen of the United States, and a resident of the City of Fairburn, Georgia. Affiant is over the age of twenty-one years, is competent to make this affidavit, and has personal knowledge of the matters contained herein.

2. Affiant is a 1973 *cum laude* graduate of Morehouse College in Atlanta, Georgia, where he earned a Bachelor of Arts degree in Economics with a minor in Accounting.

3. Affiant is a Certified Public Accountant, having attained that professional licensure in Georgia in 1977. Affiant is also a Certified Bank Auditor, having attained that national licensure in 1985.

4. Professionally, for the last 33 years, Affiant has performed the gamut of accounting, auditing and consulting services for companies in many different industries. Affiant has extensive knowledge of and experience with statistical sampling techniques and evaluation of sampling results, generally accepted auditing standards, generally accepted accounting principles, detailed financial analyses, and forensic accounting practices.

1

5. Since the conclusion of the Hearing in the aforementioned case, the Defendants have filed three motions:
   - Defendant Richard M. Scrushy's Motion to Supplement Record in Jury Challenge Hearing, which was filed on April 16, 2006 (Doc. 349);
   - Defendant Richard M. Scrushy's Second Motion to Supplement Record in Jury Challenge and Motion for Extension of Time, which was filed on April 20, 2006 (Doc 373); and,
   - Defendant Richard M. Scrushy's Amended Second Motion to Supplement Record in Jury Challenge and Request for Additional Data, which was filed on May 8, 2006 (Doc 392). (Hereinafter, collectively and separately, referred to as "the Motion(s)").

6. Chief United States Magistrate Judge Charles S. Coody has issued two Orders in response to the Motions. The first Order, issued on May 3, 2006 (Doc. 390), was in response to the Motions to Supplement filed on April 16, 2006, and April 20, 2006. This Order granted the request made in the Motion of April 20, 2006, for an extension of time to supplement the record until May 10, 2006. With respect to the Motion filed on April 16, 2006, the Order deferred a decision until the time a recommendation on the challenge is issued. The second Order, issued on May 15, 2006 (Doc. 394), ordered the United States to show cause in writing why the Amended Second Motion, filed on May 8, 2006 should not be granted.

7. Specifically, Affiant was asked to:
   - Opine on the Sworn Statement of Defendant Scrushy's Expert (Dr. James A. Gundlach, Ph.D.) included as Exhibit A to the April 16, 2006 and the May 8, 2006 Motions. His conclusion therein relates to the relevance of the percentage of African-Americans in the District-wide pools selected from the 2001 Qualified Jury Wheel ("QJW") to the percentage of African-Americans included in the 2001 QJW.
   - Opine on the Sworn Statement of Defendant Scrushy's Expert (Dr. James A. Gundlach, Ph.D.) included as Exhibit B to the May 8, 2006 Motion. His conclusions therein relate to the percentage of African-Americans included in the 2005 QJW pools, the percentage of previously deferred jurors in the 2005 QJW pools, and the relevant impact of the 2001 QJW members included in 2005 QJW pools.

2

- Perform necessary research on allegations in Defendants' May 8, 2006 Motion to facilitate a recommendation by the United States in response to the Order issued on May 15, 2006.

8. Affiant was previously retained, and has provided expert opinions and testimony, in the above-styled and numbered case with regard to certain matters previously designated and disclosed in pleadings filed with this Court.

Thus, Affiant is familiar with the jury selection requirements of the Middle District of Alabama, as well as the allegations and challenges raised by the Defendants in the above-styled and numbered case.

# RESPONSE TO AMENDED SECOND MOTION TO SUPPLEMENT FILED ON MAY 8, 2006

## I. DEFENDANTS' ALLEGATIONS

1. The Defendants allege that the 2001 QJW was not emptied prior to the creation and use of the 2005 QJW. Therefore, the Jury Selection and Service Act ("JSSA") and the Middle District of Alabama Jury Plan ("The Plan") have been substantially violated because both require that the Qualified Jury Wheel be emptied and refilled at least every four (4) years.

2. The Defendants allege that at least ten (10) members of the 2001 QJW were selected from the 2005 Deferred Maintenance Pool ("DMP") and placed on seven (7) different jury pools drawn from the 2005 QJW. One of these jurors was selected for the Siegelman/Scrushy pool. Since the 10 jurors in question came from the 2005 DMP, they are overwhelmingly white in proportion to the racial composition of the 2005 QJW (only one of the 10 jurors is African-American). Consequently, these jurors decreased the representation of African-Americans on these jury pools. Moreover, the inclusion of these jurors compromised the random selection of every pool in which they were selected.

3

3. The Defendants allege that there may be additional 2001 QJW members who are currently still in the DMP of the 2005 QJW.

4. The Defendants allege that there is under-representation of African-Americans on the two (2) most recent pools: Pool #201060403 is 19.00% African-American, and Pool #201060405 is 19.5% African-American. In addition, there is an absolute disparity in excess of 10% in six (6) of thirteen (13) District-wide pools selected from the 2005 QJW as to under-representation of African-Americans, based on the 2000 Census data of 30.466% African-American.

5. The Defendants allege that since the Siegelman/Scrushy pool (#201060403) had 29 previously deferred jurors (9.667%) and pool #201060405 had only 4 previously deferred jurors (2.00%), the Jury Administrator made a discretionary decision to add more previously deferred jurors to the Siegelman /Scrushy pool. Moreover, this disparity impeaches the Jury Administrator's testimony that she is using a setting of 10% for the percentage of previously deferred jurors selected from the DMP for all pools.

6. The Defendants allege that the root causes of the problems found in the 2001 QJW continue to affect the 2005 QJW, including:
   - Substantial flaws in the JMS computer software designed by ACS, especially as it interfaces with The Plan's provisions relative to previously deferred jurors;
   - Deficiencies in the training of the Jury Administrator;
   - Complete absence of quality controls or verification procedures to confirm that the jury pools selected by the JMS are in compliance with The Plan; and,
   - A continued pattern of systematic over-inclusion of previously deferred jurors which has the effect of reducing the number of African-Americans that are chosen to serve on District-wide jury pools.

## II. AFFIANT'S OPINIONS

1. **The 2001 QJW was emptied prior to the creation and use of the 2005 QJW. The 2005 QJW was created from completed questionnaires returned by members randomly selected from the 2005 Master Jury Wheel ("MJW").**

4

The Defendants are correct in stating that there were ten (10) members of the 2001 QJW that were selected from the 2005 DMP and placed on seven (7) different jury pools drawn from the 2005 QJW. However, based on our research and analysis, there is an explanation for this mistake other than the erroneous conclusion that the 2001 QJW was not emptied prior to the creation of the 2005 QJW.

The Clerk's Office has researched the error involving the inclusion of 2001 QJW members in jury pools selected from the 2005 QJW. In addition, we have analyzed and verified the results of that research. The inclusion of 2001 QJW members in jury pools selected from the 2005 QJW was limited to ten (10) jurors. All ten of these jurors were added to the 2005 DMP as a result of having been selected to serve on a 2001 jury pool and granted a deferral after the 2001 DMP had been emptied on August 25, 2005.

When granted these deferrals and designated as "deferred" in the JMS system, these jurors were included in the DMP in existence at that time, i.e., the 2005 DMP. Dr. Gundlach acknowledges that participant # 100084263 included in the Siegelman/Scrushy jury pool was initially summonsed to 2001 QJW pool # 101050901 on August 15, 2005, to appear for service on September 7, 2005. On August 26, 2005, this participant was granted a deferral, and placed in the 2005 DMP. (Defendant's Amended Second Motion, Exhibit B, pages 2 and 3).

Since the 2001 QJW participant was being excused from service on a 2001 jury pool after the 2001 QJW had been retired, the Jury Administrator should have simply returned the juror to the 2001 QJW rather than coding the juror as "deferred". Coding the juror as "deferred" caused the 2001 juror to be placed in the 2005 DMP in error. This should not have occurred, but it certainly does not support the conclusion that the 2001 QJW was not emptied prior to the creation of the 2005 QJW or that the Jury Administrator manipulated the jury selection process.

2. **Although the ten 2001 QJW participants who were erroneously placed in the 2005 DMP were previously deferred jurors and only one of the ten was African-American, there was no significant impact on the racial composition of the seven 2005 jury pools in which they were included.**

5

The seven pools containing the ten 2001 QJW participants had an average of 19.61% African-Americans. If those ten 2001 QJW participants had not been included in these seven 2005 jury pools, the average African-American percentage would have been 19.71%. Therefore, inclusion of these ten 2001 QJW participants in the seven 2005 jury pools affected the average percentage of African-Americans by only 0.10%. Clearly, 0.10% does not represent a significant impact on the racial composition of these 2005 jury pools. (See Exhibit A of this affidavit for an analysis of the impact on the racial composition of the seven 2005 pools that contained the ten 2001 QJW participants).

3. **Based on our research and analysis, there are no additional 2001 QJW participants left in the 2005 DMP as of May 10, 2006. There were only four (4) 2001 QJW participants remaining in the 2005 DMP as of May 8, 2006, and they were four of the ten (10) 2001 QJW participants originally identified by Dr. Gundlach. The Jury Administrator removed these four 2001 QJW participants from the 2005 DMP and returned them to the 2001 QJW on May 10, 2006.**

Since the non-deferred participants selected for each of the 2005 jury pools are drawn from the range of participant numbers that comprise the 2005 MJW, no 2001 QJW participants will be selected as part of the non-deferred portion of a 2005 jury pool. The only way a 2001 QJW participant could have been selected for a 2005 jury pool was through the DMP. As indicated above, the four 2001 QJW participants remaining in the 2005 DMP as of May 8, 2006, have been removed from the DMP and returned to the 2001 QJW. Therefore, placement of a 2001 QJW participant on a 2005 jury pool will not reoccur.

4. **The Jury Selection and Service Act ("JSSA") and the Middle District of Alabama Jury Plan ("The Plan") have not been substantially violated.**

As explained in Opinion #1 above, the 2001 QJW was, in fact, emptied prior to the creation and use of the 2005 QJW. In addition, as explained in Opinion #2 above, there was no significant impact on the racial composition of the affected 2005 jury pools as a result of the inclusion of ten previously deferred 2001 QJW participants. The inclusion of ten 2001 QJW participants in seven 2005 jury pools does not represent a "systematic" over-inclusion of previously deferred jurors. In addition, neither the nature nor the impact of this error compromises the randomness

6

of the jury selection process and, therefore, does not represent a substantial violation of the JSSA or The Plan.

5. **It is not appropriate to measure absolute disparity based on the racial composition of an individual pool. In addition, it is not appropriate to use the racial composition of the 2005 District-wide pools as the measure of the racial composition of the 2005 QJW.**

As of the date of this affidavit, there have been 17 District-wide pools and 28 civil pools drawn from the 2005 QJW. Therefore, to measure absolute disparity based on the African-American percentage representation on an individual pool, or on half of the District-wide pools (as Dr. Gundlach has done), is totally inappropriate. Dr. Gundlach indicates that there is an absolute disparity in six (6) of the thirteen (13) district-wide pools as of the time of his report. Absolute disparity should be based on the percentage representation of a distinctive group <u>on the QJW</u>. The racial composition of an individual jury pool is not representative of the racial composition of the entire 2005 QJW.

We analyzed the racial composition of all 17 District-wide pools drawn from the 2005 QJW as of the date of this affidavit. See Exhibit B of this affidavit where the average representation for African-Americans on all 17 District-wide pools was 20.36%. We also analyzed the racial composition of all 28 civil pools drawn from the 2005 QJW as of the date of this affidavit. See Exhibit C of this affidavit where the average representation for African-Americans on all 28 civil pools was 21.04%. As a result, the average representation for African-Americans on all 45 jury pools drawn from the 2005 QJW was 20.67%. The race/gender report as of February 2006, which shows 100% of the members of the 2005 QJW at that time, indicates that the percentage of African-Americans on the 2005 QJW was 21.18%. Therefore, the absolute disparity with respect to the 2005 QJW is less than 10%.[1]

---

[1] When one compares the percentage of African-Americans on the voter registration list as of February 2006 (30.58%) to the percentage of African-Americans on the race/gender report as of February 2006 (21.18%), the result is an absolute disparity of 9.40% which is less than 10%.

7

6. **Based on our research and analysis, the Jury Administrator is not making discretionary decisions about the percentage of previously deferred jurors to include on jury pools.**

Dr. Gundlach alleges that the disparity in the previously deferred jurors included in pool #201060405 (2.00%) and pool #201060403 (9.667%) supports his conclusion of non-random and preferential treatment of previously deferred jurors by the Jury Administrator.

The reason there was only 2% previously deferred jurors pulled from the DMP for pool #201060405 is because the number of previously deferred jurors available at the time was limited. Pool #201060404 (the next pool drawn after the Siegelman/Scrushy pool) was a civil pool for the Northern Division. There were eleven (11) available previously deferred jurors in the DMP at that time, and all 11 were pulled for pool #201060404.

At the time pool #201060405 (the next District-wide pool after the Siegelman/Scrushy pool) was drawn, two (2) previously deferred jurors were pulled from the DMP for the Southern Division and two (2) were pulled from the DMP for the Eastern Division. There were no previously deferred jurors in the DMP for the Northern Division at the time. The effect of this handling was to mitigate against distorting the Division mix required for District-wide pools in the Middle District of Alabama.

In any event, the point is that the Jury Administrator is not selecting the previously deferred jurors from the DMP on a discretionary basis to manipulate the pools, and she has not impeached her testimony before the Court on April 11, 2006, that the percentage of previously deferred jurors has been set at 10% in the JMS system. Since the 2005 QJW has not been in existence very long (only eight (8) months as of April 2006), there are times when the DMP will not contain enough previously deferred jurors to allow for 10% of the total requested summons to be pulled from the DMP for an individual jury pool. In addition, the Division mix of the previously deferred jurors in the DMP may not allow for 10% of the total requested summons to be pulled from the DMP when creating District-wide pools.

# RESPONSE TO MOTION TO SUPPLEMENT FILED ON APRIL 16, 2006

## I. AFFIANT'S OPINIONS

1. **Affiant did include a schedule in his <u>Report of Expert Witness</u> (Hearing, Government Exhibit A) that calculates the percentage of African-Americans in the 92 District-wide pools selected from the 2001 QJW. However, this schedule was prepared and presented to show the minimal racial impact resulting from the use of deferred jurors in violation of the <u>Plan of the United States District Court, Middle District of Alabama, for the Random Selection of Grand and Petit Jurors,</u> dated November 1, 2001 ("The Jury Plan").** It was not presented, nor was it intended to be used, as a representative sample of the racial composition of the 2001 QJW as the Defendants' Motion suggests.

2. **Affiant testified that the 20.74%, included on the JS-12 report prepared by the Clerk of the Court as of January 2002 (Hearing, Defendants' Exhibit 122), was a better measure of the percentage of African-Americans included on the 2001 QJW for the following reasons:**

    - The 20.74% for African-Americans included in the JS-12 report was based on an actual count of the racial composition of those placed on the 2001 QJW for **100%** of its members. This is obviously preferable to using a sample with a margin of error. Affiant is 100% confident that the 2001 QJW included 20.74% African-Americans as of January 2002 because this percentage includes <u>**ALL**</u> members of the QJW.

    - Dr. Gundlach's opinion that the percentage of African-Americans in the 2001 QJW should be based on an average of the actual percentages of the 92 District-wide pools implies that sample results are a better measure than calculations based on 100% of the population. In addition, this assumes that the 92 District-wide pools are representative of the entire population of the 2001 QJW, including civil pools. In my opinion, they are not representative of the entire 2001 QJW.

9

- In my opinion, and as suggested in the instructions for completion of the JS-12 form, the absolute disparity calculation should be made very early in the life of a QJW.[2] Thereafter, as long as randomness is maintained in the selection process, it is not necessary, nor is it required, to make this calculation at different points in time during the life of the QJW. The racial composition of individual jury pools will vary during the life of the QJW because of pool size, eligible population, and the random selection process.

- The legal requirement for randomness throughout the jury selection process is intended to ensure <u>a consistent and systematic fair cross-section of the community over time</u>. In addition, determining the absolute disparity percentage early in the life of the QJW, and maintaining randomness throughout the jury selection process, minimizes the administrative burden on the Clerk's Office associated with continuous calculations of the absolute disparity percentage.

- The percentage of African-Americans on the 2001 QJW early in its life was 20.74% as reported on the JS-12 prepared as of January 2002. (See <u>Report of Expert Witness</u>, Hearing, Government Exhibit A, page 20). The percentage of African-Americans on the 2001 QJW at the end of its life was 20.66%, as reported on a Race/Gender Report as of August 2005 (See <u>Report of Expert Witness</u>, Hearing, Government Exhibit A, page 20). Again, these percentages are based on an actual count of the racial composition of those placed on the 2001 QJW for **100%** of its members. This is not a sample, but reflects the entire population. Affiant is 100% confident that the QJW included 20.74% African-Americans as of January 2002 and 20.66% African-Americans as of August 2005 because these percentages include **ALL** members of the QJW.

---

[2] The instructions for completion of the JS-12 state that "…The JS-12 form is required to be completed upon the occurrence of either of the following two events: (1) the periodic refilling of the master jury wheel(s), which is required by 28 U.S.C. § 1863(b)(4) to be done at least once every four years; or (2) An amendment of the rules contained in the court's jury selection plan for the selection, qualification, excuse, or exemptions of jurors, such as to affect the qualified jury wheel…"

## II. <u>CRITIQUE OF DR. GUNDLACH'S SWORN STATEMENT</u>

There are several flaws in Dr. Gundlach's approach and conclusion in his sworn statement attached as Exhibit A to the Motions.

1. As stated above, the JS-12 Report and the Race/Gender Report state the <u>actual</u> composition of the entire 2001 QJW at two particular points in time (early in its life and at the end of its life), as opposed to Dr. Gundlach's estimation, based on 92 variant samples from a fluctuating population.

2. As Dr. Gundlach stated in his Expert Report (Hearing, Defendants' Exhibit 1, page 6), the size of the population from which the 92 jury pools were drawn at 92 distinct points in time cannot be determined at any one of those points. That is, the 2001 QJW grew from 9,860 in January 2002 to 17,228 in August 2005.

3. Each of Dr. Gundlach's samples is not a representative sample from the entire QJW. In other words, none of them is drawn from an all-inclusive QJW population.

Dr. Gundlach's conclusion that the percentage of African-Americans on the 2001 QJW should be based on potential jurors summonsed for the 92 District-wide pools fails to consider the differing characteristics of the civil jury pools. The District-wide pools include members of the QJW from all three Divisions of the Middle District of Alabama, but the jury pools for civil cases could differ in that each is drawn from its respective Division of the District. <u>It is not appropriate to estimate the racial composition of the entire 2001 QJW using samples that are not drawn from the entire population.</u>

In addition, the population of jurors summonsed for the 92 District-wide pools includes jurors who were summonsed more than once. Therefore, the samples used by Dr. Gundlach include duplications of the same juror in multiple jury pools, whereas the JS-12 report as of January 2002 and the Race/Gender Report as of August 2005 count each individual only once in calculating the racial composition of the 2001 QJW.

11

4. The use of the "finite population adjustment," one of three factors recognized by Dr. Gundlach as impacting the size of a 95% confidence level drawn around a percentage that measures a characteristic of a population (also referred to as the "finite population correction factor"), is not appropriate in the case of the 2001 QJW. This is because the "finite population adjustment" is appropriately used when multiple samples are drawn from a population <u>without replacement</u> of the items previously selected. If drawings are done <u>without replacement</u>, the probability of choosing a given element of the population on subsequent draws depends on previous selections. In order to adjust for this modification in probabilities, the "finite population correction factor" is used to adjust the standard error. In other words, if samples are drawn from a finite population <u>without replacement</u>, the variance (margin of error) is calculated by adding the "finite population adjustment" to the standard error rate.

Based on the small adjustment factors used by Dr. Gundlach in column three of his table on page 2, Exhibit A of the Motion, it appears that he has only used the adjustment factor and has assumed a zero ("0") standard error rate for this sample. That assumption is highly improbable for this method of sampling the QJW population over a four-year period of time.

However, in the case of the jury pool selection process, the jury pools are not drawn from the QJW <u>without replacement</u>. Jurors previously summonsed are "replaced" because they are returned back to the population from which subsequent pools are selected. In addition, the subsequent mailings of qualification questionnaires by the Clerk's Office serve to replace those jurors in the population who may be ineligible for selection for an extended period of time because of previous jury service, excuses granted by the Court to unneeded jurors, or granted deferrals. Therefore, the jury pools are selected <u>with replacement</u>.

5. The margin of error is intended to adjust for possible variances in the composition of the sample results when compared to the actual population. Dr. Gundlach's use of the average of 92 samples drawn from a population in constant change at 92 different points in time cannot be assigned a single margin of error. With such variables throughout the analysis, the margin of error is not consistent for each sample.

The actual racial composition of the 2001 QJW was 20.66% African-American at the end of its life. Dr. Gundlach has calculated an "upper limit margin of error" which, when added to the actual sample results, only reaches a maximum of 20.072% African-Americans on the 2001 QJW. This difference in percentages raises significant doubt about the reliability of the adjustment factors he is using because we have the benefit of hindsight to know that the percentage of African-Americans on the entire 2001 QJW was 20.66%.

6. Finally, we have no supporting data as to how Dr. Gundlach arrived at his confidence level adjustment factors. However, given that the QJW grew from 9,860 in January 2002 to 17,230 in August 2005, it is difficult to understand how he could calculate one "finite population adjustment" and apply it to an average of all of the 92 District-wide jury pools which were drawn from different populations over a four-year period.

In conclusion, Dr. Gundlach's averaging of the percentages of African-Americans in the 92 District-wide pools to determine the percentage of the African-Americans in the 2001 QJW is totally unreliable. The best measure of the racial composition of the 2001 QJW is the 20.74% included on the JS-12 Report as of January 2002 because it includes 100% of the population early in the life of the QJW, does not depend on any variables (excuses, deferrals, etc.), and does not require calculation of an estimated sampling error rate.

I hereby declare, pursuant to 28 U.S.C. § 1746, under penalty of perjury, that the foregoing is true and correct to the best of my knowledge and belief.

This 22nd day of May, 2006.

Respectfully submitted,

_____
STEPHEN A. ELMORE, SR., CPA, CBA

**U.S. vs. SIEGELMAN, et al.**                                    EXHIBIT A

**2001 QJW PARTICIPANTS INCLUDED IN 2005 JURY POOLS**

**IMPACT ON RACIAL COMPOSITION OF JURY POOLS**

| Pool Number | Total Summons | | | | | | | 2001 QJW Participants | | | | | | | Net Summons w/o 2001 QJW Participants | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Black # | % | White # | % | Other # | % | Total # | Black # | % | White # | % | Other # | % | Total # | Black # | % | White # | % | Other # | % | Total # |
| 101051101 (civil) | 13 | 11.82% | 94 | 85.45% | 3 | 2.73% | 110 | 1 | 50.00% | 1 | 50.00% | 0 | 0.00% | 2 | 12 | 11.11% | 93 | 86.11% | 3 | 2.78% | 108 |
| 201051103 | 22 | 17.60% | 103 | 82.40% | 0 | 0.00% | 125 | 0 | 0.00% | 2 | 100.00% | 0 | 0.00% | 2 | 22 | 17.89% | 101 | 82.11% | 0 | 0.00% | 123 |
| 201051201 (civil) | 24 | 24.00% | 75 | 75.00% | 1 | 1.00% | 100 | 0 | 0.00% | 1 | 100.00% | 0 | 0.00% | 1 | 24 | 24.24% | 74 | 74.75% | 1 | 1.01% | 99 |
| 201060201 | 55 | 22.00% | 186 | 74.40% | 9 | 3.60% | 250 | 0 | 0.00% | 1 | 100.00% | 0 | 0.00% | 1 | 55 | 22.09% | 185 | 74.30% | 9 | 3.61% | 249 |
| 201060202 (civil) | 10 | 20.00% | 37 | 74.00% | 3 | 6.00% | 50 | 0 | 0.00% | 2 | 100.00% | 0 | 0.00% | 2 | 10 | 20.83% | 35 | 72.92% | 3 | 6.25% | 48 |
| 201060303 | 22 | 22.00% | 75 | 75.00% | 3 | 3.00% | 100 | 0 | 0.00% | 1 | 100.00% | 0 | 0.00% | 1 | 22 | 22.22% | 74 | 74.75% | 3 | 3.03% | 99 |
| 201060403 | 57 | 19.00% | 229 | 76.33% | 14 | 4.67% | 300 | 0 | 0.00% | 1 | 100.00% | 0 | 0.00% | 1 | 57 | 19.06% | 228 | 76.25% | 14 | 4.68% | 299 |
| Totals | 203 | 19.61% | 799 | 77.20% | 33 | 3.19% | 1,035 | 1 | 10.00% | 9 | 90.00% | 0 | 0.00% | 10 | 202 | 19.71% | 790 | 77.07% | 33 | 3.22% | 1,025 |

EXHIBIT B

US vs. SIEGELMAN, et al

## ANALYSIS OF RACIAL COMPOSITION

### 2005 WHEEL DISTRICT-WIDE POOLS

| Pool # | BLACK # | % | WHITE # | % | UNKNOWN # | % | AMERICAN INDIAN # | % | ASIAN # | % | OTHER # | % | Multi-Race # | % | Total Summons | Total Percentage |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 201050902 | 25 | 20.00% | 97 | 77.60% | 1 | 0.80% | 0 | 0.00% | 1 | 0.80% | 1 | 0.80% | 0 | 0.00% | 125 | 100.00% |
| 201051001 | 33 | 16.50% | 164 | 82.00% | 2 | 1.00% | 0 | 0.00% | 1 | 0.50% | 0 | 0.00% | 0 | 0.00% | 200 | 100.00% |
| 201051101 | 42 | 21.00% | 151 | 75.50% | 0 | 0.00% | 1 | 0.50% | 2 | 1.00% | 0 | 0.00% | 4 | 2.00% | 200 | 100.00% |
| 201051103 | 22 | 17.60% | 103 | 82.40% | 0 | 0.00% | 0 | 0.00% | 0 | 0.00% | 0 | 0.00% | 0 | 0.00% | 125 | 100.00% |
| 201051202 | 42 | 21.00% | 157 | 78.50% | 0 | 0.00% | 0 | 0.00% | 1 | 0.50% | 0 | 0.00% | 0 | 0.00% | 200 | 100.00% |
| 201051203 | 17 | 28.33% | 41 | 68.33% | 0 | 0.00% | 2 | 3.34% | 0 | 0.00% | 0 | 0.00% | 0 | 0.00% | 60 | 100.00% |
| 201060104 | 38 | 19.00% | 154 | 77.00% | 2 | 1.00% | 0 | 0.00% | 2 | 1.00% | 3 | 1.50% | 1 | 0.50% | 200 | 100.00% |
| 201060105 | 21 | 35.00% | 36 | 60.00% | 2 | 3.30% | 0 | 0.00% | 0 | 0.00% | 0 | 0.00% | 1 | 1.70% | 60 | 100.00% |
| 201060201 | 55 | 22.00% | 186 | 74.40% | 4 | 1.60% | 2 | 0.80% | 1 | 0.40% | 0 | 0.00% | 2 | 0.80% | 250 | 100.00% |
| 201060303 | 22 | 22.00% | 75 | 75.00% | 3 | 3.00% | 0 | 0.00% | 0 | 0.00% | 0 | 0.00% | 0 | 0.00% | 100 | 100.00% |
| 201060304 | 33 | 16.50% | 157 | 78.50% | 4 | 2.00% | 1 | 0.50% | 0 | 0.50% | 1 | 0.50% | 3 | 1.50% | 200 | 100.00% |
| 201060402 | 45 | 22.50% | 148 | 74.00% | 3 | 1.50% | 0 | 0.00% | 0 | 0.00% | 0 | 0.00% | 4 | 2.00% | 200 | 100.00% |
| 201060403 | 57 | 19.00% | 229 | 76.33% | 10 | 3.34% | 0 | 0.00% | 0 | 0.00% | 0 | 0.00% | 4 | 1.33% | 300 | 100.00% |
| 201060405 | 39 | 19.50% | 156 | 78.00% | 3 | 1.50% | 1 | 0.50% | 0 | 0.00% | 0 | 0.00% | 1 | 0.50% | 200 | 100.00% |
| 201060502 | 23 | 18.40% | 99 | 79.20% | 3 | 2.40% | 0 | 0.00% | 0 | 0.00% | 0 | 0.00% | 0 | 0.00% | 125 | 100.00% |
| 201060601 | 43 | 21.50% | 149 | 74.50% | 6 | 3.00% | 0 | 0.00% | 0 | 0.00% | 1 | 0.50% | 1 | 0.50% | 200 | 100.00% |
| 201060602 | 14 | 23.33% | 45 | 75.00% | 1 | 1.67% | 0 | 0.00% | 0 | 0.00% | 0 | 0.00% | 0 | 0.00% | 60 | 100.00% |
| grand Totals | 571 | 20.36% average | 2,147 | 76.54% average | 44 | 1.57% | 7 | 0.25% | 9 | 0.32% | 6 | 0.21% | 21 | 0.75% | 2,805 | 100.00% |

EXHIBIT C

US vs. SIEGELMAN, et al

## ANALYSIS OF RACIAL COMPOSITION

## 2005 WHEEL CIVIL POOLS

| | Pool | Total # Summonsed | # Black | % Black | # White | % White | # Other | % Other | Total # | Total % |
|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 101050902 | 90 | 6 | 6.67% | 83 | 92.22% | 1 | 1.11% | 90 | 100.00% |
| 2 | 101051101 | 110 | 12 | 11.11% | 93 | 86.11% | 3 | 2.78% | 108 | 100.00% * |
| 3 | 101060101 | 45 | 1 | 2.22% | 44 | 97.78% | 0 | 0.00% | 45 | 100.00% |
| 4 | 101060102 | 45 | 7 | 15.56% | 33 | 73.33% | 5 | 11.11% | 45 | 100.00% |
| 5 | 101060201 | 45 | 11 | 24.44% | 34 | 75.56% | 0 | 0.00% | 45 | 100.00% |
| 6 | 201050901 | 60 | 12 | 20.00% | 46 | 76.67% | 2 | 3.33% | 60 | 100.00% |
| 7 | 201051002 | 160 | 33 | 20.63% | 126 | 78.75% | 1 | 0.63% | 160 | 100.00% |
| 8 | 201051003 | 55 | 14 | 25.45% | 41 | 74.55% | 0 | 0.00% | 55 | 100.00% |
| 9 | 201051102 | 60 | 10 | 16.67% | 50 | 83.33% | 0 | 0.00% | 60 | 100.00% |
| 10 | 201051201 | 100 | 24 | 24.24% | 74 | 74.75% | 1 | 1.01% | 99 | 100.00% * |
| 11 | 201060101 | 80 | 15 | 18.75% | 65 | 81.25% | 0 | 0.00% | 80 | 100.00% |
| 12 | 201060102 | 115 | 37 | 32.17% | 78 | 67.83% | 0 | 0.00% | 115 | 100.00% |
| 13 | 201060103 | 70 | 14 | 20.00% | 55 | 78.57% | 1 | 1.43% | 70 | 100.00% |
| 14 | 201060202 | 50 | 9 | 18.75% | 36 | 75.00% | 3 | 6.25% | 48 | 100.00% * |
| 15 | 201060301 | 100 | 17 | 17.00% | 77 | 77.00% | 6 | 6.00% | 100 | 100.00% |
| 16 | 201060302 | 160 | 46 | 28.75% | 110 | 68.75% | 4 | 2.50% | 160 | 100.00% |
| 17 | 201060401 | 70 | 13 | 18.57% | 56 | 80.00% | 1 | 1.43% | 70 | 100.00% |
| 18 | 201060404 | 120 | 27 | 22.50% | 88 | 73.33% | 5 | 4.17% | 120 | 100.00% |
| 19 | 201060406 | 70 | 14 | 20.00% | 47 | 67.14% | 9 | 12.86% | 70 | 100.00% |
| 20 | 201060501 | 45 | 12 | 26.67% | 32 | 71.11% | 1 | 2.22% | 45 | 100.00% |
| 21 | 201060503 | 70 | 17 | 24.29% | 52 | 74.29% | 1 | 1.43% | 70 | 100.00% |
| 22 | 301050901 | 130 | 31 | 23.85% | 95 | 73.08% | 4 | 3.08% | 130 | 100.00% |
| 23 | 301051201 | 125 | 24 | 19.20% | 100 | 80.00% | 1 | 0.80% | 125 | 100.00% |
| 24 | 301060201 | 50 | 14 | 28.00% | 32 | 64.00% | 4 | 8.00% | 50 | 100.00% |
| 25 | 301060401 | 90 | 15 | 16.67% | 69 | 76.67% | 6 | 6.67% | 90 | 100.00% |
| 26 | 301060402 | 50 | 11 | 22.00% | 39 | 78.00% | 0 | 0.00% | 50 | 100.00% |
| 27 | 301060501 | 90 | 26 | 28.89% | 64 | 71.11% | 0 | 0.00% | 90 | 100.00% |
| 28 | 301060601 | 50 | 12 | 24.00% | 36 | 72.00% | 2 | 4.00% | 50 | 100.00% |
| | | 2305 | 484 | 21.04% average | 1755 | 76.30% average | 61 | 2.65% average | 2300 | 100.00% |

* - race/gender report is missing some people whose summons was returned as "undeliverable"