FILED
MAY 30 2006
CLERK
U. S. DISTRICT COURT
MIDDLE DIST. OF ALA.

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

UNITED STATES OF AMERICA

v.                                                              Criminal No. 05-00119-F

Don Eugene Siegelman

## MOTION BY DEFENDANT SIEGELMAN PARTIALLY TO EXCLUDE THE TESTIMONY OF FORREST "MAC" AND NANCY MARCATO

### Introduction

The testimony of Forrest "Mac" and Nancy Marcato concerning a telephone call between Governor Siegelman and Mr. Marcato on or about September 9, 2002, is irrelevant to the charges in the Second Superseding Indictment, because, as shown by the analysis in this brief, it does not constitute a crime. Thus, under Fed. R. Evid. Rule 402, it is inadmissible.

Governor Siegelman requests that the Court bar the Government from seeking to introduce evidence of the phone call.

Governor Siegelman does not object to relevant testimony of the Marcatos on other matters in this litigation, for example, the character of "Rainline," a product manufactured by the Marcatos.

In fact, the only function to be served by offering evidence of the phone call before the jury would be an impermissible effort to introduce evidence of Governor Siegelman's character by showing alleged bad acts. *See, Id.* R. 405.

In addition, the testimony of Nancy Marcato is inadmissible hearsay under *Id.* Rule 802.

1

Governor Siegelman understands from the Second Superseding Indictment, the witness list provided by the Government, and pretrial discovery that the Government plans to offer the witness's testimony to establish:

(1) in Count II, a RICO offense, 18 U.S.C. §1962(c), Racketeering Act 5(c) (Hobbs Act, 18 U.S.C. §1951) (extortion under color of law and fear), as well as Racketeering Act 5(d) (Ala. Code §§ 13A-10-61) (Bribery); 17-22A-17(Fair Campaign Practices Act), and

(2) in Count XXXIV, a Hobbs Act offense, 18 U.S.C. §1951(extortion under color of law and fear).

Governor Siegelman believes that the testimony of the Marcatos would be the same as their Grand Jury Testimony of Wednesday, September 21, 2005, that was provided to Governor Siegelman as part of pretrial discovery.

Accordingly, Governor Siegelman requests the Court to bar Government from offering their testimony to avoid the introduction of irrelevant testimony under F. R. Evid. Rule 402, unfairly prejudicial testimony under *id.* Rule 403, and inadmissible testimony under *id.* Rules 405 and 801.

## I. Analysis

### A. Statutory Texts

18 U.S.C.§ 1951, in relevant part, reads:

§ 1951.  Interference with commerce by threats or violence

(a) Whoever ... affects commerce ... by ... extortion or attempts or conspires so to do...shall be fined ....

(b) As used in this section--
   ...

(2) The term "extortion" means the obtaining of property from another, with his consent, induced by wrongful use of ... fear, or under color of official right.

Ala. Code § 13A-1-61, in relevant part provides:

(a) A person commits the crime of bribery if:

...

(2) While a public servant, he solicits, accepts or agrees to accept any pecuniary benefit upon an agreement or understanding that his vote, opinion, judgment, exercise of discretion or other action as a public servant will thereby be corruptly influenced.

Ala. Code § 17-22A-7, in relevant part, provides:

[A] candidate, public official, or principal campaign committee shall not accept, solicit, or receive contributions for any of the following reasons:

(1) As a bribe, as defined by Sections 13A-10-60 to 13A-10-63, inclusive.

(2) For the intention of corruptly influencing the official actions of the public official or candidate for public office.

### B. Legislative History and Jurisprudence

#### a. Federal Law

18 U.S.C. § 1951 had it origins in the Anti-Racketeering Act of 1934, 48 Stat. 979. The 1934 Act was primarily aimed at controlling "extortion" by "professional gangsters." *United States v. Local 807,* 315 U.S. 521, 530 (1942). It grew out of Senate investigations into racketeering. *See Crime and Criminal Practices*, S. Rep. No. 1189, 75th Cong., 1st Sess. (1937). But Congress did not limit the 1934 Act by adopting a statutory definition of "racketeering." *United States v. Culbert*, 435 U.S. 371, 376 (1978). The Supreme Court, however, gave the 1934 Act a narrow construction in its 1942 decision. As out-of-state truckers entered New York City, local teamsters would stop them and offer "to help" them drive or unload the trucks; they would, in fact, demand payment regardless of whether the services were accepted. *Local 807,* 315 U.S.

at 525-527. After reviewing the text of the statute and its legislative history, the Court read its labor exemption as excluding—largely without qualification—any individual who proffered services for the demanded payment. *Id.* at 530-34. The outcome of the decision raised a hue and cry, which resulted in the passage in 1948, over President Truman's objections, of the Hobbs Act, 62 Stat. 793. *See* H.R. Doc. No. 561, 79th Cong., 2nd Sess. (1946) (transmitting President Truman's veto message of H.R. 4908, which contained in § 7 the language of the Hobbs Act, which was also passed in 1948 as H.R. 32, a separate measure, but enacted without veto, despite Presidential objections). Negatively, it eliminated the express "labor exception." *United States v. Green,* 350 U.S. 415, 419 (1956). Positively, it prohibited "extortion," "attempts," or "conspire[acies]" to engage in extortion that "in any way or degree" affected commerce. 18 U.S.C. § 1951(a), (b) (2).

"Extortion" under the Hobbs Act is defined as "the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear or color of law." 18 U.S.C. § 1951(b)(2). Congress took its definition of "extortion" from the New York Field Code of 1865, which codified the New York common law. *Evans v. United States,* 504 U.S. 255, 263 n.9 (1992); *United States v. Emmons*, 410 U.S. 396, 406 n.16 (1973).[1] Thus, when a legislature borrows language from the statutory text of another jurisdiction, under long-established precedent, courts construe its language in the sense in which the other jurisdiction used it. *Metropolitan R.R. Co. v. Moore*, 121 U.S. 558, 572 (1887); *accord, Willis v. Eastern Trust & Banking Co.,* 169 U.S. 295, 307-08 (1897). As such, New York law at the time of the 1948 Act, controls the sense of the language of the Hobbs Act. *See, e.g., People v. Griffin,* 2

---

[1] Judge Gibbons comprehensively reviews the relevant legislative history materials in *United States v. Mazzie*, 521 F.2d 639, 651-55 (3rd Cir. 1975).

4

Barb. 427, 430 (N.Y. 1848) ("intent to extort" read to require "*lucri causa*"); *People v. Bush*, 4 Hill, 133, 134 (N.Y. 1843 ("solicitation" plus overt act reflecting intent to commit completed offense may constitute an "attempt"); *People v. Whaley*, 6 Cow. 661, 663 (N.Y. 1827) ("[e]xtortion ... signifies the taking of money" "corruptly" (cited in the commentary to the Field Code of 1865 § 613 ("extortion")).

Following New York law, the Hobbs Act's "color of law" "extortion" requires the "corrupt" taking of any unauthorized thing of value by a public official. *Evans*, 504 U.S at 265 n.14 ("extortion ... [is] the corrupt taking ... of an unlawful fee by a public officer under color of office").[2] Thus, it requires that the taker act "corruptly, that is, with an unlawful purpose." *United States v. Tomblin*, 43 F.3d 1369, 1380 (5th Cir. 1995); *United States v. French*, 628 F.2d 1069, 1073-74 (8th Cir. 1980). It is not, therefore, a strict liability offense.[3]

The interrelation between color of law extortion and campaign contributions represents a delicate First Amendment issue. As the Court observed in *McCormick v. United States*, 550 U.S. 257, 272-73 (1991) (citations omitted),

> Serving constituents and supporting legislation that will benefit the district and individuals and groups therein is the everyday business of a legislator. It is also true that campaigns must be run and financed. Money is constantly being solicited on behalf of candidates, who run on platforms and who claim support on the basis of their views and

---

[2] For a comprehensive review of the common law materials and a survey of current federal jurisprudence on color of law extortion, *see generally* Jeremy N. Gayed, *Corruptly": Why Corrupt State of Mind Is An Essential Element for Hobbs Extortion Under Color of Official Right*, 78 NOTRE DAME LAW REV. 1731 (2005). For the convenience of the Court, Governor Seligman will file a copy of the law review note with it and give a copy to the Government.

[3] To be sure the text of the Hobbs Act's color of law extortion lacks state of mind words. But Congress drafts criminal statutes against a common law background. *United States v. X-Citement Video, Inc.*, 513 U.S. 64, 70 (1994). Silence is not enough to infer Congress intended strict liability. *Id*. Where Congress "borrows terms of art ... it presumably knows and adopts the cluster of ideas that were attached to each borrowed word." *Morissette v. United States*, 342 U.S. 246, 263 (1952) ("knowing conversion," a larceny-type offense, read also to require, as at common law, "an intent to steal," warranting a mistake of law defense). Thus, reading in "corrupt" intent follows the common law for color of law extortion, as it would be read into a bribery offense that also did not contain any state of mind words.

what they intend to do or have done. Whatever ethical considerations and appearances may indicate, to hold that legislators commit the federal crime of extortion when they act for the benefit of constituents or support legislation furthering the interests of some of their constituents, shortly before or after campaign contributions are solicited and received from those beneficiaries, is an unrealistic assessment of what Congress could have meant by making it a crime to obtain property from another, with his consent, 'under color of official right.' To hold otherwise would open to prosecution not only conduct that has long been thought to be well within the law but also conduct that in a very real sense is unavoidable so long as election campaigns are financed by private contributions or expenditures, as they have been from the beginning of the Nation. It would require statutory language more explicit than the Hobbs Act contains to justify a contrary conclusion.

This is not to say that it is impossible for an elected official to commit extortion in the course of financing an election campaign. Political contributions are of course vulnerable if induced by the use of force, violence, or fear. The receipt of such contributions is also vulnerable under the Act as having been taken under color of official right, but only if the payments are made in return for an explicit *promise or undertaking* by the official to perform or not to perform *an official act. In such situations the official asserts that his official conduct will be controlled by the terms of the promise or undertaking.* This is the receipt of money by an elected official under color of official right within the meaning of the Hobbs Act.

This formulation defines the forbidden zone of conduct with sufficient clarity. As the Court of Appeals for the Fifth Circuit observed in *United States v. Dozier*, 672 F.2d 531, 537 ((1982):

> A moment's reflection should enable one to distinguish, at least in the abstract, a legitimate solicitation from the exaction of a fee for a benefit conferred or an injury withheld. Whether described familiarly as a payoff or with the Latinate precision of *quid pro quo*, the prohibited exchange is the same: *a public official may not demand payment as inducement for the promise to perform (or not to perform) an official act* (emphasis added).

Hence, a color of law Hobbs Act conviction cannot stand in the absence of a *specific* agreement to commit or omit to commit a *specific act. See Evans*, 504 U.S. at 269:

> [T]he offense is completed at the time when the public official receives a payment in return for his agreement *to perform specific official acts*; fulfillment of the quid pro quo is not an element of the offense. ...[O]ur construction of the statute is informed by the common-law tradition from which the term of art was drawn and understood. We hold today that the Government need only show that a public official has obtained a payment to which he was not entitled, knowing that the payment was made *in return for official acts* (emphasis added).

*Accord, United States v. Martinez*, 14 F.3d 543, 554 (11th Cir. 1994) (following *McCormick* and *Evans*).

In addition, where group activity may include legal (*e.g.,* the solicitation campaign contributions) and illegal (*e.g.,* the solicitation of bribes), *strictissimi juris* applies. *See, e.g., United States v. Dellinger,* 472 F.2d 340, 392 (7th Cir. 1972) (Riot Act, 18 U.S.C. §1821 convictions for conduct during demonstration at political convention reversed based on insufficiency of the evidence, the antagonistic attitude of the trial judge, and the demeanor and remarks of the prosecutors). As the court in *Dellinger* aptly observed (*id.* at 392-94):

> When the group activity out of which the alleged offense develops can be described as a bifarious undertaking, involving both legal and illegal purposes and conduct, and is within the shadow of the first amendment, the factual issue as to the alleged criminal intent must be judged *strictissimi juris.* ... Specially meticulous inquiry into the sufficiency of proof is justified and required because of the real possibility in considering group activity, characteristic of political or social movements, of an unfair imputation of the intent or acts of some participants to all others.
>
> ...
>
> In the context of our case, the doctrine of *strictissimi juris* surely precludes (if other general principles do not) a finding that any defendant had an unlawful intent if the finding be based solely on the fact that he participated in planning and organizing ... activity ... or on the mere imputation to him of the plan of any associate ....
>
> ...
>
> We do not, however, understand the *strictissimi juris* doctrine as requiring evidence of unlawful intent so compelling that a verdict of not guilty would be perverse. We do not view it as wholly depriving the jury of its customary function in interpreting ambiguous statements in the light of circumstances and choosing among reasonable inferences. In order to convict, a jury must in any event be satisfied beyond a reasonable doubt. *The strictissimi juris doctrine emphasizes the need for care in analyzing the evidence against a particular defendant in a case of this type, both by the jury in its fact-finding process and by the court in determining whether the evidence is capable of convincing beyond a reasonable doubt* (emphasis added).

On the other hand, "extortion" by "fear" requires that the victim's consent to the obtaining of his property be induced by "fear," including the fear of the economic loss of "prospective profits" from future contracts. *United States v. Brecht,* 540 F.2d 45, 52 (2nd Cir. 1976). "Specific intent" is required. *United States v. Boylan,* 898 F.2d 230, 253 (1st Cir. 1990)

("knowingly and willfully", that is, "specific intent to do something the law forbids; that is to say, with bad purpose either to disobey or to disregard the law."). But absent force, "wrongful" is a word of limitation that excludes "legitimate" business or other practices. *See, e.g., Brokerage Concepts, Inc. v. U.S. Health Care, Inc.* 140 F.3d 494, 522-53 (3rd Cir. 1998).[4] The fear must also be "reasonable." *United States v. Flynt*, 15 F.3d 1002, 1005 (11th Cir. 1994) (citing *United States v. Haimowitz*, 725 F.2d 1561, 1572 (11th Cir. 1984)). "Obtaining" requires, not only that the victim "give up" the property—tangible or intangible—,but that the perpetrator "or another" "get it." *United States v. Green*, 350 U.S. 415, 420 (1956) ("or another"); *Scheidler* v. *National Org. of Women*, 537 U.S. 393, 404-05 (2003) ("get it "). The effect on commerce may be "to any degree," which the Court interprets as the full extent of the Congress's commerce power. *Stirone v. United States*, 361 U.S. 212, 215 (1960).

### b. Alabama Law

The definition of bribery, in gist if not in words, has changed little in the common law since Sir Edward Coke in the 17th century described it as:

> a great misprision, when any man in judicial place takes any fee or pension, robe, or livery, gift, reward or brocage of any person, that hath to do before him any way, for doing his office, or by colour of his office . . . unless it be of meat and drink, and that of small value, upon divers, and grievous punishments.

3 EDWARD COKE, INSTITUTES OF THE LAWS OF ENGLAND 144 (9th ed. 1817). The word bribery, he noted, "commeth of the French word briber, which signifieth to devoure, or eat greedily, applyed to the devouring of a corrupt judge. . . ." *Id.* Bribery was a misprision, "for that it is neither treason, nor felony; and it is a great misprision, for that it is ever accompanied with perjury." *Id.* at 146. The offense originally was applicable only to judges. In fact, the judicial

---

[4] At least in context of "labor disputes," "wrongful" also means the use of (1) illegal means (*i.e.*, violence) for (2) an illegal end (*i.e*, other than wages, hours and working conditions). *Enmons*, 410 U.S at 399-400 (1973); *compare, United States v. Strum*, 870 F.2d 769, 773 (1st Cir. 1989) (use of force or violence inherently "wrongful," but obtaining "property" by economic threat not "wrongful" if have a claim of right).

8

oath expressly bound the judges not to take any gift from any person who had a plea pending before them, *e.g., Burrough of Bodmin*, 20 L.T.R. 989, 991 (1869) (Willes, J.) (*Bodmin* Case), or any "other person concerned in the administration of justice." IV WILLIAM BLACKSTONE, COMMENTARIES ON THE LAWS OF ENGLAND 139 (Tucker ed. 1803). Coke later differentiated bribery and extortion by occupation. "[B]ribery is only committed by him, that hath judiciall place, and extortion may be committed both by him that hath a judiciall place, or by him that hath a ministeriall office." COKE, at 147. The crime, a common law misdemeanor, was, however, gradually extended to include all public officials, whether elected or appointed. *See* I WILLIAM. RUSSELL, ON CRIME 429 (Turner ed. 1958). The purpose, of course, was to promote integrity in the public service. *See* 1 JOEL BISHOP, COMMENTARIES ON THE CRIMINAL LAW 411 (2d ed. 1858); II JOEL BISHOP, COMMENTARIES ON THE CRIMINAL LAW 62 (2d ed. 1859).

Both the receiver and the giver of a bribe were subject to fine and imprisonment. Even if a bribe was rejected, the offer was punishable. *See* COKE, at 147. Bribery could also be committed "not only when a suit dependeth" on it, but also when a judge did anything under color of office, though no suit was before him at all. Illustrative is the case of Sir Francis Bacon who pleaded guilty to corruption for "many exhorbitant and sordid briberies." *Id.* If the bribe was in the form of a letter, the giver was indictable both in the country where he deposited the offer, as well as in the jurisdiction where it was received. *See* I BISHOP, at 591; II BISHOP, at 63.

Punishment varied according to the importance of the official who was bribed. The bribery of judges "hath been always looked upon" as a heinous offense. BLACKSTONE, at 139-40. During the 12th century, the punishment for all "judges and officers of the king, convicted of bribery" was the forfeiture of treble the bribe, punishment at the King's will, and discharge from

the King's service forever. *Id.* By the 17th and 18th centuries, a conviction for bribery brought a forfeiture of office, a fine, and imprisonment. *See* I WILLIAM. HAWKINS, A TREATISE OF THE PLEAS OF THE CROWN 314 (6th ed. 1777).

The crime embracery, or attempt to influence a jury, was separate from the offense of bribery, and punishable under statutes as early as the 14th century by fine and imprisonment. BLACKSTONE, at 140. As for the juror who was bribed, Blackstone reports the punishment was "perpetual infamy, imprisonment for a year, and forfeiture of the tenfold value." *Id.* The proscribed act of influencing jurors was not limited to promising them money; it could also consist of "menacing them" or "instructing them in the cause beforehand." *See* HAWKINS, at 549.

The corruption of public elections and electors, though not of as "high and aggravated nature" as judicial corruption, II BISHOP, at 63, was also punishable as a misdemeanor. According to Blackstone, both the giver and receiver of the bribe were fined 500 pounds, and they were forever disabled from voting and holding any office. *See* BLACKSTONE, at 179. Before his conviction, however, it was possible for the offender to vindicate himself by bringing about the conviction of another offender. *See* HAWKINS, at 315.

From its earliest times, Alabama's bribery jurisprudence reflected basic common law elements taken from the law of the 17th century. In brief, Alabama's statutory bribery provisions created no new offenses unknown to the common law; if anything, the statutory provisions merely varied the punishment for the offense. *See, e.g., Rivers v. State,* 97 Ala. 72, 75-76, 12 So. 434, 435 (1893) (corruptly offering a thing of value to commit perjury); *Barefied v State,* 14 Ala. 603, 605-06 (1848) ("person who shall corruptly promise, or give to any … judicial officer…any gift, or gratuity whatever, with intent to influence his … judgment …, shall …" varied the

punishment for bribery; offer to bribe not within the provision, but punishable at common law). Invariably, the offenses had to be committed "corruptly," that is, with a full consciousness of wrongdoing. *See, e.g., White v. State,* 103 Ala. 72, 82, 16 So. 63, 67 (1893) ("Essential to the offense charged, the offer, promise or gift must have been *corruptly* made by the defendant, with the intent to bias the mind or influence the decision of the juror in the case or matter pending in the court, and specified in the indictment. If ... the defendant was so intoxicated as that he was incapable of consciousness that he was committing a crime; incapable of discriminating between right and wrong, then he could not have entertained the *corrupt* intent essential to the completion of the offense.") (emphasis added).

Modern bribery prosecutions in Alabama, too, tread well-worn roads, and they reflect basic common law principles. *See, e.g., Maddox v. State*, 520 So.2d 143, 139-49(Ala. Ct. of App. 1989) (Ala. Code § 13A-10-121(a)(1), specifically prohibits the offering of a thing of value to a "witness" or "a person" that the actor believes will be "called as a witness in any official proceeding" with the intent *corruptly* to influence the testimony of that person as long as the witness might testify.) (emphasis added).

For all practical purposes, the common law of the 17th century might well be still in effect in Alabama.

### C. Application

#### a. Facts

Governor Siegelman believes that the Government will not offer evidence inconsistent with the Marcatos' Grand Jury testimony of September 21, 2005. There, after indicating that he had given campaign contributions to Governor Siegelman on his own initiative on September 9, 2002, the prosecutor directed Mr. Marcato to a phone call that occurred maybe a week or so after

his contributions. At first Marcato thought the call was a joke, but he soon realized that the Governor was on the phone. After a couple of pleasantries, Governor Siegelman said that he was going into a meeting about "Rainline," a product manufactured by the Marcatos, but almost instantly, he rolled over into talking about his being a businessman, who, like Marcato himself, required money to operate. He then asked Marcato for $250,000. Marcato told the Governor that he did not have that kind of money. The Governor said that he thought that he could. Marcato repeated that he could not. The Governor dropped down to $100,000. Marcato said that he could not do that either. The Governor replied that he should send him whatever he could. That was the end of the conversation, which did not last more that five minutes. Marcato told the prosecutor that he thought he was being "shook down." He then talked to his wife, who was not on the phone. Marcato did not give Governor Siegelman any more money. He switched his allegiance to Bob Riley. Subsequently, the State began to use "Rainline." In fact, Marcato suffered no adverse consequence as a result of his short phone call with Governor Siegelman. In short, Governor Siegelman asked for a campaign contribution. Marcato declined to make it. And that was that.

### b. **Analysis**.

Marcato did not give Governor Siegelman any money as a result of the phone call. Thus, the phone call cannot be a *completed* extortion or a bribe. *Scheidler, supra.*

Significantly, too, a fair observer looks in vain for any sign of the mandated *quid pro quo* in the short phone call. *McCormick, supra; Evans, supra; United States v. Martinez, supra.*

If anything— which it is not—, it might be argued that it was an *attempted* extortion or a *solicitation* to bribery.

It was neither, and no "reasonably-minded"[5] jury could conclude otherwise.

It fails as an attempted extortion, because under New York law, a solicitation cannot constitute an *attempt* in the absence of additional overt acts evincing intent to commit the offense solicited. *Bush, supra.*

None is present.

Nor can the phone call constitute *attempted* extortion or a *solicitation* to bribery, because the Governor lacked the required "corrupt" intent, and no reasonably-minded jury could conclude otherwise. *Whaley, supra; Boylan, supra; Tomblin, supra; French, supra.*

Nor could Marcato's supposed "fear" be fairly termed "reasonable" for fear extortion, or the Governor's request for a campaign contribution "wrongful," and no reasonably-minded juror could conclude otherwise. *Flyant, supra; Brokerage, supra.*

In fact, the evidence in this record, provided by the Government's own witness, Darin Cline, a professional fund raiser, is that the Governor made his own phone calls, seeking campaign contributions *only* with a witness present and off "focus sheets," which provided the necessary information (who, phone number, etc.) for the Governor, and which were *specifically* designed to avoid giving any person called any grounds for asserting that the request for a campaign contribution involved an illicit *quid pro quo*.

Under general principles for the evaluation of evidence in a criminal prosecution beyond a reasonable doubt, Governor Siegelman's short phone call did not constitute a crime, and no reasonably-minded juror could conclude otherwise.

---

[5] *See Lambert v. United States,* 261 F.2d 799, 801 (5 Cir. 1958) ("taking the view most favorable to the Government, a *reasonably-minded* jury might accept the relevant evidence as adequate to support a conclusion of the defendant's guilt *beyond a reasonable doubt*") (emphasis added). Under *Bonner v. City of Prichard,* 661 F.2d 1206, 1207 (11th Cir. 1981), decisions of the Fifth Circuit, prior to September 30, 1981, are the law of the Eleventh Circuit.

Applying the principle of *strictissimi juris*, any suggestion that a crime occurred during the Governor Siegelman's short phone call boarders on the preposterous, and no reasonably-minded jury could conclude otherwise. *Dellinger, supra*.

**If candidates for state offices can be hauled into Federal courts and tried for supposed crimes on such flimsy evidence, the political process as we know it is at an end or, more likely, the selective prosecution of one's political adversaries will dominate it.**

**The First Amendment permits no such result.**

## II. Conclusion

Accordingly, Governor Siegelman requests the Court to bar the Government from offering the testimony of the Marcatos about the phone call of September 9, 2002, to avoid the introduction of irrelevant testimony under F. R. Evid. Rule 402, unfairly prejudicial testimony under *id.* Rule 403, and inadmissible testimony under *id.* Rules 405 and 801.

Respectfully submitted,

_____
Vincent W. Kilborn, III
(KILBV4484)
W. Perry Hall
KILBORN, ROEBUCK &
McDONALD
Telephone: 251-479-674

G. Robert Blakey
D.C. Bar #424844
Telephone: 574-681-6626
Notre Dame Law School
Notre Dame, IN. 46556

Hiram Eastland
MS. Bar #5294
EASTLAND LAW OFFICES
Telephone: 662-897-0495
107 Grand Boulevard
Greenwood, Mississippi 38930

1810 Old Government Street
Mobile, Alabama 36606

OF COUNSEL:
David A. McDonald
203 South Warren Street
Mobile, Alabama 36606
Telephone: 251-434-0045

Charles Redding Pitt
2119 Third Ave. North
Birmingham, Alabama 35205
Telephone: 205-324-0223

*Attorneys For Don Siegelman*

## CERTIFICATE OF SERVICE

    The undersigned counsel hereby certifies that a copy of the foregoing Motion Partially to Exclude Testimony was served upon all counsel of record in the above entitled case by hand delivering it to all counsel in open court.

_____
Vincent W. Kilborn, III