Volume 78 Number 5                    August 2003

# NOTRE DAME LAW REVIEW



## "CORRUPTLY": WHY CORRUPT STATE OF MIND IS AN ESSENTIAL ELEMENT FOR HOBBS ACT EXTORTION UNDER COLOR OF OFFICIAL RIGHT

*Jeremy N. Gayed*

Reprinted from
**NOTRE DAME LAW REVIEW**
Volume 78, Issue 5
Copyright © 2003 Notre Dame Law Review

# "CORRUPTLY": WHY CORRUPT STATE OF MIND IS AN ESSENTIAL ELEMENT FOR HOBBS ACT EXTORTION UNDER COLOR OF OFFICIAL RIGHT

*Jeremy N. Gayed\**

## INTRODUCTION

Public officials of the thirteenth to late eighteenth century rightfully collected statutory dues and customary fees from the public to supplement the insufficient income paid by the Crown. Predictably, the mixture of official authority with pecuniary self-interest often resulted in abuse, with many officials taking greater fees than were rightfully appropriate. To combat this widespread corruption, England developed a body of law for the punishment of improper takings by public officials. Because these officials lived in a context of poor oversight while concurrently possessing a right to independently collect revenue, the distinction between corrupt extortion and innocent fee collection was murky. To help navigate the fog, common law courts developed a doctrine of corrupt state of mind: public officials were only guilty of extortion or bribery when they took with an unlawful purpose, that is, when they *knew* that they were not due the amount they received.[1]

Public officials of the modern American variety exist in a context strikingly similar to medieval England. Elected public officials have a right to receive campaign contributions from businesses and individuals that have an interest in their official conduct. The right to collect campaign funds is complicated; although politicians may accept contributions from interested parties intending to influence their conduct, they may not accept bribes or extort. Oversight of campaign finance is poor, and the murky lines between guilt and innocence compose an intricate web of regulation that consists of internal ethical guidelines, and extortion, bribery, and illegal gratuities statutes.

\*    Candidate for Juris Doctor, Notre Dame Law School, 2004. My gratitude goes to to Eric Tamashasky and Jason Stare for fruitful discussion and perspective and to my wife Maija-Liisa, whose steadfast support upholds all my endeavors.

1    *See infra* notes 11–116 and accompanying text.

Corruption by public officials is commonly prosecuted under the Hobbs Act.[2] The Hobbs Act, which adopts common law extortion, does not have a corrupt state of mind element on its face. Courts interpreting the Act have overlooked that extortion at common law required a corrupt state of mind, and have failed to read such a mental element into the statute.

Nevertheless, courts have increasingly recognized that using the Hobbs Act as an ethics-in-government statute presents problems both of breadth and of differentiation, and have tried to mitigate these problems through the imposition of various judicial modifications. These glosses, primarily the quid pro quo standard from *McCormick v. United States*[3] and *Evans v. United States*,[4] serve as imperfect substitutes for a corrupt state of mind.[5] Furthermore, courts have in some instances replaced the corrupt state of mind element on the face of the bribery statute with a quid pro quo standard, thus leaving both well-meaning politicians and victims of extortion susceptible to prosecution.

Both formally and functionally, the soundest solution to these difficulties in applying the Hobbs Act is to rediscover the common law corrupt state of mind requirement. Formally, reading a corrupt state of mind into the Hobbs Act would comport with the general principle of mens rea laid out in *Morrisette v. United States*.[6] Functionally, by instituting a corrupt state of mind requirement, the courts could escape the overbreadth problem created by the Hobbs Act's facial scope, the underbreadth problem created by the Supreme Court's interpretational demand for a quid pro quo, and the problems of differentiation that plague this insolubly murky area of law. Perhaps most importantly, a corrupt state-of-mind requirement could save both innocent politicians and well-intentioned victims of extortion from the tribulation of federal prosecution.

---

2    18 U.S.C. § 1951 (2000).

3    500 U.S. 257 (1991).

4    504 U.S. 255 (1992).

5    *See infra* Part V.A. *McCormick* set out an *explicit* quid pro quo requirement that is fundamentally underbroad. *See McCormick*, 500 U.S. at 271–74. *Evans* subsequently replaced this standard with an *implicit* quid pro quo requirement that is fundamentally overbroad. *See Evans*, 504 U.S. at 268–69. The ideal solution, both formally and functionally, is to abandon quid pro quo as an element in favor of a corrupt state of mind requirement.

6    342 U.S. 246, 263 (1952) (holding that when Congress creates criminal statutes that cover common law crimes, the "absence of contrary direction [regarding requisite intent] may be taken as satisfaction with widely accepted definitions, not as a departure from them").

This Note proceeds in six parts. Part I discusses the common law history of color-of-right extortion, focusing on the presence and definition of a corrupt state of mind in the crime. Part II introduces the Hobbs Act and discusses the propriety of applying the common-law corrupt state of mind requirement in light of the statute's history. Part III continues this analysis in the context of the New York Penal Code of 1865—the source of the color-of-right language in the Hobbs Act. Part IV demonstrates the modern applicability of corrupt state of mind through a case study of one modern federal case that "gets it right",[7] and another that gets it tragically wrong.[8] Part V is a broader survey of the Supreme Court and those circuits that have most relevantly addressed the issue. Part VI is a brief discussion of the differences between this Note and the seminal work in the history of corruption—Judge John T. Noonan's *Bribes*.[9]

The whole of this Note uses the phrase "corrupt state of mind requirement" and the term "corruptly" interchangeably, despite the nonexistence of any formal legal state of mind requirements during the bulk of the historical time discussed.[10] These terms represent two contentions: first, that corrupt state of mind was an element of bribery and extortion at common law, and second, that corrupt state of mind at common law meant that the defendant knew that his conduct was unlawful.

I.  COMMON LAW HISTORY: FINDING AND DEFINING "CORRUPTLY"

Extortion and bribery are behaviors modern society considers positively illegal and normatively wrong. Judge John T. Noonan suggests that the very word "bribe" first appeared in the English language in Geoffrey Chaucer's *The Canterbury Tales*[11] as "a metaphorical adaptation of the French *briber*, to eat greedily."[12] History, however, demonstrates that some level of reciprocity between rulers and ruled has

---

7    Roma Constr. Co. v. aRusso, 96 F.3d 566 (1st Cir. 1996).

8    United States v. Alfisi, 308 F.3d 144 (2d Cir. 2002).

9    JOHN T. NOONAN, JR., BRIBES (1984).

10    *See infra* note 18.

11    GEOFFREY CHAUCER, *The Friar's Prologue and Tale*, *in* THE CANTERBURY TALES 220 ll. 1350–52 (N.F. Blake ed. 1980) ("This somnour euere waityng on his pray, / For to somne an old wydewe, a ribibe, / Feynynge a cause for he wolde *brybe*" . . . . (emphasis added)).

12    NOONAN, *supra* note 9, at 747 n.63; *see also* 2 OXFORD ENGLISH DICTIONARY 536 (2d ed. 1989) (attributing the first known English use of "bribe" to Chaucer).

been the norm rather than the exception in many times and places.[13] Over the last few centuries, Western society has broken from the globally shared cultural norm of reciprocity, and reached a consensus in law about the impropriety of private takings by public officials.[14] It is to this uniquely Western history, particularly the history of England, that this Note turns.

It would seem odd if such pedigreed[15] laws as those prohibiting extortion and bribery had survived for centuries without answers to questions covering the scope of their prohibition and their requisite state of mind. Indeed, such is not the case. The common law history of extortion and bribery demonstrates that, from their inception until the end of the eighteenth century, these crimes had a uniformly accepted scope and state of mind, embodied in the word "corruptly."

According to *Morisette*, "Where Congress borrows terms of art in which are accumulated the legal tradition and meaning of centuries of practice, it presumably knows and adopts the cluster of ideas that were attached to each borrowed word . . . ."[16] Part of the "cluster of ideas" historically attached to the "borrowed word" extortion is a cor-

---

13    *See* NOONAN, *supra* note 9, at 3 ("Reciprocity is in any society a rule of life, and in some societies at least it is *the* rule of life."); *see also infra* note 375 (discussing the historical and cultural ubiquity of reciprocity).

Presumably, the modern conception of reciprocity is based at least in part on a shared commitment to the modern state's conception of the rule of law. This, however, is not necessarily the case:

> [T]he modern state is not the only effective form of rule: organized crime, for example, functions quite well under different rules. The Mafia that protects and exploits Italian immigrants in some American cities and immigrant workers in France performs a "public" function. It administers justice in an immigrant population and, relying on ethnic solidarity, protects it from a hostile society. It must serve its community well or risk losing credibility; by serving the interests of its clients, it rules paternally, and it is particularly assiduous in this because otherwise it could never extort money from the immigrants it is supposed to protect. *Whoever protects controls, and whoever controls pillages.*

1 A HISTORY OF PRIVATE LIFE: FROM PAGAN ROME TO BYZANTIUM 96–97 (Paul Veyne ed., Arthur Goldhammer trans., 1987) [hereinafter HISTORY OF PRIVATE LIFE] (emphasis added).

14    "The honest functionary is a peculiarity of modern Western nations." *Id.* at 97; *see also* NOONAN, *supra* note 9, *passim.*

15    The Statute of Westminster I, 1275, 3 Edw., c. 26 (Eng.), was the earliest statutory prohibition against extortion and bribery. At common law, extortion and bribery were not well-distinguished crimes. *See* James Lindgren, *The Elusive Distinction Between Bribery and Extortion: From the Common Law to the Hobbs Act*, 35 UCLA L. REV. 815 *passim* (1988).

16    Morisette v. United States, 342 U.S. 246, 263 (1952). In *Evans*, the Supreme Court indicated the relevance of English common law to the Hobbs Act by citing

rupt state of mind. Including this state of mind in the Hobbs Act would not only be formally correct under *Morrisette*, but would also functionally help to clear much of the smoke of modern judicial confusion in this area while providing the foundation for an effective and principled boundary to federal extortion.

Despite its grounding in the common law, the modern judiciary frequently treats "corruptly" as a vestigial appendage to the statutes in which it is found.[17] Corrupt state of mind is not, however, one of many largely inconsequential inconsistencies inevitable in a legal structure that grows organically rather than systemically. It is instead a term of art capable of principled meaning and application. This Part will discuss the relevant history by: (1) establishing the proper historical background, (2) demonstrating that corrupt state of mind was an element of extortion at common law, and (3) drawing a definition of "corruptly" from common law cases and treatises.

### A.  Historical Context

At common law, the corrupt state of mind requirement possessed remarkable versatility.[18] First, the corrupt state of mind element automatically adjusted itself to the particular case and officer. To act corruptly, an official had to violate the customs and laws pertaining to his particular office knowingly, that is, he had to act with a subjective unlawful purpose. By requiring both knowledge of fact and knowledge of law,[19] the corrupt state of mind requirement allowed the law sufficient delicacy to draw principled legal boundaries between legitimate and illegal behavior in a complex system where (much like American legislators) public officials were paid by both Crown and countrymen.

---

several English cases, the earliest of which was decided in 1298 A.D. Evans v. United States, 504 U.S. 255, 271 n.23 (1992).

17  *See, e.g.*, United States v. Alfisi, 308 F.3d 144, 144 n.2 (2d Cir. 2002) (using a quid pro quo test to display corrupt state of mind in federal bribery under 18 U.S.C. § 201(b) (2000)).

18  One important consideration to keep in mind is that the term mens rea may be only loosely applied to pre-nineteenth century case law. Formal requirements of intent did not gain ascendancy in the law until sometime after 1770, near the time where this historical analysis *ends*. *See* JOHN KAPLAN ET AL., CRIMINAL LAW 205–06 (4th ed. 2000).

When this Note speaks of intent in the historical context, it refers not to a formal element of a crime, but rather to whatever mental state the courts generally understood to be necessary to the crime's commission.

19  This "knowledge of law" on the part did not have to be actual knowledge of statutory law. Many of the fees collected by public officials were in amounts dictated by custom. Knowingly exceeding the customary fee would have been as corrupt as knowingly violating a positive legal boundary on fee collection.

In a system lacking well-defined rules about what public officials may take or request, a state of mind element capable of so differentiating between licit and illicit conduct was a necessary lubricant to the wheels of governmental process. Second, the corrupt state of mind element limited the scope of extortion and bribery in a principled manner by exempting subjectively innocent actors from liability. Corrupt state of mind remained the guidepost to extortion and bribery law until the beginning of the nineteenth century, where history shows that the corrupt state of mind element became somehow lost to the common law.[20]

---

20  That corrupt state of mind became lost as a dominant principle in the common law is evident. *See, e.g.*, Field Code, ch. 15, § 613, 1848 N.Y. Laws at 220 (1865) [hereinafter Field Code]. The Field Code cites *People v. Whaley*, 6 Cow. 661 (N.Y. Sup. Ct. 1827), as its principle color of right extortion case. Field Code, *supra*, at § 613 cmt. *Whaley* required a corrupt state of mind for color of right extortion. *Whaley*, 6 Cow. at 663–64. Despite its reliance on *Whaley*, the Field Code codifies color of right extortion as a strict liability crime.

    A partial explanation of "corruptly's" lost status may inhere in the historical movement towards codification. Codifications of the common law that did not include an express corrupt state of mind element, such as the Field Code, may have obscured the common law definition of color of right extortion. One logical consequence of this theory would be that the federal government, which relied on the Field Code in drafting the Hobbs Act, might suffer a more acute ignorance of corrupt intent than the states; and such is in fact the current state of affairs. *See infra*, Part III; *see also* Cleavland v. State, 34 Ala. 254, 254 (1859) (deciding that a state statute punishing any taking by a public official, even though it did not have an intent element, could not reach an official with "the *bona-fide* belief that the services had been rendered, and that the fee was legally due. . . . [A deliberate violation of known law] constitutes the corrupt intent which is the essence of the offense."); Hood v. State, 245 S.W. 176, 176 (Ark. 1922) (reversing a conviction for extortion because "the indictment fails to charge appellant with having received the warrant corruptly and under color of office. These [charges] are essential elements of extortion"); People v. Clark, 151 N.E. 631, 636 (N.Y. 1926) (stating that, although illegal takings statute of the charge did not contain an intent element, "[t]here can be no intent to do the prohibited act unless the defendant knows that he is asking or receiving some reward which is illegal"); State v. Pritchard, 12 S.E. 50, 51 (N.C. 1890) (asserting that "in order to prove [extortion] it is necessary to show that the fees were demanded willfully and corruptly, and not through any mistake of law or fact"); Haynes v. Hall, 37 Vt. 20, 22 (1864) (holding that, to violate a state statute punishing the taking of illegal fees, "it is necessary that the officer receiving such fees should do it with a knowledge of the illegality of the act to constitute it an offense, subjecting him to the penalty"). *But see* State v. Dickens, 2 N.C. (1 Hayw.) 406, 407 (N.C. Super. L. & Eq. 1796) (holding that "every officer is bound to know what the law is upon the subject of fees to be taken by himself. He cannot excuse himself from taking more than the legal fee by [claiming good faith]."); Lewis v. State, 64 S.W.2d 972, 974–96 (Tex. Crim. App. 1933) (holding that, where the statute is clear, a good faith mistake of law is no defense to color of right extortion).

At common law, extortion was the earliest and broadest formulation of the law against corruption.[21] Proscriptions against corrupt behavior first gained prominence in the Statute of Westminster I in 1275.[22] Understanding the history of corrupt state of mind requires a brief explanation of English social and political history between the thirteenth and late eighteenth centuries.

Public officials of the time, particularly the sheriff, carried a broad range of powers, and such officials were only loosely accountable to any central authority.[23] Dr. Austin Poole noted:

> The chief agent of the Crown in local government was the sheriff. . . . He was at the head of the fiscal, judicial, administrative, and military organization of the shire. He was responsible for the revenues due from the shire, for which he was accounted twice a year at Easter and Michaelmas at the exchequer; to him were the king's writs addressed, and it was his duty to execute the king's instructions . . . .[24]

The sheriff was accompanied in his administration of local affairs by a host of other officials, including coroners, jailers, bailiffs, and justices of the peace.[25]

Although the sheriff exercised a wide variety of judicial, administrative, and law-enforcement responsibilities, Frederic William Maitland defined the office in terms of one primary economic duty: "the profits of the market and court seem to have been farmed [collected yearly by the King in round sums]. . . . The farmer seems to have been the sheriff . . . ."[26] Although the sheriff was revenue collector, administrator, and law enforcer for the king, he received little or no compensation from the crown for his duties. The sheriffs (and other public officials) lived on fees collected from those they served.[27] Sir William Holdsworth noted that "certain of the officials of the local government were paid indirectly by fees exacted for certain activities—the clerk of the peace, the sheriffs, the justices of the peace . . .

---

21  *See supra* note 15.

22  Statute of Westminster I, 1275, 3 Edw., c. 26 (Eng.); *see also* 2 WILLIAM HOLDSWORTH, A HISTORY OF ENGLISH LAW 290 (4th ed. 1936).

23  *See* 4 HOLDSWORTH, *supra* note 22, at 24–25.

24  AUSTIN LANE POOLE, FROM DOMESDAY BOOK TO MAGNA CARTA: 1087–1216, at 387 (1951).

25  *See id.* at 389–92.

26  FREDERIC WILLIAM MAITLAND, DOMESDAY BOOK AND BEYOND: THREE ESSAYS IN THE EARLY HISTORY OF ENGLAND 204 (1907).

27  *See* 4 HOLDSWORTH, *supra* note 22, at 24–27; MAITLAND, *supra* note 26, at 204; POOLE, *supra* note 24, at 387.

and the coroners, were paid in this way."[28] Administrative officials were not alone in living on payments from their constituents; judges also charged fees to those they served.[29] Holdsworth commented that the "royal officials, even the judges, were both poorly and irregularly paid [by the Crown]."[30]

The fees collected by public officials were generally fixed—some by law, and others by custom.[31] In fact, the law of the time held many civilians (particularly those whose position implied a fiduciary trust subject to abuse or marketeering, such as millers,[32] ferrymen,[33] and ecclesial officers[34]) legally liable as public officials under charges of extortion for exceeding customary rates and charges, despite the fact that these civilians were not employed by the Crown.[35]

Although sheriffs and other public officials received poor salaries and were legally limited in their capacity to charge the public for their services, "[t]he office of sherrif was evidently a lucrative one. Men were prepared to pay a high price to be appointed."[36] The source of the sheriffs' revenue, and for that matter the revenue of the coroners, judges, jailers, and other public officials, was a blatant and widespread disregard for legal and customary limits on their fees.[37] Holdsworth noted the "widespread corruption of the constantly increasing tribe of royal officials,"[38] and Poole asserted "that [the sheriffs] were often ra-

---

28   10 HOLDSWORTH, *supra* note 22, at 153.

29   1 *id.* at 255.

30   2 *id.* at 294.

31   Statutes such as 1586, 29 Eliz., c. 4–5 (Eng.) list with explicit detail the rates and fees the named public officials were bound to follow in the administration of their duties. Many fees were not listed by any statute, but were instead fixed as a matter of custom venerated enough to carry the force of law. *See* 1 FREDERICK POLLOCK & FREDERIC WILLIAM MAITLAND, THE HISTORY OF ENGLISH LAW BEFORE THE TIME OF EDWARD I, at 183 (2d ed. 1952) ("The unenacted part—and this is the great bulk—of the law seems to be conceived as custom (consuetudo)."). St. Thomas More remarked upon the static nature of the feudal economic system, commenting that "even if the number of sheep should increase greatly, their price will not fall a penny." THOMAS MORE, UTOPIA 20 (George M. Logan & Robert M. Adams eds., Cambridge Univ. Press 1989) (1516).

32   Rex. v. Wadsworth, 87 Eng. Rep. 489 (K.B. 1694).

33   Rex. v. Roberts, 87 Eng. Rep. 286 (K.B. 1693).

34   Lake's Case, 74 Eng. Rep. 677 (K.B. 1591).

35   Two cases particularly support this point. In *Roberts,* a ferryman was convicted of extortion for accepting double the customary ferry rate. *Roberts,* 87 Eng. Rep. at 286. In *Wadsworth,* the court similarly convicted a miller of extortion for exceeding the customary rates. *Wadsworth,* 87 Eng. Rep. at 489.

36   POOLE, *supra* note 24, at 388.

37   2 HOLDSWORTH, *supra* note 22, at 294.

38   2 *Id.*

pacious and oppressive . . . ."[39] A testament to the thoroughness of corruption by public officials, particularly the sheriffs, lies in the creation of the office of coroner. Diana E.S. Dunn documented:

> The office of coroner was established in 1194. Shrieval corruption had long been a problem to the Crown, depriving it of much potential revenue, and royal finances were in a particularly parlous state at this time because of the enormous ransom which had been demanded for the release of Richard I, who was captured while on crusade. The establishment of the office of coroner was intended to act as a check on the activities of sheriffs and to ensure that judicial revenue, such an important part of the king's income, reached his coffers.[40]

The history of extortion under color of official right is best understood against the backdrop of this complex interaction of weak central regulation, unsalaried and fee-reliant public officials, and custom.

This complex system was the background for all of the law against corruption, particularly that proscribing extortion and bribery. From the time of the Statute of Westminster I in 1275 to the end of the eighteenth century, there was no meaningful distinction between the state of mind elements for these two crimes.[41] Bribes (unlawful takings by judges[42] or voters,[43] or the sale of unsaleable public offices[44]) and extortions (takings by ecclesial officers[45] or administrative officials[46] under color of right) were considered similarly corrupt,[47] and required the same corrupt state of mind under the law. Accordingly, this Note treats extortion, bribery, and oppression[48] interchangeably

---

39  POOLE, *supra* note 24, at 387.

40  DIANA E.S. DUNN, COURTS, COUNTIES AND THE CAPITAL IN THE LATER MIDDLE AGES 95 (1996).

41  *See generally* Lindgren, *supra* note 15, at 824–25 (arguing that proscriptions against corruption were designed to punish improper takings by public officials without making any meaningful distinction between whether those takings were "extortion" or "bribery").

42  *See, e.g.,* The Mayor of Lynns Case, 74 Eng. Rep. 269 (K.B. 1586).

43  *See, e.g.,* Bush v. Ralling, 96 Eng. Rep. 883 (K.B. 1756); Rex v. Plympton, 92 Eng. Rep. 397 (K.B. 1724); Rex v. Mayor of Tiverton, 88 Eng. Rep. 136 (K.B. 1723).

44  *See, e.g.,* Rex v. Vaughan, 98 Eng. Rep. 308 (K.B. 1769); Stockwell v. North, 74 Eng. Rep. 1068 (K.B. 1669).

45  *See, e.g.,* Rex v. Loggen, 93 Eng. Rep. 393 (K.B. 1797); Rex v. Eyres, 82 Eng. Rep. 1123 (K.B. 1667).

46  *See, e.g.,* Longvills Case, 83 Eng. Rep. 1218 (K.B. 1665); Dive v. Maningham, 75 Eng. Rep. 96 (K.B. 1550).

47  *See* Lindgren, *supra* note 15, at 837–82; *see also* 2 HOLDSWORTH, *supra* note 22, at 564–74.

48  Courts typically used the word oppression to describe fear or force extortion, but occasionally used it as a synonym for extortion under color of official right. *See*

for the purpose of defining the corrupt state of mind element at common law.

### B.  The Presence of "Corruptly" in Common-Law Extortion

Examination of the case law reveals a surprisingly consistent agreement across centuries about what mental state imputed guilt for extortion and bribery, that is, what constituted a "corrupt" mind. That this common thread is often implied in the text rather than expressly stated is of little moment, particularly because formal state-of-mind requirements were not dominant features of the law of the time.[49]  Further, the idea of a corrupt mind was likely well enough understood at the time to require little discussion.  Despite a dearth of direct treatment of the corrupt state of mind at common law, an ostensive definition of corruptly is possible through analysis of the facts, holdings, and dicta of common law materials.[50]  Ostensive definition is arguably the more appropriate way to define an element of a common-law crime.[51]

Extortion and bribery were virtually indistinguishable common-law crimes, and bribery at common law expressly required a corrupt state of mind.[52]  This state of mind is suggested in the 1762 case *Rex v. Williams*,[53] where justices of the peace who withheld alehouse licenses as a retribution for the plaintiffs' refusal to vote for them were tried for extortion, even though improper attempts to influence voters

---

An Act to Prevent Occasional Freemen From Voting at Elections of Members to Serve in Parliament For Cities and Boroughs, 1763, 3 Geo. 3, c. 15 (Eng.) (typifying color of right extortive behavior as "extortion, injustice, and oppression"); *see also Stockwell*, 74 Eng. Rep. at 1068 (finding the Sheriff of Nottingham's unlawful sale of the offices of jailer and bailywick a "corruption, and a great cause of oppression").  For the purposes of this Note, oppression will be subsumed under the broader category of extortion as it was at common law.

49   *See supra* note 18.

50   Connotative definition clarifies word meaning by substituting synonyms in the manner of a dictionary.  Ostensive definition describes by example.  For instance, the connotative definition of a sphere would be "the three dimensional shape described by the movement of one point a fixed distance from another stationary point."  By contrast, an ostensive definition of a sphere might involve finding a well-formed marble, and indicating that a sphere is something like *this*.

51   G. Robert Blakey, *Threats, Free Speech, and the Jurisprudence of the Federal Criminal Law*, 2002 BYU L. REV. 829, app. A.

52   Bush v. Ralling, 96 Eng. Rep. 883, 883–84 (K.B. 1756) (characterizing bribery as the corruption of a public official); *see also* 18 U.S.C. § 201(b)(1) (2000) (requiring a finding of corrupt intent for bribery by public officials).

53   97 Eng. Rep. 851 (K.B. 1762).

were more commonly typified as bribery.[54] Further, the court expressly found that the justices proceeded "from a corrupt motive," that is, an unlawful purpose; further, this finding was necessary to the conviction.[55]

In the 1740 case *Rex v. Seymour and Others*,[56] three justices of the peace were convicted (but not under the aforementioned statute) of extortion for requiring foreigners to pay ten shillings for a license to run an alehouse, when one shilling was the customary amount.[57] The defendant justices' guilt for extortion hinged upon their demand for a payment *to which they knew they were unentitled*.[58] Once again, purposeful impropriety beyond the act of taking played an important role in the determination of guilt. *Rex v. Young and Pitts, Esq.*,[59] falling chronologically between *Seymour* and *Williams*, was decided in 1758. In *Young*, two justices of the peace were charged with oppression for refusing to grant an alehouse license to one Henry Day.[60] The court held that the justices could not be subjected to an information unless "partiality, corruption, or malice shall clearly appear."[61] As demonstrated by the following passage, the court's determination of criminality hinged on the justices' state of mind: "[i]f their judgment is wrong, yet their heart and intention pure, God forbid that they should be punished! . . . The present question therefore only is, whether these gentlemen have been guilty of any partiality or malice (for corruption is not pretended,) . . . ."[62] The court was unwilling to find guilt unless the judges had acted with an impure heart; or, in terms more friendly to the modern legal imagination, an unlawful purpose.

Although *Williams* dealt with both behavior commonly considered extortion (improperly exercising power for profit by withholding a license) and behavior commonly considered bribery (influencing voters) at the same time, *Young* demonstrated that the same corrupt state of mind requirement attached to an extortion charge divorced from any charge of bribery. Further, the horror expressed in *Young* at attributing guilt to one innocent in purpose suggests that the corrupt

---

54  *See, e.g.*, Rex v. Mayor of Tiverton, 88 Eng. Rep. 136, 136 (K.B. 1723); *see also* Bush, 96 Eng. Rep. at 883.

55  *Williams*, 97 Eng. Rep. at 851.

56  87 Eng. Rep. 1305 (K.B. 1740).

57  *Id.* at 1305–06.

58  *Id.* at 1306.

59  97 Eng. Rep. 447 (K.B. 1758).

60  *Id.* at 447.

61  *Id.* at 450.

62  *Id.*

state of mind requirement was a common and deeply held assumption of the law.

In a large number of extortion cases, courts convicted public officials of extortive behavior with no reference at all to state of mind.[63] The existence of these cases does not challenge this Note's theory of "corruptly," largely because the idea of "state of mind" as it is currently conceived was not an ascendant concept in the law prior to the nineteenth century.[64] Rather these cases, by their generalized type, provide support for the theory. Viewed broadly, these cases all deal with public officials who allegedly accepted, demanded, or took fees greater than those set by statute or custom. Many of the cases contain nothing but a bare description of facts and the holding, but all the cases contain two common elements: (1) a fee was taken, and (2) the taker knew that the amount taken was inappropriate. The bulk of cases that convicted public officers of corruption without discussing state of mind concerned public officers or quasi-officers that violated a customary, rather than a statutory fee.[65] Because custom is by nature a practice of which all members of the society are aware,[66] argument over whether or not a particular defendant knew that he was violating the customs associated with his office would have served little purpose for the litigants or the court; given the definitional prevalence of custom, discussion of the defendant's knowledge thereof would likely have proven irrelevant or futile. As a result, the defendant's state of mind in such cases commonly remained undiscussed. Many such cases include no discussion beyond bare facts describing

---

63  *See, e.g.*, Miller v. Aris, 170 Eng. Rep. 598 (N.P. 1800); Hescott's Case, 91 Eng. Rep. 291 (K.B. 1795); Stotesbury v. Smith, 97 Eng. Rep. 635 (K.B. 1760); Williams v. Lyons, 88 Eng. Rep. 138 (K.B. 1724); Rex v. Colvin, 88 Eng. Rep. 162 (K.B. 1723); Rex v. Tracy, 87 Eng. Rep. 795 (K.B. 1704); Rex v. Wadsworth, 87 Eng. Rep. 489 (K.B. 1694); Rex v. Roberts, 87 Eng. Rep. 286 (K.B. 1693); Anonymus, 87 Eng. Rep. 162 (K.B. 1688); Rex v. Broughton, 83 Eng. Rep. 455 (K.B. 1673); Troy, an Attorney, 88 Eng. Rep. 686 (K.B. 1669); Stockwell v. North, 74 Eng. Rep. 1669 (K.B. 1669); Rex v. Eyres, 82 Eng. Rep. 1123 (K.B. 1667); Badow v. Salter, 82 Eng. Rep. 34 (K.B. 1625); Empson v. Bathurst, 123 Eng. Rep. 1095 (C.P. 1622); Beawfage's Case, 77 Eng. Rep. 1076 (K.B. 1600); Dive v. Maningham, 75 Eng. Rep. 96 (K.B. 1550).

64  *See supra* note 18 (noting the historical development of intent as a concept in the law).

65  *See* An Act to Prevent Occasional Freemen From Voting at Elections of Members to Serve in Parliament for Cities and Boroughs, 1763, 3 Geo. 3, c. 15 (Eng.).

66  According to the Oxford English Dictionary, custom in the sense used here means "[a]n established usage which by long continuance has acquired the force of a law or right . . . ." 4 OXFORD ENGLISH DICTIONARY, *supra* note 12, at 167. In instances where an alleged extortioner demanded more than a customary fee, his knowledge of the custom would likely be presumed due to the prevalence of knowledge inherent in the idea of custom.

the conduct and a verdict.[67] Cases dealing with customary fees often extended the class of liability beyond public officials to include some civilians, whose fiduciary positions were bounded by customary fees such as millers, ferrymen, and the clergy.[68] Far from undermining the existence or meaning of the corrupt state of mind requirement, these "intentless" cases serve only to emphasize the ubiquity of societal customs and the lack of a formal conception of state of mind.

Some of the cases where state of mind and knowledge were not at issue were predicated upon the violation of statutory rather than customary fee limits. Statutory convictions tended to generate more state of mind related discussions than custom-based cases did, indicating that such discussion was less relevant to custom cases (where a defendant's knowledge of the "law" was circumstantially easy to infer as an issue of fact) than it was to statutory conviction (where a defendant's knowledge of the law was not circumstantially assured). In *Beawfage's Case*,[69] the court convicted a sheriff of improperly taking money from a prisoner. Beawfage was tried under a statute that limited the sheriff to collecting from someone only "to be a true prisoner or to pay for his meat and drink . . . ."[70] On its face, the statute had no state of mind element.[71] Interpreting the statute, the court commented, "the statute was made to avoid perjury, extortion, and oppression."[72] As a matter of logic, the legal fees listed in the statute could not have helped public officials to follow the law, nor could the statute itself have prevented the listed crimes, unless knowledge of the statute had a bearing on commission of the crime—that is, a corrupt state of mind requirement.

Treatises interpreting the common law affirm the conclusion that common law extortion had a corrupt state of mind element. John Prentiss Bishop stated that "it is always held that extortion proceeds only from a corrupt mind."[73] Wharton commented that "as to extortion at common law, and under most of the statutes, *corrupt motive is essential*."[74] Perkins and Boyce concurred, stating that "there is a special element which constitutes the mens-rea of the crime [extortion],

---

67    *See supra* note 63.

68    *See supra* notes 32–34.

69    77 Eng. Rep. 1076 (K.B. 1600).

70    23 Hen. 6 c., 10. (Eng.)

71    *Id.*

72    *Beawfage's Case*, 77 Eng. Rep. at 1081.

73    2 JOHN PRENTISS BISHOP, BISHOP ON CRIMINAL LAW 328 (John M. Zane & Carl Zollman eds., 9th ed. 1923).

74    2 FRANCIS WHARTON, WHARTON'S CRIMINAL LAW § 1906 (12th ed. 1932) (emphasis added).

NOTRE DAME LAW REVIEW    [VOL. 78:5

and this is *corruption*. Because of this fact extortion is not committed by the officer who innocently receives an unlawful fee as a result of an honest mistake of fact or law."[75] Clark and Marshall stated that to "constitute extortion at common law, and very generally under the statutes, there must be a *corrupt* intent."[76]

Using extortion and bribery as our definitional bases for "corruptly," we now proceed to the ostensive process of defining corruptly. One well-accepted definition of common-law extortion comes from William Hawkins' *A Treatise of the Pleas of the Crown*.[77] Hawkins stated:

> It is said, that extortion in a large sense signifies any oppression under colour of right; but that in a strict sense it signifies the taking of money by any officer, by colour of his office, either where none at all is due, or not so much is due, or where it is not yet due.[78]

While Hawkins provided a functional definition of the actus reus of extortion (with which a wide variety of legal scholars have agreed),[79]

75  ROLLIN M. PERKINS & RONALD N. BOYCE, CRIMINAL LAW 446–47 (3d ed. 1982) (emphasis added).

76  WILLIAM L. CLARK & WILLIAM L. MARSHALL, A TREATISE ON THE LAW OF CRIMES 795 (6th ed. 1958) (emphasis added).

77  1 WILLIAM HAWKINS, A TREATISE OF THE PLEAS OF THE CROWN (8th ed. 1824).

78  1 *id.* at 418.

79  Hawkins's treatise, originally published 1716, is the first in a long line of treatises that support this Note's view of the corrupt state of mind requirement in color of right extortion. Chronologically, these are 4 BLACKSTONE, COMMENTARIES *141 (originally published 1769) (" *[E]xtortion* is an abuse of public justice, which consists in any officer's unlawfully taking, by colour of his office, from any man, any money or thing of value that is not due to him, or more than is due, or before it is due."); 3 JOSEPH CHITTY, THE CRIMINAL LAW 293 n.(q) (1816) ("Where a statute annexes a fee to an office, it will be extortion to take more than it specifies. . . . [but] [w]here nothing at all is due, that fact ought to be averred, and where any thing was due, the sum that ought to have been lawfully taken must be expressed."); 2 FRANCIS WHARTON, A TREATISE ON THE CRIMINAL LAW OF THE UNITED STATES § 2519 (7th ed. 1874) (originally published 1846) ("Extortion, in its general sense, signifies any oppression by color of right; but technically it may be defined to be the taking of money by an officer, by reason of his office, either where none is due, or none is yet due."); CLARK & MARSHALL, *supra* note 76, at 794 (originally published 1863) ("Extortion is the obtaining of the property of another, with his consent induced by the wrongful use of force or fear or under the color of official right."); JAMES FITZJAMES STEPHEN, A DIGEST OF THE CRIMINAL LAW 112 (Frederick Sturge ed., 9th ed. 1950) (originally published 1877) ("If the illegal act consists in taking under the colour of office from any person any money or valuable thing which is not due from him at the time when it is taken, the offence is called 'extortion' . . . . Extortion, in its general sense, signifies any oppression by color of right; but technically it may be defined to be the taking of money by an officer, by reason of his office, either where none is due, or none is yet due."); 2 EMLIN MCCLAIN, THE CRIMINAL LAW 129 (1897) ("The [extortion] indictment should charge not only the taking of unlawful fees, but the facts showing the fees to be unlaw-

he does not state a mens rea for the offense. Nevertheless, Hawkins suggested a state of mind requirement when he later explicated that "the chief danger of oppression is from officers being left at their liberty to set their own rates on their labour, and make their own demands; but there cannot be so much fear of these abuses while they are restrained to *known* and stated fees."[80]

Hawkins made two assumptions. First, Hawkins assumed that laws against extortion were designed to curb abuse by requiring officials to adhere to "stated fees." Second, Hawkins assumed that to commit extortion, the official must *know* that he is violating the stated fees. While these implications alone may not comprise incontrovertible authority, their constant reaffirmation in the case law suggests their correctness. Although Hawkins's extortion definition (and the definitions of the long line of treatise writers that rely upon it) has no express corrupt state of mind requirement, such a state of mind requirement was nevertheless assumed.[81] Omitting "corruptly" altogether is a mistake unique to the modern law.

### C. The Meaning of Corruptly at Common Law

In *Rex v. Clerk of the Peace of Cumberland*,[82] a judicial clerk was accused of taking "more than his just fee and due."[83] While this was an otherwise typical charge of color-of-right extortion, the opinion contained uncommonly useful commentary from the bench.[84] One of the defendant's objections to the indictment was that the indictment did not show with particularity how much the clerk took, how much he was entitled to take, and his reason for taking more than he was allowed.[85] Dissenting from the conviction, Justice Holt commented that "[e]xtortion is a specific offence . . . he said he took ten shillings more than his fee; why this may be, for perhaps he had another de-

---

ful. It should state what was demanded and received, and . . . what was due; and it must be charged that what was received was for official services."); PERKINS & BOYCE, *supra* note 75, at 443 (characterizing common law extortion as the corrupt collection of an unlawful fee by an officer under color of office, "with no proof of threat, force, or duress required" (quoting United States v. Williams, 621 F.2d 123, 124 (5th Cir. 1980))).

80    1 HAWKINS, *supra* note 77, at 419 (emphasis added).

81    *See infra* notes 114–16 and accompanying text.

82    88 Eng. Rep. 908, 908 (K.B. 1706).

83    *Id.*

84    The majority of the cases from this period and area of the law generally record only a bare record of the facts and the holding, with minimal discussion.

85    *Cumberland*, 88 Eng. Rep. at 909.

mand upon him."[86] Holt's dissent demonstrates that the required
mental state exceeded mere knowledge that the official was collecting
a fee. Holt implied that the clerk, to have a corrupt mind, needed to
not only intend his actions, he needed to understand the propriety of
his actions in light of the law. Holt dissented because the court
wanted to attribute guilt to a person whose unlawful purpose re-
mained unproven.[87] Ultimately, the law followed Holt's dissent in-
stead of *Cumberland*'s holding.

Following Holt both in time and in law, the court in *Rex v. Go-
ver*[88] affirmed an extortion conviction because the defendant "color
officii extorsive injuriose he took money, and sheweth not for what
matter or cause."[89] The court indicated that, if the defendant had
been able to show cause (in other words, had proof of a lawful pur-
pose), no conviction would lie.[90]

The idea that the corrupt mind *knows* that it is violating the law is
further emphasized in *Rex v. Vaughan*.[91] In *Vaughan*, the defendant
was convicted of bribegiving for offering to buy a clerkship at the Su-
preme Court of Jamaica. The court found that the defendant
Vaughan, when offering to buy the office from Duke Grafton, made
special arrangements that the dealings between himself and the Duke
remain secret.[92] Vaughan claimed in response that he believed the
office was saleable, and that the secrecy surrounding the sale was the
product of Duke Grafton's fears that the transaction was a political
trap.[93] The court convicted Vaughan of bribery,[94] and the center-
piece of its deliberation was whether or not Vaughan believed that the
office was saleable.[95] The secrecy with which he undertook the trans-
action proved his undoing, as the court convicted him upon the rea-
soning that "all [the circumstances] prove that he himself looked
upon it as an unjustifiable transaction."[96]

Vaughan's guilt hinged upon whether or not he *believed* that his
offer to buy the office was legitimate—not whether or not the office

---

86   *Id.* (Holt, J., dissenting).

87   *Id.* (Holt, J., dissenting).

88   83 Eng. Rep. 992, 992 (K.B. 1663).

89   *Id.*

90   *Id.*

91   98 Eng. Rep. 308, 308 (K.B. 1769).

92   *Id.*

93   *Id.* at 309. Ironically, Duke Grafton's alleged fears would serve as circumstan-
tial evidence that the sale was "corrupt"—that is, that both parties knew that the trans-
action was not entirely appropriate under the law.

94   *Id.* at 310–11.

95   *See id.* at 308–10.

96   *Id.* at 310.

actually was saleable. This is a telling statement on the court's conception of "corruptly." Bribery and extortion required a special mental state: the perpetrator had to know that his behavior contradicted custom or law. In the words of the *Vaughan* court, the perpetrator had to know that he conducted an "*unjustifiable* transaction."[97]

The notion that a corrupt state of mind involves awareness of illegality is further supported in *Rex v. Young and Pitts, Esq.*[98] *Young* provides a glance at conduct the courts were sure did *not* proceed from a corrupt mind. In *Young,* the court admitted that "corruption is not pretended" concerning the defendants' state of mind.[99] The justices' conduct (i.e., refusing to grant a license) was not extortion, regardless of whether their decision was based on dislike, favoritism, or other ignoble but legal uses of discretion. The court implied what manner of mental state it would have found culpable when it asked, "why are [the defendants] liable to be called to account . . . unless they act faultily and willfully wrong?"[100] Because the court required action "faultily and willfully"[101] wrong for guilt, *Young,* like *Cumberland* and *Vaughan,* must be read to hold that corrupt purpose is an unlawful purpose, involving knowledge of both fact and law.

Not only did corrupt state of mind at common law involve both knowledge of fact and knowledge of law, it involved knowledge of fact and of *particular* law. Because every public official could collect a different set of legal and customary fees, the official could only be guilty of extortion if the court found that he deliberately violated the fee schedule attached to his *particular* office. Evidence for this proposition lies in the plain fact of existence of elaborate statutory fee schemes for public officials that overlaid the pre-existing social customs.[102] The case law also bears out this interpretation. In *Floyd and St. Tho Cannon's Case,*[103] the court declared that "if a man exihibiteth against another man for extortion, there the sum certaine which he did extort, must be laid out particularly in the bill."[104] Similarly, in *Lake's Case,*[105] the court commented, "if no fee be due, the same ought to appear in the judgment."[106] In *Rex v. Tracy*[107] the court re-

97  *Id.* (emphasis added).

98  97 Eng. Rep. 447 (K.B. 1758).

99  *Id.* at 450.

100  *Id.* at 448.

101  *Id.*

102  *Id.; see also* 1586 29 Eliz. c. 4–5 (Eng.).

103  78 Eng. Rep. 257, 257 (K.B. 1628).

104  *Id.*

105  74 Eng. Rep. 677, 677 (K.B. 1591).

106  *Id.*

fused to convict the defendant because the prosecution failed to show that the defendant had taken anything to which he particularly was unentitled.[108] The court in *Cumberland* summarized the point well when it declared "where there is a charge of extortion, it must be particularized."[109] Extortion at common law, therefore, was an offense particular to the legal limits of the office involved, and knowledge of that law was an element of corrupt state of mind.

The court in *Dive v. Maningham*[110] convicted a sheriff of extortion for setting an unbailable prisoner free in return for an illegal fee. Discussing the nature of official right, the court commented, "this word *colore officii sui* is always taken . . . in malam partem, and signifies an act badly done under the countenance of office . . . and is properly called *extortion*."[111] Although the court made no direct reference to Maningham's state of mind, the court's description of the crime shows that, for guilt to attach, the taking must have been "in malam partem" or have been "*badly* done."[112] The court, by its language, assumed that the statute included a corrupt state of mind element.

In short, the case law ostensibly defines "corruptly" as an unlawful purpose, that is, as the purpose to give, take, receive, or accept, anything of value that is illegal or inappropriate to that particular office, knowing that it is illegal or inappropriate. "Corruptly" involves both knowledge of fact (the defendant must know what he is accepting or taking) and knowledge of law (the defendant must know that what he is accepting or taking is inappropriate to his office). The treatises bear out this interpretation.

Wharton contended that corrupt behavior could only occur "above all with knowledge that [the taking or receiving] was wrong . . . ."[113] Clark and Marshall described corruptly as follows: "it is not enough to show that unlawful fees were demanded and received, but it must appear that they were demanded and received corruptly, and, according to the better opinion, not under any mistake either of law or fact."[114] Stephen followed this interpretation when he claimed that "an illegal exercise of authority, caused by a mistake as to the law, made in good faith, is not a misdemeanor [of extortion]."[115] McClain

---

107   87 Eng. Rep. 795, 795 (K.B. 1703).
108   *Id.*
109   Rex v. Clerk of the Peace of Cumberland, 88 Eng. Rep. 908, 908 (K.B. 1706).
110   75 Eng. Rep. 96 (K.B. 1550).
111   *Id.* at 108.
112   *Id.* (emphasis added).
113   2 WHARTON, *supra* note 79, § 2517.
114   CLARK & MARSHALL, *supra* note 76, at 795.
115   STEPHEN, *supra* note 79, at 112.

concurred, adding: "[A]s to the intent, the statute should be limited to cases where there is a purpose to extort, and it may be shown by way of defense that the officer had grounds to believe and did believe that he was justified in taking the fees received."[116]

The common thread amongst the treatise characterizations is that to extort, a public officer had to be aware of his customary fees, had willfully to obtain or accept some value, and also had to know that the thing he obtained or accepted violated his appropriate official dues. Thus, "corruptly" implicated both knowledge of fact *and* knowledge of the law. That the treatises even treat mistake of law as a defense to extortion—despite the general precept that *ignorantia legis neminem excusat*—further supports this definition of corrupt state of mind as embracing an unlawful purpose. Most tellingly, all of these treatises follow Hawkins in defining extortion without an express corrupt state of mind requirement.[117]

## II.  THE HOBBS ACT: AN INTRODUCTION AND A BRIEF HISTORY

### A.  An Introduction to the Statutes

Three federal crimes are particularly relevant to corruption in the context discussed by this Note:[118] bribery, 18 U.S.C. § 201(b), illegal gratuities, 18 U.S.C. § 201(c), and color of law extortion, 18 U.S.C. § 1951(b)(2).  The bribery statute punishes whoever

> (1) directly or indirectly, corruptly gives, offers or promises anything of value to any public official or person who has been selected to be a public official, or offers or promises any public official or any person who has been selected to be a public official to give anything of value to any other person or entity, with intent—
>> (A) to influence any official act; or
>> (B) to influence such public official or person who has been selected to be a public official to commit or aid in committing,

---

116  2 McCLAIN, *supra* note 79, at 130.

117  *See supra* note 79.

118  The United States Code includes six types of conduct that do (or should, in the case of the Hobbs Act) carry a corrupt state of mind requirement. They are: bribery, governed by 18 U.S.C. § 201(b) (2000); illegal gratuities, covered by 18 U.S.C. § 201(c); extortion, covered by 18 U.S.C. § 1951(b)(2); theft and embezzlement, covered by 18 U.S.C. § 666(a)(1)(B); obstruction of justice, covered by 18 U.S.C. § 1503(a); and obstruction of the Internal Revenue laws, covered by 26 U.S.C. § 7212. This Note primarily addresses color of right extortion, with some commentary on bribery and illegal gratuities. While the idea of corrupt state of mind advanced by this Note is also applicable to the statutes not expressly considered within the Note, further discussion in this area would exceed this Note's scope.

or collude in, or allow, any fraud, or make opportunity for the
commission of any fraud, on the United States; or

    (C) to induce such public official or such person who has been
selected to be a public official to do or omit to do any act in
violation of the lawful duty of such official or person;

(2) being a public official or person selected to be a public official,
directly or indirectly, corruptly demands, seeks, receives, accepts, or
agrees to receive or accept anything of value personally or for any
other person or entity . . . .[119]

    Section 201(b)(2), the portion of the statute that prohibits
bribetaking by public officials, punishes much of the same conduct as
color-of-right extortion. Moreover, bribery under § 201(b) forbids
only the *corrupt* donation or receipt of gifts. Although the statutes
prohibit identical conduct, the color-of-right extortion provision of
the Hobbs Act has no corrupt state of mind requirement. Following
Parts of this Note will discuss in detail the importance of requiring a
corrupt state of mind to find guilt in an alleged extortioner (or, in this
case, bribetaker, for the same rationale applies to the bribery statute).
Over- and underbreadth are both serious dangers if a properly inter-
preted corrupt state of mind element is excluded or ignored.

    Section 201(b) bribery punishes acts of the bribe *giver* as well as
the bribetaker. If a public official can commit color-of-right extortion
and bribetaking for the exact same transaction, then a gift that is an
extortion when accepted by a public official is also a bribe when given.
Prosecutorial discretion, then, is all that separates a color-of-right ex-
tortion victim from a bribery defendant. Reading the Hobbs Act with-
out a corrupt state of mind requirement embraces the Model Penal
Code's misguided belief that "corruptly" should be removed from the
bribery statute altogether *so* that those who give in to extortionate
threats can be punished.[120] The solution to this conundrum is to ad-
here to the language already in the bribery statute and require that
the gift must be *corrupt,* that is, given with an unlawful purpose.

    By contrast, the illegal gratuities statute punishes whoever

(1) otherwise than as provided by law for the proper discharge of
official duty—

    (A) directly or indirectly gives, offers, or promises anything of
value to any public official, former public official, or per-
son selected to be a public official, for or because of any
official act performed or to be performed by such public

---

119  18 U.S.C. § 201(b)(1)–(2).
120  MODEL PENAL CODE § 240.1 (1980) (stating that the corrupt state of mind
should be removed because it hinders the prosecution of the victims of color of right
extortion).

    official, former public official, or person selected to be a
    public official; or

(B)  being a public official, former public official, or person se-
    lected to be a public official, otherwise than as provided by
    law for the proper discharge of official duty, directly or in-
    directly demands, seeks, receives, accepts, or agrees to re-
    ceive or accept anything of value personally for or because
    of any official act performed or to be performed by such
    official or person . . . .[121]

The primary differences between the illegal gratuities statute and
the bribery and extortion statutes are the lack of a corrupt state of
mind requirement and the punishment. The strict liability gratuities
statute carries a maximum punishment of only two years; by compari-
son, those convicted of bribery may serve five.[122]

By further contrast, the Hobbs Act punishes anyone who

[O]bstructs, delays, or affects commerce or the movement of any
article or commodity in commerce, by robbery or extortion or at-
tempts or conspires so to do, or commits or threatens physical vio-
lence to any person or property in furtherance of a plan or purpose
to do anything in violation of this section shall be fined under this
title or imprisoned not more than twenty years, or both.[123]

The Hobbs Act defines extortion as "the obtaining of property from
another, with his consent, induced by wrongful use of actual or
threatened force, violence, or fear, or under color of official right."[124]

Since the bribery and extortion statutes apply to substantially sim-
ilar conduct,[125] the most meaningful difference between the two
crimes is the facial presence of a state of mind element. While the
bribery statute requires that the exchange be made "corruptly," the
Hobbs Act has no state of mind attached to its color-of-right language.
Formally, as demonstrated in Part I, a corrupt state of mind should be
read into the Hobbs Act. Functionally, a well-defined corrupt state of
mind is all that prevents these statutes from encompassing political
logrolling and much accepted campaign-finance activity.[126]

---

121  18 U.S.C. § 201(c)(1).

122  *Compare* 18 U.S.C. § 201(b), *with* 18 U.S.C. § 201(c). One further difference is
that of personality: § 201(b) bribery can punish enterprises, while the illegal gratuities
statute inflicts only personal liability. 18 U.S.C. § 201(a).

123  18 U.S.C. § 1951(a).

124  18 U.S.C. § 1951(b)(2).

125  *See supra* Part I.

126  The Hobbs Act, on its face, encompasses any behavior that hinders interstate
commerce by threats, force, or extorsively under color of right. 18 U.S.C.
§ 1951(b)(2). Although the statute does not incorporate the word corruptly on its
face, this Note argues that a corrupt state of mind was required at common law as a

### B.    The History of the Hobbs Act

*Morissette* holds that statutory words should be read in light of their common-law meanings unless Congress otherwise instructs the courts.[127] In the face of congressional silence regarding the requisite state of mind for a common-law crime, the "[a]bsence of contrary direction may be taken as satisfaction with widely accepted definitions, not as a departure from them."[128] Whether the courts should read a corrupt state of mind into the Hobbs Act in accordance with *Morissette* therefore depends upon whether Congress: (1) adopted common-law extortion; or (2) having adopted common-law extortion, specifically intended to omit the common-law state of mind. The history of the Hobbs Act immediately reveals two relevant facts. First, Congress adopted common-law extortion when it enacted the Hobbs Act. Second, the focus of Congress and the Court was the control of racketeering activity, and corruption was an area on which Congress was silent. The common-law meaning of extortion—that is, one including a corrupt state of mind—should therefore obtain.

The Hobbs Act was not the first congressional effort to control racketeering, but was born as an amendment to the Anti-Racketeering Act of 1934.[129] The Act of 1934 was passed to "protect trade and commerce against interference by violence, threats, coercion, or intimidation."[130] The 1934 Act, in relevant part, punished whoever

> (a) Obtains or attempts to obtain, by the use of or attempt to use or threat to use force, violence, or coercion, the payment of money or other valuable considerations, or the purchase or rental of property or protective services, not including, however, the payment of wages by a bona-fide employer to a bona-fide employee; or
> (b) Obtains the property of another, with his consent, induced by wrongful use of force or fear, or under color of official right; or
> (c) Commits or threatens to commit an act of physical violence or physical injury to a person or property in furtherance of a plan or purpose to violate subsections (a) or (b) . . . .[131]

The occasion for drafting the Act is apparent in its "Anti-Racketeering" moniker. Although the statute was not originally contem-

---

practical necessity, and should be similarly included in modern federal jurisprudence. *See* Lindgren, *supra* note 15, at 907.

127    Morissette v. United States, 342 U.S. 246, 263 (1952).

128    *Id.*

129    Anti-Racketeering Act of 1934, Pub. L. No. 73-376, 48 Stat. 979, *repealed by* Hobbs Act, c. 645, 60 Stat. 420 (1946) (codified as amended at 18 U.S.C. § 1951 (2000)).

130    *Id.*

131    *Id.* § 2(a)–(c).

plated as a corruption control device for public officials, the statute's language embodies such an application.

In 1933, Senate Resolution 74 of the 73rd Congress authorized a subcommittee of the Committee on Commerce to investigate racketeering activity. The subcommittee, eventually called the "Copeland Committee" after its chair, New York Senator Royal S. Copeland, filed an interim report claiming that more than ninety-two bills introduced to the Senate between January and June of 1934 were "designed to close gaps in existing federal laws and to render more difficult the activities of predatory gangs of the Kelly and Dillinger types."[132] Senate Bill 2248, which would later become the Anti-Racketeering Act of 1934, was among the bills described by Copeland as an effort to punish organized crime.[133] Attorney General Homer Cummings explained the bill in a letter to the Chairman of the House Judiciary Committee, Hatton W. Sumners: "the typical racketeering activities affecting interstate commerce are those in connection with price fixing and economic extortion directed by professional gangsters."[134] Controlling political corruption was an unmentioned application of the Act.

The debate surrounding the bill ignored the Act's potential impact on public officials to the extent that no questions were raised about the "color-of-right" language in the debates or committee reports. Nowhere in the history of the Act of 1934 is there any indication that Congress recognized that the Act could be used to prosecute political corruption, misuse of office, or political finance activity.

Instead, the debate surrounding the Act's passage focused mainly on its potential impact on organized labor. In the letter to Congressman Sumners, Attorney General Cummings wrote,

> The original bill was susceptible to the objection that it might include within its prohibition the legitimate and bona fide activities of employers and employees. As the purpose of the legislation is not to interfere with such legitimate activities but rather to set up severe penalties for racketeering by violence, extortion, or coercion, which affects interstate commerce, it seems advisable to definitely exclude such legitimate activities.[135]

The power of the labor interest in the bill became apparent during debate on the House floor. The following exchange between Con-

---

132  S. REP. No. 73-1440, at 1 (1934).
133  *Id.* at 2.
134  Letter from Homer Cummings, Attorney General of the United States, to Hatton W. Sumners, U.S. Representative from Texas (May 18, 1934), *reprinted in* PETER W. LOW & JOSEPH L. HOFFMAN, FEDERAL CRIMINAL LAW 268–69 (1997).
135  *Id.*

**NOTRE DAME LAW REVIEW** [VOL. 78:5

gressman Oliver of New York and Congressman Schulte typified the debate surrounding the bill:

> MR. SCHULTE: I reserve the right to object, Mr. Speaker.
>
> MR. OLIVER of New York: This is the noted racketeering bill recommended here and agreed upon by organized labor and by the Department of Justice. It has been agreed upon by every factor involved in this kind of controversy. We have Mr. Green [President of the American Federation of Labor] on record—
>
> MR. SCHULTE: Has the gentleman a letter from Mr. Green which he states he is on record in favor of this bill?
>
> MR. OLIVER of New York: Yes.
>
> MR. SCHULTE: If so, I shall withdraw my objection, if the gentleman will show me the letter.
>
> MR. OLIVER of New York: I cannot show the gentleman the letter, but Mr. Green specifically agreed to it and it is stated in the report that there is a letter from the Attorney General embodying the agreement—
>
> MR. SCHULTE: I do not care anything about the Attorney General.
>
> MR. OLIVER of New York: And Mr. Green appeared before our committee and stated before our committee that he intended to go into a further conference—
>
> MR. SCHULTE: Will the gentleman give me his assurance that he has a letter from Mr. Green stating that he has agreed to this bill?
>
> MR. OLIVER of New York: I will not say I have a letter—
>
> MR. SCHULTE: Has the gentleman seen such a letter from Mr. Green?
>
> MR. OLIVER of New York: No; but I have seen an agreement in which the Attorney General said that Mr. Green had agreed to it.[136]

Despite the potentially broad impact of the statutory text, Congress's overwhelming concern was how the Anti-Racketeering Act would affect organized labor. No meaningful reflection or discussion on how the bill might affect the members of Congress themselves occurred.

The enacted language of the 1934 Act was tailored to except organized labor activities from the statute's purview.[137] Seven years after the Act's passage, the Supreme Court considered its scope in *United*

---

136  78 CONG. REC. 10,867 (1934).

137  Anti-Racketeering Act of 1934, Pub. L. No. 73-376, § 2(a), 48 Stat. 979 ("not including, however, the payment of wages by a bona-fide employer to a bona fide employee").

*States v. Local 807.*[138] In *Local 807*, the Court upheld the Second Circuit's reversal of the convictions of several teamsters under the Anti-Racketeering Act.[139] The Local 807, whose membership included most of the truck drivers in New York City, had been in the practice of meeting non-member drivers and farmers driving to market near the city limit, stopping their vehicles, forcing them to allow a union driver to drive the truck into the city, and then requiring payment for the service.[140] In response to this outrageous behavior, federal prosecutors sought to punish members of the union under the Anti-Racketeering Act.[141] At issue was whether the hijacking non-member trucks by union teamsters fell within "that portion of § 2(a) which excepts from punishment any person who 'obtains or attempts to obtain, by . . . threat to use force, violence or coercion . . . the payment of wages by a bona-fide employer to a bona-fide employee.'"[142] After surveying the legislative history, the Court determined that Congress had intended to protect this kind of labor activity, and had "plainly attempted to distinguish militant labor activity from [racketeering] and afford it ample protection."[143] Accordingly, the Court concluded that, so long as the accused teamsters had a purpose to "obtain a chance to work for a wage," they did not fall within the Act's purview.[144]

The Court's construction of the Anti-Racketeering Act in *Local 807* was so controversial and unpopular that Congress drafted another bill for the express purpose of overruling the decision.[145] "To amend the Act entitled 'An Act to protect trade and commerce against interference by violence threats, coercion, or intimidation,'" Congress passed the Act eventually codified as 18 U.S.C. § 1951—the Hobbs Act.[146] The differences between the Hobbs Act and the Anti-Racketeering Act are best understood in the context of the Hobbs Act's origin as a congressional response to *Local 807*. The debates surrounding passage of the Hobbs Act concentrated solely on the its potential application to labor: "There was much vilification of . . . the *Local 807* case, but . . . in spite of their broad wording, almost no

---

138  315 U.S. 521 (1942).
139  *Id.* at 539.
140  *Id.* at 526.
141  *Id.* at 524–25.
142  *Id.* at 527 (quoting Anti-Racketeering Act § 2(a)).
143  *Id.* at 531.
144  *Id.* at 534.
145  PETER W. LOW & JOSEPH L. HOFFMAN, FEDERAL CRIMINAL LAW 292 (1997).
146  Hobbs Act, c. 645, 60 Stat. 420 (1946) (codified as amended at 18 U.S.C. § 1951 (2000)).

discussion of the possible application of the bill outside the labor con-
text."[147]  The attitude surrounding the bill's passage was typified by
the following exchange from the first House debate on the bill:

> MR. HALLECK: The celebrated *807* case in New York came on for
> decision by the Supreme Court. The case involved the conduct of
> individuals who stopped trucks going into the city of New York and
> in effect hijacked the drivers . . . . The Supreme Court held that
> under the exception [in § 2(a)] the prosecution would not lie in
> that case. I know a lot of good lawyers who violently disagree with
> that decision, and personally I disagree with it . . . .
>
> This bill seeks to supply the deficiency created by that decision.[148]
>
> MR. HANCOCK: [This bill] covers the most heinous crimes the
> criminal statute book contemplates. It had its origin in the activities
> of the Dillinger gang. All the bill does is abolish the double stan-
> dard which Justice Byrnes established [in *807*] and makes labor re-
> sponsible for crimes just as well as those who are not laborers. That
> is all it does.
>
> MR. CELLER: I wish the gentleman's interpretation were correct,
> but I fear that he is woefully in error. This bill is primarily aimed at
> labor. It has a label of racketeering, it has a label of extortion, it has
> a label of robbery, but it is an antilabor bill. Let us not delude our-
> selves, because were it not for the so-called Teamsters' Local deci-
> sion by Justice Byrnes, a labor decision, we would not have had this
> bill.[149]

The forgoing history demonstrates that the Hobbs Act was never
explicitly considered a weapon against political corruption. Predict-
ably, given the lack of congressional guidance, the proper application
of the "color of official right" language is now a source of controversy
in the federal courts.[150]  Congressional silence is in this case convinc-
ing evidence that the prosecution of political corruption was not an
explicit goal of the Hobbs Act. Although it tests the imagination to
speculate that Congress would intentionally leave a self-applicable pro-
vision of law such as color-of-right extortion to unfettered judicial in-
terpretation, they nevertheless did.  The significance of this
conclusion is that the lack of a corrupt state of mind requirement on
the face of the statute was not a deliberate congressional command
regarding the elements of color-of-right extortion, because Congress
made no *express* commands regarding the use of the Hobbs Act as a

---

147  Low & Hoffman, *supra* note 145, at 298.
148  89 Cong. Rec. 3192–93 (1943).
149  *Id.* at 3201.
150  *See infra* Parts IV–V.

corruption control device. Rather, Congress never contemplated that the Hobbs Act would be used to prosecute such conduct. In the light of such congressional silence, the courts should give extortion its common-law meaning.[151]

Interpreting the Hobbs Act's "color-of-right" language to comport with common-law meaning in light of congressional silence does not therefore leave the "color-of-right" clause undefined. The language of the Hobbs Act was taken whole cloth from the Field Code.[152] During the second House debate over the Act, Congressman Hobbs, the Act's sponsor, declared that "[t]he definitions in this bill are copied from the New York Code substantially."[153] *United States v. Evans*, one of the few Supreme Court decisions to address color-of-right extortion, also noted that the Hobbs Act enacted Field Code extortion.[154] Because the Field Code codified the common law, Congress by adopting it instituted a common-law extortion provision requiring a corrupt state of mind.[155]

### III. THE FIELD CODE

#### A. The Code

The Field Code defines extortion as "the obtaining of property from another, with his consent, induced by a wrongful use of force or fear, or under color of official right."[156] The Field Code's definition of extortion is almost identical to the corresponding language in the Hobbs Act extortion provision.[157] The Field Code further recognizes that, as at common law, color-of-right extortion differs substantially from "fear and force" extortion. While the Field Code treated "fear and force" extortion as a felony, it prescribed a different punishment for extortion under color of right: "[e]very person who commits any extortion under color of official right, in cases for which a different

---

151  *See* Morissette v. United States, 342 U.S. 246, 263 (1952).

152  *See* 91 CONG. REC. 11,900 (1945) (stating that the language of the Hobbs Act was taken from the Field Code); *see also* Field Code, *supra* note 20, § 613.

153  91 CONG. REC. 11,900 (1945).

154  504 U.S. 255, 261–62, 263 n.9 (1991).

155  *See supra* Part II.

156  Field Code, *supra* note 20, § 613.

157  *Compare* 18 U.S.C. § 1951(b)(2) (2000) (defining extortion as "the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right"), *with* Field Code, *supra* note 20, § 613 (defining extortion as "the obtaining of property from another, with his consent, induced by a wrongful use of force or fear, or under color of official right"). The two differ only slightly, and only regarding force and fear extortion. The color-of-right provisions are identical.

punishment is not prescribed by this Code or by some of the statutes which it specifies as continuing in force, is guilty of a misdemeanor."[158]

Although the Field Code purportedly codifies common-law extortion, its definition omits a corrupt state of mind element. The reason for the lack of a corrupt state of mind requirement may be explicable by the Field Code's date of publication: 1865. The Field Code was created and published well after the common-law definition of extortion had become muddied and corrupt state of mind as an effective element of color-of-right extortion had become lost. That "corruptly" as it related to color-of-right extortion was lost, however, does not preclude its validity as a part of the common law, or its adoption by the Field Code and then the Hobbs Act.

Hints of the corrupt state of mind that should inhere in color-of-right extortion can nevertheless be found by analyzing the Field Code. First, the Field Code deals with extortion under "Title XV: Of Crimes Against Property."[159] Under the Field Code's classification system, extortion's neighbors include arson, burglary, forgery, larceny, embezzlement, and false personation.[160] As would be expected with common-law crimes, all of these carry a "specific intent."[161] "Willful and malicious"[162] intent is required for arson; "intent to commit some crime"[163] for burglary; "intent to defraud"[164] for forgery; "with fraud or stealth, or without color of right thereto, and with the intent to deprive another thereof"[165] for larceny; "fraudulently"[166] for embezzlement; and "falsely"[167] for false personation.

The grammatical situation of the intent within these crimes is telling. Four crimes include the disjunctive "or" in their elemental definitions: larceny, forgery, false personation, and extortion. The larceny statute punishes "the taking of personal property accomplished by fraud or stealth, *or* without color of right thereto, and with

---

158  Field Code, *supra* note 20, § 616.

159  *Id.* at xlvii, l.

160  *Id.* at xlvii.

161  KAPLAN ET AL., *supra* note 18, at 207 (stating that all crimes for which common law courts had defined an intent element require a 'specific' intent (citing 1 JOEL PRENTISS BISHOP, COMMENTARIES ON THE CRIMINAL LAW 229, 220–22 (Boston, Little & Brown 1856))).

162  Field Code, *supra* note 20, § 521.

163  *Id.* § 540.

164  *Id.* §§ 553–57.

165  *Id.* § 584.

166  *Id.* § 601.

167  *Id.* § 620.

intent to deprive another thereof."[168] Each disjunct is given its own intent element. Forgery, for example, punishes "[e]very person who, with intent to defraud, forges, counterfeits *or* falsely alters."[169] Here the "or" is part of a list, all of whose components are covered by the provision's intent clause. False personation has a similar setup containing an intent element that covers a disjunctive list of culpable conduct, although there the list is more lengthy.[170]

Although it also contains a disjunctive clause, the extortion provision has a slightly different structure. The Field Code, like the Hobbs Act modeled upon it, defines extortion as "the obtaining of property from another, with his consent, induced by a wrongful use of force or fear, *or* under color of official right."[171] The difference between the "fear and force" extortion and "color-of-right" extortion is emphasized in a footnote to the definition of larceny. The Field Code states, "in extortion there is again a taking. Now it is *with* the consent of the party injured; but this is a consent induced by threats, *or* under color of official right."[172] The "color-of-right" clause is clearly separated in kind from the more familiar "wrongful use of force and fear" clause, but, unlike the disjunctive clauses in other crimes' definitions, it is neither graced with language of an independent intent, nor part of a list included under a broader intent. Nonetheless, color-of-right extortion is a common law crime listed by the Field Code as a crime against property, and as such its prosecution should require a "specific" state of mind. The inclusion of color-of-right extortion amongst other property crimes hints at that which the Field Code does not mention—that color-of-right extortion carries the "specific" state of mind "corruptly."

### B. Corruption, Bribery, and Extortion: Definition and Comparison within the Field Code

The Field Code, like Title 18 of the United States Code, facially retains a corrupt state of mind requirement for bribery, but not for extortion. Unlike the federal code, the Field Code has a working definition of "corruptly." The Field Code adequately (if somewhat narrowly) defines "corruptly" as "import[ing] a wrongful design to acquire or cause some pecuniary or other advantage to the person

---

168   *Id.* § 584 (emphasis added).
169   *Id.* § 553 (emphasis added).
170   *Id.* § 620.
171   *Id.* § 613 (emphasis added); *cf.* 18 U.S.C. § 1951(b) (2000) (using the Field Code language to define extortion under color of official right).
172   Field Code, *supra* note 20, § 584 cmt. (emphasis added).

guilty of the act or omission referred to, or to some other person."[173] The Field Code rightly states that the heart of the corrupt state of mind is a "wrongful design." Further, it is the design—that is, purpose—that is wrongful, not the mere conduct of acquisition.

Functionally, the structure of the Hobbs Act suggests that color-of-right extortion should carry a heightened state of mind element. Federal bribery, which can arise from the same conduct as color-of-right extortion and itself carries a corrupt state of mind requirement, carries a maximum penalty of fifteen years.[174] Color-of-right extortion under the Hobbs Act, which on its face has no state of mind element, carries a maximum penalty of twenty years.[175] It is a well-recognized principle of the criminal law that separate crimes covering similar conduct generally punish the more evil-meaning mind (that is, one with a more specific purpose to commit a wrong) with the greater sentence.[176] It makes little sense for two federal statutes covering much of the same conduct to carry substantially different penalties when the *more harshly punished conduct requires the lesser state of mind.* The solution to this apparent structural flaw is to read a corrupt state of mind requirement into color-of-right extortion, as at common law.

## C.  People v. Whaley

The Field Code's only cited case regarding color-of-right extortion is *People v. Whaley.*[177] Further, the Supreme Court relied upon *Whaley* as precedent in both *Evans*[178] and *McCormick.*[179] The Field Code's omission of an express corrupt state of mind element is interesting in light of its use of *Whaley* as a source, given that *Whaley* expressly included a jury finding of corrupt state of mind as an essential

---

173  *Id.* § 765.

174  18 U.S.C. § 201(b)(4) (2000).

175  18 U.S.C. § 1951(a).

176  Punishment for the taking of human life, for example, may vary widely. "Murderers," or those who take life deliberately without excuse or justification, are punished more severely than "manslaughterers," those who commit the same conduct with a lesser degree of intent. This example typifies the criminal law.

177  6 Cow. 661 (N.Y. Sup. Ct. 1827).

178  Evans v. United States, 504 U.S. 255, 276 (1992) (using *Whaley* to rebut Justice Scalia's dissenting claim (which itself relied on *Whaley*) that color-of-right extortion at common law always involved false pretenses).

179  McCormick v. United States, 500 U.S. 257, 279 (1991) (citing *Whaley* as the sole pre-Hobbs Act New York prosecution of color of right extortion, in an attempt to demonstrate the dearth of authority for the crime's definition. As Part I demonstrates, however, ample authority for the definition of color of right extortion exists if research is extended but a little further back in time.

element of the charge.[180] The jury sitting in *Whaley* found guilt by concluding that the defendant judge "received and demanded . . . money by color of his office, *and with the corrupt intent charged in the indictment.*[181] The opinion stated that "[t]hese facts being proved, the [offense] was complete."[182] In contrast to the Field Code and the Supreme Court jurisprudence that draw upon *Whaley* as precedent, the *Whaley* itself included "corruptly" as an essential element to the charge of extortion under color-of-right.

Furthermore, *Whaley* held that "[t]he questions of fact and [corrupt] intent were fairly submitted to the jury. It was their province to judge of both . . . ."[183] As corrupt intent was a question of fact for the jury, *Whaley* strongly suggests that mistake of law was a defense to the element of corrupt state of mind. If mistake of the law is a defense to color-of-right extortion, then knowledge of the law must be an element of the corrupt state of mind. *Whaley*'s holding has the additional benefit of being correct in light of the common-law tradition.

The Hobbs Act drew its language and meaning from the Field Code. The Field Code was a codification of the common law. *Whaley,* the common-law opinion referenced by the Field Code, recognized the longstanding common-law tradition of requiring a corrupt state of mind for guilt, and therefore admitting a possible mistake of law defense in color-of-right extortion cases. Accordingly, courts should require that color-of-right extortion under the Hobbs Act be committed "corruptly."

## IV. *Alfisi* and *Roma*: A Case Study in the Confusion of the Modern Courts

Recently, federal courts and reform bodies have struggled with various stopgap measures designed to mitigate the potential reach of the bribery and extortion statutes. One prominent discussion, addressed by the Supreme Court in *McCormick v. United States,*[184] settled in the affirmative a judicial debate over whether the Hobbs Act included a quid pro quo requirement for color-of-right extortion. The quid pro quo requirement, however, serves as a pained and ill-fitting

---

180  *Whaley,* 6 Cow. at 664.

181  *Id.* (emphasis added).

182  *Id.*

183  *Id.*

184  500 U.S. 527 (1991) (asserting that color-of-right extortion could not be found absent a finding of quid pro quo).

effort by the Court to recover the utility of a properly defined corrupt state of mind requirement.[185]

Another band-aid, this one applied to bribery by the American Law Institute (ALI), is found in the Model Penal Code's recommendation (adopted in several states)[186] that the "corruptly" language be removed from bribery statutes altogether because "the requirement of 'corrupt' purpose provides virtually no guidance as to the intended scope of the law of bribery."[187] Despite the ALI's argument to the contrary, purging the law of "corruptly" has resulted not in greater clarity, but rather in deeper confusion.[188]

A case contrast between proper and improper conceptions of corrupt state of mind as it relates to extortion and bribery will serve as a useful to guide to inform a broader survey of the federal courts. In *Roma Construction Co. v. aRusso*,[189] the First Circuit correctly captured the proper role of corrupt state of mind. In *Roma*, Peter Zanni and Roma Construction Company entered into a real estate development venture.[190] Unbeknownst to them, their partners in the venture had made a deal with the "de facto government of the Town" in which cash would be exchanged for necessary approvals.[191] Eventually, the partners departed and Roma and Zanni were informed of the preexisting deal and asked to pay up.[192] Faced with a choice between capitulating to the extortionate demand or losing their multimillion dollar investment, Roma and Zanni decided to pay.[193] Three years later, after Zanni succeeded in selling his shares of the venture, he contacted

---

185  *See infra* Part V.A.

186  The Model Penal Code lists Arkansas, Colorado, Connecticut, Delaware, Georgia, Hawaii, Idaho, Illinois, Indiana, Iowa, Kansas, Kentucky, Louisiana, Maine, Minnesota, Missouri, Montana, Nebraska, New Hampshire, New Jersey, New Mexico, New York, Oregon, Pennsylvania, South Dakota, Texas, Utah, Virginia, Washington, and West Virginia as following their 'corruptless' approach. MODEL PENAL CODE § 240.1 cmt. n.10 (1980).

187  *Id.* § 240.1 cmt.

188  This Note contends that *Roma Construction v. aRusso*, 96 F.3d 566 (1st Cir. 1996) is a solid example of a well-decided case in this area. *Roma* was decided under Rhode Island state law, which had not adopted the Model Penal Code formulation of bribery. Under the Model Penal Code scheme, *Roma* would have been decided differently and wrongly. By contrast, *United States v. Alfisi*, 308 F.3d 144 (2d Cir. 2002), is a good example of the problems that inevitably result from omitting a corrupt state of mind requirement. *See infra* text accompanying notes 201–14.

189  96 F.3d at 566.

190  *Id.* at 568.

191  *Id.*

192  *Id.*

193  *Id.*

the FBI and cooperated with the resulting investigation.[194] Zanni and Roma later brought a civil claim against the "de facto government" that included a count under the Racketeer Influenced and Corrupt Organizations Act (RICO).[195]

The district court concluded that Roma and Zanni could not bring a RICO claim because they were not "innocent victims," that is, their capitulation to the extortion was itself illegal behavior—namely bribery.[196] The First Circuit condemned the district court's reliance on the Model Penal Code analysis of bribery, claiming that the ALI view "represents a shift from the common law in expanding the scope of bribery sanctions for payors to situations in which the payor does not act corruptly."[197] The court continued "[t]he *mens rea* implicated by 'corruptly' concerns the *intention* to obtain ill-gotten gain; by contrast, the Model Penal Code converts the lack of willpower to stand up to abusive authority into a degree of culpability."[198] The court allowed Roma and Zanni to continue with their RICO claim because they "were in fact victims of coercive extortion, and . . . have not pled guilty to a crime that involves 'corrupt intent' as an element."[199] Tellingly, the court commented that "'[t]he best thing that can be said for [the Model Penal Code's conception of bribery] is that it makes difficult questions of crime definition easy, but this clarity is bought at the cost of ignoring the settled law of centuries and current notions of right and wrong.'"[200]

*Roma* demonstrates that, because bribery and extortion are crimes that cover the same conduct, a well-defined corrupt state of mind requirement is necessary to protect the *victims* of color-of-right extortion from charges of bribery.

---

194  *Id.*

195  *Id.*; *see also* 18 U.S.C. § 1964(a) (2000) [hereinafter RICO]. In this case, the predicate acts for the RICO count were state extortion provisions under Rhode Island law. *See* Roma Constr. Co. v. aRusso, 906 F. Supp. 78, 81–82 (D.R.I. 1995).

196  *Roma*, 906 F. Supp. at 78, 81–82. The court analyzes the "innocent victim" element under Rhode Island's bribery law, which is substantially similar to federal bribery under § 201(b). *Id. Compare* R.I. GEN. LAWS § 11-7-4(a) (1953) ("No person shall corruptly give . . . any gift or valuable consideration to . . . any public official as an inducement or reward for doing or forebearing to do . . . any act in relation to the business of . . . the state, city or town of which he or she is an official."), *with* 18 U.S.C. § 201(b) (punishing "[w]hoever . . . corruptly gives . . . anything of value to any public official . . . with intent . . . to influence any official act").

197  *Roma*, 96 F.3d at 573.

198  *Id.* at 574 (emphasis added).

199  *Id.*

200  *Id.* (quoting Lindgren, *supra* note 15, at 824 n.41).

NOTRE DAME LAW REVIEW

In contrast to the First Circuit's ruling in *Roma,* the Second Circuit found that victims of color-of-right extortion could be charged as bribegivers in *United States v. Alfisi.*[201] In *Alfisi,* Mark Alfisi was charged with bribery and payment of an illegal gratuity.[202] The charges were predicated upon a series of payments made by Alfisi to William Cashin, a USDA Marketing Agricultural Service inspector.[203] According to the court, a "routine" practice at Hunt's Point Market (where Alfisi and Cashin conducted business) was to bribe a USDA inspector to alter his report of produce shipment's quality in such a way as to allow the bribegiver to renegotiate advantageously the contract price for the shipment.[204] Alfisi argued that he did not pay Cashin to secure an unfair benefit; rather, given the routine (and hence, expected) nature of the kickback, he paid only to induce Cashin to perform his job faithfully.[205] In effect, Alfisi argued that Cashin was extorting the payments in return for proper performance of his official duties.

The court responded to Alfisi's argument in a remarkable fashion. It contended that, even if Alfisi were an extortion victim only paying Cashin to perform his lawful duty, Alfisi would nevertheless be guilty of the bribery charges. Relying on *United States v. Sun-Diamond Growers,*[206] the court maintained, "a defendant may be properly convicted for paying bribes to a public official for *any* kind of *quid pro quo* exchange."[207] The court thus reduced "corruptly" from a meaningful state of mind element to a mere aid for distinguishing between a bribe and an illegal gratuity.[208]

The court contended that a corrupt state of mind element is unnecessary to avoid problems of over- and underbreadth. It maintained that the risk of overbreadth is "minimalized . . . by the existence of the economic coercion defense."[209] The court balked at the prospect of requiring proof of unlawful intent; it feared that "if the government must prove beyond a reasonable doubt actual or intended violations of official duties, many highly culpable payments

---

201  308 F.3d 144 (2d Cir. 2002).

202  *Id.* at 146 (stating that Alfisi was charged under both 18 U.S.C. § 201(b)(1)(A) (2000) (bribery of a public official) and 18 U.S.C. § 201(c)(1)(A) (giving an illegal gratuity to a public official)).

203  *Id.* at 147.

204  *Id.*

205  *Id.*

206  526 U.S. 398 (1998).

207  *Alfisi,* 308 F.3d at 150 n.1 (first emphasis added).

208  *Id.* at 151 n.2.

209  *Id.* at 151.

would go underpunished as unlawful gratuities, or unpunished altogether."[210] The court proved too much—its phobia of making culpability an element of the crime rather than an issue of judicial discretion has no place in a free society operating on a presumption of innocence.

The court's majority opinion is countered successfully by Judge Sack's dissent. Judge Sack argued, "the nature of the *quid pro quo* the payor is looking for matters."[211] Sack contended that "to act corruptly is to act with the specific intent to secure an unlawful advantage or benefit."[212] Sack commented insightfully on the majority's interpretation of *Sun-Diamond Growers*, noting that

> [A]ttributing the *quid pro quo* element to the word "corruptly" does not avoid the surplusage because the words of the statute indicate that the *quid pro quo* element is established not by the term "corruptly," but rather by other terms, i.e., a payment "with intent . . . to influence an official act."[213]

Sack contended, "*Sun-Diamond* . . . holds what plain meaning suggests: The *quid pro quo* element arises not from the term 'corruptly,' but rather from the term 'to influence.'"[214]

The lesson of *Roma* and *Alfisi* is apparent. The *Roma* court, by requiring a corrupt state of mind, could distinguish between licit and illicit behavior without significant difficulty, could maintain a definition of corruption that is neither over- nor underbroad, and could limit the borders of a potentially limitless extortion statute. The *Alfisi* court, by effectively reading the corrupt state of mind requirement out of the bribery statute, left itself helpless in the face of these problems.

## V.  A SURVEY OF THE MODERN COURTS

### A.  *The Supreme Court*

Most courts operate with neither the insightfulness of the *Roma* court nor the blindness of the *Alfisi* court, but rather fall somewhere in between. The Supreme Court's jurisprudence regarding extortion is confused in many respects. Since the passage of the Hobbs Act, the Court has struggled with the breadth of the Act's coverage, particu-

---

210  *Id.*

211  *Id.* at 154 (Sack, J., dissenting).

212  *Id.* (Sack, J., dissenting) (quotations omitted).

213  *Id.* at 156 (Sack, J., dissenting).

214  *Id.* at 157 (Sack, J., dissenting).

NOTRE DAME LAW REVIEW [VOL. 78:5]

larly in the areas of organized labor[215] and, more relevant to this Note, color-of-right extortion.[216]

The Court's confusion regarding color-of-right extortion—particularly in the context of campaign finance—is understandable. The Hobbs Act, on its face, could criminalize substantial amounts of common campaign finance activity; yet reforming the campaign finance system by arresting politicians for the receipt of private funds was not the Act's purpose, or even within its feasible charter.[217] Nevertheless, the Court recognized that some campaign finance activity is culpable under extortion or bribery in the three cases that best define the Court's jurisprudence regarding color-of-right extortion: *McCormick v. United States*,[218] *Evans v. United States*,[219] and *United States v. Sun-Diamond Growers*.[220]

In *McCormick*, Robert L. McCormick, a former member of the West Virginia House of Delegates, appealed his conviction under the Hobbs Act.[221] The background of McCormick's conviction, while unique in its details, describes a fairly commonplace situation for an elected politician, that is, a context of closely interacting personal and constituent interests.

In the early 1980s, West Virginia "had long suffered" from a shortage of licensed medical doctors.[222] In response, the state developed a program that allowed graduates of foreign medical schools to obtain temporary licenses to practice while they studied for state licensing exams.[223] Although some temporary license holders repeatedly failed the state licensing exams, the state allowed them to retain the privilege to practice.[224] The House of Delegates debated ending the temporary licensing program, and in response several of the temporary license holders formed a political interest group and hired a lobbyist.[225] The lobbyist contacted McCormick, who successfully sponsored a bill that extended the life of the temporary licensing program.[226] McCormick then agreed to sponsor legislation that would

---

215   *See supra* Part III.

216   *See* McCormick v. United States, 500 U.S. 257 (1991); *see also* Evans v. United States, 504 U.S. 255 (1991).

217   *See supra* Part III.

218   500 U.S. 257 (1991).

219   504 U.S. 255 (1992).

220   526 U.S. 398 (1999).

221   *McCormick*, 500 U.S. at 261, 266–67.

222   *Id.* at 259.

223   *Id.*

224   *Id.*

225   *Id.* at 259–60.

226   *Id.* at 260.

grant a permanent license without testing temporary license holders who had sufficient experience.[227]

In 1984, McCormick successfully ran for reelection.[228] During the campaign (after he had extended the life of the temporary permit program but before he had an opportunity to propose the permanent license legislation), McCormick told the doctors' lobbyist that "his campaign was expensive, that he had paid considerable sums out of his own pocket, and that he had not heard anything from the foreign doctors."[229] The lobbyist contacted the doctors, and returned to Mc-Cormick with two envelopes containing a total of $2900 in cash.[230] McCormick twice more received cash payments from the doctors, but he did not list any of these payments as campaign contributions, nor did he report the money as income in his tax return.[231] McCormick was investigated and subsequently charged with five counts of Hobbs Act extortion under color of official right.[232]

The Supreme Court overturned McCormick's conviction because the Fourth Circuit Court of Appeals "affirmed McCormick's conviction on legal and factual theories never tried before the jury."[233] The Court first considered the sufficiency of the jury instructions, concluding that "the Court of Appeals [failed to] note that the jury was not instructed in accordance with the court's holding that the difference between legitimate and illegitimate campaign contributions was to be determined by *the intention of the parties* after considering specified factors."[234]

The Court considered McCormick's claim that the payments made by the doctors "were campaign contributions, the receipt of which did not violate the Hobbs Act."[235] In reaching this conclusion, the Court disapproved of a seven-part test used by the courts below to differentiate legitimate from illegitimate contributions. The factors of that test were

(1) whether the money was recorded by the payor as a campaign contribution, (2) whether the money was recorded and reported by the official as a campaign contribution, (3) whether the payment was in cash, (4) whether it was delivered to the official personally or

227  *Id.*
228  *Id.*
229  *Id.*
230  *Id.*
231  *Id.*
232  *Id.* at 261.
233  *Id.* at 270 n.8.
234  *Id.* at 269 (emphasis added).
235  *Id.* at 268.

to his campaign, (5) whether the official acted in his official capacity at or near the time of the payment for the benefit of the payor or supported legislation that would benefit the payor, (6) whether the official had supported similar legislation before the time of the payment, and (7) whether the official had directly or indirectly solicited the payor individually for the payment.[236]

The Court rightly noted that the seven-part test used by the court below was not an adequate determinate of whether or not funds were extorted or contributed, because even if "the result of each of these seven inquiries was unfavorable to McCormick . . . we cannot agree that a violation of the Hobbs Act would be made out."[237] Instead, the Court held that the proper test for color-of-right extortion would be the finding of a quid pro quo, that is, "if the payments are made in return for an explicit promise or undertaking by the official to perform or not perform an official act."[238] The Court asserted that "[t]his formulation defines the forbidden zone of conduct with sufficient clarity,"[239] and further, that

> [t]o hold otherwise would open to prosecution conduct that has long been thought to be well within the law but also conduct that in a very real sense is unavoidable so long as election campaigns are financed by private contributions or expenditures, as they have been from the beginning of the Nation.[240]

In a concurring opinion, Justice Scalia proposed an idiosyncratic reading of extortion at common law. After discussing some of the history of the Hobbs Act, Justice Scalia disparaged the majority's "questionable" assumption that "under color of official right means on account of one's office."[241] Justice Scalia proposed that a more historically accurate reading of color-of-right extortion "more naturally connotes some false assertion of official *entitlement* to the property."[242] Justice Scalia's position has merit insofar as it recognizes that, historically, public officials had to know that they were not entitled to that which they took. Insofar as he contends that color-of-right extortion necessarily entails fraud, however, Justice Scalia misapprehends the law. This will be discussed at length later.[243]

---

236  McCormick v. United States, 896 F.2d 61, 66 (4th Cir. 1990), *rev'd*, 500 U.S. 257 (1991).
237  *McCormick*, 500 U.S. at 272.
238  *Id.* at 273.
239  *Id.* at 272.
240  *Id.* at 273.
241  *Id.* at 278 (Scalia, J., concurring) (quotations omitted).
242  *Id.* (Scalia, J., concurring).
243  *See infra* text accompanying notes 283–300.

*McCormick* admirably demonstrates the confusion under which the Court labors regarding color-of-right extortion. The Court faced a difficult dilemma: it not only had to adjudicate with some clarity the thin and wavering line that separates legitimate campaign contributions from extorted payoffs, it had to do so without creating excessive overbreadth or underbreadth in the Hobbs Act. A plain reading of the statute would have resulted in its potential application to "conduct that has long been thought to be well within the law," and even adhering to the Fourth Circuit's seven-part test would have extended the statute to apply to lawful conduct.[244] Neither was the Court free to exempt transactions in the political realm from the Hobbs Act, because the color of official right provision in § 1951(b)(2) cannot be reasonably read *not* to apply to such conduct. By establishing a quid pro quo requirement, the Court attempted to limit the breadth of color-of-right extortion to an appropriate scope while defining "the forbidden zone of conduct with sufficient clarity."[245]

While the quid pro quo requirement adequately addresses the problems of breadth and differentiation directly presented by *McCormick*, it fails to fix either problem generally. Regarding breadth, the quid pro quo requirement shares the same flaw as the seven-part test that it replaced: both standards criminalize otherwise accepted and lawful conduct. At the same time, a defendant could fail every aspect of the Fourth Circuit's seven-part test and yet not be guilty of color-of-right extortion.[246] The quid pro quo standard narrows, but does not solve, the overbreadth problem. Indeed, as Justice Stevens noted in dissent, "*quid pro quo* tends to confuse the analysis."[247]

Overbreadth and underbreadth remain a problem under the quid pro quo standard. The requirement increases the difficulty of proving a charge of Hobbs Act extortion against public officials involved in the normal rough-and-tumble of campaign finance, but it still includes some of those activities within the line of statutory proscription, especially in light of the Court's reluctance to allow the requirement to be circumvented by "winks and nods."[248] In the complex negotiations and exchanges of campaign finance, the term "quid pro quo" will likely prove unhelpful to a politician seeking to avoid illegality. First, all campaign donees expect or hope that the public official to whom they donate will act in their interest in re-

---

244  *McCormick*, 500 U.S. at 272.
245  *Id.* at 273.
246  *Id.* at 272.
247  *Id.* at 283 (Stevens, J., dissenting) (quotations omitted).
248  Evans v. United States, 504 U.S. 255, 275 (1992); *see also* United States v. Carpenter, 961 F.2d 824, 827 (9th Cir. 1992).

sponse to the donation. To that extent, all donees act with some intent to influence. Second, all politicians accept donations with some intent to be influenced. To attract donations, public officials must promise to act in certain ways for their donees. Officials often phrase promises as assurances that they will remain open to an idea, or will remain favorably disposed towards some area of legislation, or even will choose staff members with the donee's interests in mind. None of these promises are illegal or even irregular, but, if made in direct connection with a donation, they all technically meet the quid pro quo standard as "situations [wherein] the official asserts that his official conduct will be controlled by the terms of the promise or undertaking,"[249] particularly in light of the "winks and nods" gloss.

Another example of acceptable behavior criminalized under the quid pro quo standard is logrolling. Politicians, as a regular part of their occupation, agree to trade support. Generally, officials will "sell" votes on issues not directly relevant to their constituencies in return for similar votes from other officials on issues that do.[250] For example, a senator from Indiana might agree to vote for a bill authorizing the construction of more coastal lighthouses if a senator from Maine agrees to vote favorably for corn subsidies. Although surely distasteful to some observers, this behavior is necessary grease for a legislative body whose members represent diverse and frequently non-overlapping interests. Logrolling quite literally falls within the quid pro quo proscription: each official is making an explicit promise that his official conduct will be influenced in return for the other's favor.

Furthermore, the quid pro quo standard adds a problem of underbreadth not found in the Fourth Circuit test because it requires that the public official perform some act in return for the illicit payment. As Justice Stevens noted in dissent, "[s]ubtle extortion is just as wrongful—and probably much more common—than the kind of express understanding that the Court's opinion seems to require."[251] In common practice, public officials can extort without explicitly promising benefit or threatening harm; the threat of harm, if any, may be the unstated power inherent in the office itself. Under the quid pro quo standard, the conduct of public officials who make bald requests for funds unaccompanied by explicit promises or threats (even though an implicit threat exists by virtue of the office) falls outside of the proscriptions of the Hobbs Act.

---

249  *McCormick*, 500 U.S. at 273.

250  *See* Philip P. Fricky & Steven S. Smith, *Judicial Review, the Congressional Process, and the Federalism Cases: An Interdisciplinary Critique*, 111 YALE L.J. 1707, 1712 (2002).

251  *McCormick*, 500 U.S. at 283 (Stevens, J., dissenting).

A better method of achieving the delicate balance towards which the Court strives does exist. Rather, this method exist*ed* at common law, and has been largely overlooked by the modern law. The corrupt state of mind element as found in the common law functioned to re-solve precisely the questions of breadth and differentiation that plagued the *McCormick* Court. A corrupt state of mind requirement solves the problem of breadth by making knowledge of wrongdoing part of the definition of the crime. Public officials conducting the normal gray affairs of campaigning are safe from conviction so long as they avoid accepting contributions that they know to be illegal. The courts also benefit from a flexible and adroit standard capable of ade-quately differentiating between licit and illicit behavior in a wide vari-ety of situations.

Much of the utility of corrupt state of mind as a standard is that it is an element of *intent*. As such, it naturally requires circumstantial evidence for its proof.[252] In a corrupt state of mind analysis, all the factors of the Fourth Circuit's seven-part test would be relevant not to prove that the defendant committed extortion, but to prove that he acted corruptly. The court would have to further determine that the conduct was itself illicit to convict. This extra layer of analysis narrows the scope of the Hobbs Act more precisely than the quid pro quo requirement. Corrupt state of mind analysis mitigates the over-breadth problem by limiting the statute to persons who know that they are misusing their office. For example, logrolling, which falls squarely within the quid pro quo standard, is rightfully viewed as law-ful conduct under a corrupt state of mind analysis. The required find-ing of a corrupt mind also significantly mitigates the underbreadth problem by allowing the statute to reach persons who extort without making explicit threats or promises, if the circumstantial evidence demonstrates an unlawful intent.

A corrupt state of mind requirement also helps courts to differen-tiate more adeptly between legitimate and illegitimate behavior. By criminalizing behavior that an official knew was unlawful, and recog-nizing such knowledge (shown by circumstantial evidence such as re-questing cash payments or improper tax reporting) as an element of the crime, the corrupt intent element steers courts towards bona fide extortions and away from legitimate but questionable behavior. For example, under a corrupt state of mind analysis, the Court would have probably upheld McCormick's conviction because the available evi-dence demonstrated that he understood the illegality of his conduct. By concentrating on the actual intent of the official, the Court can

---

252  *See* KAPLAN ET AL., *supra* note 18, at 706–08.

NOTRE DAME LAW REVIEW [VOL. 78:5]

more discerningly evaluate questionable conduct. This is not to say that all receipts of value that an official believes are unlawful constitute extortion; rather, such a belief can serve as a helpful guide for courts that must make bright-line differentiations in unclear areas of conduct.

In *Evans v. United States*,[253] the Supreme Court defined color-of-right extortion under the Hobbs Act as an offense derived from the common law.[254] The issue considered by the *Evans* Court was "whether an affirmative act of inducement by a public official, such as a demand, is an element of extortion under color of official right prohibited by the Hobbs Act."[255] The defendant, John Evans, was an elected public official serving on the Board of Commissioners of DeKalb County, Georgia.[256] As part of a federal investigation into public corruption in the Atlanta, an FBI special agent initiated a series of conversations (almost all of which were taped or recorded) in which he sought Evans's help in rezoning a twenty-five acre tract of land.[257] The agent provided Evans with cash totaling $7000 and a $1000 check written to his campaign.[258] Evans reported the check as a campaign donation, but did not report the cash as a campaign donation or as income for tax purposes.[259] At trial, the jury found that Evans accepted the cash "knowing that it was intended to ensure that he would vote in favor of the rezoning application and that he would try to persuade his fellow commissioners to do likewise."[260] The trial court instructed the jury that "if [Evans] demands or accepts money in exchange for [a] specific requested exercise of his or her official power, such a demand or acceptance does constitute a violation of the Hobbs Act regardless of whether the payment was made in the form of a campaign contribution."[261] In affirming the conviction, the Eleventh Circuit held that the inducement requirement "is *automatically* satisfied by the power connected with the public office."[262]

The Supreme Court affirmed Evans's conviction by insisting that, consistent with color-of-right extortion at common law, quid pro quo

---

253  504 U.S. 255 (1992).

254  *Id.* at 259.

255  *Id.* at 256 (quotations omitted).

256  *Id.* at 257.

257  *Id.*

258  *Id.*

259  *Id.*

260  *Id.*

261  *Id.* at 258.

262  *Id.* at 258 n.1 (emphasis omitted).

does not require the public official to have induced payment.[263] Rather, the Court maintained, "although [Evans] did not initiate the transaction, his acceptance of the bribe constituted an implicit promise to use his official position to serve the interests of the bribegiver."[264] This holding, insofar as it suggests that the quid pro quo need *not* be express, exists in tension with *McCormick*'s contrary holding.

Although the tension between the holdings in *Evans* and *McCormick* suggests that the quid pro quo standard is functionally inadequate, *Evans*'s primary significance for the purposes of this Note is that in both the majority and dissenting opinions the Court insists that Congress deliberately enacted common-law extortion by passing the Hobbs Act.[265] Further, the Court uses the common law to clarify whether or not color-of-right extortion contains an inducement element.[266] Recognizing that Hobbs Act extortion is an offense fundamentally defined by the common law allowed the Court to acknowledge that the official did not have to induce the payment to commit a culpable act—he needed only to receive it.[267] While the Court did use the common-law "no inducement" gloss to repair some of the breadth problems that it created with the quid pro quo test, it created two additional problems. First, the Court failed to realize that a "no inducement" gloss on culpable conduct only makes sense in light of an additional corrupt state of mind requirement. Second, by allowing implicit quid pro quo exchanges to count, the *Evans* Court created significant tension with the previous year's holding in *McCormick*.

The Court emphasized the Hobbs Act's common-law origin by reiterating the holding from *Taylor v. United States*:[268] "'a statutory term is generally presumed to have its common law meaning.'"[269] The Court also read the Hobbs Act in light of the teaching of *Morrisette v. United States*:[270]

> [W]here Congress borrows terms of art which are accumulated the legal tradition and meaning of centuries of practice, it presumably

---

263   *Id.* at 255–56.
264   *Id.* at 257.
265   *Id.* at 255; *see also id.* at 279 (Thomas, J., dissenting).
266   The Court recently reaffirmed its commitment to interpreting the Hobbs Act in light of common-law extortion in *Scheidler v. Nat'l Org. for Women* 537 U.S. 393 (2003).
267   *Evans,* 504 U.S. at 259–60.
268   495 U.S. 575 (1990).
269   *Evans,* 504 U.S. at 259 (quoting *Taylor,* 495 U.S. at 592).
270   342 U.S. 246 (1952).

> knows and adopts the cluster of ideas that were attached to each
> borrowed word in the body of learning from which it was taken and
> the meaning its use will convey to the judicial mind unless otherwise
> instructed. In such case, absence of contrary direction may be
> taken as satisfaction with widely accepted definitions, not as a depar-
> ture from them.[271]

The Court, after reviewing the various opinions of the circuits, con-
cluded that "the majority view is consistent with the common-law defi-
nition of extortion, which we believe Congress intended to adopt,
[and] we endorse that position."[272]

After establishing that Congress enacted common-law extortion,
the Court attempted to define common-law extortion:

> At common law, extortion was an offense committed by a public
> official who took "by colour of his office" money that was not due to
> him for the performance of his official duties. A demand, or re-
> quest, by the public official was not an element of the offense. Ex-
> tortion by the public official was the rough equivalent of what we
> would now describe as "taking a bribe."[273]

This definition, while technically correct, is remarkably unhelpful. As
this Note shows, a deeper look at common-law history yields a more
detailed and helpful definition.[274]

The other issue of significance addressed by the *Evans* Court was
whether the Hobbs Act had modified common-law extortion. The
Court recognized that the Hobbs Act was modeled on the Field
Code,[275] which itself directly adopted common-law extortion.[276] The
Court determined that Congress had not significantly changed the
common-law definition of extortion, since "[t]here was nothing in ei-
ther the statutory text or the legislative history that could fairly be
described as a 'contrary direction.'"[277] Most important, the Court ac-
knowledged the significance of "common law history to guide our in-
terpretation of the statutory text" when considering color-of-right
extortion in the Hobbs Act.[278] Furthermore, the Court explicitly
stated that, at common law, "extortion was defined as the *corrupt* tak-

---

271  *Evans*, 504 U.S. at 259–60 (quoting *Morissette*, 342 U.S. at 263).

272  *Id.* at 259.

273  *Id.* at 260.

274  *See supra* Part I.

275  *See supra* Part III; *see also* Field Code, *supra* note 20, § 613.

276  *Evans*, 504 U.S. at 261 n.9; *see supra* Part III.A.

277  *Id.* at 264 (quoting *Morissette*, 342 U.S. at 263).

278  *Id.* at 265.

ing or receipt of an unlawful fee by a public officer under color of office."[279]

The *Evans* Court invoked the common law to address the underbreadth problem created by *McCormick*'s quid pro quo standard. In so doing, the *Evans* Court nevertheless failed to address the problems of overbreadth and differentiation also created by quid pro quo.[280] Furthermore, the *Evans* Court (like most modern courts) ignored the full import of an extortion statute informed by the common law. Although the Court recognized that the common law defined color-of-right extortion as a *corrupt* taking, it treated corrupt intent as surplusage empty of content and unworthy of comment. Nevertheless, the Court's holding that official right extortion has no inducement requirement *only* makes sense in light of a corrupt intent element. Without an element of unlawful intent, color-of-right extortion under *Evans* is essentially a strict liability crime. The "no inducement" holding, in light of quid pro quo holding in *McCormick*, makes the predicate conduct intentless: since the official need not have induced the payment, the official need only know that he was accepting any payment at all. Under *Evans*, a politician could conceivably spend twenty years in prison because he was mistaken about the legality of what he believed to be an innocent campaign contribution.

In both *Evans* and *McCormick*, Justice Scalia disagreed with the majority's conception of color-of-right extortion at common law. In *McCormick*, Justice Scalia contended that the color-of-right language "connote[d] some false assertion of official *entitlement* to the property."[281] Later, in *Evans*, Justice Thomas wrote a dissent in which Justice Scalia joined.[282] Following the line of thought Scalia established in *McCormick*, Thomas's dissent argued that the

> color of office element of extortion . . . had a definite and well-established meaning at common law. "At common law it was essential that the money or property be obtained under color of office, *that is, under the pretense that the officer was entitled thereto by virtue of his office.* The money or thing received must have been claimed or accepted in right of office, and the person paying must have yielded to official authority."[283]

Thomas maintained, "[a] survey of 19th and early 20th century cases construing state extortion statutes in light of the common law makes

---

279  *Id.* at 265 n.14 (emphasis added).
280  *Id.* at 265.
281  *McCormick v. United States*, 500 U.S. 257, 278 (1991) (Scalia, J., concurring).
282  *Evans*, 504 U.S. at 278 (Thomas, J., dissenting).
283  *Id.* at 279 (Thomas, J., dissenting) (quoting 3 RONALD A. ANDERSON, WHARTON'S CRIMINAL LAW AND PROCEDURE § 1393, at 790 (1957)).

plain that the offense was understood to involve not merely a wrongful taking by a public official, but a wrongful taking under a false pretense of official right."[284]

Justice Thomas's historical analysis rightly recognizes that color-of-right extortion at common law involved an element of knowledge that the fee taken for official action was inappropriate. Indeed, the social and economic context of medieval England practically required laws governing extortion to some special state of mind element, because all officials legally accepted private fees for official action.[285] Justice Thomas, however, concluded that this special state of mind element was not "corruptly," but rather intent to defraud. He reached this conclusion by examining early American case law, virtually all of which was decided after the corrupt state of mind requirement became "lost."[286] Ironically, to support his theory of color-of-right extortion-as-fraud, Justice Thomas cited authority that rightly recognizes a corrupt state of mind:

> Our extortion statute, which had its origin at least as early as 1796, appears on its face to have been originally intended to be reiterative of the common law. The essence of that offense was the receiving or taking by any public officer, by color of his office, of any fee or reward not allowed by law for performing his duties. The purpose would seem to be simply *to penalize the officer who non-innocently insisted upon a larger fee than he was entitled to or a fee where none was permitted or required to be paid for the performance of an obligatory function of his office.* The matter was obviously of particular importance in the days when public officials received their compensation through fees collected and not by a fixed salary.[287]

Justices Scalia and Thomas misinterpreted the common law as saying that color-of-right extortion always involved pretense or fraud. While color-of-right extortion certainly could involve pretense or fraud, these are not necessary elements of the crime. This can be easily shown by review of a few of the cases that support this Note's historical analysis.[288] *Rex v. Seymour and Others,*[289] *Rex v. Young & Pitts,*[290] and *Rex v. Williams*[291] are three examples of common law color-of-

---

284  *Id.* at 281 (Thomas, J., dissenting) (emphasis omitted).

285  *See supra* Part I.A–B.

286  *See supra* note 20.

287  *Evans,* 504 U.S. at 284 n.4 (Thomas, J., dissenting) (quoting State v. Begyn, 167 A.2d 161, 166–67 (N.J. 1967)) (citations omitted).

288  *See supra* Part I.

289  87 Eng. Rep. 1305 (K.B. 1740).

290  97 Eng. Rep. 447 (K.B. 1758).

291  97 Eng. Rep. 851 (K.B. 1762).

right extortions without pretense or fraud—these cases involved bald unlawful demands. Furthermore, as *Rex v. Wadsworth*,[292] *Rex v. Roberts*,[293] and *Lake's Case*[294] all demonstrate, the class of possible offenders in common-law extortion extended beyond public officials to civilians (such as millers or ferrymen) who were subject to customary fee limitations. If civilians that collected customary dues could be prosecuted for color-of-right extortion, and the customary fees were a matter of common knowledge, the offense could not have always required pretense or fraud, because deception in that context would have been improbable bordering on impossible. Justice Scalia and Justice Thomas's conception of common-law extortion is, however, understandable. The Justices drew mainly from sources that were written *after* corrupt intent became "lost" in the late eighteenth century.[295] Some of the cases cited by these sources, such as *People v. Whaley*, nevertheless essentially retained a corrupt state of mind requirement without using the word "corruptly."[296] Other sources, such as the Field Code, did not.

The Justices' position seems to rely upon commentary found in the Field Code.[297] In a footnote to a section on obtaining property by false pretenses under the crime of false personation, the Code explains that, in that specific section, it forewent the use of the phrase "'by color of' . . . in order that it may be clear that [false personation] cases are embraced in which a false pretense is used in aid of the fraud, but such pretense is not the controlling inducement operative upon the mind of the party defrauded."[298] This commentary seems to imply what Justice Thomas claims—that the color-of-right language at common law applied only to false pretenses. Unfortunately, Field himself may have substantially overlooked the import of "corruptly" as it related to color-of-right extortion; or at least failed to make it express.[299] Justice Scalia and Justice Thomas consequently misinterpret the message of the common law. A deeper reach into earlier com-

---

292  87 Eng. Rep. 849 (K.B. 1694).

293  87 Eng. Rep. 286 (K.B. 1693).

294  74 Eng. Rep. 677 (K.B. 1591).

295  In *McCormick*, Justice Scalia relies upon *People v. Whaley*, 6 Cow. 661 (N.Y. Sup. Ct. 1827). McCormick v. United States, 500 U.S. 257, 279 (1991) (Scalia, J., concurring). In *Evans*, Justice Thomas's dissent uses *Collier v. State*, 55 Ala. 125 (1867), and *Whaley* to support the relevant points. Evans v. United States, 504 U.S. 255, 281–82 (1992) (Thomas, J., dissenting).

296  *See supra* Part III.C.

297  *See* Field Code, *supra* note 20, § 623 cmt.

298  *Id.*

299  *See supra* Part III.

mon-law history would have clarified their misapprehension.[300] The Justices' misapprehension, however, is less harmful than others that the Court has relied upon in this field.

For example, in *United States v. Sun-Diamond Growers*,[301] the Supreme Court emphasized the similarity in kind between bribery and color-of-right extortion by equating the corrupt state of mind requirement on the face of the bribery statute with the quid pro quo standard laid out in *McCormick*.[302]

The defendants, members of an agricultural interest group, were charged with violating the gratuities statute for giving former Secretary of Agriculture Michael Espy approximately $5900 in gifts.[303] The defendants challenged the district court's jury instruction, which "placed an expansive gloss" on 18 U.S.C. § 201(c) by "saying, among other things, that '[i]t is sufficient if Sun-Diamond provided Espy with unauthorized compensation simply because he held public office,' and that '[t]he government need not prove that the alleged gratuity was linked to a specific or identifiable official act or any act at all.'"[304]

To help explain its view of the law, the Supreme Court endeavored to "place § 201(c)(1)(A) within the context of the statutory scheme."[305] The Court noted that the difference between the two crimes subsisted primarily in their state of mind requirements: "[b]ribery requires intent 'to influence' an official act . . . while illegal gratuity requires only that the gratuity be given or accepted 'for or because of' an official act. In other words, for bribery there must be a *quid pro quo*."[306] Although it construed illegal gratuities as a strict liability crime, the Court nevertheless maintained that even the gratuities statute requires a nexus between the gift and *some* official act beyond the possession of office itself.[307] The difference between bribery and an illegal gratuity, then, is an issue of degree rather than of kind: where bribery requires a quid pro quo between the gift and a *specific* act, an illegal gratuity needs only a connection to *any* act at all. According to the Court, the benefit of this position is that it allows the

---

300   *See supra* Part I.
301   526 U.S. 398 (1999).
302   McCormick v. United States, 500 U.S. 257 (1991).
303   *Sun-Diamond Growers*, 526 U.S. at 401.
304   *Id.* at 403.
305   *Id.* at 404.
306   *Id.*
307   *Id.* at 405–06.

statute's definition of "official act"[308] to control the bounds of the statute.

The Court's equation of a corrupt state of mind requirement with the finding of quid pro quo is not entirely dysfunctional, but it is insufficient. First, reading "corruptly" as a specific intent to trade pecuniary value for an official act fails to protect either the possibly extorted bribegiver or the possibly mistaken public official bribetaker from the problems of breadth that plague color-of-right extortion. Tellingly, the Court admits that conduct *permissible* under guidelines established by the Office of Governmental Ethics could conceivably still violate the illegal gratuities statute.[309] Also, by comparing illegal gratuities and bribery in terms of different degrees of quid pro quo, the Court's interpretation demotes "corruptly," the express intent element in the bribery statute, from an element of the crime to little more than a glorified sentencing guideline.

## B.   The Circuits

The circuit courts that have considered color-of-right extortion fall into two groups regarding corrupt intent. The Second, Third, Fourth, and Ninth Circuit Courts of Appeals attempt to approximate a corrupt intent element without using the "corruptly" language. The Fifth, Sixth, and Eighth Circuit Courts of Appeals expressly recognize a corrupt state of mind requirement, but treat it as surplusage.

One commonality amongst the circuits that bears discussion is a significant agreement (at least before the holding to the same effect in *United States v. Evans*[310]) that bribery and extortion are not mutually exclusive, and that both crimes may stem from the same underlying conduct.[311] Because a corrupt state of mind requirement is on the face of the federal bribery statute,[312] the agreement amongst the circuits that the same predicate conduct can lead to Hobbs Act color-of-right extortion strongly suggests that corrupt state of mind is an implicit part of the extortion statute.

---

308   The statute defines official act as "[a]ny decision or action on any question, matter, cause, suit, proceeding, or controversy, which may at any time be pending, or which may by law be brought before any public official, in such official's official capacity, or in such official's place of trust or profit." 18 U.S.C. § 201(a)(3) (2000).

309   *Sun-Diamond Growers*, 526 U.S. at 412.

310   United States v. Evans, 504 U.S. 255, 268 (1992).

311   *See* United States v. Harding, 563 F.2d 299 (6th Cir. 1977); United States v. Adcock, 558 F.2d 397 (8th Cir. 1977); United States v. Hall, 536 F.2d 313 (10th Cir. 1976); United States v. Addonizio, 451 F.2d 49 (3d Cir. 1971); United States v. Hyde, 448 F.2d 815 (5th Cir. 1971).

312   18 U.S.C. § 201(b)(1) ("whoever . . . corruptly gives").

### 1. The Second, Third, Fourth, and Ninth Circuits

The Second Circuit addressed color-of-right Hobbs Act extortion in *United States v. Coyne*.[313] In *Coyne*, the court affirmed a conviction for federal extortion and bribery.[314] Coyne challenged the jury instruction given at trial.[315] The instruction required the prosecution to prove beyond a reasonable doubt that "the defendant accepted or solicited the thing of value, at least in part, for or because of his conduct or *intending to be influenced* in connection with any business or transaction . . . ."[316] Coyne's objection was to the "in part" language in the instruction, but the unchallenged portion of the instruction constituted a finding of corrupt state of mind. The Second Circuit upheld the instruction's propriety because it "satisfies the *quid pro quo* requirement of *McCormick*."[317] The court failed to realize what this Note argues: that instruction, by requiring a corrupt state of mind as an element of the crime, provided a standard both truer to the common law and more useful than the quid pro quo standard. *Coyne* shows that the Second Circuit defined color-of-right extortion in terms of an unlawful intent, and that they were able to do so because, in that case, the conduct also fell within the standard of quid pro quo. When the Second Circuit faces a more marginal case, where a public official's conduct includes a quid pro quo but does not include an unlawful intent,[318] the court's duty to comply with the quid pro quo standard laid down by the Supreme Court will leave it vulnerable to the problems of breadth and differentiation.

The Third Circuit similarly approximated corrupt intent in *United States v. Cerilli*.[319] *Cerilli* involved questionable political finance practices, but was decided before *Evans* or *McCormick*. Because the case was decided before *McCormick* and *Evans*, the Third Circuit was free from a precedential mandate to apply the quid pro quo standard.

---

313   4 F.3d 100 (3d Cir. 1993).

314   *Id.* at 113.

315   *Id.*

316   *Id.* (emphasis added).

317   *Id.* at 114.

318   The Second Circuit's approach is ill-equipped to deal with any case where a public official accepts any thing of value with any connection to her official duty. For example, accepting a jacket in return for participation in a charity golf event while in office would constitute grounds for prosecution under this view. *See, e.g.*, United States v. McDade, 827 F.Supp. 1153, 1172 (E.D. Pa. 1993) (refusing to dismiss counts of Hobbs Act extortion under color of official right and bribery directed at Congressman Joseph McDade, despite McDade's belief that he had acted in accordance with the House Rules of Ethics).

319   603 F.2d 415 (3d Cir. 1979).

The court affirmed the conviction on the grounds that Cerilli acted with a corrupt state of mind, without explicitly using the "corruptly" language. Cerilli, a Superintendent for the Pennsylvania Department of Tranportation in Westmoreland County, was convicted of Hobbs Act extortion for requiring extra payments from companies that wished to compete for contracts to lease snow removal equipment.[320] Cerilli contended that these payments were political contributions (some of the payments were in fact checks made out to political committees), and that these contributions could not be punished under the Hobbs Act because they were not collected for an unlawful purpose.[321] The court recognized that "[t]he receipt of money whether by a political party, a charitable institution, or by an individual is generally not inherently wrongful. *The wrong under the Hobbs Act is the manner in which it is obtained.*"[322] Determining that Cerilli and his confederates obtained the money wrongfully, the court affirmed their convictions. The key distinction made by the court was that the crime was collecting the money *with* an unlawful purpose, not necessarily *for* an unlawful purpose. This insistence that subjective intent mattered was, in effect, a reinstatement of a corrupt intent requirement. The only thing the court lacked was a literary vessel in which to encapsulate its meaning—"corruptly" would have served well. The Third Circuit, however, is now required to subordinate this insight to the quid pro quo standard. In "middle of the road" cases this will make little difference, but, as always, harder cases will expose the court to the functional problems of breadth and differentiation that the corrupt state of mind requirement aims to solve.

The Fourth Circuit's decision in *United States v. Taylor*[323] is a model of how the quid pro quo problems of breadth and differentiation can be avoided by requiring a corrupt state of mind. In *Taylor*, the Fourth Circuit reversed the conviction of a state legislator for extortion and bribery.[324] At trial, the jury was instructed that "[t]here need be no specific *quid pro quo* to establish extortion under color of official right. . . . In other words, the essence of the offense is the corrupt effort to obtain payment of the powers public office (sic) . . . ."[325] In light of the holdings in *Evans* and *McCormick*, the Fourth Circuit was unable to approve this instruction, and held that the prosecution had to prove only that "a public official has obtained a pay-

---

320  *Id.* at 418.
321  *Id.* (emphasis added).
322  *Id.* at 419–20 (emphasis added).
323  993 F.2d 382 (4th Cir. 1993).
324  *Id.* at 382.
325  *Id.* at 385.

NOTRE DAME LAW REVIEW    [VOL. 78:5

ment to which he is not entitled, knowing that the payment was in return for official acts."[326] *Evans* and *McCormick* required the Fourth Circuit to lose an effective instruction: by complying with the Supreme Court's demand for a quid pro quo, the Fourth Circuit rejected the entire instruction, the second part of which rightly required a corrupt state of mind. Had the court been free to approve of the district court's common-law-based instruction, it would have been able to affirm the conviction. Instead, the Fourth Circuit found itself helpless in the face of the underbreadth created by the quid pro quo standard. Because no explicit exchange had occurred, the corrupt behavior could not be punished.

The Ninth Circuit addressed color-of-right extortion under the Hobbs Act in *United States v. Carpenter*.[327] California state senator Paul Carpenter appealed his conviction of four counts of racketeering and extortion.[328] At issue in the appeal was whether Carpenter's jury instruction, which stated, "there need be no specific quid pro quo to establish extortion under color of official right" violated the *McCormick* standard.[329] The court held that such an instruction was impermissible, and that an explicit quid pro quo was required.[330]

The court acknowledged that a great deal of political corruption does not occur in readily identifiable exchanges in open daylight. Accordingly, it construed *McCormick*'s explicitness standard to apply to situations beyond when "an official has explicitly stated that he will exchange official action for a contribution."[331] The court recognized that, strictly applied, the express quid pro quo standard would "allow officials to escape liability under the Hobbs Act with winks and nods, even when the evidence as a whole proves that there has been a meeting of the minds . . . ."[332] All that the Ninth Circuit court required for guilt was that the "quid pro quo be clear and unambiguous, leaving no uncertainty about the terms of the bargain."[333] The court explained that the "understanding need not be verbally explicit. The jury may consider both direct and circumstantial evidence, including the con-

---

326   *Id.*

327   961 F.2d 824 (9th Cir. 1992).

328   *Id.* at 825.

329   *Id.* at 826 (citations omitted).

330   *Id.*

331   *Id.* at 827.

332   *Id.* The Ninth Circuit's reasoning was portentous. The Supreme Court later in the same year also abandoned *McCormick*'s express quid pro quo requirement in *United States v. Evans*, 504 U.S. 255 (1992).

333   *Carpenter*, 961 F.2d at 827.

text in which a conversation took place, to determine if there was a meeting of the minds on a quid pro quo."[334]

Like the Supreme Court, the Ninth Circuit attempted to construe the Hobbs Act in a manner that would help it to differentiate between acceptable and corrupt political activity. The court explained that the explicitness requirement "serves to distinguish between contributions that are given or received with the 'anticipation' of official action and contributions that are given or received in exchange for a 'promise' of official action."[335]

Nevertheless, a quid pro quo requirement—even one glossed with an additional explicitness requirement—is a blunt tool insufficient to the surgical task of separating licit from illicit political activity. The language of the court, by its appeal to evidence of intent as relevant to the explicitness requirement, suggests that it was attempting to determine whether the public official *intended* to subvert his office by accepting or demanding undue payment. As a matter of common sense, such an inquiry into whether a public official was acting with unlawful intent could proceed with greater efficiency and accuracy if conducted directly, rather than indirectly through the use of a quid pro quo determination.

## 2. The Fifth, Sixth, and Eighth Circuits

The Fifth Circuit requires extortion to be committed corruptly. Although the court does not apply the common law term of art "corruptly" to color-of-right extortion, it does define the elements of extortion in the same fashion as it defines the word "corruptly" for federal bribery. More important, the Circuit's definition of "corruptly" equates with the word's meaning at common law.

In *United States v. Tomblin*,[336] Darell A. Tomblin appealed multiple convictions, the relevant of which were federal bribery and Hobbs Act extortion.[337] The acts that led to Tomblin's conviction revolved around his efforts to develop financial prospects in Grenada and to gain controlling interests in several savings and loan institutions.[338] Tomblin convinced two Texas bankers to assist with bankrolling his plans.[339] Tomblin promised that he would use his political influence with Nevada Senator Jacob Hecht to help the bankers bypass the Fed-

---

334    *Id.*
335    *Id.*
336    46 F.3d 1369 (5th Cir. 1995).
337    *Id.* at 1374.
338    *Id.*
339    *Id.*

eral Home Loan Bank Board so that they could legitimate their questionable takeover of Suburban Savings Association.[340] Tomblin agreed to use his political influence to arrange a meeting between the bankers and the chairman of the Board in return for a $250,000 loan, a $25,000 lobbying fee to a third party, and a $50,000 campaign contribution to Hecht's campaign fund.[341] Tomblin promised a $50,000 campaign contribution and a 10% share in the venture to Glen Maudlin, Hecht's administrative assistant and campaign treasurer.[342] Tomblin's request for the $250,000 loan was the source of his extortion conviction, and his promises to Maudlin were the grounds for the bribery conviction.[343]

Affirming Tomblin's conviction for bribery, the court upheld the district court's jury instructions by reasoning from *McCormick* and *Evans*:

> Under the bribery statutes, the government must prove a quid pro quo, that is, that the official took money in return for an exercise of official power. *McCormick v. United States*, 500 U.S. 257, 269–73. In order to convict a briber, the government must prove that the accused intended to bribe the official. Intending to make a campaign contribution does not constitute bribery, even though many contributors hope that the official will act favorably because of their contributions. . . . Accordingly, a jury instruction must adequately distinguish between the lawful intent associated with making a campaign contribution and the unlawful intent associated with bribery.[344]

The jury instruction to which Tomblin had objected required only that the bribe have been offered corruptly.[345] Tomblin contended that a corrupt state of mind requirement was inconsistent with *McCormick*'s requirement of a quid pro quo.[346] The court responded that, because the instructions defined "corruptly" as "'intent to influence an official act,' the instructions explain the reciprocity element of the *quid pro quo*. [By offering money to Maudlin with intent to influence], *Tomblin had acted corruptly, that is, with unlawful purpose.*"[347] This definition of the corrupt mental state is consistent with the definition of corrupt intent at common law, that is, unlawful intent.

---

340   *Id.*
341   *Id.* at 1375.
342   *Id.*
343   *Id.*
344   *Id.* at 1379.
345   *Id.* at 1380.
346   *Id.*
347   *Id.* (emphasis added).

The court naturally applied corrupt intent to Tomblin's bribery charge because a corrupt state of mind requirement is included on the face of the statute, but it did not apply "corruptly" to the extortion charge. Instead, the court construed color-of-right extortion so that an "unlawful purpose" was one of the crime's elements. Unlawful purpose is synonymous with unlawful intent, which is the essence of corrupt intent at common law. To prove that Tomblin had a wrongful purpose, the court approvingly referenced the jury instruction's statement that "wrongful . . . is to cause the victim to give property to someone who has no legitimate claim to the property."[348] The court's "legitimate claim" standard asked the jury to evaluate the actor's awareness of the legitimacy of his claim—that is, his knowledge of the legality of his actions. The court's color-of-right extortion standard was therefore not materially different from the requirement of corrupt intent that it affirmed in the bribery conviction.

*Tomblin* demonstrates the inconsistency created by excluding corrupt state of mind as an element of the Hobbs Act. The court had no trouble affirming the bribery conviction, but, when it turned to the extortion conviction, it experienced the underbreadth and differentiation problems created by the lack of a corrupt state of mind requirement. The court's reasoning in affirming Tomblin's bribery conviction was straightforward, but the court had to engage in verbal gymnastics to justify upholding the extortion conviction for substantially similar conduct. Further, the logical gymnastics in which the court engaged were designed to imply an element of corrupt intent into the Hobbs Act, so that Tomblin's obviously wrongful conduct could be punished.

In *United States v. Harding*,[349] the Sixth Circuit nominally construed color-of-right extortion to comport with its common-law meaning. Harding, the executive director of the Tennessee Real Estate Commission, was convicted of extortion for offering to sell copies of licensing exam answers.[350] Harding raised objections to the scope of the Hobbs Act. Affirming his conviction, the court reasoned that the "'under color of official right' language reflects the common law definition of extortion, which could be committed only by a public official's corrupt taking of a fee under color of his office and did not require proof of threat, fear, or duress."[351] The court further noted, "bribery and extortion as used in the Hobbs Act are not mutually ex-

348   *Id.* at 1385.
349   563 F.2d 299 (6th Cir. 1977).
350   *Id.* at 301.
351   *Id.* at 306.

clusive."[352] Both by connotative definition and analogy to bribery, the court asserted that extortion under color of official right did and should require a corrupt state of mind.[353]

Soon after *Harding*, the court decided *United States v. Butler*.[354] In *Butler*, the court held that bribery and extortion are not mutually exclusive and could result from the same underlying conduct,[355] implying that extortion under color of right also has to be committed "corruptly." Also, as in *Harding*, the court subscribed to the common-law definition of extortion that itself included corrupt state of mind as an element.[356] Lastly, the court held that "any wrongful use of a public official's power for private personal gain is proscribed by the Hobbs Act."[357] This holding followed the court's earlier statement that an official's use of power, to be extortionate, must be committed with unlawful intent.

Although the Sixth Circuit used the word "corrupt" in its definition of extortion, and its reasoning was at least nominally tailored to ferret out unlawful intent, the court did not indicate any consciousness of the value of the corrupt state of mind element. Even if the court did possess such an understanding, it is nevertheless now bound to follow the holdings of *McCormick* and *Evans*, which limit the value of corrupt intent as a differentiating and limiting element.

The Eighth Circuit occupies a unique position in color-of-right extortion law. The Circuit recognized corrupt state of mind as an element prior to *Evans* and *McCormick*, but the court maintained that the taking had to be *for* a corrupt purpose rather than *with* a corrupt purpose. In *United States v. French*,[358] the Eighth Circuit explicitly read a corrupt intent element into color-of-right extortion. *French* has a fact pattern strikingly similar to many of the cases at common law. French, the city marshal of St. Louis, had an official duty to collect from the surety a forfeited bail bond if the defendant failed to appear in court.[359] French was convicted on four occasions for allowing a surety to pay amounts substantially less than the actual amount of the bond as long as the surety also made an additional, personal, cash payment to French.[360]

---

352   *Id.*
353   *Id.*
354   618 F.2d 411 (6th Cir. 1980).
355   *Id.* at 417–18.
356   *Id.*
357   *Id.* at 419.
358   628 F.2d 1069 (8th Cir. 1980).
359   *Id.* at 1071.
360   *Id.*

The court reversed the district court's decision to set aside the jury conviction.[361] Although the district court felt that no extortion had been proven, the Circuit court maintained that "[t]here is no doubt that 'under color of official right' includes this kind of corrupt use of public office by the official to obtain such a wrongful personal fee."[362] The court further held that "[i]t is the wrongful purpose of the taking under color of official right that makes the appellee's conduct extortion under the Hobbs Act."[363] The court's idea of wrongful taking is supported by an explicit statement of corrupt intent: that is, that "a public officer who corruptly seeks payment in return for short-changing his duty to enforce the law has committed extortion."[364] The court asserted that "Hobbs Act coverage may . . . extend to other kinds of wrongful taking of money to which the extortioner may also have a rightful claim."[365] This contention created a critical distinction between the Eighth Circuit's conception of extortion and the conception at common law: the Eighth Circuit penalized takings for a corrupt purpose, while the common law punished takings with a corrupt intent.

## VI.  JUDGE JOHN T. NOONAN'S *BRIBES*

No historical account of extortion or bribery can be complete without reference to Judge John T. Noonan's book *Bribes*.[366] The book, which stands as both a monumental work in its own right and as the seminal composition in the history of corruption, fails to recognize corrupt state of mind as an element of common-law extortion. Noonan contends that bribery and extortion were separate crimes at common law.[367] His understanding of bribery at common law included a corrupt state of mind,[368] but he believed that "[e]xtortion . . . required a showing of coercion . . . ."[369] In Noonan's view, extortion always required an element of coercion, therefore whatever state of mind it may have required was already easily inferred from the coercion. Further, extortion's coercive nature left little danger of a public official committing it with innocent intent, as was possible with bribetaking. Noonan's view of distinct extortion and bribery informs

---

361  *Id.* at 1070.
362  *Id.* at 1073.
363  *Id.* at 1074.
364  *Id.*
365  *Id.* at 1075.
366  NOONAN, *supra* note 9.
367  *Id.* at 398–99.
368  *See id.* at 334–424.
369  *Id.* at 398.

NOTRE DAME LAW REVIEW [VOL. 78:5

his apparent distaste for the use of the Hobbs Act to punish bribetaking behavior by public officials.[370]

This Note substantially disagrees with Noonan in only one respect: it asserts that, at common (and modern) law, there was (and is) little distinction between color-of-right extortion and bribery. At least in this respect, the position adopted by this Note has been supported by scholarly authority[371] and, more importantly, by the Supreme Court in *United States v. McCormick*[372] and *United States v. Evans*.[373] As Professor James Lindgren noted, "Noonan [did not write] a history of extortion and neither cites any extortion cases to support [his] views that extortion was limited to coercion at English common law."[374]

Common-law extortion in England was in one sense similar to current American jurisprudence. The criminal act alone—receipt of inappropriate value by a public official—spanned a potentially limitless range of conduct. Furthermore, this law coexisted with a system in which public officials acted within a complex array of customary fees, statutory fee tables, and duty. The historical context of the public officials at whom the Crown and the courts directed laws against corruption contains striking parallels to modern politics, particularly to the campaign finance system. One primary difference, however, between corrupt behavior as seen by the common law and modern corruption law is that common-law extortion operated in the context of a well-defined intent element—"corruptly"—whereas modern federal extortion law has no coherent principle with which to differentiate the guilty from the innocent, or to limit the potentially limitless language of the Hobbs Act.

CONCLUSION

Corruption is a practice both complex and historically endemic.[375] Potentially corrupt behavior often straddles already murky lines of propriety. To regulate corruption properly, the law requires a

---

370  *See id.* at 585–87.

371  *See, e.g.*, Lindgren, *supra* note 15, at 824.

372  500 U.S. 257 (1991).

373  504 U.S. 255 (1992).

374  James Lindgren, *The Theory, History, and Practice of the Bribery-Extortion Distinction*, 141 U. PA. L. REV. 1695, 1729 (1993).

375  Noonan notes "[t]hat bribery is wrong, that a bribe must distort judgment—assumptions which may seem too obvious to need justification—are not self-evident." NOONAN, *supra* note 9, at 3. According to Noonan, bribery and extortion were common in cultures ranging from ancient Egypt, Babylon, and Mesopotamia, to classic Rome, Byzantium, England, and the United States of America. *Id.* at 3–9, 31, 104–05, 114–16, 233, 427. In modern day Russia, business owners pay public officials an esti-

mated $33 billion in bribes yearly "to keep things running smoothly . . . ." Sabrina Tavernise, *A Russian Tilts at Graft*, N.Y. TIMES, Feb. 10, 2003, at A3.

    Examining corruption in the ancient Roman state (circa 74 B.C.) is particularly instructive: "in Rome, legitimate power was in the hands of a governing elite, which stood out by its opulence." 1 HISTORY OF PRIVATE LIFE, *supra* note 13, at 95. While mere access to power, without more, often breeds some corruption, the Roman system compounded the problem by making such access exclusive: "The Senate was a club, and the club members decided whether or not a man had the social profile necessary for membership . . . . Public offices were treated as though they were private dignities, access to which depended on private contracts." 1 *id.* at 95–96. Unsurprisingly, conduct that modern society would characterize as corrupt was rife: "In Rome every superior stole from his subordinates. . . . Every public function was a racket . . . ." 1 *id.* at 97. Although we would classify the Roman system as hopelessly corrupt, it is more helpful to characterize it as based upon substantially different concepts of right and reciprocity. *See* NOONAN, *supra* note 9, at 3–5. Reciprocity in the form of bribery was so entrenched in the Roman system that "an official schedule of bribes eventually was established and posted in every office." 1 HISTORY OF PRIVATE LIFE, *supra* note 13, at 99. Failure to act on a bribe by a public official could even give rise to a judicially enforceable right to redress on the part of the bribegiver:

> Even the least important public positions, (*militia*), such as apparitor or clerk of the courts, were sold by their incumbents to aspiring candidates, because every position carried with it a guaranteed income in the form of bribes. A new officeholder was supposed to pay a substantial gratuity (*sportula*) to his superior. In the Late Empire, even the highest dignitaries, appointed by the Emperor, paid such a gratuity to the imperial treasury. From the very beginning of the Empire, every dignity bestowed by the emperor, from consul to mere captain, imposed upon the person honored the moral duty to make a bequest to his benefactor, the emperor. Failure to fulfill this duty meant running the risk of having one's will set aside for ingratitude and one's estate confiscated by the imperial treasury. And, since every nomination was made on the recommendation of "patrons" with court connections, these recommendations (*suffragia*) were sold, or, in any case, paid for. If the patron did not keep his word, the victim did not hesitate to complain to the courts.

1 *id.* at 98–99.

    Although bribery was not, strictly speaking, immoral, excessive corruption could incur liability. In perhaps the most famous case of Roman corruption, Cicero prosecuted the infamous Gaius Verres for "committing many acts of lechery and brutality against the citizens and allies of Rome, and many crimes against God and man. . . . [Verres] has illegally taken from Siciliy sums amounting to forty million seterces." CICERO, *Against Verres, in* CICERO: SELECTED WORKS 35, 57 (Penguin Classics ed., Michael Grant trans., 1971). Verres's crime was not that he had accepted bribes and extorted from the province he was given to govern, rather it was that he had extorted so much and so brutally. *Id. passim.* Tellingly, a substantial portion of Cicero's opening narration in the trial focuses not on Verres, but on integrity of the *judges* in the extortion court where Verres was being tried (the existence of a special court for extortions is itself suggestive). *Id.* at 44–55. Cicero's concern is not his ability to prove Verres's guilt, but rather with Verres's ability to bribe the entire court. *Id.* Presumably, such behavior was fairly common. L.H.G. Greenwood, *Introduction* to 1 CIC-

tool that is flexible enough to solve problems of breadth and precise enough to overcome difficulties of differentiation. Fortunately, courts can meet this functional need by doing nothing more than remaining faithful to the formal principle of *Morrisette*, and rediscovering the common law's corrupt state of mind.

"Corruptly" can have one of two alternate roles in the context of bribery, extortion, and illegal gratuities. It can have a central role as a guarantor against the prosecution of ethically protected campaign activity and extortion victims, against bribery and extortion statutes with boundless scope, and against serious problems of over- and under-breadth. This is the role properly assigned to it both formally and functionally, the role consistent with history and common sense. The alternative, sadly adopted by some courts, assigns corrupt state of mind a marginal role whose sole purpose is to distinguish between a bribe and an illegal gratuity whilst color-of-right extortion is left a strict liability crime.

ERO: THE VERRINE ORATIONS, at ix–xvi (L.H.G. Greenwood trans., 1989).