IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | * | |
| | * | |
| | * | Case No. 2:05-cr-119-MEF |
| | * | |
| DON EUGENE SIEGELMAN | * | |

RENEWED MOTION FOR JUDGMENT OF ACQUITTAL PURSUANT
TO FED. R. CRIM. P. 29 ON COUNTS
THREE, FIVE, SIX, SEVEN, EIGHT, AND NINE –
THE § 371, § 666(a)(1)(B), AND HONEST SERVICES CHARGES

PRELIMINARY STATEMENT

Trial of this matter began on May 1, 2006.  The government accused Governor

Siegelman of numerous crimes including 70 RICO predicate acts, more than 30 federal crimes

besides the RICO allegations, and of misusing nearly $100 million state and federal funds for his

personal benefit or the benefit of his supporters.  At the close of the government's case,

Governor Siegelman moved for judgment of acquittal.  The Court deferred ruling on Governor

Siegelman's motion until after the jury returned its verdict.  On June 29, 2006, the jury

eliminated the majority of Governor Siegelman's Rule 29 motion by acquitting Governor

Siegelman on most of the charges brought against him.

The jury convicted Governor Siegelman on Counts Three, Five, Six, Seven, Eight, and Nine

– all of which relate to $500,000.00 contributed to the Alabama Education Lottery Foundation

(AELF) and its successor, the Alabama Education Foundation (AEF).[1] The jury's verdict on

Counts Five, Six, Seven, Eight, and Nine (the Honest Services Counts) followed this Court's

departure from the Eleventh Circuit Pattern Instructions and Eleventh Circuit case law.  The

---

[1]  Count Three, 18 U.S.C. § 666(a)(1)(B) (federal bribery); Count Five, 18 U.S.C. § 371 (Section 371 conspiracy to violate honest services mail fraud, 18 U.S.C. §§ 1341 and 1346 ); Counts Six through Nine, 18 U.S.C. §§ 1341 and 1346 (honest services mail fraud).

Court adopted the government's Rule 29 arguments and the government's arguments at the jury charge conference that a quid pro quo in exchange for a specific official act is not requisite to proving a *bribery*-based honest services charge.[2] Instead, the Court modified the Eleventh Circuit Pattern Jury Instructions as requested by the government and followed the First Circuit *Sawyer* case[3] that does not require a quid pro quo for honest services *gratuities*[4] cases and does not require honest services *gratuities* cases to prove the *gratuities* were in exchange for a specific official act. The Court's honest services charges to the jury thus included First Circuit honest services *gratuities* case rationale that did not require the government to prove a quid pro quo for the honest services alleged *bribery*-based campaign contribution benefits here, much less an *explicit* quid pro quo for the honest services alleged *bribery*-based campaign contributions benefits at issue in Counts Five through Nine.  Indeed, in all due respect, even the First Circuit *Sawyer* case recognizes there must be proof of a "specific quid pro quo"[5] for honest service "bribery-like"[6] cases![7]

---

[2]  The Court denied Governor Siegelman's proposed honest services jury instruction that provides that in order to prove the bribery-based honest services charges for campaign contributions the government must prove an explicit quid pro quo in exchange for a specific official act.

[3]  *United States v. Sawyer*, 85 F.3d 713, 730 (1st Cir. 1996).

[4]  Importantly, the Supreme Court in *United States v. Sun-Diamond Growers*, 526 U.S. 398, 404-405 (1999) recognized that requisite proof of "bribery" requires proof of a quid pro quo while requisite proof for a "gratuity" does not. "The District Court's instructions in this case, in differentiating between a bribe an illegal gratuity, correctly noted that only a bribe requires proof of a *quid pro quo*." *Id.*

[5]  *Sawyer*, 85 F.3d at 730; *see also*, *Sawyer*, 85 F.3d at 741 (recognizing "*quid pro quo bribery*" "*honest services cases*" and determining that the *gratuities* in the *Sawyer* case "*is not 'bribery'* within the meaning of the Travel Act." *Id.* (emphasis added).

[6]  *Id.* at 730.

[7]  *Accord, United States v. Woodward*, 149 F.3d 46, 49 (1st Cir. 1998), *cert. denied* 525 U.S. 1138 (1999).  Likewise, the District Court in *United States v. Warner*, 2005 WL 2367769, *3, *5 (N.D. ILL September 23, 2005) recently applied the explicit quid pro quo requirement to the honest services charges in Governor Ryan's case that involved campaign contributions.

The Court repeatedly expressed concern at the jury charge conference over the government's insistence that the Court apply the First Circuit's rationale to the requisite proof for the honest services charges in this case, stating that the government needed to understand that in the event there was a conviction and appeal regarding the honest services charges the honest services charges could very well be reversed on appeal.

Similarly, in all due respect, the federal jury instruction for the Court's instruction for the Count Three Section 666 federal bribery charge[8] also fell short of requiring that the government prove an *explicit* quid pro quo to sustain a federal bribery conviction for the campaign contributions at issue. Indeed, the Eleventh Circuit in *United States v. Davis*, 30 F.3d 108 (11th Cir. 1994) (*Davis II*) reversed *United States v. Davis*, 967 F.2d 516 (11th Cir. 1992) (*Davis I*) for jury instructions very similar to the instructions provided the jury in this case.

As similar to the federal bribery instructions provided by the Court in this case utilizing charging language of "agree[ing]" to take benefits "in exchange for" official acts, the Eleventh Circuit panel in *Davis I* found the language "agreeing to take or withhold official action"…."is near enough to the 'explicit promise or undertaking by the official to perform an official act' outlined in *McCormick* we cannot say the jury was misled."[9] Importantly, however, the Eleventh Circuit in *Davis II* reversed *Davis I*, holding that the jury must be instructed they must find an "explicit" promise or agreement, a "specific quid pro quo."[10]

Accordingly, as discussed in more detail below, the Rule 29 sufficiency of the evidence in this case for the Section Count Three alleged federal bribery campaign contribution

---

[8]   As well as the Count Four Section 666 federal bribery charge against Mr. Scrushy.
[9]   *Id.* at 522.
[10]  *Davis II*, 30 F.3d at 108. (requisite "explicit", "specific quid pro quo") Importantly, Governor Siegelman would note that the First Circuit *Sawyer* and *Woodward* cases speak in terms of a "specific quid pro quo" for honest services based bribery cases as well. *Sawyer,* 85 F.3d at 730; *accord*, *Woodward*, 149 F.3d at 49.

convictions as well as the Counts Five through Nine alleged honest services bribery based campaign contribution convictions must be reviewed under heightened quid pro quo requisite proof requiring an *explicit* agreement, an *explicit* promise, an *explicit* quid pro quo—a specific quid pro quo, an expressed agreement.

Indeed, the government, in its opening statement, even conceded that it bore the burden of proving that Mr. Scrushy and Governor Siegelman reached an explicit agreement that if Mr. Scrushy paid Governor Siegelman $500,000.00, Governor Siegelman would appoint Mr. Scrushy to the CON Board:  "If it's campaign money, you have to find there was an expressed what they call *quid pro quo*,[11] an[] *expressed agreement*." *Opening Statement by Mr. Feaga*, *May 1, 2006* 69/3-18. (emphasis added). The government further promised that "Mr. Bailey . . . [is] going to come in and . . . tell you there was an expressed agreement." *Id.*  Mr. Bailey did not do that.  He could not testify to "an expressed agreement" – or, to use the Eleventh Circuit's precise phrase, "an explicit promise or undertaking" – between Mr. Scrushy and Governor Siegelman, because Bailey was never in a room with Governor Siegelman and Mr. Scrushy, and Bailey did not participate or observe any conversations between Mr. Scrushy and Governor Siegelman.

"Explicit" or "Expressed" are very limiting terms when considering the Rule 29 insufficiency of the evidence of an "expressed agreement", an "explicit quid pro quo," much less when considering the evidence of an alleged expressed agreement or explicit quid pro quo under the appropriate *strictissimi juris* standard of review also discussed below.  *Black's Law*

---

11        "Quid pro quo" literally means "something for something," *American Heritage Dictionary of the English Language* (4th ed. 2000), and has been used in the English language since the 16th Century to mean "an equal exchange or substitution." *Id.*; *American Heritage Dictionary of Idioms* (1997).  In the context of bribery, a quid pro quo is "a specific official act in exchange for a specific corrupt payment."  *United States v. Paradies*, 98 F.3d 1266, 1289 (11th Cir. 1996).

*Dictionary* provides the legal definition for the interchangeable terms "express" and "explicit" as follows:

> *Express*: Clear; definite; *explicit*, plain; direct; unmistakable; not dubious; or ambiguous. Declared in terms; set forth in words. Directly and distinctly stated. *Made known distinctly and explicitly*, and *not left to inference. Manifested by direct and appropriate language*, *as opposed to inferred from conduct. The word is contrasted with 'implied.'* (emphasis added).

As discussed below, Bailey's testimony clearly failed to meet this requisite proof beyond a reasonable doubt. Because the government failed to carry its burden of demonstrating an expressed agreement, an *explicit quid pro quo* agreement between Mr. Scrushy and Governor Siegelman, Governor Siegelman must be acquitted on all of the federal bribery as well as all of the honest services charges.

Furthermore, with respect to the Count Three federal bribery charge, section 666 requires that the quid pro quo be a "any thing of value." 18 U.S.C. §§ 666(b)(2). As discussed below, the contributions arranged by Mr. Scrushy were *not* "of value" within the meaning of Section 666 and there must be acquittal on the Count Three[12] federal bribery charges.

Finally, while Count Three charges Governor Siegelman pursuant to § 666(a)(1)(B), the government failed to timely bring these charges within the applicable five-year statute of limitations. Because the government failed to prove beyond a reasonable doubt that it brought this charge within five years of the alleged crime, Governor Siegelman must be acquitted on the Count Three federal bribery charge.

### Standard of Review

The usual standard of review for a Rule 29 motion at the end of the Government's case in chief or at the conclusion of the entire trial is:

> [T]aking in the view most favorable to the Government, a reasonable
> minded jury might accept the relevant evidence as adequate to support a
> conclusion of the defendant's guilt beyond a reasonable doubt.

*Lambert v. United States,* 261 F.2d 799, 801 (5th Cir. 1958) (cited in *Jackson v. Virginia*, 433

U.S. 307, 319 (1979); *accord, United States v. Saba,* 321 F.3d 662, 671 (11th Cir. 1998) (quoting

*Jackson*). Even under this traditional standard of review, the Government's evidence well-short

of the manifest elements of the charges leveled against Governor Siegelman.

But this standard of review does not obtain under the doctrine of *strictissimi juris* as it is

advocated by Governor Siegelman, as matter of first impression, in the context of campaign

contributions. Governor Siegelman's arguments may be quickly summarized. Governor

Siegelman argues that *strictissimi juris* must mean, in the context of campaign contribution, that:

(1) The court should act as a "13th juror," making sure, *for itself*, not merely deferring to the jury

  on, for example, matters of credibility or inference, that the evidence is sufficient for

  conviction.  If appellate judges so act in First Amendment litigation generally, and they

  do, why, for the similar reasons here, trial courts and appellate courts should so act in the

  campaign contribution area, as a matter of *strictissimi juris*.  *See, e.g., Bose v. Consumers

  Union,* 466 U.S. 485, 510-11 (1984) (defamation); *Jenkins v. Georgia*, 418 U.S. 153, 160

  (1974) (obscenity); *Hess v. Indiana*, 414 U.S. 105, 107-09 (1973) (excitement);

(2) The testimony of one conspirator (e.g. Nick Bailey)against an alleged conspirator (e.g.,

Governor Siegelman) should require corroboration in a similar fashion that his confession, to be

used against him, must be corroborated; thus, a similar rule, for similar reasons, should be

adopted as a matter of *strictissimi juris* in the area of compaign contributions. *See, e.g., Wong

Sun v. United States,* 371 U.S. 471, 488-89 (1963) ("Where the crime involves physical damage

to person or property, the prosecution must generally show that the injury for which the accused

---

12

confesses responsibility did in fact occur, and that some person was criminally culpable. A notable example is the principle that an admission of homicide must be corroborated by tangible evidence of the death of the supposed victim. … There need in such a case be no link, outside the confession, between the injury and the accused who admits having inflicted it. But where the crime involves no tangible *corpus delicti*, we have said that 'the corroborative evidence must implicate the accused in order to show that a crime has been committed.' …Finally, we have said that one uncorroborated admission by the accused does not, standing alone, corroborate an unverified confession.")(citations omitted); *see also Smith v. United States*, 348 U.S. 147, 153 (1954) and VII JOHN HENERY WIGMORE, EVIDENCE § 2072, n. 5 (3d ed. 1940)). Such corroboration can *not* come from another co-conspirator, but must come from independent evidence (*e.g.,* a bug or another witness, not implicated in the plot), and the court must operate *expressly* under the traditional rule, *falsus in uno, falsus in omnibus*, reflecting Justice Story's opinion in *The Santissima Trinidad*, 20 U.S. (7 Wheat 28, 74) 282, 339 (1822); *accord, Kanawha & m. R. Co. v. Kerse*, 239 U.S. 576, 581 (1916); *Tel. Cases*, 126 U.S. 1, 459 (1888); *United States v. Castillero*, 67 U.S. 17, 208 (1863); and

(4) Where the prosecution relies, as here on an agreement to bribe, as well as the mail fraud conspiracy and scheme to defraud under honest services, not, say, on a bug before fact or a wire after the fact, either of which is independently verifiable, but on suspect witness testimony and on inferences drawn from purely circumstantial evidence, it should have to negate reasonable alternative hypotheses. Negating reasonable alternative hypotheses used to be the general rule for reasonable doubt where the prosecution used circumstantial evidence. *See, e.g., United States v. Elliot*, 571 F.2d 880, 906 (5th Cir. 1978); it is, of course, not the general rule for typical prosecutions now. *United States v.*

*Johnson*, 730 F.2d 683, 688 (11th Cir. 1984) (citing *Unites States v. Bell,* 678 F.2d 547,

549 n. 3 (5th Cir. 1982) (rejecting the old rule as inconsistent with *Holland v. United*

*States*, 348 U.S. 121, 139-40 (1954)); **nevertheless, it ought to obtain in the area of**

**campaign contribution as a matter of *strictissimi juris*.**

<u>**First Amendment Context**</u>

   This prosecution raises delicate and profound First Amendment issues that cannot be

ignored. Justice Frankfurter observed in dissent in *United States v. Rabinowitz,* 339 U.S. 56, 59

(1950), "where one comes out on a case depends on where one goes in." Thus, the Supreme

Court in *Buckley v. Valeo*, 424 U.S. 1 (1970), while it upheld certain narrow contributions limits,

struck down other expenditure limits as a substantial and direct restriction of the ability of

candidate, citizens,  and associations to engage in political expression "It can hardly be doubted [

Court observed ,] that the [First Amendment] has its fullest and most urgent application precisely

to the conduct of campaigns for public office. *Id.* at 16. The Court then added:

> Close examination ... is required where ... the legislature imposes criminal
> penalties in an area permeated by [First Amendment] interests. ... The test is
> whether the language [of the statute] affords the 'precision of regulation [that is]
> the touchstone of an area closing touching our most precious freedoms.'

*Id.* (citing *National Association for the Advancement of Colored People v. Button*, 371 U.S. 415,

438 (1963). Significantly, the Court added:

> In such circumstances vague laws may not only 'trap the innocent by not
> providing fair warning' or 'foster arbitrary and discriminatory application,' but
> also to inhibit protected expression by inducing  citizens to 'steer wide of the
> unlawful zone ...than if the boundaries of the forbidden area were clearly marked.'

*Id.* at n.48 (citing *Grayned v. City of Rockford,* 408 U.S. 104, 108-09 (1972))

   Similarly, in all respect, the Court's failure to impose a strict "explicit" quid pro quo to

the government's proof of federal bribery for campaign contributions under Count Three and

'explicit" quid pro quo proof for the alleged bribery based honest services charges for campaign contributions under Counts five through Nine would clearly unconstitutionally foster the application of the Section 666 federal bribery and the Section 1346 honest services statutes in a manner that would also render the statutes void for vagueness, especially in light of First Amendment considerations. Indeed, the Eleventh Circuit recently reiterated that "Vagueness concerns are more acute when a law implicates First Amendment rights and a heightened level of clarity and precision is demanded of criminal statutes because their consequences are more severe." *United States v. Williams*, 444 F.3d 1386, 2006 U.S. App. LEXIS 8384, AT *57 (11th Cir. April 6, 2006) (also recognizing that three basic reasons for holding a statute void for vagueness are "(1) to avoid punishing people for behavior that they could not have known was illegal; (2) *to avoid subjective enforcement of the laws based on arbitrary or discriminatory interpretations of government officers*; and (3) to avoid any chilling effect on the exercise of sensitive First Amendment freedoms." *Id.*) (emphasis added). It is thus also significant to note that in reversing a panel ruling that the Section 1346 statute is void for vagueness the Second Circuit, *en banc*, nevertheless admonished "there is no reason to think that Congress sought to grant Carte Blanche to federal prosecutors, judges, and juries to define 'honest services' from case to case for themselves." *United States v. Rybicki*, 354 F.3d 138 (2d Cir., *en banc*).

If any doubt exists about the continuing validity of *Buckley* and the above First Amendment and void for vagueness concerns admonishing restraint, it was certainly dispelled by the Court in *Randall v. Sorrel,* 126 Sup Ct. 2579, 90-912 (2006).

Similarly, Governor Siegelman asks that if such is required of legislation, as it is, how much more so should equally stringent standards be applied in the prosecution of the actual conduct of campaigns to avoid criminalization of the political process.

More focused on these proceeding are the comment of the Supreme Court in *McCormick*

*v. United States*, 550 U.S. 257, 272-73 (1991):

> Serving constituents and supporting legislation that will benefit the district and individuals
> and groups therein is the everyday business of a legislator. It is also true that campaigns
> must be run and financed. Money is constantly being solicited on behalf of candidates,
> who run on platforms and who claim support on the basis of their views and what they
> intend to do or have done. Whatever ethical considerations and appearances may indicate,
> to hold that legislators commit the federal crime of extortion when they act for the benefit
> of constituents or support legislation furthering the interests of some of their constituents,
> shortly before or after campaign contributions are solicited and received from those
> beneficiaries, is an unrealistic assessment of what Congress could have meant by making
> it a crime to obtain property from another, with his consent, "under color of official
> right." To hold otherwise would open to prosecution not only conduct that has long been
> thought to be well within the law but also conduct that in a very real sense is unavoidable
> so long as election campaigns are financed by private contributions or expenditures, as
> they have been from the beginning of the Nation.

While the Court made these comments in the context of its effort to limit the wide scope

of color law extortion in the Hobbs Acts, they are equally applicable to

prosecution for bribery or violations of the honest services provisions of the mail

fraud statutes.  *See, e.g., United States v. Allen*, 10 F.3d 405, 410-411 (7th Cir.

1993) (principles of restraint equally applicable bribery); *Davis II*, 30 F.3d at 108

(11th Circuit following *Allen*); *United States v. Martinez*, 14 F.3d 543, n.5 at 553

(11th Cir. 1994) (followed by *Davis II* and recognizing that principles of restraint

apply equally to bribery); *Warner*, at *3, *5. (principles of restraint equally

applicable to bribery based honest services prosecutions for campaign

contributions).

Indeed, the considerations that led the Court to narrow Federal prosecutions in the area of

the Hobbs extortion as well as other bribery statutes also led the Supreme Court to

place narrow limitations on prosecutors in the area of gratuities under Title 18 in

*United States v Sun-Diamond Growers*, 526 U.S. 398 (1999). Responding to an

extravagant construction of 18 U.S.C. § 201, which contains the Federal bribery and gratuities provisions, in connection with the prosecution of the Secretary of Education, the Court aptly observed:

[W]e are inclined to believe [that our narrow construction is] correct because of the peculiar results that the Government's alternative reading would produce. It would criminalize, for example, token gifts to the President based on his official position and not linked to any identifiable act -- such as the replica jerseys given by championship sports teams each year during ceremonial White House visits, ... Similarly, it would criminalize a high school principal's gift of a school baseball cap to the Secretary of Education, by reason of his office, on the occasion of the latter's visit to the school. That these examples are not fanciful is demonstrated by the fact that counsel for the United States maintained at oral argument that a group of farmers would violate § 201(c)(1)(A) by providing a complimentary lunch for the Secretary of Agriculture in conjunction with his speech to the farmers concerning various matters of USDA policy -- so long as the Secretary had before him, or had in prospect, matters affecting the farmers. ... Of course the Secretary of Agriculture *always* has before him or in prospect matters that affect farmers, just as the President always has before him or in prospect matters that affect college and professional sports, and the Secretary of Education matters that affect high schools.  It might be said in reply to this that the more narrow interpretation of the statute can also produce some peculiar results. In fact, in the above-given examples, the gifts could easily be regarded as having been conferred, not only because of the official's position as President or Secretary, but also (and perhaps principally) "for or because of" the official acts of receiving the sports teams at the White House, visiting the high school, and speaking to the farmers about USDA policy, respectively. The answer to this objection is that those actions -- while they are assuredly "official acts" in some sense -- are not "official acts" within the meaning of the statute, which, as we have noted, defines "official act" to mean "any decision or action on any question, matter, cause, suit, proceeding or controversy, which may at any time be pending, or which may by law be brought before any public official, in such official's official capacity, or in such official's place of trust or profit." *Thus, when the violation is linked to a particular "official act," it is possible to eliminate the absurdities through the definition of that term. When, however, no particular "official act" need be identified, and the giving of gifts by reason of the recipient's mere tenure in office constitutes a violation, nothing but the Government's discretion prevents the foregoing examples from being prosecuted.*

*Id.* at 406-07.

The Court's point about the downside of prosecutive discretion as a limitation on the breath of the Federal criminal code, particularly in the areas of the First Amendment, is one of

the central points of Governor Siegelman's arguments in this motion. Notably, the Court's illustrations focused on executive action. They could as easily have been focused on judicial action. From time to time, judges are asked to make remarks at various conferences or gatherings, say, a college or university commencement. Should the giving or taking of a college or university sweat shirt or cap as a token of appreciation be made a Federal felony at the discretion or whim of a Federal prosecutor? The matters alleged in this prosecution are not so trivial, but in principle they are indistinguishable

Because of these concerns, the court apply the doctrine of *strictissimi juris* to guarantee the First Amendments freedoms are not lost. *See United States v. Dellinger,* 472 F.2d 340, 392 (7th Cir. 1972) (reversing convictions under the Federal Riot Act).

## THE *QUID PRO QUO* REQUIREMENT IS HEIGHTENED IN CAMPAIGN CONTRIBUTION CASES TO REQUIRE AN "EXPLICIT" *QUID PRO QUO*

**The *quid pro quo* requirement is heightened to require an "explicit" or "specific quid pro quo" whenever the government bases its criminal charges on underlying bribery-type or extortion charges.** This principle applies regardless of whether the prosecution is for extortion, federal or state law bribery, or bribery-type honest services charges.

The heightened "explicit" quid pro quo requirement has its origins in *McCormick v. United States*, 500 U.S. 257, 273 (1991), in which the Court held that "[t]he receipt of [campaign] contributions is . . . vulnerable under the [Hobbs] Act as having been taken under color of official right, but only if the payments are made in return for an *explicit* promise or undertaking by the official to perform or not to perform an official act." (emphasis added). The Court explained:

> [T]o hold that legislators commit the federal crime of extortion when they act for the benefit of constituents or support legislation furthering the interests of some of their constituents, shortly before or after campaign contributions are solicited and received from those beneficiaries, **is an unrealistic assessment of what**

> **Congress could have meant by making it a crime to obtain property from another**, with his consent, "under color of official right." [Emphasis added]

500 U.S. at 272.

Importantly, the strict principle of restraint requiring proof of an "explicit" quid pro quo, a "specific quid pro quo", has been widely recognized by the courts to apply to any type of federal bribery charge involving campaign contributions as well as any bribery-type honest services charges involving campaign contributions.

Indeed, the Seventh Circuit in *United States v. Allen,* 10 F.3d 405, 410-411 (7th Cir. 1993) provides an excellent analysis and rationale as to why it is so important to exercise restraint and to strictly require an "explicit" quid pro quo to convict a public official for bribery-type as well as extortion charges so as not to criminalize the political process as we have know it since the birth of our nation.

> Allen's response to the district court's distinction between bribery and Hobbs Act extortion is essentially, 'So what?'. Allen maintains that whether the charge against a defendant be extortion or bribery, the concerns that led the Supreme Court to adopt the quid pro quo requirement in *McCormick* exist. This argument is not without force. *McCormick* recognized several realities of the American political system. Money fuels the American political machine. Campaigns are expensive, and candidates must constantly solicit funds. People vote for candidates and contribute to the candidates' campaigns because of those candidates' views, performance, and promises. It would be naïve to suppose that contributors do not expect some benefit support for favorable legislation, for example, ---for their contributions. To hold that a politician committed extortion merely by acting for some constituents' benefit shortly before or after receiving campaign contributions from those constituents 'would open to prosecution not only conduct that has long been thought to be well within the law but also conduct that in a very real sense is unavoidable so long as election campaigns are financed by private contributions or expenditures, as they have been from the beginning of the nation,' (*McCormick* citation omitted). Only statutory language much more explicit than that in the Hobbs Act would justify a contrary conclusion. *Id.*
>
> As the law has evolved, extortion 'under color of official right' and bribery are really different sides of the same coin. 'Extortion' under color of official right' equals the knowing receipt of bribes….[I]t is extortion if the official knows that the bribe---is motivated by a hope that it will influence him in the existence of his office and if, knowing this, he accepts the bribe. (citations

omitted)….Because of the realities of the American political system, and the fact that the Hobbs Act's language did not justify making commonly accepted political behavior criminal, the Supreme Court in *McCormick added* to this definition of extortion the requirement that the connection between the payment and the exercise of the office—*the quid pro quo be explicit*.  Given the minimal difference between extortion under color of official right and bribery, it would seem that the *courts should exercise restraint in interpreting bribery statutes* as the *McCormick* Court did in interpreting the Hobbs Act: absent some fairly explicit language otherwise, *accepting a campaign contribution does not equal a bribe unless* the payment is *in exchange for* an *explicit* promise to perform or not to perform an official act.  Vague expectations of some future benefit should not be sufficient to make a payment a bribe. *Id.* (emphasis added).

The Eleventh Circuit in *Davis II*, 30 F.3d at 108, followed *Allen* in requiring an "explicit quid pro quo", a "specific quid pro quo", and also recognized that this same principle applies to bribery in *United States v. Martinez*, 14 F.3d 543, n.5 553 (11th Cir. 1994). Indeed, the Eleventh Circuit rejected the government's attempts to limit McCormick's *quid pro quo* requirements to campaign contribution cases.  In *Martinez*, the Eleventh Circuit discussed both *McCormick* and *Evans v. United States*, 504 U.S. 255, 268 (1992), and concluded that *both McCormick* and *Evans* require the government to prove a *quid pro quo*.  The *Martinez* court concluded that *McCormick* required an *explicit quid pro quo* in campaign contribution cases, and *Evans* required *quid pro quo* in non-campaign contribution cases.[13]  *Martinez at 552-553.*

_____

[13]      The Eleventh Circuit re-affirmed *Martinez* when it reheard *United States v. Davis*, 30 F.3d 108, 109 (11th Cir. 1994) (*Davis* II).  The defendant was an Alabama legislator charged with conspiring to extort money in return for help in getting a bill out of her committee.  The district court charged the jury that a defendant violates the Hobbs Act "[by] taking or offering to take or agreeing to take or withhold official action for the money" and that "a specific quid pro quo is not always necessary for a public official to be guilty of extortion." *United States v. Davis*, 967 F.2d 516, 521 (11th Cir. 1992).  The Eleventh Circuit originally held that this charge was "near enough to the 'explicit promise or undertaking by the official to perform or not to perform an official act' outlined in *McCormick*" and affirmed the conviction.  *Id.* at 522.  But, on reconsideration, the same panel (Judges Kravitch, Edmondson, and Godbold) reversed itself, holding:

Moreover, The Northern District of Illinois applied the explicit quid pro quo requirement to an honest services case involving campaign contributions in *United States v. Warner*, 2005 WL 2367769 (N.D. Ill. September 23, 2005).  Former Illinois Governor Ryan and the prosecutors filed competing motions in limine regarding the proof required on the honest services charges against him – some but not all of which involved campaign contributions.  2005 WL 2367769 *1-5.  The court held that the government had to prove an explicit quid pro quo on the honest services charges that involved campaign contributions, though not on the other honest services charges.  *Id.* *5 ("Nor must the government prove an explicit quid pro quo outside the campaign contribution context").

Indeed, *Sawyer* itself recognizes the "specific quid pro quo" requisite proof for bribery-type honest services cases. *Sawyer*, *supra*; *Woodward*, *supra*.

## II.  <u>NO BRIBE: THE GOVERNMENT'S SUBSTANTIVE PROOF FAILED</u>

In addition to the § 666(a)(1)(B) charge in Count Three, Count Five charged Governor Siegelman with 18 U.S.C. § 371 honest services conspiracy, and Counts Six through Nine charged Governor Siegelman with honest services mail fraud (18 U.S.C. §§ 1341, 1346), *Second Superseding Indictment*, ¶¶ 52-60.  Further, Counts Five through Nine allege that Governor

---

For the reasons stated in *United States v. Martinez*, 14 F.3d 543, 552-54 (11th Cir. 1994), under United States Supreme Court precedent, an explicit promise by a public official to act or not act is an essential element of Hobbs Act extortion, and the defendant is entitled to a reasonably clear jury instruction to that effect. Because the district court failed to charge Davis's jury as to the necessity of finding an explicit promise before the jury properly could convict – and indeed informed the jury that "a specific quid pro quo is not always necessary for a public official to be guilty of extortion – appellant's conviction is due to be REVERSED and the case REMANDED to the district court for further proceedings consistent with this opinion.

30 F.3d at 109.  As *Davis* II noted, other circuits agree.

Siegelman deprived the state of Mr. Scrushy's honest services as a CON Board member. *Id.* ¶¶
52-60.

The government's substantive proof failed on all Counts referenced above because the
government failed to prove the required explicit *quid pro quo*, and because the government
offered no evidence that Governor Siegelman did anything to deprive Alabama citizens of Mr.
Scrushy's honest services.

### A.  The Evidence

Bailey testified that during the meeting (which Bailey did not attend), Mr. Scrushy made
some form of a commitment to Governor Siegelman to contribute $500,000.00 to the AELF:

Q.    Okay.  Now, when the Governor showed you the check what, if anything, did he
say to you?

A.    He made a comment referring to Mr. Scrushy's commitment to give 500,000 and
he's halfway there.

\*            \*            \*            \*

Q.    What did you say when you showed him the check and he said, he's halfway
there?

A.    **I responded by, what in the world is he going to want for that?  And the
Governor said, the C-O-N Board or the CON Board.  And I said, I wouldn't
think there would be a problem with it; and he said, I wouldn't think so.**

\*            \*            \*            \*

Q.    You said he said at the outset of that conversation, he's halfway there.  Do you
know what he was talking about when he said that this $250,000 was halfway
there?

A.    He was referring to the $500,000 commitment that Mr. Scrushy had made to our
lottery campaign.

*Nick Bailey Testimony on Direct Examination, May 2, 2006* 173/6-9; 175/20 – 176/4; 176/21 –
177/4; 183/8-14. [Emphasis added]

The testimony excerpted above is as close as the government ever gets to presenting evidence of an explicit *quid pro quo* agreement between Mr. Scrushy and Governor Siegelman. Bailey does not recall specific dates, he does know regardless of the inconsistencies in his testimony, Bailey testified that Governor Siegelman received the IHS check (which was dated July 19, 1999) sometime in July of 1999.

The government's own witness, Alva Lambert, testified that appointees to the CON Board, like other political appointees, are often contributors to the governor who appoints them.[14]  Mr. Lambert made clear that this is a normal and acceptable practice:

> Q.    Yes, sir.  In fact, Mr. Lambert, many people who are appointed not only to boards, but also to cabinet positions, have either contributed or played significant roles in a governor's campaign?
>
> A.    Yes.
>
> Q.    And you would consider that the norm?
>
> A.    Yes.
>
> Q.    That's just Alabama politics, isn't it?
>
> A.    Yes, sir.

*Testimony of Alva Lambert on Cross-Examination, May 2, 2006* 83/12-21.

When Governor Siegelman appointed Mr. Scrushy to the CON Board, he appointed seven others, including chair Margaret Sellers.  *Government Exhibits 6A-I*; *Alva Lambert Testimony on Direct Examination*, 20/2 – 21/6.  The government presented no evidence that Mr. Scrushy was in any way derelict in his duties.  On the contrary, each of the government's witnesses testified that Mr. Scrushy was qualified to serve on the CON Board, that he served under Governor Siegelman with distinction, that he had served in the same position under several

---

[14] *Testimony of Alva Lambert on Cross-Examination, May 2, 2006* 81/19 – 82/22

previous governors, and, like the other members of the CON Board, Mr. Scrushy served without compensation.[15]

The government presented no evidence that the $500,000.00 contributed to AELF and AEF was of any benefit to Governor Siegelman. Throughout the trial, the government repeatedly argued that Governor Siegelman benefitted from the $500,000.00 contribution because he guaranteed an AEF debt. However, the evidence clearly demonstrates that this debt did not exist and was not even contemplated in July of 1999 when Mr. Scrushy committed to raising $500,000.00.

### 1.  Explicit Quid Pro Quo Required

In its opening statement, the government acknowledged its burden of proving an ***explicit agreement***, involving a ***quid pro quo***:

> [Y]ou may have to draw some distinctions between whether you think a given gift was personal or campaign. Because we think you could find fairly with some of these that some are personal and one or more may be campaign. And the Court is going to be instructing you that there may be a slightly different standard. And it's important, but it's a difference. **If it's campaign money, you have to find there was an expressed what they call quid pro quo, an expressed agreement.** That's where Mr. Bailey and Mr. Allen are going to come in and they're going to tell you there was an expressed agreement with regard to all of these.

*Opening Statement by Mr. Feaga, May 1, 2006* 69/3-18. **The government argued against this statement six weeks later at the jury charge conference, and this statement is substantially different than the charge the Court submitted to the jury.**

Congress passed 18 U.S.C. § 666 as part of Title XI of the Comprehensive Crime Control Act of 1984. *Pub. L. 98-473, 98th Cong., 2d Sess. (1984).* Its aim was "to create new offenses to augment the ability of the United States to vindicate significant acts of theft, fraud, and bribery involving Federal monies that are disbursed to private organizations or State and local governments pursuant to a Federal program." *S. Rep. No. 225, 98th Cong., 2d Sess. 369* (1984), *reprinted in* 1984 U.S. Code Cong. & Admin. News 3510.

One purpose of enacting §666 was to resolve a split between the federal courts as to whether the general federal bribery statute, 18 U.S.C. § 201, covered bribes to non-federal

---

[15] *Testimony of Alva Lambert on Cross-Examination, May 2, 2006* 77/9-19; 78/14 – 79/9; 81/3-18. See also, *Testimony of Margie Sellers, Roosevelt McCorvey, Harold Philpot, Gilder Wideman.*

officials.[16]  The issue was before the United States Supreme Court,[17] but Congress acted to remove any doubt.[18]

Section 666(a)(1)(B) is the bribery portion of the statute.[19]  It provides:
(a) Whoever . . . .

(1) being an agent of an organization, or of a State, local, or Indian tribal government, or any agency thereof –

(B) corruptly solicits or demands for the benefit of any person, or accepts or agrees to accept, anything of value from any person, intending to be influenced or rewarded in connection with any business, transaction, or series of transactions of such organization, government, or agency involving anything of value of $5,000 or more . . . .

shall be fined under this title, imprisoned not more than 10 years, or both.

---

[16]    Noting that § 201 applied only to "public officials," which that statute defined as "officer[s] or employee[s] or person[s] acting for or on behalf of the United States" or any of its departments, agencies, or branches, the Second Circuit held that it did not cover bribes to non-federal officials.  *See, e.g., United States v. Del Toro*, 513 F.2d 656, 661-62 (2d Cir.) (city official not covered), *cert. denied*, 423 U.S. 826 (1975).  The Seventh Circuit disagreed.  *United States v. Mosley*, 659 F.2d 812, 814-16 (7th Cir. 1981) (state officials covered).

[17]    *S. Rep. No. 225, 98th Cong., 2d Sess. 369* (1984), *reprinted in* 1984 U.S. Code Cong. & Admin. News 3510-11 & n. 2 (noting the grant of certiorari in *United States v. Hinton*, 683 F.2d 195 (7th Cir. 1982)).

[18]    With respect to bribery, 18 U.S.C. 201 generally punishes corrupt payments to Federal public officials, but there is some doubt as to whether or under what circumstances persons not employed by the Federal Government may be considered as a "public official" under the definition in 18 U.S.C. 201(a) as anyone "acting for or on behalf of the United States, or any department, agency or branch of Government thereof, including the District of Columbia, in any official function."  The courts of appeals [in the Second and Seventh Circuit cases] have divided on the question whether a person employed by a private organization receiving Federal monies pursuant to a program is a "public official" for purposes of section 201.  The issue is due to be decided soon by the Supreme Court, at least in the context of the particular HUD program involved in that case. . . . It is . . . the intent to reach . . . bribery in situations of the types involved in the [Second and Seventh Circuit] cases[.]

*Id.* 1984 U.S. Code Cong. & Admin. News 3510-11 (footnotes omitted).

[19]    *Salinas v. United States*, 522 U.S. 52, 56 (1997) (Section 666(a)(1)(B) "forbids acceptance of a bribe by a covered official who intends 'to be influenced or rewarded in connection with any business, transaction, or series of transactions of [the defined] organization, government or agency.'").

Section 666(a)(1)(B) is "patterned on" § 201, **though § 666 imposes more stringent proof requirements on the government** in some respects. ___. Section 201 bribery requires a quid pro quo. In *United States v. Sun-Diamond Growers*, 526 U.S. 398 (1999), the United States Supreme Court held:

> Bribery [under § 201] requires intent "to influence" an official act or "to be influenced" in an official act . . . . In other words, for bribery there must be a *quid pro quo* – a specific intent to give or receive something *in exchange for* an official act.

*Id.* at 404-05.[20]

**Other circuit and district courts have held that § 666(a)(1)(B) bribery likewise requires a *quid pro quo*.** In *United States v. Medley*, 913 F.2d 1248, 1260 (7th Cir. 1990), for example, the Seventh Circuit stated that "[t]he essential element of a section 666[(a)(1)(B)] violation is a 'quid pro quo'; that is, whether the payment was accepted to influence and reward an official for an improper act." In *United States v. Ford*, 435 F.3d 204, 213 (2d Cir. 2006), the Second Circuit held that "[the defendant in a § 666(a)(1)(B) case] must have accepted the thing of value while 'intending to be influenced.' Or, as the Supreme Court put it plainly in *Sun-Diamond Growers*, there must be a *quid-pro-quo*."[21]

The Eleventh Circuit has not spoken directly, but has followed *Medley* on more than one occasion. *Medley* held that a jury instruction tracking the language of § 666(a)(1)(B) suffices to convey the quid pro quo requirement to the jury. The Eleventh Circuit held in *United States v. Paradies*, 98 F.3d 1266, 1289 (11th Cir. 1998):

> We have carefully reviewed the jury charges given in this case, and we are persuaded that the district court did not commit reversible error under the reasoning in *Medley*. The jury charges tracked the statutory requirements, and the evidence at trial was sufficient for a jury to find that [the defendant at issue] accepted payment for his votes and his influence upon the City Council and the administration. Such a finding would satisfy any quid pro quo requirement under the statute.

*See also, United States v. Woodall*, 171 Fed. Appx. 778, 780, 2006 WL 700933 *1 (11th Cir. March 21, 2006).

    a.  An Honest Services Charge Based On A Payment To A Public Official

---

[20]     Justice Scalia, writing for the majority in *Sun-Diamond*, made clear that the payment must be made "in exchange for" a *specific* official act. 526 U.S. at 405.

[21]

Requires A *Quid Pro Quo*

In the Eleventh Circuit, a public official violates his honest governmental services duty if he "accepts a bribe or personally benefits from an undisclosed conflict of interest." *United States v. Lopez-Lukis*, 102 F.3d 1164, 1169 (11th Cir. 1997); *United States v. deVegter*, 198 F.3d 1324, 1329 (11th Cir. 1999).  Since the allegation here is of payment to Governor Siegelman, this case is about the "accepts a bribe" component.

As the various defendants already have briefed and argued extensively (Governor Siegelman adopts all defendants' honest services arguments made throughout the case), in the Eleventh Circuit, "accepts a bribe" means *quid pro quo* bribery.  Among other things, between the time the Eleventh Circuit articulated the "accepts a bribe" standard in *Lopez-Lukis*, and the time it reiterated that standard in *deVegter*, the Supreme Court issued the *Sun-Diamond* decision finding that § 201 bribery requires a *quid pro quo*. *Lopez-Lukis* and every other Eleventh Circuit public official case prosecuted under this portion of the honest services statute has involved *quid pro quo* bribery.[22]

That also is true with respect to the reported public official cases under this portion of the statute, other than the *United States v. Sawyer* line of cases,[23] that undersigned counsel has been able to locate.[24]

---

[22]    *United States v. Paradies*, 98 F.3d 1266, 1271-72 (11th Cir. 1996) (concessionaires at Atlanta airport paid bribes to Atlanta City Council member to reduce rent for their concessions at airport)

*United States v. Castro*, 89 F.3d 1443, 1447-48 (11th Cir. 1996) (judge in Dade County accepted kickbacks in exchange for appointments of lawyers as special assistant public defenders)

*United States v. Italiano*, 894 F.2d 1280, 1281-82 (11th Cir. 1990) (bribes to Hillsborough County, Florida county commissioners in exchange for the award of cable television franchises)

[23]    The *Sawyer* line of cases consists of *United States v. Sawyer*, 85 F.3d 713 (1st Cir. 1996) (*Sawyer* I); *United States v. Woodward*, 149 F.3d 46 (1st Cir. 1998), *cert. denied* 525 U.S. 1138 (1999); and *United States v. Sawyer*, 239 F.3d 31 (1st Cir. 2001) (*Sawyer* II).

[24]    *United States v. Sedoma*, 332 F.3d 20, 22 (1st Cir. 2003) (Tiverton, Massachusetts police officer paid to provide confidential police information to drug ring)

*United States v. Boots*, 80 F.3d 580, 592-93 (1st Cir. 1996) (bribes paid to Native American reservation police chief by tobacco smuggling ring)

*United States v. Grandmaison*, 77 F.3d 555, 557-58 (1st Cir. 1996) (Nashua, New Hampshire alderman bribed colleagues for votes leading to the selection of his construction firm for lucrative construction project)

*United States v. Bucuvalas*, 970 F.3d 937, 939 (1st Cir. 1992) (among other mail fraud violations, "Bucuvalas and his co-conspirators [who operated adult entertainment establishments] bribed licensing board members and police officers to avoid accountability for infractions which might otherwise have resulted in license suspensions or revocations")

*United States v. Potter*, 2005 WL 2367677 *2-3 (D.R.I. 2005) (dog track owner paid bribe to Speaker of Rhode Island House of Representatives for favorable legislative action on coin-operated gambling machines and video lottery terminals at dog track, as well as unfavorable legislative action toward Native American tribe proposal for casino gambling)

*United States v. Lenoci*, 377 F.3d 246, 248-49 (2d Cir. 2004) (developer provided free landscaping and other services for personal residences of mayor and official at state of Connecticut's Office of Community and Economic Development; in exchange, mayor wrote a letter in support of development and state official advanced $6.5 million in state development funds to project)

*United States v. Alkins*, 925 F.2d 541, 544-45 (2d Cir 1991) (DMV officials processing applications for driver's licenses and other licenses, absent proper documentation, in exchange for cash payments)

*United States v. Quinn*, 359 F.3d 666, 671-72 (4th Cir. 2004) (bribes to Department of Treasury officials for contracts)

*United States v. Barber*, 668 F.2d 778, 781 (4th Cir.) (alcoholic beverage control commissioner charged with "soliciting and accepting thousands of dollars in bribes from certain liquor companies" as well as helping himself to free liquor), *cert. denied* 459 U.S. 829 (1982)

*United States v. Holzer*, 816 F.2d 304, 308 (7th Cir. 1987) ("systematic and long-continued receipt of bribes" by county trial judge from lawyers appearing before him)

*United States v. Lovett*, 811 F.2d 979, 981 (7th Cir. 1987) (bribe from cable television company to mayor for cable rights in town – offer of 5% ownership in the company)

*United States v. Rauhoff*, 525 F.2d 1170, 1171-72 (7th Cir. 1975) (bribes to Illinois Secretary of State "in order to procure and retain contracts for the production of Illinois license plates")

In pretrial filings and Rule 29 oral argument, the government "adopt[ed],"[25] and urged this Court to adopt, the First Circuit's honest governmental services standard set forth in the *Sawyer* cases.[26] In those cases, the First Circuit "expanded [honest services fraud] from <u>quid pro quo</u> bribery to include a more generalized pattern of gratuities to coax 'ongoing favorable official action.'" *United States v. Woodward*, 149 F.3d 46, 49 (1st Cir. 1998), *cert. denied* 525 U.S. 1138 (1999). For all of the reasons set forth in all of the defendants' pretrial and Rule 29 filings, and in the defendants' Rule 29 oral arguments (which Governor Siegelman expressly incorporates here), the First Circuit's reasoning is erroneous. Its standard does not supply the clarity about a public official's duty that due process demands.

**The misgivings that this Court expressed during the jury charge conference about departing from the Eleventh Circuit Pattern Jury Instructions were correct. It was error for the Court to amend the Eleventh Circuit pattern honest services jury instruction to include language from the *Sawyer* cases (and thus to instruct the jury at least partially on a *Sawyer* theory).** Among other things, instructing the jury on the incorrect *Sawyer* theory, and permitting it to return a general verdict, will mandate a new trial on the honest services counts, under the *Griffin/Yates* line of cases.[27] This will be discussed in greater detail if Governor Siegelman is forced to file a Rule 33 motion.

In any event, the government's evidence is insufficient even under the *Sawyer* standard. There was no "generalized pattern of gratuities to coax on-going favorable official action" – there were two checks made payable to a foundation that supported educating Alabama

---

*United States v. Madeoy*, 912 F.2d 1486, 1488 (D.C. Cir. 1988) (bribes to public officials to obtain FHA-insured loans).

[25]

[26] *United States' Response To Defendant Hamrick's Motion In Limine To Bar Evidence And Argument Regarding Alleged Payments Made By Mr. Young To Mr. Hamrick* at 5-7 (Doc. 317).

[27]    The *Griffin/Yates* cases established the law on "a general jury verdict under a single count charging the commission of an offense by two or more means." *Griffin v. United States*, 502 U.S. 46, 50 (1991). If a single count charges the commission of an offense by two or more means, and the charge with respect to one of those means is legally inadequate under applicable federal law, a general verdict on that count cannot stand. *Griffin*, 502 U.S. at 55-56. The paradigm case is *Yates v. United States*, 354 U.S. 298, 304-12 (1957). The Eleventh Circuit acknowledged the *Griffin/Yates* line of cases in *Clark v. Crosby*, 335 F.3d 1303, 1308-10 (11th Cir. 2003)

children allegedly in exchange for a CON Board seat for which Mr. Scrushy was undisputably qualified. Moreover, the government offered no evidence that Governor Siegelman intended to deceive the public, as the *Sawyer* cases require. See *Sawyer I* 85 F.3d at 732-33.

**B. Applying The Heightened Quid Pro Quo Requirement to the Facts of This Case**

The government failed to meet the heightened quid pro quo standard here. Its proof is very similar to the proof offered – and found insufficient, even under the standard applicable in civil cases – in *Roger Whitmore's Automotive Services, Inc. v. Lake County, Illinois*, 424 F.3d 659 (7th Cir. 2005). There, a civil RICO plaintiff alleged that he operated a towing service that was on the county sheriff department's approved list, eligible to be called by the county dispatcher for towing needs. He alleged:

> [I]nclusion on the list does not come cheap. Three different sheriffs, over the years, personally visited [plaintiff] in order to sell tickets for political fundraisers. For example, [one sheriff] made personal appearances at [plaintiff's business] with tickets in hand. [Another sheriff] came to [plaintiff's business], placed fund-raiser tickets on the counter, and collected checks from [plaintiff]. [A third sheriff] did likewise. Sheriff's deputies often followed up these visits, to pick up checks or to verify that [plaintiff] would be attending the fund raisers.
>
> [Plaintiff] felt pressured to purchase the tickets for several reasons. For one, the officers appeared at [plaintiff's] business openly displaying badge and gun. Plus, [plaintiff] had heard rumors that a towing company refusing to purchase tickets had found itself "kicked off" the approved list. [Plaintiff] therefore felt intimidated and concluded that he had no choice but to purchase the tickets, because otherwise "maybe they would take [his] business away." Even when some sheriffs mailed tickets, rather than making personal appearances, [plaintiff] felt "slightly uncomfortable."

424 F.3d at 663-64. He sued when, after a new sheriff was elected whom he had not supported in the primary, his towing territory was reduced. The Seventh Circuit held this evidence "woefully inadequate" to prove a civil RICO violation based on Hobbs Act extortion and Illinois bribery and extortion, and affirmed the district court's grant of summary judgment to the defendants:

> [Plaintiff] offers no objective evidence that the defendants were extorting the campaign funds from him or other towing operators. Instead, [plaintiff] merely points to eivdence that [the new sheriff] accepted money from him and other towers (which, of course, is undisputed) and contends that the contributions could only have been in exchange for presence on the list or from fear of being removed from the list. [Plaintiff] relies heavily on subjective belief that the payments were a sort of *quid pro quo* or offered out of

fear.  For example, he offers the fact that towers made up a disproportionate percentage of [the new sheriff's] campaign contributions.  He claims that the defendants received one contribution of cash in an envelope, and argues that [the new sheriff] violated his rule prohibiting face-to-face solicitation. [Plaintiff] also testified to his discomfort at having sheriffs sporting guns and badges personally pick up contributions and cites isolated testimony from a fellow tower that "it helps" to make contributions to the incumbent sheriff.  All of this, [plaintiff] contends, is proof that the defendants extorted funds from towers.

We do not believe a rational jury could find in [plaintiff's] favor on the basis of this evidence.  For one, it should hardly be surprising that towers made up a disproportionate percentage of [the new sheriff's] campaign contributions, given the manner in which the Lake County sheriff's department has long used a list of approved towers.  This is the very nature of politics, and in the absence of evidence indicating some wrongdoing independent of legal solicitation of campaign contributions, this proportional disparity is evidence of nothing.  As state, Illinois law expressly allows for solicitation of contributions like [the new sheriff's], so merely accepting cash is not evidence of extortion, especially when there is no separate evidence of an explicit, promised quid pro quo.

Likewise, [plaintiff's] bald assertion that he and other towers had been intimidated does not carry the day.  As noted, any fear that [he] or the others may have felt must be reasonable.  This is where [plaintiff's] failure to present some objective evidence of extortion – for example, historical data tying the award or denial of towing to contributions made or not made – becomes a serious problem for [his] case.  If a plaintiff's subjective discomfort with uniformed and armed law enforcement officers dropping by for contributions is enough to qualify as Hobbs Act extortion, it won't be long before all police fund raisers (for political or other purposes) come to an end.  There must be objective evidence to indicate that the plaintiff's fears are reasonable and otherwise to allow a jury to find Hobbs Act extortion; we find none in this record to satisfy [plaintiff's] burden of establishing a material issue for trial.

424 F.3d at 671-72.

A 1992 campaign contribution case, involving one of the agents who investigated

this case (Jack Brennan), demonstrates the level of proof required for an explicit quid pro quo:

In our view, what *McCormick* requires is that the quid pro quo be clear and unambiguous, leaving no uncertainty about the terms of the bargain.

*                    *                    *                    *

As part of an undercover investigation, FBI agent Jack Brennan

posed as an Alabama businessman seeking a change in California

law.  Brennan met with Carpenter's aide John Shahabian several

times between July and September 1986 to discuss AB 3773.

25

> Brennan asked "what's it going to cost" and Shahabian responded
> with a figure of $20,000. Shahabian told Brennan that Carpenter
> would be the best person to "front" the legislation. Shahabian
> testified that he later told Carpenter about AB 3773, that Brennan
> would need help solving legislative problems, and that Shahabian
> had suggested a contribution of $20,000. Shahabian testified that
> Carpenter responded that he would assist the bill through the
> Senate. In conversations with Brennan, Carpenter assured him that
> things were going smoothly and that he had the "right friends" on
> the Banking and Commerce Committee.

*United States v. Carpenter*, 961 F.2d 824, 827-28 (9th Cir. 1992).

Here, there was no undercover investigation and no eyewitness to any conversation between Mr. Scrushy and Governor Siegelman. An explicit quid pro quo requires a "threat or promise accompanying the demand for funds."[28] That is difficult to prove with indirect evidence, and the government's proof here did not meet the standard the case law imposes for indirect evidence in campaign contribution cases.

In *United States v. Moeller*, 80 F.3d 1053, 1057-58 (5th Cir. 1996), Texas Agriculture Department officials gave Department contracts to political consultants who raised campaign contributions for them. The defendants sought reversal of their § 666(a)(1)(B) convictions, claiming that the government had not offered evidence of "any connection between the issuance of the consulting contracts . . . and [the consultants'] independent campaigning work." *Id.* at 1057. The Fifth Circuit affirmed, holding that the government's indirect evidence - - that the contracts were shams – was sufficient.

> [The consultants] travelled with [one of the officials] to visit
> [Department of Agriculture] regulated businesses on government
> time, using funds made available by the consulting contracts, for
> the purpose of soliciting campaign contributions. Moreover, the
> requests for campaign contributions were not made casually or in a
> manner that was incidental to the conduct of agency business. [The
> official], who was travelling in his capacity as an agency official,
> was at least once assigned the task of holding the money collected,

---

28      *Cobbs v. Sheahan*, 319 F. Supp.2d 865, 870-71 (N.D. Ill. 2004) (applying *McCormick* in context of demands for campaign contributions forming basis of civil RICO allegations).

and recorded contributions in the same small ledger book used for agency bsuiness. [The official], who knew that [the consultants] were asking $1,000 from each "target," was also aware that soliciting contributions in the context of agency business raised serious legal and ethical questions under Texas law. Indeed, [the official] attempted to anticipate when the request for money was coming, and would try to extricate himself from the room before the request was made. [The official] was not always successful in this effort, and numerous representatives from regulated entities testified that they felt intimidated or coerced into contributing [to the campaign at issue].

*        *        *        *

Two agency officials testified that [the official], who was obviously aware of the campaigning, told them on different occasions that the consulting contracts were unnecessary to agency business. However, one of those individuals testified that [the official] had acknowledged that the contracts were politically motivated and that he had to "deal with politics" as a part of his job with the agency.

*Id.* at 1057-58.

In *United States v. Ford*, 435 F.3d 204 (2d Cir. 2006), a union official gave a political communications consultant a union contract, and paid inflated invoices, while the political consultant was working on her union re-election campaign. *Id.* at 206-08. The consultant conceded that his bill to the union was "somewhere between the high end of the range and inflated" because "the fact that I was doing reelection work for which I was not being particularly well compensated led me to want to make sure that I was very well compensated for the union work I was doing." *Id.* at 208. After the official lost the election, the consultant decided that his actions "may have appeared to be wrong," mailed a backdated invoice to the union official for the campaign work (which was never paid), and (apparently) created a false calendar entry to create the impression that he was being paid for the campaign work. *Id.* at 208-09. The Second Circuit noted that this evidence would sustain a § 666(a)(1)(B) conviction, *id.* at 214, but reversed the conviction for failing properly to instruct the jury on § 666(a)(1)(B)'s quid pro quo requirement. *Id.* at 211-14.

The Scrushy appointment stands in stark contrast to these examples. It is standard practice – and entirely lawful – for a governor to give CON Board seats to contributors. Mr. Scrushy is a world leader in the health care field, eminently qualified for the position. He served conscientiously and well. He was paid nothing for his service.

The only evidence that the Scrushy appointment was anything other than entirely ordinary was Mr. Bailey's off-hand question – "what in the world is he going to want for that?" – and his rendition of Governor Siegelman's off-hand response, "the CON Board." That is hardly evidence of an explicit promise or express agreement – or indeed, of a promise or agreement of any kind. There is no evidence that Governor Siegelman or Mr. Scrushy discussed the CON Board appointment when they met or, if they did, what they said to each other about it. It is not at all abnormal for a Governor to expect that a large contributor might want an appointment to a state board, even if the two had not discussed it.

The federal funds bribery, conspiracy, and honest services convictions here criminalize standard, lawful politics, and cannot stand. The Court's language in *McCormick* is equally applicable here: "To hold otherwise would open to prosecution not only conduct that has long been thought to be well within the law but also conduct that in a very real sense is unavoidable so long as election campaigns are financed by private contributions or expenditures, as they have been from the beginning of the Nation."

### 2. No Evidence That Governor Siegelman Deprived The State Of Mr. Scrushy's Honest Governmental Services

The conspiracy and honest services convictions in Counts Five through Nine cannot stand for the additional reason that there is no evidence that Governor Siegelman deprived the state of Mr. Scrushy's honest governmental services. For a person to deprive the public of a public official's honest services, he must bribe the public official or help him conceal a material conflict of interest.[29] There is no evidence, and the government does not contend, that Governor Siegelman did so with respect to Mr. Scrushy.

### PAYMENTS TO PROMOTE FUNDING EDUCATION ARE NOT "THINGS" OF VALUE UNDER § 666

Section 666 requires that the *quid pro quo* be "any thing of value" 18 U.S.C. § 666 (b) (2). Siegelman recognizes, as he must, that "thing," despite its plain meaning, need *not* be tangible. *Salinas v. United States*, 522 U.S. 52, 57(1999) ("personal property *or other valuable consideration*") (emphasis added); *United States v. Giraud*, 601 F.2d 69, 71 (2nd Cir.

---

[29]

1979) (information a "thing of value" under 18 U.S.C. § 641 (prohibiting unauthorized sale of government property; "The word "thing" notwithstanding, the phrase is generally construed to cover intangibles as well as tangibles.")  Nevertheless, "of value" are words of limitation; they do not extent to the limits of the imagination of the ingenious advocate, prosecutor or defense counsel.  For example, the phrase does *not* include an agreement by the Government to forgo prosecution. *United States, v. Condon*, 170 F.3d 687, 688-89 (7th Cir. 1999) ("[f]orgoing prosecution … is not a 'thing of value' within …§ 201(c) (2)") Thus, the construction of Section 666 must reflect the policy judgments, not of prosecutors, or the whim of jurors, but of Congress, which manifestly did *not* intend to enact a federal campaign finance statute. *United States v. Cicco*, 938 F.2d 441, (3rd Cir. 1991) (Section 666 is not applicable to solicitation of campaign "services and loyalty"; "the defendants corruptly solicited political services and loyalty from municipal employees and did so intending to be influenced in the distribution of municipal jobs. ... [Nevertheless, the district court found the defendants not guilty after a jury verdict because it rightly] believed that Congress did not intend § 666 to apply to the defendants' actions. …[T]he district court [properly] found that the government's interpretation of the statute was unconstitutionally vague and deprived the defendants of fair notice. …. [I]f § 666 is read as broadly as the government reads it, its boundaries are difficult to limn. If solicitation of what the government characterizes as 'party loyalty' is covered … those boundaries become vague indeed."). Section 666 is, after all, part of Title 18, which must be narrowly construed generally. *McNally* **v**. *United States,* 483 U.S. 350, 360-61 (1987) ("defraud" read narrowly; "when there are two rational readings of a criminal statute, one harsher than the other, we are to choose the harsher only when Congress has spoken in clear and definite language. … Rather than construe the statute in a manner that leaves its outer boundaries ambiguous and involves the Federal Government in setting standards of … good government for local and state officials, we read ["defraud" mail fraud statute narrowly.]") (citations omitted) Where First Amendment values are at issue, as here in the prosecutor's far-reaching and unprecedented application of Section 666 to campaign financing, the legislation, so that First Amendment freedoms are not chilled, must be even more "narrowly tailored." *See Clark v. Community for Creative Non-Violence*, 468 U.S. 288, 293 (1984) Implicated, too, are principles of federalism, which caution against an

29

expansive reading of a statute that treads on state and local matters, such as local elections and the give-and-take of party politics. *See Jones v. United States*, 529 U.S. 848, 858 (2000) ("arson" read narrowly; "unless Congress conveys its purpose clearly, it will not be deemed to have significantly changed the federal-state balance" in the prosecution of crimes.") (citations omitted); *see generally*, REPORT OF THE 2002 FORUM FOR STATE APPELLATE COURT JUDGES, ROSCOE POUND INSTITUTE, *State Court And Federal Authority: A Threat to Judicial Independence*? (2006)

The campaign donations at issue here were, of course, in the form of money, classically a "thing of value." But the issue is not "value" in the abstract, but "value" to whom they are given. *United States v. Williams*, 705 F.2d 603 F.2d 603, 623 (2nd Cir. 1983) (test of value is subjective belief by recipient under 18 U.S.C. § 201(bribery)). Here the donations were made by check to a campaign fund, not in cash in a dark alley in a disguise valise. They were *not* made out to Governor Siegelman *personally*; they were deposited into campaign accounts; and they were publicly disclosed, albeit late, but without penalty by the state authorities to whom the enforcement of the Alabama campaign disclosure laws are properly entrusted. Indeed, Governor Seligman's research finds *no* case that squarely upholds the Government's questionable use of Section 666 in an effort to *re-characterize* legitimate campaign contributions as "things of value" within Section 666. In short, the donations— factually and legally— were *not* "of value" to Governor Siegelman; they *were* "of value" to the campaign. Thus, they could not have violated Section 666.  The Government raised the issue during the trial that the donations were "of value" to the Governor, because they were ultimately used to pay off a debt of the Democratic Party where Governor Siegelman was a guarantor on its debts. But the debts were not assumed until *after* the alleged bribery occurred; thus, they could not have been a "thing of value" conveyed to the Governor at the time of the alleged bribery. Each element of Section 666 had to occur at the time of the alleged "bribe," not *later*, that is, when the Governor legitimately decided to have the lottery campaign assume the debts of the party. Nor does the record include *any* evidence that the Governor had at the time of the donations a secret intent to have the lottery campaign assume the debts of the Party. To suggest otherwise is sheer fancy. In fact, as the record shows, he did *not* even know that the Party had debts until after the election was over.

30

A guarantor is *not* a cosigner who is equally liable with the principal debtor; a guarantor's liability is contingent solely on the failure of the principal debtor to pay. The rule goes back to the 19th century. *See, e.g., Lawson v. Townes Oliver & Co.,* 2 Ala 373, 375 (1891) According to the bank officer's testimony, here, too, the main guarantor, that is, the person that the bank was looking to for repayment of the debt should it default, was Merv Nabors; he was the one who had considerable moneys on deposit with the bank; he was the one who provided the bank with the financial statements on which the loan committee relied. In fact, Governor Siegelman did *not* even provide a financial statement to the bank. Thus, the bank was in fact not in any event looking to the Governor for repayment of the loan. To look at it in another fashion, to suggest that the Governor received a "thing of value" when the Party's debts were paid is like saying the he had "imputed income" under federal or state law for tax purposes. If the Government believes its "thing of value" theory, why were not Nabors and the Governor indicted for tax evasion? In fact, nothing in the indictment that was returned showed restraint by these prosecutors; the limited conduct that the they had to focus on was sliced and diced into any offense that their imaginations could dream up. So why not tax evasion? The answer is simple: they would have had to run the theory by the Tax Division in the Department of Justice, and it would not have passed muster, for such is *not* the law either under Federal or state tax law. *See Selfe v. United States*, 778 F.2d 769, 773 (11th Cir. 1985); *Depart. of Revenue v. Acker,* 363 So.2d 470, 473 (Ala. Ct. of App. 1994) To uphold the Government's theory of receipt of "thing of value" would constitute a revolutionary reading of the law of campaign financing (to say nothing of tax theory) through, not legislation, but retroactive criminalization at the whim of unrestrained federal prosecutors and a jury that was not given due instruction on the serious First Amendment implications of the prosecution in front of them. In short, the Governor, did not, in fact or in law, receive a "thing of value."

## THE § 666(a)(1)(B) PROSECUTION IS TIME-BARRED

Count Three of the Second Superseding Indictment alleges that Governor Siegelman violated the federal funds bribery statute, 18 U.S.C. § 666(a)(1)(B), because he "solicited, demanded, accepted, and agreed to accept" $500,000 from Mr. Scrushy "intending to be influenced and rewarded in connection with" that appointment. *Second Superseding Indictment* ¶¶ 48-49.

As will be discussed in greater detail later, the government never demonstrated that the $500,000.00 contributed to the AELF and AEF was of any benefit to Governor Siegelman, or that there was ever an explicit agreement between Governor Siegelman and Mr. Scrushy regarding Mr. Scrushy's appointment to the CON Board. However, the Court does not need to explore any of these issues to grant Governor Siegelman's Motion for Acquittal on Count Three. It cannot be disputed that the government failed to bring Count Three within the applicable five-year statute of limitations.

The general statute of limitations for non-capital federal offenses, 18 U.S.C. § 3282, governs prosecutions under 18 U.S.C. § 666.[30] It provides:

> Except as otherwise expressly provided by law, no person shall be prosecuted, tried, or punished for any offense, not capital, unless the indictment is found or the information is instituted within five years next after such offense shall have been committed.

The government bears the burden of proving that a defendant committed an alleged offense within the five-year limitations period.[31] This is an essential element of the offense that the government must prove beyond a reasonable doubt.[32] Except for continuing offenses as noted in *Toussie v. United States*, 397 U.S. 112 (1970), an offense is committed when it is completed,[33] and an offense is completed when each element of the offense has occurred.[34]

The government presented evidence that Governor Siegelman appointed Richard Scrushy to the CON Board on July 26, 1999. *Government Exhibits 6A-I*; *Alva Lambert Testimony on Direct Examination*, 20/2 – 21/6. The government relied on the testimony of former Governor Siegelman aide, Nick Bailey, to establish the existence and date of the alleged bribery scheme between Governor Siegelman and Scrushy. Bailey testified that sometime in June or July, 1999 (before Mr. Scrushy's July 26, 1999 appointment to the CON Board) Governor Siegelman met with Mr. Scrushy in the Governor's office. Bailey did not attend or participate in this meeting:

> Q.    Mr. Bailey, I'd like to get your agreement at the outset that with regard to Richard Scrushy, you were not an eyewitness to any meeting that he had with Governor Siegelman?
>
> A.    And you mean by me – by witness of the meeting, was I included in the meeting?
>
> Q.    That's precisely what I mean, sir.
>
> A.    Then I will agree with you absolutely. I was not.

*Nick Bailey Testimony on Cross-Examination*, *May 4, 2006* 274/6-15.

Bailey testified that in a conversation sometime after this meeting, Governor Siegelman indicated that Mr. Scrushy had made a "commitment" to raise $500,000.00 for AELF.  *Nick Bailey Testimony on Direct Examination, May 2, 2006* 173-183.

Bailey is equally unclear as to the exact date when the $250,000.00 IHS check was delivered. Bailey admits that before trial, he told investigators that Governor Siegelman exited his meeting with Mr. Scrushy, opened his left coat pocket, and showed Bailey a check for $250,000.00 with Mr. Scrushy's signature on it.  Bailey even made a sketch of the Governor's office which purports to describe Governor Siegelman's office on July 14, 1999 (the day the government claims this meeting occurred).  At trial, Bailey recanted and stated that the check he saw must have been the IHS check (which was not signed by Mr. Scrushy) and that he could not have seen this check immediately following the meeting because the check was dated July 19, 1999–five days after the day that the government contends this meeting occurred.  Bailey was certain that the meeting, the alleged commitment, and delivery of the IHS check occurred before Mr. Scrushy was appointed to the CON Board on July 26, 1999.  *Siegelman Exhibit 305; Nick Bailey Testimony on Cross-Examination, May 3, 2006* 218-232.

Bailey testified that Governor Siegelman did not receive the second $250,000 from Mr. Scrushy until sometime in May of 2000.  This check dated May 18, 2000, is drawn on a HealthSouth account and is made payable to the AEF.[35]  Bailey could only say that this check was received somewhere near the time that it was dated:

Q.     Would the date that's on that check tell us at or near the time that you went up there to pick that check up?

A.     It would likely be at or near the time, yes, sir.

Q.     How about the depositing or the – the transaction that was conducted with it at First Commercial Bank?  Would that give us the approximate date that that happened?

A.     Approximate date, yes, sir.

Q.     Do you have a recollection here today of when that was?

A.     No, sir, I don't.

6/8-20.

---

[35] *Government Exhibit #27B.*

Bailey's testimony mandates acquittal on Count Three because it demonstrates that the government failed to bring this charge within the five-year statute of limitations. In *United States v. Yashar*, 166 F.3d 873 (7th Cir. 1999), the Seventh Circuit ruled that a §666 offense is not a continuing offense, that it is complete, and that the "limitations period begins to run once all elements of the offense are established, regardless of whether the defendant continues to engage in criminal conduct." *Id.*, 166 F.3d at 779-880. The *Yashar* Court further held that the elements of an offense are "established" *on the first date* on which the government could have proceeded with criminal charges. Specifically, under §666, the offense is complete when the defendant's prohibited conduct *first* involves $5,000 or more (and the relevant government or agency has received $10,000 in federal funds). *Id.*

In *Yashar*, the Court expressly rejected the government's efforts to transform §666 into a "continuing offense" similar to the RICO statute. In Yashar, the government did not argue that § 666 was a "continuing offense," but, essentially, the government tried to convert § 666 into a "continuing offense" by arguing that it was a "normal" offense that could be committed by a "continuing course of conduct." The *Yashar* Court noted that the RICO statute, which criminalizes a "pattern" of activity was expressly intended by Congress to be a "continuing offense" statute as an *exception* to the "normal" limitations period. The Court concluded that the government's efforts to expand § 666 would render statutes of limitations meaningless:

> **That position would undermine the purpose of the statute of limitations, which is "to limit exposure to criminal prosecution to a fixed period of time following the occurrence of those acts the legislature has decided to punish by criminal sanctions," to discourage prosecution based on facts obscured by the passage of time, and to encourage law enforcement officials promptly to investigate suspected criminal activity.** *Toussie*, 397 U.S. at 114-15. Allowing the prosecution to extend the statute of limitations by charging a course of conduct would risk prosecutions based on stale facts and would not encourage prompt investigation and prosecution of criminal activity. Those goals can only be promoted by an interpretation that starts the limitations period when all elements of the crime are first present. [Emphasis added]

*Yashar at 879.*

* * *

> Moreover, under the government's position, **a prosecutorial decision regarding the scope of the charge would determine the running of the limitations period. In that manner, the statute of limitations, designed as a control on governmental action, would instead be defined by it.** Virtually any criminal actions that extend over time could fall within this expansive definition depending upon how a prosecutor chose to charge a case. A prosecutor has a great deal of discretion in deciding whether to charge a course of conduct as a single offense or as multiple offenses. *See United States v. Berardi,* 675 F.2d 894, 898 (7th Cir. 1982). [citations omitted] [Emphasis added]

34

* * *

Under the government's argument, that charging decision could delay the running of the limitations period on the discrete offenses. For instance, a series of drug sales could be charged as a single scheme. **The government could then wait to prosecute until well beyond five years after the initial drug sales, as long as at least one overt act occurred within the last five years, and regardless of whether that one act constituted an element of the charged crime.** With this approach, the limitations period would be virtually unbounded. At oral argument, we posed a hypothetical to the government in which **a ghost payroller received $ 15,000 in salary in 1970 and, 25 years later, received $ 300 in retirement benefits attributable to that sham employment. The government declared that the limitations period might not begin to run on the 1970 conduct until after the retirement benefits were received in 1995, if the payments were deemed to be part of a single scheme. With this interpretation, the limitations period would apparently not begin to run until the person's death if that person received ongoing pension payments attributable at least in part to the ghost payrolling scheme.** That example demonstrates how the prosecutor's charging decision could dramatically impact the limitations period. **This approach would transform the limitations period from a check on governmental delay in prosecution to a function of prosecutorial discretion.** It would gain for the government the expanded statute of limitations of a conspiracy or RICO claim, without requiring the government to prove either.[36] [citations omitted] [Emphasis added]

In this case, the limitations period began to run, at the latest, when Governor Siegelman first accepted a payment involving at least $5,000. That date, according to Bailey, was sometime prior to Mr. Scrushy's July 26, 1999 appointment to the CON Board. **Since the original indictment was found May 17, 2005,[37] the § 666(a)(1)(B) charge in Count Three must be barred by the five-year statute of limitations.**

Any argument that the government raises to the contrary will fail the hypothetical posed by the Seventh Circuit to the government in *Yashar*. For example, suppose that rather than two $250,000.00 payments, Governor Siegelman and Mr. Scrushy agreed that this alleged "bribe" could be made payable in ten $50,000.00 annual payments. The government contends that the five-year statute does not begin to run until the tenth payment is made, so that the government has fifteen years to bring an indictment rather than the five years expressly stated in the applicable statute of limitations. This certainly is not what Congress intended. According to the testimony presented by the government, all of the elements of a violation of 18 U.S.C. § 666(a)(1)(B) occurred on or before July 26, 1999. Accordingly, the Court must acquit Governor Siegelman on this first $250,000.00 payment.

---

[36] A district court in the Fifth Circuit has noted questions about *Bustamante*'s continuing viability after *Yashar*. *United States v. Aubrey*, 53 F. Supp.2d 1355, 1356 (E.D. Tex. 1999).

[37]

For similar reasons, the statute of limitations requires an acquittal for Governor Siegelman on the second $250,000.00 payment. Again, all of the elements of the "crime" alleged in Count Three (according to the government's own argument) existed on or before July 26, 1999: Mr. Scrushy's offer to pay $500,000.00 in exchange for a seat on the CON Board, Governor Siegelman's acceptance of this offer, and an actual payment in excess of $5,000.00. The second $250,000.00 payment from HealthSouth dated May 18, 2000 does not extend the statute of limitations just because *that* payment was arguably made within five years of the indictment.

For example, assume that on July 14, 1999 (the date the government alleges that Mr. Scrushy and Governor Siegelman reached this unlawful agreement), rather than verbally committing to pay $500,000.00, Mr. Scrushy instead immediately paid $5,000.00 cash and executed a promissory note to the AELF for the remaining $495,000.00. Clearly, in this scenario, the statute of limitations would begin to run upon payment of the statutorily required $5,000.00. No reasonable interpretation of § 666 or the applicable statute of limitations would justify tolling the statute of limitations until the promissory note was completely paid off.

The evidence the government offered here does not prove that the § 666(a)(1)(B) offense occurred within the limitations period (much less constitutes such proof beyond a reasonable doubt). That failure of proof mandates Governor Siegelman's acquittal on Count Three.

### III.  CONCLUSION

For at least the foregoing reasons, and for all of the other reasons previously articulated in his prior Rule 29 arguments, Governor Siegelman respectfully requests a judgment of acquittal on Counts Three and Five through Nine.

Respectfully submitted,


s/David A. McDonald

David A. McDonald
Kilborn, Roebuck & McDonald
P.O. Box 832
Mobile, Alabama 36602
Phone: (251) 434-0045
Fax:     (251) 434-0047
E-mail: dam@krmlaw.com


s/Vince F. Kilborn, III

Vince F. Kilborn, III
Kilborn, Roebuck & McDonald

P.O. Box 66710
Mobile, Alabama 36606
Phone: (251) 479-9010
Fax:    (251) 479-6747
E-mail: vfk@krmlaw.com


s/George Robert Blakey
George Robert Blakey
University of Notre Dame Law School
Kresge Law Library
P.O. Box R
Notre Dame, IN 46556
Phone: (574) 631-5717
Fax:    (574) 631-4197
E-mail: blakey.1@nd.edu


s/Hiram Chester Eastland, Jr.
Hiram Chester Eastland, Jr.
Eastland Law Offices
107 Grand Boulevard
Greenwood, MS 38930
Phone: (662) 897-0495
Fax:    (662) 453-2808
E-mail: eastlandlaw@bellsouth.net


## CERTIFICATE OF SERVICE

I certify that on August 4, 2006, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to counsel of record.


s/David A. McDonald
David A. McDonald
Kilborn, Roebuck & McDonald
P.O. Box 832
Mobile, Alabama 36602
Phone: (251) 434-0045
Fax:    (251) 434-0047
E-mail: dam@krmlaw.com