IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | * | |
| | * | |
| v. | * | Case No. 2:05-cr-119-MEF |
| | * | |
| DON EUGENE SIEGELMAN | * | |

SUPPLEMENTAL BRIEF IN SUPPORT OF MOTION FOR JUDGMENT OF
ACQUITTAL PURSUANT TO FED. R. CRIM. P. 29 ON COUNTS
THREE, FIVE, SIX, SEVEN, EIGHT, AND NINE –
THE § 371, § 666(a)(1)(B), AND HONEST SERVICES CHARGES

## *TABLE OF CONTENTS*

*PRELIMINARY STATEMENT* ................................................................. 3

**I.    STANDARD OF REVIEW** .......................................... 7

**II.   FIRST AMENDMENT CONTEXT** .......................... 10

**III.  THE QUID PRO QUO REQUIREMENT IS HEIGHTENED
IN CAMPAIGN CONTRIBUTION CASES TO REQUIRE
AN "EXPLICIT" QUID PRO QUO** ................................ 14

**IV.   INSUFFICIENT EVIDENCE TO SUSTAIN AN EXPLICIT
QUID PRO QUO FOR THE § 666 FEDERAL BRIBERY
CHARGES AS WELL AS THE § 1346 BRIBERY-TYPE
HONEST SERVICES CHARGES** ................................ 18

**A.   The Evidence** ................................................. 18
**B.   Proof of an Explicit Quid Pro Quo is Required** ............. 20
**C.   Comparison of the Evidence in this Case to Similar Cases Shows
the Government's Evidence to be "Woefully Inadequate"** ........... 22

**V.    NO EVIDENCE THAT GOVERNOR SIEGELMAN DEPRIVED
THE STATE OF MR. SCRUSHY'S HONEST GOVERNMENTAL
SERVICES** ............................................................. 26

**VI.   PAYMENTS TO PROMOTE FUNDING EDUCATION FOR THE
BENEFIT OF THE GENERAL PUBLIC ARE NOT "THINGS OF
VALUE" TO GOVERNOR SIEGELMAN UNDER § 666** ........... 26

**VII.    GOVERNOR SIEGELMAN'S APPOINTMENT OF MR. SCRUSHY
         TO THE CON BOARD COULD NOT HAVE BEEN DONE
         "CORRUPTLY" AS DEFINED BY § 666** ...................................................... 30

**VIII.   THE § 666(a)(1)(B) PROSECUTION IS TIME-BARRED** .......................................... 31

**CONCLUSION** ............................................................................................................. 39

**SUPPLEMENTAL BRIEF IN SUPPORT OF MOTION FOR JUDGMENT OF
ACQUITTAL PURSUANT TO FED. R. CRIM. P. 29 ON COUNTS
THREE, FIVE, SIX, SEVEN, EIGHT, AND NINE –
THE § 371, § 666(a)(1)(B), AND HONEST SERVICES CHARGES**

### *PRELIMINARY STATEMENT*

Trial of this matter began on May 1, 2006.  The government accused Governor

Siegelman of numerous crimes including 70 RICO predicate acts, more than 30 federal crimes

besides the RICO allegations, and of misusing nearly $100 million state and federal funds for his

personal benefit or unlawfully for the benefit of his campaign contributors.  At the close of the

government's case, Governor Siegelman moved for judgment of acquittal.  The Court deferred

ruling on this motion until after the jury returned its verdict.  On June 29, 2006, the jury resolved

most of Governor Siegelman's Rule 29 motion by acquitting Governor Siegelman on most of the

charges brought against him.

The jury convicted Governor Siegelman on Counts Three, Five, Six, Seven, Eight, and

Nine[1] – all of which relate to $500,000.00 contributed to the Alabama Education Lottery

Foundation (AELF) and its successor, the Alabama Education Foundation (AEF).[2]  The jury's

verdict on Counts Five, Six, Seven, Eight, and Nine (the Honest Services Counts) followed this

Court's departure from the Eleventh Circuit Pattern Instructions and Eleventh Circuit case law.

The Court adopted the government's argument that a *quid pro quo* in exchange for a specific

---

[1]The jury also convicted Governor Siegelman on Count Seventeen, Obstruction of Justice.  This
issue has been addressed by a separate brief.

[2]Count Three, 18 U.S.C. § 666(a)(1)(B) (federal bribery); Count Five, 18 U.S.C. § 371 (Section
371 conspiracy to violate honest services mail fraud, 18 U.S.C. §§ 1341 and 1346); Counts Six
through Nine, 18 U.S.C. §§ 1341 and 1346 (honest services mail fraud).

official act is not required to prove a *bribery*-based honest services charge.[3]  The Court modified the Eleventh Circuit Pattern Jury Instructions and followed the First Circuit *Sawyer* case[4] which a) does not require a *quid pro quo* for honest services *gratuities*[5] cases and b) does not require honest services *gratuities* cases to prove that *gratuities* were in exchange for a specific official act.

**The Court's honest services charges to the jury followed the First Circuit's rationale in an honest services *gratuities* case which did not involve the *bribery*-based campaign contributions alleged in this case.  Consequently, this Court's jury charge failed to instruct the jury that they must find the *explicit quid pro quo* that the Eleventh Circuit and the Supreme Court require for the honest services alleged *bribery*-based campaign contributions benefits at issue in Counts Five through Nine.**  Although this Court indicated its reliance upon the First Circuit *Sawyer* case as authority for its jury charge, even *Sawyer* recognizes there must be proof of a "specific *quid pro quo*"[6] for honest service "bribery-like"[7]

---

[3]The Court denied Governor Siegelman's proposed honest services jury instruction that stated the government must prove an explicit *quid pro quo* in exchange for a specific official act in order to prove the bribery-based honest services charges regarding campaign contributions.

[4]*United States v. Sawyer*, 85 F.3d 713, 730 (1st Cir. 1996).

[5]Importantly, the Supreme Court in *United States v. Sun-Diamond Growers*, 526 U.S. 398, 404-405 (1999) recognized that requisite proof of "bribery" requires proof of a *quid pro quo* while requisite proof for a "gratuity" does not.  "The District Court's instructions in this case, in differentiating between a bribe and illegal gratuity, correctly noted that **only a bribe requires proof of a *quid pro quo*."** *Id.*  [Emphasis added]

[6]*Sawyer*, 85 F.3d at 730; *see also, Sawyer*, 85 F.3d at 741 (recognizing "*quid pro quo bribery*" "*honest services cases*" and determining that the *gratuities* in the *Sawyer* case "*is not 'bribery'* within the meaning of the Travel Act." *Id.* [Emphasis added]

[7]*Id.* at 730.

cases.[8]

The Court's instruction on the Count Three § 666 federal bribery charge[9] also fell short of requiring that the government prove an *explicit quid pro quo* to sustain a conviction for the campaign contributions at issue. The Eleventh Circuit in *United States v. Davis*, 30 F.3d 108 (11th Cir. 1994) (*Davis II*) **reversed its prior ruling[10] for jury instructions very similar to the instructions provided the jury in this case**.

In *Davis I*, the Eleventh Circuit panel ruled that the language "agreeing to take or withhold official action"[11]…."is near enough to the 'explicit promise or undertaking by the official to perform an official act' outlined in *McCormick* we cannot say the jury was misled."[12] In *Davis II*, the Eleventh Circuit reversed *Davis I*, holding that **the jury must be instructed that they must find an "explicit" promise or agreement, a "specific *quid pro quo*."**[13]

Accordingly, Counts Three and Counts Five through Nine must all be reviewed pursuant to a Rule 29 sufficiency of the evidence standard by applying the heightened *quid pro quo* requisite of proof which requires an *explicit* agreement, an *explicit* promise, an *explicit quid pro*

---

[8]*Accord, United States v. Woodward*, 149 F.3d 46, 49 (1st Cir. 1998), *cert. denied* 525 U.S. 1138 (1999). Likewise, the District Court in *United States v. Warner*, WL 2367769, *3, *5 (N.D. ILL September 23, 2005) recently applied the explicit *quid pro quo* requirement to the honest services charges in Governor Ryan's case that involved campaign contributions.

[9]As well as the Count Four § 666 federal bribery charge against Mr. Scrushy.

[10]*United States v. Davis*, 967 F.2d 516 (11th Cir. 1992) (*Davis I*)

[11]**The *Davis I* charge is nearly identical to the charging language used by this Court: "agree[ing]" to take benefits "in exchange for" official acts.**

[12]*Id.* at 522.

[13]*Davis II*, 30 F.3d at 108. (requisite "explicit," "specific *quid pro quo*") Importantly, the First Circuit *Sawyer* and *Woodward* cases also recognize a requisite "specific *quid pro quo*" for honest services based bribery cases. *Sawyer*, 85 F.3d at 730; *accord, Woodward*, 149 F.3d at 49.

*quo*—a specific *quid pro quo*, an expressed agreement. At the beginning of this trial, even the government acknowledged that it bore the burden of proving that Mr. Scrushy and Governor Siegelman reached an explicit agreement that if Mr. Scrushy paid Governor Siegelman $500,000.00, Governor Siegelman would appoint Mr. Scrushy to the CON Board: "If it's campaign money, you have to find there was an expressed what they call *quid pro quo*,[14] an[] *expressed agreement*." *Opening Statement by Mr. Feaga*, *May 1, 2006* 69/3-18. [Emphasis added]. **The government further promised that "Mr. Bailey . . . [is] going to come in and . . . tell you there was an expressed agreement."** *Id.*

"Explicit" or "Expressed" are very limiting terms when considering the Rule 29 insufficiency of the evidence of an "expressed agreement", an "explicit *quid pro quo*."[15] *Black's Law Dictionary* provides the legal definition for the interchangeable terms "express" and "explicit" as follows:

> *Express*: Clear; definite; *explicit*, plain; direct; unmistakable; not dubious; or ambiguous. Declared in terms; set forth in words. Directly and distinctly stated. *Made known distinctly and explicitly*, and *not left to inference. Manifested by direct and appropriate language*, *as opposed to inferred from conduct. The word is contrasted with 'implied.'* [Emphasis added]

**Mr. Bailey did not provide the testimony promised by the government.** Bailey did not and could not testify to "an expressed agreement" that was "clear," "definite," "explicit," "plain," "direct," "unmistakable," and that was "not dubious," "or ambiguous" because Bailey

---

[14]"*Quid pro quo*" literally means "something for something," *American Heritage Dictionary of the English Language* (4th ed. 2000), and has been used in the English language since the 16th Century to mean "an equal exchange or substitution." *Id.*; *American Heritage Dictionary of Idioms* (1997). In the context of bribery, a *quid pro quo* is "a specific official act in exchange for a specific corrupt payment." *United States v. Paradies*, 98 F.3d 1266, 1289 (11th Cir. 1996).

[15]Much less when considering the evidence of an alleged expressed agreement or explicit *quid pro quo* under the appropriate *strictissimi juris* standard of review discussed below.

6

did not participate in or observe any conversations between Mr. Scrushy and Governor

Siegelman. Neither Bailey nor any other witness called by the government carried the

government's burden of proving beyond a reasonable doubt that an "expressed" or an *explicit*

*quid pro quo* agreement existed between Mr. Scrushy and Governor Siegelman. Accordingly,

Governor Siegelman must be acquitted on Counts Three and Counts Five through Nine.

Moreover, the government failed to meet its burden of proving beyond a reasonable

doubt other necessary elements of Count Three, the federal bribery charge. Section 666 requires

that the *quid pro quo* be a "thing of value." 18 U.S.C. § 666(b)(2). The contributions arranged

by Mr. Scrushy were *not* "of value" within the meaning of § 666. Further, § 666 requires that

the expressed agreement be "corrupt." And, even if the government had met its burden of

proving beyond a reasonable doubt that Governor Siegelman and Mr. Scrushy had an agreement

that in exchange for a donation to the lottery campaign Mr. Scrushy would be appointed to the

CON Board, that agreement does not constitute a "corrupt" agreement under § 666.

Accordingly, for these independent reasons, Governor Siegelman must be acquitted on Count

Three.

Finally, while Count Three charges Governor Siegelman pursuant to § 666(a)(1)(B), the

government failed to timely bring these charges within the applicable five-year statute of

limitations. Because the government failed to prove beyond a reasonable doubt that it brought

this charge within five years of the alleged crime, Governor Siegelman must be acquitted on

Count Three.

## I.    *STANDARD OF REVIEW*

The usual standard of review for a Rule 29 motion at the end of the government's case in

chief or at the conclusion of the entire trial is:

> [T]aking in the view most favorable to the Government, a reasonable minded jury might accept the relevant evidence as adequate to support a conclusion of the defendant's guilt beyond a reasonable doubt.

*Lambert v. United States,* 261 F.2d 799, 801 (5th Cir. 1958) (cited in *Jackson v. Virginia*, 433 U.S. 307, 319 (1979); *accord, United States v. Saba,* 321 F.3d 662, 671 (11th Cir. 1998). Even under this traditional standard of review, the government's evidence falls well-short.

But this customary standard of review, in the context of campaign contributions, is insufficient to adequately protect the important First Amendment issues involved in such a case. Governor Siegelman, contends, as a matter of first impression, that *strictissimi juris* should be applied in cases of campaign contributions:

(1)    The court should act as a "13th juror," making sure, *for itself*, not merely deferring to the jury on, for example, matters of credibility or inference, that the evidence is sufficient for conviction.  If appellate judges so act in First Amendment litigation generally, and they do, for similar reasons here, trial courts and appellate courts should so act in the campaign contribution area, as a matter of *strictissimi juris*.  *See, e.g., Bose v. Consumers Union,* 466 U.S. 485, 510-11 (1984) (defamation); *Jenkins v. Georgia*, 418 U.S. 153, 160 (1974) (obscenity); *Hess v. Indiana*, 414 U.S. 105, 107-09 (1973) (excitement);

(2)    The testimony of one conspirator (e.g. Nick Bailey)against an alleged conspirator (e.g.,  Governor Siegelman) should require corroboration in a similar fashion that his confession, to be used against him, must be corroborated; thus, a similar rule, for similar reasons, should be adopted as a matter of *strictissimi juris* in the area of compaign contributions. *See, e.g., Wong Sun v. United States,* 371

U.S. 471, 488-89 (1963).[16]  Such corroboration should *not* come from an alleged

co-conspirator, but, instead, from independent evidence (*e.g,* a bug or another

witness, not implicated in the plot), and the court should operate *expressly* under

the traditional rule, *falsus in uno, falsus in omnibus*, reflecting  Justice Story's

opinion in *The Santissima Trinidad*, 20 U.S. (7 Wheat 28, 74) 282, 339 (1822);

*accord, Kanawha & m. R. Co. v. Kerse*, 239 U.S. 576, 581 (1916); *Tel. Cases*,

126 U.S. 1, 459 (1888); *United States v. Castillero*, 67 U.S. 17, 208 (1863); and

(4)      Where the prosecution relies, as here on an agreement to bribe, as well as

the mail fraud conspiracy and scheme to defraud under honest services, not, say,

on a bug before fact or a wire after the fact (either of which is independently

verifiable), but on suspect witness testimony and on inferences drawn from purely

circumstantial evidence, it should have to negate reasonable alternative

hypotheses. Negating reasonable alternative hypotheses used to be the general

rule for reasonable doubt where the prosecution used circumstantial evidence.

*See, e.g., United States v. Elliot*, 571 F.2d 880, 906 (5th Cir. 1978); it is, of course,

not the general rule for typical prosecutions now. *United States v. Johnson*, 730

---

[16]"Where the crime involves physical damage to person or property, the prosecution must
generally show that the injury for which the accused confesses responsibility did in fact occur,
and that some person was criminally culpable. A notable example is the principle that an
admission of homicide must be corroborated by tangible evidence of the death of the supposed
victim. … There need in such a case be no link, outside the confession, between the injury and
the accused who admits having inflicted it. But where the crime involves no tangible *corpus
delicti*, we have said that 'the corroborative evidence must implicate the accused in order to
show that a crime has been committed.' …Finally, we have said that one uncorroborated
admission by the accused does not, standing alone, corroborate an unverified confession."
(citations omitted); *see also Smith v. United States*, 348 U.S. 147, 153 (1954) and VII JOHN
HENRY WIGMORE, EVIDENCE § 2072, n. 5 (3d ed. 1940).

F.2d 683, 688 (11th Cir. 1984) (citing *Unites States v. Bell,* 678 F.2d 547, 549 n. 3

(5th Cir. 1982) (rejecting the old rule as inconsistent with *Holland v. United*

*States*, 348 U.S. 121, 139-40 (1954));  nevertheless, it ought to obtain in the area

of campaign contribution as a matter of *strictissimi juris*.

## II.    FIRST AMENDMENT CONTEXT

This prosecution raises delicate and profound First Amendment issues that cannot be

ignored. Justice Frankfurter observed in dissent in *United States v. Rabinowitz,* 339 U.S. 56, 59

(1950), "where one comes out on a case depends on where one goes in." Thus, the Supreme

Court in *Buckley v. Valeo*, 424 U.S. 1 (1970), while it upheld certain narrow contributions limits,

struck down other expenditure limits as a substantial and direct restriction of the ability of

candidate, citizens,  and associations to engage in political expression: "It can hardly be doubted

[the Court observed,] that the [First Amendment] has its fullest and most urgent application

precisely to the conduct of campaigns for public office. *Id.* at 16.

The *Buckley* Court concluded that "close examination" is necessary when a legislature

imposes criminal penalties in an area permeated by First Amendment interests."  *Id.* (citing

*National Association for the Advancement of Colored People v. Button*, 371 U.S. 415, 438

(1963).

Significantly, the Court added:

In such circumstances vague laws may not only 'trap the innocent by not
providing fair warning' or 'foster arbitrary and discriminatory application,' but
also to inhibit protected expression by inducing  citizens to 'steer wide of the
unlawful zone ...than if the boundaries of the forbidden area were clearly
marked.'

*Id.* at n.48 (citing *Grayned v. City of Rockford,* 408 U.S. 104, 108-09 (1972))

Similarly, the failure to impose a strict "explicit" *quid pro quo* to the government's proof

10

of federal bribery for campaign contributions in this case unconstitutionally fosters application of the § 666 federal bribery and the § 1346 honest services statutes in a manner that would render the statutes void for vagueness, especially in light of First Amendment considerations. Indeed, the Eleventh Circuit recently reiterated that **"Vagueness concerns are more acute when a law implicates First Amendment rights and a heightened level of clarity and precision is demanded of criminal statutes because their consequences are more severe."** *United States v. Williams*, 444 F.3d 1386, 2006 U.S. App. LEXIS 8384, AT *57 (11[th]Cir. April 6, 2006).[17]  It is thus also significant to note that in reversing a panel ruling that the § 1346 statute is void for vagueness the Second Circuit, *en banc*, nevertheless admonished "there is no reason to think that Congress sought to grant Carte Blanche to federal prosecutors, judges, and juries to define 'honest services' from case to case for themselves." *United States v. Rybicki*, 354 F.3d 138 (2d Cir. 2003, *en banc*).

If any doubt exists about the continuing validity of *Buckley* and the above First Amendment and void for vagueness concerns admonishing restraint, it was certainly dispelled by the Court in *Randall v. Sorrel,* 126 Sup Ct. 2579, 90-912 (2006).

Similarly, Governor Siegelman asks that if such is required of legislation, as it is, how much more so should equally stringent standards be applied in the prosecution of the actual conduct of campaigns to avoid criminalization of the political process.

More focused on these proceeding are the comment of the Supreme Court in *McCormick*

---

[17](Also recognizing that the three basic reasons for holding a statute void for vagueness are "(1) to avoid punishing people for behavior that they could not have known was illegal; (2) *to avoid subjective enforcement of the laws based on arbitrary or discriminatory interpretations of government officers*; and (3) to avoid any chilling effect on the exercise of sensitive First Amendment freedoms." *Id.*) [Emphasis added]

*v. United States*, 550 U.S. 257, 272-73 (1991):

> Serving constituents and supporting legislation that will benefit the district and individuals and groups therein is the everyday business of a legislator. It is also true that campaigns must be run and financed. Money is constantly being solicited on behalf of candidates, who run on platforms and who claim support on the basis of their views and what they intend to do or have done. **Whatever ethical considerations and appearances may indicate, to hold that legislators commit the federal crime of extortion when they act for the benefit of constituents or support legislation furthering the interests of some of their constituents, shortly before or after campaign contributions are solicited and received from those beneficiaries, is an unrealistic assessment of what Congress could have meant by making it a crime to obtain property from another, with his consent, "under color of official right."** To hold otherwise would open to prosecution not only conduct that has long been thought to be well within the law but also conduct that in a very real sense is unavoidable so long as election campaigns are financed by private contributions or expenditures, as they have been from the beginning of the Nation. [Emphasis added]

While the Court made these comments in the context of its effort to limit the wide scope of color of law extortion in the Hobbs Acts, they are equally applicable to prosecution for bribery or violations of the honest services provisions of the mail fraud statutes. *See*, *e.g.*, *United States v. Allen*, 10 F.3d 405, 410-411 (7th Cir. 1993) (principles of restraint equally applicable bribery); *Davis II*, 30 F.3d at 108 (11th Circuit following *Allen*); *United States v. Martinez*, 14 F.3d 543, n.5 at 553 (11th Cir. 1994) (followed by *Davis II* and recognizing that principles of restraint apply equally to bribery); *Warner*, at *3, *5. (principles of restraint equally applicable to bribery based honest services prosecutions for campaign contributions).

Indeed, the considerations that led the Court to narrow Federal prosecutions in the area of the Hobbs extortion as well as other bribery statutes also led the Supreme Court to place narrow limitations on prosecutors in the area of gratuities under Title 18 in *United States v Sun-Diamond Growers*, 526 U.S. 398 (1999). Responding to an extravagant construction of 18 U.S.C. § 201, which contains the Federal bribery and gratuities provisions, in connection with the prosecution

of the Secretary of Education, the Court aptly observed:

> [W]e are inclined to believe [that our narrow construction is] correct because of the peculiar results that the Government's alternative reading would produce. It would criminalize, for example, token gifts to the President based on his official position and not linked to any identifiable act -- such as the replica jerseys given by championship sports teams each year during ceremonial White House visits, ... Similarly, it would criminalize a high school principal's gift of a school baseball cap to the Secretary of Education, by reason of his office, on the occasion of the latter's visit to the school. That these examples are not fanciful is demonstrated by the fact that counsel for the United States maintained at oral argument that a group of farmers would violate § 201(c)(1)(A) by providing a complimentary lunch for the Secretary of Agriculture in conjunction with his speech to the farmers concerning various matters of USDA policy -- so long as the Secretary had before him, or had in prospect, matters affecting the farmers. ... Of course the Secretary of Agriculture *always* has before him or in prospect matters that affect farmers, just as the President always has before him or in prospect matters that affect college and professional sports, and the Secretary of Education matters that affect high schools. It might be said in reply to this that the more narrow interpretation of the statute can also produce some peculiar results. In fact, in the above-given examples, the gifts could easily be regarded as having been conferred, not only because of the official's position as President or Secretary, but also (and perhaps principally) "for or because of" the official acts of receiving the sports teams at the White House, visiting the high school, and speaking to the farmers about USDA policy, respectively. The answer to this objection is that those actions -- while they are assuredly "official acts" in some sense -- are not "official acts" within the meaning of the statute, which, as we have noted, defines "official act" to mean "any decision or action on any question, matter, cause, suit, proceeding or controversy, which may at any time be pending, or which may by law be brought before any public official, in such official's official capacity, or in such official's place of trust or profit." ***Thus, when the violation is linked to a particular "official act," it is possible to eliminate the absurdities through the definition of that term. When, however, no particular "official act" need be identified, and the giving of gifts by reason of the recipient's mere tenure in office constitutes a violation, nothing but the Government's discretion prevents the foregoing examples from being prosecuted.*** [Emphasis added]

*Id.* at 406-07.[18]

---

[18]Accordingly, even the *Sawyer gratuities* language that this Court used to modify the Eleventh Circuit Pattern Jury Instructions (which instructed the jury that they could find an honest services violation through a "pattern" of "coaxing" a public official with gifts without connecting those gifts to a "particular 'official act'") does not pass muster under the *Sun-Diamond gratuities* ruling, much less the Supreme Court's recognition in *Sun-Diamond* that

The Court's point about the downside of prosecutive discretion as a limitation on the breadth of the Federal criminal code, particularly in the areas of the First Amendment, is one of the central points of Governor Siegelman's arguments in this motion. Notably, the Court's illustrations focused on executive action. They could as easily have been focused on judicial action. From time to time, judges are asked to make remarks at various conferences or gatherings, say, a college or university commencement. Should the giving or taking of a college or university sweat shirt or cap as a token of appreciation be made a Federal felony at the discretion or whim of a Federal prosecutor? The matters alleged in this prosecution are not so trivial, but in principle they are indistinguishable

Because of these concerns, the court should apply the doctrine of *strictissimi juris* to guarantee that First Amendments freedoms are not lost. *See United States v. Dellinger,* 472 F.2d 340, 392 (7th Cir. 1972) (reversing convictions under the Federal Riot Act).

### III. THE QUID PRO QUO REQUIREMENT IS HEIGHTENED IN CAMPAIGN CONTRIBUTION CASES TO REQUIRE AN "EXPLICIT" QUID PRO QUO

The *quid pro quo* requirement is heightened to require an "explicit" or "specific *quid pro quo*" whenever the government bases its criminal charges on underlying bribery-type or extortion charges. This principle applies regardless of whether the prosecution is for extortion, federal or state law bribery, or bribery-type honest services charges.

The heightened *explicit quid pro quo* requirement has its origins in *McCormick v. United States*, 500 U.S. 257, 273 (1991), in which the Court held that "[t]he receipt of [campaign] contributions is . . . vulnerable under the [Hobbs] Act as having been taken under color of

_____

*bribery* requires a *specific quid pro quo* in exchange for a "particular 'official act.'" *See also, McCormick, supra,; Davis II, supra.; Martinez, supra.;* and *Warner, supra.*

official right, but only if the payments are made in return for an *explicit* promise or undertaking by the official to perform or not to perform an official act." [Emphasis added].  The Court explained:

> [T]o hold that legislators commit the federal crime of extortion when they act for the benefit of constituents or support legislation furthering the interests of some of their constituents, shortly before or after campaign contributions are solicited and received from those beneficiaries, **is an unrealistic assessment of what Congress could have meant by making it a crime to obtain property from another**, with his consent, "under color of official right." [Emphasis added]

500 U.S. at 272.

Importantly, the strict principle of restraint requiring proof of an "explicit" or "specific" *quid pro quo* has been widely recognized by the courts to apply to any type of federal bribery charge involving campaign contributions as well as any bribery-type honest services charges involving campaign contributions.

Indeed, the Seventh Circuit in *United States v. Allen*, 10 F.3d 405, 410-411 (7th Cir. 1993) provides an excellent analysis and rationale as to why it is so important to exercise restraint and to strictly require an "explicit" *quid pro quo* to convict a public official for bribery-type as well as extortion charges so as not to criminalize the political process as we have known it since the birth of our nation:

> Allen's response to the district court's distinction between bribery and Hobbs Act extortion is essentially, 'So what?'.  Allen maintains that whether the charge against a defendant be extortion or bribery, the concerns that led the Supreme Court to adopt the quid pro quo requirement in *McCormick* exist.  This argument is not without force.  *McCormick* recognized several realities of the American political system.  Money fuels the American political machine.  Campaigns are expensive, and candidates must constantly solicit funds.  People vote for candidates and contribute to the candidates' campaigns because of those candidates' views, performance, and promises.  **It would be naive to suppose that contributors do not expect some benefit support for favorable legislation, for example, ---for their contributions.  To hold that a politician committed extortion merely by acting for some constituents' benefit shortly**

before or after receiving campaign contributions from those constituents **'would open to prosecution not only conduct that has long been thought to be well within the law but also conduct that in a very real sense is unavoidable so long as election campaigns are financed by private contributions or expenditures, as they have been from the beginning of the nation,'** (*McCormick* **citation omitted). Only statutory language much more explicit than that in the Hobbs Act would justify a contrary conclusion.** *Id.*

As the law has evolved, extortion 'under color of official right' and bribery are really different sides of the same coin. 'Extortion' under color of official right' equals the knowing receipt of bribes....[I]t is extortion if the official knows that the bribe---is motivated by a hope that it will influence him in the existence of his office and if, knowing this, he accepts the bribe. (citations omitted)....Because of the realities of the American political system, and the fact that the Hobbs Act's language did not justify making commonly accepted political behavior criminal, **the Supreme Court in** *McCormick* **added** to this definition of extortion the requirement that the connection between the payment and the exercise of the office—***the quid pro quo be explicit***. Given the minimal difference between extortion under color of official right and bribery, it would seem that the ***courts should exercise restraint in interpreting bribery statutes*** as the *McCormick* Court did in interpreting the Hobbs Act: **absent some fairly explicit language otherwise,** *accepting a campaign contribution does not equal a bribe unless* **the payment is** *in exchange for* **an** *explicit* **promise to perform or not to perform an official act. Vague expectations of some future benefit should not be sufficient to make a payment a bribe.** *Id.* [Emphasis added].

The Eleventh Circuit in *Davis II*, 30 F.3d at 108, followed *Allen* in requiring an *explicit* and *specific quid pro quo*, and also recognized that this same principle applies to bribery in *United States v. Martinez*, 14 F.3d 543, n.5 553 (11th Cir. 1994). Indeed, **the Eleventh Circuit rejected the government's attempts to limit McCormick's** *quid pro quo* **requirements** to campaign contribution cases. In *Martinez*, the Eleventh Circuit discussed both *McCormick* and *Evans v. United States*, 504 U.S. 255, 268 (1992), and concluded that *both McCormick* and *Evans* require the government to prove a *quid pro quo*. The *Martinez* court concluded that *McCormick* required an *explicit quid pro quo* in campaign contribution cases, and *Evans*

16

required *quid pro quo* in non-campaign contribution cases.[19]  *Martinez at 552-553.*

Moreover, The Northern District of Illinois applied the explicit *quid pro quo* requirement to an honest services case involving campaign contributions in *United States v. Warner*, 2005 WL 2367769 (N.D. Ill. September 23, 2005).  Former Illinois Governor Ryan and the prosecutors filed competing motions in limine regarding the proof required on the honest services charges against him – some but not all of which involved campaign contributions.  2005 WL 2367769 *1-5.  The court held that the government had to prove an explicit *quid pro quo* on the honest services charges that involved campaign contributions, though not on the other honest

---

[19]The Eleventh Circuit re-affirmed *Martinez* when it reheard *United States v. Davis*, 30 F.3d 108, 109 (11th Cir. 1994) (*Davis* II).  The defendant was an Alabama legislator charged with conspiring to extort money in return for help in getting a bill out of her committee.  The district court charged the jury that a defendant violates the Hobbs Act "[by] taking or offering to take or agreeing to take or withhold official action for the money" and that "a specific quid pro quo is not always necessary for a public official to be guilty of extortion."  *United States v. Davis*, 967 F.2d 516, 521 (11th Cir. 1992).  The Eleventh Circuit originally held that this charge was "near enough to the 'explicit promise or undertaking by the official to perform or not to perform an official act' outlined in *McCormick*" and affirmed the conviction.  *Id.* at 522.  But, on reconsideration, the same panel (Judges Kravitch, Edmondson, and Godbold) reversed itself, holding:

> For the reasons stated in *United States v. Martinez*, 14 F.3d 543, 552-54 (11th Cir. 1994), under United States Supreme Court precedent, **an explicit promise by a public official to act or not act is an essential element of Hobbs Act extortion, and the defendant is entitled to a reasonably clear jury instruction to that effect**.  Because the district court failed to charge Davis's jury as to the necessity of finding an explicit promise before the jury properly could convict – and indeed informed the jury that "a specific quid pro quo is not always necessary for a public official to be guilty of extortion – appellant's conviction is due to be REVERSED and the case REMANDED to the district court for further proceedings consistent with this opinion.

*Davis*, 30 F.3d at 109.  As *Davis* II noted, other circuits agree.  *See, e.g., United States v. Allen*, 10 F.3d 405, 411 (7th Cir. 1993); *United States v. Farley*, 2 F.3d 645, 651 (6th Cir.), *cert. denied* 510 U.S. 1030 (1993); *United States v. Garcia*, 992 F.2d 409, 414 (2d Cir. 1993); *United States v. Taylor*, 993 F.2d 382, 384 (4th Cir.), *cert. denied* 510 U.S. 891 (1993). [Emphasis added]

services charges.  *Id.* *5 ("Nor must the government prove an explicit *quid pro quo* outside the campaign contribution context").

Indeed, **Sawyer** **itself recognizes the "specific *quid pro quo*" requisite proof for bribery-type honest services cases**. *Sawyer*, 85 F.3d at 130; *Woodward*, 149 F.3d at 49.

## IV.   INSUFFICIENT EVIDENCE TO SUSTAIN AN EXPLICIT QUID PRO QUO FOR THE § 666 FEDERAL BRIBERY CHARGES AS WELL AS THE § 1346 BRIBERY-TYPE HONEST SERVICES CHARGES

The government's substantive proof failed on Counts Three and Five through Nine because the government failed to prove the required *explicit quid pro quo*.

### A.  The Evidence

**The government's evidence hinges exclusively on Bailey's testimony about what transpired at a meeting that he did not attend.**  Bailey claims that during a meeting between Mr. Scrushy and Governor Siegelman, Mr. Scrushy made some form of a commitment to contribute $500,000.00 to the AELF and that sometime after this meeting, Governor Siegelman showed Bailey a check for $250,000.00.  The government relies upon Bailey's recollection of a conversation that he allegedly had with Governor Siegelman:

> Q.    Okay.  Now, when the Governor showed you the check what, if anything, did he say to you?
>
> A.    He made a comment referring to Mr. Scrushy's commitment to give 500,000 and he's halfway there.
>
>             *                    *                    *                    *
>
> Q.    What did you say when you showed him the check and he said, he's halfway there?
>
> A.    **I responded by, what in the world is he going to want for that?  And the Governor said, the C-O-N Board or the CON Board.  And I said, I wouldn't think there would be a problem with it; and he said, I wouldn't think so.**

18

      \*            \*            \*            \*

Q.     You said he said at the outset of that conversation, he's halfway there. Do you know what he was talking about when he said that this $250,000 was halfway there?

A.     He was referring to the $500,000 commitment that Mr. Scrushy had made to our lottery campaign.

*Nick Bailey Testimony on Direct Examination, May 2, 2006* 173/6-9; 175/20 – 176/4; 176/21 – 177/4; 183/8-14. [Emphasis added]

**The testimony excerpted above is as close as the government ever gets to presenting evidence of an *explicit quid pro quo* agreement between Mr. Scrushy and Governor Siegelman. And, this evidence falls far short of an *explicit quid pro quo* agreement.**

The government's position seems to be that an *explicit quid pro quo* should be inferred from the fact that Mr. Scrushy's company, HealthSouth, contributed money to the education foundations that Governor Siegelman established and from the fact that HealthSouth encouraged IHS to likewise contribute to these foundations. However, evidence of contributions is hardly evidence of a bribe. The government's own witness, Alva Lambert, testified that appointees to the CON Board, like other political appointees, usually contribute to the campaign of the governor who appoints them.[20] Mr. Lambert made clear that this is a normal and acceptable practice:

Q.     Yes, sir. In fact, Mr. Lambert, many people who are appointed not only to boards, but also to cabinet positions, have either contributed or played significant roles in a governor's campaign?

A.     Yes.

Q.     And you would consider that the norm?

---

[20]*Testimony of Alva Lambert on Cross-Examination, May 2, 2006* 81/19 - 82/22

A.    Yes.

Q.    That's just Alabama politics, isn't it?

A.    Yes, sir.

*Testimony of Alva Lambert on Cross-Examination, May 2, 2006* 83/12-21.

### B.    Proof of an Explicit Quid Pro Quo is Required

In its opening statement, the government acknowledged its burden of proving an ***explicit agreement***, involving a ***quid pro quo***:

> [Y]ou may have to draw some distinctions between whether you think a given gift was personal or campaign. Because we think you could find fairly with some of these that some are personal and one or more may be campaign. And the Court is going to be instructing you that there may be a slightly different standard. And it's important, but it's a difference. **If it's campaign money, you have to find there was an expressed what they call quid pro quo, an expressed agreement.** That's where Mr. Bailey and Mr. Allen are going to come in and they're going to tell you there was an expressed agreement with regard to all of these.

*Opening Statement by Mr. Feaga, May 1, 2006* 69/3-18.

The government argued against this statement six weeks later at the jury charge conference, and **misled the Court into providing instructions to the jury that require *no quid pro quo* much less the requisite *explicit quid pro quo* for the honest services bribery-type charges for campaign contributions**. Furthermore, the government misled the Court at the jury charge conference into failing to require proof of an *explicit quid pro quo* for the § 666 federal bribery charges.

The government urged this Court to adopt the First Circuit's honest services *gratuity* standard set forth in the *Sawyer* cases. In those cases, the First Circuit "*expanded* [honest services fraud] from *quid pro quo bribery* to *include* a more generalized pattern of *gratuities* to coax 'ongoing favorable official action.'" *United States v. Woodward*, 149 F.3d 46, 49 (1st Cir.

1998), *cert. denied* 525 U.S. 1138 (1999) [Emphasis added]

Even the First Circuit in the *Sawyer* and *Woodward* cases, however, continued to recognize that a "specific *quid pro quo*"[21] is required for bribery-type honest services cases. *Sawyer*, 85 F.3d at 730, 741 (recognizing *quid pro quo* bribery-type honest services cases requiring "specific *quid pro quo*"); *Woodward*, 149 F.3d at 49. For the reasons set forth in all of the defendants' prior written and oral arguments (which Governor Siegelman expressly incorporates herein), the **Sawyer** rationale which requires no *quid pro quo* in an honest services *gratuity* **case does not apply to the "*bribery*-type" honest services charges that are before this Court**. Accordingly, the honest services charges requiring no *quid pro quo* is error. See *McCormick, supra.; Sun-Diamond, supra.; Sawyer, supra.; Woodward, supra.; Davis II, supra.; Martinez, supra.; Allen, supra.;* and *Warner, supra.*

**The misgivings that this Court expressed during the jury charge conference about departing from the Eleventh Circuit Pattern Jury Instructions were correct. It was error for the Court to amend the Eleventh Circuit pattern honest services jury instruction to include *gratuity* language from the *Sawyer* cases and instruct the jury on First Circuit *Sawyer gratuity* theory when the government has alleged this to be a *bribery* not a *gratuity* theory honest services case.**

In any event, the government's evidence is insufficient even under the incorrect and inapplicable *Sawyer gratuities* standard because there was no "generalized pattern of gratuities to coax on-going favorable official action." There was no *pattern* of benefits here – there were only two checks made payable to a foundation that supported educating Alabama children

---

[21]*See also, Davis II*, 30 F.3d at 108 (Eleventh Circuit also recognizing requisite "specific *quid pro quo*").

allegedly in exchange for a CON Board seat for which Mr. Scrushy was undisputably qualified. Further, **the government clearly charged this case as an honest services *bribery* case, and *not as a gratuities* case**.  Finally, the government offered no evidence that Governor Siegelman intended to deceive the public, as the *Sawyer* cases require.  See *Sawyer* I 85 F.3d at 732-33.

Applying the heightened explicit *quid pro quo* requirement to the facts of this case plainly reveals that there was no "explicit promise," no "specific *quid pro quo*," and no "express agreement" under the previously discussed case law.  Furthermore, as consistent with the legal meaning of the heightened *explicit* requisite *quid pro quo*, there is no evidence in this case indicating:

> *Express*: Clear; definite; *explicit*, plain; direct; unmistakable; not dubious; or ambiguous. Declared in terms; set forth in words. Directly and distinctly stated. *Made known distinctly and explicitly*, and *not left to inference.  Manifested by direct and appropriate language*, *as opposed to inferred from conduct*. The word is contrasted with 'implied.'  [Emphasis added]

*Black's Law Dictionary.*

### C.    *Comparison of the Evidence in this Case to Similar Cases Shows the Government's Evidence to be "Woefully Inadequate"*

A review of similar cases reversed on appeal reveals that the evidence in this case falls far short of a *quid pro quo*, much less an *explicit quid pro quo*.  The government failed to meet the heightened *explicit quid pro quo* standard here.  Its proof is very similar to the proof offered – and found insufficient, even under the standard applicable in civil cases.  In *Roger Whitmore's Automotive Services, Inc. v. Lake County, Illinois*, 424 F.3d 659 (7th Cir. 2005), a civil RICO plaintiff alleged that he operated a towing service that was on the county sheriff department's approved list, eligible to be called by the county dispatcher for towing needs.  The plaintiff alleged:

> [I]nclusion on the list does not come cheap.  Three different sheriffs, over the
> years, personally visited [plaintiff] in order to sell tickets for political fundraisers.
> For example, [one sheriff] made personal appearances at [plaintiff's business]
> with tickets in hand. [Another sheriff] came to [plaintiff's business], placed fund-
> raiser tickets on the counter, and collected checks from [plaintiff]. [A third
> sheriff] did likewise.  Sheriff's deputies often followed up these visits, to pick up
> checks or to verify that [plaintiff] would be attending the fund raisers.
>
> [Plaintiff] felt pressured to purchase the tickets for several reasons.  For one, the
> officers appeared at [plaintiff's] business openly displaying badge and gun.  Plus,
> [plaintiff] had heard rumors that a towing company refusing to purchase tickets
> had found itself "kicked off" the approved list. [Plaintiff] therefore felt
> intimidated and concluded that he had no choice but to purchase the tickets,
> because otherwise "maybe they would take [his] business away."  Even when
> some sheriffs mailed tickets, rather than making personal appearances, [plaintiff]
> felt "slightly uncomfortable."

424 F.3d at 663-64.  The Plaintiff sued after a new sheriff (whom he had not supported in the

primary) reduced his towing territory.  The Seventh Circuit held this evidence "woefully

inadequate" to prove a civil RICO violation based, in part, on Hobbs Act extortion:

> [Plaintiff] offers no objective evidence that the defendants were extorting the
> campaign funds from him or other towing operators.  Instead, [plaintiff] merely
> points to evidence that [the new sheriff] accepted money from him and other
> towers (which, of course, is undisputed) and contends that the contributions could
> only have been in exchange for presence on the list or from fear of being removed
> from the list. **[Plaintiff] relies heavily on subjective belief that the payments
> were a sort of *quid pro quo* or offered out of fear.**  For example, he offers the
> fact that towers made up a disproportionate percentage of [the new sheriff's]
> campaign contributions.  He claims that the defendants received one contribution
> of cash in an envelope, and argues that [the new sheriff] violated his rule
> prohibiting face-to-face solicitation. [Plaintiff] also testified to his discomfort at
> having sheriffs sporting guns and badges personally pick up contributions and
> cites isolated testimony from a fellow tower that "it helps" to make contributions
> to the incumbent sheriff.  All of this, [plaintiff] contends, is proof that the
> defendants extorted funds from towers.
>
> **We do not believe a rational jury could find in [plaintiff's] favor on the basis
> of this evidence.**  For one, it should hardly be surprising that towers made up a
> disproportionate percentage of [the new sheriff's] campaign contributions, given
> the manner in which the Lake County sheriff's department has long used a list of
> approved towers.  **This is the very nature of politics**, and in the absence of
> evidence indicating some wrongdoing independent of legal solicitation of

campaign contributions, this proportional disparity is evidence of nothing.  As state, Illinois law expressly allows for solicitation of contributions like [the new sheriff's], so merely accepting cash is not evidence of extortion, especially when there is **no separate evidence of an explicit, promised quid pro quo**.

Likewise, [plaintiff's] bald assertion that he and other towers had been intimidated does not carry the day.  As noted, any fear that [he] or the others may have felt must be reasonable.  This is where [plaintiff's] failure to present some objective evidence of extortion – for example, historical data tying the award or denial of towing to contributions made or not made – becomes a serious problem for [his] case.  If a plaintiff's subjective discomfort with uniformed and armed law enforcement officers dropping by for contributions is enough to qualify as Hobbs Act extortion, it won't be long before all police fund raisers (for political or other purposes) come to an end.  There must be objective evidence to indicate that the plaintiff's fears are reasonable and otherwise to allow a jury to find Hobbs Act extortion; we find none in this record to satisfy [plaintiff's] burden of establishing a material issue for trial.  [Emphasis added]

424 F.3d at 671-72.

A 1992 campaign contribution case, involving one of the agents who investigated this

case (Jack Brennan), demonstrates the level of proof required for an *explicit quid pro quo*:

In our view, **what *McCormick* requires is that the quid pro quo be clear and unambiguous, leaving no uncertainty about the terms of the bargain**.

\*                    \*                    \*                    \*

As part of an undercover investigation, FBI agent Jack Brennan posed as an Alabama businessman seeking a change in California law.  Brennan met with Carpenter's aide John Shahabian several times between July and September 1986 to discuss AB 3773.  Brennan asked "what's it going to cost" and Shahabian responded with a figure of $20,000.  Shahabian told Brennan that Carpenter would be the best person to "front" the legislation.  Shahabian testified that he later told Carpenter about AB 3773, that Brennan would need help solving legislative problems, and that Shahabian had suggested a contribution of $20,000.  Shahabian testified that Carpenter responded that he would assist the bill through the Senate.  In conversations with Brennan, Carpenter assured him that things were going smoothly and that he had the "right friends" on the Banking and Commerce Committee. [Emphasis added]

*United States v. Carpenter*, 961 F.2d 824, 827-28 (9th Cir. 1992).

Here, there was no undercover investigation and no eyewitness to any conversation

24

between Mr. Scrushy and Governor Siegelman.  An ***explicit quid pro quo*** requires a "threat or promise accompanying the demand for funds."[22] That is difficult, if not impossible, to prove with indirect evidence.  And, the government's proof here did not even come close to meeting the standard the case law imposes for indirect evidence in campaign contribution cases.  The government did not even present as much evidence in *this* case as it did in the cases discussed above–which were reversed on appeal for insufficient evidence.  In this case, the government set out, blatantly, to criminalize entirely lawful conduct.  As Alva Lambert testified, it is standard practice – and entirely lawful – for a governor to give CON Board seats to contributors.  Mr. Scrushy is a world leader in the health care field, eminently qualified for a position on the CON Board.  Every witness who is knowledgeable of Mr. Scrushy's service on the CON Board testified that he served conscientiously and well.  He was paid nothing for his service.  This is hardly evidence of a federal crime.

Bailey's testimony that Governor Siegelman told him that Mr. Scrushy wanted appointed to the CON Board is not evidence of an explicit promise or express agreement – or indeed, of a promise or agreement of any kind.  There is no evidence that Governor Siegelman or Mr. Scrushy discussed the CON Board appointment when they met or, if they did, what they said to each other about it.  It is not at all abnormal for a Governor to expect that a large contributor might want an appointment to a state board, even if the two had not discussed it.

The federal funds bribery, conspiracy, and honest services convictions here criminalize standard, lawful politics, and cannot stand.  The Court's language in *McCormick* is equally applicable here: **"To hold otherwise would open to prosecution not only conduct that has**

---

[22] *Cobbs v. Sheahan*, 319 F. Supp.2d 865, 870-71 (N.D. Ill. 2004) (applying *McCormick* in context of demands for campaign contributions forming basis of civil RICO allegations).

long been thought to be well within the law but also conduct that in a very real sense is unavoidable so long as election campaigns are financed by private contributions or expenditures, as they have been from the beginning of the Nation."

### V.     NO EVIDENCE THAT GOVERNOR SIEGELMAN DEPRIVED THE STATE OF MR. SCRUSHY'S HONEST GOVERNMENTAL SERVICES

The conspiracy and honest services convictions in Counts Five through Nine cannot stand for the additional reason that there is no evidence that Governor Siegelman deprived the state of Mr. Scrushy's honest governmental services.  As charged in the Indictment, for a person to deprive the public of a public official's honest services, he must bribe the public official. There is no evidence, and the government does not contend, that Governor Siegelman did so with respect to Mr. Scrushy.

Further, when Governor Siegelman appointed Mr. Scrushy to the CON Board, he appointed seven others, including chair Margaret Sellers.  *Government Exhibits 6A-I*; *Alva Lambert Testimony on Direct Examination*, 20/2 – 21/6.  The government presented no evidence that Mr. Scrushy was in any way derelict in his duties.  On the contrary, each of the government's witnesses testified that Mr. Scrushy was qualified to serve on the CON Board, that he served under Governor Siegelman with distinction, that he had served in the same position under several previous governors, and, like the other members of the CON Board, Mr. Scrushy served without compensation.  See *Testimony of Alva Lambert, Margie Sellers, Lori Skelton,* and *Dr. McCorvey.*

### VI.     PAYMENTS TO PROMOTE FUNDING EDUCATION FOR THE BENEFIT OF THE GENERAL PUBLIC ARE NOT "THINGS OF VALUE" TO GOVERNOR SIEGELMAN UNDER § 666

Section 666 requires that the *quid pro quo* be "any thing of value" 18 U.S.C. § 666(b)(2).

26

A "thing" under this provision need *not* be tangible. *Salinas v. United States*, 522 U.S. 52, 57(1999) ("personal property *or other valuable consideration*"); *United States v. Giraud*, 601 F.2d 69, 71 (2ⁿᵈ Cir. 1979) (information a "thing of value" under 18 U.S.C. § 641). However, "of value" are words of limitation; they do not extend to the limits of the imagination of the advocate, prosecutor or defense counsel. For example, the phrase does *not* include an agreement by the Government to forgo prosecution. *United States, v. Condon*, 170 F.3d 687, 688-89 (7ᵗʰ Cir. 1999).

Thus, the construction of § 666 must reflect the policy judgments, not of prosecutors, or the whim of jurors, but of Congress, which manifestly did *not* intend to enact a federal campaign finance statute. *United States v. Cicco*, 938 F.2d 441, (3ʳᵈ Cir. 1991).[23] Section 666 is part of Title 18, which must be narrowly construed generally. *McNally* v. *United States,* 483 U.S. 350, 360-61 (1987) ("defraud" read narrowly; "when there are two rational readings of a criminal statute, one harsher than the other, we are to choose the harsher only when Congress has spoken in clear and definite language. … Rather than construe the statute in a manner that leaves its outer boundaries ambiguous and involves the Federal Government in setting standards of … good government for local and state officials, we read ["defraud" mail fraud statute narrowly.]") (citations omitted)

---

[23]In *Cicco*, the Court ruled that § 666 is not applicable to solicitation of campaign "services and loyalty"; "the defendants corruptly solicited political services and loyalty from municipal employees and did so intending to be influenced in the distribution of municipal jobs. ... [Nevertheless, the district court found the defendants not guilty after a jury verdict because it rightly] believed that Congress did not intend § 666 to apply to the defendants' actions. …[T]he district court [properly] found that the government's interpretation of the statute was unconstitutionally vague and deprived the defendants of fair notice. …. [I]f § 666 is read as broadly as the government reads it, its boundaries are difficult to limit. If solicitation of what the government characterizes as 'party loyalty' is covered … those boundaries become vague indeed.".

Where First Amendment values are at issue, as here in the prosecutor's far-reaching and unprecedented application of § 666 to campaign financing, the legislation, so that First Amendment freedoms are not chilled, must be even more "narrowly tailored." *See Clark v. Community for Creative Non-Violence*, 468 U.S. 288, 293 (1984) Implicated, too, are principles of federalism, which caution against an expansive reading of a statute that treads on state and local matters, such as local elections and the give-and-take of party politics. *See Jones v. United States*, 529 U.S. 848, 858 (2000) ("arson" read narrowly; "unless Congress conveys its purpose clearly, it will not be deemed to have significantly changed the federal-state balance" in the prosecution of crimes.") (citations omitted); *see generally*, REPORT OF THE 2002 FORUM FOR STATE APPELLATE COURT JUDGES, ROSCOE POUND INSTITUTE, *State Court And Federal Authority: A Threat to Judicial Independence*? (2006)

The campaign donations at issue here were, of course, in the form of money, classically a "thing of value." But the issue is not "value" in the abstract, but "value" to whom they are given. *United States v. Williams*, 705 F.2d 603 F.2d 603, 623 (2nd Cir. 1983) (test of value is subjective belief by recipient under 18 U.S.C. § 201(bribery)). **Here the contributions were *not* made out to Governor Siegelman *personally*. In fact, they were not even made to a campaign to elect Governor Siegelman to office. Instead, the contributions were made to a foundation established by Governor Siegelman to promote a lottery campaign that was designed to fund education for the benefit of the general public.** The contributions were publicly disclosed, albeit late, but without penalty by the state authorities to whom the enforcement of the Alabama campaign disclosure laws are properly entrusted.

**Governor Siegelman's research finds *no* case that squarely upholds the government's questionable use of § 666 in an effort to *re-characterize* legitimate**

**contributions to foundations that were established to benefit the general public as "things of value" within § 666.**  In short, the contributions— factually and legally— were *not* "of value" to Governor Siegelman; they *were* "of value" to the foundations that were promoting a referendum on a lottery to fund public education. Thus, they could not have violated § 666.

The government claims that the contributions were "of value" to the Governor, because they were ultimately used to pay off a debt of the Democratic Party for which Governor Siegelman subsequently signed as guarantor. Each element of § 666 had to occur at the time of the alleged "bribe," not *later*, that is, when the Governor legitimately decided to have the lottery campaign assume the debts of the Party.  There is no evidence in the record that even suggests that the Governor had, at the time these contributions were made, a secret intent to have the lottery campaign assume the debts of the Party.

More importantly, contributions to the lottery foundations could not be considered a "thing of value" to Governor Siegelman even after he signed as a guarantor of the foundation's debt.  A guarantor is *not* a cosigner who is equally liable with the principal debtor; a guarantor's liability is contingent solely on the failure of the principal debtor to pay. The rule goes back to the 19th century. *See, e.g., Lawson v. Townes Oliver & Co.,* 2 Ala 373, 375 (1891).  **The government presented no evidence that the AEF was ever in danger of defaulting on its loan.**

**Further, according to the government's own witnesses, there was yet another layer insulating Governor Siegelman from even being potentially responsible for the AEF's loan.** According to Todd Beard, an officer at First Commercial Bank, the main guarantor, that is, the person that the bank was looking to for repayment of the debt should the AEF default, was Merv Nabors.  **Nabors had considerable monies on deposit with the bank (approximately $19**

**million), and he was the one who provided the bank with the financial statements on which the loan committee relied. Governor Siegelman did *not* provide a financial statement to the bank and the bank's own records reflect that it relied upon the financial strength of Nabors, not Governor Siegelman, in extending the loan to AEF.**

Accordingly, there was no "thing of value" conveyed at the time of the alleged bribery, and there could not have been a "thing of value" when the AEF debt was guaranteed and ultimately paid off. To look at it another way, to suggest that the Governor received a "thing of value" when the Party's debts were paid is like saying the he had "imputed income" under federal or state law for tax purposes. If the government believes its "thing of value" theory, why were not Nabors and the Governor indicted for tax evasion? The answer is simple: these prosecutors would have had to run the theory by the Tax Division in the Department of Justice, and it would not have passed muster, for such is *not* the law either under Federal or state tax law. *See Selfe v. United States*, 778 F.2d 769, 773 (11th Cir. 1985); *Depart. of Revenue v. Acker,* 363 So.2d 470, 473 (Ala. Ct. of App. 1994).

To uphold the government's theory of receipt of "thing of value" would constitute a revolutionary reading of the law of campaign financing (to say nothing of tax theory) through, not legislation, but retroactive criminalization at the whim of unrestrained federal prosecutors and by a jury that was not given due instruction on the serious First Amendment implications of the prosecution in front of them. In short, the Governor, did not, in fact or in law, receive a "thing of value."

### VII.    GOVERNOR SIEGELMAN'S APPOINTMENT OF MR. SCRUSHY TO THE CON BOARD COULD NOT HAVE BEEN DONE "CORRUPTLY" AS DEFINED BY § 666

Assuming arguendo that the government has presented evidence of an explicit, expressed

*quid pro quo* agreement between Mr. Scrushy and Governor Siegelman that Scrushy would be appointed to the CON Board in exchange for contributions to the lottery campaign, Mr. Scrushy's appointment still would not have been "corrupt" as defined by § 666 because it would have been neither "dishonest" nor "wrongful."  Mr. Scrushy would *not* be seeking an appointment for which he was unqualified; nor would Governor Siegelman be making an appointment outside the expected customary range of typical goverorial appointments; he would *not* have been seeking something for himself, only a legitimate campaign donation for a lottery designed for the benefit of the children of Alabama.

Thus, neither party would have had a "corrupt" state of mind, as the law traditionally defines the concept.  *Roma Construction Co. v. Russo*, 96 F.3d 566, 574 (1st Cir. 1996) (paying money in response to an extortionate demand not common law bribery where payer does not seek an illicit advantage) ("[t]he mens rea implicated by 'corruptly' [within common law bribery] concerns the intention to obtain ill-gotten gains"); Eleventh Circuit Pattern Jury Instructions, Criminal, 18 U.S.C. § 201(b)(2) at 95 (2003) ("'corruptly' means to act knowingly and dishonestly for a wrongful purpose") [Emphasis added]; see generally, Jeremy N. Gayed, *"Corruptly": Why Corrupt State of Mind is an Essential Element for Hobbs Act Extortion Under Color of Official Right*, 78 Notre Dame Law Rev. 1731 (2003) (tracing the history to date of the concept in its common law origins in the law of extortion and bribery).

### VIII.    THE § 666(a)(1)(B) PROSECUTION IS TIME-BARRED

Count Three of the Second Superseding Indictment alleges that Governor Siegelman violated the federal funds bribery statute, 18 U.S.C. § 666(a)(1)(B), because he "solicited, demanded, accepted, and agreed to accept" $500,000 from Mr. Scrushy "intending to be influenced and rewarded in connection with" that appointment.  *Second Superseding Indictment*

31

¶¶ 48-49.

The government never demonstrated that the $500,000.00 contributed to the AELF and AEF was of any benefit to Governor Siegelman, or that there was ever an explicit agreement between Governor Siegelman and Mr. Scrushy regarding Mr. Scrushy's appointment to the CON Board. However, the Court does not need to explore any of these issues to grant Governor Siegelman's Motion for Acquittal on Count Three. It cannot be disputed that the government failed to bring Count Three within the applicable five-year statute of limitations.

The general statute of limitations for non-capital federal offenses, 18 U.S.C. § 3282, governs prosecutions under 18 U.S.C. § 666.[24] It provides:

> Except as otherwise expressly provided by law, no person shall be prosecuted, tried, or punished for any offense, not capital, unless the indictment is found or the information is instituted within five years next after such offense shall have been committed.

The government bears the burden of proving that a defendant committed an alleged offense within the five-year limitations period.[25] This is an essential element of the offense that the government must prove beyond a reasonable doubt.[26] Except for continuing offenses as

---

[24]*See, e.g., United States v. Yashar*, 166 F.3d 873, 875 (7th Cir. 1999); *United States v. Rogers*, 781 F.Supp. 1181, 1190 (S.D. Miss. 1991) (applying §3282 limitations period to § 666 bribery case); *United States v. Richards*, 925 F.Supp. 1097, 1103 (D.N.J. 1996) (same).

[25]*Gruenewald v. United States,* 353 U.S. 391, 396-97 (1957); *see also, e.g., United States v. York*, 888 F.2d 1050, 1057 (5th Cir. 1989); *United States v. Hankin*, 607 F.2d 611, 612-13 (3d Cir. 1979); *United States v. Walls*, 577 F. Supp. 772, 773 (N.D. Ga. 1984).

[26]*See, e.g., United States v. Wilson*, 249 F.3d 366, 373 (5th Cir. 2001) (citing *United States v. York*, 888 F.2d 1050, 1057 n. 10 (5th Cir. 1989)). As the Eleventh Circuit and other federal courts have noted, an exception to the rule that "proof of the specific date of [a] crime is not an essential element," is that the government must prove beyond a reasonable doubt that "the crime . . . occurred . . . within the statute of limitations and before the indictment." *United States v. Griffin*, 705 F.2d 434, 436 (11th Cir. 1983); *United States v. Francisco*, 575 F.2d 815, 818 (10th Cir. 1978); *United States v. Falcon*, 957 F. Supp. 1572, 1582-83 (S.D. Fla. 1997).

noted in *Toussie v. United States*, 397 U.S. 112 (1970), an offense is committed when it is completed,[27] and an offense is completed when each element of the offense has occurred.[28]

The government presented evidence that Governor Siegelman appointed Richard Scrushy to the CON Board on July 26, 1999. *Government Exhibits 6A-I*; *Alva Lambert Testimony on Direct Examination*, 20/2 – 21/6. The government relied on the testimony of former Governor Siegelman aide, Nick Bailey, to establish the existence and date of the alleged bribery scheme between Governor Siegelman and Scrushy. Bailey testified that sometime in June or July, 1999 (before Mr. Scrushy's July 26, 1999 appointment to the CON Board) Governor Siegelman met with Mr. Scrushy in the Governor's office. Bailey did not attend or participate in this meeting:

> Q.    Mr. Bailey, I'd like to get your agreement at the outset that with regard to Richard Scrushy, you were not an eyewitness to any meeting that he had with Governor Siegelman?
>
> A.    And you mean by me – by witness of the meeting, was I included in the meeting?
>
> Q.    That's precisely what I mean, sir.
>
> A.    Then I will agree with you absolutely. I was not.

*Nick Bailey Testimony on Cross-Examination*, *May 4, 2006* 274/6-15.

Bailey testified that in a conversation sometime after this meeting, Governor Siegelman indicated that Mr. Scrushy had made a "commitment" to raise $500,000.00 for AELF. *Nick Bailey Testimony on Direct Examination, May 2, 2006* 173-183. According to the government,

---

[27]*Toussie v. United States*, 397 U.S. 112, 115 (1970); *United States v. Gilbert*, 136 F.3d 1451, 1453 (11th Cir. 1998).

[28]*See, e.g., United States v. Barefield*, 6 Fed. Appx. 351, 353, 2001 WL 300714 *1 (7th Cir. March 27, 2001); *United States v. Yashar*, 166 F.3d 873, 875 (7th Cir. 1999); *United States v. Cooper*, 283 F. Supp.2d 1215, 1229 (D. Kan. 2003); *United States v. Donne*, 2000 WL 33710849 *3 (D. Utah October 5, 2000).

Mr. Scrushy honored this commitment by raising $250,000.00 from Integrated Health Services (IHS) and, later, by having HealthSouth contribute $250,000.00.

Bailey is unclear as to the exact date when the $250,000.00 IHS check was delivered to the AELF. Bailey admits that before trial, he told investigators that Governor Siegelman exited his meeting with Mr. Scrushy, opened his left coat pocket, and showed Bailey a check for $250,000.00 with Mr. Scrushy's signature on it. Bailey even made a sketch which purports to describe the meeting between Mr. Scrushy and Governor Siegelman on July 14, 1999 (the day the government claims this meeting occurred).

At trial, Bailey recanted and stated that he was mistaken about seeing Mr. Scrushy's signature (Scrushy did not sign the IHS check). Bailey further admitted that he could not have seen the IHS check immediately following the meeting between Scrushy and Governor Siegelman because the IHS check was dated July 19, 1999–five days after the day that the government contends this meeting occurred. But, Bailey was certain that the meeting, the alleged commitment, and delivery of the IHS check occurred before Mr. Scrushy was appointed to the CON Board on July 26, 1999. *Siegelman Exhibit 305; Nick Bailey Testimony on Cross-Examination, May 3, 2006* 218-232.

Bailey testified that Governor Siegelman did not receive the *second* $250,000 from Mr. Scrushy until sometime in May of 2000. This check is dated May 18, 2000, drawn on a HealthSouth account, and made payable to the AEF.[29] Bailey could only say that this check was received somewhere near the time that it was dated:

> Q.     Would the date that's on that check tell us at or near the time that you
>         went up there to pick that check up?

_____

[29] *Government Exhibit #27B.*

A.    It would likely be at or near the time, yes, sir.

Q.    How about the depositing or the – the transaction that was conducted with it at First Commercial Bank?  Would that give us the approximate date that that happened?

A.    Approximate date, yes, sir.

Q.    Do you have a recollection here today of when that was?

A.    No, sir, I don't.

*Nick Bailey Testimony on Direct Examination, May 3, 2006* 6/8-20.

Bailey's testimony mandates acquittal on Count Three because it demonstrates that the government failed to bring this charge within the five-year statute of limitations.  In *United States v. Yashar*, 166 F.3d 873 (7ᵗʰ Cir. 1999), the Seventh Circuit ruled that a §666 offense is not a continuing offense, that it is complete, and that the "limitations period begins to run once all elements of the offense are established, regardless of whether the defendant continues to engage in criminal conduct." *Id.*, 166 F.3d at 779-880.  The *Yashar* Court further held that **the elements of an offense are "established"** *on the first date* **on which the government could have proceeded with criminal charges.  Specifically, under §666, the offense is complete when the defendant's prohibited conduct** *first* **involves $5,000 or more (and the relevant government or agency has received $10,000 in federal funds).**  *Id.*

In *Yashar*, the Court expressly rejected the government's efforts to transform §666 into a "continuing offense" similar to the RICO statute.  The government did not contend that § 666 was a "continuing offense."  Rather, the government argued that Yashar had engaged in a "continuing course of conduct" that straddled the limitations period.  The Seventh Circuit rejected this argument as a distinction without a difference.  The Court compared § 666 to the RICO statute which criminalizes a "pattern" of activity.  The *Yashar* Court noted that it was

clear that Congress intended the RICO statute to be a "continuing offense" statute as an

*exception* to the "normal" limitations period. On the other hand, if the Court accepted the

government's argument that it had the right to charge a "continuing course of conduct," and,

thereby, expand the statute of limitations for a § 666 charge, the government would effectively

render statutes of limitations meaningless:

> **That position would undermine the purpose of the statute of limitations, which is "to limit exposure to criminal prosecution to a fixed period of time following the occurrence of those acts the legislature has decided to punish by criminal sanctions," to discourage prosecution based on facts obscured by the passage of time, and to encourage law enforcement officials promptly to investigate suspected criminal activity.** *Toussie*, 397 U.S. at 114-15. Allowing the prosecution to extend the statute of limitations by charging a course of conduct would risk prosecutions based on stale facts and would not encourage prompt investigation and prosecution of criminal activity. Those goals can only be promoted by an interpretation that starts the limitations period when all elements of the crime are first present. [Emphasis added]

*Yashar at 879.*

* * *

> Moreover, under the government's position, **a prosecutorial decision regarding the scope of the charge would determine the running of the limitations period. In that manner, the statute of limitations, designed as a control on governmental action, would instead be defined by it.** Virtually any criminal actions that extend over time could fall within this expansive definition depending upon how a prosecutor chose to charge a case. A prosecutor has a great deal of discretion in deciding whether to charge a course of conduct as a single offense or as multiple offenses. *See United States v. Berardi*, 675 F.2d 894, 898 (7th Cir. 1982). [citations omitted] [Emphasis added]

* * *

> Under the government's argument, that charging decision could delay the running of the limitations period on the discrete offenses. For instance, a series of drug sales could be charged as a single scheme. **The government could then wait to prosecute until well beyond five years after the initial drug sales, as long as at least one overt act occurred within the last five years, and regardless of whether that one act constituted an element of the charged crime.** With this approach, the limitations period would be virtually unbounded. At oral argument,

we posed a hypothetical to the government in which **a ghost payroller received $ 15,000 in salary in 1970 and, 25 years later, received $ 300 in retirement benefits attributable to that sham employment. The government declared that the limitations period might not begin to run on the 1970 conduct until after the retirement benefits were received in 1995, if the payments were deemed to be part of a single scheme. With this interpretation, the limitations period would apparently not begin to run until the person's death if that person received ongoing pension payments attributable at least in part to the ghost payrolling scheme.** That example demonstrates how the prosecutor's charging decision could dramatically impact the limitations period. **This approach would transform the limitations period from a check on governmental delay in prosecution to a function of prosecutorial discretion.** It would gain for the government the expanded statute of limitations of a conspiracy or RICO claim, without requiring the government to prove either.[30] [citations omitted] [Emphasis added]

In this case, the limitations period began to run, at the latest, when Governor Siegelman first accepted a payment involving at least $5,000. That date, according to Bailey, was sometime prior to Mr. Scrushy's July 26, 1999 appointment to the CON Board. **Since the original indictment was found May 17, 2005,[31] the § 666(a)(1)(B) charge in Count Three must be**

---

[30] The Seventh Circuit further distinguished a number of cases in which, in its view, the defendant engaged in numerous acts that straddled the limitations period, but the offense could properly charge only the acts that fell within the period. 166 F.3d at 877-78 (distinguishing *United States v. Jaynes*, 75 F.3d 1493 (10th Cir. 1996); *United States v. Silkowski*, 32 F.3d 682, 689-90 (2d Cir. 1994); *United States v. Jensen*, 608 F.2d 1349, 1355 (10th Cir. 1979); *United States v. Provenzano*, 334 F.2d 678 (2d Cir. 1964); *United States v. Hedman*, 630 F.2d 1184, 1199 (7th Cir. 1980)). The Seventh Circuit noted that *United States v. Bustamante*, 45 F.3d 933 (5th Cir. 1994) and *United States v. DiSalvo*, 34 F.3d 1204 (3d Cir. 1994), may fall into this category as well, though "it is difficult to determine whether they involve offenses that are continuing under the *Toussie* definition, or offenses in which all elements are present within the five-year period." 166 F.3d at 878. A district court in the Fifth Circuit has noted questions about *Bustamante*'s continuing viability after *Yashar*. *United States v. Aubrey*, 53 F. Supp.2d 1355, 1356 (E.D. Tex. 1999).

[31] There are two views as to when an indictment is "found": (1) when it is returned to the magistrate, *see, e.g., United States v. Srulowitz*, 819 F.2d 37, 40 (2d Cir. 1987), and (2) when the grand jury votes to indict the defendant and the foreperson subscribes the bill as a true bill. *United States v. Thompson*, 287 F.3d 1244 (10th Cir. 2002). Regardless of the standard applied, the First Indictment in this case was found on May 17, 2005. *Docs. 1, 2, 3.*

**barred by the five-year statute of limitations.**

Any argument that the government raises to the contrary will fail the hypothetical posed by the Seventh Circuit to the government in *Yashar*. For example, suppose that rather than two $250,000.00 payments, Governor Siegelman and Mr. Scrushy agreed that this alleged "bribe" could be made payable in ten $50,000.00 annual payments. Following the government's logic, the five-year statute would not begin to run until the tenth payment is made, so that the government would have *fifteen years* to bring its indictment rather than the five years expressly stated in the applicable statute of limitations. This certainly is not what Congress intended. According to the government's theory, all of the elements of a violation of 18 U.S.C. § 666(a)(1)(B) occurred on or before July 26, 1999. Accordingly, the Court must acquit Governor Siegelman on this first $250,000.00 payment.

For similar reasons, the statute of limitations requires an acquittal for Governor Siegelman on the second $250,000.00 payment. Again, all of the elements of the "crime" alleged in Count Three (according to the government's allegations) existed on or before July 26, 1999: Mr. Scrushy's alleged offer to pay $500,000.00 in exchange for a seat on the CON Board, Governor Siegelman's alleged acceptance of this offer, and an actual payment in excess of $5,000.00. The second $250,000.00 payment from HealthSouth dated May 18, 2000[32] does not extend the statute of limitations just because *that* payment was arguably made within five years

---

[32]Additionally, the government failed to prove beyond a reasonable doubt that this check was delivered *within* the applicable statute of limitations. Since the First Indictment was found on May 17, 2005, the government must prove that all of the criminal conduct alleged in Count Three occurred, at the very latest, *after* May 17, 2000. The government failed to present specific evidence regarding the date that this second check, dated May 18, 2000, was delivered. Bailey testified that it was delivered "on or about" the date of the check. But, for all the record shows, this check could have been post-dated May 18, 2000 and delivered on May 16, 2000–falling outside even the government's calculation of the statute of limitations.

of the indictment.

For example, assume that on July 14, 1999 (the date the government alleges that Mr. Scrushy and Governor Siegelman reached this unlawful agreement), rather than verbally committing to pay $500,000.00, Mr. Scrushy instead immediately paid $5,000.00 cash and executed a promissory note to the AELF for the remaining $495,000.00. Clearly, in this scenario, the statute of limitations would begin to run upon payment of the statutorily required $5,000.00. No reasonable interpretation of § 666 or the applicable statute of limitations would justify tolling the statute of limitations until the promissory note was completely paid off. However, this is the exact rationale that the government uses in claiming that the statute did not begin to run until the second $250,000.00 payment was made.

The evidence the government offered here does not prove that the § 666(a)(1)(B) offense occurred within the limitations period (much less constitutes such proof beyond a reasonable doubt). That failure of proof mandates Governor Siegelman's acquittal on Count Three.

### CONCLUSION

For at least the foregoing reasons, and for all of the other reasons previously articulated in his prior Rule 29 arguments, Governor Siegelman respectfully requests a judgment of acquittal on Counts Three and Five through Nine.

Respectfully submitted,

s/David A. McDonald
David A. McDonald
Kilborn, Roebuck & McDonald
P.O. Box 832
Mobile, Alabama 36602
Phone: (251) 434-0045
Fax:    (251) 434-0047
E-mail: dam@krmlaw.com

39

s/Vince F. Kilborn, III
Vince F. Kilborn, III
Kilborn, Roebuck & McDonald
P.O. Box 66710
Mobile, Alabama 36606
Phone: (251) 479-9010
Fax:    (251) 479-6747
E-mail: vfk@krmlaw.com

s/George Robert Blakey
George Robert Blakey
University of Notre Dame Law School
Kresge Law Library
P.O. Box R
Notre Dame, IN 46556
Phone: (574) 631-5717
Fax:    (574) 631-4197
E-mail: blakey.1@nd.edu

s/Hiram Chester Eastland, Jr.
Hiram Chester Eastland, Jr.
Eastland Law Offices
107 Grand Boulevard
Greenwood, MS 38930
Phone: (662) 897-0495
Fax:    (662) 453-2808
E-mail: eastlandlaw@bellsouth.net

## CERTIFICATE OF SERVICE

I certify that on August 7, 2006, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to counsel of record.

s/David A. McDonald
David A. McDonald
Kilborn, Roebuck & McDonald
P.O. Box 832
Mobile, Alabama 36602
Phone: (251) 434-0045
Fax:    (251) 434-0047
E-mail: dam@krmlaw.com