**IN THE UNITED STATES DISTRICT COURT FOR
THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| **v.** | ) | |
| | ) | **CRIMINAL NO. 2:05-CR-119-F** |
| **DON EUGENE SIEGELMAN, and** | ) | |
| **RICHARD M. SCRUSHY** | ) | |

<u>**UNITED STATES' RESPONSE TO DEFENDANTS' MOTIONS FOR JUDGMENT OF
ACQUITTAL PURSUANT TO RULE 29(c) OF THE FEDERAL RULES OF CRIMINAL
PROCEDURE**</u>

COMES NOW the United States of America, by and through Louis V. Franklin, Sr., Acting

United States Attorney for the Middle District of Alabama, and Edward Nucci, Acting Chief of the

Public Integrity Section of the Criminal Division of the United States Department of Justice, and

hereby responds to Defendants' Motions for Judgment of Acquittal Pursuant to Rule 29(c) of the

Federal Rules of Criminal Procedure (hereinafter, the "Motions").  This Court should deny the

Motions because the evidence presented at trial was certainly sufficient to sustain Defendants'

convictions, and in fact overwhelmingly established their guilt as found by the jury.  To grant

Defendants' petition to overrule the jury's verdicts, this Court would have to graft additional

elements onto the relevant statutes under which Defendants were convicted and ignore the mountain

of evidence proving their culpability for their criminal actions.  Rather, a review of the law and facts

compels the denial of the Motions.  As support for its position, the United States submits the

following:

**I.      Standard of Review**

In ruling on the Motions, this Court

> "must view the evidence in the light most favorable to the government, and
> determine whether a reasonable jury could have found the defendant guilty

> beyond a reasonable doubt.  The prosecution need not rebut all reasonable hypotheses other than guilt.  The jury is free to choose between or among the conclusions to be drawn from the evidence presented at trial, and the district court must accept all reasonable inferences and credibility determinations made by the jury."

United States v. Miranda, 425 F.3d 953, 959 (11th Cir. 2005) (quoting United States v. Sellers, 871 F.2d 1019, 1021 (11th Cir. 1989) (internal citations omitted in Miranda).  See also Burks v. United States, 437 U.S. 1, 16 (1978) ("The prevailing rule has long been that a district judge is to submit a case to the jury if the evidence and inferences therefrom most favorable to the prosecution would warrant the jury's finding the defendant guilty beyond a reasonable doubt."); United States v. Hernandez, 433 F.3d 1328, 1334 (11th Cir. 2005) ("That [the defendant's] statements and behavior are subject to innocent explanations is also immaterial.  A jury is free to choose among reasonable constructions of the evidence. [The defendant] cannot prevail . . . by repeating his unsuccessful argument to the jury.") (citations and quotations omitted), cert. denied., 126 S. Ct. 1635 (2006).

Defendants' references to circumstantial evidence, see Defendant Scrushy Mot. at 8, and the doctrine of strictissimi juris, see Defendant Siegelman Supp. Mot. at 8-10, are of no moment since the standard of review is the same regardless of the nature and substance of the evidence presented at trial.  United States v. Lyons, 53 F.3d 1198, 1202 (11th Cir.), cert. denied, 516 U.S. 902 and, cert. denied, 516 U.S. 937 (1995); United States v. Forszt, 655 F.2d 101, 103 (7th Cir. 1981) (applying usual Rule 29 standard of review to review sufficiency of evidence for bribery conviction).  Moreover, the same test applies whether the motion for judgment of acquittal is made at the close of the government's case, at the close of all the evidence, or after the jury's return of a guilty verdict.  United States v. Hasson, 333 F.3d 1264, 1270 (11th Cir. 2003), cert. denied, 541 U.S. 1056 (2004)

and cert. denied 543 U.S. 1173 (2005); United States v. Burns, 597 F.2d 939, 941 (5th Cir. 1979).[1]

In making its determination, this Court's role is quite limited for it is not permitted "to weigh the

evidence or assess the credibility of witnesses." Burks, 437 U.S. at 16. See also Hernandez, 433

F.3d 1328.

      The controlling standard of review also narrowly circumscribes the issues this Court can now

consider. "'The sole ground for a post-trial motion under Rule 29(c) is that the evidence was

insufficient to sustain a conviction.'" Miranda, 425 F.3d at 962 (quoting United States v. Fozo, 904

F.2d 1166, 1171 (7th Cir. 1990)). See also, 2A Wright, et.al., Federal Practice and Procedure,

Criminal 3d § 466 (2006) ("There is only one ground for a motion for a judgment of acquittal" –

insufficiency of the evidence). Consequently, this Court must sift through the jumble of Defendants'

assertions and distinguish their allegations of trial errors (e.g., assertions of incorrect jury

instructions) from those of evidentiary insufficiency. The former calls for a determination of

whether "a defendant has been convicted through a judicial process which is defective in some

fundamental respect, e.g., . . . incorrect instructions," and "implies nothing with respect to the guilt

or innocence of the defendant." Burks, 437 U.S. at 15. Such contentions must await a motion for

a new trial pursuant to Rule 33. See, e.g., United States v. Terlingo, Nos. CR. 99-525-06, -07, and

-08, 2001 WL 474407, at *2 (E.D. Penn. Apr. 30, 2001) (noting that the trial court's denial of a

defendant's requested jury instructions should be addressed in a motion for a new trial rather than

in a motion for a judgment of acquittal); United States v. Ellis, 493 F. Supp. 1092, 1098 (M.D.

Tenn. 1979) (noting that any error in the trial court's jury instructions is not a cognizable ground for

---

[1]In Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), the court
adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to the
close of business on September 30, 1981.

a motion for a post-trial entry of a judgment of acquittal), aff'd, 617 F.2d 604 (6th Cir.) (table), cert.

denied, 449 U.S. 840 (1980). See also United States v. Urena, 27 F.3d 1487, 1490 (10th Cir.) ("The

proper basis for a Rule 29(a) motion for judgment of acquittal is a claim of insufficient evidence in

light of the elements of the offense charged.") (emphasis added), cert. denied, 513 U.S. 977 (1994).

The difference in remedy for a finding of a prejudicial trial error versus a finding of

evidentiary insufficiency dictates the difference in procedure for raising these issues. A reversal for

trial error results in a new trial whereas a retrial after a determination of evidentiary insufficiency

would violate a defendant's rights under the Double Jeopardy Clause. Burks, 437 U.S. at 17. See,

e.g., United States v. Markiewicz, 978 F.2d 786, 804 (2d Cir. 1992) (vacating conviction and

remanding for a new trial for failure to charge knowledge as an element of the offense where the

evidence was sufficient to prove that missing element), cert. denied, 506 U.S. 1086 (1993). The

upshot of the foregoing is simply stated – "[t]he jury's verdict must stand unless no trier of fact could

have found guilt beyond a reasonable doubt." Lyons, 53 F.3d at 1202.

A defendant carries a "heavy burden" in challenging the sufficiency of evidence supporting

his convictions. See United States v. McCarrick, 294 F.3d 1286, 1290 (11th Cir. 2002) (noting the

defendant's sufficiency of the evidence burden on appeal); United States v. Evans, 149 F. Supp. 2d

1331, 1336, 1345 (M.D. Fla. 2001) (in considering the defendants' post-trial motions for judgment

of acquittal, the trial court noted that the defendants have the burden to establish that no reasonable

jury could have found them guilty beyond a reasonable doubt), aff'd in part, vacated in part, 344 F.3d

1131 (11th Cir. 2003). See also United States v. Irving, 452 F.3d 110, 119 (2d Cir. 2006) (in holding

that the trial court did not err in denying the defendant's Rule 29 motion, the court noted that the

defendant did not meet his "weighty" burden); United States v. Jackson, 335 F.3d 170, 180 (2d Cir.

2003) (noting that a defendant who, pursuant to Rule 29, challenges the sufficiency of the evidence supporting his conviction bears a heavy burden); <u>United States v. Ozsusamlar</u>, No. S1 05 CR 1077(PKL), 2006 WL 2051117, at *3 (S.D. N.Y. July 20, 2006) (noting that the defendant's burden to persuade the trial court that no rational trier of fact could have found the elements of the offense charged beyond a reasonable doubt is a "'very heavy burden'") (quoting <u>United States v. Scarpa</u>, 913 F.2d 993, 1003 (2d Cir. 1990)) (internal quotations omitted).

## II.    Defendants Have Failed to Carry Their Burden that the Evidence was Insufficient to Sustain Their Convictions

Despite their protestations to the contrary, Defendants have failed to carry their burden of showing that the evidence was insufficient to sustain their convictions.  The jury convicted Defendant Siegelman on Counts Three, Five, Six through Nine, and Seventeen for violating 18 U.S.C. §§ 666(a)(1)(B), 371, 1341 & 1346, & 1512(b)(3), respectively.  The jury convicted Defendant Scrushy on Counts Four, Five, and Six through Nine for violating 18 U.S.C. §§ 666(a)(2), 371, & 1341 & 1346, respectively.  As discussed more fully <u>infra</u>, the evidence presented at trial was unquestionably sufficient to establish Defendants' guilt for these crimes.

In the Motions, Defendants quote and cite extensively to unofficial transcripts of the proceedings at trial.  Defendants do not reveal the source of these transcripts, but in no way intimate that they are the official record of the proceedings.  Defendant Scrushy makes the only reference to the origin of these transcripts, describing them as a "rough draft" provided to his counsel by an unidentified person.  Defendant Scrushy Mot. at 9 n.2.  This Court, as it has previously stated at trial, is precluded from relying upon any transcript of the proceedings other than the official transcript prepared by the Court's reporter.  28 U.S.C. § 753(b) ("No transcripts of the proceedings of the court

shall be considered as official except those made from the records certified by the reporter or other individual designated to produce the record."). This Court, therefore, should disregard Defendants' use of these unofficial transcripts and not rely upon them in rendering its decision on the Motions.

### A.      Defendants Have Failed to Carry Their Burden that the Evidence was Insufficient to Sustain Their Convictions on Counts Three Through Nine

Counts Three through Nine of the second superseding indictment charge offenses arising out of Defendants' unlawful actions involving the CON Board. Though variously couched, the vast majority of Defendants' arguments for judgment of acquittal can be distilled to a single assertion – that each statute charged in Counts Three through Nine requires proof of an explicit quid pro quo and that no reasonable jury could have made such a finding based on the evidence presented at trial. See Defendant Scrushy Mot. at 25. Defendants' cornerstone argument is not supported by the law nor the facts, and consequently, the Motions are without foundation and due to be rejected. Defendants' other miscellaneous arguments (e.g., statute of limitations, mailing in furtherance of the honest services fraud scheme) are similarly flawed in law and fact. Simply stated, Defendants are not entitled to the extraordinary remedy they seek; rather, the jury's verdicts must stand.

Defendants' cornerstone argument of a specific quid pro quo element for the statutes of Federal Program Bribery (18 U.S.C. § 666), Conspiracy (18 U.S.C. § 371), and Honest Services Mail Fraud (18 U.S.C. §§ 1341 and 1346) is based on their assertion that the $500,000 in payments from Defendant Scrushy to Defendant Siegelman were legitimate campaign contributions. According to Defendants, based on their reading of McCormick v. United States, 500 U.S. 257 (1991), the presence of purported campaign contributions in a public corruption case automatically grafts a Hobbs Act quid pro quo element onto every statute charged in the indictment . See Defendant

Siegelman Supp. Mot. at 14. Consequently, the government, Defendants claim, was required to prove a Hobbs Act explicit quid pro quo between Defendants Siegelman and Scrushy -- that is that Defendants had a specific agreement that in exchange for Defendant Scrushy's hidden payments, Defendant Siegelman would provide him with influence over the CON Board.

Defendants' cornerstone argument, and consequently, the Motions, fail on legal and factual grounds. First, the statutes for which the jury convicted Defendants do not require the Hobbs Act's formulation of a quid pro quo element, especially so in this case where the payments from Defendant Scrushy to Defendant Siegelman were not remotely qualified as legitimate campaign contributions. Second, even if the statutes charged required proof of a Hobbs Act quid pro quo element (which they do not), the evidence presented at trial established such an agreement between Defendants. Without question, a rational juror hearing the evidence presented at trial could conclude beyond a reasonable doubt that Defendants had a specific agreement that Defendant Siegelman and Defendant Scrushy would provide HealthSouth with membership on, representation at, and influence over the CON Board in exchange for Defendant Scrushy's fraudulent, concealed, and corrupt payments of $500,000. As a result, this Court should deny the Motions.

## 1. Federal Program Bribery Does Not Require Proof of a Hobbs Act Formulation of a Quid Pro Quo Element

Defendants argue that proof of a Hobbs Act quid pro quo is required to sustain a conviction under 18 U.S.C. § 666, where as here (they claim), the monies received by the agent of State government were campaign contributions. See Defendant Siegelman Supp. Mot. at 20. In short, Defendants are urging this Court to import the specialized jurisprudence of the Hobbs Act as announced in McCormick to the completely separate realm of Section 666, the offense charged in

Counts Three and Four.

In making their arguments, Defendants disregard the differences in purpose, scope, and statutory language between Section 666 and 18 U.S.C. § 1951 – the particular statute the Supreme Court addressed in McCormick and the appellate courts discussed in the cases upon which Defendants rely.  See Defendant Siegelman Supp. Mot. at 14-17 (citing to the Courts' discussions of the Hobbs Act in McCormick, Davis II, Martinez, and Allen to justify his quid pro quo argument); Defendant Scrushy Mot. at 7-8 (relying upon McCormick and Carpenter – Hobbs Act cases – to support his theory).  Defendants ask this Court to rewrite Section 666 to require a Hobbs Act quid pro quo by analogizing their facts with the plight of the defendant in McCormick, and claiming that this Court's failure to do so will criminalize the financing of election campaigns via private contributions.  Defendants' attempt to bootstrap to McCormick and its progeny fails, however, because of the legal and factual differences between McCormick and the instant case.

The Supreme Court in McCormick was divining the meaning of "under color of official right" in Section 1951, and was concerned about permitting a conviction where there was no connection, other than a generalized hope of benefit, between the giving of a campaign contribution and an act of official discretion.  See McCormick, 500 U.S. at 273 (defining "under color of official right" in Section 1951 in the context of campaign contributions).  The words and context of Section 666 are completely distinct from the statute in McCormick.  Section 666 is a statute containing no nebulous term of art such as "under color of official right," and it clearly defines the conduct penalized.  The Section 666 offenses charged in Counts Three and Four criminalize only those actions performed "corruptly" and "in connection with" particular business or transactions of the State government.  18 U.S.C. § 666(a).  Thus, by its express terms, Section 666 does not proscribe

completely innocent conduct, such as the giving of a legitimate campaign contribution with the mere hope of benefit untethered from any plausibly criminal intent.

The Section 666 intent element of "corruptly" requires the jury, as it was charged in this case, to find that Defendants acted "voluntarily, deliberately and dishonestly for the purpose of <u>either</u> accomplishing an unlawful end or result <u>or</u> of accomplishing some otherwise lawful end or lawful result by an unlawful method or means."[2] Court's Revised Jury Instructions at 41.  <u>Accord</u> Eleventh Circuit Pattern Jury Instructions 24.  In addition, the language of the statute demands that the jury find, like it did in this case, that the corrupt giving or accepting of "anything of value" was  "in connection with" a business or transaction of the State government.  18 U.S.C. § 666(a).  The language of Section 666 itself thus provides the link between the payment of money to the public official and the official action.  Moreover, this Court further clarified the requirements under the express terms of the statute by charging that "[a] Defendant does not commit a crime by giving something of value to a government official unless the Defendant and official agree that the official will take specific action in exchange for the thing of value."  Court's Revised Jury Instructions at 41.

Certainly, this jury did not convict Defendants for engaging in the innocent act the Supreme Court was seeking to protect in <u>McCormick</u>:  the giving of a campaign contribution with the mere hope of some future, uncertain benefit from the public official.  Rather, as discussed <u>infra</u>, the jury found that Defendants had entered into an agreement under which Defendant Scrushy would give Defendant Siegelman $500,000 in connection with the appointment of Defendant Scrushy to the CON Board.  Simply stated, Congress, in the drafting of Section 666, has already addressed and

---

[2]The conclusion that the "corrupt" element of Section 666 cabins the reach of the statute to criminal conduct is supported by the Supreme Court's noting that "corrupt" means "wrongful, immoral, depraved, or evil." <u>Arthur Anderson v. United States</u>, 544 U.S. 696, 705 (2005).

alleviated the concerns Defendants raise to mislead this Court into transplanting the Hobbs Act's quid pro quo element into Section 666.

Not surprisingly, given the language of the statute and the legislative purpose behind it ("to protect the integrity of the vast sums of money distributed through federal programs from theft, fraud, and undue influence by bribery," United States v. Castro, 89 F.3d 1443, 1454 (11th Cir. 1996)), cert. denied, 519 U.S. 1118 (1997), the Eleventh Circuit has never incorporated a Hobbs Act formulation of a quid pro quo into Section 666. Cf. United States v. Woodall, No. 04-00472-CR-LSC-PWG, 2006 WL 700933 (11th Cir. March 21, 2006) (unpublished) (holding that the jury was properly instructed based on the terms of Section 666). At most, the Eleventh Circuit has noted that in certain cases the proof adduced against the defendant was sufficient to support the conviction under Section 666 assuming arguendo that proof of a quid pro quo was required. See United States v. Paradies, 98 F.3d 1266, 1289 (11th Cir. 1996) (concluding that the evidence "would satisfy any quid pro quo requirement under the statute," but declining to hold that Section 666 actually has such a requirement), cert. denied, 521 U.S. 1106 and cert. denied, 522 U.S. 1014 (1997). Rather, in Castro, the Court stated that to prove a violation of Section 666(a)(2) the government must prove beyond a reasonable doubt that the defendant "(1) gave or offered to give a thing of value to any person (2) with the corrupt intent to influence or reward an agent of an organization that in a one-year period received benefits in excess of $10,000 under a federal program (3) in connection with any business transaction or series of transactions of such organization, government, or agency involving anything of value of $5,000 or more." 89 F.3d at 1454. Similarly, to convict under Section 666(a)(1)(B), the same elements must be met except that the first element would then require proof that the defendant solicited, demanded for the benefit of any person, or accepted or agreed to accept,

-10-

anything of value from any person.  See 18 U.S.C. § 666(a)(1)(B).  At no time has the Eleventh

Circuit adopted a Hobbs Act formulation of a quid pro quo element for Section 666.

The Seventh Circuit has furthered expressly held that Section 666 does not have a quid pro

quo element.  In United States v. Gee, 432 F.3d 713 (7th Cir. 2005) (Easterbrook, J.), cert. denied,

126 S. Ct. 1925 (2006), the defendant argued that the evidence was insufficient to support his

conviction because the lack of proof of a quid pro quo, that is "that the evidence does not establish

any specific act that [the public official] took in response to any specific payment."  Id. at 714.  In

particular, the defendant contended that "the absence of a quid pro quo prevents conviction."  Id.

The Seventh Circuit succinctly responded that

> the statute does not require any such link.  A quid pro quo of money for a specific
> legislative act is sufficient to violate the statute, but it is not necessary.  It is enough
> if someone "corruptly solicits or demands for the benefit of any person, or accepts
> or agrees to accept, anything of value, from any person, intending to be influenced
> or rewarded in connection with any business, transaction, or series of transactions of
> such organization, government, or agency involving any thing of value of $5,000 or
> more."

Id. at 714-15.

The Seventh Circuit's decision in Gee follows consistently from its earlier decision in United

States v. Agostino, 132 F.3d 1183 (7th Cir. 1997), cert. denied, 523 U.S. 1079 (1998), wherein the

Court clarified its opinion in United States v. Medley, 913 F.2d 1248 (7th Cir. 1990) – a case upon

which Defendants erroneously rely for the proposition that the Eleventh Circuit in Paradies, 98 F.3d

1266, adopted the Seventh Circuit's position that Section 666 has a quid pro quo element.  See

Defendant Scrushy Mot. at 7.  The Seventh Circuit in Agostino made clear that Medley did not hold

that a quid pro quo was "an additional element to the statutory definition of the crime."  Agostino,

132 F.3d at 1190.  Instead, the Medley Court was merely recognizing that a quid pro quo was a sine

qua non violation of Section 666. Id. at 1190. The Court expressly declined "to import an additional, specific quid pro quo requirement into the elements of § 666(a)(2)." Thus, the Seventh Circuit, like the Eleventh Circuit, reads not a Hobbs Act quid pro quo formulation into the elements of Section 666.

### 2. The Evidence Was Sufficient to Sustain Defendants' Convictions For Counts Three and Four Under 18 U.S.C. § 666

The evidence presented at trial was sufficient to sustain the jury's verdicts that Defendants violated Section 666. The evidence established each element of both Section 666(a)(1)(B) and Section 666(a)(2) as delineated supra. The facts also belie Defendants' attempt to portray the $500,000 from Defendant Scrushy as legitimate campaign contributions. Moreover, even assuming arguendo that Section 666 requires proof of a Hobbs Act quid pro quo (which it does not as discussed supra), the Court's instruction (the propriety of which is not an issue to be now considered) required the jury to find and the evidence at trial established beyond a reasonable doubt that Defendants had an agreement whereby Defendant Siegelman would appoint Defendant Scrushy to the CON Board in exchange for Defendant Scrushy's payment of $500,000. A review of all the evidence, as distinguished from the snippets of testimony referenced by Defendants, eviscerates Defendants' petition for this Court to overturn the jury's verdicts on Counts Three and Four.

To the extent Defendants challenge the nature of the government's evidence (i.e., direct versus circumstantial), see Defendant Scrushy Mot. at 8, the Eleventh Circuit has already foreclosed sufficiency challenges based on this premise. United States v. Massey, 89 F.3d 1433 (11th Cir. 1996), cert. denied, 519 U.S. 1127 (1997). In rejecting a sufficiency challenge for a conviction under Section 666(a)(2), the Eleventh Circuit noted that the defendant incorrectly assumed "that the

government must produce direct evidence of a verbal or written agreement in order for this court to sustain the bribery conviction." Id. at 1439.

> Direct evidence of an agreement, however, is unnecessary: proof of such an agreement may rest upon inferences drawn from relevant and competent circumstantial evidence. To hold otherwise would allow defendants to escape liability with winks and nods, even when the evidence as a whole proves that there has been a meeting of the minds to exchange official action for money.

Id. (citations and quotations omitted).

The evidence adduced at trial was sufficient to sustain the jury's verdicts as to Counts Three and Four. Upon information and belief, the United States recounts the following evidence, which though not exhaustive of all the evidence supporting the jury's verdict, conclusively shows that a reasonable jury could have found Defendants guilty beyond a reasonable doubt of violating Section 666 as charged in the indictment. Nick Bailey testified that he was Defendant Siegelman's confidential assistant and executive secretary during the time of the offenses. Bailey testified that Defendant Scrushy had supported Defendant Siegelman's opponent during the 1998 gubernatorial election in the amount of $350,000 and that Defendants were not great friends. Bailey testified that after Defendant Siegelman was sworn in as governor, but before he had made any appointments to the CON Board, Bailey overheard a conversation between Eric Hanson, Defendant Scrushy's outside corporate lobbyist, and Defendant Siegelman. During this conversation Defendant Siegelman told Hanson that Defendant Scrushy had given $350,000 to Defendant Siegelman's opponent and that given that amount with interest, it would take about $500,000 for Defendant Scrushy to "get right" with Defendant Siegelman.

Bailey further testified that subsequent to this conversation he was aware of one and possibly two meetings between Defendants. Bailey testified that on or about July 19, 1999, he saw Defendant

-13-

Siegelman in the Governor's office holding a check in the amount of $250,000 drawn on the account of Integrated Health Services (IHS), a Maryland corporation. Defendant Siegelman, referring to the IHS check, told Bailey "He's halfway there." Bailey then said, "What in the world is he going to want for that?" Defendant Siegelman responded "The CON Board." Bailey asked "That won't be a problem, will it?" and Defendant Siegelman replied, "I wouldn't think so." Bailey also testified that he saw Defendant Siegelman with the IHS check and had this conversation with Defendant Siegelman prior to Defendant Siegelman appointing Defendant Scrushy to the CON Board. Bailey also testified that prior to Defendant Siegelman appointing Defendant Scrushy to the CON Board, he talked to Defendant Siegelman about his reasons for appointing Defendant Scrushy to, and making him vice-chair of, the CON Board. Defendant Siegelman told Bailey and that the basis for these officials actions by Defendant Siegelman were Defendant Siegelman's and Bailey's conversations with Hanson during which Hanson told them that Defendant Scrushy wanted these actions in exchange for the $500,000 to Defendant Siegelman.

Mike Martin corroborated Bailey's testimony about the agreement between Defendants (i.e., that Defendant Scrushy pay $500,000 to Defendant Siegelman and in return Defendant Siegelman would give HealthSouth membership on, representation at, and influence over the CON Board). Martin testified that he was the Chief Financial Officer of HealthSouth and that Defendant Scrushy involved him in obtaining the money from IHS that was to be paid to Defendant Siegelman. Defendant Scrushy told Martin that obtaining the money from IHS was time sensitive and that he (Scrushy) needed to hand deliver the check to Defendant Siegelman immediately upon its receipt. Martin testified that it was his understanding that Defendant Scrushy personally delivered the IHS check to Defendant Siegelman. Martin testified that he threatened an investment banking company

-14-

that did business with HealthSouth to obtain the money that Defendant Scrushy wanted – action that Martin believed was immoral, unethical, and possibly illegal.  Martin further testified that Hanson bragged that he was able to get HealthSouth representation on the CON Board via the IHS check. Martin stated flatly that based on his conversations with Defendant Scrushy and Hanson he knew that the IHS check given by Defendant Scrushy to Defendant Siegelman was in exchange for HealthSouth having a spot on the CON Board.  Martin testified that Defendant Scrushy told him that if Defendant Scrushy gave the money to Defendant Siegelman, then Defendant Siegelman had assured HealthSouth a seat on the CON Board.

Lori Skelton testified that she was the HealthSouth employee responsible for CON Board matters and also was the key person for managing HealthSouth's political contributions.  Skelton testified Defendant Scrushy never informed her about either of the $250,000 payments Defendant Scrushy made to Defendant Siegelman.  Skelton also testified that having representation on the CON Board was important to HealthSouth because of the effect the CON Board had on healthcare providers in the State of Alabama.

Even this brief recount of some of the evidence presented at trial demonstrates clearly that for the $500,000 to Defendant Siegelman, Defendant Scrushy procured HealthSouth membership on, representation at, and influence over the CON Board as shown by Defendant Scrushy's and Thomas Carmen's appointments to the CON Board, Defendant Scrushy's appointment as vice chairman, and the ability to use his position on the CON Board to influence at least one other CON Board member to affect HealthSouth's and its competitors' interests.

In his Motion, as at trial, Defendant Scrushy continues to argue about, and place great weight upon, the exact date that Defendant Scrushy delivered the IHS check to Defendant Siegelman.

Defendant Scrushy, then and now, fails to comprehend that the actual date of delivery, and the actual courier, of the IHS check had only a minimal and tangential bearing on the clarity of Bailey's memory of the events surrounding Defendants' arrangement concerning the CON Board. At trial, Bailey testified that one of two things occurred surrounding the delivery of the IHS check – either Defendant Scrushy delivered the check the same day Defendant Siegelman showed the IHS check to Bailey, or Bailey was confused and it was after Defendant Scrushy visited Defendant Siegelman that Defendant Siegelman showed him the IHS check. Regardless of the scenario, Bailey was very clear that Defendant Siegelman appointed Defendant Scrushy to the CON Board after receiving the IHS check from Defendant Scrushy. At trial, Defendants argued unsuccessfully to the jury that because HealthSouth flight logs only showed Defendant Scrushy on one plane trip to Montgomery on June 29, 1999, that Defendant Scrushy could not have delivered the IHS check; therefore, Bailey's testimony should be disregarded because he was unsure about the exact details concerning when he saw Defendant Siegelman with the IHS check.

Though Defendant Scrushy dogmatically clings to his theory of the case, the jury could have easily, and did, reject his version of the facts. The jury could have reasonably found that Defendant Scrushy met with Defendant Siegelman on more than one occasion, and/or that Defendant Scrushy did not fly on the HealthSouth helicopter when Bailey saw Defendant Scrushy at the governor's office, and/or that Bailey saw Defendant Scrushy at the governor's office earlier than the date of the delivery of the IHS check and that a person other than Defendant Scrushy delivered the IHS between July 19, 1999, the date of the IHS check, and June 26, 1999, the date Defendant Siegelman appointed Defendant Scrushy to the CON Board.

The evidence at trial clearly established the agreement between Defendants for HealthSouth

to have membership on, representation at, and influence over the CON Board in exchange for Defendant Scrushy's "colossal" payment of money to Defendant Siegelman. Without question, Defendant Scrushy was responsible for the circuitous, extortionate, and completely nefarious, manner in which the $250,000 IHS check was generated and for the second non-disclosed installment of $250,000 from HealthSouth. The IHS check was delivered from Defendant Scrushy to Defendant Siegelman as they agreed and within days of such delivery, Defendant Siegelman appointed Defendant Scrushy to the CON Board. Testimony at trial informed the jury that Defendant Siegelman went to extraordinary efforts to hide from the public his receipt of the IHS and HealthSouth checks by violating Alabama's Fair Campaign Practices Act. Defendant Siegelman did not report his receipt of the monies he received from Defendant Scrushy until contacted by the Alabama Attorney General's Office more than two years after the statutorily-mandated reporting deadline. Defendant Siegelman further showed his criminal intent and guilt by lying to his professional fundraising chairman Darrin Cline. Defendant Siegelman told Cline that he was going to return the IHS check to its issuer and not use it, when in fact Defendant Siegelman took the IHS check, deposited it in a secret bank account in another city before ultimately using it to pay off a loan for which he was personally liable as a guarantor. Defendants' efforts to conceal and disguise the payment of $500,000 from Defendant Scrushy to Defendant Sigelman are compelling evidence of their knowledge of the criminal nature of their activities and their intent to commit criminal offenses, including violations of Section 666.

Defendant Siegelman's contention that he must have personally benefitted from the $500,000 for it to be a thing of value under Section 666 is both legally and factually flawed. See Defendant Siegelman Supp. Mot. at 28. First, the thing of value referenced in Section 666 may be corruptly

solicited or demanded for the benefit of "<u>any</u> <u>person</u>," 18 U.S.C. § 666(a)(1)(B), or given or offered to "<u>any</u> <u>person</u>." 18 U.S.C. § 666(a)(2).  It is thus wholly and completely immaterial to either Defendant's guilt if the money at issue was solicited or received for the personal benefit of Defendant Siegelman.  The money at issue can be solicited for or received by any other person, third party, or entity, even a wholly disinterested, guiltless person, third party, or entity, who is completely unconnected to transactions for which a state agent is to be "influenced or rewarded."  This rule of law is clear on the face of the statute.  The United States is unaware of any case where a court has ruled otherwise.  <u>See</u>, <u>e.g.</u>, <u>United States v. Moeller</u>, 80 F.3d 1053, 1057 (5th Cir. 1996) (upholding convictions of state employees under Section 666(a)(1)(B) where the defendants had granted sham contracts to compensate third parties for raising campaign contributions for one of the defendants as well as a non-defendant).

Second, a review of the facts shows that Defendant Siegelman did benefit from the $500,000 payments made by Defendant Scrushy since the IHS and HealthSouth checks were both used by Defendant Siegelman to pay down the $730,000 debt for which he was personally liable as a guarantor.  <u>See</u> <u>United States v. Marmolejo</u>, 89 F.3d 1185, 1191-92 (5th Cir. 1996) (stating that Section 666 covers tangible and intangible things of value), <u>aff'd</u> <u>sub</u> <u>nom</u>. <u>Salinas v. United States</u>, 522 U.S. 52 (1997).  <u>See also</u> <u>United States v. Nilsen</u>, 967 F.2d 539, 542-43 (11th Cir. 1992) (discussing 18 U.S.C. § 876, but declaring that "thing of value" is a term of art used in various criminal statutes that covers both tangibles and intangibles), <u>cert</u>. <u>denied</u>, 507 U.S. 1034 (1993).

Defendant Siegelman's argument that the jury's conviction on Count Three must be set aside on statute of limitations grounds is equally unavailing.  It is well-established that the expiration of the limitations period is an affirmative defense and, as such, is waived if not timely asserted before

or at trial.  See United States v. Najjar, 283 F.3d 1306, 1308 (11th Cir.) (holding that the statute of limitations is a defense that must be asserted at trial) (citing Capone v. Aderhold, 65 F.2d 130, 131 (5th Cir. 1933)), cert. denied, 537 U.S. 823 (2002).  See also United States v. Walsh, 700 F.2d 846, 856 (2d Cir. 1983) (the statute of limitations is not an element of the offense charged), cert. denied, 464 U.S. 825 (1983).  Other circuits that have considered this issue have also concluded that the expiration of the statute of limitations is an affirmative defense that a defendant waives if not timely asserted.  283 F.3d at 1308-09, and cases cited therein.  See, e.g., United States v. Jockish, No. 04-14723, 2005 WL 3445579, at * 3 (11th Dec. 16, 2005) (in declining to address the issue of whether specific counts were time-barred, the court treated it as a challenge to the indictment that was waived because it was not raised in a Rule 12(b) motion) (unpublished); United States v. Daniels, No. 04-10439, 2005 WL 1395065, at *5 (11th Cir. June 14, 2005) (the court construed the defendant's claim in his motion for a new trial asserting a defect in the indictment – that it included time outside the applicable period of limitations – as a statute of limitations defense that should have been asserted at trial and was thus waived) (unpublished), cert. denied, 126 S. Ct. 466 (2005); United States v. Ramirez, 324 F.3d 1225, 1227-28 (11th Cir.) (in construing a previous version of Rule 12, not substantially different from the current version, the court concluded that a limitations defense raised for the first time during trial, in a Rule 29 motion made after opening statements, was waived because it was should have been asserted in a Rule 12(b) motion), cert. denied, 540 U.S. 881 and cert. denied, 540 U.S. 928 (2003).

The Fifth Circuit Court of Appeals, in United States v. Arky, 938 F.2d 579 (5th Cir. 1991), cert. denied, 503 U.S. 908 (1992), rejected the appellant's argument that the evidence was insufficient to prove that any overt act within the scope of the conspiracy occurred within the

applicable statute of limitations by treating it as an assertion of the affirmative defense for the first time on appeal.  Id. at 583.  In holding that a defendant must affirmatively assert a limitations defense at trial, the court reasoned that "if the limitations defense is not jurisdictional, as [that court] held in Aderhold, then it is difficult to conceive why it alone, of all the defendant's affirmative defenses, should not be waived if not asserted at trial."  Id. at 582.  Thus, the affirmative defense of expiration of the statutes of limitations must be asserted at the first appropriate opportunity – before or at trial, see Ramirez, 324 F.3d at 1228 ("we recognize that there may be times when a statute of limitations defense cannot be raised before trial because the development of facts pertaining to that defense is necessary"), but not after the jury has retired to reach a verdict.  In United States v. Yashar, 166 F.3d 873 (7th Cir. 1999), the case upon which Defendant Siegelman primarily relies, the defendant, unlike Defendant Siegelman here, properly presented the limitations issue in a motion to dismiss the indictment.  Id. at 875.

Because Defendant Siegelman did not likewise present his claim in a Rule 12 motion to dismiss the indictment, his post-verdict assertion of the expiration of the limitations period as a ground for acquittal in regard to Count Three is not cognizable.

### B. Defendants Have Failed to Carry Their Burden that the Evidence was Insufficient to Sustain Their Convictions on Counts Five and Six Through Nine Under 18 U.S.C. §§ 371 & 1341 & 1346

The jury convicted Defendants of Counts Five (Conspiracy under Section 371) and Six through Nine (Honest Services Mail Fraud) based on their unlawful actions involving the CON Board.  As in their assertions under Section 666, Defendants claim that the evidence was insufficient to sustain their convictions on these Counts because each offense requires proof of the Hobbs Act formulation of an explicit quid pro quo, and such proof was lacking at trial.  Once again, Defendants'

contentions are flawed in law and fact.  The law does not require proof of the Hobbs Act's explicit quid pro quo element to establish a violation of either a conspiracy to commit honest services mail fraud under Section 371 or honest services mail fraud under Sections 1341 and 1346.  As set forth above and below, the evidence presented at trial was more than sufficient to prove each element of the conspiracy and honest services mail fraud offenses, and was further sufficient even assuming <u>arguendo</u> that the government was required to prove an explicit quid pro quo element above and beyond the elements of the statute.

> **1.     Neither Conspiracy nor Honest Services Mail Fraud Requires Proof of a Hobbs Act Quid Pro Quo Formulation**

As they attempt under Section 666, Defendants would lead this Court to extend the specific interpretation of the Hobbs Act in <u>McCormick</u> to the wholly different statutory context of honest services mail fraud charged in Counts Five through Nine of the indictment.  Counts Six through Nine charge mailings in violation of the honest services mail fraud statute, 18 U.S.C. Sections 1341 and 1346, and Count Five charges conspiracy to violate that statute.  18 U.S.C. § 371.  Defendants, however, ignore the significantly different scope and purpose of the honest services fraud statute and its elements versus "extortion ... under color of official right," which was at issue in <u>McCormick</u>. By again insisting on this fundamental error in analysis for mail fraud, just as they do for federal program bribery, they incorrectly demand the incorporation of the Hobbs Act's quid pro quo element into Sections 1341 and 1346.

<u>McCormick</u> presented the Supreme Court with a statute and instructions under the Hobbs Act that created criminal liability for conduct without any element of criminal intent, which would reach routine conduct that no person would believe to be criminal, and which Congress plainly did not

intend to punish. Accordingly, the Supreme Court interpreted the statute to require a particular formulation of a quid pro quo element that would sufficiently evince criminal intent. Under Sections 1341 and 1346, however, a defendant is guilty of an offense only "having devised or intending to devise ... a scheme or artifice to defraud ... includ[ing] a scheme or artifice to deprive another of the intangible right of honest services." Mailings in furtherance of such an intentional scheme are felonies wholly independent of the specific text, elements, and history of the specific Hobbs Act provision that was carefully parsed by the Court in <u>McCormick</u> and in <u>Evans v. United States</u>, 504 U.S. 255 (1992).

Specifically, and in sharp contrast to the Hobbs Act, the mail fraud statute requires as elements "First: That the Defendant knowingly devised or participated in a scheme to fraudulently deprive the public of the intangible right of honest services, as charged; Second: That the Defendant did so willfully with an intent to defraud ... ." Court's Instructions at 26-27; <u>accord</u> Eleventh Circuit Pattern Criminal Jury Instruction 50.2 (2003). Nor did this Court give these elements short shrift, but rather reiterated and expanded upon their importance several times in accord with the Eleventh Circuit's pattern instructions and going even further to state that "You are further instructed ... that you must find <u>not only</u> that the Defendants intended to deprive the public of their honest services <u>but also</u> that they intended to deceive the public <u>and</u> that they intended to alter their official actions as a result of the receipt of campaign contributions or other benefits." Court's Instructions at 28.

These elements, which are present on the face of the statute and which the Court pointedly presented to the jury, were entirely missing from the term "extortion under color of official right" and from the jury instructions at issue in <u>McCormick</u>. They obviate the unavoidable need in <u>McCormick</u> and <u>Evans</u> to interpret the words in Section 1951 so that they could not reach innocent

actors intending only routine campaign contributions without any element of specific intent. Sections 1341 and 1346 are replete with such elements as Congress has already written them and as this Court instructed the jury. Accordingly, there is no need to redundantly engraft the specific Hobbs Act formulations of a quid pro quo element onto the mail fraud statute to meet the concerns of the <u>McCormick</u> Court, and this Court should not attempt to do so.

Further, the Eleventh Circuit has expressly recognized the understanding of honest services mail fraud on which this case and this Court's instructions are premised. In <u>United States v. Hasner</u>, 340 F.3d 1261, 1270-73 (11th Cir. 2003), <u>cert</u>. <u>denied</u>, 543 U.S. 810 (2004), the court expressly held the evidence sufficient for honest services mail fraud where a public servant takes official action without disclosing material information such as a financial agreement, and where the public official and his co-schemer take steps to conceal their financial relationship. <u>See</u> <u>also</u> <u>United States v. Waymer</u>, 55 F.3d 564, 572 (11th Cir.1995) (withholding material information), <u>cert</u>. <u>denied</u>, 517 U.S. 1119 (1996).

Moreover, the scope and purpose of Sections 1341 and 1346 have been further explored on similar facts by the First Circuit, which, relying on leading Eleventh Circuit precedent, has explained repeatedly that Section 1346 reaches violations of duty by public officials acting with fraudulent intent and without the Hobbs Act formulation of quid pro quo as an additional element. In <u>United States v. Sawyer</u>, 239 F.3d 31 (1st Cir. 2001), the court held that evidence of a lobbyist's pay-for-play scheme to influence legislators with gratuities, which were not tied to official acts by any quid pro quo agreement, was sufficient to show a violation within the scope of Section 1346. In reaching this holding, the court first noted the expansive intent of Congress in enacting Section 1346, and rejected an inapposite  analogy (much like the one advanced by Defendants in this case) between Section

-23-

1346 and a much narrower statute for federal bribery and gratuities, 18 U.S.C. § 201, as interpreted

by the Supreme Court in United States v. Sun Diamond Growers, 526 U.S. 398 (1999).  It then

expressly relied on the Eleventh Circuit's reasoning (which closely tracked this Court's ultimate jury

instruction) in holding that public officials owe citizens a duty  of "honesty and loyalty," and that

> [t]heft of honest services occurs when a public official strays from this duty: "When
> a government officer decides how to proceed in an official endeavor ... his
> constituents have a right to have their best interests form the basis of that decision.
> If the official instead secretly makes his decision based on his own personal interests
> – as when an official accepts a bribe or personally benefits from an undisclosed
> conflict of interest – the official has defrauded the public of his honest services."
> United States v. Lopez-Lukis, 102 F.3d 1164, 1169 (11th Cir. 1997).

Sawyer, 239 F.3d at 39.  See also United States v. Woodward,149 F.3d 46 (1st Cir. 1998) (dual intent

to influence official and to cultivate friendship will support Section 1346 conviction), cert. denied,

525 U.S. 1138 (1999).

Defendants, however, would artificially narrow Section 1346 to the confines of one element

of the Hobbs Act, much as defendant Sawyer unsuccessfully sought to narrow it to the confines of

Section 201.  In the absence of any precedent on point, let alone binding precedent in this Court,

Defendants nevertheless argue that the explicit quid pro quo element as formulated for Hobbs Act

campaign contribution cases should be imported wholesale into the mail fraud statute.  In light of

the clear roots of McCormick, Evans, and every other circuit precedent in the specific context of the

Hobbs Act and bribery law, Defendants' authority for this construction reduces to their own policy

views together with one pre-trial decision in a district court of another circuit, United States v.

Warner, No. 02 CR 506 2005 WL 2367769 (N.D. Ill. September 23, 2005) -- which actually holds

simply that non-campaign contribution violations have no quid pro quo element under Section 1346.

As the Eleventh Circuit reasoned in Hasner and Lopez-Lukis, Section1346 protects intangible

-24-

rights to the performance of duties free from fraudulently intended schemes that utilize hidden or conflicting interests of public officials. This Court should reject Defendants' attempt to substitute their policy assertions for the judgment of Congress in enacting Sections 1341 and 1346, and this Court may rely on the cogent analyses of the Eleventh and First Circuits in holding that there is no Hobbs Act quid pro quo requirement for fraudulently and deceitfully concealed payments and conflicts of interest of public officials, whether particular transactions are denominated as campaign contributions or not.

### 2. The Evidence Was Sufficient to Sustain Defendants' Convictions for Counts Five and Six Through Nine

As discussed above and below, the evidence was more than sufficient to show that Defendants' scheme fraudulently concealed hidden financial interests and motives of each other and of other CON Board members. As charged in the indictment, this scheme was to

> deprive the State of Alabama of its right to the honest and faithful services of DON EUGENE SIEGELMAN and RICHARD M. SCRUSHY in their capacities as Governor of the State of Alabama and a member of the CON Board, respectively, as well as other members of the CON Board, performed free of deceit, favoritism, bias, self-enrichment, self-dealing, and conflict of interest concerning the CON Board to give HealthSouth membership on and representation at the CON Board and to allow HealthSouth to exert influence over the CON Board.

As the Court will recall (and as the record will reflect when it becomes available), the evidence included proof of $500,000 in elaborately concealed payments by Defendant Scrushy to Defendant Siegelman pursuant to the scheme, which were eventually deposited to another entity than the purported "campaign" fund at issue, and applied to relieve Defendant Siegelman of personal indebtedness. The evidence further showed Defendant Scrushy's entirely foreseeable execution of the scheme by wielding concealed influence on other Board members including, for example, the

$11,000 concealed employment relationship with CON Board Member Tim Adams and ex parte contact with Board Chairperson Margaret Sellers. This and the other evidence all amply demonstrated Defendants' agreement and intent to deprive the public of honest services by fraudulently and deceptively engaging in hidden financial relationships as charged and in violation of Section 1346. E.g., Lopez-Lukis.

Moreover, and in the alternative, even if a Hobbs Act formulation of a quid pro quo element is transplanted onto Sections 1341 and 1346, the very same evidence is more than sufficient to show at least two such quid pro quo in this case. (While the Court's instructions are not properly at issue on the present motion, the government notes that this Court did in fact instruct the jury that it must find a quid pro quo before convicting under Sections 1341 and 1346, and the government would argue at the appropriate time that those instructions were more than sufficient even if a Hobbs Act formulation of a quid pro quo element is required.)

First, the evidence of the $500,000 payment to Defendant Siegelman and the $11,000 to CON Board member Adams was more than sufficient to demonstrate that public officials "obtained a payment to which [they were] not entitled, knowing that the payment was made in return for official acts," Evans, 504 U.S. at 268. While the government readily acknowledges that there was no direct eyewitness to quid pro quo discussions between Defendants Siegelman and Scrushy, nor any electronic surveillance of such conversations, Defendants misstate the law and defy common sense in expressly demanding such proof. In United States v. Carpenter, 961 F.2d 824, 827 (9th Cir.), cert. denied, 506 U.S. 919 (1992), a campaign contribution case cited by both Defendants, the court specifically noted that even under the strictest Hobbs Act quid pro quo review reserved for true campaign contributions, the "understanding need not be verbally explicit." Nor would any

reasonable construction of the statute require proof of either magic words from disinterested eyewitnesses or written bribery contracts. Rather, as <u>Carpenter</u> explained, the facts and circumstances can demonstrate the required quid pro quo agreement for the Hobbs Act, and the facts and circumstances of this case more than adequately do so.

The evidence adduced at trial proving Defendants' agreement as to the concealed financial transactions involving the $500,000 in payments by Defendant Scrushy has already been set forth <u>supra</u>. With respect to Defendants' unlawful actions pertaining to CON Board member Tim Adams, Skelton testified that Defendant Siegelman appointed Adams and Defendant Scrushy to the CON Board on the same date. Skelton stated that Defendant Scrushy began to court Adams shortly after they met at the first CON Board meeting. According to Skelton, Adams, at Defendant Scrushy's invitation, began to ride with her and Defendant Scrushy on HealthSouth's opulent corporate helicopter to CON Board meetings. Adams went with Defendant Scrushy to out-of-town events, was offered employment at HealthSouth by Defendant Scrushy, and was paid $8,000 and $3,000 in conjunction with drafting a PET Scanner application for HealthSouth and attending CON Board meetings at which the Board considered HealthSouth CON applications. Adams' presence and/or vote was required at these meetings to create a quorum and/or approve HealthSouth's applications.

Skelton testified that she warned Defendant Scrushy that his activities with Adams were improper, but Defendant Scrushy told her that they were of no consequence. In fact, Defendant Scrushy told Skelton to keep Adams happy even though they knew that Adams was using his position on the CON Board to pressure them for favors. Defendant Scrushy wanted to keep Adams happy to ensure that Adams did not use his position on the CON Board to hurt HealthSouth. Skelton also testified that Adams was trying to use his position on the CON Board to get access to

HealthSouth. Keeping Adams happy was a major directive to Skelton from Defendant Scrushy because Scrushy was looking for favorable action from Adams on matters HealthSouth had before the CON Board. Skelton testified that each action she took to keep Adams happy was performed pursuant to her instructions from Defendant Scrushy and that she was uncomfortable taking such actions. Skelton finally stopped discussing the impropriety of the relationship between Adams and Defendant Scrushy with Defendant Scrushy because she thought it would not change Defendant Scrushy's actions toward Adams.

Adams acted favorably toward HealthSouth while serving on the CON Board. Adams created a quorum at the CON Board meeting where the Board approved HealthSouth's PET scanner application, even though HealthSouth had paid him $8,000 to help draft this application. Adams also attended, created a quorum for, and voted in favor of HealthSouth's CON application for a rehabilitation hospital – actions Adams took solely because HealthSouth paid him $3,000 to attend this particular CON Board meeting. All of these facts demonstrate the further quid pro quo intent and conduct of Defendants.

To the extent that Defendants urge the Court to engraft the strictest possible Hobbs Act formulation of a quid pro quo element, the "explicit" or "specific" quid pro quo element sometimes required for Hobbs Act cases premised on campaign contributions, compare McCormick with Evans, the evidence is clear that first there was no such "campaign contribution" in this case remotely resembling the type of unconcealed, legitimate political financing at issue in McCormick. On this record, the financial transactions in this case were far beyond the pale of the routine and transparent political donations that concerned the McCormick Court. The financial corruption of CON Board Member Adams is not even arguably a campaign contribution -- on its face and in every detail it is

a hidden financial interest unrelated to any political campaign.

Nor can the $500,000 payment qualify under McCormick. Rather than direct payment from Defendant Scrushy to Defendant Siegelman's AELF campaign, properly and timely reported under Alabama law, rather even than a payment from Defendant Scrushy to the institution holding the note guaranteed by Defendant Siegelman, or even from Defendant Scrushy to the AEF nominally liable for the note, this transaction was elaborately and coercively laundered through third parties for the express purpose of concealment, it was held for long periods until applied for Defendant Siegelman's personal benefit as a loan guarantor, and, despite its massive size, it was not reported as campaign related until several months after the criminal investigation in this case had begun and the Alabama Attorney General's Office had contacted Defendant Siegelman's office. Reviewing the facts of the $500,000 in the light most favorable to the government, there was no "campaign contribution" meriting any protection or concern under McCormick. See United States v. Allen, 10 F.3d 405, 412 (7th Cir. 1993) (finding that the failure to file required contribution reports tended to make the contributor's payment more akin to bribes than legitimate campaign contributions).

Moreover, even if McCormick did require a stricter Hobbs Act quid pro quo standard, that is no difficulty on these facts. Under Carpenter, there is no need for a tape recording of Defendants' conversations or a disinterested eyewitness. The circumstances of elaborate concealment are again overwhelming evidence of a specific quid pro quo by which Defendants would, as charged in the indictment, exchange money for HealthSouth having membership on, representation at, and influence over the CON Board.

Defendants make much of evidence that other persons, who were unaware of the circumstances of the hidden payments and relationships at issue, either did nothing improper

themselves, or opined that nothing improper had happened.  Of course, the jury was entirely free to

discredit that testimony, and on Rule 29 should be presumed to have done so.  See Hasner, 340 F.3d

at 1272 ("A proper inference the jury can make from disbelieved testimony is that the opposite is

true.") (quoting United States v. Mejia, 82 F.3d 1032, 1038 (11th Cir.), cert. denied, 519 U.S. 872

(1996).  Moreover, even assuming, arguendo, that the jury would credit such testimony, it entirely

ignores the salient evidence of concealment and deceit in assuming, for example, that Elmer Harris'

purportedly benign advice to Defendant Scrushy properly and completely explains Defendant

Scrushy's conduct.  And that evidence remains, as discussed, more than sufficient to show mail

fraud.  See Woodward (dual purpose relationship within statute).

 Defendants submit a cursory argument that the charged mailings did not further the scheme.

As the Eleventh Circuit has noted, "The only requirement is that the mailing be related to some 'step

in the plot.'"  Lopez-Lukis, 102 F.3d at 1168 n.11 (quoting United States v. Waymer, 55 F.3d 564,

569 (11th Cir.1995) (quoting Schmuck v. United States, 489 U.S. 705, 711 (1989)), cert. denied, 517

U.S. 1119 (1996).  The mailings need not be an "essential element of the scheme."  Hasner, 340 F.3d

at 1272.  Each of the specific mailings at issue in Counts Six through Nine, which also serve as

some, but not all of the overt acts charged for Count Five, are plainly related to the charged scheme.

The appointment letters in Counts Six and Seven were not only related to a step in the plot, they were

vital to the core mechanism of the charged scheme "to give HealthSouth membership on and

representation at the CON Board" in that they actually appointed HealthSouth personnel to the CON

Board.

 The letters in Counts Eight and Nine were likewise indispensable to the charged scheme to

create "conflict of interest concerning the State of Alabama Certificate of Need Review Board," for

the charged purpose of the scheme to "give HealthSouth official membership on, representation at, and influence over the CON Board by means of hidden financial payments and financial relationships and to conceal these activities." Specifically, the letter in Count Eight was the final step in exploiting HealthSouth's hidden financial influence over CON Board Member Adams concerning the Board's action on approving HealthSouth's application for a rehabilitation hospital, in which Adams acted to establish a quorum and enable the Board to consider HealthSouth's application. The letter in Count Nine, moreover, exploited HealthSouth's influence over Adams in the case of a PET scanner application both by removing his independent judgment from the review and by completing a step in the hidden financial relationship by which Adams received $11,000 for working on the application at issue. See, e.g., Schmuck (government act in mailing car title sufficiently related).

The evidence is sufficient to sustain Defendants' convictions on Counts Five through Nine involving honest services fraud, even if a Hobbs Act quid pro quo element is required. To hold otherwise on these facts is to adopt the rule that Defendants' now expressly and revealingly demand: namely that no bribery of a public official may be proven without either a disinterested witness to or electronic surveillance of a quid pro quo conversation. As neither disinterested witnesses to nor electronic surveillance of historical (i.e. completed) bribery negotiations will ever exist, this rule would absurdly immunize almost all such crimes. On any reading of the mail fraud statute, and under any rules of statutory construction, Congress cannot plausibly be thought to have intended such a result. Consequently, Defendants' Motions as to Counts Five through Nine must be denied.

**C.     Defendant Siegelman Has Failed to Carry His Burden that the Evidence was Insufficient to Sustain His Conviction on Count Seventeen**

Defendant Siegelman argues that the evidence was insufficient to sustain his conviction on Count Seventeen, Obstruction of Justice in violation of 18 U.S.C. § 1512(b)(3). Defendant Siegelman, though admitting he conspired with Bailey to cover-up receiving $9,200 from Lanny Young on January 20, 2000, asserts that he is not guilty of violating Section 1512(b)(3) because he did not "tamper" with a witness. See Defendant Siegelman Supp. Mot. at 4. Once again, Defendant Siegelman's argument is not supported in law or fact and must be denied.

Count Seventeen charged Defendant Siegelman with contravening Section 1512(b)(3) in that he did either knowingly corruptly persuade or attempt to knowingly corruptly persuade another person, or engage in misleading conduct toward another person, with intent to hinder, delay, and prevent communication to the Federal Bureau of Investigation by Young, Bailey, or Bailey's counsel, of information concerning federal offenses relating to $9,200 that Young gave to Defendant Siegelman on January 20, 2000. The indictment charged that Defendant Siegelman committed this offense by causing Bailey to provide him with a check in the amount of $2,973.35 with the notation "balance due on m/c." The evidence presented at trial was more than sufficient for a reasonable jury to convict Defendant Siegelman of this offense as charged.

Section 1512(b)(3) is a "broad" statute designed to capture those persons that pervert "the truth-seeking function of investigative or judicial processes." United States v. Veal, 153 F.3d 1233, 1246 (11th Cir. 1998), cert. denied, 526 U.S. 1147 (1999). Congress over the years has amended the statute to ensure that it covers "the rare type of conduct that is the product of the inventive criminal mind and which also thwarts justice." Id. at 1247 (citations and quotations omitted). See United States v. Gabriel, 920 F. Supp. 498, 501-02 (S.D.N.Y. 1996) (noting that on each occasion Congress has amended Section 1512 it has "done so in a manner favoring the broadest reach of the statute")

aff'd 125 F.3d 89 (2d Cir. 1997), overruled in part, Arthur Anderson v. United States, 544 U.S. 696

(2005). The statute, thus, "is to be read to include a wide range of conduct that thwarts justice" and

"expressly includes activities designed to create witnesses as part of a cover-up and to use unwitting

third parties or entities to deflect the efforts of law enforcement agents in discovering the truth."

Veal, 153 F.3d at 1247. The statute proscribes efforts to use "conduits to create false and misleading

evidence about the events [surrounding a possible federal crime]." Id.

In United States v. Ronda, Nos. 03-15640, 2006 WL 1914248 (11th Cir. July 13, 2006), the

Eleventh Circuit recently reiterated the elements for proving a violation of Section 1512(b)(3) under

the misleading conduct prong of the statute. See id. at * 7.

> Thus, to obstruct justice in violation of § 1512(b)(3), a defendant must knowingly
> and willfully (1) engage in misleading conduct toward another person, (2) with the
> intent to hinder, delay, or prevent the communication of information to a federal
> official, (3) about the commission or the possible commission of a federal crime.

Id. (citing Veal, 153 F.3d at 1253). Misleading conduct, defined at Section 1515(a)(3), includes

"knowingly making a false statement, . . . with intent to mislead, knowingly submitting or inviting

reliance on a writing . . . that is false, . . . or knowingly using a trick, scheme, or device with intent

to mislead." 18 U.S.C. § 1515(a)(3).

In United States v. Shotts, 145 F.3d 1289 (11th Cir. 1998), cert. denied, 525 U.S. 1177 (1999),

the Eleventh Circuit declared that "corruptly persuades" under Section 1512(b)(3) has the "same

well-established meaning already attributed by the courts to the comparable language in Section

1503(a), i.e., motivated by an improper purpose." Id. at 1301. See Gabriel, 920 F. Supp. at 502

(noting that to establish "corruptly persuades" the Second Circuit requires the government to prove

"that the defendant's attempt to persuade was motivated by an improper purpose") (citations and

-33-

quotations omitted).  In <u>Arthur Anderson</u>, 544 U.S. 696, the Supreme Court further explained that

to be guilty of a "corruptly persuades" offense under Section 1512(b)(3) the defendant must be

"conscious of wrongdoing" in performing the obstructing conduct.  <u>Id</u>. at 706.  The Supreme Court

expressly declined to set the "outer limits" of this element of the offense.  <u>Id</u>.

Without question, based on the evidence adduced at trial, a rational juror could find beyond

a reasonable doubt that Defendant Siegelman is guilty of violating Section 1512(b)(3) under the

misleading conduct and/or corruptly persuades prongs of the statute.  The evidence established that

on October 16, 2001, Defendant Siegelman caused Bailey to write and give him a check for

$2,973.95.  Bailey testified that this transaction was part of the cover-up story Defendant Siegelman

and Bailey created to disguise the payment of $9,200 to Defendant Siegelman by Young on January

20, 2000, which payment was part of the honest services fraud scheme between Defendant

Siegelman, Bailey, and Young.  At the time of Defendant Siegelman's acceptance of the check from

Bailey on October 16, 2001, Defendant Siegelman was well aware that federal agents were

conducting a criminal investigation of his administration, including his dealings with Young since

the investigation initially focused on Young's involvement with the GH Project.  Bailey testified that

he and Defendant Siegelman knowingly entered into the October 16, 2001, transaction as an effort

to hide the truth about the $9,200 payment from Young to Defendant Siegelman from the federal

agents.  Defendant Siegelman and Bailey each knew that the transaction on October 16, 2001, was

a rouse to cover up possible federal crimes committed by Defendant Siegelman in his activities with

Young.  In the transaction, Bailey gave Defendant Siegelman the check with the notation "balance

due on m/c" in exchange for a bill of sale to Defendant Siegelman's motorcycle.  Defendant

Siegelman and Bailey conducted this transaction in the presence of their attorneys, but never

-34-

disclosed to the attorneys that the transaction was really a sham and part of their cover-up story.

More specifically, Bailey testified that he was a conduit for $9,200 that was transferred to Defendant Siegelman from Young on January 20, 2000. Bailey testified that on that date Young, after Defendant Siegelman told him that he (Siegelman) wanted Young to give him $9,200, obtained a cashier's check payable to Bailey in the amount of $9,200. Young gave this check to Bailey and thereafter Bailey wrote a check to Lori Allen (Defendant Siegelman's wife's maiden name) which was thereafter deposited into a bank account of Defendant Siegelman. Young testified that while he and Defendant Siegelman agreed that they would call the transfer of funds a purchase of an interest by Young in Defendant Siegelman's motorcycle, no transfer of title or possession of the motorcycle between Young and Defendant Siegelman ever occurred. Young never purchased insurance on the motorcycle. Defendant Siegelman's insurance agent testified that Defendant Siegelman continued to insure the motorcycle until August 2001, which was well after the commencement of the investigation and Defendant Siegelman's subsequent efforts to obstruct the same.

Bailey testified that Young told him the $9,200 was money Defendant Siegelman asked Young to give him and that it was pursuant to an ongoing agreement between Defendant Siegelman and Young that Young would provide things of value to Defendant Siegelman and Defendant Siegelman would provide Young with favorable discretionary actions as Governor. Young testified that he gave the $9,200 to Defendant Siegelman at Defendant Siegelman's request to help (Young believed) Defendant Siegelman buy a motorcycle. Young testified that he gave Defendant Siegelman the money as part of the ongoing agreement that he would give Defendant Siegelman money when asked and Defendant Siegelman would take favorable discretionary action for Young

when asked. Young testified that he had no interest in purchasing any part of Defendant Siegelman's motorcycle and did not do so.

Bailey testified that on June 5, 2001, after Bailey and Defendant Siegelman learned of the ongoing investigation by the Federal Bureau of Investigation, Bailey and Defendant Siegelman agreed that Bailey would write a check in the amount of $10,503.39 to Young with the notation "repayment of loan plus interest" to make it appear that the $9,200 transferred from Young to Defendant Siegelman on January 20, 2000, was a loan from Young to Bailey for Bailey to buy a partial interest in Defendant Siegelman's motorcycle when in fact the $9,200 payment was part of the ongoing honest services fraud scheme. Young testified that Bailey wrote the check to him on June 5, 2001, to make it appear that the $9,200 he gave to Defendant Siegelman on January 20, 2000, was a loan to Bailey when in reality it was a payment to Defendant Siegelman pursuant to the unlawful agreement.

Bailey testified that on October 16, 2001, he wrote a check in the amount of $2,973.95 to Defendant Siegelman as part of the cover-up plan to disguise the $9,200 paid to Defendant Siegelman by Young. Bailey testified the October check was to continue to perpetuate the deception and lie that the $9,200 from Young to Defendant Siegelman on January 20, 2000, was a loan from Young to Bailey when in reality it was nothing more than a payoff to Defendant Siegelman from Young. Bailey testified this transaction was all accomplished as part of a plan to protect Bailey and Defendant Siegelman from the ongoing federal and state investigation. Bailey testified that when state and federal law enforcement agents first questioned him about the $9,200 payment from Young and the October 16, 2001, transaction between he and Defendant Siegelman, he (Bailey) lied to the agents about these transactions as part of his and Defendant Siegelman's cover-up plan. Bailey

-36-

testified that he lied to protect him and Defendant Siegelman. Bailey's and Young's testimony establish unequivocally that all these transactions, including the October 16, 2001, transaction, was accomplished with Defendant Siegelman's full knowledge and complicity for the purpose of thwarting the federal criminal investigation into his administration's affairs.

As shown, the evidence at trial conclusively established Defendant's guilt on Count Seventeen. Defendant Siegelman authored and participated in the October 16, 2001, transaction with Bailey with full knowledge of the federal investigation and with conscious knowledge of executing a cover-up scheme. The jury could have reasonably found that Defendant Siegelman engaged in misleading conduct in a number of ways, e.g., by knowingly making a false statement by having Bailey write a check to him for $2,973.35 for "balance due on m/c" when in truth in fact the transaction was part of the cover-up ploy and disguise; by knowingly inviting reliance on this check with an intent to mislead, and/or by knowingly using the cover-up scheme to throw the investigators off the trail of his unlawful dealings with Young. See 18 U.S.C. § 1515(a)(3). Defendant Siegelman engaged in this misleading conduct toward Bailey and Bailey's counsel, who was present when Defendant Siegelman accepted the check from Bailey and was falsely told that this transaction was part of a legitimate transfer of Defendant's motorcycle. Further, Defendant Siegelman was Bailey's boss and Bailey testified that he was executing Defendant Siegelman's commands by engaging in the October 16, 2001, transaction. Consequently, a reasonable jury could have found that Defendant Siegelman corruptly persuaded Bailey to engage in the October 16, 2001, transaction since Defendant Siegelman knew the wrongfulness of his actions and was motivated by an improper purpose (i.e., covering up his criminal activity with Young).

Defendant Siegelman's conduct in authoring and executing the October 16, 2001, transaction

with Bailey squarely falls within the ambit of criminal activities Congress intended to punish under

Section 1512(b)(3).    Through this transaction with Bailey and Bailey's counsel, Defendant

Siegelman manufactured "conduits to create false and misleading evidence" about his dealings with

Young.  Veal, 153. F.3d at 1247.  Defendant Siegelman, as charged in Count Seventeen and proven

to the jury, engaged in activity designed to create witnesses (e.g., Bailey, Bailey's counsel, and the

documentary evidence – check, bill of sale) as "part of a cover-up and to use unwitting third parties

or entities to deflect the efforts of law enforcement agents in discovering the truth."  Id.  Indeed, the

evidence at trial showed that Defendant Siegelman's efforts were successful since Bailey, as part of

Defendant Siegelman's plan, lied to the federal law enforcement agents when first questioned about

the October 16, 2001, transaction and Defendant Siegelman's dealings with Young.  Defendant

Siegelman's conduct in this case is akin to the cover-up actions of the defendants in Veal and Ronda

that the Eleventh Circuit found to be well within the bounds of Section 1512(b)(3).  See id. at 1254-

55; Ronda, 2006WL1914248, at* 1 (affirming convictions of defendants who fabricated evidence

in attempt to thwart criminal investigation).  Defendant's Siegelman's Supplemental Motion as to

Count Seventeen, therefore, should be denied.

## III.    Conclusion

Defendants seek an extraordinary remedy from this Court – the setting aside of the jury's

verdicts reached after approximately eight weeks of trial and several days of deliberations.

Accordingly, Defendants must meet an onerous burden to warrant this relief.  Defendants have not

done so.  Rather, as discussed herein, no rational jury could have found that the evidence adduced

at trial was insufficient to sustain the jury's verdicts.  Defendants' arguments are neither supported

in law nor fact.  Consequently, this Court must deny the Motions and affirm the jury's verdicts.

Respectfully submitted this the 18th day of August, 2006

LOUIS V. FRANKLIN, SR.
ACTING UNITED STATES ATTORNEY

/s/ Louis V. Franklin, Sr.
Acting United States Attorney
One Court Square, Suite 201
Montgomery, AL 36104
Phone: (334)223-7280
Fax:     (334)223-7560
Email: louis.franklin@usdoj.gov

/s/ J.B. Perrine
Assistant United States Attorney
One Court Square, Suite 201
Montgomery, AL 36104
Phone: (334)223-7280
Fax:     (334)223-7135
Email: jb.perrine@usdoj.gov
ASB-9077-E31J

/s/ Jennifer Garrett
Special Assistant United States Attorney
Assistant Attorney General
Office the Attorney General
11 S. Union
Montgomery, AL 36130
Phone: (334)353-8494
Fax:     (334)242-4890
Email:  jgarrett@ago.state.al.us
ASB-4600-T77J

/s/ Stephen P. Feaga
Assistant United States Attorney
One Court Square, Suite 201
Montgomery, AL 36104
Phone: (334)223-7280
Fax:     (334)223-7560
Email: steve.feaga@usdoj.gov
ASB-7374A60S

EDWARD NUCCI
ACTING CHIEF, PUBLIC INTEGRITY
SECTION

/s/Richard C. Pilger
Department of Justice, Criminal Division
Public Integrity Section
10th & Constitution Ave, NW
Bond Building - 12th Floor
Washington, DC 20530
Phone: (202)514-1412
Fax:     (202)514-3003
Email: richard.pilger@usdoj.gov

/s/ Joseph L. Fitzpatrick, Jr.
Special Assistant United States Attorney
Assistant Attorney General
Office of the Attorney General
11 S. Union
Montgomery, AL 36130
Phone: (334)353-4839
Fax:    (334)242-4890
Email: j.fitzpatrick@ago.al.state.us

IN THE UNITED STATES DISTRICT COURT FOR
THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| | ) | |
| vs. | ) | CR. NO. 2:05-cr-119-MEF |
| | ) | |
| DON EUGENE SIEGELMAN, and | ) | |
| RICHARD M. SCRUSHY. | ) | |

### CERTIFICATE OF SERVICE

I hereby certify that on August 18, 2006, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all counsel of record.

Respectfully submitted,

LOUIS V. FRANKLIN, SR.
ACTING UNITED STATES ATTORNEY

/s/ Louis V. Franklin, Sr.
LOUIS V. FRANKLIN, SR.
Acting United States Attorney
Post Office Box 197
Montgomery, Alabama 36101-0197
(334) 223-7280
(334) 223-7135 fax
louis.franklin@usdoj.gov