United States v. Don Eugene Siegelman
and Richard M. Scrushy
2:05cr119-MEF

# EXHIBIT 5-B

1

```
 1

 2

 3

 4          .

 5          TRANSCRIPTION OF VIDEOTAPED INTERVIEW

 6

 7

 8                              OF

 9

10

11          ████████████████████

12          TAKEN ON OR ABOUT JULY 19, 2006

13

14

15

16

17

18

19

20     Transcribed by:   Eleanor S. Pickett,

21                       Certified Shorthand

22                       Reporter and Notary

23                       Public
```

2

```
1        A.    I didn't want to put up with
2   that.  I decided not to watch it.
3        Q.    First could you state your
4   name and spell it for us?
```



```
7        Q.    First just tell us a little
8   bit about yourself.
9        A.    Oh, what do you want to know?
```



```
14  you know, I don't know what all else you
15  want to know.
16       Q.    Were you totally shocked to be
17  on this jury?
18       A.    I was very surprised.  You
19  know, with the -- you know, you just don't
20  know.  With all the people that are pulled
21  from and the juror pool being so huge and
22  everything, you just -- you just don't
23  ever think -- even when you get the
```

3

1    summons, you're just there's just no way

2    I'm going to get selected for this trial.

3    So it was very surprising to be selected.

4         Q.    Was it tough having to go

5    through that, what was it, seven or eight

6    weeks and to be, you know, Juror Number

7    40?

8         A.    You know, it was a long time,

9    and I think -- actually I think the first

10   couple of weeks were some of the hardest

11   because you kind of have to get into a

12   rhythm of things.  And for the first

13   couple of weeks, you're just sitting there

14   thinking about everything that you're

15   missing on the outside and you can't go to

16   work and you can't see your friends and

17   stuff like that and you're busy and you're

18   tired, and it's all new and everything.

19   And so from there, you know, you're just

20   like, okay.  And then you kind of get used

21   to it.  And then you start to get to

22   really know the jurors and you become

23   friends with them.  And so then you look

4

1    forward to going and seeing them and the

2    people at the court and everything like

3    that, so you kind of adjust to it.

4         Q.    Yeah.   I was reading y'all

5    actually went out to eat together after

6    the verdict?

7         A.    We did.  Especially in the

8    first part of the trial, we heard so much

9    testimony about Bud's and Sinclair's and

10   how every time the inner circle would go

11   to Bud's and Sinclair's.  And so we said

12   early that, you know, when this thing is

13   over, we're going to Sinclair's for dinner

14   and Bud's for a drink after this is over.

15   So when it was ended, we're like, okay,

16   we're going to do that, and we did.

17        Q.    So did it live up to all the

18   hype?

19        A.    You know, I have been to

20   Sinclair's before, so I knew what to

21   expect there, but I had never been to

22   Bud's before.  It was smaller than I

23   expected, but we had a good time.

5

1      Q.     Describe in a few words your
2    time on the jury.
3          A.     That's hard.  It was -- it was
4    interesting.  It was very -- it was
5    challenging.  And not just in terms of
6    being away from your family and being away
7    from work and everything like that, but
8    also it was -- it was a complicated case.
9    It required a lot of mental focus.  And so
10   it was -- it was kind of like going
11   through like a nine-week crash semester at
12   school where you really have to pay
13   attention, you know, and figure out what's
14   going on.
15         Q.     Was it tough because there was
16   so much evidence and so much testimony and
17   so many charges to keep up with it all?
18         A.     You know, it was -- it was --
19   I think, you know, when you're sitting in
20   trial, we don't have a copy of the
21   indictment.  We don't know exactly.  I
22   mean, they tell you at the beginning, but
23   you're so overwhelmed those first two

6

1    days, you know, first -- during opening

2    arguments and stuff like that, you really

3    don't know.  And so you're hearing all

4    this evidence and all these people coming

5    in, and you're not always completely sure

6    how they all tie together or what's

7    important, what's -- I mean, you assume

8    everything is important, but it is kind of

9    hard to keep up with that.  And then when

10    you go back into the deliberation's room

11    and you have the indictment, you have the

12    instructions from the judge, then -- well,

13    then it's overwhelming as well, but you

14    kind of -- you see where everything starts

15    to piece together.

16        Q.    Did you feel a tremendous

17    burden to come up with a verdict?

18        A.    I felt like it was our duty,

19    speaking for me personally.  I felt like

20    it -- we were there to come up with a

21    verdict.  It was important to me to come

22    up with a verdict because, you know, it's

23    kind of -- you know, you don't want to see

7

1  anything tie.  You know, football games,

2  baseball games, they all have contingency

3  plans so it doesn't go to a tie.  We

4  didn't want a tie.  We wanted to come up

5  with the verdict.  And, you know, our

6  instructions from the judge were to come

7  up with a verdict if we can, and I'm glad

8  that we did.

9        Q.    At one point your foreman came

10 out and called some of the jurors

11 lackadaisical.

12       A.    You know, we weren't --

13       Q.    But he came back and said we

14 can't come up with a verdict, but we want

15 to keep working.

16       A.    Well, you know, none of us,

17 other than the foreman, have seen that

18 note.  And so, you know, it's difficult

19 for me to comment on anything related to

20 that note because I've never seen it.  And

21 so I don't know what it said or exactly

22 what it was referring to.  So I really

23 can't really comment on that.  I think

8

1    that after -- after that time when we --

2    you know, we told the judge we had not

3    come up with a verdict, you know, and he

4    brought us back into the courtroom and

5    said I'm going to give you additional

6    instructions and then you're going to come

7    back tomorrow and tell us whether or not

8    you think future deliberations -- you

9    know, further deliberations would be

10   useful.  And I think at that point we all

11   decided, I decided, that, you know, our --

12   we're here to look at the evidence, look

13   at the law and come up with a verdict if

14   we can.  And we can do that.  And so I'm

15   glad that we all committed ourselves to

16   seeing the task all the way through.

17       Q.    Talk about that deadlock.

18   What were some of the issues?

19       A.    You know, you have twelve

20   people who come into -- come into a room

21   and they come from different walks of

22   life, they come from very different

23   backgrounds, a lot of different

9

1   experiences, a lot of different education,

2   and twelve intelligent people who all come

3   in and are tasked with looking at the

4   evidence that's presented to us, looking

5   at the law and saying are these four

6   people, each one of them, are they guilty

7   or are they not guilty.  And when you have

8   that number of people looking through all

9   of those issues, you don't automatically

10  sit down and agree.  It takes discussion

11  on the evidence, looking at things from

12  different points of view in order to come

13  up with what we eventually came up with,

14  which we feel is the correct verdict for

15  this case.

16       Q.   Were there specific charges or

17  what specifically contributed to the

18  deadlock?

19       A.   You know, I think a lot of

20  it -- it was a complicated case, and so we

21  didn't want to rush to a decision.  We

22  didn't want to take longer than we had to,

23  but at the same time, we really wanted to

10

1  give -- you know, be thorough, look

2  through all of the evidence, look through

3  all of the testimony, evaluate everything

4  carefully, look through -- you know, just

5  the instructions on the law, you know,

6  themselves were complicated.  And so --

7  you know, and different people with

8  different points of view, you know, when

9  you first read something, you come to --

10 you have different initial reactions to

11 things.  And so the discussions between

12 the twelve of us were very important to

13 coming up with what that final verdict

14 was, and that doesn't happen right away.

15 And so I think that's where initially it

16 was just, you know, people taking their

17 time to really sort through the evidence

18 for themselves and look at the law for

19 themselves and come up with their decision

20 on what they thought.

21      Q.     Did you go ahead and take a

22 vote?  What were they split on?

23      A.     You know, each count we looked

11

 1   at individually.  And so you couldn't --
 2   you know, there weren't -- you know, I
 3   think there is some speculation that, you
 4   know, well, you know, six people are this
 5   way and six people are this way, or seven
 6   people are here and five people are here,
 7   and it really wasn't that way.  You know,
 8   you -- every count was different.  We
 9   looked at every count, not only just the
10   count itself, but also who it's related
11   to.  Each of those was an individual
12   discussion.  And so you couldn't just look
13   at it and go well all of us felt this way
14   on here, you know, and not on here.  It
15   was very different, depending on what
16   issue you were talking about.
17        Q.    How were you able to move past
18   that deadlock and come up with a verdict?
19   How were those people able to change their
20   mind?
21        A.    You know, I think that it was
22   a commitment to coming up with a verdict.
23   I think that was, you know, where we

12

1    realized -- we really realized it was our

2    duty to come up with something and to look

3    at the evidence and look at the law and to

4    decide based on those two factors and

5    nothing else what was the correct verdict

6    to come up with.  And I feel like up until

7    that point, we really had -- we really

8    tried very hard to look at those two

9    things.  But I think with that final --

10   almost -- it was almost -- we kind of

11   felt after the judge's final instructions

12   to us we kind of had an out.  You know, he

13   gave us the -- you know, the instructions

14   to if -- you know, if you go back and you

15   discuss and you see that further

16   deliberations would be useless, then send

17   us a note and let us know.  And we all

18   kind of took that to be that we can -- we

19   can go home tomorrow if we want to.  We

20   can look at this and we can just decide,

21   hey, look, we have been discussing this,

22   we haven't come up with something yet, and

23   we can go home.  And I think almost that

13

```
1    option to get out of there almost
2    encouraged us to -- we had a different
3    motivation for being there.  We realized
4    it was our duty to do what the courts had
5    selected us to do, and we all were
6    committed to doing that.
7         Q.    So you don't feel the holiday
8    contributed to, okay, let's go ahead and
9    come up with a verdict so we can go home?
10        A.    Not at all.  I mean, like, you
11   know, I feel we did not want to rush into
12   any decision whatsoever.  However, once we
13   came up with the verdict, we felt like it
14   was the right of the people, the
15   defendants, you know, their attorneys, the
16   prosecutors, the judge, for us to go ahead
17   and let them know what our decision was.
18   And so, you know, that really didn't
19   factor into our decision-making at all.
20        Q.    Your foreman had
21   said when questioning the five hundred
22   thousand dollar donation from Scrushy when
23   some fellow jurors doubted the evidence
```

14

1    there, he pulled out a notebook where he

2    had kept up with red e's for evidence.

3    Can you tell me about that?

4        A.    You know, everyone kept their

5    own set of notes.  I kept -- you know, I

6    have -- I have a few notes.  I am not much

7    of a note taker.  But everyone kept up

8    with their own set of evidence.  And so,

9    you know, each of us had different reasons

10   for coming up with the, you know, ultimate

11   decision that we came up with.  Especially

12   in the counts where we found Don Siegelman

13   guilty and found Richard Scrushy guilty,

14   the evidence was overwhelming that -- as

15   it pertained to the law that they were

16   guilty on those counts.

17           And so I think a lot of people

18   had, you know, based on the notes that

19   they took, based on the evidence that was

20   entered in, based on our remembrances of

21   the testimony and all of those things,

22   there was no doubt that they were guilty

23   on those charges.

15

1     Q.   Any evidence stand out more

2  than other, more -- stick out more in your

3  mind, a particular witness?

4     A.   You know, we tried to look at

5  -- I tried, I can't speak for anybody else

6  on the jury, I tried to look at the

7  totality of the evidence.  And so I tried

8  not to make my decision just based on

9  okay, well, Nick Bailey came in here and

10  said this, and so I believe him or I don't

11  believe him.  It was more well, Nick

12  Bailey said this and Mike Martin from

13  HealthSouth came in and said this and Lori

14  Skelton came in and said this.  And so you

15  look at all of it.  We have these

16  different bank records that were entered

17  into evidence.  And so you try to look at

18  the whole picture and not base all of it

19  on just one particular person or one

20  particular piece of evidence.  You put all

21  of it together to look at all of it as it

22  relates to the charges.

23     Q.   An attorney, a particular

16

```
 1   attorney stick out in your mind, did they
 2   influence you in any way?
 3        A.   You know, not really.  We were
 4   very -- I was very impressed by all of the
 5   attorneys.  You know, you kind of expect
 6   after -- you know, it's like well, this is
 7   the former governor of Alabama, you know,
 8   and Richard Scrushy, you expect them to
 9   have good attorneys.  And they were good
10   attorneys.  We were very impressed by --
11   you know, by the attorneys.  And the
12   prosecutors were good attorneys as well.
13   And so all of them, you know, were --
14   seems like they were very much committed
15   to their jobs and, you know, very capable
16   at doing what they did.
17        Q.   How did you feel after the
18   verdict?
19        A.   I was thrilled.  I was very
20   happy that -- I was happy that we came up
21   with a verdict after the length of the
22   discussions, the length of the trial,
23   especially after watching the news reports
```

17

1    after it was done and hearing all the

2    speculation that had gone on while we

3    were, you know, deliberating.  I was very

4    happy that we, you know, came up with --

5    came up with a verdict and came up with

6    what I feel was the right verdict.

7         Q.    So you're still confident in

8    the verdict?

9         A.    I am very confident in the

10   verdict.

11        Q.    While the verdict was being

12   read, did you look at the defendant?

13        A.    I did, yeah.  I did.  I wanted

14   to see -- I mean, like I tried every day

15   to look at everybody in the courtroom and

16   see who was there and, you know, see how

17   they were responding to the witnesses and

18   to -- you know, the -- whatever was

19   happening.  And so, yeah, I wanted to see

20   what their reactions were to -- to the

21   verdicts.

22        Q.    What was that?

23        A.    They were very -- you know,

18

1   they really kept a very blank face.

2   Hamrick, Paul Hamrick, showed more

3   emotion, you know.  You could tell he was

4   very thankful to have been found not

5   guilty and -- and same with Mac Roberts.

6   Richard Scrushy and Don Siegelman didn't

7   show a lot of emotion.  And so, you know,

8   it's difficult to -- you know, it's

9   difficult to guess what they were thinking

10   during -- when the verdicts were being

11   read.

12       Q.   Was it tough with these two

13   powerful men, was that a tough job for

14   you?

15       A.   You know, I tried not to look

16   at it that way.  You know, I think all of

17   us -- it didn't come up in deliberations.

18   I can't speak for what other people --

19   what they would enter into their minds,

20   what they were thinking, but it didn't

21   come up in the discussions.  It could have

22   been the person next door and -- or it

23   could have been, you know, the person who

19

```
 1   comes in and fixes your house.  We were
 2   looking at the evidence and we were
 3   looking at the law.  And it didn't factor
 4   -- it didn't factor into my thinking at
 5   all whether this was the former governor
 6   of Alabama or this was the former CEO of a
 7   large corporation in Alabama.  It didn't
 8   matter.  It didn't matter if -- our
 9   feeling was was that if the evidence
10   showed they broke the law, they're guilty,
11   regardless of who they were.  And if the
12   evidence showed they did not break the
13   law, they were not guilty, regardless of
14   who they were.
15        Q.    But you found them guilty.  Is
16   it disappointing to you that this was the
17   governor at the time, now former governor?
18        A.    It is disappointing.  Any time
19   you -- any time -- you know, I vote.  It's
20   important to me.  I like the political
21   process.  And any time you elect somebody
22   into office, you elect them with the
23   expectation that they will be looking out
```

20

1   for the best interest of the state as a

2   whole and not looking out for the

3   interest -- their personal interest and

4   not looking out for the interests of their

5   friends or close acquaintances.  And so it

6   is disappointing to see that someone would

7   take an elected position and use it for

8   their own personal gain or misplace the

9   trust that the people put in them when

10  they elected them into that office.

11      Q.    What would you like to see

12  happen now?

13      A.    In terms of the defendants?

14  That's not up to me.  You know, I

15  really -- I like to keep with -- you know,

16  I'll probably follow the case very

17  closely.  But that's a decision for, you

18  know, the judge, that's something that

19  their attorneys and the prosecution -- I

20  really don't know how that whole process

21  works.  And so, you know, I really don't

22  have a specific opinion as to what I think

23  should or should not happen to them.  I

21

1    feel that the political process or the

2    process by which they were convicted is a

3    good process.  And so the process by which

4    their sentence will be determined will

5    also be a good process.  And I will be

6    satisfied with whatever happens.

7        Q.    Scrushy was found guilty on

8    all counts?

9        A.    Right.  Oh, he was guilty.

10   Based on the evidence, there was no

11   question whether or not he was guilty as

12   it pertained to the law.

13       Q.    When you were back there

14   deliberating, was there one charge more

15   than others that took more time that you

16   were more unsure of?

17       A.    All of the charges took a

18   significant amount of time.  We looked at

19   each one individually.  We looked at each

20   defendant individually.  And so there

21   really wasn't one that just kind of like

22   stumped us all.  You know, we -- it was a

23   lot of evidence.  And the charges,

22

1  especially, you know, the RICO charges,

2  were very complicated.  We tried to be

3  very organized in going through --

4  after -- you know, after -- initially you

5  kind of sit down and you're just shell

6  shocked.  You sit there and you're just

7  like we have all this evidence, we have

8  the law, we have the indictment, and

9  you're just like where in the world do we

10 begin.  And so we found it very necessary

11 from the beginning to try to keep things

12 as organized as possible.

13     Q.    And the charges you came back

14 on with Siegelman, can you talk about

15 those a little bit and why some guilty,

16 why some not guilty?

17     A.    Again, it's, you know, looking

18 at the evidence, looking at the testimony,

19 looking at what was -- what was entered in

20 in terms of documents and everything.  The

21 charges that Siegelman was found guilty

22 of, there was no question -- it was beyond

23 a reasonable doubt that he was guilty of

23

1    those charges. And the other ones, it

2    wasn't the same standard.

3         Q.    Is there one piece of evidence

4    that was more incriminating to you?

5         A.    You know, I don't know if I

6    could put my finger on -- on a particular

7    piece of evidence or a particular, you

8    know, person who came in and testified. I

9    think the totality of the evidence spoke

10   very strongly towards Don Siegelman's

11   guilt on the charges that we found him

12   guilty on.

13        Q.    And what evidence, or lack

14   thereof, to let these other two guys who

15   are cleared on all charges?

16        A.    I think it's just -- the

17   totality of the evidence didn't paint as

18   clear of a picture as it did for the

19   charges related to Governor Siegelman and

20   then the charges related to Richard

21   Scrushy.

22        Q.    It seems you took your job

23   pretty serious?

24

1      A.    I did.  I did.

2      Q.    You couldn't watch any news.

3  You stuck to all that?

4      A.    I did.  I saw one Iter -- I

5  did see one Internet article.  So I'll

6  confess.

7      Q.    By accident?

8      A.    It was -- it was -- yes, it

9  was almost by accident.  It was -- after I

10  saw the headline, I was oh, I wonder what

11  that says.  But I really did try very

12  hard.  I really wanted to not base my

13  decision on anything other than what was

14  entered in court.  And so I wanted to make

15  sure that there was -- I wanted to make

16  sure that when the verdict was reached at

17  the end, that I had confidence that the

18  verdict had been reached based on the

19  evidence entered in and the law and by no

20  other consideration.  So it was important

21  to me not to let any other consideration

22  come into my decision-making.

23      Q.    Early on there was some

25

1    bickering between attorneys.  Did that

2    play into your -- I mean, how did you feel

3    about that?  Some people said they were

4    acting like children.

5        A.    That is a big question.  You

6    know, a lot of people -- you know, it's a

7    formal proceeding, and it's an important

8    matter.  Any trial is important.  And so

9    you kind of expect a certain level of

10   decorum to be maintained by all the

11   parties involved, yet it did kind of break

12   up the monotony a little bit.  And so, you

13   know, it's not that it was a laughing

14   matter, but at the same time, you know, it

15   was -- it was my first trial, you know, as

16   a juror ever.

17       Q.    Was it disappointing to see

18   them behave that way?  It was interesting?

19       A.    It was interesting.  It was

20   interesting.  It was -- you know, it was

21   obvious that it was passionate to both

22   sides.  I was not one of the people who --

23   you know, I have heard speculation that,

26

    1    you know, people that it was too personal
    2    to the attorneys.  I didn't feel that way.
    3    I don't feel like it was personal to the
    4    attorneys.  I felt like they look their
    5    job seriously, and I feel like anybody
    6    takes -- I take my job seriously.  And so
    7    I am passionate about my job, but not more
    8    than I think I ought to be.  And so I
    9    was -- it didn't make me look negatively
   10    really on either side.  It didn't really
   11    -- it didn't enter my decision-making
   12    process.
   13          Q.    You didn't get to watch the
   14    news, so you didn't --
   15          A.    No, I didn't.
   16          Q.    -- see Siegelman's comments
   17    every day that he was always saying this
   18    was politically motivated.  Did you feel
   19    that way?
   20          A.    I did not.  I did not feel
   21    that way.  I didn't feel like -- I didn't
   22    feel that way.  I didn't feel like any of
   23    the -- that didn't enter into our

27

1   deliberations, you know, in terms of -- I

2   don't attribute bad motives to the

3   government for bringing the case.  I don't

4   attribute bad motives to the defense

5   attorneys for, you know, defending who

6   they did.  I think they were doing their

7   jobs.  And so I did not go into it with

8   the expectation that it was politically

9   motivated.  I don't think that it was.

10        Q.   Has this changed you in any

11   way, this trial?

12        A.   I don't think you can walk

13   away from any nine-week experience without

14   being changed to a certain amount.  It was

15   a very interesting experience.  I enjoyed

16   it.  I didn't -- you know, like the first

17   couple of weeks were difficult for me to

18   adjust to.  But by the end, I really did

19   enjoy the experience.  It was very

20   stimulating, you know, intellectually, and

21   I -- you know, I made some great friends

22   off of -- I really feel like all of the

23   other seventeen jurors, I am friends with

28

1    every single one of them.  And so I

2    enjoyed that aspect of it.

3         Q.    You will keep in touch with

4    them?

5         A.    I will.  I will keep in touch

6    with them.  I think all of us are planning

7    on keeping in touch with each other.

8         Q.    The RICO statute was a big

9    focus on this.  Why the not guilty on

10   that?

11        A.    It's complicated.  It's a very

12   complicated case.  That's not the only

13   reason why.  You know, the evidence did

14   not clearly show the guilt beyond the

15   standard of reasonable doubt.  That's the

16   only reason I can give you why those two

17   charges were found not guilty in relation

18   to Governor Siegelman and in relation to

19   Paul Hamrick.

20        Q.    Anything you can think of I

21   did not ask you?

22        A.    You know, I don't know what

23   all else you --

29

1      Q.   Did you feel like some of the

2   jurors were tired?  I mean, you didn't see

3   that note, but reporters heard, you know,

4   what the foreman said.

5      A.   We were -- we were all tired,

6   but we were all committed to coming up

7   with a verdict.

8      Q.   What do you think he meant by

9   that, that word?

10     A.   You know, I -- like I said, I

11  haven't seen the notes.  You know, I'm

12  supposing that's a direct quote from the

13  note.  But not having seen it, I really,

14  you know, feel hesitant to comment at all

15  on what he meant or may not have meant by

16  that, not seeing what context it was

17  written in or any of that, I really don't

18  know.  But I can say that based on the

19  discussions that we had when the judge

20  gave us the option to go home and based on

21  the discussions that ensued from that, we

22  were all committed to coming up with a

23  verdict and coming up with the correct

30

1   verdict.

2       Q.    Ever any heated debates?  I

3   don't want to say arguments, but --

4       A.    Our discussions were lively.

5   I mean, they weren't -- they were not --

6   they were -- they were very lively, but

7   they weren't personal.  That's -- you

8   know, to me you can have a very, you know,

9   engaging discussion on the issues, but it

10  wasn't a personal discussion.  And when

11  the door opened and the deliberations

12  ceased, we just went back to being

13  friends.  And so even though you may have

14  come from very different points of view

15  and have very different opinions, you

16  know, the commitment is to the evidence

17  and to the law, and it takes a long time

18  to figure out exactly what the evidence is

19  and exactly what the law is, especially

20  after that many weeks of testimony, just

21  trying to remember like, oh, yeah, we did

22  have somebody come in and testify on that,

23  didn't we, you know.  And so just

31

1    remembering all of that stuff, it takes a

2    fair amount of time and -- and we worked

3    really hard to make sure that our

4    decision-making -- and in the end, that's

5    what we decided, we wanted to come up with

6    a verdict that was only based on two

7    things, and that was the evidence and the

8    law.  And I really feel like we did that.

9         Q.    Were there jurors or one or

10   two jurors that felt strongly one way and

11   then turned and went completely the other

12   way after they went through all the

13   evidence?

14        A.    All of us felt very strongly.

15   All of us felt very strongly.  I think,

16   thought, all of us did not want to base

17   our decision, our ultimate decision, on

18   personal opinion.  It has nothing to do

19   with your personal opinion.  It has only

20   to do with what was entered into as

21   evidence and what does the law say about

22   that.  And we tried very hard.  And I feel

23   like in the end, the verdict that we came

32

1   to, we came to that because of our

2   commitment to following our instructions

3   and doing what we were supposed to do.

4        Q.   Do you feel all the jurors are

5   comfortable with the verdict now?

6        A.   Yeah, I really do.  I feel

7   very comfortable with the verdict.  You

8   know, just -- you know, you go out.  You

9   know, we went out to dinner afterwards,

10   you know, we went to Sinclair's and went

11   to Bud's afterwards, and we had said that

12   from the beginning that we were going to

13   do that, and we were happy to do that.

14   And, you know, of course, you do just sit

15   there and discuss, you know, like okay,

16   well, now that it's been, you know, like,

17   oh, what, three hours, how do you feel,

18   you know.  And we all I think are very

19   confident with the verdict.

20        And I think that one of the

21   reasons why we came up with the verdict,

22   and one of the reasons why I am so

23   confident about the verdict that we came

1    up with is because as a group, as the

2    twelve of us that ultimately were the

3    deliberating twelve, we were very -- we

4    were very committed to the truth and we

5    started off every day by holding hands and

6    asking God to give us wisdom to come up

7    with the right decision.  And I think as a

8    group our willingness to humble ourselves

9    and ask God for his wisdom on these issues

10   led us to make the right decision.  I am

11   very confident that we made the right

12   decision on all of the issues that we --

13   that we discussed and decided.

14        Q.    Anything else?

15        A.    I don't have anything else.  I

16   don't know if you have any other

17   questions.

18        Q.    If you think of anything --

19        A.    I'm like why don't you come

20   and watch, you know, it's just like --

21   especially until deliberations start, you

22   know, we know less than what everybody

23   else --

34

```
 1        Q.    Did anyone try to discuss it
 2   with you, didn't know you were on the
 3   jury?
 4        A.    You know, every -- you can't
 5   help it, people know you're on the jury.
 6   You know, you can't disappear for nine
 7   weeks without people knowing that you're
 8   on -- I would love to discuss it with you.
 9   When this is over, we'll go get a bite to
10   eat or something like that, but until
11   then, I can't, you know.
12
13             END OF TRANSCRIPTION OF
14                VIDEOTAPED INTERVIEW
15
16
17
18
19
20
21
22
23
```

35

```
 1              C E R T I F I C A T E
 2
 3
 4     STATE OF ALABAMA)
 5     JEFFERSON COUNTY)
 6
 7              I hereby certify that the
 8     above and foregoing transcription of
 9     attached DVD was reduced to typewriting
10     under my supervision, and that the
11     foregoing represents a true and correct
12     transcript to the best of my hearing and
13     understanding of said attached DVD.
14              I further certify that I am
15     neither of counsel nor of kin to the
16     parties to the action, nor am I in anywise
17     interested in the result of said cause.
18
19
20
21
22
23              COMMISSIONER - NOTARY PUBLIC
```