IN THE UNITED STATES DISTRICT COURT FOR
THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | |
| | ) | CRIMINAL NO. 2:05-CR-119-F |
| DON EUGENE SIEGELMAN, and | ) | |
| RICHARD M. SCRUSHY | ) | |

<u>UNITED STATES' RESPONSE TO DEFENDANTS' MOTION FOR NEW TRIAL
PURSUANT TO RULE 33(a) OF THE FEDERAL RULES OF CRIMINAL
PROCEDURE, DEFENDANT SIEGELMAN'S EMERGENCY MOTION FOR ORDER
TO REQUIRE PRESERVATION OF EVIDENCE, AND DEFENDANT SCRUSHY'S
MOTION FOR EXPEDITED CONSIDERATION OF AN ORDER TO REQUIRE
PRESERVATION OF EVIDENCE</u>

COMES NOW the United States of America, by and through Louis V. Franklin, Sr., Acting

United States Attorney for the Middle District of Alabama, and Edward C. Nucci, Acting Chief of

the Public Integrity Section of the Criminal Division of the United States Department of Justice, and

hereby responds to Defendants' Motion for New Trial Pursuant to Rule 33(a) of the Federal Rules

of Criminal Procedure (hereinafter, the "Motion"). Pursuant to this Court's Order, dated October

10, 2006, in this Response, the United States also shows cause why this Court should not grant

Defendant Siegelman's Emergency Motion for Order to Require Preservation of Evidence

(hereinafter, the "Emergency Motion"). This Court should deny the Motion because Defendants

have failed to produce any credible evidence of any juror impropriety or consideration of prejudicial

extrinsic evidence; Federal Rule of Evidence 606(b) precludes any inquiry into the deliberations and

mental processes of the jurors; no reasonable possibility of prejudice arises from any purported

extraneous matters reaching a juror; and Defendants can point to no improper, let alone prejudicial,

<u>ex parte</u> communication between this Court and the jury. Under well-settled precedent, Defendants

are not entitled to relief, nor to any further investigation in derogation of Rule 606(b) into their

specious allegations of jury impropriety, which transparently seek to scrutinize the jury's deliberations. Accordingly, the Emergency Motion should also be denied.

Defendants' allegations of juror misconduct rely on exhibits that are entirely speculative and unauthenticated. These exhibits raise more questions about their manufacture and Defendants' possession of them than they do about any possibility of juror misconduct. Consequently, being wholly unreliable and incredible on their face, they do not merit any intrusion on the jury's province via an investigation into Defendants' spurious allegations. The specious nature of Defendants' exhibits alone should lead this Court to deny the Motion and Emergency Motion.

Further, even assuming Defendants' exhibits present any remotely colorable factual basis to question the jury's conduct (which they do not), they do not provide any legal basis for further investigation or a new trial. Rule 606(b, in fact, affirmatively precludes any inquiry of the jurors about their deliberations or anything which may have affected their mental processes during deliberations, except for claims of extraneous prejudicial information or improper outside influence. Rule 606(b) thus bars any investigation into any factual issues that Defendants claim are raised in the unauthenticated emails Defendants purportedly received anonymously over the past two months without the knowledge of the Court or the government. Moreover, Defendants have utterly failed to carry their burden of showing any extrinsic contact with the jury that could mandate relief. Defendants have not presented any reliable or credible evidence of a single instance of extraneous prejudicial information reaching the jury or of any improper outside influence on the jury. Even assuming _arguendo_ that these allegations were remotely colorable, Defendants further fail to address, let alone carry, their burden to prove prejudice. Finally, this Court engaged in no improper _ex parte_ communications with a juror and Defendants can identify no harm from any communication between

this Court and the jury.

Defendants' Motion is replete with speculation, innuendo, conspiracy theories, and conclusory allegations of juror misconduct; however, it is noticeably and fatally devoid of credible evidence of any improper behavior requiring any further investigation by this Court, much less a new trial for Defendants. The Motion and the Emergency Motion are due to be denied. As grounds for its position, the United States submits the following:

**I.      The Highly Speculative, Unreliable Nature of Defendants' Exhibits Should Lead this Court to Deny The Motion and Emergency Motion.**

To justify their claims of relief, Defendants attached several exhibits to the Motion, which, they claim, set forth evidence of juror misconduct. In particular, Defendants' arguments for relief rely heavily upon affidvits of Juror A, his pastor, and his wife, and unauthenticated emails allegedly between jurors which Defendants state they received anonymously over the past two months. A review of these affidvits and emails on their face, however, shows that this Court should deny the Motion and Emergency Motion without further inquiry.

"The trial court has broad discretion as to how to proceed when confronted with an allegation of jury misconduct, including discretion with regard to the initial decision as to whether to interrogate jurors." United States v. Ayarza-Garcia, 819 F.2d 1043, 1051 (11th Cir.), cert. denied, 484 U.S. 969 (1987), superseded by statute on other grounds, United States v. Tinoco, 304 F.3d 1088 (11th Cir. 2002). See United States v. Hernandez, 921 F.2d 1569, 1578 (11th Cir.) ("The decision to investigate allegations of jury misconduct rests within the sound discretion of the district court."), cert. denied, 500 U.S. 958 (1991). Importantly, the propriety of a district court's exercise of discretion in response to a claim of juror misconduct turns in part on the nature of the defendant's

evidence supporting his claim.

> Cases dealing with the degree of investigation required fall along a continuum focusing on two factors: the certainty that some impropriety has occurred and the seriousness of the accusation. The more speculative or unsubstantiated the allegation of misconduct, the less burden there is to investigate; the more serious the potential jury contamination, especially where alleged extrinsic influence is involved, the heavier the burden to investigate.

Id. (citing United States v. Caldwell, 776 F.2d 989, 998 (11th Cir. 1985)). Thus, there is no per se rule requiring an inquiry in every instance of alleged misconduct. United States v. Cuthel, 903 F.2d 1381, 1382-83 (11th Cir. 1990). "The trial court's exercise of discretion will not be disturbed absent a showing of bias or prejudice to the defendant." Hernandez, 921 F.2d at 1578.

Where the defendant has failed to come forward with credible evidence of juror misconduct, the trial court has no duty to conduct any investigation. Id. ("It is only when the defendant has made a colorable showing of extrinsic influence that the court must investigate the asserted impropriety."); United States v. Caporale, 806 F.2d 1487, 1503 (11th Cir. 1986) ("The law in this Circuit is well settled that the defendant bears the burden of establishing that an extrinsic contact with a jury in fact occurred."), cert. denied, 482 U.S. 917 and 483 U.S. 1021 (1987); United States v. Barshov, 733 F.2d 842, 851 (11th Cir. 1984) ("The duty to investigate arises only when the party alleging misconduct makes an adequate showing of extrinsic influence to overcome the presumption of jury impartiality. In other words, there must be more than speculation."), cert. denied, 469 U.S. 1158 (1985).

To merit a post-trial hearing on alleged jury misconduct, much less to obtain a new trial, a defendant must meet a high burden. "To justify a post-trial hearing involving the trial's jurors, the defendant must do more than speculate; he must show 'clear, strong, substantial and incontrovertible

evidence . . . that a specific, nonspeculative impropriety has occurred.'" Cuthel, 903 F.2d at 1383

(quoting United States v. Ianniello, 866 F.2d 540, 543 (2d Cir. 1989) (internal quotations omitted)).

See United States v. Moon, 718 F.2d 1210, 1234 (2d Cir. 1983) ("[A] trial court is required to hold

a post-trial hearing only when reasonable grounds for investigation exist."), cert. denied, 466 U.S.

971 (1984).

Powerful policy reasons promoting the finality of litigation, protection of jurors, and

confidence in our criminal justice system counsel against any investigation of alleged juror

misconduct where the defendant has not met his burden of proof and merely desires to conduct a

fishing expedition in a desperate attempt to attack the verdict. The Supreme Court has succinctly

described the dangers associated with permitting post-verdict investigation into jurors' conduct

where the defendant has failed to produce credible evidence of any impropriety.

> There is little doubt that postverdict investigation into juror misconduct would in
> some instances lead to the invalidation of verdicts reached after irresponsible or
> improper juror behavior. It is not at all clear, however, that the jury system could
> survive such efforts to perfect it. Allegations of juror misconduct, incompetency, or
> inattentiveness, raised for the first time days, weeks, or months after the verdict,
> seriously disrupt the finality of the process. . . . Moreover, full and frank discussion
> in the jury room, jurors' willingness to return an unpopular verdict, and the
> community's trust in a system that relies on the decisions of laypeople would all be
> undermined by a barrage of postverdict scrutiny of juror conduct.

Tanner v. United States, 483 U.S. 107, 120-21 (1987) (citations omitted). See Moon, 718 F.2d at

1234 ("A hearing is not held to afford a convicted defendant the opportunity to 'conduct a fishing

expedition.'") (quoting United States v. Moten, 582 F.2d 654, 667 (2d Cir. 1978)).

Accordingly, postverdict recall and examination of jurors is an extraordinary remedy that

prudence dictates should be granted sparingly and only when a defendant has clearly met his

evidentiary burden.

> Jurors who complete their service should rarely, if at all, be recalled for proceedings such as those appellants propose here. It is qualitatively a different thing to conduct a voir dire during an ongoing proceeding at which the jury is part of the adjudicative process than to recall a jury months or years later for that purpose.

United States v. Gilsenan, 949 F.2d 90, 97 (3d Cir. 1991), cert. denied, 504 U.S. 987 (1992).

An application of these principles is provided in United States v. Camacho, 865 F. Supp. 1527 (S.D. Fla. 1994), aff'd sub nom. United States v. Veal, 153 F.3d 1233 (11th Cir. 1998), cert. denied, 526 U.S. 1147 (1999). In that case, the defendants, in their Rule 33 motion, claimed, inter alia,[1] that four days after the jury returned convictions against them, one of the jurors who participated in the deliberations was waiting for an attorney for one of the defendants at the attorney's office. Id. at 1538. The juror told the attorney that the verdict did not comport with her assessment of the record evidence and she had been influenced by an outside source, which had also likely affected other jurors. Id. Subsequently, the attorney received a phone call from a second juror who reiterated these sentiments. Id. The defendants then argued that they had a "good faith belief" that prejudicial extraneous information had reached the jury and improperly influenced its verdict such that the court should grant them leave to interview the jurors. Id.

The Camacho district court rejected the defendant's requested relief. "Although counsel may have a good faith belief of an extrinsic influence, a good faith belief does not satisfy the requirement

---

[1] Similar to this case, the Camacho defense also presented juror affidavits and claimed that a compromise verdict was not based on record evidence, that the jury could not communicate with the court because the foreperson would not forward their notes to the judge, and that the jury engaged in premature deliberations. Id. at 1531-37. The court rejected the defendants' request for further investigation of these claims, as well as a new trial, because Rule 606(b) precluded any inquiry of such matters and the defendants had not met their burden of showing "clear, strong, substantial and incontrovertible evidence . . . that a specific, nonspeculative impropriety has occurred." Id. (quote at 1530). This Court should reject the similar arguments of Defendants on the same grounds. See infra.

in <u>Cuthel</u> – counsel must present a substantial and specific showing of an extrinsic influence." <u>Id</u>. The defendants had not met their burden, having failed to cite "<u>any</u> specifics or evidentiary support to back up" their allegations. <u>Id</u>. The defendants had only referenced the two jurors' statements to them that an outside source had influenced the jury. <u>Id</u>.

> Stating that such an extrinsic influence was at work here . . . is so speculative in nature as to necessitate the conclusion that Defendants may not be given leave to interview the members of the jury. Were Defendants successful in their attempt to obtain leave from this Court to interview the jurors based upon the conclusory, speculative statements contained in the joint motion, we are constrained to conclude that almost any request for leave to interview jurors would have to be granted.

<u>Id</u>. The "scant evidentiary foundation" supporting the defendants' allegations of juror misconduct compelled the court not simply to deny their Rule 33 motion, but to forgo any intrusion into the jury's province through further investigation of the claimed improprieties. <u>Id</u>.

The allegations of juror misconduct in this case are even more speculative, spurious, and specious, than those the court rejected in <u>Camacho</u>. Defendants place significant weight upon unauthenticated emails allegedly between jurors, which Defendants state that they received from an anonymous source. Defendants readily admit that they have no clue whether the emails are authentic, but champion them as a basis to conduct an extensive and searching investigation of the jurors. <u>See</u>, <u>e.g.</u>, Mot. at 12 (noting that their arguments are contingent upon the emails being "authenticated"). These emails, rather than supporting Defendants' position, actually expose the baselessness of their claims.

The emails' origin with an anonymous source severely discounts their credibility and legitimacy, and removes any burden on this Court to conduct an intrusive investigation into their

provenance or their content.[2] See Caldwell, 776 F.2d at 999 ("the anonymity of the call in our minds simply creates no burden to investigate"); United States v. Smith, No. Crima 4:97CR35, 2006 WL 2578919 at * 6 (N.D. Ga. Sept. 5, 2006) (denying the defendants' request to investigate jurors on anonymous claim of alleged bribe of a juror by the prosecutor because "[a]n anonymous allegation of jury tampering is too speculative to meet the defendant's burden of proving extrinsic influence"); United States v. Edwards, 486 F. Supp. 673, 674 (S.D.N.Y. 1980) ("To grant this request upon the foregoing anonymous and hearsay calls would mean that every instance in which a statement is made by a defendant or his attorney that he received an anonymous telephone call charging jury dereliction or disregard of the court's instructions would mandate a judicial inquiry, and subject the members of the jury to investigation as to their deliberations. [Such a request] borders on the absurd and is denied."), aff'd, 631 F.2d 1049 and 631 F.2d 207 (2d Cir. 1980). The anonymous emails upon which Defendants rely fall woefully short of providing this Court with "clear, strong, substantial and incontrovertible evidence . . . that a specific, nonspeculative impropriety has occurred," Cuthel, 903 F.2d at 1383, and thus, do not justify relief.

---

[2]Related to the emails' dubious origin and complete lack of authenticity is the manner in which Defendants' counsel received them. According to counsel, they received the anonymous letter containing the alleged emails and personal information of Juror B on September 5, 2006. At that time, counsel made no effort to contact this Court about the possibility of jury tampering, especially the possibility that an unidentified individual was investigating and accumulating personal information about a juror, including highly personal information completely irrelevant to this case. Instead, counsel continued to receive correspondence from the anonymous source over a two month period while making no effort to contact this Court, report the possibility of jury tampering to the authorities, or make any inquiry into the identity of the anonymous mailer. In fact, counsel received one installment of information from the anonymous source on approximately September 22, 2006 (given the September 21, 2006 postmark) – three days before they filed the Motion. Counsels' articulated concern about possible juror misconduct is belied by their abject failure to initiate any remedial action to protect the integrity of this Court's proceedings and the secrecy of deliberations.

Moreover, the affidavits of Juror A, his wife, and his pastor, which together are the other pillar of Defendants' evidentiary proffer, are as speculative and unreliable as the unauthenticated emails from the anonymous source. In fact, these affidavits raise more questions about their creation and Defendants' possession of them than they do about alleged improprieties occurring in the jury room during trial. Glaringly, Defendants have promised, see Mot. at 3, but failed to inform the Court about the circumstances leading to the affidavits' production or how Defendants came to possess them. From the fax tags of Exhibits 6 and 7, one learns that the affidavit of Juror A's pastor and wife were faxed to Defendant Siegelman's attorneys on September 8, 2006, at 4:30 p.m. The affidavits were pages 2 and 3 of a seven page fax, but Defendants do not include page 1, ostensibly the cover page, or the remaining four pages. Curiously, Juror A's first affidavit is four pages in length, but does not have a fax tag, though it was notarized the same day as the pastor's and wife's affidavits. Perhaps Juror A's first affidavit is the undisclosed four pages to Defendant Siegelman's attorneys. Defendants, the only persons with that answer, did not think it expedient or important to answer this question for the Court, government, or public.

Similarly, Juror A's second affidavit, Exhibit 9, has a fax tag that reveals it was apparently faxed to a Staples office store in the Atlanta metro area on September 2, 2006, at 6:13 p.m. Notably, two of Defendant Scrushy's attorneys live and practice in the Atlanta area. Defendants once again provide absolutely no explanation for why Juror A's affidavit would be faxed to a public location in Atlanta, who faxed the affidavit, why it was faxed, to whom it was faxed, and why Defendants even know this second affidavit was in existence. Also, the cover page of the three page fax, which would answer many of these questions, is not included in Exhibit 9. Defendants' failure to provide the cover pages is even more suspicious in light of their explanation for including (and publicizing)

wholly irrelevant personal information of Juror B, which they attributed to their purported desire to include all the material they received from the anonymous source of the emails. Defendants' stated focus on completeness evaporates, however, when it comes to revealing who made the contact with Juror A, his pastor and his wife, why Defendants knew about such contacts, and all the other circumstances surrounding Defendants' obtaining these affidavits. Further, Juror A's second affidavit was faxed six days before someone faxed his pastor's affidavit and his wife's affidavit (and possibly Juror A's affidavit) to Defendant Siegelman's attorneys. Simply stated, the affidavits contain numerous irregularities and peculiarities that cast overwhelming doubt on their reliability, and on the veracity of their contents.

Defendants possess the affidavits of Juror A despite this Court's Local Rule 47.1 which flatly prohibits any attorney, defendant, or any person acting for them or on their behalf from interrogating a juror, either in person or writing, "in an attempt to determine the basis for any verdict rendered or to secure other information concerning the deliberations of the jury or any members thereof." See United States v. Venske, 296 F.3d 1284, 1291 (11th Cir. 2002) ("[I]t is well settled that district courts have the power to make rules and issue orders prohibiting attorneys and parties from contacting jurors, whether directly or indirectly, absent prior court approval."), cert. denied, 540 U.S. 1011 (2003). The affidavits Defendants attached to the Motion are exactly the type of interrogation Local Rule 47.1 proscribes without first obtaining this Court's permission. See id. at 1291 ("the principal purpose [for local juror contact rules] is to prevent 'fishing expeditions in search of information with which to impeach jury verdicts'") (quoting United States v. Davila, 704 F.2d 749, 754 (5th Cir. 1983)).

Defendants' possession of these affidavits ipso facto shows their violation of Local Rule

47.1.  Defendants have either themselves interrogated Juror A, or received these affidavits from someone who did so with the express purpose of inquiring into the basis for the jury's verdict.  Either way, this violation of Local Rule 47.1 is grounds alone to deny the Motion and any requested relief for further investigation.  Tanner, 483 U.S. at 126 ("The juror affidavit submitted in support of the second new trial motion was obtained in clear violation of the District Court's order and the court's local rule against juror interviews . . . on this basis alone the District Court would have been acting within its discretion in disregarding the affidavit.");  Venske, 296 F.3d at 1291 (affirming district court's exclusion of the defendants' alleged evidence of juror misconduct obtained in violation of local juror rules because "where attorneys or parties obtain evidence in violation of the court's rules or orders, the court may exercise its power to enforce those rules and orders by excluding the evidence wrongfully obtained").  See United States v. Brasco, 516 F.2d 816, 819 n.4 (2d Cir.) ("[C]omplicity by counsel in a planned, systematic, broad-scale, posttrial inquisition of the jurors by a private investigator or investigators is reprehensible, to say the least."), cert. denied, 423 U.S. 860 (1975).

The highly speculative and questionable circumstances surrounding the manufacture of the affidavits should lead this Court not to conduct any further inquiry nor to hold a hearing.  If the Court decides to grant a hearing, the sole issue investigated should be the creation of the affidavits and Defendants' possession of them.  See Venske, 296 F.3d at 1289 (noting the trial court's decision to reserve ruling on the merits of the defendant's motion for new trial and having a hearing on the circumstances surrounding their posttrial contact with jurors); Ianniello, 866 F.2d at 544 (authorizing district court to inquire into whether any person violated the law or court orders barring posttrial interrogation of jurors).  Numerous questions concerning the affidavits arise from even a cursory

-11-

review of them.

The first affidavit of Juror A, his wife, and his pastor are each taken on August 9, 2006, in Jefferson County, Alabama, though each affiant provides an address in Ozark, Alabama, which is in Dale County. Defendants do not even attempt to explain why these affidavits were taken in Jefferson County (a location where one or more of Defendant Scrushy's legal counsel resides), instead of Dale County, how the affiants traveled to and from Dale County to Jefferson County (especially given Juror A's claim of financial hardship), to whom in Jefferson County the affiants gave the affidavits, and the connection between the recipients of the affidavits and Defendants.

The pastor's affidavit states that he advised Juror A's wife to "seek further legal help to promote healing for her husband," but Defendants provide no information about what prior legal assistance Juror A's wife had sought or from whom, nor any information about whom the pastor advised her to further consult. Moreover, government notes that they credibility of the pastor is questionable in that he has been charged in Dale County in a felony indictment for criminal offenses stemming from his possession of three forged checks.

Juror A's wife, moreover, states in her affidavit that she is "here today" to tell their story, but Defendants provide no details on where she is, to whom she is telling their story, and whether this affidavit is part of the "further legal help" the pastor told her to obtain. Certainly, Juror A's wife statement that her husband told her postverdict about purported aspects of the jury's deliberations (e.g., internet communications among the jury) is hearsay and entirely devoid of any specific factual allegation that jurors discussed the substance of the case in any way. Any reading of Juror A's wife's affidavit, let alone a reading in light of Defendants' burden, shows that it does not provide "clear, strong, substantial and incontrovertible evidence . . . that a specific, nonspeculative impropriety has

occurred." Cuthel, 903 F.2d at 1383. Consequently, the wife's affidavit, like the pastor's affidavit, provides no basis to grant Defendants any relief.

The affidavits of Juror A are less credible and more speculative than the affidavits of his pastor and wife, raise additional questions about their manufacture, and call for further scrutiny of Defendants' actions in obtaining and possessing them. Puzzlingly, the affidavits are in question and answer format, but the identity of the questioner in the affidavits is never revealed, nor discussed in the Motion. Each affidavit is taken by an anonymous person, which fact alone calls for its complete rejection by this Court. See supra (citing cases). Defendants' failure to identify the unknown inquisitors is not surprising given that revelation of the source and motives for coaxing this attack on the verdict would likely undermine its credibility, and given the potential punishment for a violation of Local Rule 47.1. The unknown inquisitors are obviously legally trained given his/her questions to Juror A and his/her statements in the affidavits. In addition, the unknown inquisitors are determined to coax answers from Juror A and create an affidavit designed to show juror misconduct during deliberations to benefit Defendants.

The affidavits could not be less objective, and yet Defendants claim that they present objective, substantial proof of juror misconduct – all the while Defendants fail even to mention that an unknown inquisitor is cross-examining Juror A under unknown circumstances. For example, the unknown inquisitor tells Juror A that he has symptoms common to "post jury stress syndrome," Mot., Exh. 8 at 3, and rephrases Juror A's answers to sound more alarming than they were. See e.g., Mot., Exh. 8 at 3 ("So what you are really saying is that you were coerced, forced, and compelled by the judge. You were intimidated by his power to detain you, and authority to force the jury to reach a speedy verdict."). Most questionable, is how the unknown inquisitors provided the affidavits

-13-

to Defendants. Permitting Defendants to engage in further investigation of the jurors, much less granting them a new trial, on the basis of this flimsy, unsubstantiated, highly speculative, anonymous information would be to sanction a fishing expedition of the type the Supreme Court has specifically admonished courts not to grant postverdict. See Tanner, 483 U.S. at 120-21.

The second affidavit of Juror A increases the speculation around his questioning and its connection to Defendants. The second affidavit is taken in Dale County, rather than Jefferson County, on September 1, 2006. Mot., Exh. 9. Initially, Defendants provide no reason why a second affidavit of Juror A was obtained, who decided to obtain this second affidavit, the circumstances leading to Juror A providing this second affidavit, or any other detail about the second affidavit other than its existence. Defendants fail to inform the Court why the second affidavit is taken in a different location before a different notary public than the first affidavit. The second affidavit states that it is "continued" from the first affidavit, but Defendants believe it unimportant to state who wanted to continue the questioning, why the questioning was continued, where the questioning was performed, and who was present during the questioning. Defendants do not apprise the Court of why this second affidavit was taken almost a month after the first affidavit. Defendants do not reveal whether they knew about the first affidavit prior to the taking of the second affidavit. In fact, Defendants never state when or how they received either affidavit. The second affidavit, like the first one, is in question and answer format, but the inquisitor is still unknown. Defendants do not say whether the inquisitor for the first affidavit was the inquisitor for the second affidavit. Defendants do not relate who decided on what questions to ask Juror A. Again, the unknown inquisitor of the second affidavit is one skilled in the law and focuses the questions for the purpose of having Juror A paint a picture of alleged juror impropriety. The initial "continued" questioning

immediately addresses the issue of alleged extrinsic information reaching the jury, and no longer mentions Juror A's need of healing or any symptoms of posttrial stress syndrome – though this was the averred reason for his seeking "further legal help" for his medical condition. Juror A's avowed purpose of impeaching his own verdict, moreover, significantly detracts from his credibility. See United States v. Williams-Davis, 90 F.3d 490, 501 (D.C. Cir. 1996) ("[T]he court found [the juror's] affidavit to be particularly suspect because of a likely motive to impeach his verdict."), cert. denied, 519 U.S. 1128 and 519 U.S. 1129 (1997).

In addition, Juror A, along with the eleven other jurors, was polled in open court after the jury's verdict was announced and orally affirmed his assent to the verdict. The polling of the jurors, which Defendants requested, provides a juror with the optimal opportunity to express disagreement with, or reservations about, the verdict. The jurors' unanimous affirmation of the verdict during the polling process provides Defendants with the assurance that a true verdict was reached and gives finality to the litigation. See Camacho, 865 F. Supp. at 1536 ("The procedure of polling all the jurors specifically and individually is to reinforce the message of unanimity in the jury's decision as building from each juror's individual decision as to the guilt or innocence of the defendants."). See also Tanner, 483 U.S. at 127 (noting the other procedural safeguards during a trial, which were all present in this case, which ensure the reliability of a verdict, e.g., voir dire, observation of the jurors by the court, counsel, court personnel, and other jurors). Given all the peculiar, questionable, and unusual circumstances surrounding his affidavits, which Defendants do not even attempt to explain, Juror A's purported willingness to impeach his verdict, more than a month after the conclusion of the trial, is highly suspect at best, and sinister at worst.

Even a cursory review of the emails and affidavits in Defendants' exhibits compels the

conclusion that the Motion should be denied without further inquiry or investigation.  The Motion

is steeped in speculation, unanswered questions, unsubstantiated allegations, and premised on

information from anonymous and untrustworthy sources.  Numerous courts, when faced with

incredible and speculative proffers similar to the one Defendants have made here, have rejected the

defendants' requests for further investigation and a new trial on strong policy grounds.  As the

Eleventh Circuit has noted

> To require any investigation in the face of such unreliable accusations would place
> an imposing burden on the district court to risk jury contamination from the
> investigative process itself, when the court has no basis whatsoever to adjudge the
> reliability of the initial accusation.

Caldwell, 776 F.2d at 999.  The Third Circuit has also noted the wisdom of not embarking on

judicial inquiries, especially postverdict, merely because a defendant voices an unsubstantiated

allegation of juror impropriety.

> In reaching our result [to affirm the district court's decision to limit additional
> investigation] we recognize that sometimes judges are tempted to order hearings to
> put matters to rest even if not strictly required.  After all, a call for a hearing has an
> inherently reasonable ring to it.  But this is not one of those circumstances for there
> are compelling reasons not to hold a hearing involving the recalling of discharged
> jurors.  As the Court of Appeals for the Second Circuit recently said: "We are always
> reluctant to haul jurors in after they have reached a verdict in order to probe for
> potential instances of bias, misconduct or extraneous influences.  As we have said
> before, post-verdict inquiries may lead to evil consequences: subjecting juries to
> harassment, inhibiting juryroom deliberations, burdening courts with meritless
> applications, increasing temptation for jury tampering and creating uncertainty in jury
> verdicts."

Gilsenan, 949 F.2d at 97 (quoting Ianniello, 866 F.2d at 543).

A trial court's denial of a defendant's Rule 33 motion based on conjecture and innuendo,

rather than clear, strong, substantial, incontrovertible evidence, without conducting further

investigation reflects the realities of the criminal justice system.  Jurors need to be protected from

-16-

postverdict inquisitions by convicted felons seeking to avoid the consequences of their criminal actions.

> '[I]t is at least fair to say that disappointed defendants serving lengthy terms of incarceration will quite understandably use every weapon at their disposal to set aside their convictions.' We do not doubt that desperate criminals willing to commit . . . crimes in the first place would think nothing of attempting to intimidate jurors in an effort to overturn verdicts.

Id. at 98 (quoting United States v. Dinorscio, 661 F. Supp. 1041, 1042 (D.N.J. 1987)). Such is the situation here.

From the beginning of these proceedings, through the jury's verdict, until now, Defendants have consistently denied all accountability for their criminal actions. Moreover, concerns about Defendant Scrushy tampering with the jury were raised during his criminal trial in the Northern District of Alabama last year. In addition, the evidence at trial which led the jury to convict these men showed that they voluntarily, willfully, and knowingly engaged in deceitful, fraudulent, and corrupt practices. For example, Defendant Scrushy told his chief financial officer to obtain the IHS check in such a way to ensure that Defendant Scrushy's fingerprints were not on the check. Defendant Siegelman lied to his chief campaign fundraiser when he told him that he was going to return the IHS check to its issuer. Defendant Siegelman further lied to his fundraiser and to the public when he knowingly failed to report the IHS check to the Alabama Secretary of State, which was in clear violation of the Alabama Fair Campaign Practices Act. Defendant Siegelman's failure to report the IHS check effectively hid from the public and law enforcement his receipt of this $250,000 from Defendant Scrushy even though his fundraiser learned in 15-20 minutes that this money was from Defendant Scrushy. Defendant Siegelman further lied to and deceived the public when he surreptitiously opened and deposited the IHS check into a secret bank account in

-17-

Birmingham, Alabama. The jurors heard this evidence, believed it to be true, and convicted these men for their criminal behavior – including convicting Defendant Siegelman for obstruction of justice.

Now, these same Defendants petition this Court for permission to conduct a sanctioned inquisition of the jurors, who honorably served during this trial, in complete disregard of the jurors' First and Fourth Amendment rights. Defendants make this request despite their having already engaged in activities, which violate at least the spirit, if not the strict letter, of Local Rule 47.1, and have led them to obtain alleged personal information and sworn statements from jurors from anonymous sources and unknown inquisitors.

Even with taking such actions, Defendants still have not carried their burden of presenting credible evidence of juror impropriety. On its face, the Motion reeks of speculation and conjecture. This Court, therefore, would be acting well within its discretion by denying the Motion without conducting any further investigation, much less granting Defendants a new trial.

## II.    Rule 606(b) Bars Defendants from Investigating the Jurors about Deliberations and Mental Processes.

Federal Rule of Evidence 606(b) narrowly circumscribes the evidence upon which a defendant may rely to impeach a jury verdict. Rule 606(b) bars testimony of a juror, his affidavit, or evidence of any statement by him concerning "any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon his or any other juror's mind or emotions as influencing him to assent to or dissent from the verdict ... or concerning his mental processes in connection therewith." Fed. R. Evid. 606(b). Under Rule 606(b), a juror may testify on "the question whether extraneous prejudicial information was improperly brought to the jury's attention

or whether any outside influence was improperly brought to bear upon any juror." Id. Unless the defendant satisfies his evidentiary burden as to prejudicial extrinsic information, the court may not question the jurors. Cuthel, 903 F.2d at 1383. See, e.g., United States v. Prosperi, 201 F.3d 1335, 1340-41 (11th Cir.) (holding that the trial court properly declined, pursuant to Rule 606(b), to investigate allegations of internal influences occurring during deliberations), cert. denied, 531 U.S. 956 (2000).

Rule 606(b) embodies the common-law rule against admission of juror testimony to impeach a verdict and the exception for juror testimony relating to extraneous influences. See Tanner, 483 U.S. at 117, 121. The Supreme Court has repeatedly acknowledged the "long-recognized and very substantial concerns" supporting Rule 606(b). Id. at 127. In Tanner, the Supreme Court recognized the need to protect the jury's deliberations from public scrutiny:

> "[L]et it once be established that verdicts solemnly made and publicly returned into court can be attacked and set aside on the testimony of those who took part in their publication and all verdicts could be, and many would be, followed by an inquiry in the hope of discovering something which might invalidate the finding. Jurors would be harassed and beset by the defeated party in an effort to secure from them evidence of facts which might establish misconduct sufficient to set aside a verdict. If evidence thus secured could be thus used, the result would be to make what was intended to be a private deliberation, the constant subject of public investigation – to the destruction of all frankness and freedom of discussion and conference."

483 U.S. at 120 (quoting McDonald v. Pless, 238 U.S. 264, 267-68 (1915)). This Circuit's pattern instructions specifically inform jurors that they will be protected from threats and assures them that they will not be harassed by the losing party. Eleventh Circuit Pattern Jury Instructions, Criminal Cases, Basic Instruction No. 11 (2003) ("Your deliberations will be secret; you will never have to explain your verdict to anyone.") As discussed supra, the Supreme Court has noted the substantial harm emanating from unrestrained postverdict investigation on the ground of juror misconduct. See

Tanner, 483 U.S. at 120-21.  The prophylactic of Rule 606(b) further protects jurors from "'the possible exploitation of disgruntled to otherwise badly-motivated ex-jurors.'"  Id. at 124 (quoting S. Rep. No. 93-1277, p. 13-14 (1974), U.S. Code Cong. & Admin. News 1974, p.7060).

In addition to the strong policy reasons of preserving the sanctity of the jury verdict, the legislative history of Rule 606(b) supports a narrow reading of the rule to limit the evidence a trial court can consider in a defendant's attempt to impeach the jury's verdict.  See, e.g., Tanner, 483 U.S. at 125 (noting that Congress rejected a version of Rule 606(b) that would have permitted impeachment of verdicts with juror testimony about juror conduct during deliberations); Camacho, 865 F. Supp. at 1529 ("Although the language of the Rule is clear, the legislative history behind Rule 606(b) is particularly illuminating as to the limited contours of a court's review of matters relating to the deliberative process.").

Rule 606(b)'s prohibition against juror's testimony applies regardless of the form of that testimony.  Rule 606(b) ( "Nor may a juror's affidavit or evidence of any statement by the juror concerning a matter about which the juror would be precluded from testifying be received for these purposes.").  See 27 Charles Alan Wright, et. al., Federal Practice and Procedure Evidence § 6074 at 415-16 (2006) (the courts have excluded "all manner of juror statements" in applying Rule 606(b), including "juror affidavits, verbal out-of-court statements testified to by conjurors, in-court statements made by a juror while announcing the verdict, or while being polled, notes written by jurors during deliberations, a newspaper article reporting juror statements, a letter sent by the jury to the judge during deliberations, a letter sent by a juror to counsel after the verdict, a letter attached to the verdict, and explanatory notes written by the jury on the verdict itself") (notes omitted).  See, e.g., United States v. Sjeklocha, 843 F.2d 485, 488 (11th Cir. 1988) (holding that the district court

-20-

erred in granting a new trial because it relied on the jury foreman's affidavit and newspaper interview that revealed that he would have voted differently had he been aware of the defendant's newly discovered evidence); United States v. Kelley, 461 F.3d 817, 831 (6th Cir. 2006) (ruling that jurors' statements in a newspaper interview regarding their thoughts about the trial are incompetent per Rule 606(b) and cannot be considered in a Rule 33 motion); United States v. Blackwell, 459 F.3d 739, 769 (6th Cir. 2006) (finding inadmissible under Rule 606(b) juror's statements in published article regarding his own mental processes or impressions in reaching his verdict); United States v. Stewart, 433 F.3d 273, 307-08 (2d Cir. 2006) (upholding trial court's denial of an evidentiary hearing to investigate a juror's statement in televised interview revealing his reliance on particular testimony, which was contrary to the trial court's instruction); United States v. Febus, 218 F.3d 784, 795 (7th Cir.) (noting that Rule 606(b) bars any inquiry into juror's statements recounted in newspaper article that the court's instructions had confused her and that other juror had pressured her to reach a verdict), cert. denied, 531 U.S. 1021 (2000).

Most of Defendants' allegations are based solely on alleged postverdict statements of jurors that concern internal matters in the jury deliberations rather than on credible evidence of extraneous prejudicial information or outside influences. For example, Defendants rely heavily upon the affidavits of Juror A, hearsay statements of Juror A in his wife's affidavit, and alleged emails between jurors. Assuming arguendo that these exhibits were credible, legitimate, and authentic, Rule 606(b) bars this Court from considering them.

A court's decision to proceed with an investigation of juror misconduct must rest, in substantial measure, on the anticipated results of such an investigation. United States v. Sokoloff, 696 F. Supp. 1451, 1458 (S.D. Fla. 1988). See Gilsenan, 949 F.2d at 97 (3d Cir. 1991) ("[A] hearing

need not be held at the behest of a party whose allegations if established would not entitle it to relief."). Here, any investigation of Defendants' allegations of intrinsic juror misconduct would necessarily probe only the jurors' collective and individual deliberative processes – a prohibited and useless endeavor because a verdict may not be impeached on that basis. See Sokoloff, 696 F. Supp. at 1458 (citing Tanner and Rule 606(b)). Thus, Defendants' allegations do not merit any postverdict judicial inquiry into the jury's deliberative process. See, e.g., Tanner, 483 U.S. at 121-22 (holding that Rule 606(b) prohibited the postverdict taking of juror testimony regarding jurors' alcohol intoxication, ingestion of cocaine, and smoking of marijuana during deliberations because such conduct was not an external influence); Sokoloff, 696 F. Supp. at 1455 (denying request to investigate claims of juror misconduct because there was no indication that the jury had been influenced by external factors).

Turning to Defendants' specific allegations of juror misconduct, Defendants contend that at least Jurors B and D were given extraneous information regarding the applicable penalties for the offenses charged, and at least Juror D considered those penalties in his or her deliberations. Mot. at 21. They base this argument on Juror D's ambiguous statement in an unauthenticated email to Juror B that "penalty 2 severe." Mot., Exh. 12. This statement, however, in no way indicates jury contamination by extraneous information or outside influences. This statement does not show that jurors considered the issue of punishment in reaching their verdict.

More importantly, Defendants have not shown that any juror learned of any penalty from an extrinsic source. Without such a showing based on strong, substantial, incontrovertible proof, see Cuthel, 903 F.2d at 1383, Rule 606(b) forecloses any investigation into the jurors' deliberation, including the matters they considered. See, e.g., Camacho, 865 F. Supp. at 1533 (denying the

defendants' request to investigate allegation that the jury considered the penalties facing the defendants because there had been no showing that such information had come from an outside source). Further, this Court instructed the jury not to consider the issue of punishment in reaching its verdict. Eleventh Circuit Pattern Inst. (Criminal), 10.4 (2003) ("Also, the question of punishment should never be considered by the jury in any way in deciding the case. If a Defendant is convicted the matter of punishment is for the Judge alone to determine later."). Defendants have presented no credible evidence to rebut the presumption that the jury followed this instruction. Brown v. Jones, 255 F.3d 1273, 1280 (11th Cir. 2001) ("[J]urors are presumed to follow the court's instructions").

Though not admissible under Rule 606(b), to the extent this Court decides to consider them, Juror B's and C's statements to the media show that the jury did not improperly consider the issue of punishment in reaching its verdict. See infra (recounting jurors' statements that they only considered the evidence admitted and this Court's instructions on the law in reaching their verdict).

Absent credible evidence that possible penalties were learned from an extrinsic source, juror statements mentioning the future effect of their verdict is inconsequential because such speculation is a matter inherent in jury deliberations and, thus, does not merit judicial inquiry. Camacho, 865 F. Supp. at 1533 ("to the extent to which these individual jurors' statements reflect speculation by some jurors as to future effects of their verdict, for example in the form of future court actions, we ... find these to be matters inhering in the internal deliberative process that do not merit further inquiry"); United States v. Straach, 987 F.2d 232, 242 (5th Cir. 1993) (holding that where there was no indication that the jurors had knowledge from an outside source of the penalties, the verdicts must stand). Moreover, even assuming the emails between Jurors B and D are authentic, Juror D's statement shows that any consideration of the penalties was favorable to Defendants and in no way

prejudiced them. See Williams-Davis, 90 F.3d at 499 (finding that exchange between juror and dismissed alternate who told juror not to allow forfeiture of the defendant's property did not prejudice the defendants because the alternate's comments were favorable to the defendants).

Defendants rely on the following statement in Juror A's August 9, 2006, affidavit to further claim jury misconduct during deliberations, "I thought that the governor had put the money from Healthsouth in his personal account. But now I know that ain't true." Mot., Exh. 8. They claim that Juror A's purportedly erroneous impression of the evidence at some point during the deliberative process was clearly the product of extrinsic evidence gleaned from the internet by another juror and injected into the deliberations. Mot. at 21. Defendants make this assertion without a scintilla of evidence to support it. Without proof of extraneous prejudicial information, Juror A's alleged confusion is just that – a mistaken impression of the evidence presented to the jury. "Courts wisely have treated allegations of a juror's inability to ... comprehend at trial as an internal matter." Tanner, 483 U.S. at 118. See also United States v. Schwartz, 787 F.2d 257, 261-62 (7th Cir. 1986) (finding that the postverdict statements of the foreman and another juror indicating their misconception of the evidence could not be used, under Rule 606(b), to impeach their verdict). Defendants' reliance on Juror A's postverdict ruminations about the evidence is simply unavailing.

Defendants' claim that at least Juror B and Juror C engaged in premature deliberations likewise fails for lack of competent evidence and, thus, warrants no investigation. Mot. at 22-26. Defendants argue that the unauthenticated, speculative emails between Juror B and Juror C imply that some jurors engaged in premature deliberation prior to the conclusion of the Government's case. Mot., Exhs. 10 and 11. Defendants buttress this allegation with the averment by Juror A's wife that Juror A had told her that there were "Internet communications among the jury." Mot. at 12; Exh.

7. Juror A, however, failed to mention this alleged internet communication in either of his question-and-answer affidavits, and the unknown inquisitor did not craft Juror A's alleged knowledge of such communication in his/her questions of Juror A.  Mot., Exhs. 8 and 9.

At most, the emails, assuming they are authentic, suggest that Juror B was referring to the jurors' general understanding of the charges when she allegedly emailed, "I agree some of the kounts r confusing 2 our friends.  Chek text.30/38 still off trac."  These statements are not deliberations about Defendants' guilt.  As such, they are not the target of the prohibition on premature deliberations.  They do not mention a formed opinion of guilt, comment on the facts or merits of the case, express any bias against Defendants, indicate a less than open mind, exemplify a disregard for the collective deliberative process, or indicate a shift in the burden of proof.[3]  See United States v. Resko, 3 F.3d 684, 689-90 (3d Cir. 1993) (listing six reasons for the prohibition against premature deliberation).  See, e.g., United States v. Dominguez, 226 F.3d 1235, 1244 (11th Cir. 2000) (affirming the trial court's finding of no juror misconduct where, even before the prosecution had finished presenting its case, some jurors had discussed the facts of the case and there was a "fairly general consensus"), cert. denied, 532 U.S. 1039 (2001); Sokoloff, 696 F. Supp. at 1456 (refusing to interview jurors about predeliberation discussions of the attorneys and their trial strategies).

Regardless of the nature of the emails, the Eleventh Circuit and other courts have consistently held that predeliberation intrajury communications and expression of opinion as to guilt, while not condoned and in violation of the court's instructions, cannot serve as the basis to impeach a verdict and thus are not grounds for further investigation into the jury's conduct.  Camacho, 865 F. Supp.

---

[3]Again, even though not admissible under Rule 606(b), to the extent this Court decides to consider them, Juror B's and C's statements to the media show that the jury did not engage in premature deliberations.  See infra.

at 1534. See, e.g., Tejada v. Dugger, 941 F.2d 1551, 1561 (11th Cir. 1991) (affirming the trial court's denial of the defendant's motion to depose an excused juror to support his postverdict speculation of premature deliberation because the defendant failed to show the presence of extraneous information or outside influence), cert. denied, 502 U.S. 1105 (1992); Williams-Davis, 90 F.3d at 504 (holding that Rule 606(b) barred consideration of five jurors' postverdict assertions of predeliberation discussions, and stating that "a trial court is virtually automatically justified in declining to pursue such an inquiry"); Cuthel, 903 F.2d at 1383 (prohibiting any further investigation under Rule 606(b) because an alternate juror's postverdict claim of premature deliberation did not present any showing of external influence); Camacho, 865 F. Supp. at 1534 (refusing to conduct further investigation on basis of postverdict juror affidavits stating that some jurors discussed the merits of the case and expressed opinion as to guilt or innocence before the case was submitted to the jury because the allegations lacked evidence of extrinsic influence); Sokoloff, 696 F. Supp. at 1457 (conducting no investigation where the assumed discussion among the jurors pertained only to the manner in which counsel conducted the trial, did not concern the merits of the case, commit a juror to any outcome, or demonstrate any prejudgment, and showed no presence of outside influence). Cf. Dominguez, 226 F.3d at 1248 & n.13 ("when there are premature deliberations among jurors with no allegations of external influence on the jury, the proper process for jury decisionmaking has been violated, but there is no reason to doubt that the jury based its ultimate decision only on evidence formally presented at trial") (citing Resko, 3 F.3d at 690). Any postverdict probe into jurors' premature deliberation (as opposed to a preverdict inquiry, which falls outside the ambit of Rule 606(b)) would require an inquiry into the jurors' mental processes -- an inquiry Rule 606(b) expressly prohibits. Camacho, 865 F. Supp. at 1534. See, e.g., Sokoloff, 696

F. Supp. at 1456 (ruling that Rule 606(b) precludes any postverdict inquiry into the allegations that a juror may have formed an opinion too soon and that some jurors had not followed the court's instructions not to discuss the case and to keep an open mind).

Defendants fail to acknowledge that this Court repeatedly instructed the jury several times each day during trial, and at the close of the case, not to discuss the merits of the charges until they retired for their deliberations. See Eleventh Circuit Pattern Instr. (Criminal) 2.2 (2003) (instructing jury not to discuss the case among themselves in any manner prior their deliberations at the end of the case). Defendants have once again not presented any credible evidence to rebut the presumption that the jurors adhered to this Court's instructions. Brown, 255 F.3d at 1280 ("[J]urors are presumed to follow the court's instructions").

Finally, the return of a split verdict in this case further dismisses Defendants' allegation of premature deliberation, for "[t]he careful weighing of evidence inherent in a split verdict makes the verdict itself 'evidence that the jury reached a reasoned conclusion free of undue influence and did not decide the case before the close of evidence.'" Dominguez, 226 F.3d at 1248 (quoting Cuthel, 903 F.2d at 1383). See also Sokoloff, 696 F. Supp. at 1457 (noting that a split verdict "alone heavily militates against the belief that the jury had decided the case based on pre-deliberative conversations among themselves concerning the attorneys").

Defendants also argue that the emails between Jurors B and C are evidence of a conspiracy between them to manipulate the other jurors to render guilty verdicts. Mot. at 25. Presumably, Defendants incorporate into this argument the recently disclosed email, allegedly between Juror B and Juror F ("proud of u ... other 6 kounts most important ... c.u.n. am.") Mot., Exh. 15. See "Defendant Scrushy's Motion for Expedited Consideration of an Order to Require Preservation of

Evidence," (Doc. 472-1) at 3, n.3 (asserting that the three purported emails "demonstrate a pattern of Juror B trying to orchestrate guilty verdicts against Defendants Scrushy and Siegelman").

Again, however, the substance of the emails do not support Defendants' speculation. Aside from the question of their legitimacy, they do not reflect any predisposition regarding the evidence or Defendants' guilt. Moreover, and dispositively, the purported emails, even if authenticated, would not be admissible under Rule 606(b)'s prohibition of juror testimony regarding the method by which the jury arrived at its decisions. "[T]he suggestion that individuals encountered pressure from other jurors during their debates or that the jurors reached a compromise in the verdict that resulted from their debate is not something that this Court will interfere with" because such allegations "go to the heart of the deliberative process." Camacho, 865 F. Supp. at 1532. See also United States v. Casamayor, 837 F.2d 1509, 1515 (11th Cir. 1988) ("the alleged harassment or intimidation of one juror by another would not be competent evidence to impeach the verdict under Rule 606(b)"), cert. denied, 488 U.S. 1017 (1989); Sokoloff, 696 F. Supp. at 1456 ("the 'pressure' to reach a verdict is inherent to the system, and the [anonymous] caller, even if a juror, could have been referring to the type of internal influence to which jurors simply cannot testify under Federal Rule of Evidence 606(b) and Tanner").

Pressure from other jurors is not an outside influence and therefore cannot be a basis for a juror misconduct claim if a reasonable jury could have found that the conviction was supported by the evidence beyond a reasonable doubt. Straach, 987 F.2d at 241-42. This Court has already determined that the Government's evidence supported Defendants' guilt beyond a reasonable doubt. See Order, October 2, 2006, at 7-8 (Doc. 468) ("the Government presented substantial evidence upon which a reasonable trier of fact could conclude that Siegelman and Scrushy engaged in the conduct

for which they were convicted"). <u>See</u> <u>also</u> <u>Cuthel</u>, 903 F.2d at 1383 (affirming the decision not to investigate an anonymous telephone call from a woman, allegedly stating that "we were pressured into making our decision," because pressure on the jury to make a decision is "a normal dynamic of jury deliberations, with the intense pressure often required to reach a unanimous decision"). Even if the jury relies upon a mistake, compromise, or lenity in rendering its verdict, thus making its ultimate decision for impermissible reasons, the trial court has no power to review it. <u>Camacho</u>, 865 F. Supp. at 1532. Even if Defendants had shown the emails to be authentic (which they admit they cannot do), Rule 606(b) bars this Court from considering their contents to impeach the jury's verdict.

Defendants also contend that the unauthenticated emails between Juror D ("penalty 2 severe ... still unclear on couple of counts against pastor & gov"), Mot., Exh. 12, and Juror B ("... stay focused ... remember what judge said ... have plans for 4th ... right?"), Mot., Exh. 13, are evidence of their deliberating outside the presence of the entire jury. Presumably, Defendants incorporate into this argument the most recent alleged email, supposedly from Juror B to Juror F ("proud of u ... other 6 kounts most important ... c.u.n. am"), Mot., Exh. 15. Even if authenticated, these emails likewise are not competent evidence under Rule 606(b). These purported messages, like the ones upon which Defendants base their premature-deliberation allegation, are on their face statements of jurors that this Court cannot consider under Rule 606(b). <u>See</u>, <u>e.g.</u>, <u>Camacho</u>, 865 F. Supp. at 1537 (ruling that Rule 606(b) bars inquiry posttrial into the exclusion of a juror from key moments during the deliberations). As the purported emails go straight to the heart of the jury's deliberative process, Rule 606(b) bars further investigation.

Based on their speculative and unsubstantiated hearsay exhibits, Defendants claim that Juror A told his wife about "the pressure and intimidation from the Judge," Mot., Exh. 7, and that the

-29-

Court had "practically threatened" the jury.  Mot., Exh. 8.  Juror A claims that the Court told the

jurors that he "had all the time in the world" because he has a lifetime appointment and that "he had

no problem holding [the jury] until the next Fourth of July," so the jurors "had to do whatever to get

out of there." Mot., Exh. 8.  As a result, they "voted based on the pressure applied by the judge."

Mot., Exh. 9.  On information and belief, the Government asserts that the Court did not make these

purported comments.  Rather, all of the Court's comments were entirely proper, and in no way

coerced the jury.  If anything, the Court went out of its way to constantly include accommodations

to the defense in its communications with the jury, as for example, when the Court, at Defendants'

behest, instructed the jury on the standard of reasonable doubt when giving the pattern <u>Allen</u> charge.

Any juror's statement that a juror was unduly pressured by the court's instructions and

comments falls within Rule 606(b)'s prohibition against testimony regarding the jurors' deliberations

and their internal mental processes.  <u>Watson v. Alabama</u>, 841 F.2d 1074, 1076 n. 2 (11th Cir.), <u>cert</u>.

<u>denied</u>, 488 U.S. 864 (1988); <u>United States v. Vincent</u>, 648 F.2d 1046, 1049 (5th Cir. Unit A June

1981).[4]  <u>See</u> <u>also</u> <u>Camacho</u>, 865 F. Supp. at 1533 (noting that a juror's statements revealing his

interpretation of the meaning and the application of the jury instructions is "at the very heart of the

jury deliberation process" and are thus not evidence under Rule 606(b)); <u>United States v. Chandler</u>,

950 F. Supp. 1545, 1579 (N.D. Ala. 1996) (ruling that Rule 606(b) precludes consideration of an

affidavit describing a juror's mental reactions to the court's jury charge), <u>aff'd</u>, 218 F.3d 1305 (11th

Cir. 2000), <u>cert</u>. <u>denied</u>, 531 U.S. 1204 (2001).  This prohibition excludes from consideration any

statement by Juror A and his wife relating to the jury's internal workings and deliberative process

---

[4]In <u>Bonner v. City of Prichard</u>, 661 F.2d 1206 (11th Cir. 1981), the court adopted as
precedent all decisions of the former Fifth Circuit Court of Appeals decided prior to October 1,
1981.

and the jurors' mental operations. Furthermore, Defendants do not present any prejudice in the form of an objective manifestation of any possible coercive effect from the Court's instructions and comments. Accordingly, the trial court should refuse to grant Defendants any relief on the basis of undue pressure on the jurors.

In his affidavit, Juror A further claims that he now regrets his concurrence with the verdict. Second-guessing a verdict goes to the innermost mental processes of a juror – a topic certainly within the scope of Rule 606(b). To launch a post-verdict inquiry on such evidence would "plainly eviscerate Rule 606(b)." Camacho, 865 F. Supp. at 1537 (refusing to consider a juror's post-verdict expression of a willingness to express a different verdict). See United States v. Miller, 806 F.2d 223, 225 (10th Cir. 1986) (holding that Rule 606(b) barred investigation of a juror's post-verdict concerns, as expressed to her pastor, that she was having second thoughts about her vote as a juror, that she was now unsure of the defendant's guilt, and that, in hindsight, she believed she had been unduly influenced by other jurors).

Given the inadmissibility of any jurors' testimony through affidavit, any statement by a juror to a nonjuror, any email exchange between jurors, any allegation in an anonymous letter, or any statement attributed to a juror in a newspaper article or television interview pertaining to the above internal matters, and given further the complete absence of nonjuror evidence to support Defendants' allegations, this Court should not pursue any investigation into Defendants' allegations. See Tanner, 483 U.S. at 127 (holding that the district court did not err in denying an additional evidentiary hearing because of the inadmissibility of juror testimony and the insufficiency of the nonjuror testimony). The inquiry Defendants adamantly want to conduct into the jury's deliberations is precisely the sort of inquiry that Rule 606(b) prohibits.

In sum, and for solid policy reasons, Rule 606(b) severely curtails the grounds upon which Defendants can pursue postverdict relief. Rule 606(b) prevents a court from haling jurors back to face a disappointed Defendants' inquisition as to how they reached their verdict. Allegations of postverdict remorse, confusion about the evidence, premature deliberations, deliberations outside the jury's presence, and undue pressure from the Court are simply not areas which this Court can or should delve absent a clear, strong, substantial, incontrovertible showing of extraneous prejudicial influences. Defendants have made no such showing. Therefore, Rule 606(b) operates to preclude the vast majority of the Motion's claims, and compels its denial.

## III. Defendants' Claims of Extrinsic Information Reaching the Jury Do Not Justify Relief Because They Have Failed to Carry Their Evidentiary Burden and No Reasonable Possibility of Prejudice Exists From Any Alleged Extrinsic Contact

Defendants claim that the jurors considered extrinsic matters in reaching their verdict, and that they are, therefore, entitled to relief – an opportunity to further investigate their claims, or, preferably, a new trial. See Mot. at 13. Defendants, however, are not entitled to any relief whatsoever because they have not met their evidentiary burden of showing extrinsic influence on the jury. Further, even assuming, arguendo, that their allegations are true, no reasonable possibility of prejudice arises from the claimed extrinsic contacts with the jurors. Consequently, this Court should deny the Motion.

### A. The Proper Analytical Framework to Consider Defendants' Allegations of Extrinsic Evidence

In assessing an allegation of extrinsic influence on the jury, this Court must first determine whether Defendants have met their evidentiary burden of making a "colorable showing of extrinsic influence" sufficient "to overcome the presumption of jury impartiality." Barshov, 733 F.2d at 851.

See United States v. Pessefall, 27 F.3d 511, 515 (11th Cir. 1994) (noting the defendant's burden to establish that the jury had an extrinsic contact), cert. denied, 513 U.S. 1174 (1995). As discussed supra, this evidentiary burden requires the defendant to come forward with "clear, strong, substantial and incontrovertible evidence that a specific, nonspeculative impropriety has occurred." Cuthel, 903 F.2d at 1383 (citations and quotations omitted).

Once the defendant has sufficiently shown the jurors to have considered extrinsic evidence, relief is warranted only if the extrinsic influence "poses a reasonable possibility of prejudice to the defendant." United States v. Rowe, 906 F.2d 654, 656 (11th Cir. 1990). Eleventh Circuit case law is unsettled on how the district court is to first assess the possibility of prejudice. One line of cases, cited by Defendants, states that "prejudice is presumed and the burden shifts to the government to rebut the presumption." United States v. Ronda, 455 F.3d 1273, 1299 (11th Cir. 2006) (citing Remmer v. United States, 347 U.S. 227, 229 (1954)). "To rebut the presumption of prejudice, the government must show that the jurors' consideration of extrinsic evidence was harmless to the defendant." Id. A conflicting line of cases, which Defendants fail to acknowledge, holds that "[p]rejudice is not presumed, [and t]he defendant has the burden of demonstrating prejudice by a preponderance of the evidence." Rowe, 906 F.2d at 656 (citing United States v. Winkle, 587 F.2d 705, 714 (5th Cir.), cert. denied, 444 U.S. 827 (1979)). The Eleventh Circuit has yet to resolve this conflict. Ronda, 455 F.3d at 1299 n.36. Instead, the Eleventh Circuit has typically granted the defendant the presumption of prejudice because the record showed that the government could sufficiently rebut the presumption. See id.

Other Circuits have addressed this conflict and held that the Supreme Court has overruled, or at least narrowed, the Remmer presumption of prejudice. See, e.g., United States v. Sylvester,

143 F.3d 923, 934 (5th Cir. 1998) ("We agree that the Remmer presumption of prejudice cannot survive [Smith v.] Phillips[, 455 U.S. 209 (1982)] and [United States v.] Olano[, 507 U.S. 725 (1993)]. Accordingly, the trial court must first assess the severity of the suspected intrusion; only when the court determines that prejudice is likely should the government be required to prove its absence."); Williams-Davis, 90 F.3d at 497 ("[W]e think the district court was correct under the Supreme Court's and our cases to inquire whether any particular intrusion showed enough of a 'likelihood of prejudice' to justify assigning the government a burden of proving harmlessness."); United States v. Boylan, 898 F.2d 230, 261 (1st Cir.) ("[T]he [Remmer] presumption is applicable only where there is an egregious tampering or third party communication which directly injects into the jury process."), cert. denied, 498 U.S. 849 (1990). See also Parker v. Head, 244 F.3d 831, 839 n.6 (11th Cir.) (noting other Circuits' resolution of the Remmer conflict), cert. denied, 534 U.S. 1046 (2001).

A review of Remmer, its progeny, and the cases addressing this conflict in the law should lead this Court to the conclusion that a presumption of prejudice is not triggered by a defendant's proper showing of an extrinsic influence on the jury. Remmer dealt with a particularly egregious, preverdict, extrinsic contact with a juror (namely, an attempted bribe of a juror during the trial) and an investigation of that contact which was not disclosed to the defendant. See Remmer, 347 U.S. at 229. Rarely will an extrinsic contact with a juror rise to this level, and such is certainly not present in this case. Consequently, this Court should follow Rowe and place on Defendants "the burden of demonstrating prejudice by a preponderance of the evidence." Rowe, 906 F.2d at 656. Since Defendants have not met this burden, this Court should deny the Motion. In the alternative, this Court, on the record before it, can reserve resolution of the Remmer conflict, presume prejudice, and

-34-

find that any consideration of extrinsic evidence by the jurors was harmless to Defendants.  See

Ronda, 455 F.3d at 1299.  Under either approach, Defendants are not entitled to any relief.

**B.**   **Defendants Are Not Entitled to Relief Because They Have Not Met Their Evidentiary Burden and Any Purported Instance of Consideration of Extrinsic Evidence by a Juror Was Harmless**

Defendants allege several instances of improper extrinsic influence.  In particular, Defendants

claim that the affidavits of Juror A, his pastor, and his wife allegedly establish that the jury

considered "Internet stuff," and that Juror B had searched the Internet which was somehow

(Defendants fail to explain) related to her knowing much about "law and legal procedures."  Mot.

at 20.  In addition, Defendants point to Juror B's statement to the media that she saw "one Internet

article" about the case and Juror C's statement to the media that he "Googled" to see "what a

foreman was supposed to do," concluding these are other extrinsic contacts that warrant a new trial.

Defendants' arguments for relief on the basis of extrinsic influence are without merit.  Defendants

have failed to meet their evidentiary burden of establishing that extraneous prejudicial information

reached the jury.  Moreover, even assuming that the allegation were true, Defendants suffered no

prejudice from Juror B's reading of one Internet article and Juror C's search for the duties of a

foreman.

As discussed supra, the affidavits of Juror A, his pastor, and his wife are inherently

unreliable, speculative, and contrived.  These affidavits fall woefully short of providing credible

evidence of any improper extrinsic contact on the jury.  For this reason alone, see supra, the Motion

should be denied.  Further, Juror A's alleged comments that the jurors considered "Internet stuff"

and that Juror B told them law and legal procedures are entirely too speculative to warrant relief.

For example, the court in Camacho held that an attorney's statement that two jurors told him that the

verdict was "influenced by an outside source" and did not reflect their "assessment of the record evidence" did not satisfy the requirement of presenting a "substantial and specific showing of an extrinsic influence." Camacho, 865 F. Supp. at 1538. Similarly, in Barshov, the Eleventh Circuit held that the defendants had not met their evidentiary burden via affidavits which alleged that a juror's son had engaged in conversations with his mother and other jurors during lunches and recesses during trial. Barshov, 733 F.2d at 851-52. Such an allegation was too speculative to justify even holding a hearing on the matter. Id. at 852. In Ayarza-Garcia, the defendant argued that the jury had considered extrinsic evidence based on a juror's statement to the media that he knew the law pertaining to certain issues in the case. Ayarza-Garcia, 819 F.2d at 1051 n.6. The court ruled that the juror's statement was "insufficient to raise a colorable claim of jury impropriety." Id.

Defendants' claims of prejudicial extrinsic evidence based on the alleged affidavits of Juror A, his pastor, and his wife are more speculative than the allegations rejected in Camacho, Barshov, and Ayarza-Garcia. In this case, Juror A's affidavit speaks to "Internet stuff," "stuff out of files," "some were talking about Internet information," and "we considered everything that everybody brought and pulled out of the files." Mot., Exh.8 at 3 & Exh. 9 at 1. Defendants' allegations could not be more general and obtuse. Defendants fail to identify "stuff," "some Internet information," and "everything and everybody." Unconscionably, Defendants urge this Court to engage in an intrusive postverdict inquisition of the jurors based on purported affidavits replete with irregularities, peculiarities, and speculation (e.g., the affidavits on their face were prepared under cross-examination by unknown inquisitors under circumstances suggesting involvement of Defendants' counsel). If ever the district courts may deny a motion for new trial for failure to produce credible evidence of prejudicial extrinsic influence, as the caselaw discussed supra clearly hold that they may,

-36-

this is that case.

Defendants fare no better in demonstrating a reasonable possibility of prejudice from the alleged extrinsic influences. To determine the extent of prejudice, this Court is to "consider the totality of the circumstances surrounding the introduction of the extrinsic evidence to the jury." Ronda, 455 F.3d at 1299-1300. Relevant factors to consider include the nature of the extrinsic evidence, the manner in which the information reached the jury, and the strength of the government's case. Id. at 1300. Additional considerations pertinent to the inquiry are the nature of the jury's verdict, the instructions given to the jury, and the degree to which jurors were exposed to extrinsic evidence. See e.g., Cuthel, 903 F.2d at 1383 (noting that the split verdict supported the district court's finding of no prejudicial extrinsic influence on the jury); Gilsenan, 949 F.2d at 96 (acknowledging that the split verdict showed that jurors followed the trial court's instructions to decide the case solely on the evidence and not extrinsic information); Barshov, 733 F.2d at 852 ("It is presumed that the jurors followed the court's oft-repeated instructions not to discuss the case with anyone."); Stewart, 433 F.3d at 307 (considering "the well-settled proposition that jurors are presumed to follow instructions"); Boylan, 898 F.2d at 263 (upholding denial of the defendant's new trial motion because nothing tangible surmounted the presumption that the jurors followed the court's instructions); Ronda, 455 F.3d at 1300 n.37 (examining whether juror communicated extrinsic information to fellow jurors).

In considering Defendants' allegations, this Court has guidance from the Supreme Court's opinion in Smith v. Phillips, 455 U.S. 209 (1982).

> [D]ue process does not require a new trial every time a juror has been placed in a potentially compromising situation. Were that the rule, few trials would be constitutionally acceptable. . . . [I]t is virtually impossible to shield jurors from every

> contact or influence that might theoretically affect their vote. Due process means a jury capable and willing to decide the case solely on the evidence before it, and a trial judge ever watchful to prevent prejudicial occurrences and to determine the effect of such occurrences when they happen.

Id. at 217. In addition, "while due process of law mandates that a fair trial be provided to the [defendant], there is no constitutional right to a perfect trial." United States v. De La Vega, 913 F.2d 861, 870 (11th Cir. 1990) (citations and quotations omitted), cert. denied, 500 U.S. 916 (1991).

The completely speculative nature of Defendants' affidavits precludes any meaningful evaluation of Juror A's claims that the jury considered extrinsic information. Juror A identifies only "Internet stuff," "stuff in files," and "law and legal procedures." The affidavits of Juror A and his wife do not point to any particular document or item of information. Nor does Juror A identify who had files containing documents. Defendants' proffer simply does not support a finding of prejudice. See id. (noting the lack of evidence to support a finding of prejudice). Prudence counsels against launching a posttrial inquiry of the jurors on such flimsy and unsubstantiated allegations contained in affidavits rife with anomalies and submitted by defendants who have been less than candid with this Court about how these affidavits came into being and into their possession. Juror A's affidavit is particularly suspect given his apparent motive to impeach his verdict. Williams-Davis, 90 F.3d at 501.

Defendants have presented no credible evidence to rebut the presumption that the jurors followed this Court's repeated instruction not to consider anything other than the evidence and law presented at trial. See supra (citing cases that a defendant must present credible evidence to rebut the presumption that a jury follows a court's instructions not to consider any extrinsic materials).

See also United States v. Phillips, 664 F.2d 971, 997 (5th Cir. Unit B Dec. 1981)[5] ("The court's constant admonitions to the jury concerning media coverage and its collective questioning of the jury were adequate safeguards to ensure that appellants received a fair trial free from prejudice."), cert. denied, 457 U.S. 1136 and 459 U.S. 906 (1982), superceded by Rule on other grounds, United States v. Huntress, 956 F.2d 1309 (5th Cir. 1992), cert. denied, 508 U.S. 905 (1993).  Defendants must do much more than point to Juror B's mere admission that she saw "one Internet article" related to the case.  They have the burden to present "clear, strong, substantial and incontrovertible evidence . . . that a specific, nonspeculative impropriety has occurred." Cuthel, 903 F.2d at 1383.  See also Sun Myung Moon, 718 F.2d at 1234 (finding that the defendant had made "no showing, let alone a substantial one, that any of the jurors read prejudicial newspaper accounts of the case" even where one juror admitted that he and other jurors cut out articles about the case to read after the trial).  Defendants have not shown whether the "one Internet article" was prejudicial.  Instead, Defendants rely on Juror B's statement to the media that she saw the article, and completely ignore Juror B's other statements in the media accounts about her and the other jurors' impartiality and adherence to this Court's instructions.

In the media reports on which Defendants rely,[6] Jurors B and C emphatically state that no extrinsic matter influenced the jury's verdict.  See Mot., Exh. 1 at 5 (Juror C stating that the jurors "never strayed from the notebook of instructions given by the judge");  Exh. 3 at 1 (Juror C

---

[5]After October 1, 1981, only the decisions of the continuing Fifth Circuit Administrative Unit B are binding on this circuit, while Unit A decisions are merely persuasive.  Stein v. Reynolds Sec., Inc., 667 F.2d 33, 34 (11th Cir. 1982).

[6]Though Rule 606(b) renders them inadmissible, see supra, the United States points to the jurors' posttrial media statements in case this Court decides to consider them.

commenting that the jurors "took the judge's instructions very seriously"); Exh.3 at 2 (Juror C averring that "[t]he decision was based on evidence"); Exh. 5-A (Juror B stating that she "wanted to not base my decision on anything other that [sic] what was entered in court"); Exh. 5-B at 8 (Juror B noting that the jury's task was "to look at the evidence, look at the law and come up with a verdict if we can"); Exh. 5-A at 12 (Juror B stating that the jury's duty was "to look at the evidence and look at the law and to decide based on those two factors and nothing else what was the correct verdict to come up with"); Exh. 5-A at 19 (Juror B commenting that "[w]e were looking at the evidence and we were looking at the law"); Exh. 5-A at 24 (Juror B noting that "I wanted to make sure that when the verdict was reached at the end, that I had confidence that the verdict had been reached based on the evidence entered in and the law and by no other consideration.  So it was important to me not to let any other consideration come into my decision-making."); Exh. 5-A at 30 (Juror B announcing that the jury's "commitment is to the evidence and to the law"); Exh. 5-A at 31 (Juror B concluding that "in the end, that's what we decided, we wanted to come up with a verdict that was only based on two things, and that was the evidence and the law.  And I really feel like we did that."); Exh. 5-A at 31-32 (Juror B stating that "[i]t has only to do with what was entered into as evidence and what does the law say about that. . . . And I feel like in the end, the verdict that we came to, we came to that because of our commitment to following our instructions and doing what we were supposed to do."); Exh. 5-A at 34 (Juror B denying that she discussed the case with any third party).  See also Bob Johnson, Siegelman Attorney Must Refile Motion Seeking New Trial, Mobile Press Register, Sept. 28, 2006, at 2B (quoting a juror from this case who said that "Nothing was ever brought into that jury room that was not allowed to be brought in by the judge.  Nothing.").  Without conceding in any way that Rule 606(b) can or should be ignored in any way, Defendants' misleading selection

of a misleading portion of the inadmissible evidence weighs heavily against them.

Important as well to the assessment of prejudice is that Defendants do not allege and the evidence does not show that any third party made an extrinsic contact with the jury. See Williams-Davis, 90 F.3d at 501 (noting that the Supreme Court in Remmer was especially concerned with third party contacts with jurors). Relatedly, no evidence demonstrates that Juror B and Juror C, contrary to Defendants' representation, see Mot. at 2, shared any extrinsic information (i.e., "one Internet article" and "how to be a foreman article") with any other jurors. See Ronda, 455 F.3d at 1300 (noting that a juror's not sharing extrinsic information with other jurors is important to a finding that no reasonable possibility of prejudice arose from the extrinsic contact).

Moreover, Juror C's review of information on "how to be a foreman" in no way prejudiced Defendants, but rather, served only to make the jury's deliberations more conscientious and fair. Courts have held that similar actions by jurors in other cases were not prejudicial to the defendants. For example, in De La Vega, 913 F.2d 861, the jury foreman, after the first day of deliberations, went to the library and checked out a book titled What You Need to Know for Jury Duty. Id. at 869. The foreman read the book and the next day implemented its suggestions on how to organize the jurors. Id. A few days later, the foreman brought the book into the jury room and showed "some jurors a page in the book which outlined the organizational steps which he was following." Id. The book then remained in the jury room for the foreman's reference, though no other juror read it. Id. at 869-70. Responding to the defendants' claim that they were entitled to a new trial based on the foreman's consideration of extrinsic evidence, the Eleventh Circuit held that no reasonable possibility of prejudice existed that warranted a new trial. Id. at 870-71. The Court stated that "solely the foreman read the book, and he found it useful only in providing a structurally logical

framework for jurors to examine the reams of evidence presented over the course of the two month

trial." Id. at 871. The Court relied on an Eighth Circuit case that also held that the defendants were

not entitled to a new trial because a juror had used information from a library book on Robert's Rules

of Order to organize and direct discussions in the jury room. See id. at 870 (discussing United States

v. Bassler, 651 F.2d 600, 601-03 (8th Cir.), cert. denied, 454 U.S. 944 (1981)).

      In this case, like in De La Vega and Bassler, no reasonable possibility of prejudice arises

from Juror C's consulting information from the Internet on "how to be a foreman." Juror C used the

information for the sole purpose of organizing the deliberations, which occurred after a lengthy, two-

month trial. Juror C did not share this information with any other juror. See De La Vega, 913 F.2d

at 871 (stressing that no other juror read the library book). The "how to be a foreman" information

was strictly "procedural," see id., and "could only have been used to 'aid the jury in being

conscientious and serious in attempting to deliberate in a fair and impartial manner.'" Id. (quoting

Bassler, 651 F.2d at 603). Consequently, Defendants' arguments that they were prejudiced by Juror

C's actions are without moment.

      Additional factors lead to the conclusion that no reasonable possibility of prejudice exists

from Defendants' alleged instances of extraneous information reaching a juror. The evidence against

Defendants was overwhelming. This Court, in its Order denying Defendants' Rule 29 Motions,

stated that the government had presented "substantial evidence" upon which the jury could have

found Defendants guilty beyond a reasonable doubt. Order, Doc. # 468 at 7 (Oct. 2, 2006). See

Pessefall, 27 F.3d at 516 (noting that the "substantial properly admitted evidence" of the defendant's

guilt was a reason for finding no reasonable possibility of prejudice from jurors' consideration of

extrinsic evidence); United States v. Calbas, 821 F.2d 887, 895 (2d Cir. 1987) (placing much

importance on the strength of the government's case against the defendant in finding that he was not prejudiced by the jury's consideration of extraneous information), cert. denied, 485 U.S. 937 (1988). The United States refers this Court to its Response to Defendants' Rule 29 Motions, Doc. # 459 (Aug. 18, 2006), which details the mountain of evidence proving Defendants' guilt.

Further, in the media accounts attached as Defendants' Exhibits, Jurors B and C unequivocally state that the evidence of Defendants' guilt was "overwhelming." See, e.g., Mot., Exh. 1 at 1 (quoting Juror C saying that "I didn't have any trouble connecting the dots" to find Defendants guilty); Exh. 2 at 4 (quoting Juror B saying, "The evidence was overwhelming and compelling that the verdict was guilty on those counts."); Exh. 3 at 3 (quoting Juror C averring, "The decision was based on evidence. For me, it came down to one simple question. Did the governor sell that seat and did Scrushy buy that seat? I think he did, based on the evidence. . . . [T]here was too much direct and circumstantial evidence of a quid pro quo. The evidence we had all added up to a guilty vote."); Exh. 5-B at 14 (quoting Juror B stating, "Especially in the counts where we found Don Siegelman guilty and Richard Scrushy guilty, the evidence was overwhelming that – as it pertained to the law that they were guilty on those counts."); id. (quoting Juror B saying that "based on the evidence that was entered in, based on our remembrances of the testimony and all of those things, there was no doubt that they were guilty on those charges"); id. at 21 (quoting Juror B stating, "[Scrushy] was guilty. Based on the evidence, there was no question whether or not he was guilty as it pertained to the law."); id. at 22 (quoting Juror B's statement that "looking at the evidence, looking at the testimony . . . what was entered in in terms of documents and everything. The charges that Siegelman was found guilty of, there was no question – it was beyond a reasonable doubt that he was guilty of those charges."); id. at 23 (quoting Juror B stating, "I think the totality of the

evidence spoke very strongly towards Don Siegelman's guilt on the charges that we found him guilty on."). The strength of the government's case against Defendants, therefore, precludes any assertion that a reasonable possibility of prejudice exists from the jury's consideration of the insubstantial, purported extraneous information advanced by Defendants.

The split verdict returned by the jury further belies Defendants' assertion that extrinsic influences prejudiced the jurors against them. The jury convicted and acquitted Defendant Siegelman on seven and twenty-six counts, respectively; convicted Defendant Scrushy on all six counts against him; and acquitted the other two Defendants on all charges against them. The jury thus demonstrated that it individually and conscientiously considered the evidence against each Defendant and based its verdict solely on the evidence and law applicable to each Defendant. Many courts have held that the return of a split verdict indicates that the jury was not prejudiced by any outside information. See, e.g., Cuthel, 903 F.2d at 1383 (noting that the jury's split verdict supported the district court's finding that "the jury reached a reasoned conclusion free of undue influence"); Gilsenan, 949 F.2d at 96 (ruling that the split verdict showed that the jury had carefully delineated among the offenses and between the defendants and was not influenced by extraneous matters).

Defendants' Exhibits containing the media interviews of Juror B reveal that the jury properly considered the evidence against each Defendant individually and based its verdict solely on the evidence admissible against each Defendant. See Mot., Exh. 2 at 5 (noting that Juror B did not find the evidence against Defendants Hamrick and Roberts as compelling as that against Defendants Scrushy and Siegelman); Exh 5-B at 10-11 (quoting Juror B stating that "each count we looked at individually. . . . We looked at every count, not only just the count itself, but also who it's related to. Each of those was an individual discussion."); id. at 19 (quoting Juror B's statement that "our

-44-

feeling was was that if the evidence showed they broke the law, they're guilty, regardless of who they were.  And if the evidence showed they did not break the law, they were not guilty, regardless of who they were."); id. at 21 (quoting Juror B commenting, "We looked at each one individually.  We looked at each defendant individually."); id. at 22-23 (Juror B averring that the degree of evidence was different as to the convicted and acquitted Defendants); id. at 28 (Juror B noting that the evidence was insufficient to convict on the RICO counts as to Defendants Siegelman and Hamrick).

### IV.    Any Ex Parte Communications Between This Court and the Jury Were Proper and Harmless to Defendants

Based on media accounts of Juror C, Defendants claim that this Court engaged in improper ex parte communications with the jury foreman in violation of Federal Rule Criminal Procedure 43(a)(2), and demand an investigation into the Court's contacts with the jury.  Mot. at 30.  In particular, Defendants point to newspaper articles in which Juror C states that the Court sent the jury a note inquiring about their progress, and that Juror C told a marshal that some of the jurors were losing interest.  Id. at 29.  To make this claim, Defendants resort to a hyper-technical reading of Rule 43.  Contrary to Defendants' assertions, any such contacts between the Court and the jury were benign, do not violate Rule 43(a)(2), and were harmless to Defendants.  Such communications justify no further investigation, nor any other relief.

The Supreme Court has recognized that "the right to personal presence at all critical stages of the trial and the right to counsel are fundamental rights of each criminal defendant."  Rushen v. Spain, 464 U.S. 114, 117 (1983) (emphasis added).  Concomitantly, the Supreme Court has recognized "'the necessity for preserving society's interest in the administration of criminal justice.'"  Id. at 118 (quoting United States v. Morrison, 449 U.S. 361, 364 (1981)).  Balancing these

principles, the Court rejected the proposition that "an unrecorded ex parte communication between trial judge and juror can never be harmless error." Id. at 117. The Supreme Court noted that

> There is scarcely a lengthy trial in which one or more jurors do not have occasion to speak to the trial judge about something whether it relates to a matter of personal comfort or to some aspect of the trial. The lower federal courts' conclusion that an unrecorded ex parte communication between trial judge and juror can never be harmless error ignores these day-to-day realities of courtroom life and undermines society's interest in administration of criminal justice.

Id. at 118-19. See United States v. Adams, 799 F.2d 665, 668 (11th Cir. 1986) ("The mere occurrence of an ex parte conversation between a trial judge and a juror does not constitute a deprivation of any constitutional right.") (citations and quotations omitted), cert. denied, 481 U.S. 1070 (1987). Consequently, "a defendant has a due process right to be present at a proceeding only when 'his presence has a relation, reasonably substantial, to the fullness of his opportunity to defend against the charge.'" United States v. Watchmaker, 761 F.2d 1459, 1466 (11th Cir. 1985) (quoting United States v. Gagnon, 470 U.S. 522, 526 (1985)), cert. denied, 474 U.S. 1100 and 474 U.S. 1101 (1986).

Following the Supreme Court's guidance, lower federal courts have held that "innocuous" ex parte communications between the court and a juror are not improper and are harmless beyond a reasonable doubt. See Rushen, 464 U.S. at 121 (finding harmless the ex parte communications between a juror and the trial judge about the juror's knowing a victim of a murder brought up during the impeachment of a defense witness); Watchmaker, 761 F.2d at 1466 (concluding that any error under Rule 43 from the ex parte communication between the judge and juror about the juror's fear of retaliation from the defendants was harmless); Caldwell, 776 F.2d at 997 (holding that any "technical violation of Rule 43" was harmless); United States v. Bascaro, 742 F.2d 1335, 1355 (11th

Cir. 1984) ("courts have universally held that where wholly innocuous inquiries . . . are responded to by the court without first consulting counsel, any error thereby committed is nonprejudicial"), cert. denied, 472 U.S. 1017 and 472 U.S. 1021 (1985). See also United States v. Abbell, 271 F.3d 1286, 1290 (11th Cir. 2001) (noting that "during jury deliberations, the court received word that one of the jurors was behaving improperly and refusing to obey the law or to obey the court's jury instructions"), cert. denied, 537 U.S. 813 (2002).

An exchange between the court and the jury about the status of deliberations is a prime example of an "innocuous" ex parte communication between the judge and the jury. United States v. Head, 697 F.2d 1200, 1213 (4th Cir. 1982) (finding no violation of Rule 43 because the notes between the judge and jury "dealt not with substantive questions or supplemental jury instructions but rather only informed the judge and jury regarding the state of deliberations"), cert. denied, 462 U.S. 1132 (1983). Objecting to such inquiries ignores the "day-to-day realities of courtroom life and undermines society's interest in administration of criminal justice." Rushen, 464 U.S. at 119. In fact, adopting Defendants' position "would be to make it almost utterly impossible for a trial court to make inquiry of the jury as to the progress of their deliberations. It would impede the reasonable and orderly conduct of a trial." United States v. Mack, 249 F.2d 321, 324 (7th Cir. 1957), cert. denied, 356 U.S. 920 (1958). Tellingly, Defendants do not point to any case holding "that an inquiry as to the prospect of the jury agreeing upon a verdict was improper, prejudicial or coercive." Id. Defendants' presence at the time the Court inquired of the status of the jury's deliberations simply does not have a "relation, reasonably substantial, to the fullness of [their] opportunity to defend against the charge." Watchmaker, 761 F.2d at 1466. See Gilsenan, 949 F.2d at 97 ("[A] hearing need not be held at the behest of a party whose allegations if established would not entitle it to

relief.").

Defendants' claim of error arising out of <u>ex parte</u> communications does not merit any relief. Any <u>ex parte</u> communication between the Court and the jury pertained solely to procedural issues and did not concern any substantive matters, such as further instructions.  Defendants' reliance upon Rule 43 for posttrial relief, and their desperate attack on the Court's conduct (following unsuccessful pretrial attacks on the government's conduct) is simply unavailing.

## V.     Conclusion

Consistent with their conduct throughout these proceedings, Defendants, after having been found guilty beyond a reasonable doubt by a jury of their peers, assail this Court, the jurors, and the government in an effort to avoid having to take responsibility for their criminal actions.  Their bombastic allegations are matched only by the spurious nature of the evidence they proffer to support them.  Defendants urge this Court to engage in a sweeping, unprecedented inquisition of the jurors who honorably served in this case, without consideration of the jurors' First and Fourth Amendment rights. They do so on the basis of unauthenticated, unsubstantiated, uncorroborated information from anonymous and untrustworthy sources.  Defendants are simply not entitled to any relief on any legal, factual, or policy grounds.  Therefore, this Court should deny the Motion and Emergency Motion.

Respectfully submitted this the 13th day of October, 2006

LOUIS V. FRANKLIN, SR.
ACTING UNITED STATES ATTORNEY

/s/ Louis V. Franklin, Sr.
Acting United States Attorney
One Court Square, Suite 201
Montgomery, AL 36104
Phone: (334)223-7280
Fax:    (334)223-7560
Email: louis.franklin@usdoj.gov

/s/ J.B. Perrine
Assistant United States Attorney
One Court Square, Suite 201
Montgomery, AL 36104
Phone: (334)223-7280
Fax:    (334)223-7135
Email: jb.perrine@usdoj.gov
ASB-9077-E31J

/s/ Jennifer Garrett
Special Assistant United States Attorney
Assistant Attorney General
Office the Attorney General
11 S. Union
Montgomery, AL 36130
Phone: (334)353-8494
Fax:    (334)242-4890
Email: jgarrett@ago.state.al.us
ASB-4600-T77J

/s/ Stephen P. Feaga
Assistant United States Attorney
One Court Square, Suite 201
Montgomery, AL 36104
Phone: (334)223-7280
Fax:    (334)223-7560
Email: steve.feaga@usdoj.gov
ASB-7374A60S

EDWARD C. NUCCI
ACTING CHIEF, PUBLIC INTEGRITY SECTION

/s/Richard C. Pilger
Department of Justice, Criminal Division
Public Integrity Section
10th & Constitution Ave, NW
Bond Building - 12th Floor
Washington, DC 20530
Phone: (202)514-1412
Fax:    (202)514-3003
Email: richard.pilger@usdoj.gov

/s/ Joseph L. Fitzpatrick, Jr.
Special Assistant United States Attorney
Assistant Attorney General
Office of the Attorney General
11 S. Union
Montgomery, AL 36130
Phone: (334)353-4839
Fax:    (334)242-4890
Email: j.fitzpatrick@ago.al.state.us

## IN THE UNITED STATES DISTRICT COURT FOR
## THE MIDDLE DISTRICT OF ALABAMA
## NORTHERN DIVISION

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | **)** | |
| | **)** | |
| | **)** | |
| **vs.** | **)** | **CR. NO. 2:05-cr-119-MEF** |
| | **)** | |
| **DON EUGENE SIEGELMAN, and** | **)** | |
| **RICHARD M. SCRUSHY.** | **)** | |

## CERTIFICATE OF SERVICE

I hereby certify that on October 13, 2006, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all counsel of record.

Respectfully submitted,

LOUIS V. FRANKLIN, SR.
ACTING UNITED STATES ATTORNEY

/s/ Louis V. Franklin, Sr.
LOUIS V. FRANKLIN, SR.
Acting United States Attorney
Post Office Box 197
Montgomery, Alabama 36101-0197
(334) 223-7280
(334) 223-7135 fax
louis.franklin@usdoj.gov