**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION**

UNITED STATES OF AMERICA,

vs.                                              Criminal No: 2:05-cr-119-MEF

DON EUGENE SIEGELMAN, et al.,

**DEFENDANT DON EUGENE SIEGELMAN'S
REPLY TO THE UNITED STATES' RESPONSE
TO DEFENDANTS' JOINT MOTION FOR NEW TRIAL**

Comes now the Defendant, DON EUGENE SIEGELMAN (Siegelman), by and through his counsel of record, and files this Reply to the Government's Response to the Defendants' Joint Motion for New Trial, and states as follows:

The Government's shrill Response to the Defendants' Joint Motion for New Trial smacks of desperation. Rather than encouraging the Court to conduct an investigation to ensure that the jury's verdict is not tainted, the Government attacks the Defendants and their counsel. The Government apparently views Governor Siegelman's constitutional rights as an annoyance that should be overlooked in favor of "finality" of the jury's verdict. The Government does not respond to the merits of Defendants' Motion at all. In fact, the Government makes no effort to distinguish a single case cited in Governor Siegelman's Motion for New Trial.

The Government's salacious personal attacks against the Defendants and their counsel appear to be calculated to distract this Court from the obvious: the Defendants are

1

entitled to an evidentiary hearing, and, thereafter, the Defendants are entitled to a new trial.

## I.     Governor Siegelman did not violate Local Rule 47.1

The Government spent most of its Response attacking the Defendants and their counsel.  For example, the Government argues:

> Defendants possess the affidavits of Juror A despite this Court's Local Rule 47.1 which flatly prohibits any attorney, defendant, or any person acting for them or on their behalf from interrogating a juror, either in person or writing, 'in an attempt to determine the basis for any verdict rendered or to secure other information concerning the deliberations of the jury or any members thereof.' [citation omitted] The affidavits Defendants attached to the Motion are exactly the type of interrogation Local Rule 47.1 proscribes without first obtaining this Court's permission. [citation omitted] **Defendants' possession of these affidavits <u>ipso</u> <u>facto</u> shows their violation of Local Rul 47.1.  Defendants have either themselves interrogated Juror A, or received these affidavits from someone who did so with the express purpose of inquiring into the basis for the jury's verdict.  Either way, this violation of Local Rule 47.1 is grounds alone to deny the Motion and any requested relief for further investigation.** [Emphasis added]

[Government Brief, pp. 10-11]

Further, the Government speculates as to the reason for the time, place, and substance of the affidavits submitted by the Defendants–taking every opportunity to contend that Defendants and their counsel engaged in highly unethical conduct.  Based upon the "fax tags" on Exhibits 6 and 7, the Government even speculates that Governor Siegelman's attorneys received these exhibits "on September 8, 2006 at 4:30 p.m." and that Governor Siegelman's attorneys are withholding several pages of evidence from the Court.  The Government, apparently, does not know how to read "fax tags."  In its zeal to

attack Governor Siegelman's counsel, the Government (not for the first time) has overlooked the obvious: the "fax tags" to which the Government refers identifies Siegelman's attorneys as the *senders* not *recipients* of these exhibits. Neither Governor Siegelman nor his counsel are withholding evidence from the Court. But, it would be interesting to hear from the Government (in light of its vigorous objection to an evidentiary hearing based on the overwhelming evidence presently before the Court) exactly what "evidence" that Governor Siegelman or his counsel could possibly possess that would change the Government's position.

**Governor Siegelman welcomes an evidentiary hearing concerning the affidavits submitted to the Court in support of the Joint Motion for New Trial.** The Court could make this inquiry part of its larger inquiry into potential juror misconduct. The Court will find that there are no facts to support the Government's outrageous accusations against Governor Siegelman. In short, Governor Siegelman's counsel received a telephone call on or about August 18, 2006 from a Birmingham attorney who indicated that she had some information that might have a bearing on the jury verdict in this matter. This attorney wanted to meet with Governor Siegelman's counsel in person.

On August 20, 2006, counsel for Governor Siegelman met with this attorney (Juror A's counsel) in Birmingham. At this meeting, Juror A's counsel presented Governor Siegelman's counsel with the three affidavits dated August 9, 2006. Neither Governor Siegelman nor his counsel had any knowledge of these affidavits (or their contents) before this August 20, 2006 meeting. Later, counsel for Juror A provided Governor

Siegelman's counsel with the second affidavit of Juror A dated September 1, 2006.

The Government's rank speculation as to how these affidavits came to be is pure fiction. The Court must focus on the *facts* before it, not the *fantasies* of a Government blinded by power, ambition, and a misplaced sense of justice.

## II.    Federal Rule of Evidence 606(b) does not prohibit judicial inquiry

The Government argues, wrongly, that Fed.R.Evid. 606(b) prohibits a judicial inquiry into the issues of alleged juror misconduct and extrinsic evidence. First of all, the Government's vigorous argument *against* any form of investigation is peculiar. Is it not the Government's job to investigate crimes? Both sides can agree that no matter which side is proved correct, a crime has been committed: if the Defendants are right, two jurors repeatedly and willfully defied this Court's instructions and orchestrated a guilty verdict by interjecting extrinsic evidence into jury deliberations, conspiring on how to obtain convictions, and by lobbying individual jurors outside of jury deliberations; if the Government is right (and the emails filed with the Court are forgeries), then someone is deliberately tampering with a jury's verdict. An unbiased government that is solely interested in justice, a fair trial, and protecting *all* citizens' constitutional rights would demand a judicial inquiry into this matter.

Regardless of the Government's hypocritical stance regarding criminal investigations, the Government's argument that Fed.R.Evid. 606(b) prohibits a judicial inquiry or prohibits this Court from granting a new trial is exactly wrong. Federal Rule of

Evidence 606(b) states, in pertinent part, that a court cannot elicit testimony about what

occurred:

> during the course of the jury's deliberations or to the effect of anything
> upon that or any other juror's mind or emotions as influencing the juror to
> assent or dissent from the verdict or indictment or concerning the juror's
> mental processes in connection therewith, except that a juror may testify on
> the question whether extraneous prejudicial information was improperly
> brought to the jury's attention or whether any outside influence was
> improperly brought to bear upon any juror.

Excerpt from Fed.R.Evid. 606(b).

**Contrary to the Government's argument, the limitations imposed by
Fed.R.Evid. 606(b) upon the scope of the Court's inquiry do not *limit* the
circumstances in which the Court must grant a new trial, they *broaden* them.**  This is
perhaps best stated in *United States v. Posner*, 644 F.Supp. 885 (S.D. Fla. 1986) *aff'd sub
nom.* (without opinion) *United States v. Scharrer*, 828 F.2d 773 (11th Cir. 1987) *cert.
denied Scharrer v. United States*, 485 U.S. 935, 108 S.Ct. 1110, 99 L.Ed.2d 271 (1988).
In *Posner*, the defendant was a wealthy financier charged with tax evasion for inflating
the value of a parcel of land that he donated to a Miami college.  The jury convicted
Posner on ten counts of tax fraud.  *Posner* at 885-86.

Following the trial, *The Wall Street Journal* quoted one of the jurors as saying that
there was "some information tossed around in the jury room that I don't think anyone
would have known unless they had been discussing the trial or reading the paper."
*Posner* at 886.  One month after *The Wall Street Journal* article, a news magazine article
in a Sunday insert of the *Miami Herald* reported that one of the jurors "made an

independent investigation of the property site during the trial." *Posner* at 886.

The trial court conducted an investigation and confirmed the accuracy of both media reports. The court found that jurors had read articles related to the case, had discussed the merits of the case before deliberations, and that the juror who conducted the on-site investigation reported to her fellow jurors her impressions regarding the property's true value. *Posner* at 886. Following this investigation, the trial court concluded:

> These in camera interviews gave rise to the unmistakable and unfortunate conclusion that improper extrinsic influences made its way into the jury room. Furthermore **these extrinsic matters had a reasonable possibility of influencing the jurors in a way that may have prejudiced the verdict and deprived the Defendant of receiving a fair trial**. In their response to an order to show cause why this Court should not grant a new trial, the **Government stated that the burden that the law places upon them is an impossible one to meet and that they could not oppose the granting of a new trial**. n4
>
> * * *
>
> n4 **More specifically, the Government pointed out that because the law forbids asking a juror the effect that any evidence may have had on his or her vote, the burden then of convincing a court that extrinsic material did not have a reasonable possibility of tainting the verdict is one that the Government can almost never meet.**
>
> * * *
>
> This Court agrees with the Government that **the burden is virtually insurmountable because the Court cannot inquire into the mental processes of a juror to determine the effect such information may have had on the verdict**. Furthermore, the Court found and the Government concurred that the jury received outside information that lends itself to having a reasonable possibility of prejudice. Based on the above, this Court

is compelled to conclude that the Defendant, Mr. Posner did not receive a
fair trial. [Emphasis added]

*Posner* at 886.

In this case, both affidavits of Juror A make clear that extrinsic information was

interjected into jury deliberations. Juror A's affidavits have already been confirmed by

two jurors who have publicly admitted that they obtained extrinsic information from the

Internet for use during jury deliberations. And, the Defendants have submitted several

emails which suggest that two jurors predetermined the Defendants' guilt, defied the

Court's Orders, improperly persuaded jurors *outside of jury deliberations*, and otherwise

improperly orchestrated the guilty verdict. **The evidence pending before this Court**

**already eclipses the evidence that the trial court found in *Posner* after an evidentiary**

**hearing.**

Based on the court's finding in *Posner*, this Court does not even need to proceed

with an evidentiary hearing to grant the Defendants' Motion for New Trial. But, if the

Court does conduct an evidentiary hearing, the limitations placed upon the scope of the

inquiry by Fed.R.Evid. 606(b) militate for a new trial, not against. **The Government**

**repeatedly argues that the extrinsic evidence viewed by the jury foreman and the**

**other juror had no effect on the verdict because both jurors have already given**

**statements saying this material had no impact on the verdict. However, this is**

**exactly the type of conclusion that Fed.R.Evid. 606(b) prohibits this Court from**

**making. This Court *must* determine what extrinsic evidence was viewed by the**

7

**jurors, and, without inquiring into the mental processes of each juror, determine the**

**effect such information *may have had on the verdict*.**

The Government's other arguments against a new trial or even an evidentiary

hearing are specious.  For example, the Government argues that even if the jurors

engaged in pre-deliberation discussions about the merits of the case, this is a "harmless"

error that does not justify a new trial.  The Eleventh Circuit does not agree with this

assessment:

> The sixth amendment guarantees every defendant in a
> criminal prosecution the right to trial by 'an impartial jury.'
> **Any discussion among jurors of a case prior to formal
> deliberations certainly endangers that jury's impartiality.**
> *See Edwards*, 696 F.2d 1277; *Winebrenner v. United States*,
> 147 F.2d 322 (8th Cir.), *cert. denied*, 325 U.S. 863, 65 S.Ct.
> 1197, 89 L.Ed. 1983 (1945). [Emphasis added]

*United States v. Yonn*, 702 F.2d 1341, 1344 (11th Cir. 1983).  This Court, during the trial,

was very sensitive to Governor Siegelman's Sixth Amendment rights.  To that end, this

Court, at nearly every break, cautioned the jury against engaging in any discussions about

the case before formal jury deliberations.  Had the Court become aware of these

substantial pre-deliberation discussions during the course of the trial, it might have been

able to correct this error without declaring a mistrial.  However, since this evidence only

surfaced *after* the jury verdict (through no fault of the Defendants), there is no way to

remedy the devastating effect that these pre-deliberation discussions have had, other than

to grant Governor Siegelman a new trial.

Even if there were not substantial evidence of juror misconduct related to pre-

deliberation discussions, discussions outside the jury room, and efforts to orchestrate a

guilty verdict long before deliberations, the fact that jurors were exposed to extrinsic

evidence warrants a new trial, or, at the very least, an evidentiary hearing on this matter:

> In keeping with this concern over juror impartiality, **a court must be mindful that any contact which individual jurors may experience that is beyond the evidence presented at trial and that the jurors received without the knowledge or instruction of the trial judge is presumptively prejudicial**. *Remmer v. United States*, 347 U.S. 227, 229, 98 L. Ed. 654, 74 S. Ct. 450 (1954); *Perkins*, 748 F.2d at 1533 (11th Cir. 1984). Moreover, once the defendant establishes or the court discovers the presence of extrinsic material finding its way into the jury room, **the burden is then placed upon the Government to negate the presumption of prejudice**. *Remmer*, 347 U.S. at 229. [Emphasis added]

*Posner* at 887.

The Defendants' Motions for New Trial are premised upon extraneous evidence

brought into jury deliberations *and* evidence that two jurors repeatedly defied this Court's

Orders. The juror misconduct suggested by the emails submitted to the Court should be

thoroughly investigated. They are not protected by Fed.R.Evid. 606(b). This Court must

investigate these emails and the extent to which extrinsic evidence entered the jury room

to ensure that Governor Siegelman's Sixth Amendment right to a fair trial before an

impartial jury was protected. Further, this Court should investigate allegations of

egregious juror misconduct to preserve the public's confidence in the integrity of the

judicial system.

The Government has not and cannot cite a single case where a trial court was

upheld for refusing to conduct an evidentiary hearing after receiving such overwhelming

evidence of extrinsic evidence and juror misconduct tainting jury deliberations. The Government appears to be aware of this fact. In fact, it appears that the Government agrees with its position in *Posner* that the burden of proof it carries in these circumstances "can almost never be met." *Posner* at 886.

This is the only rational explanation for why the Government spends so much time lashing out at Defendants' counsel and attacking the credibility of Juror A's affidavits. The Government attacks the affidavits' "veracity" [Government Brief, p. 10], labels the affidavits "speculative" [Government Brief, p. 13], claims the affidavits "could not be less objective" [Government Brief, p. 13], and labels the affidavits "flimsy, unsubstantiated, highly speculative, [and] anonymous" [Government Brief, p. 14].

The Government's animosity towards Juror A is misguided. Rather than attacking a juror who, on his own, has come forward to point out substantial defects in this verdict, the Government should either take this opportunity to *prove* the legitimacy of this verdict or demonstrate, as it did in *Posner*, that the Government will not tolerate or accept verdicts obtained by juror misconduct. At the very least, an evidentiary hearing would give the Government an opportunity to demonstrate to the Court, the Defendants, and the public that the verdict obtained against the Defendants was not marred by the introduction of extrinsic evidence and juror misconduct. So, why does the Government so vigorously oppose an evidentiary hearing?

Throughout its Response, the Government repeats its mantra that the Defendants have presented nothing more than "speculation" that extrinsic evidence entered the jury's

10

deliberations.  This mantra ignores all of the evidence submitted by the Defendants.  And, as discussed in the Defendants' Joint Motion, the Court must conduct an investigation to determine the nature and extent of the extrinsic evidence that entered jury deliberations.  See *United States v. Martinez*, 14 F.3d 543 (11th Cir. 1994).  Again, the Government does not even attempt to distinguish the Eleventh Circuit's holding in *Martinez*.

### III.    Even the cases cited by the Government demonstrate that the Court must investigate the Defendants' allegations of juror misconduct

The Government attempts to create the *illusion* that this Court has broad discretion to deny an evidentiary hearing by mischaracterizing the cases that it cites.  But, the cases relied upon by the Government make clear that in circumstances such as this, the Court *must* conduct an evidentiary hearing to determine the nature and extent of the extrinsic evidence that infiltrated the jury:

> When jurors consider extrinsic evidence, we require a new trial if the evidence poses a *reasonable possibility of prejudice* to the defendant. Prejudice is not presumed. The defendant has the burden of demonstrating prejudice by a preponderance of credible evidence. 'Such prejudice may be shown by evidence that extrinsic factual matter tainted the jury's deliberations.' **However, since it is the court's duty to ensure that the jury verdict is in no way tainted by improper outside influences, the court must investigate the asserted impropriety upon merely a colorable showing of extrinsic influence.** Subject only to *Federal Rule of Evidence 606(b)*, the court may use whatever inquisitorial tools are necessary and appropriate to determine prejudice. If after this inquiry the court determines that the defendant met his burden of showing by a preponderance of the evidence the likelihood of jury prejudice, the burden shifts to the government to prove that the consideration of the extrinsic evidence was harmless. In recognizing the degree of prejudice required and the government's burden to establish harmless error, the strength of the government's case has a bearing on the issue of prejudicial error. Also relevant is the nature of the information learned by the jurors and the

manner in which it was revealed. Finally, the standard by which we review the district court's determination of whether the defendants were prejudiced is a factual one committed to the court's 'large discretion.' [Emphasis added]

*United States v. Rowe*, 906 F.2d 654, 656-57 (11th Cir. 1990).

Two affidavits from a juror, the admission by the jury foreman that he gathered materials from the Internet that he later used as a guide during jury deliberations, the admission from another juror that she read materials on the Internet pertaining to the trial, and several purported emails between the jurors reflecting pre-deliberation conclusions, communications outside the jury room, and deliberate efforts to circumvent the Court's repeated instructions, are *substantially more* than "merely a colorable showing of extrinsic influence."

The cases upon which the Government primarily relies do not support the proposition for which they are cited. For example, the Government cites *United States v. De La Vega*, 913 F.2d 861 (11th Cir. 1990) to support its argument that the jury foreman's introduction of extrinsic evidence into jury deliberations was harmless error. [Government Brief, pp. 41-42] However, *the Government neglects to inform this Court that the trial court and the Eleventh Circuit reached their conclusions in* De La Vega ***only after the trial court conducted an exhaustive evidentiary hearing to determine which jurors were exposed to the extrinsic evidence and only after the trial court thoroughly analyzed the contents of the extrinsic evidence to determine the potential prejudice it may have had upon jury deliberations***. *De La Vega* at 869-70. **This Court**

**cannot reach the same conclusion reached by the Eleventh Circuit in *De La Vega* *without* conducting an evidentiary hearing.**

Likewise, the Government repeatedly cites *United States v. Cuthel*, 903 F.2d 1381 (11th Cir. 1990)[1] as an analogous case when, in fact, *Cuthel* is not at all like the facts in this case.  In *Cuthel*, one of the defendants received an anonymous phone call in which a woman reportedly stated that "we were pressured into making our decision" and that she was "sorry."  Later, the prosecutor received a letter (which was attached in its entirety to the appendix in *Cuthel*) sent by one of the alternate jurors expressing her view of the trial, the lawyers, and the defendant.  *Cuthel* at 1382.  Neither the letter nor the anonymous phone call provided any inkling of juror misconduct.  On appeal, the Eleventh Circuit cut to the chase:

> **But here there was no allegation of extraneous prejudicial information being brought to the jury's attention; nor was there evidence of improper outside influence sufficient to warrant an inquiry.**  The anonymous allegation that 'we [the jurors] were pressured into making our decision' can suggest the normal dynamic of jury deliberations, with the intense pressure often required to reach a unanimous decision. [Emphasis added]

*Cuthel* at 1383.

*Cuthel* is not analogous to this case.  In the case before this Court, **it is undisputed that at least two jurors brought extraneous evidence into the jury deliberations.  Further, a third juror has submitted two affidavits confirming that information from the**

---

[1]The Government also frequently cites *United States v. Sokoloff*, 696 F.Supp. 1451 (S.D. Fla. 1988).  *Cuthel* is the appellate version of *Sokoloff*.

**Internet was brought into jury deliberations.** Finally, the Court has before it several emails which contain email addresses that could, upon this Court's investigation, be readily linked to the jurors (or quickly disproved) upon the Court's minimal investigation.

In *Cuthel*, both the District Court and Eleventh Circuit concluded that an investigation was unwarranted because even if an investigation proved the defendant's allegations to be true (a juror felt "pressured" into rendering a guilty verdict and an alternate juror had already made up her mind of the defendant's guilt before deliberations) these facts would not warrant a new trial. **In this case, if *any* of the allegations raised by the Defendants are true, the Defendants will be automatically entitled to a new trial.**

The case most frequently cited by the Government, *United States v. Camacho*, 865 F.Supp. 1527 (S.D. Fla. 1994), is not analogous to this case. In *Camacho*,[2] Camacho and his co-defendants, Veal, Watson, Haynes, Sinclair and Trujillo, were members of the Miami Police Department's Street Narcotics Unit (SNU). Camacho and his colleagues received word that a local drug dealer, Leonardo Mercado, was purportedly plotting to murder Camacho. So, Camacho and his colleagues, while on duty, went to Mercado's house and beat him to death. *Veal* at 153 F.3d 1233.

Camacho and his colleagues then engaged in an elaborate scheme to make it

---

[2]The facts of *Camacho* are set forth in detail in the appellate version which is reported at *United States v. Veal*, 153 F.3d 1233 (11th Cir. 1998).

appear as if Mercado had attacked Camacho, and Camacho dealt the fatal blows to Mercado defending himself. *Veal* at 1234.

The jury found Camacho, Haynes, Veal, and Watson guilty on a charge of obstruction of justice. *Camacho* at 1528. Following the verdict, the Defendants moved for a new trial based upon: a) two identical affidavits from jurors who discussed details of the jury's deliberations and expressed their "belief" that other jurors discussed the case before it was submitted to the jury for deliberations, b) a letter that the Court received from another juror detailing the "most secretive, internal workings of the jury's deliberative process," and c) a joint motion by the defendants recounting a meeting that one of the defendant's attorneys had with a juror wherein she related that her vote "was influenced by an outside source, and expressed a belief that numerous other members of the jury were similarly situated." *Camacho* at 1529 and 1537-38.

The trial court refused to move forward with questioning the jury because it concluded:

> That as to each of the allegations of juror misconduct implied in the statements and motions, defendants have failed to carry their burden to show that an extrinsic influence affected the jury deliberations in such a manner as to warrant leave to interview the jurors in this case, or a new trial as to Count II, or finally, a judgment notwithstanding the verdict as to Count II.

*Camacho* at 1529.

Regarding defense counsel's conversation with the two jurors, the trial court held:

> Although counsel may have a good faith belief of an extrinsic influence, a good faith belief does not satisfy the requirement in Cuthel – counsel must

15

present a substantial and specific showing of an extrinsic influence. Stating that such extrinsic influence was at work here – **without any specifics or evidentiary support to back up the statement** – is so speculative in nature as to necessitate the conclusion that Defendants may not be given leave to interview the members of the jury. Were Defendants successful in their attempt to obtain leave from this Court to interview the jurors based upon the conclusory, speculative statements contained in the joint motion, we are constrained to conclude that almost any request for leave to interview jurors would have to be granted. [Emphasis added]

*Camacho* at 1538.

Unlike *Camacho*, Governor Siegelman has submitted specific, substantial, evidentiary support to back up his claims that extrinsic materials were interjected into jury deliberations. Two jurors publicly admitted viewing extrinsic materials. Another juror filed an affidavit confirming that information from the Internet entered into jury deliberations. And, Governor Siegelman has submitted additional evidence that suggests two jurors orchestrated these guilty verdicts. In *Camacho*, the defendants only had *allegations* of extrinsic evidence entering the jury room. **In this case, Governor Siegelman has *evidence* that extrinsic evidence entered the jury room–some of it in the form of affidavits and some of it in the form of admissions by the offending jurors.**

In *Camacho*, the court was concerned that if it granted the defendants' motion for evidentiary hearing without any evidence, the court would be obliged to grant *every* disgruntled defendant's request for an evidentiary hearing. In this case, the opposite is true. In this case, the question should be: "Given the overwhelming evidence before the Court that extrinsic evidence entered jury deliberations and that certain jurors engaged in

significant misconduct in order to orchestrate this guilty verdict, if Governor Siegelman is not entitled to a new trial, or, at very least, a full evidentiary hearing, how could any defendant ever be entitled to such relief?"

The Government relies heavily upon *United States v. Venske*, 296 F.3d 1284 (11th Cir. 2002), but this case also mandates that Governor Siegelman's Motion for an Evidentiary Hearing be granted.  In *Venske*, the defendants move for a new trial and an evidentiary hearing based on two affidavits by private investigators alleging juror misconduct and extrinsic influence on jurors.  The first affidavit was signed by a private investigator named William Porter.  The Court concluded that portions of this affidavit "relating to the jury's internal workings and deliberative process" could not be considered by the Court pursuant to Fed.R.Evid. 606(b).  The Court further ruled that the remaining portions of the affidavit did not satisfy the defendants' burden of coming forward with "credible and persuasive evidence of juror misconduct."  *Venske* at 1287-88.

The second affidavit was from Fred Roberts, another private investigator who interviewed the jury foreman.  Roberts claims he interviewed the foreman as part of a "book-writing project sponsored by . . . [one of the defendant's] brother-in-law."  *Venske* at 1288.  Roberts testified that the jury foreman told him:

> [A court bailiff] had told the jury members that one of McCorkle's witnesses was a witness for the defense attorney, [F. Lee] Bailey, when Bailey was a defense attorney in the 'son of Sam' case.  McDaniel said that [the bailiff] told them that the witness had asked why he was a witness in the McCorkle case because he had never bought into the McCorkle plan.

\* \* \*

17

> McDaniel said that [the bailiff] had told the jury they would not have any trouble convicting McCorkle if they knew what he knew. McDaniel said that he believed that [the bailiff] meant that he had heard information in the case that the jury had not heard.

*Venske* at 1288.

The trial court ruled that the allegations concerning the Bailiff comments, "if properly presented, warranted a further inquiry." *Venske* at 1288. The court held an evidentiary hearing to determine the circumstances surrounding the post-trial contact with the jurors. After hearing testimony from everyone involved, the court rejected the defendants' contention that the jury foreman was interviewed as part of a "book-writing project." Instead, the court found that two of the defendants, their families, and the private investigators "knowingly and intentionally engaged in a scheme to defy the law precluding post-verdict juror interviews without prior permission of the court." *Venske* at 1289.

On appeal, the Eleventh Circuit affirmed the trial court's ruling. **The Eleventh Circuit found that the allegations in the Roberts' affidavit "clearly involved extrinsic communications that, if properly presented in the district court, necessitate further inquiry."** *Venske* at 1289. However, the Eleventh Circuit found that the trial court did not abuse its discretion in excluding the Roberts' affidavit in light of the court's finding that two of the defendants had violated the local rule. *Venske* at 1289.

As explained above, Governor Siegelman did not violate this Court's Order prohibiting post-trial jury contact. The court in *Venske* makes clear that, absent the

18

defendants' violation of the court's order prohibiting initiating contact with the jury, the contents of the Roberts' affidavit was sufficient to mandate an evidentiary hearing.  In this case, the evidence that Governor Siegelman has submitted to the Court is significantly more powerful than that presented in the Roberts' affidavit because ***all* of the evidence in Roberts' affidavit was hearsay.  Roberts was merely quoting what he claims the jury foreman told him about what a bailiff allegedly told other members of the jury**.

In this case, Governor Siegelman has presented the Court with firsthand evidence that:

1)      Juror A either saw or heard material from the Internet that was brought into the jury room;

2)      the jury foreman has publicly admitted that he brought outside information into the jury room;

3)      another juror has publicly admitted that she read extrinsic information that related to the case; and

4)      several emails, which, if authenticated, will demonstrate that certain jurors engaged in pre-deliberation discussions, attempted, from the very beginning, to orchestrate a guilty verdict, and systematically engaged in deliberations outside the jury room.

Accordingly, Governor Siegelman has presented substantially more credible evidence than did the defendant in *Venske* which the Eleventh Circuit acknowledged warranted further inquiry.  Far from supporting the Government's position in this case, *Venske* supports that, at the very least, an evidentiary hearing be immediately held.

19

## <u>CONCLUSION</u>

The Government has not and cannot support its position that the Defendants are not entitled, at the very least, to a full evidentiary hearing.  Accordingly, Governor Siegelman respectfully requests that an evidentiary hearing be immediately held, that Governor Siegelman's Motion for an Emergency Order to the ISP providers of Jurors B and C immediately be issued, and, upon conclusion of the evidentiary hearing, Governor Siegelman be granted a new trial.

**WHEREFORE**, the premises considered, Defendant Governor Siegelman requests the relief originally sought in the Defendants' Joint Motion for New Trial, and for such further, other, and different relief to which Defendant is entitled.


/s/ David A. McDonald
David A. McDonald (MCDOD5329)
KILBORN, ROEBUCK & McDONALD
203 South Warren Street (36602)
Post Office Box 832
Mobile, Alabama 36601
Telephone: (251) 434-0045
Fax: (251) 434-0047
**Attorney for Defendant Siegelman**

OF COUNSEL:

Vincent F. Kilborn, III (KILBV4483)
W. Perry Hall (HALLW9043)
KILBORN, ROEBUCK & McDONALD
1810 Old Government Street
Post Office Box 66710
Mobile, Alabama 36660
Telephone: (251) 479-9010
Fax: (251) 479-6747

**CERTIFICATE OF SERVICE**

I do hereby certify that on this 20th day of October, 2006, I electronically filed the foregoing pleading with the Clerk of the Court using the CM/ECF system which will send notification of such to all counsel of record.


/s/ David A. McDonald
DAVID A. McDONALD