**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF ALABAMA**
**NORTHERN DIVISION**

UNITED STATES OF AMERICA,

vs.                                                    Criminal No: 2:05-cr-119-MEF

DON EUGENE SIEGELMAN, et al.,

**DEFENDANT SIEGELMAN'S BRIEF ON EXTRINSIC INFORMATION**

*INTRODUCTION*

The Court, following established precedent, has presumed prejudice because of the jury's exposure to extrinsic information.  The Government cannot meet its burden of proving that the jury's consideration of extrinsic information was "harmless" because even the Court's limited investigation reveals that Jurors 7 and 40 openly, deliberately, and repeatedly defied this Court's Orders prohibiting the review of extrinsic information.  Jurors 7 and 40 obtained extrinsic information with the express purpose of supplementing the materials allowed by the Court, and they used their knowledge of extrinsic information to guide deliberations and manipulate the verdict against Governor Siegelman.

Almost every juror admitted knowing that Jurors 7 and 40 had information not available to the other jurors.  Jurors 7 and 40 elevated themselves above the other 10 jurors and created an imbalance of power during deliberations.  This jury did not consist of 12 equals; it consisted of two "super jurors" and 10 "ordinary" jurors who deferred to the two who possessed more information than the others.  The scales of justice, once so tilted, cannot be realigned.

Jurors 7's and 40's procurement of extrinsic information was not inadvertent.  They set out to obtain extrinsic information, and, in so doing, Jurors 7 and 40 opened jury deliberations to cyberspace with the same disastrous and irreversible outcome as Pandora opening her box.

Jurors 7 and 40's misconduct was not isolated.  It is clear from the testimony of their fellow jurors that Jurors 7 and 40 consulted the Internet on numerous occasions.  Every time these two jurors returned to the Internet, the prejudicial effect to Governor Siegelman increased exponentially.

### I.  Juror 7's Misconduct Warrants a New Trial

**A.       Juror 7's Testimony is Inconsistent and Unbelievable**

On November 17, 2006 (nearly 5 months after rendering the verdict), Juror 7 testified: "as far as I can recall today," the U.S. Middle District's official website was the only extraneous information that he consulted during the trial.  [T-119, 123]

However, in an interview conducted within hours of rendering the verdict, **Juror 7 stated that he had surfed the Internet looking for information regarding his duties as juror foreman**: "I didn't look up anything about the case, but **I Googled to see exactly what a foreman was supposed to do** . . . ."  [Exhibit 1][1] [Emphasis added]

Depending on the search terms used, **it is statistically impossible that Juror 7's Google search led him to, and only to, the Middle District's website**.  For example, a Google search using any combination of the terms "jury," "foreman," "duty," or "responsibilities" will result in over one hundred thousand links to websites.  While one of these *may* link to the Middle District website, none of the first several hundred links connect to the Middle District's website.[2]

---

[1]All exhibits cited herein refer to exhibits attached to the Defendants' Joint Motion for New Trial [Doc 467] or in Scrushy's Motions to Supplement [Doc 509 and Doc 510] as adopted by Siegelman [Doc 511].

[2]The undersigned conducted several similar Google searches *before* filing for new trial. Now that the Motions have been filed, new Google searches link to articles about this case, but they still do not readily link to the Middle District's website.

**B.**    **Other Jurors Contradict Juror 7's Testimony**

Logic contradicts Juror 7's claim that he conducted a Google search that led him directly

to, and only to, the Middle District's website.  So does Juror 66.  She is clear that **Juror 7**

**conducted multiple Internet searches, obtained "detailed information," and interjected**

**what he had found into jury deliberations**:

> Q:    Tell me all of what you can recall that he said regarding any independent
> investigation that he had done outside of the Court's instructions, the evidence
> and the exhibits admitted into the trial of this case.
>
> A:    Okay.  He said first of all **he looked up the role of the foreman on the**
> **jury and** *just other information as related to the process of* – and I guess
> he may have copied – gotten one of the indictments.  He downloaded that
> and went through that and looked at each one of the cases while he was at
> home – each one of the charges while he was at home and **when he came**
> **back he brought just detailed information about how we should**
> **consider each one of the charges and what they were saying**.

[Juror 66, T-51-52] [Emphasis added]

Juror 7 claims that he does not believe the information he researched on the Internet

differs substantially from the Court's jury charges.  **However, his co-jurors are clear that**

**Juror 7 brought "other information" into jury deliberations that this Court did not allow**

**into evidence.  Juror 7 guided deliberations on** *every charge* **using this extraneous**

**information**:

> Q:    And you say that he had *other information* that you believe that he got
> from the Internet –
>
> A:    Yes.
>
> Q:    – about the indictment?
>
> A:    Yes.

* * *

> Q:    No, no, I don't want to know how much time he spent researching it, what
> I want to know is how much time did he spent with the jury talking with

you about what research he had done or what information he had received outside of what the Court gave you as the evidence and the law to consider in this case?

A:      I don't know if I can break down and say exactly how much time because when we went through each one of them it was always okay, well, but **when you look here this says this and** *it's not in the book that you gave us***, it's not in the indictment so – and he had his paperwork there, so each one of the charges there was information about it.  So it was never okay, we are going to discuss this one charge or discuss all of the research I have done, it was each one of the charges as we went through it**.

Q:      And you went through it charge by charge?
A:      By charge.

Q:      Did you see any of the information that he brought in about the charges?
A:      I didn't.

Q:      And he just discussed it as you went through it?
A:      Like I said, he didn't read it, you know, I mean, but you can – he took it out of his jacket or whatever or something so he had it and he was reading from it.

[T-54-55, 57] [Emphasis added]

Other jurors testified that Juror 7 openly discussed the daily media trial coverage and

what can only be WSFA's daily blog:

Q:      During the time that you were serving as a juror did any other juror say or do anything that caused you to believe that he or she had been exposed to extraneous information about this case from any source?
A:      Yes, sir.

Q:      Tell me what you know about that.
A:      There was one of the jurors said that they had been on the Internet and – well, **it was like one of the TV stations had all the proceedings was on the Internet, you could go read it, and that was mentioned.  And that's the only thing that I know of that they had read what was going on in the court.**  I mean it wasn't anything else besides what had happened here.

[T-38] [Emphasis added] [See also, T-71-74]

4

**C.**    **Juror 7's Public Statements Reveal That He Conducted Substantial Independent Legal Research**

Within days of rendering this verdict, Juror 7 granted an interview to the *Auburn Villager*. In this interview, Juror 7 demonstrated a working knowledge of legal terms that this Court never defined.  For example, Juror 7 discussed with his interviewer the merits of an "Allen charge," the purpose of such a charge, and, whether in Juror 7's opinion, any charge given by this Court rose to the level of an "Allen charge":

> The judge called the jury into the courtroom and reminded them it was not unusual to take some time because of the complexity of the case.  Some commentators have described the judge's instructions as an 'Allen charge,' when jurors are told to try to make a decision.  **'He gave us a little pep talk, which was so mildly worded that we didn't think it was an 'Allen charge,'** Hendrix said. [Exhibit 3] [Emphasis added]

This Court did not *use* (much less *define*) the term "Allen charge" or discuss the circumstances in which such charges are given.  Juror 7 obtained his working knowledge of what constitutes an "Allen charge" somewhere outside of this Court.

**D.**    **Juror 7 Repeatedly, Openly, and Deliberately Defied this Court's Order**

Juror 7 used the Internet to research Governor Siegelman's co-Defendants:

Q:    Anything else that you are aware of that he discussed with the jury in your presence?
A:    **He did – he looked up information on another one of the Defendants.**

Q:    He looked up information about what?
A:    **On another Defendant, on one that's not here today.  He looked up to see what – how long he had been with his employer and what he had to –**

Q:    One of the Defendants that were found not guilty?
A:    Yes.

[T-52] [Emphasis added]

Later testimony revealed that Juror 7 conducted research on *both* Paul Hamrick and Mack Roberts and shared his research with other members of the jury. [T-57-58] The Court did not investigate what evidence Juror 7 obtained about Hamrick or Roberts, but **given their positions in the Siegelman administration (Hamrick: Chief of Staff; Roberts: ALDOT Director), it is *impossible* to research either Hamrick or Roberts and not obtain extraneous information about Governor Siegelman.** For example, *any* Internet research of Hamrick links directly to *Mobile Register* articles – all of which are highly critical of Governor Siegelman and contain highly prejudicial allegations that were not admitted at trial.

Jurors 16, 22, 29, 30, 38, 66, and 68, all confirmed that Juror 7, at some point, confessed to them that he had conducted research on the Internet. [T-31-33, 38, 51-57, 73, 104, 110-111] **Even though it was common knowledge throughout deliberations that the jury foreman had deliberately and repeatedly violated this Court's Order prohibiting independent research, no juror ever reported this violation to the Court.** Juror 7 enjoyed such an elevated status on this jury that his fellow jurors followed his lead and even re-voted for him to remain jury foreman – knowing that he had violated this Court's Order. Juror 7's misconduct has hopelessly tainted this verdict.

Governor Siegelman is entitled to a new trial even based upon the limited extrinsic information that Juror 7 admits to viewing.[3] During its examination of Juror 7, the Court

---

[3]Governor Siegelman objects to the Court's apparent decision to accept, as true, Juror 7's testimony despite his contradictory public statements and the conflicting testimony of his co-jurors. The Court's November 17, 2006 inquiry did not explore "the entire picture" as required by *Remmer v. United States*, 350 U.S. 377 (1956). As Justice Brandeis said: "sunlight is said to be the best of disinfectants." (L. Brandeis, *Other People's Money* 62 (1933) quoted in *United States v. Moten*, 582 F.2d 654, 660 (2nd Cir. 1977)).

suggested (and Juror 7 agreed) that the information he reviewed on the Internet regarding his

duties as jury foreman did not differ substantially from the Court's jury charge on this topic.

But, Juror 7 did not explain *why* he researched extraneous information *if* the Court's jury charges

sufficiently covered this issue.  The fact that Juror 7 *conducted* the prohibited research and

*announced* his conduct to the other jurors improperly affected the balance of power within jury

deliberations.  Whether true or not, Juror 7 led the other jurors to believe that he had more

*information* about how to conduct deliberations than they did.  And, it became clear at the

November 17, 2006 hearing that the 10 jurors who followed this Court's Orders deferred to the

two jurors (7 and 40) who repeatedly violated the Court's Orders.  The Government cannot

demonstrate that the introduction of this extrinsic information into jury deliberations was

"harmless."

## II.  *Juror 40's Misconduct Warrants a New Trial*

### A.    **Juror 40's Testimony is Contradicted by Her Prior Statements**

At the November 17, 2006 hearing, Juror 40 testified that she saw an article regarding the

trial in the *Montgomery Advertiser* but did not read it. [T-77] However, in an interview shortly

after the trial, Juror 40 confessed to having read the article:

> Q:    You couldn't watch any news.  You stuck to all that?
> A:    I did.  I saw one Inter – **I did see one Internet article.  So, I'll confess.**
>
> Q:    By accident?
> A:    It was – it was – **yes, it was almost by accident**.  It was – after I saw the
>       headline, I was oh, I wonder what that says.  But I really did try very hard.

[Exhibit 5-B] [Emphasis added]

The *Montgomery Advertiser* published several articles about this trial on the days that it

discussed Faulkner's accreditation.  These articles quote the acting U.S. Attorney making

numerous pejorative statements about the Defendants and most certainly would have prejudiced

even the least impressionable juror. [Exhibit 21]

###### B.    Juror 40's Testimony is Contradicted by Other Jurors

According to her co-jurors, Juror 40 not only read articles about the trial, she discussed

them with other jurors:

> A:    She didn't show us anything.  She did say that while she was on that Web
>        site and she saw another Internet article about the trial, and that –
>
> Q:    Did she discuss what was in that article or that news report?
> A:    She said something about it but I am not certain.
>
> Q:    Do you know how much time she spent discussing what she had read that
>        was contained in the news article, first of all?
> A:    I don't think it was discussed about it, but she said she did read something
>        about it.  **And I done forgot which news article it was but she just
>        made a comment about the writer and the Defendants or whatever.**

[T-59] [Emphasis added]

Other jurors testified that Juror 40 made statements that indicated **she had been**

**following the entire trial on the Internet**. [T-71-72; see also, T-92-95, T-103-104, T-134-137]

###### C.    Juror 40's Testimony is Contradicted by Her Own Email

On May 29, 2006, more than two weeks before the jury was supposed to begin

deliberations, Juror 40 sent the following email to Juror 7:  "I agree some of the kounts r

confusing 2 our friends.  Chek text.30/38 still off trac." [Exhibit 11]

This email was preceded by an email from Juror 40 to 7 [Exhibit 10] which said "need to

talk."  **Read together, Exhibits 10 and 11 make clear that Jurors 7 and 40 were deliberating**

**via email and telephone long before this case was ever submitted to the jury.**

The Court has not yet addressed the issue of Juror 7 and Juror 40's engagement in

substantial pre-deliberations – the primary basis for Governor Siegelman's Motion for New

Trial.  However, these emails also impeach the sworn testimony of Jurors 7 and 40.  Both

testified that they did not obtain a copy of the Indictment until *after* deliberations.  But, **their**

**emails reveal that *both* were consulting copies of the Indictments throughout the trial**.

Exhibit 11 specifically references "kounts," "text," and discusses Jurors 30 and 38 who testified

at the November 17, 2006 hearing.

### III.  Wrong Indictment:  Juror 7 and Juror 40's Downloading Copies of the Wrong Indictment Warrant a New Trial

Juror 7 admits searching for a copy of the Indictment on the Internet, printing it, making

notes on it, and carrying it into jury deliberations.  Juror 7 denies showing his copy of the

Indictment or his notes to the other jurors, and he now claims that he has since destroyed this

document.  [T-121-122] Likewise, Juror 40 admits downloading a copy of the Indictment during

deliberations, but denies taking it into the jury room. [T-81-82]

The decision by Jurors 7 and 40 to ignore the Court's prohibition against extrinsic

information and print their own copies of the Indictment is extremely significant.  The jury in

this cause twice reported to the Court that it was deadlocked.  In his interview immediately

following the verdict, Juror 7 attributed **the deadlocked (and nearly hung jury) to the**

**complexity of the Indictments**:

> [Juror 7] said the jury had a difficult time reaching a verdict because of the number of indictments, the number of people charged and the "complex issues."

[Exhibit 1, 07/01/06 *Montgomery Advertiser*]

**The Indictments downloaded by Jurors 7 and 40 differed from the Indictments the**

**Court gave to the jury on the very Counts that the jury ultimately convicted Governor**

**Siegelman and Mr. Scrushy.** The Court required the Government to elect which claims to pursue against Messrs. Siegelman and Scrushy. Accordingly, the Government dismissed one Count each against Siegelman and Scrushy, and the Court submitted a revised Indictment to the jury. However, Jurors 7 and 40 used their copy of the wrong Indictment (as well as other information obtained from the Internet) to guide jury deliberations *after* the jury indicated that it was deadlocked. [T-54-55, 59]

This Court cannot reach any conclusion other than that absent Juror 7 and 40's improper downloading of the wrong Indictments and their use of these Indictments during jury deliberations, this jury would have either acquitted Governor Siegelman or at least hung on the few Counts on which Governor Siegelman was convicted.

### *CONCLUSION*

The overwhelming evidence is that Jurors 7 and 40 – the only two jurors to grant public interviews following the trial, the only two jurors to repeatedly and deliberately violate this Court's Orders, and the only two jurors to conduct Internet research throughout this trial – were the two jurors that led jury deliberations and orchestrated this verdict. By their actions, Governor Siegelman was deeply prejudiced by the jury's consideration of extrinsic evidence that was not subject to the Court's "full judicial protection of [Governor Siegelman's constitutional] right of confrontation, of cross-examination, and of counsel." Farese v. United States, 428 F.2d 178, 180 (5th Cir. 1970); United States v. Perkins, 748 F.2d 1519, 1533 (11th Cir. 1984). The Government cannot prove that Jurors 7 and 40's misconduct was harmless, and Governor Siegelman is entitled to a new trial.

Dated: December 1, 2006.

Respectfully submitted,

/s/ David A. McDonald
David A. McDonald (MCDOD5329)
KILBORN, ROEBUCK & McDONALD
203 South Warren Street (36602)
Post Office Box 832
Mobile, Alabama 36601
Telephone: (251) 434-0045
Fax: (251) 434-0047

**Attorney for Defendant Siegelman**

OF COUNSEL:

Vincent F. Kilborn, III (KILBV4483)
W. Perry Hall (HALLW9043)
KILBORN, ROEBUCK & McDONALD
1810 Old Government Street
Post Office Box 66710
Mobile, Alabama 36660
Telephone: (251) 479-9010
Fax: (251) 479-6747

**CERTIFICATE OF SERVICE**

I do hereby certify that on this 1st day of December, 2006, I electronically filed the foregoing pleading with the Clerk of the Court using the CM/ECF system which will send notification of such to all counsel of record.

/s/ David A. McDonald
DAVID A. McDONALD