IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| | ) | |
| v. | ) | CASE NO.: 2:05-cr-119-MEF |
| | ) | |
| DON EUGENE SIEGELMAN and | ) | (WO-Recommended for Publication) |
| RICHARD M. SCRUSHY | ) | |

## MEMORANDUM OPINION AND ORDER

This cause is before the Court on matters relating to Defendants Don Eugene Siegelman's and Richard M. Scrushy's Motion for New Trial Pursuant to Rule 33(a) of the Federal Rules of Criminal Procedure (Doc. # 467). On September 29, 2006, Defendants Don Eugene Siegelman ("Siegelman") and Richard M. Scrushy ("Scrushy")[1] jointly filed this motion. In their joint motion, Defendants argued that their Sixth Amendment right to trial by an impartial jury had been denied based on a variety of arguments relating to the conduct of the jurors during the lengthy and high-profile trial.[2] Consequently, they jointly sought a new trial based on the exhibits and argument then submitted to the Court. In the alternative, they sought further information about possible juror misconduct or improper extraneous influence on juror deliberations and a future opportunity to argue that the additional

---

[1] Unless otherwise indicated, the use of the word "Defendants" in this Memorandum Opinion and Order is intended to refer to Siegelman and Scrushy.

[2] The joint motion for new trial also raised an argument which related to the Court's communications with the jury. After considering this argument, the Court denied the motion on that ground during a hearing held on October 31, 2006.

information provided further support for their contention that a new trial was warranted. The Government opposed all of the relief Defendants sought on a variety of grounds. By prior Memorandum Opinion and Order, this Court denied the joint motion to the extent that it sought a new trial solely on the basis of exhibits and arguments initially submitted. Additionally, this Court denied the various mechanisms proposed by Defendants' joint motion for gathering additional factual evidence relating to possible juror misconduct or exposure to extrinsic evidence. Instead, following the relevant precedents from the Eleventh Circuit Court of Appeals, this Court itself conducted two evidentiary hearings and allowed limited supplemental argument on the issue of whether a new trial was required in light of the evidence revealed at those hearings. Not surprisingly, the parties maintain their original positions on the appropriateness of a new trial. After careful consideration, it is the conclusion of this Court that the sole remaining requested relief in the Defendants' joint motion, the grant of a new trial, is due to be DENIED.

## RELEVANT FACTUAL AND PROCEDURAL BACKGROUND INFORMATION

### The Indictment of Siegelman and Scrushy

On May 17, 2005, a federal grand jury handed down an indictment against Siegelman and Scrushy. Initially, the indictment was sealed. In October of 2005, a Superseding Indictment was handed down by the grand jury which added additional defendants and charges to the case. In December of 2005, the grand jury handed down the Second Superseding Indictment. It is this indictment which presented the actual charges against the

four defendants who proceeded to trial.

From the moment that the indictment was unsealed, the case drew significant media attention. The indictment included allegations of public corruption. Additionally, Siegelman, a former Governor of Alabama, was seeking his political party's nomination to run for Governor again and remained a candidate for that office when the trial started.[3] Scrushy is a prominent Alabama businessman. In 2005, Scrushy had been tried and acquitted of federal criminal charges in another case filed in the United States District Court for the Northern Division of Alabama, relating to certain events while he was the Chief Executive Officer of HealthSouth, a large health care corporation.

Because of the intense public interest in this case and the large volume of requests made to the Clerk's office for a copy of the Second Superseding Indictment, the Court posted a link to a copy of the Second Superseding Indictment on the home page of the website maintained by the United States District Court for the Middle District of Alabama. The link was posted before trial began, and it remained active until sometime after the jury had reached its verdict. The posting of this link was consistent with this Court's prior practice in other cases of posting links to court filings which generate significant public interest. The link enabled anyone accessing the website to view or print a copy of the Second Superseding Indictment.

_____

[3] In fact, the primary election was held during the trial on June 6, 2006. Siegelman did not win the primary.

**The Specific Charges Against All Of The Defendants**

The indictment[4] named Siegelman as a defendant and alleged that during relevant periods of time, he held various public offices in the executive branch of the government of the State of Alabama.

> [F]rom on or about January 16, 1995, to on or about January 18, 1999, [Siegelman was] the Lieutenant Governor of the State of Alabama, and while Lieutenant Governor was also, from on or about March 31, 1996, to on or about November 3, 1998, a candidate for Governor of the State of Alabama, and was, from on or about January 18, 1999, to on or about January 20, 2003, the Governor of the State of Alabama.

(Second Superseding Indictment at ¶ 1.c).

The indictment also named as defendants Paul Michael Hamrick ("Hamrick"), Gary Mack Roberts ("Roberts"), and Scrushy. During the relevant time periods, Hamrick was employed in the Lieutenant Governor's Office of the State of Alabama and later as Chief of Staff to the Governor. Siegelman appointed Roberts to serve as the Director of the Alabama Department of Transportation.[5] Scrushy was the Chairman and Chief Executive Officer of HealthSouth Corporation, an entity which was regulated by the State of Alabama Certificate of Need Review Board ("CON Board").

Count One of the indictment alleged that Siegelman and Hamrick engaged in a RICO

---

[4] Unless otherwise specifically noted, all references to the indictment are to the Second Superseding Indictment in this case.

[5] Prior to his appointment, Roberts was employed by a business which had substantial dealings with the Alabama Department of Transportation.

4

conspiracy in violation of 18 U.S.C. § 1962(d).[6] With respect to the "enterprise" requirement of the RICO statutes, the indictment alleged that the "enterprise" is the "Executive Department of the State of Alabama . . . whose members functioned as a continuing unit for a common purpose of achieving the objectives of the enterprise." The alleged broad purpose of the racketeering conspiracy alleged in Count One was "to give or withhold official governmental acts and influence . . . in exchange for money and property to which the participants in the conspiracy were not entitled," and "to deprive the State of Alabama of its right to the honest services of its public officials and employees in exchange for money and property" and "to conceal and otherwise protect the conspiracy and its participants from detection and prosecution." (Second Superseding Indict. at ¶ 5).

Count Two of the indictment alleged a substantive RICO count charging a violation of 18 U.S.C. § 1962(c) which provides as follows:

> It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

Count Two of the indictment alleged that Defendants Siegelman and Hamrick "unlawfully and knowingly conducted and participated . . . in the conduct of the affairs of the enterprise through a pattern of racketeering activity" as further set out in the indictment. Count Two

---

[6] This section of the statute provides that it is "unlawful for any person to conspire to violate any of the provisions" of the first three subsections of 18 U.S.C. § 1962.

set forth a number of separate racketeering acts.

Counts Three and Four of the indictment, in which both Siegelman and Scrushy were originally named, charged them with federal funds bribery and aiding and abetting each other "in connection with the appointment of Richard Scrushy to the CON Board," all in violation of 18 U.S.C. §§ 2 & 666(a)(1)(B). (Second Superseding Indict. at ¶¶ 49-51).

Count Five, in which Siegelman and Scrushy were named, charged them with conspiracy to "defraud and deprive the State of Alabama of its right to the honest and faithful services" of Siegelman as Governor and Scrushy as a member of the CON board, in violation of 18 U.S.C. § 371. (Second Superseding Indict. at ¶¶ 52-66).

Counts Six through Nine, in which Siegelman and Scrushy were named, charged them with aiding and abetting each other to commit honest services mail fraud as part of their scheme to defraud and deprive the State of Alabama of its right to honest services of Siegelman and Scrushy in connection with the CON board, in violation of 18 U.S.C. §§ 2, 1341, & 1346. (Second Superseding Indict. at ¶¶ 57-60).

Counts Ten through Twelve, in which Siegelman and Hamrick were named, charged them with aiding and abetting each other to commit honest services mail fraud as part of their scheme to defraud and deprive the State of Alabama of its right to honest services from themselves as public officials in connection with governmental regulation of specified activities, allocation of bond funding and construction contracting, in violation of 18 U.S.C. §§ 2, 1341, & 1346. (Second Superseding Indict. at ¶¶ 61- 63).

6

Counts Thirteen and Fourteen, in which Siegelman and Hamrick were named, charged them with aiding and abetting each other to commit honest services mail fraud concerning performance bonds on a construction contract as part of their scheme to defraud and deprive the State of Alabama of its right to honest services from themselves as public officials, in violation of 18 U.S.C. §§ 2, 1343, & 1346. (Second Superseding Indict. at ¶¶ 64-65).

Count Fifteen, in which Hamrick was charged, and Counts Sixteen and Seventeen, in which Siegelman was named, charged them with obstruction of justice, in violation of 18 U.S.C. §§ 1512(b)(3) & 2. (Indict. at ¶¶ 64-68).

Counts Eighteen through Thirty-Three, in which Siegelman and Roberts were named, charged them with aiding and abetting each other to commit honest services mail fraud as part of their scheme to defraud and deprive the State of Alabama of its right to honest and faithful services from themselves as public officials in connection with functions of the Alabama Department of Transportation, in violation of 18 U.S.C. §§ 2, 1341, & 1346. (Second Superseding Indict. at ¶¶ 69-71).

Finally, Count Thirty-Four, in which Siegelman was named, charged him with extortion under color of official right and by fear of economic harm, in violation of 18 U.S.C. § 1951. (Second Superseding Indict. at ¶ 72).

**Jury Selection**

In March of 2006, the Court sent out Summonses for Jury Service for the trial of this case. The packet sent to prospective jurors included a cover letter, an expanded juror

7

questionnaire, a memo on proper attire from the Jury Administrator, a notice regarding the

Jury Automated System, information and materials about parking, and a six page document

entitled Jury Instructions.[7]  The last paragraph of the Jury Instructions materials included the

following information:

> *Questions?*
>
> **If you have any questions/problems in connections with your service as a juror in this court**, please call the jury administrator, Ms. Melissa Myers, at 334-954-3950, write us at Office of the Clerk, U.S. District Court, P.O. Box 711, Montgomery, AL 36101, **or check the Court's website http://www.almd.uscourts.gov.**

Jury Instructions at p. 6 (emphasis added with bold typeface).

Indeed, the Court's website has on its home page a link to information for jurors.  The

information for jurors addresses several topics: the importance of jury service, service in the

Middle District, the courts, the voir dire examination, the jurors' solemn oath, the eight

stages of the trial, an explanation of the role of various people in the courtroom, courtroom

etiquette, conduct of the jury during trial, information on what happens in the jury room,

information about events after the trial, courthouse locations, and information about the plan

for selection of jurors.  The first paragraph of the information on the website under the topic

of what happens in the jury room includes the following statements: "In this district, jurors

---

[7]  While some portions of the materials sent to the potential jurors in this case was different than that which is commonly used in this Court, the 6 page document entitled Jury Instructions is no different than what is used in other cases.

elect a foreperson. The foreperson presides over the jury's deliberations and must give every juror a fair opportunity to express his or her views." For the sake of the completeness of the record, a copy of the information for jurors from the Court's website is attached to this Memorandum Opinion and Order as Appendix A.[8]

On April 19, 2006, this Court convened for the purpose of selecting a jury for the trial of this cause. The Court brought in separate panels of potential jurors. While the Court conducted most of the voir dire of the potential jurors, it also allowed counsel for the Government and each of the defendants to conduct limited voir dire of each panel and to question particular members of the panel individually. The Court addressed the challenges for cause raised by various parties, including such a challenge to Juror #5 from Siegelman and Roberts. Juror #5 and other potential jurors were brought before the Court and counsel individually for additional questioning.   After the individual voir dire, neither the Government, nor any defendant made any argument that Juror # 5 should be removed for cause; moreover, no one used a peremptory challenge to remove him from the jury. The voir dire process was completed on the afternoon of April 20, 2006.  Counsel then struck a jury of twelve and six alternate jurors.[9]

---

[8] This information was printed from the website in December of 2006, for the purpose of making it an Appendix to this Memorandum Opinion and Order. The Court is not aware of any changes made to the content of this material during 2006.

[9] Consistent with this Court's practice, the members of the jury were not informed that some of them were alternates until after all parties had rested and the alternates were excused.

Despite the intense public interest in the case and the widespread media reporting on the case, neither the Government, nor *any* defendant requested that the jury be sequestered. The Court considered completely sequestering the jury, but had concerns about the hardship that would impose on the jurors. The Court determined that it would be appropriate to partially sequester the jurors during the trial. To that end, the jurors met each day at a location away from the courthouse and were driven into the courthouse compound by the United States Marshal's Service. Additionally, meals were provided to the jury in the courthouse during trial and deliberations so that the jurors would not have to be exposed to the large phalanx of reporters encamped outside the courthouse. At the end of the day, the United States Marshal's Service delivered jurors back to their vehicles. Some jurors who had transportation problems or long commutes were provided with rooms at area hotels. Steps were taken to allow the jurors to remain anonymous if they wished to be able to do so.

**The Trial**

The trial began on the morning of Monday, May 1, 2006. The Court gave preliminary instructions to the jury based on the long version of the Eleventh Circuit Court of Appeals' Pattern Jury Instructions. Included in these instructions was the following:

> During the trial you must not discuss the case in any manner among yourselves or with anyone else, and you must not permit anyone to attempt to discuss it with you or in your presence; and, insofar as the lawyers are concerned, as well as others whom you may come to recognize as having some connection with the case, you are instructed that, in order to avoid even the appearance of impropriety, you should have no conversation whatever with those persons while you are serving

10

on the jury.

> You must also avoid reading any newspaper articles that might be published about the case now that the trial has begun, and you must also avoid listening to or observing any broadcast news program on either television or radio because of the possibility that some mention might be made of the case during such a broadcast now that the trial is in progress.

> The reason for these cautions, of course, lies in the fact that it will be your duty to decide this case only on the basis of the testimony and evidence presented during the trial without consideration of any other matters whatever.

The Government and each defendant gave opening statements.  In these opening statements the parties addressed the various charges set forth in the Second Superseding Indictment.

The Government began its case in chief and presented sixty-five witnesses and evidence for parts of twenty-seven trial days.  Many trial days began at 8:30 a.m. and did not finish until after 5:30 p.m.  The Court does not mean to attribute the length of the trial to solely to the length of the Government's examination of witnesses; to the contrary, many witnesses endured exceptionally lengthy cross-examination by counsel for the defendants.

As the June 6, 2006 primary election approached, the Court became concerned about the escalating media attention given to the case and about certain political advertisements Siegelman's campaign ran which attacked the motivations of the Government for bringing the criminal charges against him and alleged political bias.  Consequently, on June 2, 2006, the Court gave the jury a special supplemental instruction to the jury noting that the case had

attracted media attention including reporting in newspapers, on the radio, on the television, *and on the internet*. The Court admonished the jury that *anything* that they heard outside of the courtroom about the case or the charges in the case was not evidence and was not equivalent to testimony given under oath and subject to cross-examination. The Court further warned the jurors that such outside information might be inaccurate or might emphasize unimportant points. The Court instructed the jury that it must make its decision in the case only and exclusively on the basis of testimony and other evidence presented in the courtroom during the trial and that the jury must not be influenced in any way by other information. Finally, the Court told the jury to immediately communicate with the Court if any of its members became concerned that something seen or heard outside of the courtroom may have in any way compromised the ability of the juror to serve as a fair and impartial juror in the case.

In addition to this special instruction on June 2, 2006, the Court instructed the members of the jury several times a day on each and every day of the trial not to discuss the facts of the case and not to allow anyone to discuss the facts of the case with them. Certainly these broad prohibitions were sufficiently clear for the members of the jury to know that they should not discuss the case by any means, including email, telephone, or text message. Additionally, the Court instructed the jurors at the close of every day of trial to avoid any discussions regarding the case and any contact with any information about the case, especially from news reports.

12

On Thursday, June 8, 2006, the Government rested its case in chief after presenting evidence and witnesses over twenty-seven trial days. The Court heard argument from each defendant on motions for judgment of acquittal pursuant to Federal Rule of Criminal Procedure 29 on June 8, 2006 and June 9, 2006. As part of his Rule 29 motion, Siegelman argued, *inter alia*, that Counts 3 and 4 were multiplicitious and urged the Court to require the Government to elect between them.

Prior to trial, the Court had addressed the issue of whether Counts 3 and 4 were multiplicitous in conjunction with its ruling on motions to dismiss filed by Scrushy and Siegelman. In an Order dated March 22, 2006 (Doc. # 254), the Court ruled that as drafted Counts 3 and 4 were multiplicitous and that rather than dismissing the indictment, it would instead require the Government to elect, at an appropriate time prior to submission of the case to the jury, on which counts it would proceed before sending the case to the jury. On June 12, 2006, the Government filed a motion to reconsider that ruling (Doc. # 422). On June 13, 2006, the Court denied the Government's motion to reconsider and made it clear that either under its March 22, 2006 ruling or based on a ruling partially granting Defendants' Rule 29 motions, it was requiring the Government to elect how to redact the Second Superseding Indictment to address the multiplicity in Counts 3 and 4. At that time, the Government announced its intention to redact the Second Superseding Indictment by removing Scrushy's name from Count 3 and Siegelman's name from Count 4.

From June 9, 2006 to June 12, 2006, each of the defendants had the opportunity to

present witnesses and evidence in their defense. All defendants had rested their cases by Monday, June 12, 2006. The Government rested without calling rebuttal witnesses on June 12, 2006.

On June 14, 2006, closing arguments began. Closing arguments were completed by late morning on June 15, 2006.

**Jury Deliberations**

Around midday on June 15, 2006, the jury, having heard closing argument and the Court's instructions, began their deliberations by selecting Juror # 7 to serve as its foreman. At the start of their deliberations, the jury was provided with the exhibits admitted in evidence. Each juror also received a written copy of the jury instructions which the Court had read at the conclusion of the trial. The foreperson also received a copy of a redacted version of the Second Superseding Indictment.[10] Shortly after the jury returned to deliberate on the morning of June 16, 2006, the Court received a request from the jury for eleven additional copies of the redacted version of the Second Superseding Indictment. The requested copies were made and provided to the jury.

**Verdicts**

The jury deliberated for a total of nine days. On the afternoon of June 29, 2006, the jury returned unanimous verdicts. The jury found Defendants Hamrick and Roberts not

---

[10] The redaction was necessary to remove Count Three against Scrushy and Count Four against Siegelman which had been withdrawn based on a ruling by the Court that the Counts were multiplicitous.

14

guilty on all counts. The jury found Scrushy guilty on Counts Four, Five, Six, Seven, Eight, and Nine. The jury found Siegelman guilty on Counts Three, Five, Six, Seven, Eight, Nine, and Seventeen. The jury found Siegelman not guilty on Counts One, Two, Ten, Eleven, Twelve, Thirteen, Fourteen, Sixteen, Eighteen, Nineteen, Twenty, Twenty-One, Twenty-Two, Twenty-Three, Twenty-Four, Twenty-Five, Twenty-Six, Twenty-Seven, Twenty-Eight, Twenty-Nine, Thirty, Thirty-One, Thirty-Two, Thirty-Three, and Thirty-Four.

**Post-Trial Motions**

Both Siegelman and Scrushy made oral motions for judgment of acquittal pursuant to Federal Rule of Criminal Procedure 29(a) before the case was submitted to the jury. Scrushy also had made a written motion for judgment of acquittal pursuant to Federal Rule of Criminal Procedure 29(a) before the case was submitted to the jury. *See* Doc. # 413. Pursuant to Federal Rule of Criminal Procedure 29(b), the Court reserved decision on the motions.

On June 30, 2006, this Court entered a written Order (Doc. # 443) setting deadlines for final written submissions relating to motions for judgment of acquittal. Additionally, this Order set a September 29, 2006 deadline for the filing of all motions for new trial pursuant to Federal Rule of Criminal Procedure 33(a). After the jury's verdicts, both Siegelman and Scrushy filed written motions for judgment of acquittal pursuant to Federal Rule of Criminal Procedure 29(c). *See* Doc. # 453, Doc. # 454, & Doc. # 455. On October 2, 2006, this Court entered a Memorandum Opinion and Order (Doc. # 468) denying all pending motions for

judgment of acquittal. In so doing, this Court specifically held that substantial evidence supported the convictions of Siegelman and Scrushy. (Doc. # 468 at 7).

On September 25, 2006, Siegelman and Scrushy jointly filed Defendants Don Eugene Siegelman's and Richard M. Scrushy's Motion for New Trial Pursuant to Rule 33(a) of the Federal Rules of Criminal Procedure (Doc. # 462). Due to problems with how the motion was filed, it was stricken and Siegelman and Scrushy were granted leave to refile their joint motion. On September 29, 2006, Siegelman and Scrushy jointly filed Defendants Don Eugene Siegelman's and Richard M. Scrushy's Motion for New Trial Pursuant to Rule 33(a) of the Federal Rules of Criminal Procedure (Doc. # 467). The joint motion was initially supported by fourteen exhibits and thirty-three pages of argument. The joint motion sought a new trial on the basis of the exhibits and argument. In the alternative, the joint motion sought a broadening of the factual record by further investigation into juror misconduct which Siegelman and Scrushy contended had occurred and another opportunity based on the expanded factual record to argue that a new trial was warranted.[11]

As grounds for the relief requested in the joint motion, Siegelman and Scrushy pointed to the Sixth Amendment guarantee to every criminal defendant the constitutional right to a

---

[11] Specifically, the joint motion asked the Court to: (a) allow Defendants' counsel to interview all jurors; (b) issue certain subpoenas relating to email or text messaging records of the jurors; (c) preserve certain computer records relating to juror internet usage; (d) require jurors to disclose the internet service providers, telephone companies and text-messaging services that they used during a specified period; (e) conduct an evidentiary hearing at which jurors would be caused to testify; and (f) expedite ruling on the requested measures to assure that the records or information would be preserved.

fair trial before an impartial jury. Siegelman and Scrushy argued that they were denied their right to a fair trial for three reasons: (1) because the jury was exposed to extraneous information, (2) because the jury engaged in premature deliberations, and (3) because the jurors engaged in misconduct by deliberating with fewer than all of the members of the jury present and by considering the severity of the penalties on the basis of what Defendants contend must have been exposure to extrinsic evidence regarding the applicable penalties. Finally, on the basis of certain post-trial news reports, Defendants raised a concern about the completeness of the record relating to possible *ex parte* contact between the Court and a juror and noted that, in certain circumstances, improper *ex parte* contact between the Court and a juror can require a new trial.[12]

Defendants' argument that the jury had been exposed to extraneous information was predicated on several evidentiary submissions. First, Defendants pointed to a post-trial newspaper interview given by Juror # 7, the foreman of the jury, in which he was quoted as having stated that he had conducted internet research using Google into what a foreman was supposed to do. *See* Doc. # 467-2. Second, Defendants pointed to a post-trial television interview given by Juror # 40, in which she stated that she saw one internet article or headline about the case. *See* Doc. # 462-7 at p. 24. Third, Defendants relied on two

---

[12] As previously noted, the Court has already addressed the issue of *ex parte* contact between it and the juror. At the October 31, 2006 hearing, this Court clarified the factual record on this issue and ruled that on the basis of the correct and complete factual record, the joint motion for new trial was DENIED to the extent it was predicated on an argument that there was *ex parte* contact between the Court and the jury foreman.

documents purporting to be copies of affidavits from Juror #5.[13] *See* Doc. # 467-11 & Doc. # 467-12. Finally, Defendants relied on a document which they contend was sent to them anonymously and which may be a copy of a June 25, 2006 email communication between Juror # 40 and someone who may be one of the other jurors in the case. This document states "penalty 2 severe...still unclear on a couple of counts against pastor & gov." *See* Doc. # 462-15.

Defendants' contentions that the jury had engaged in misconduct by improperly engaging in premature deliberations, improperly engaging in deliberations with fewer than all jurors present, and improperly considering the penalty defendants might face if convicted were based solely on documents they received in the mail from an anonymous source. These documents purport to be copies of email messages between jurors. The first purports to be a May 29, 2006 email from Juror # 40 to Juror # 7 indicating that Juror # 40 needed "to talk." *See* Doc. # 462-13. The second purports to be another May 29, 2006 email from Juror # 40 to Juror # 7 that says "I agree some of the kounts r confusing 2 our friends. Chek text.30/38 still off trac. [juror's first name]" *See* Doc. # 462-14. The third purports to be a June 25, 2006 email from an email address that does not indicate the sender's real name to Juror # 40 that says "penalty 2 severe...still unclear on a couple of counts against pastor & gov." *See*

---

[13] Defendants also relied on two documents purporting to be affidavits from Juror #5's wife and her pastor which Defendants contend corroborate Juror #5's beliefs that improprieties occurred by showing that he made statements to them similar to the statements he made in his "affidavits."

Doc. # 462-15.  The fourth purports to be an email from Juror # 40 to the sender of the document included in the record as Doc. # 462-15 that states "stay focused...remember what judge said...have plans for 4th...right? [Juror #40's first name]"  *See* Doc. # 462-16.  Finally, the fifth purports to be a June 25, 2006 email from Juror #40 to another email address from which it is not possible to ascertain the name of the recipient that states "proud of u...other 6 kounts most important...c.u.n. am [Juror #40's first name]"  *See* Doc. # 473-1.

On October 13, 2006, the Government filed its response to the joint motion.  The Government argued that the Court should deny all relief requested in the joint motion.  The Government cast doubt on the reliability of Defendants' evidence.  The Government argued that Federal Rule of Evidence 606(b) precluded inquiry into the jury's deliberations and mental processes.   The Government characterized much of Defendants' evidence as speculative, unreliable, and unauthenticated.  Additionally, the Government called into question whether the documents purporting to be affidavits of Juror # 5 had been obtained in violation of Rule 47.1 of the Local Rules for the United States District Court for the Middle District of Alabama for Civil and Criminal Cases, which prohibits post-verdict interrogation of jurors and which provides that:

> [a]ttorneys, parties, or anyone acting for them or on their behalf shall not, without filing a formal motion therefor with the court and securing the court's permission, interrogate jurors in civil or criminal cases, either in person or in writing, in an attempt to determine the basis for any verdict rendered or to secure other information concerning the deliberations of the jury or any members thereof.   The court itself may conduct such interrogation in lieu of granting permission to the movant.

Finally, the Government argued in general terms that there was no reasonable possibility of prejudice arising from any juror's alleged contact with extrinsic or extraneous information. Rather than filing a joint reply, Scrushy and Siegelman each filed a lengthy reply brief.

**Post-Trial Proceedings Relating To Issues Raised By The Joint Motions For New Trial**

As previously noted, in support of the joint motion for new trial, Defendants had provided to the Court four documents which purported to be affidavits from Juror # 5, Juror # 5's wife, and the pastor for Juror # 5's wife. The Court was only provided with copies of faxed documents purporting to be affidavits from these persons and a rather cryptic and incomplete explanation of how the documents came to be in the possession of the attorneys for the Defendants. The Court scheduled an evidentiary hearing to inquire into the origins and authenticity of the documents and to investigate whether any attorney or any other person acting on behalf of either Siegelman or Scrushy had violated Rule 47.1 of the Local Rules of the United States District Court for the Middle District of Alabama for Civil and Criminal Cases.

At the evidentiary hearing, the Court heard testimony from two notaries: Donna Armstrong, who had signed the August 9, 2006 documents purporting to be affidavits of Juror # 5, his wife, and her pastor; and Diana Flentory, who had signed the September 1, 2006 document purporting to be the second affidavit of Juror # 5. The Court also heard testimony from Juror # 5, his wife, and her pastor. Finally, the Court heard testimony from a Birmingham pastor named Charles Winston and his attorney wife Debra Bennett Winston.

The credible testimony at the hearing made it quite plain that Charles Winston authored the documents dated August 9, 2006 and that those documents were not sworn to or signed in the presence of a notary. The credible testimony at the hearing also made it quite plain that the document purporting to be an affidavit from Juror # 5 dated August 9, 2006 (Doc. # 467-11) was not in Juror # 5's own words, but rather the characterizations of events described in the documents are in Charles Winston's words. Juror # 5 and Charles Winston had a conversation. Charles Winston then created the document and read it to Juror # 5. Juror # 5, who does not read that well, questioned Charles Winston about the document's content, but Charles Winston told Juror # 5 that what he had written meant basically the same thing as what Juror # 5 had said. When asked about the veracity of the content of the first document, Juror # 5 said that it wasn't his words, but it was "kind of" in sync with what was going on.

With respect to the September 1, 2006 affidavit (Doc. # 467-12), the credible testimony presented at the October 31, 2006 evidentiary hearing indicated that the answers attributed to Juror # 5 were in his own words and that the affidavit was properly notarized. However, the credible testimony at the evidentiary hearing held on October 31, 2006 raised serious concerns in this Court's mind about whether the September 1, 2006 affidavit of Juror # 5 was obtained in violation of Local Rule 47.1 of the Local Rules for the United States District Court for the Middle District of Alabama for Civil and Criminal Cases. It is clear that both Charles Winston and Debra Bennett Winston had connections to Richard M.

Scrushy prior to August of 2006. It is clear that after Charles Winston obtained the August 9, 2006 documents from Juror # 5, Juror # 5's wife and her pastor, Charles Winston presented the documents to his wife, Debra Bennett Winston. Upon receiving the documents Debra Bennett Winston admits that she attempted to contact counsel for both Siegelman and Scrushy; but she did not attempt to provide any information about what she perceived to be problems with the conduct of the jury in the Siegelman/Scrushy trial with either the Court or the Office of the United States Attorney. Moreover, it is undisputed that Debra Bennett Winston met with counsel for Siegelman prior to meeting with Juror # 5 on September 1, 2006, to obtain a different affidavit from him.

This Court carefully considered the testimony it heard at the October 31, 2006 evidentiary hearing and the evidence Defendants submitted in support of their joint motion for new trial. On November 6, 2006, this Court entered a Memorandum Opinion and Order in which it found that Siegelman and Scrushy had made the requisite colorable showing of extrinsic influence on the jury sufficient to warrant a further inquiry by the Court into certain aspects of the jury's conduct during the trial. Accordingly, the Court set another evidentiary hearing for November 17, 2006.

Each of the twelve jurors who deliberated to verdict in the case were required to appear at the November 17, 2006 hearing and provide testimony regarding whether the jury had been exposed to extrinsic evidence or influences. The jurors were also required to bring certain documents or things relating to exposure to extrinsic evidence or influences with them

to the evidentiary hearing.[14]  The Court conducted the questioning of the jurors and had an

opportunity to directly assess the credibility and demeanor of each juror as testimony was

given under oath.  The Court's questioning of the jurors was intended to ascertain whether

anything found in previous cases by either the United States Supreme Court or the Eleventh

Circuit Court of Appeals to constitute extraneous information or outside influence warranting

a new trial had reached the jury in this case.  Prior to questioning the jurors, the Court

---

[14]  The subpoena delivered to the jurors required that they bring the following:

> To the extent that during either the trial or jury deliberations in
> the case of *United States v. Don Eugene Siegelman and Richard
> M. Scrushy,* 2:05-cr-119-MEF, any juror, including yourself,
> may have considered, consulted, viewed, or discussed **any
> information other than:** (1)  the exhibits admitted into
> evidence, (2) the testimony of the witnesses, or (3) the judge's
> instructions, please bring any documents or objects which relate
> to the information considered, consulted, viewed, or discussed.
> For example, if you have knowledge that any juror, including
> yourself, may have considered, consulted, viewed, or discussed
> any of the following information during the trial or jury
> deliberations you should bring all documents or objects related
> to that information: (a) outside information relating to the facts
> of the case; (b) outside information relating to or concerning any
> defendant or witness in the case; (c) outside information relating
> to the law applicable to any aspect of the case; (d) outside
> information relating to the possible penalty any defendant might
> face if convicted; (e) outside information relating to the process
> of jury deliberations, the role of a juror, or the role of a
> foreperson of a jury; (f) outside information relating to any
> media coverage of the trial; or (g) outside information relating
> to or concerning any aspect of the law or legal procedures.
> Items (a) through (g) above are not an exhaustive list, but are
> intended to be examples of the types of documents you are to
> bring.

explained to them the limited scope of the evidentiary hearing, namely to determine whether any extraneous information was brought to the jury's attention by any person, including by any juror, and to determine whether any outside influence was improperly brought to bear upon any juror. In so doing, the Court explained that extraneous information referred to *any* information other than the information that the jury received from the Court's instructions on the law, the factual evidence presented in this case through witness testimony from the witness stand, and factual evidence presented in the case through exhibits properly admitted at trial, and that any information not from one of those three sources constitutes extraneous information. The Court also explained that outside influence referred to attempts to influence a juror's thoughts about the case or the outcome of the jury's deliberations by anyone other than another juror during the jury deliberations.

All twelve jurors denied any knowledge of any outside influence on any juror. The jurors' testimony about extraneous information was less than unanimous. At least one of the jurors, Juror # 8, denied any knowledge of any juror having had access to extraneous information.

Several other jurors testified that early in deliberations, Juror # 7, the foreman, had looked up the role of a foreman on an internet site. All jurors indicating that Juror # 7 had done so testified that Juror # 7 had made a very brief statement that he had looked up this information and that the matter was not discussed further. Juror # 7 testified under oath that he had accessed this Court's website and read a sentence regarding the role of the foreman

24

that indicated that the foreperson presides over the jury's deliberations and must give every juror a fair opportunity to express his or her views.[15]  Juror # 7 also testified that he had printed a copy of the Second Superseding Indictment off of this Court's website after deliberations had begun so that he could read it and think about it at his leisure.  Some, but not all of the other jurors were aware that he had done so.  Jurors # 7, # 22, and # 40 each testified that they had incidental and inadvertent exposure to portions of media reports about the case during the trial, but each indicated that they did their best to avoid such exposure and that they did not read or watch the media coverage after they realized the nature of the information addressed.[16]

Like Juror # 7, Juror # 40 testified that she had printed a copy of the Second Superseding Indictment off of this Court's website during jury deliberations so that she could read it at her leisure.  Some of the other jurors testified that Juror # 40 had admitted going

---

[15] This sworn testimony is somewhat inconsistent with a media report which appeared shortly after trial in which Juror # 7 was quoted as having indicated that he conducted a Google search on the role of a foreperson.

[16] For example, Juror # 7 subscribes to two newspapers.  He testified that during the trial he occasionally inadvertently saw a headline relating to the case, but did not read any articles until after the case was over.  Similarly, he was aware of media coverage of the case on the internet because he inadvertently encountered it, but he did not read the stories until after the trial.  Similarly, Juror # 22 testified that she tried to avoid media coverage by leaving the room or muting the television when stories came on the news, but she may have inadvertently heard some coverage before the mute button was pressed or before she could leave the room.  Finally, Juror # 40 testified that she saw a headline on the *Montgomery Advertiser's* internet site when she was looking for an unrelated news story, but that she did not read the article.  This testimony is arguably somewhat different than a media interview in which she appeared to admit that she read one news article about the case during the trial.

online to get a copy of the indictment. Other jurors testified that Juror # 40 had gotten some

information from the internet, but they were not sure exactly what it was. Juror # 30 assumed

that Juror # 40 was reading media reports about the case on the internet because Juror # 40

had mentioned that the whole trial was on the internet daily.

Having heard testimony from all twelve jurors who deliberated to a verdict in this case

and considered all evidence properly before it, the Court found that there was credible

evidence which established that during deliberations some of the jurors were exposed to the

following extrinsic or extraneous evidence: (1) a complete copy of the Second Superseding

Indictment obtained from the website of the United States District Court for the Middle

District of Alabama and (2) juror information from the website of the United States District

Court for the Middle District of Alabama concerning the foreperson's obligation to preside

over the jury's deliberations and to give every juror a fair opportunity to express his or her

views. The Court informed counsel for all parties of this finding and of its intention to apply

the rebuttable presumption of prejudice set forth in *Remmer v. United States*, 347 U.S. 227

(1954)[17] and its progeny. The Court directed the parties to simultaneously submit briefs on

the remaining issue in the legal analysis of the appropriateness of granting a new trial,

namely, whether the jurors' consideration of the extrinsic evidence was harmless to the

---

[17] While it appears that the United States Circuit Court of Appeals for the Eleventh
Circuit has been somewhat inconstant in its adherence to *Remmer* as binding precedent, this
Court felt constrained to follow *Remmer* and the decisions from the Eleventh Circuit Court
of Appeals which have recognized the presumption of prejudice from *Remmer*.

Defendants.[18]

## SPECIFIC FACTUAL FINDINGS

The Court reaches the following specific factual findings after carefully studying the evidentiary record, including all post-trial testimony and exhibits, and after taking into account each juror's demeanor before the Court during his or her sworn testimony. In some respects the Court's factual findings in this cause are complicated by inconsistencies in the respective testimony of various jurors or by contradictions between sworn juror testimony and other evidence before this Court. The range of responses to the questions posed by the Court suggests that some jurors may have exaggerated the misconduct of their fellow jurors or assumed misconduct that may not have actually occurred and others may have been either oblivious to actions of other jurors or less than candid in their testimony. In the final analysis, this Court must judge the credibility of each juror and distinguish the believable from the unbelievable. Having done so, the Court makes the following specific factual findings relating to the issues raised by the joint motion for new trial:

1. The Court finds that there is no credible evidence that, prior to the verdict in this case, any juror was subjected to any outside influences such as bribes, threats or other attempts by anyone other than another juror to influence the juror's thinking about the case

---

[18] In its brief in opposition to the joint motion for new trial, the Government had argued that any purported instance of consideration of extrinsic evidence by a juror was harmless; however, given the expanded factual record, the Court deemed it appropriate to allow the parties further argument.

or the outcome of the case.

2. Based on the unanimous, sworn denials of the jurors at the November 17, 2006 hearing, the Court finds that there is absolutely no credible evidence that any juror was exposed to any extraneous or extrinsic information about the penalty that might be applicable to any defendant if he was convicted of the charges in this case. The Court further finds that the document (Doc. # 467-15), anonymously sent to Defendants, which purports to be an email between two jurors during the trial which says "penalty 2 severe" does not constitute credible information which can in any way cast doubt on the sworn testimony of the jurors before this Court to the effect that they were not exposed to any extraneous or extrinsic information about the penalty that might be applicable to any defendant if he was convicted of the charges in this case.

3. The Court finds that Juror # 7's sworn testimony at the November 17, 2006 hearing – that he had briefly viewed information on the role of a jury foreperson from this Court's website – is more credible than the media report in which an unsworn statement attributed to Juror # 7 indicated that he had conducted internet research using Google to find information on the role of the foreperson. Thus, the Court finds that the credible evidence establishes that Juror # 7 was exposed to extrinsic evidence during jury deliberations that indicated that the foreperson presides over the jury's deliberations and must give every juror a fair opportunity to express his or her views as set forth by the juror information on the Court's own web site.

4. The Court finds that the credible evidence establishes that Juror # 7 mentioned to the other members of the jury that he had researched the role of a jury foreperson, that this fact was mentioned early in deliberations, most likely on the second day of deliberations, and that total time this matter was discussed by any member of the jury was no more than a few minutes.

5. The Court does not find credible the wholly uncorroborated testimony of Juror # 66 to the effect that Juror # 7 looked up information on the employment of a defendant other than Scrushy or Siegelman (presumably Roberts).

6. Juror # 5's testimony before this Court is far more credible than any information attributed to him by any of the documents purporting to be affidavits dated August 9, 2006 (Doc. # 467-9, Doc. # 467-10, & Doc. # 467-11).

7. While Juror #5's testimony before this Court on November 17, 2006 is not necessarily inconsistent with his September 1, 2006 affidavit (Doc. # 467-12). To the extent that any variance between the two exists, the Court finds that due to the circumstances under which the affidavit was obtained from him, Juror # 5's testimony before this Court is far more credible than his September 1, 2006 affidavit.

8. Juror # 30's testimony regarding Juror # 40 and Juror # 7 having contact with extraneous information is based on assumption and speculation and therefore it is not more credible than the testimony of either Juror # 40 or Juror # 7.

9. Juror # 38 testified that Juror # 7 had been on the internet and one of the television

29

stations had all the proceedings on it and you could go read it does not constitute credible evidence that Juror # 7 or any other juror actually did read any internet media coverage relating to the trial.

10.  The Court finds credible the testimony of Juror # 7, Juror # 22, and Juror # 40 regarding their response to inadvertent contact with media coverage relating to the trial. Specifically, the Court finds credible the testimony of Juror # 7 that he may have inadvertently seen news story headlines in the newspaper or on the internet, but that he did not read any articles or intentionally access such content until after the trial.  Similarly, the Court finds credible the testimony of Juror # 22 that she may have inadvertently heard parts of television news coverage about the trial, but that she avoided it as best she could by leaving the room, turning off the television sound, or having her husband turn off the television sound.  Finally, the Court finds credible the testimony of Juror # 40 that she saw a news headline on a newspaper internet site while she was looking for an unrelated news story, but that she did not read the article.

11.  The Court finds that the credible evidence before it establishes that Juror # 40 did obtain an unredacted copy of the Second Superseding Indictment from the Court's internet website during the jury's deliberations and that she did read this document outside of the juror room for the purpose of being able to read it at her leisure.  The Court further finds that the credible evidence before it establishes that Juror # 40 disclosed to the other jurors that she had obtained a copy of the Second Superseding Indictment from the internet and

reviewed it. The Court further finds that the total time the jury spent discussing this fact during deliberations did not exceed thirty minutes.

12. The Court finds that the credible evidence before it establishes that Juror # 7 did obtain an unredacted copy of the Second Superseding Indictment from the Court's internet website during the jury's deliberations and that he did read this document outside of the juror room for the purpose of being able to think about the document and how to organize the jury's discussion of the counts in it and the Court's instructions outside of the setting of the jury deliberation room. The Court further finds that the credible evidence before it establishes that Juror # 7 disclosed to the other jurors that he had obtained a copy of the Second Superseding Indictment from the internet and reviewed it and that he brought the document into the jury deliberation room. The Court further finds that Juror # 7 referred to this document during two days of the jury's deliberations toward the beginning of the process and then discarded the document. The Court finds credible the testimony of Juror # 7 that his notes and the use of this copy of the indictment was intended to help organize and facilitate the process of deliberations.

## DISCUSSION

### A. Juror Exposure to Extraneous Information

The Sixth Amendment to the United States Constitution provides that an individual

accused of a crime has a right to trial by an *impartial* jury.[19]   Various court decisions

addressing the contours of this right have expanded the protections implicit in this guarantee

by holding that under our system of justice, the jury is to determine cases on the basis of the

evidence developed in the adversary area of the courtroom and the instructions on the law

provided by the court. *See, e.g., Turner v. Louisiana*, 379 U.S. 466, 472-73 (1965);

*Patterson v. Colorado*, 205 U.S. 454, 462 (1907); *United States v. De La Vega*, 913 F.2d

861, 870 (11th Cir. 1990), *cert. denied sub nom Carballo v. United States*, 500 U.S. 916

(1991); *United States v. Howard*, 506 F.2d 865, 866 (5th Cir. 1975).[20]

> However, "[w]hile due process of law mandates that a fair trial
> be provided to the appellants, there is no constitutional right to
> a perfect trial." *United States v. Alvarez,* 755 F.2d 830, 859
> (11th Cir. 1985) (quoting *United States v. Ragsdale,* 438 F.2d 21
> (5th Cir. 1971)).   Mindful of this oft-quoted aphorism and
> cognizant that "it is virtually impossible to shield jurors from
> every contact or influence that might theoretically affect their

---

[19]  The Sixth Amendment specifically provides that

> [i]n all criminal prosecutions, the accused shall enjoy the right
> to a speedy and public trial, *by an impartial jury* of the State and
> district wherein the crime shall have been committed; which
> district shall have been previously ascertained by law, and to be
> informed of the nature and cause of the accusations; to be
> confronted with the witnesses against him; to have compulsory
> process for obtaining witnesses in his favor, and to have the
> assistance of counsel for his defense.

U.S. Const. amend. VI (emphasis added).

[20]  In *Bonner v. City of Prichard, Ala.*, 661 F.2d 1206, 1209 (11th Cir. Nov. 3, 1981)
(*en banc*), the Eleventh Circuit adopted as binding precedent all Fifth Circuit decisions
handed down prior to the close of business on September 30, 1981.

vote," we recognize that "[d]ue process means a jury capable and willing to decide the case solely on the evidence before it, and a trial judge ever watchful to prevent prejudicial occurrences when they happen." *Smith v. Phillips*, 455 U.S. 209, 217 (1982).

*De La Vega*, 913 F.2d at 870.

A defendant seeking to attack a jury verdict against him on the ground that his right to an impartial jury has been violated does not have an unfettered ability to assail the verdict on that basis. Local rules limit a defendant's ability to contact jurors and may prevent a defendant from gathering evidence relating to the jury's deliberations.[21] Indeed, if a juror's affidavit submitted in support of a new trial motion was obtained in clear violation of a court order or a local rule against interrogation of jurors, then the court may disregard that affidavit. *See, e.g., Tanner v. United States*, 483 U.S. 107, 126 (1987); *Venske*, 296 F.3d at

---

[21] For example, Local Rule 47.1 of the Local Rules for the United States District Court for the Middle District of Alabama for Civil and Criminal Cases prohibits post-verdict interrogation of jurors, by providing:

> [a]ttorneys, parties, or anyone acting for them or on their behalf shall not, without filing a formal motion therefor with the court and securing the court's permission, interrogate jurors in civil or criminal cases, either in person or in writing, in an attempt to determine the basis for any verdict rendered or to secure other information concerning the deliberations of the jury or any members thereof.    The court itself may conduct such interrogation in lieu of granting permission to the movant.

The Eleventh Circuit Court of Appeals has found this very type of rule to be constitutional. *See, e.g., United States v. Venske*, 296 F.3d 1284, 1291 (11th Cir. 2002), *cert. denied sub nom McCorkle v. United States*, 540 U.S. 1011 (2003).

1291-92.

Moreover, for nearly a century, courts have recognized a near-universal and firmly established common-law rule flatly prohibiting the admission of juror testimony to impeach a jury verdict. *See Tanner*, 483 U.S. at 117. Courts recognize few exceptions to this common-law rule and allow juror testimony on the jury's activities *only* in situations in which an *extraneous influence*[22] been shown. *Id.* "In situations that did not fall into this exception for external influence, however, the [Supreme] Court [has] adhered to the common-law rule against admitting juror testimony to impeach a verdict." *Id.* On more than one occasion, the Supreme Court has considered and affirmed the wisdom of this approach and in so doing has discussed the numerous and substantial policy considerations supporting this approach. *See, e.g., Tanner*, 483 U.S. at 117-21 (collecting cases). Indeed, the Eleventh Circuit and the Supreme Court have repeatedly found that district courts did not abuse their discretion in denying motions for new trial or in rejecting defendants' demands for the examination of jurors predicated on arguments of a variety of types of juror misconduct *not encompassing* external influence on the jury.

While some might be tempted to criticize these well established limitations on a defendant's ability to attack a jury verdict, important policy considerations support such

---

[22] Extraneous influence on a jury would include: (a) a bribe paid to influence a juror; (b) a threat made to influence a juror; (c) exposure of jurors to prejudicial information not admitted into evidence, such as media reports or the fruits of independent juror investigations of facts relating to the case; or (d) other prejudicial contacts between jurors and third parties.

limitations. Indeed, it is well-settled that without such limitations our very system of justice would be jeopardized.

"[T]he essential feature of a jury obviously lies in the interposition between the accused and his accuser of the commonsense judgment of a group of laymen, and in the community participation and shared responsibility that results from that group's determination of guilt or innocence." *Williams v. Florida*, 399 U.S. 78, 100 (1970). Because our system of justice so prizes the unique and essential feature of our criminal justice system, the role of the jury, it tolerates some of the defects attendant to that system;[23] indeed, it is well-accepted that a lack of perfection inheres in the jury system. *See, e.g., United States v. D'Angelo*, 598 F.2d 1002, 1004-05 & n.4 (5th Cir. 1979). As the United States Supreme Court has explained:

> There is little doubt that postverdict investigation into juror misconduct would in some instances lead to the invalidation of verdicts reached after irresponsible or improper juror behavior. *It is not at all clear, however, that the jury system could survive such efforts to perfect it. Allegations of juror misconduct, incompetency, or inattentiveness, raised for the first time days, weeks, or months after the verdict, seriously disrupt the finality of the process. Moreover, full and frank discussions in the jury room, jurors' willingness to return an unpopular verdict, and the community's trust in a system that relies on the decisions of laypeople would all be undermined by a barrage of postverdict scrutiny of juror conduct.*

---

[23] For example, a jury may render logically inconsistent verdicts on different counts of an indictment or as to different co-defendants. A jury may engage in jury nullification. Courts may not speculate as to whether a particular jury verdict may have been the result of compromise, mistake or even carelessness.

*Tanner*, 483 U.S. at 120-21 (internal citations omitted; emphasis added).

The United States Supreme Court has repeatedly emphasized the necessity of shielding jury deliberations from public scrutiny. *See, e.g., Tanner*, 483 U.S. 107; *McDonald v. Pless*, 238 U.S. 264 (1915); *Mattox v. United States*, 146 U.S. 140 (1892).[24] In so doing, the highest court in our land has repeatedly expressed concerns that defendants would launch inquiries into jury conduct in the hope of discovering something that might invalidate the verdicts against them; that jurors would be harassed and beset by the defeated party in an effort to secure from them evidence of facts which would establish misconduct sufficient to set aside the verdict; and that such events would result in the destruction of all frankness and

---

[24] In this decision, the United States Supreme Court expressed other concerns inherent in allowing too much intrusion into or examination of the process by which a jury reached a verdict:

> Public policy forbids that a matter resting in the personal consciousness of one juror should be received to overthrow the verdict, because, being personal, it is not accessible to other testimony. It gives to the secret thought of one the power to disturb the expressed conclusions of twelve. Its tendency is to produce bad faith on the part of a minority; to induce an apparent acquiescence with the purpose of subsequent dissent; to induce tampering with individual jurors subsequent to the verdict. But as to overt acts, they are accessible to the knowledge of all the jurors. If one affirms misconduct, the remaining eleven can deny. One cannot disturb the action of the twelve; it is useless to tamper with one, for the eleven may be heard.

*Mattox*, 146 U.S. at 148-49.

freedom of discussion during jury deliberations. *Id.* The Eleventh Circuit Court of Appeals

has echoed these important policy considerations. *See*, *e.g.*, *Venske*, 296 F.3d at 1291-92.

The Federal Rules of Evidence buttress the common law rule against the admission

of jury testimony to impeach a verdict and the exception for juror testimony relating to

*extraneous influences*. Federal Rule of Evidence 606(b), which addresses the competency

of jurors as witnesses, provides:

> **(b) Inquiry into validity of verdict or indictment.** *Upon an
> inquiry into the validity of a verdict or indictment, a juror may
> not testify as to any matter or statement occurring during the
> course of the jury's deliberations or to the effect of anything
> upon that or any other juror's mind or emotions as influencing
> the juror to assent to or dissent from the verdict or indictment or
> concerning the juror's mental processes in connection therewith,
> except that a juror may testify on the question whether
> extraneous prejudicial information was improperly brought to
> the jury's attention or whether any outside influence was
> improperly brought to bear upon any juror.* Nor may a juror's
> affidavit or evidence of any statement by the juror concerning a
> matter about which the juror would be precluded from testifying
> be received for these purposes.

Fed. R. Evid. 606(b) (emphasis added). While Rule 606(b) specifically applies only to juror

testimony or juror affidavits, the Eleventh Circuit  has held that it applies equally to juror

statements reported by the press. *See United States v. Sjeklocha*, 843 F.2d 485, 488 (11th

Cir. 1988).

Not surprisingly, the Eleventh Circuit enforces the prohibition on using certain types

of evidence to attack the impartiality of a jury's verdict set forth in the common law and Rule

606(b). As one panel put it, "[p]ost-verdict inquiries into the existence of impermissible

extraneous influences on a jury's deliberations are allowed under appropriate circumstances, but inquiries that seek to probe mental processes of jurors are impermissible." *United States v. Ayarza-Garcia*, 819 F.2d 1043, 1051 (11th Cir.), *cert. denied*, 484 U.S. 969 (1987) (citations omitted). Indeed, courts faced with affidavits from jurors containing information about the jury's deliberative processes along with information about possible impermissible extraneous influences are to disregard the portions of the affidavits dealing with forbidden testimony under Federal Rule of Evidence 606(b) and must only have a hearing on possible extraneous influences on the jury's deliberations if the remaining content warrants one. *See*, *e.g.*, *Venske*, 296 F.3d at 1290.

In this case, Siegelman and Scrushy predicated their joint motion for a new trial on arguments that their right to trial by an impartial jury had been violated and they sought further factual inquiry into certain issues relating to that argument. The Court had little difficulty concluding that the evidentiary records submitted with the joint motion for new trial was insufficient as a matter of law to require a new trial. The more difficult question posed by Defendants' joint motion was whether the evidentiary record warranted further factual inquiry and interrogation of the jurors. While initially evaluating the joint new trial motion, the Court was mindful that it had

> broad discretion as to how to proceed when confronted with an allegation of jury misconduct, including discretion with regard to the initial decision as to whether to interrogate jurors. Cases dealing with the degree of investigation required fall along a continuum focusing on two factors: the certainty that some impropriety has occurred and the seriousness of the accusation.

38

> The more speculative or unsubstantiated the allegation of
> misconduct, the less burden there is to investigate; the more
> serious the potential jury contamination, especially where
> alleged extrinsic influence is involved, the heavier the burden to
> investigate.

*Ayarza-Garcia*, 819 F.2d at 1051 (internal citations omitted).

The Court began its analysis with the presumption that the jury had been impartial and

unbiased. *See, e.g., United States v. Winkle,* 587 F.2d 705, 714 (5th Cir.), *cert. denied*, 444

U.S. 827 (1979) (When confronted with a motion for new trial predicated on an argument

that a defendant's right to an impartial jury has been violated, a court must start with the

presumption that the jury has been impartial and unbiased.); *United States v. Robbins*, 500

F.2d 650, 653 (5th Cir. 1974) (same). Given that presumption, Siegelman and Scrushy bore

> the burden of establishing that extrinsic matters have been
> considered by the jury during its deliberations. *United States v.
> Winkle,* 587 F.2d 705, 714 (5th Cir.), *cert. denied,* 444 U.S. 827
> (1979). It is only when the defendant has made a colorable
> showing of extrinsic influence that the court must investigate the
> asserted impropriety. *Id.*

*Ayarza-Garcia*, 819 F.2d at 1051. *Accord, United States v. Barshov*, 733 F.2d 842, 851 (11th

Cir. 1984), *cert. denied*, 469 U.S. 1158 (1985).

Under the relevant legal precedents, the Court found that most of the evidence on

which Siegelman and Scrushy relied in their joint motion failed to help them satisfy their

burden or failed to satisfy this Court that it must investigate various aspects of alleged juror

misconduct. Much of the evidence on which Siegelman and Scrushy based their joint motion

did not relate in any way to extraneous influences on the jury. Some of the evidence on

which Siegelman and Scrushy relied was speculative and unsubstantiated. Clearly, some of the evidence on which Siegelman and Scrushy relied was improper under the aforementioned common-law rule and Federal Rule of Evidence 606(b).

The strongest evidence that there may have possibly been extraneous influences on the jury warranting further investigation was contained in portions of the two "affidavits" of Juror #5.[25]  Because this Court had questions and concerns about the origins of these "affidavits," it held an evidentiary hearing on the circumstances surrounding possible post-trial contact with jurors on October 31, 2006.  The Court cannot say that this hearing assuaged all of its concerns about whether the "affidavits" of Juror # 5 were obtained through a violation of Local Rule 47.1 of the Local Rules for the United States District Court for the Middle District of Alabama for Civil and Criminal Cases.  Indeed, the Court cannot even say that it found the relevant testimony on this issue to be at all credible.  Nevertheless, there was insufficient evidence before this Court on which to base a ruling that the August 9, 2006 "affidavit"[26] of Juror #5 was obtained in violation of Local Rule 47.1.  Given the content of

---

[25] These "affidavits" are Exhibits 8 and 9 to Defendants Don Eugene Siegelman's and Richard M. Scrushy's Motion for New Trial Pursuant to Rule 33(a) of the Federal Rules of Criminal Procedure (Doc. # 467).

[26] It is very clear from the testimony at the October 31, 2006 hearing that the August 9, 2006 Affidavit of Juror #5 (Ex. 8 to Doc. # 467) was not properly notarized.  Moreover, it is amply clear from the testimony at the hearing that the specific content of the "affidavit" concerning alleged consideration by the jury during deliberations of information obtained from the internet is not actually in the words of the affiant despite the fact that it appears in quotation marks.  Nevertheless, Juror #5 did maintain that it was his belief that information obtained from the internet was discussed during the jury's deliberations in this case.  Given that the applicable legal precedents do not seem to require that a defendant rely on properly

the August 9, 2006 affidavit and the testimony of Juror #5 regarding that document, the Court

found that Siegelman and Scrushy had made colorable showing of extrinsic influence on the

jury sufficient to warrant a further inquiry by the Court into certain aspects of the jury's

conduct during the trial.  For that reason, the Court conducted the November 17, 2006

evidentiary hearing at which all twelve jurors were called upon to answer the Court's detailed

questions[27] about possible exposure to extraneous information or outside influence.

Having heard testimony from all twelve jurors who deliberated to a verdict in this

case, the Court has found that there was credible evidence which establishes that during

deliberations some of the jurors were exposed to the following extrinsic or extraneous

evidence: (1) a copy of the Second Superseding Indictment obtained from the website of the

United States District Court for the Middle District of Alabama and (2) juror information

from the website of the United States District Court for the Middle District of Alabama

concerning the foreperson's obligation to preside over the jury's deliberations and to give

every juror a fair opportunity to express his or her views.[28]  In light of this evidence of juror

---

notarized affidavits or other sworn testimony to satisfy the burden of making a colorable
showing of extrinsic influence on the jury, the Court could not disregard the August 9, 2006
Affidavit due to the defects inherent in it.

[27] Interestingly, the Government objected that the Court's questions and the scope of
the hearing was too broad and the Defendants objected that the Court's questions and the
scope of the hearing was too narrow.

[28] The Court finds that the testimony concerning the inadvertent exposure of certain
jurors to an extremely limited amount of news reporting on this case is insufficient to
constitute exposure to extrinsic or extraneous evidence within the meaning of the Sixth
Amendment.

exposure to extraneous information, this Court must, pursuant to *Remmer v. United States*, 347 U.S. 227 (1954)[29] and its progeny, presume that the exposure to the extraneous information was prejudicial to the Defendants. Accordingly, the burden shifts to the Government to rebut this presumption of prejudice.

Not every case in which a jury has been exposed to extrinsic evidence results in finding that a new trial must be granted. *See, e.g., United States v. Ronda*, 455 F.3d 1273, 1299 (11th Cir. 2006); *United States v. Bolinger*, 837 F.2d 436, 440-41 (11th Cir.), *cert. denied sub nom De La Fuente v. United States*, 486 U.S. 1009 (1988). To rebut the presumption of prejudice, the Government must show that the jurors' consideration of the extrinsic evidence was harmless to the defendants. *See, e.g., United States v. Ronda*, 455 F.3d at 1299.

> To evaluate whether the government has rebutted that presumption, [a circuit court reviewing the issue will] consider the totality of the circumstances surrounding the introduction of the extrinsic evidence to the jury. The factors [to be considered] include: (1) the nature of the extrinsic evidence; (2) the manner in which the information reached the jury; (3) the factual findings in the district court and the manner of the court's inquiry into the juror issues; and (4) the strength of the government's case.

*Ronda*, 455 F.3d at 1299-1300 (internal citations omitted).

---

[29] While it appears that the United States Circuit Court of Appeals for the Eleventh Circuit has been somewhat inconstant in its adherence to *Remmer* as binding precedent, this Court feels constrained to follow *Remmer* and the decisions from the Eleventh Circuit Court of Appeals which have recognized the presumption of prejudice from *Remmer*.

Given the strictures of Federal Rule of Evidence 606(b) and the common law rule, the standard the Court applies necessarily must focus on the probable effect of the exposure on an average juror or jury, rather than the actual effect the exposure had on the actual juror or the jury's deliberation.

> The evidentiary inquiry before the district court on remand must be limited to objective demonstration of extrinsic factual matter disclosed in the jury room. Having determined the precise quality of the jury breach, if any, the district court must then determine whether there was a reasonable possibility that the breach was prejudicial to the defendant. [internal citations omitted.] Again, the district court is precluded from investigating the subjective effects of any breach on any jurors, whether such effects might be shown to affirm or negate the conclusion of actual prejudice.

United States v. Howard, 506 F.2d 865, 869 (5th Cir. 1975).[30]

Thus, a juror's own testimony that the exposure to the extrinsic evidence did not effect the deliberations or was harmless is not controlling. Bolinger, 837 F.2d at 440. The district court can consider that testimony, but it also must consider the other factors such as the nature of the extrinsic evidence and the strength of the evidence properly presented by the government against the defendant. Id. The key is for the court to ascertain whether there was an objectively reasonable possibility of prejudice. Id.

---

[30] Much of Siegelman's argument mistakes the nature of the inquiry. He focuses too much on arguments about the actual effect of events on the deliberations of the jurors in this case rather than properly arguing about the probable effect on a hypothetical average juror.

### 1. Exposure to Extrinsic Information About the Role of the Foreperson

The totality of the relevant circumstances establishes that Defendants were not harmed by the exposure of some of the jurors to information from the Court's website about the role of the foreperson. The juror information from this Court's website accessed by Juror # 7 and mentioned in jury deliberations was extrinsic evidence improperly consulted during deliberations. Whether viewed in its entirety, or specifically with reference to the portion that Juror # 7 focused on, the juror information from the Court's website did not pertain to any substantive issue in the Defendants' trial. It concerned only the process of deliberation. Moreover, it did not contradict any instruction that this Court gave the jurors. It was consulted and discussed for only a few moments at the beginning of what turned out to be rather lengthy deliberations. It was consulted and discussed to facilitate full participation by all members of the jury. The jury's exposure to the extraneous information did not result from the actions of anyone other than a member of the jury.

Courts have held that analogous actions by jurors in other cases were not prejudicial to defendants. *See generally*, *De La Vega*, 913 F.2d 861. After deliberations began in *De La Vega*, the jury foreperson went to the library and checked out a book entitled *What You Need to Know for Jury Duty. Id.* at 869. The foreperson read the book, implemented suggestions for procedures outlined in the book, brought the book to the jury room, showed some other jurors a page in the book which outlined organizational steps. *Id.* at 869-70. Relying on a case from another circuit in which a juror had used information from a library

book on Roberts' Rules of Order to direct discussions in the jury room, the Eleventh Circuit held that the introduction of this extrinsic evidence created no reasonable possibility of prejudice warranting a new trial. *Id.* at 870-71.

Given the strength of the Government's case on the counts of conviction[31] and the other relevant circumstances relating to the exposure of the jury to this extrinsic information, the Court finds that the introduction of this material was indeed harmless beyond a reasonable doubt, and the Government has satisfied its burden of rebutting the presumption of prejudice. In this Court's view, there is simply no reasonable possibility of prejudice arising out of the exposure to this information in this case. Accordingly, to the extent that Defendants' joint motion for new trial seeks relief on the basis of the exposure to this extrinsic information, it is due to be DENIED.

### 2. Exposure to Unredacted Second Superseding Indictment

As explained in this Memorandum Opinion and Order, on the thirtieth day of the trial, the Government elected to cure what the Court had determined to be multiplicity in the Second Superseding Indictment by removing reference to Siegelman in Count 4 and to Scrushy in Count 3. Prior to this time, all parties had referred to the Second Superseding Indictment as it was initially drafted. Nevertheless, after the Government's election, a copy

---

[31] This Court has previously held that the Government presented substantial evidence of Defendants' guilt on the counts of conviction. (Doc. # 468 at 7). In reaching its holding on the instant motion, the Court reiterates that the properly admitted evidence of the guilt of Siegelman and Scrushy on the counts of conviction is substantial.

of the redacted version of the Second Superseding Indictment was provided to the jury on the first day of its deliberations. On the second day of its deliberations, additional copies of the redacted version of the Second Superseding indictment were provided to the jury so that each member of the jury could have his or her own copy.

This Court has found that credible evidence exists that Juror # 7 and Juror # 40 did access a copy of the unredacted Second Superseding Indictment early during the jury's lengthy deliberations.[32] They each obtained this document from this Court's website in order to be able to review the allegations outside of the jury deliberation room. Additionally, some other members of the jury became aware that Juror # 7 and Juror # 40 had spent time outside of the jury room reviewing the content of the Second Superseding Indictment. While the jury did not discuss this fact at length, it did discuss it. Nevertheless, there is no evidence that any members of the jury other than Juror # 7 and Juror # 40 actually read the unredacted Second Superseding Indictment.

The Court has found that the unredacted Second Superseding Indictment necessarily constitutes extrinsic information. The Government correctly points out that the difference between the unredacted Second Superseding Indictment and the version provided to the jury is a matter of only a few words, but it is nonetheless a different document obtained from outside of the court proceedings in this case. The Court is satisfied, however, that the

---

[32] The Court does not mean to suggest that there exists any evidence that either Juror # 7 or Juror # 40 ever realized that there was any difference between the copy of the indictment given to them by the Court and the one they obtained. There is no such evidence.

exposure of two jurors to the unredacted Second Superseding Indictment and the exposure of some of the other members of the jury to the fact that those jurors had obtained a copy of the document from the internet does not create a reasonable possibility of prejudice to the Defendants in the circumstances of this case.  Accordingly, the Defendants' joint motion for new trial on the grounds of this exposure to extrinsic information is due to be DENIED.

Prior to the redaction of the Second Superseding Indictment on the thirtieth day of trial, the jurors were repeatedly exposed to comment on the contents of the document by both the Court and the parties during voir dire and opening statements and otherwise.  The fact that the extrinsic evidence to which certain jurors were exposed during deliberations was innocuous and cumulative of information properly before the jury, such as the remaining allegations of the redacted Second Superseding Indictment, the Court's instructions, or the arguments of counsel, supports the Government's contention that the exposure to the information was harmless and the possession by some jurors during deliberations of an unredacted copy of the Second Superseding Indictment did not create a reasonable possibility of prejudice. *See*, *e.g.*, *United States v. Pessefall*, 27 F.3d 511, 515-16 (11th Cir. 1994), *cert. denied sub nom Rickman v. United States*, 513 U.S. 1174 (1995); *United States v. Guida*, 792 F.2d 1087, 1093-94 (11th Cir. 1986); *Llewellyn v. Stynchcombe*, 609 F.2d 194, 195-96 (5th Cir.), *reh'g denied,* 613 F.2d 314 (5th Cir. 1980).

This conclusion is bolstered by the fact that the extrinsic information at issue here is the charging document itself.  From the beginning of the case, the jurors were all clearly

instructed that the indictment was not evidence of guilt.   It is well-settled that the Court must

presume that the jury follows its instructions.  *See, e.g., United States v. Shenberg*, 89 F.3d

1461, 1472 (11th Cir. 1996), *cert. denied sub nom Sepe v. United States*, 519 .S. 1117 (1997).

Where, as here, the Court has properly instructed the jury as to the purpose and contents of

the indictment, the exposure of some or all jurors to an unredacted copy of the indictment is

harmless beyond a reasonable doubt.  *See, e.g., United States v. Klein*, 93 F.3d 698, 704 (10th

Cir.), *cert. denied*, 519 U.S. 1048 (1996); *United States v. Haynes,* 573 F.2d 236, 241-42 (5th

Cir.), *cert. denied*, 439 U.S. 850 (1978).

The Court cannot find, especially in light of the substantial evidence of guilt on the

counts of conviction, that any reasonable juror would have been prejudiced by reading the

unredacted indictment during the jury deliberations.  Moreover, the fact of the exposure to

this document by Juror # 7 and Juror # 40 was discussed only for a relatively brief time

during the lengthy deliberations.  This Court cannot find that the exposure of any juror to the

unredacted Second Superseding Indictment would have provided that juror with factual

information to which the juror did not already properly have access.  Similarly, the exposure

could not have caused a juror to have legal knowledge different from that provided to the

jury as a whole by the Court.  Finally, the Court repeatedly made clear to the jury through its

instructions that it must decide the case solely on the evidence properly admitted during the

trial.  Having considered all of the relevant factors, the Court finds that the exposure to the

unredacted Second Superseding Indictment was harmless beyond a reasonable doubt and that

it created no reasonable possibility of prejudice to Defendants.

### 3. Incidental, Inadvertent Exposure to Limited Portions of Media Coverage

When questioned by the Court at the November 17, 2006 hearing, Jurors # 7, 22, and 40 revealed that they had inadvertently experienced limited exposure to some media coverage during the trial.[33]  Given the intense media scrutiny to which the trial was subjected, this admission was not surprising.  Based on the credible evidence before it, the Court is satisfied that these jurors did not intentionally seek information about the case from media sources and that these jurors avoided obtaining the content of the media reports once they realized that the case was being discussed. For example, Juror # 22 would leave the room or mute the television sound when a news report on the trial came on and Jurors # 7 and # 40 saw headlines in newspapers or online, but did not read the stories prior to the verdict.  None of these jurors can remember the specific content of any media report or headline to which they were exposed.  There is no credible evidence before this Court that the content of any media reports were discussed by the jury.  Given these facts and the strength of the Government's case, the Court is persuaded that a new trial is not warranted on the basis of this limited and incidental exposure by these jurors to media reports about the trial.  There is simply no reasonable possibility of prejudice to Defendants. *See, e.g., United States v. Ronda*, 455 F.3d

---

[33] In this Court's view, the fact that these jurors disclosed this information makes the entirety of their testimony more credible.  These jurors felt compelled to disclose even the most incidental and inadvertent exposure to extraneous information.  This shows how conscientiously forthcoming they were in responding to the Court's inquiries.

at 1300-01. Accordingly, to the extent that Defendants' joint motion for new trial is predicated on juror exposure to media coverage,[34] it is due to be DENIED.

## B. Alleged Juror Misconduct

Throughout the course of the argument of the joint motion for new trial, the Defendants have relief heavily on certain exhibits, which purport to be copies of emails between jurors for certain, of their arguments in support of new trial. Specifically, Defendants contend that Exhibits 10, 11, 12, 13 and 15 to their joint motion for new trial (Doc. # 467-13, Doc. # 467-14, Doc. # 467-15, Doc. # 467-16, & Doc. # 473-1) are evidence that some of the jurors improperly deliberated prior to the submission of the case to them for deliberation and that certain members of the jury improperly deliberated over certain aspects of the case outside of the presence of all members of the jury. Defendants contend that the evidence of premature deliberations or deliberations by fewer than all members of the jury requires this Court to grant them a new trial. The Court has several problems with this contention.

First, while it is true that the legal precedents cited to this Court by Defendants in support of their motion make it clear that premature deliberations or deliberations by fewer than all members of the jury are disfavored, the Court does not find that the cited cases actually hold that evidence of either type of juror misconduct warrants the grant of a new

---

[34] Defendants spend much of their argument on *supposed* exposure to media coverage rather than on the *actual limited* exposure established by the evidence. The Court will not grant relief on this entirely speculative basis.

trial. Indeed, this Court, through its own research, was unable to locate any authority which holds that to be the case. As the movants, the Defendants are charged with informing this Court of the legal precedent for the relief requested and, if it does not exist, with candidly stating that they are in good faith seeking an extension of the law. In this Court's view, its role is to follow the law, rather than to create it. The absence of clear legal support for Defendants' argument from either the United States Supreme Court or the Eleventh Circuit Court of Appeals makes this Court very skeptical about the legal predicate for the relief sought from the verdict on the basis of alleged juror misconduct.

In addition to this Court's concerns about the legal precedent for this portion of the motion, the Court also has serious concerns about the factual predicate for the argument. The "evidence" of premature deliberations or deliberations by fewer than all members of the jury in this case is problematic. The documents on which defendants rely are photocopies of documents which were sent anonymously to counsel for Defendants after trial. Because of Local Rule 47.1 of the Local Rules for the United States District Court for the Middle District of Alabama for Civil and Criminal Cases, the Defendants cannot contact the jurors to try to establish the authenticity of these documents. Federal Rule of Evidence 606(b) prohibits this Court from asking the jurors about their deliberations or influences on their deliberations. Except for allowing juror testimony on the question of whether extraneous prejudicial information was brought to the jury's attention or whether any outside influence was improperly brought to bear upon any juror, Federal Rule of Evidence 606(b) and the

common law on which it is based bars this Court from seeking information from the jurors about these documents. Of course, Defendants urged the Court to obtain discovery from third parties which might have been able to authenticate these documents such as juror emails, but Defendants provided no legal precedent for such an unusual and intrusive investigation of jurors.

In this Court's view, the relevant precedents did not support an evidentiary hearing into the circumstances involving alleged juror misconduct unrelated to the extraneous evidence or outside influence on the jury. *See, e.g.*, Fed. R. Evid. 606(b); *United States v. Cuthel*, 903 F.2d 1381 (11th Cir.), *reh'g denied,* 920 F.2d 13 (11th Cir. 1990) (no evidentiary hearing required despite evidence of premature deliberations by jury and evidence of intrajury pressure to reach a verdict.); *United States v. Barshov*, 733 F.2d 842, 852 (11th Cir. 1984), *cert. denied*, 469 U.S. 1158 (1985) (No per se rule requires the trial court to investigate the internal workings of the jury whenever a defendant asserts juror misconduct; the duty to investigate arises only when the party alleging misconduct makes an adequate showing of extrinsic influence.); *United States v. Camacho*, 865 F. Supp. 1527 (S.D. Fla. 1994), *aff'd sub nom United States v. Veal*, 153 F.3d 1233 (11th Cir. 1998), *cert. denied*, 526 U.S. 1147 (1999) (denying both defendant's requests to interview the jury members and motion for new trial based on evidence of premature deliberations, deliberations with fewer than all members of jury present, and improper consideration of the penalty not based on extraneous information).

The evidentiary hearings conducted by this Court leave no doubt whatsoever that the documents purporting to be juror emails on which the Defendants rely are wholly unrelated to any evidence of jury exposure to extraneous information or outside influence.[35] Even if the Court were to assume *arguendo* the authenticity of these documents, the documents only establish very limited evidence of premature deliberation in that some of the emails might relate to discussions of the case prior to the submission of the case to the jury, limited evidence of deliberation by fewer than all members of the jury, and very limited juror misconduct in the form of consideration of the possible penalty Defendants would face if convicted. While it is unquestionably clear that such discussions constitute juror misconduct, it is not juror misconduct of the sort into which this Court can or should directly inquire by interrogating jurors, nor is it in this Court's view grounds for granting a new trial. When all of the relevant circumstances of the case are considered, including the strength of the Government's evidence on the counts of conviction, the length of the jury deliberations, the

---

[35] Initially, the Court had some concerns that the alleged email which included a statement that the penalty was too severe might arguably present some evidence that some or all members of the jury had been exposed to extraneous information on the penalty. No evidence, argument or instruction concerning the penalties that any defendant might face had been discussed during the trial. To the contrary, the jury was instructed not to concern itself with matters of penalty. While the Court believed it possible that either this email was not authentic or that jurors might have been speculating about possible penalties and that either explanation would explain the comment regarding the penalty, out of an abundance of caution, the Court did ask all members of the jury about any exposure to extraneous information about penalties any defendant might face if convicted. The jurors credibly and unanimously denied any such exposure. Accordingly, the Court is satisfied that none of the documents purporting to be juror emails relate in any way to any exposure to outside influence or information.

Court's instructions to the jury, including its instructions not to decide or discuss the case prematurely and its repeated instructions regarding the presumption of innocence, as well as the split verdict reached by the jurors, the Court finds that Defendants suffered no prejudice from any premature deliberations, discussion of penalty, or deliberation with fewer than all members of the jury present.

The Eleventh Circuit Court of Appeals has held that if the jury reaches a split verdict, this fact demonstrates that the jury carefully weighed the evidence and reached a reasoned conclusion free of undue influence and did not decide the case before the close of the evidence. *See, e.g., United States v. Dominguez*, 226 F.3d 1235, 1248 (11th Cir. 2000)*, cert. denied*, 532 U.S. 1039 (2001); *Cuthel*, 903 F.2d at 1383.

> That split verdict evidences that the jury necessarily must have considered the charges individually and assessed the strength of the evidence as to each charge.   The careful weighing of the evidence inherent in a split verdict makes the verdict itself evidence that the jury reached a reasoned conclusion free of undue influence and did not decide the case before the close of the evidence.

*Dominguez*, 226 F.3d at 1248.

It is undisputed that the jury convicted only two of four defendants and that Siegelman was acquitted on some of the charges against him and convicted on other charges against him.  Because he was convicted on all charges against him, Scrushy argues that there was not a split verdict in this case. The Court disagrees. A split verdict is one in which the jury finds "guilt as to some defendants or charges but not as to others." *United States v. Baker*, 432

F.3d 1189, 1237 (11th Cir. 2005), *cert. denied sub nom Pless v. United States*, 126 S. Ct. 1809 (2006). This is certainly a case in which the jury, after long deliberations, found guilt as to some defendants, but not as to others; thus, it meets the Eleventh Circuit's definition of a split verdict. This Court is therefore entitled to consider the fact of the split verdict as evidence demonstrating that the jury carefully weighed the evidence and reached a reasoned conclusion free of undue influence and that the jury did not decide the case before the close of the evidence. Thus, to the extent that the joint motion for new trial is predicated on Defendants' arguments that the jury engaged in misconduct by prematurely deliberating, deliberating with fewer than all members present, or improperly considering the penalty, it is due to be DENIED.

## CONCLUSION

For the foregoing reasons, it is hereby ORDERED that any request for relief contained in Defendants Don Eugene Siegelman's and Richard M. Scrushy's Motion for New Trial Pursuant to Rule 33(a) of the Federal Rules of Criminal Procedure (Doc. # 467) not previously addressed by this Court, including any remaining request for a new trial, is DENIED. It is further ORDERED that any pending objections to this Court's approach to *any aspect*[36] of the inquiry into the merits of the issues relating to Defendants Don Eugene

---

[36] The Court intends this statement to extend to objections made relating to: the page limitations on briefs, the requirement of the simultaneous submission of final briefs, the questioning of witnesses at any hearing, the Court's factual findings, and the Court's rulings regarding the scope of the evidence to be admitted.

Siegelman's and Richard M. Scrushy's Motion for New Trial Pursuant to Rule 33(a) of the Federal Rules of Criminal Procedure (Doc. # 467) are OVERRULED.

Due to the pendency of several motions relating to Defendants' challenges to the composition of the jury pool, this Court will not set a date for sentencing of the Defendants at this time.

The Court appreciates the service of each and every juror and alternate juror in this case. This was a very lengthy trial with complex legal and factual issues. Trial days were frequently very long, yet the jurors remained conscientiously engaged in the process. The jurors had to have been aware to some extent that the entire trial was in the spotlight and that their decisions would be important to not only the parties and counsel, but to members of the public. They handled admirably this additional pressure.

When the trial ended, the focus on the jurors increased rather than decreased. Despite the Court's efforts to shield them, many jurors were bombarded with requests for interviews. To the extent that interviews were given by some jurors, those interviews became part of the basis for more controversy and for Defendants' joint motion for new trial. As events unfolded, this Court was required to take the rather uncommon step of holding additional hearings at which jurors were called as witnesses.

While it is true that certain members of this jury have been criticized for a lack of perfection regarding their service in this matter, there can be no question that this jury has sacrificed a great deal of their time and energy in the interest of justice. They have fulfilled

their obligations to their country and to this Court.  For that, this Court will forever be

grateful.

      DONE this the 13th day of December, 2006.

 

CHIEF UNITED STATES DISTRICT JUDGE