IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| vs. | ) | CR. NO. 2:05cr119-MEF |
| | ) | (WO) |
| RICHARD SCRUSHY | ) | |
| DON EUGENE SIEGELMAN | ) | |

**RECOMMENDATION AND ORDER OF THE MAGISTRATE JUDGE**

**I. INTRODUCTION**

This case presents yet another challenge to the method of selecting criminal petit and

grand juries in the Middle District of Alabama ("the District").  Defendants Richard Scrushy

("Scrushy") and Don Eugene Siegelman ("Siegelman") timely challenge the composition of

the jury pool from which the grand jury that indicted them was selected as well as the petit

jury selection process in this district.[1]  (Docs. # 104 & 110.)  In January 2006, both

defendants filed virtually identical motions in which they allege that the District's method

of grand and petit jury selection violates (1) the Jury Selection and Service Act ("JSSA") of

1968, 28 U.S.C. §§ 1861-1869; (2) the Sixth Amendment guarantee of a jury drawn from a

"fair-cross-section" of the community; (3) the Due Process Clause of the Fifth Amendment

to the United States Constitution; and (4) the  Equal Protection Clause of the Fifth

---

[1] Defendant Paul Michael Hamrick also filed a challenge (doc. # 111).  However, on June 29, 2006, defendant Hamrick was acquitted of all charges after a trial by jury. *See* Doc. # 440.  Consequently, his challenge to the grand and petit juries is moot.

Amendment to the United States Constitution.[2]  The defendants challenge the selection of their grand jury venire from the 2001 Master and Qualified jury wheels and the selection of their petit jury venire[3] from the 2005 Master and Qualified jury wheels.  The court ordered the parties to submit briefs supporting their arguments and held an evidentiary hearing from April 10 to April 13, 2006.  At the conclusion of the hearing, the court heard argument on the motions.

Jury selection began on April 19, 2006 and continued until April 21, 2006.  The trial of these defendants commenced on May 1, 2006.  On June 29, 2006, Scrushy and Siegelman were convicted of federal funds bribery in violation of 18 U.S.C. § 666(a)(2), conspiracy in violation of 18 U.S.C. § 371, and four counts of honest services mail fraud, all in violation of 18 U.S.C. §§ 1341 & 1346.  *See Redacted Jury Verdicts*, Docs. # 437 & 438, June 29, 2006.

After carefully reviewing the briefs filed in support of and in opposition to the motions and the supporting and opposing evidentiary material as well as the evidence presented during the evidentiary hearing, the court concludes that the defendants' statutory and constitutional challenges lack merit and do not warrant a new trial.

---

[2]  As required by 28 U.S.C. § 1867(d), defense counsel James K. Jenkins filed an affidavit attesting to his belief that the District's implementation of its written jury selection plan was a substantial violation of the Jury Selection and Service Act ("JSSA").  The government does not contest the timeliness or procedural correctness of the defendants' motions.

[3]In this recommendation, the terms "venire" and "jury pool" are used synonymously.

2

## II. PROCEDURAL HISTORY and FACTS[4]

Pursuant to 28 U.S.C. § 1863(a) of the JSSA,[5] this District adopted a written Plan for jury selection on November 1, 2001, which was approved by the Judicial Council of the Eleventh Circuit on December 17, 2001. Some features of the District's current Plan resulted from a successful challenge to the District's method of selecting criminal petit juries in

---

[4] The parties conducted extensive discovery including depositions and review of numerous records in preparation for the April 10, 2006 evidentiary hearing. Except as indicated in this recommendation, the facts of this case are not disputed.

[5] Section 1863(a) of the Act provides:

Each United States district court shall devise and place into operation a written plan for random selection of grand and petit jurors that shall be designed to achieve the objectives of sections 1861 and 1862 of this title, and that shall otherwise comply with the provisions of this title. The plan shall be placed into operation after approval by a reviewing panel consisting of the members of the judicial council of the circuit and either the chief judge of the district whose plan is being reviewed or such other active district judge of that district as the chief judge of the district may designate. The panel shall examine the plan to ascertain that it complies with the provisions of this title. If the reviewing panel finds that the plan does not comply, the panel shall state the particulars in which the plan fails to comply and direct the district court to present within a reasonable time an alternative plan remedying the defect or defects. Separate plans may be adopted for each division or combination of divisions within a judicial district. The district court may modify a plan at any time and it shall modify the plan when so directed by the reviewing panel. The district court shall promptly notify the panel, the Administrative Office of the United States Courts, and the Attorney General of the United States, of the initial adoption and future modifications of the plan by filing copies therewith. Modifications of the plan made at the instance of the district court shall become effective after approval by the panel . . .

*United States v. Clay*, 159 F. Supp. 2d 1357 (M.D. Ala. 2001) (Thompson, J.).[6]  Because there have been several challenges to the District's prior and current implementation of those plans, a brief history is necessary to understand this case's current posture.

### A. The Clay Challenge and Reform

In *Clay*, the defendant challenged the process of granting deferrals[7] and the way in which deferred jurors were reintegrated into the jury-selection process once their deferral period expired.  Up to and including the selection of Clay's trial jury, the clerk's office almost always granted temporary deferrals from jury service to individuals who claimed that jury service would create undue hardship or inconvenience. The jury administrator removed their names from the summons list, and those individuals became available for service at the end of their deferral period.

The court found that a *combination* of three factors in the pre-*Clay* system resulted in a non-random selection process that substantially violated the JSSA.  *Clay*, 159 F.Supp.2d at 1367.  First, because the Clerk granted nearly every request for a deferral, deferred jurors were essentially self-selecting.  Second, the number of eligible deferred jurors to be used in any given venire was left to the discretion of the jury administrator.  Finally, the jury administrator grouped deferred jurors together at the top of the summons lists, a preferential position that ensured their inclusion in the final venires. Because white jurors requested

---

[6] The *Clay* challenge involved the District's 1997 Jury Plan.

[7] A "deferral" is a temporary excuse from jury service for a definite period of time after which a person is again subject to selection as a juror.

4

deferrals at twice the rate of black jurors, the deferred jurors were disproportionately white. The system, therefore, in addition to being non-random, provided an increased opportunity for racial discrimination. *Id*. at 1368.

Clay's attack on the 1997 Jury Plan which produced his criminal jury venire included statutory and constitutional objections, but the court declined to consider the constitutional claim after sustaining a related statutory objection. In *Clay*, the Magistrate Judge concluded

> that Clay's allegations of a substantial violation of the Plan and the JSSA resulting from what he characterizes as the Clerk's usurpation of authority in determining the standards for granting temporary excuses and deferments, failure to obtain valid addresses for returned or undeliverable jury summonses, and failure to properly maintain the appropriate number of names in the MJW and QJW are not substantial violations of the JSSA warranting a new trial.

> However, the court concludes that the combined effect of the Clerk's practice of liberally granting undue hardship deferments to any juror who requests one, placing temporarily deferred jurors en masse at the top of the summons lists, and excluding K jurors from the coding process which purges the summons lists of excess jurors is a non-random process of creating final venire lists which is a substantial violation of the JSSA.[8] An unfortunate consequence of this non-random process is that the predominately white K jurors have priority for inclusion on the venire list at the expense of the predominately African-American TZ jurors. Because the record clearly indicates that the Clerk's methodology of constructing venire lists introduces a significant element of nonrandomization into the selection of the District's jury venires that is not only a technical violation, but a substantial violation of the Plan and the JSSA, Clay's motion for a new trial is due to be granted. Because the court concludes that Clay's statutory challenge succeeds, the court pretermits consideration of Clay's Fifth and Sixth Amendment constitutional claims.

(*Report and Recommendation of the Magistrate Judge*, Crim. Act. No. 2:99cr137-MHT, Doc.

---

[8] The court's conclusions in this regard only refer to the method of selecting venire lists in criminal trials.

# 550, Feb. 5, 2001, at 18-19) (footnote in original).  The District Judge adopted all of the Magistrate Judge's post-hearing findings and did not convene another evidentiary hearing. The District Judge subsequently overruled the objections of the parties, adopted the Report and Recommendation of the Magistrate Judge,  and granted Clay a new trial.  (*Order*, Doc. # 571, Sept. 7, 2001).

In response to the violations found in *Clay*, the District rewrote its jury plan in two key ways prior to the creation of the 2001 wheel: first, the Plan provided that the number of previously deferred jurors called for service in any particular petit jury pool could not exceed 15% of the total number of jurors called; and, second, deferred jurors were not to be given preference over other individuals in the compilation of the jury summons lists.

## B.  The Carmichael Challenge

On November 19, 2003, Leon Carmichael, Sr. ("Carmichael") and Freddie Williams (collectively, "the Carmichael defendants") were indicted on one count of conspiracy to possess with intent  to distribute 100 kilograms or more of marijuana.  On June 6, 2005, the Carmichael defendants were tried on a third superseding indictment.  On June 17, 2005, a jury convicted both Carmichael defendants of conspiring to distribute 7,000 pounds of marijuana, in violation of 21 U.S.C. §§ 841(a)(1) and 846, and also convicted Carmichael of money laundering prohibited by 18 U.S.C. 1956(h), a charge added by the second superseding indictment.[9]

---

[9]  *Superseding Indictment* filed August 17, 2004 (doc. # 227); *Redacted Indictment for Trial Purposes* (doc. # 422); *Redacted Jury Verdicts* (docs. # 601 & 602).

Prior to the *voir dire* examination on June 6, 2005, the defendants timely asserted an objection to their jury venire and to the jury selection process utilized by the Middle District of Alabama.  Carmichael challenged the composition of his jury venire by specifically asserting claims founded in the Due Process and Equal Protection Clauses of the Fifth Amendment to the Constitution, the Sixth Amendment's guarantee of a jury drawn from a "fair-cross-section" of the community,  and the Jury Selection and Service Act ("JSSA") of 1968, 28 U.S.C. §1861, *et seq.*   As the factual basis for his challenge, Carmichael represented:

> Only 12 of the 122 members, or 9.8 percent, of the current petit jury venire are African-Americans.  This percentage is in stark contrast to the percentage of African-Americans in the population of the Middle District of Alabama, which according to the 2000 Census is thirty-two percent. . . .  The percentage is also dramatically less than the 25.02 percent of African-Americans who were on the qualified jury wheel that was created for the Middle District of Alabama in 1996.  *See United States v. Clay*, 159 F. Supp. 2d 1357, 1363 (M.D. Ala. 2001).[10]   Based on these figures, it appears that African-Americans are substantially under-represented in the current petit jury venire.  This significant under-representation raises the presumption that the method currently used for selecting jury venires improperly allows for the under-representation of African-Americans in the jury venire. [11]

---

[10]  "Counsel recognizes that the 1996 jury wheel is no longer in use at this time, but has not had an opportunity to gather any information about the percentage of African-Americans on the current jury wheel at this point.  Counsel cites to the 1996 jury wheel as evidence of the percentage that could be expected to be found on the current jury wheel." (Doc. # 400, n.1).

[11]  For the 23 counties comprising the Middle District, Counsel's Affidavit reported these statistics from the 2000 census: a total population of 1,042,657, of which 683,517, or 66 percent, are Caucasian, and 333,061, or 32 percent, are Black.  "Accordingly, [counsel] would anticipate a jury venire drawn from a fair cross-section of the community of the Middle District of Alabama would be 32 percent African-American and 66 percent

In lieu of staying the trial, United States District Judge Myron H. Thompson stayed the objection, and on June 20, 2005, referred it for consideration and recommendation by United States Magistrate Judge Delores R. Boyd.  On September 13, 2005, the court issued the first of several orders setting the parameters for the discovery on the jury challenge which continued for approximately seven months.  Unanticipated difficulties in securing and interpreting relevant discovery about computer software programs applied in the selection process required extended  discovery.

An evidentiary hearing on the Carmichael jury challenge commenced on April 26 and continued through May 2, 2006. The parties submitted stipulations on the qualifications of expert witnesses and the admission of statistical reports, documents, and other evidence.[12] Evidentiary exhibits totaled 158 for Carmichael, and 22 for the United States; additionally, the court granted a  joint motion to admit the original depositions of all witnesses.[13]

Hearing testimony came from six witnesses summoned by Carmichael:  James Gundlach, Ph.D ("Dr. Gundlach") – the parties stipulated to his qualifications as an expert

---

Caucasian."  (Doc. # 400-2, Chartoff *Aff*. ¶¶ 4-5).

[12] *Joint Submissions for Stipulations of Fact and Evidence* (doc. # 673), as amended for stipulation number 3 on April 24, 2006 (doc. # 679).

[13] Hr'g Tr. vol. V, at 182-185, May 2, 2006.  To ensure the confidentiality of  jurors identified by name, the court directed that these depositions be filed *under seal*: Melissa Myers, Wanda Robinson, Debra Hackett, James H. Gundlach, Stephen Andrews, and Stephen Elmore.

in statistical analysis, sociological research methods, and demography;[14]  Robert White, Director of Voter Registration for the Alabama Secretary of State; the Clerk of the Court for the Middle District of Alabama, Debra Hackett ("Hackett"); current and former Juror Administrators Melissa Myers ("Myers") and Wanda Robinson ("Robinson"); and Systems Administrator Cornelius White.  Stephen Elmore, C.P.A. ("Mr. Elmore") – the parties stipulated to his qualifications as an expert in forensic accounting and auditing[15] – testified for the United States.  The court also admitted the deposition testimony of Stephen Andrews ("Andrews"), a management employee of Affiliated Computer Services ("ACS"), the company headquartered in British Columbia, Canada, that designed this District's computer-based jury selection program.

As noted earlier, Carmichael's jury challenge was not the first in this district.  As aptly described by Judge Boyd in her Report and Recommendation, "[t]his jury challenge does not arise in a vacuum."  (*Report and Recommendation of the Magistrate Judge*, Crim. Act. No. 2:03cr259-MHT, Doc. # 550, Feb. 5, 2001, at 25).[16]   On June 29, 2006, Judge Boyd recommended that the defendants' challenge to the composition and selection of their jury venire be denied.  (Doc. # 737).

The defendants filed objections to the Report and Recommendation of the Magistrate

---

[14] *See* Stipulation no. 1, *Joint Submission for Stipulations of Fact and Evidence* (doc. # 673).

[15] *See* Stipulation no. 2, *id.*

[16] Magistrate Judge Boyd's Recommendation will be cited as Boyd Rec.

Judge.  In August 2006, the court heard oral argument on the objections.  On December 18, 2006, in a detailed, well-reasoned and lengthy opinion, the District Court overruled the defendants' objections and adopted the Report and Recommendation of the Magistrate Judge.  *United States v. Carmichael*, 467 F.Supp.2d 1282 (M.D. Ala. 2006).

### C.  The Siegelman/Scrushy Challenge

On May 17, 2005, in a sealed indictment, defendants Siegelman and Scrushy were charged with conspiracy in violation of 18 U.S.C. § 371 and bribery involving federal funds in violation of 18 U.S.C. § 666(a)(1)(B).  The indictment was superseded twice.  On January 24, 2006, defendant Scrushy filed his motion challenging the manner in which this District selects grand and petit juries.[17]  (Doc. # 104).  He also filed a motion seeking discovery of jury records.  (Doc. # 105).  Scrushy specifically challenges the selection of the grand jury venire from the 2001 Wheels[18] which indicted him and the 2005 Master and Qualified jury

---

[17]    The right to a "representative" grand jury is a federal right that derives not from the requirement of equal protection but from the Fifth Amendment's explicit requirement of a grand jury. That right is similar to the right applicable to state proceedings to a representative petit jury under the Sixth Amendment. To the extent that the Fifth and Sixth Amendments are applicable, a defendant need only show that the jury selection procedure "systematically exclude(s) distinctive groups in the community and thereby fail(s) to be reasonably representative thereof."

*Castaneda v. Partida,* 430 U.S. 482, 509-510 (1977) (Powell, J., dissenting) (citations omitted).  Whether the source of the right is properly found in the Fifth or Sixth Amendment, the analysis is the same.

[18]The 2001 Qualified Jury Wheel is the wheel from which the grand and petit juries for the Carmichael defendants were selected and were the subject of their jury challenges.

wheels from which his petit jury would be selected.  On January 27, 2006, defendant Siegelman filed a virtually identical motion raising the same challenges as defendant Scrushy.  (Doc. # 110).

The court permitted extensive discovery and ordered the submission of briefs.  On April 10, 2006, the court began a four-day evidentiary hearing on the defendants' challenge. At that evidentiary hearing, the jury administrators, the Clerk of the Court, and the systems administrator testified.  Dr. Gundlach and Mr. Elmore also testified as experts.  After the hearing, the court heard argument on the motions.

## III.  THE APPROACH IN THIS RECOMMENDATION

Seldom if ever has any district court's plan and process of selecting grand and petit jurors been subject to the degree of scrutiny as represented by the *Clay*, *Carmichael* and the *Siegelman/Scrushy* jury challenges.[19]  The defense lawyers as well as the expert who

---

[19]The defendants unquestionably have the right and their counsel have the obligation to insure that their constitutional and statutory rights are respected.  At the same time, however,

[t]he central inquiry in a criminal case ought to be whether the defendant committed the crime charged. By diverting the inquiry to another subject, "the focus of the trial, and the attention of the participants therein, are diverted from the ultimate question of guilt or innocence that should be the central concern in a criminal proceeding." *Stone v. Powell*, 428 U.S. 465, 489-90, 96 S.Ct. 3037, 3050, 49 L.Ed.2d 1067 (1976). There is a cost to looking for defects in the criminal justice system, during proceedings initiated to determine whether a particular individual committed a particular crime. The cost of looking is not only time and money for the search, but corrosion of public respect for a judicial system that loses its focus on what Stone calls "the ultimate question." *Id.*

participated in the jury challenge in *Carmichael* are the same advocates[20] who participated in the *Siegelman/Scrushy* challenges.   Thus, it is not at all surprising that Judge Boyd's recommendation and Judge Thompson's opinion discuss virtually all of the factual and legal issues which arise in this case.  More importantly, I have carefully and exhaustively perused their cogent findings and analysis and, except where noted in this recommendation I fully agree with their analysis and conclusions.  Accordingly, there is no reason to present at length my findings or conclusions where I reach the same result as set forth in Judge Boyd's recommendation or Judge Thompson's opinion.  Rather, I will set forth a synopsis of those conclusions and refer to Judge Boyd's recommendation or Judge Thompson's opinion for a full discussion of the issues.  Of course, where necessary, I will set forth my views more fully and completely as, for example, in my discussion of the reliability of the experts in this case.  As a matter of convention, I will refer to Judge Boyd's recommendation or Judge Thompson's opinion for citation to their work.  My own views will be referred to as the "court's" findings or conclusions.

## IV.  THE DISTRICT'S GRAND AND PETIT JURY SELECTION PLAN

### A.  Introduction

Even though this recommendation will be shorter because of the work by other judges in the *Carmichael* case, not every person reading this necessarily will be familiar with the

---

*United States v. Artero,*  121 F.3d 1256, 1262 (9th Cir. 1997).

[20]The use of this term in conjunction with the defendants' expert is not inadvertent as discussed later in this recommendation.

court's jury selection process.  Thus, a brief discussion will establish some needed context for discussion of the issues.  The District's jury selection process under its Plan begins with the construction of a Master Jury Wheel ("MJW"), every four years,[21] by the random selection of at least five percent (5%) of the registered voters from each of the District's twenty-three counties.[22]  (*Plan for the Random Selection of Grand and Petit Juries*, M.D. Ala. at 3, ¶ 7a).  Pursuant to 28 U.S.C. § 1863(b)(3), each county within the District's three divisions must be substantially proportionately represented in the MJW.[23]  The Clerk of

---

[21]  The Plan provides that the Master Jury Wheel ("MJW") is emptied and refilled no later than September 1 of the year following a general presidential election.  (*Plan for the Random Selection of Grand and Petit Juries*, M.D. Ala. at 4, ¶ 9(a)).  The term "Master Jury Wheel" is a term of art to designate those names "selected at random from the voter registration lists of the Counties that comprise the District."  *Id.* at 3-4, ¶ 8).  The term does not denote a physical wheel containing the names.  In fact, the MJW is contained within an electronic data processing computer system.

[22]  The District is comprised of the following counties: Autauga, Barbour, Bullock, Butler, Chambers, Chilton, Coffee, Coosa, Covington, Crenshaw, Dale, Elmore, Geneva, Henry, Houston, Lee, Lowndes, Macon, Montgomery, Pike, Randolph, Russell, and Tallapoosa.  (*Plan for the Random Selection of Grand and Petit Juries*, M.D. Ala. at 1-2, ¶ 3).

[23]  28 U.S.C. § 1863(b) requires a plan to:

(3) specify detailed procedures to be followed by the jury commission or clerk in selecting names from the sources specified in paragraph (2) of this subsection. These procedures shall be designed to ensure the random selection of a fair cross section of the persons residing in the community in the district or division wherein the court convenes. They shall ensure that names of persons residing in each of the counties, parishes, or similar political subdivisions within the judicial district or division are placed in a master jury wheel; and shall ensure that each county, parish, or similar political subdivision within the district or division is substantially proportionally represented in the master jury wheel for that judicial district, division, or combination of divisions. For the purposes of determining proportional

Court for the Middle District of Alabama ("Clerk") is then directed by the Plan to randomly select from the MJW the names of as many persons as may be required to maintain an adequate number of names in the District's three qualified jury wheels ("QJWs"). (*Id.* at 3, ¶ 7(a)). The Clerk is authorized to use a computerized process to randomly select names from the MJW. (*Id.* at 2-3, ¶ 6-7). The Plan requires that the selection of names from the MJW must ensure that the mathematical odds of any single name being picked are substantially equal. (*Id*. at 2, ¶ 6). After this selection process is completed, the Clerk mails preliminary juror qualification questionnaires to each person selected.

The Clerk then uses the information on the preliminary juror qualification questionnaires to determine whether an individual is qualified, exempt, or excused from jury service.[24] According to the Plan, any person who is a citizen, is at least 18 years old and has resided in the district for one year is presumed to be qualified for jury service unless he or she:

 i.  is unable to read, write, or understand the English language with a degree of proficiency sufficient to satisfactorily complete the juror qualification form;

 ii.  is unable to speak the English language;

 iii.  is incapable, by reason of mental or physical infirmity, to render satisfactory jury service; or

---

representation in the master jury wheel, either the number of actual voters at the last general election in each county, parish, or similar political subdivision, or the number of registered voters if registration of voters is uniformly required throughout the district or division, may be used.

[24] The Plan specifically allows the Chief District Judge or the Chief Judge's designee to authorize the Clerk of the Court to determine juror qualifications. *See Plan* at 5, ¶ 11.

      iv.     has a charge pending against him or her for the commission of, or has been convicted in a state or federal court of record of a crime punishable by imprisonment for more than one year and his or her civil rights have not been restored.

(*Id.* at 5-6, ¶ 12(c)).

The Plan also has two provisions outlining the criteria for excuses or exemptions from jury service. (*Id*. at 6-9, ¶ 13-14). The Plan exempts members in active service of the armed forces of the United States, members of state and municipal fire or police departments, and public officers actively engaged in the performance of official duties in the legislative, executive, or judicial branches of local, state, or federal government from jury service. (*Id*. at 6, ¶ 13). The Plan also presumes that jury service would involve undue hardship and extreme inconvenience to individuals who (1) are over the age of seventy; (2) are actively engaged in professional occupations including full-time physicians, pharmacists, dentists, registered nurses, attorneys, ministers and members of religious orders; (3) have active care and custody of an infirm person or a child under ten years of age; (4) have served as grand or petit jurors within the past two years; (5) provide essential services[25] to a business, commercial, or agricultural operation; (6) full time students; (7) work for agencies which provide fire fighting, rescue, and ambulance services; or (8) any person who can demonstrate "undue hardship or extreme inconvenience." (*Id*. at 6-7, ¶ 14). These individuals are

---

[25] A person provides essential services when the absence of that person would cause the business of the enterprise to "suffer a severe economic hardship" as a result of the individual's absence. *See Plan*, at 8, ¶ 14(b)(v).

15

excused from jury service.[26]

After the preliminary questionnaires are processed, people who are qualified to serve as jurors are placed into one of three Qualified Jury Wheels (QJW), separated based upon the person's county of residence in either the Northern,[27] Southern,[28] and Eastern[29] Divisions. "The names of persons found qualified to serve as jurors, based upon their response to the juror qualification questionnaire, shall be transferred to a 'Qualified Wheel,' as described in this Plan." (*Id.* at 4, ¶ 8). The Plan does not require the Clerk to take any action regarding questionnaires which are not returned or are undeliverable. Like the MJW, the QJWs are created every four years and consist of the names of those individuals chosen from the MJW who have completed and returned the preliminary jury questionnaire and who meet the requirements for jury service. The Plan requires that the Northern Division's QJW contain at least 600 names and the Eastern and Southern Division's QJW each contain at least 200 names. (*Id.* at 9, ¶ 15).

When jurors are needed for a particular term of court, the Clerk uses a computerized process to randomly select names from the QJWs. All criminal trials are conducted in

---

[26] Jurors may be excused by the Clerk upon her review of their questionnaire or they may, in writing, request to be excused or deferred from service.

[27] The Northern Division consists of Autauga, Barbour, Bullock, Butler, Chilton, Coosa, Covington, Crenshaw, Elmore, Lowndes, Montgomery, and Pike Counties.

[28] The Southern Division consists of Coffee, Dale, Geneva, Henry, and Houston Counties.

[29] The Eastern Division consists of Chambers, Lee, Macon, Randolph, Russell, and Tallapoosa Counties.

Montgomery, unless otherwise ordered, and "criminal petit juries [are] drawn from the District at large." (*Id*. at 10, ¶ 16(a)). When selecting jurors for criminal trial terms, the Plan requires that the Clerk randomly select names from the district at large by "drawing names from each Division Wheel in approximately the same proportion to the total number drawn as the number of names in the Master Wheel from that Division bears to the total number of names in the Master Wheel." (*Id*. at 10, ¶ 16(a)(ii)). When selecting jurors to serve on petit jurors, the Plan requires the Clerk to "draw by a pure random process as authorized by the Plan." (*Id*. at 10, ¶ 16(b)). The Plan also requires grand jurors to be "drawn randomly and proportionately by Divisions for the District at large." (*Id*. at 10, ¶ 17). Furthermore, the Plan gives discretionary authority to any Judge requiring a jury panel for a particular term of court to grant excuses from jury service as well as vests the Clerk with the discretionary authority to grant temporary excuses. The Plan specifically provides, in the event of temporary excuses, that:

> [t]emporarily excused or deferred jurors whose period of excuse or deferment has expired shall be summoned on a pure, random basis for service on a civil or criminal petit jury.

(*Id*. at 8, ¶ 14(d)(i)). Moreover, for each civil or criminal petit jury, deferred or excused jurors cannot comprise more than fifteen percent (15%) of the total number of jurors summoned. (*Id*. at 8, ¶ 14(d)(ii)).

## B.  The District's Implementation of the Plan

The Clerk of the Court is responsible for the implementation of the Plan and is assisted in fulfilling that responsibility by the jury administrator. The jury administrator has

a variety of responsibilities, including operating the Jury Management System ("JMS") computer program,[30] helping create a MJW and QJWs, constructing summons lists for particular terms of court and issuing summons for jury duty.  To create the District's 2001 and 2005 MJWs and QJWs, the Clerk's office used the JMS.  (Evid. Hr'g Tr. at 397).  (*Id.* at 396).  The JMS was installed and is maintained by Affiliated Computer Services ("ACS"), a company presently based in Vancouver, British Columbia.

To construct the MJW, the jury administrator secures from the Alabama Secretary of State the necessary data from the voter registration information from the 23 counties that comprise the Middle District of Alabama.  The Clerk then provides this information to a company that creates a database for the JMS program.  (*Id*. at 403-05).  The database consists of all active, registered voters in this District who are assigned participant numbers.  These individuals constitute the MJW.  Next, the Clerk notifies the company of the number of jurors to be randomly selected from each county on a pro rata basis.  The company then randomly selects the names of the pre-determined number of  jurors from the MJS for the Clerk's Office to send qualifying questionnaires.  The jurors are selected by their assigned participant number and the QJWs are created from these jurors.    The Clerk sends

---

[30]   The JMS is the approved computerized program introduced by the Administrative Office of the Courts to the district courts.  (Evid. Hr'g Tr. at 396).  All 94 federal district courts utilize the JMS.  (*Id*. at 466).  In 2002, the National Institute of Standards and Technology, United States Department of Commerce, verified that "[u]nder a definition of fair selection in which each possible candidate has an equal chance to be selected for a jury pool, this [pseudo-random number generator that is the basis for this] algorithm is adequate." A copy of this verification letter is attached to this recommendation.

preliminary juror questionnaires to the pre-determined number of the jurors selected from the MJW. Completed questionnaires are returned to the Clerk's Office and reviewed to determine whether the jurors are qualified to sit on a jury in this district. Those jurors, whose questionnaires are deemed qualified, are placed in the QJWs.

### C.  Creation of the 2001 MJW and QJWs

The Plan required the District to build a new MJW and QJWs after the 2000 presidential election. Consequently, the Clerk's Office began the process of creating the 2001 Master and Qualified Jury Wheels. The Clerk requested the necessary voter registration information from the 23 counties that comprise the Middle District of Alabama from the Secretary of State's office. That information was provided on a disk and the Clerk then provided this information to a private company to create the 2001 MJW.

The Clerk next requested, and the company randomly selected, 99,604 names from the voter registration database to create the 2001 MJW.[31] On February 26, 2001, the juror administrator[32] utilized the JMS to generate a list of 25,000 names to whom to send

---

[31]  A report entitled "Report on Operation of the Jury Selection Plan," commonly referred to as a JS-12, was completed on April 9, 2002. The JS-12 is a statistical review of the MJW and the QJW. The JS-12 is the source of the figures for the 2001 MJW and QJWs.

[32]  In this case, three jury administrators were involved in the creation and maintenance of the 2001 MJW and QJWs: Cindy Kimbrell ("Kimbrell"), Wanda Robinson ("Robinson") and Melissa Myers ("Myers"). Kimbrell was the jury administrator until December 2000 when she left the District. Robinson then served as jury administrator from December 2000 until March 2005 when she was promoted to courtroom deputy. Myers is the current jury administrator, and has been since March 2005.

preliminary juror questionnaires.  Of the 25,000 questionnaires mailed, a number of questionnaires were returned as "undeliverable."  A number of questionnaires were never returned; these were labeled "non-responded."  When the questionnaires were returned with a forwarding address, the jury administrator forwarded the questionnaires to the new addresses.  In the case of "undeliverable" questionnaires, the jury administrator, utilizing the participant number, coded the questionnaire as "undeliverable."  None of these jurors were part of the qualified wheels.  No code was entered for any "non-responder" nor were these jurors part of the qualified wheels.

When completed questionnaires were returned, the jury administrator entered the questionnaires into the system by using a scantron to capture the data.  The scantron extracted the appropriate data from the questionnaires and the data was uploaded into the JMS.

The system separated the questionnaires into three types: (1) disqualified based on information on the form; (2) disqualified for technical reasons, *i.e.* the form is torn or the juror used a pen instead of a pencil to complete the form; and (3) qualified based on the information on the form.  The jurors who are initially disqualified based on the information contained on their questionnaires were referred to the Clerk for review and consideration.  She reviewed each questionnaire and determined whether the juror was correctly disqualified.  The jury administrator reviewed the second category of disqualified jurors – those who were disqualified for technical reasons.  The jury administrator reviewed each rejected questionnaire to determine whether the juror was qualified to serve.  If the juror was

determined to be qualified by either the Clerk or the jury administrator, the jury administrator manually entered the juror's information into the system.  The third category of jurors were qualified jurors.  Their information was captured by the system when their questionnaires were read into the system.

Once the juror questionnaires were reviewed and all the qualified juror information was captured in the system, the JMS uploaded the information and these jurors constituted the QJWs.  For the 2001 MJW, the JS-12 report indicates that a total number of 99,604 names were originally placed in the MJW.  On two occasions, February 26, 2001, and October 1, 2001, 25,000 names were drawn from the MJW to create the QJWs.  A total of 14,324 juror questionnaires were returned:  3,766 questionnaires were returned "undeliverable;" and 6910 questionnaires were not returned (*i.e.* were non-responders). According to the JS-12, the QJWs contained 9860 qualified jurors.  Although the sections of the JS-12 in which the racial composition of the MJW and QJW is determined are designated as representative samplings of the wheels, the undisputed testimony clearly demonstrates that the April 2002 JS-12 calculations were based on the entire wheels and are not merely derived from a sample of those wheels.  (Evid. Hr'g Tr. at 46).  According to the statistical data, while white jurors comprised 67.7% of the general population of the district, they constituted 75.96% of the total QJW.  In comparison, while African-American jurors comprised 30% of the general population of the district, they constituted 20.74% of the total QJW.

### D.  Selection of Petit and Grand Juries From the 2001 QJW

After the creation of the QJWs, pools of petit and grand juries were selected for terms of court.  From the first draw from the QJWs on June 4, 2001 until the last draw on September 7, 2005, 92 district-wide pools were drawn from the 2001 QJWs.  A jury pool is that group of jurors summoned to appear for a specific jury term.

In this district, criminal petit juries are drawn from all three divisions.[33]  The jury pool from which petit juries are drawn is created utilizing the JMS.  The jury administrator requests a pre-determined number of jurors be drawn for a particular criminal jury trial term, usually 200 jurors.  The JMS draws the jurors, on a pro rata basis, from each division as well as from its deferred maintenance pool of jurors.  The JMS computer program has a default value of 10% to be drawn from the deferred maintenance pool, but that value can be modified.  The jury plan permits the jury administrator to draw up to 15% of the total jurors in a jury pool from the deferred maintenance pool for each civil or criminal petit jury.

The selection of grand jury pools occurred in the same manner.  However, as will be discussed at length, the jury plan contains no limitation on the use of deferred jurors for grand jury pools.  The special grand jury in this case was summoned for service on June 21, 2004 and consisted of 100 jurors.[34]

---

[33]  This differs from the selection of civil petit juries because in civil cases, the jury pools typically are drawn only from the particular division in which the case arises.

[34]The special grand jury pool from which the Siegelman/Scrushy grand jury was drawn is pool number 201040604.  (Evid. Hr'g Tr. at 644).

## E.  Creation of the 2005 MJW and QJW

The process of creating the 2005 MJW and the QJWs initially followed the same process used in creating the 2001 wheels.  Melissa Myers took over as the Jury Administrator when 40 thousand qualification questionnaires selected by the JMS system from the Master Wheel were mailed to citizens of the district (Evid. Hr'g Tr. at 232) in March 2005. (Evid. Hr'g Tr. at 233).  A second qualification questionnaire mailing of 25 thousand was done in September 2005.  (Evid. Hr'g Tr. at 234). These were the only two mailings done for the QJW at the time that the petit jury in this case was selected.  *Id.*

For district-wide juries, the Clerk determined the percentage of persons to be drawn from each Division.  (Evid. Hr'g Tr. at 257).  For 2005, those percentages were 50% for the Northern Division; 21% from the Southern Division and 29% from the Eastern Division. (Evid. Hr'g Tr. at 258).  Normally 200 people would be selected for a criminal jury pool from which petit juries would be selected.  (Evid. Hr'g Tr. at 259).  The Jury Administrator for the 2005 wheels did not check after a pool was created to determine if the JMS system properly allocated the jurors among the three divisions according to the established percentages.  (Evid. Hr'g Tr. at 258).

Beginning with the 2005 QJW, jurors who were summoned but who did not have to appear at the courthouse for service were given a one-year deferment from service.  (Evid. Hr'g Tr. at 383) These persons were placed in the deferred maintenance pool for a year and then placed back in the QJW.  (Evid. Hr'g Tr. at 384).

# IV. DISCUSSION

## A.  Introduction

Challenges to the jury selection process may be based on the fair cross-section requirement of the Sixth Amendment, *Duren v. Missouri*, 439 U.S. 357 (1979), the equal protection component of the Fifth Amendment, *Castaneda v. Partida*, 430 U.S. 482 (1977), the due process clause of the Fifth Amendment, *Peters v. Kiff*, 407 U.S. 493 (1972), or a substantial failure to comply with the provisions of the JSSA.  *United States v. Paradies,* 98 F.3d 1266, 1279 (11th Cir. 1996).  Although defendants typically raise both constitutional and statutory challenges, a profound distinction exists between the two types of challenges because each addresses a different aspect of the jury selection process.  The JSSA requires that the federal district courts adopt a detailed procedure for selecting juries which ensures that grand and petit juries are randomly selected from a fair cross section of the community. Although § 1861 of the JSSA adopts the fair cross section language of the Sixth Amendment and §1862 prohibits the type of intentional discrimination prohibited by the Fifth Amendment, the right to a jury "selected at random" is a statutory creation not a constitutional command.  *United States v. Hawkins*, 566 F.2d 1006, 1012 (5th Cir. 1978); *United States v. Kennedy*, 548 F.2d 608, 614 (5th  Cir. 1977).[35]  This distinction between a statutory and constitutional challenge becomes even more important when the defendant

---

[35]  All decisions of the former Fifth Circuit, decided prior to October 1, 1981, are binding precedent in this circuit. *Bonner v. City of Prichard*, 661 F.2d 1206 (11th Cir.1981) (en banc).

24

alleges concomitant statutory and constitutional grounds of relief because of the well-settled jurisprudential principle that a case should not be decided on constitutional grounds when it can be resolved on statutory grounds. *Califano v. Yamasaki*, 442 U.S. 682, 692 (1979); *Ashwander v. Tennessee Valley Authority*, 297 U.S. 288, 347 (1936); *White v. State of Ala.*, 74 F.3d 1058, 1061 n. 5 (11th Cir. 1996); *United States v. Bearden*, 659 F.2d 590 (5th Cir. 1981). Given this admonition, the court must first address the JSSA claims before consideration of the defendants' constitutional claims.

As a prelude to the court's discussion of specific issues, a digression of sorts is necessary. The primary architect of many of the defendants' arguments is Dr. James Gundlach. Gundlach is a professor of sociology at Auburn University and holds a Ph.D in sociology and demography. He has previously appeared as an expert for defendants in other cases in this court including both the *Clay* and the *Carmichael* cases. The United States did not challenge the admissibility of any of Dr. Gundlach's opinions set forth in his report or his testimony.[36] Unquestionably, Dr. Gundlach is a competent expert in the fields of sociology, demography and statistical analysis of data commonly used and applied in those fields. However, neither his expertise nor the lack of a challenge to it is a sufficient basis alone for the wholesale acceptance or admission of all his opinions and conclusions. The

---

[36]Given this lack of adversariness, it is understandable that Judge Boyd did not consider Dr. Gundlach's qualifications or the reliability of his conclusions in her recommendation. Judge Thompson did not have occasion to consider the issue either because he primarily was addressing the objections to Judge Boyd's recommendation. Nonetheless, the court concludes that the FED. R. EVID. 702 issues must be independently considered by the court.

25

court must insure that his testimony meets the mandate of FED. R. EVID. 702 which provides:

> If scientific, technical, or other specialized knowledge will assist the trier of
> fact to understand the evidence or to determine a fact in issue, a witness
> qualified as an expert by knowledge, skill, experience, training, or education,
> may testify thereto in the form of an opinion or otherwise, if (1) the testimony
> is based upon sufficient facts or data, (2) the testimony is the product of
> reliable principles and methods, and (3) the witness has applied the principles
> and methods reliably to the facts of the case.

In *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), the Supreme

Court held that FED. R. EVID. 702 requires a trial court to ensure any scientific testimony

offered under the rule is "not only relevant, but reliable." 509 U.S. at 589. In *Kumho Tire

Co., Ltd. v. Carmichael*, 526 U.S. 137 (1999), the Supreme Court clarified the scope of

*Daubert*, holding that the Rule 702 gatekeeping duties of the trial judge apply to all expert

testimony, whether such testimony is based on scientific, technical or other specialized

knowledge.  To fulfill this duty, the court must engage in a rigorous three-part inquiry

considering whether:

> (1) the expert is qualified to testify competently regarding the matters he
> intends to address; (2) the methodology by which the expert reaches his
> conclusions is sufficiently reliable as determined by the sort of inquiry
> mandated in *Daubert*; and (3) the testimony assists the trier of fact, through the
> application of scientific, technical, or specialized expertise, to understand the
> evidence or to determine a fact in issue.

*City of Tuscaloosa v. Harcros Chems., Inc.*, 158 F.3d 548, 562 (11th Cir. 1998).

As already noted, Dr. Gundlach is an expert in the fields of sociology, demography

and statistics associated with those areas of expertise.  However, many passages of Dr.

Gundlach's report as well as his testimony offer opinions in areas in which he plainly lacks

qualifications.  Indeed, as alluded to earlier in this recommendation, some passages in his report read more like an advocate's brief than an expert's report.[37]  For example, the facts show without dispute that virtually all persons who requested a temporary excuse (a deferral) from jury service were granted a deferral.  Dr. Gundlach characterizes this as the "clerk's improper liberal deferral policy."  After reciting the applicable statutory basis for granting "undue hardship or extreme inconvenience" excuses, 18 U.S.C. § 1869(j), Dr. Gundlach opines that "a review of the reasons for which jurors are granted deferrals demonstrates that the Clerk is making no effort to apply the statutory requirements for a showing of 'undue hardship or extreme inconvenience,' and is, in numerous cases, clearly ignoring this standard."  (Gundlach Report at 14). The defendants advanced no evidence to show that Dr. Gundlach has any expertise in statutory construction or legal analysis and for that reason alone his gratuitous opinions about the granting of deferrals or whether the actions of the Clerk were consistent with the statutes must be discounted as impermissible under FED. R. EVID. 702.[38]

Even were that not so, the defendants' strident position about the liberality of deferrals

---

[37] An expert witness's post-graduate degree does not protect the court against the tendentiousness of advocacy research. A judge must exercise independent judgment to "ensure that any and all scientific testimony or evidence is not only relevant, but reliable." *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 589 (1993).

[38] "The expert's testimony must be grounded in an accepted body of learning or experience in the expert's field, and the expert must explain how the conclusion is so grounded."  FED. R. EVID. 702 advisory committee's note.  Indeed, in his testimony before this court, Dr. Gundlach admitted he had no legal expertise.  (Evid. Hr'g Tr. at  497).

is not well taken.[39]  Voltaire's maxim that "the perfect is the enemy of the good"[40] illustrates the fallaciousness of the rigid interpretation advanced by the defendants.  Judge Thompson eloquently points this out in his discussion of the hardship faced by a parent called to jury duty at the same time as a conflicting requirement to be present at a child's school function. *United States v. Carmichael*, 467 F.Supp.2d at 1294 n. 22.  It is difficult to imagine that Congress intended courts faced with balancing jury duty with parental duty to always decide that the former trumps the latter.  That "perfect" solution is surely not "good."[41]

In *Kumho Tire*, the Court said, "[T]he objective of . . . [the court's gatekeeping requirement] is to ensure the reliability and relevancy of expert testimony. It is to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field."  526 U.S. at 152.  The burden of establishing qualification, reliability, and helpfulness rests on the proponent of the expert opinion. *United*

---

[39]The court does not mean by this that the granting of virtually all deferrals is not a liberal policy.  Rather, the court means that the defendants' arguments about what constitutes undue hardship or extreme inconvenience are so narrow as to practically read those exceptions out of the statute.

[40]The original quote in French is "Le mieux est l'ennemi du bien," from Voltaire's Dictionnaire Philosophique (1764).  Literally translated as "The best is the enemy of good," but it is more commonly cited as "The perfect is the enemy of the good."

[41]Of course, the court recognizes that leniency best characterizes the practice of granting excuses in this court.  As noted by Judge Thompson, even though the policy is objective, it "is vulnerable to the charge that it is not in compliance with the statutory requirement that exclusions be permitted only on the basis of undue hardship or extreme inconvenience." *Carmichael*, 467 F.Supp.2d at 1295.

28

*States v. Frazier,* 387 F.3d 1244, 1260 (11ᵗʰ Cir. 2004).  And the court's gatekeeping function requires more than simply "taking the expert's word for it. " Fᴇᴅ. R. Eᴠɪᴅ.702 advisory committee's note.  Upon these premises, the court turns to consider the issues.

## B.  The Jury Service and Selection Act (JSSA) Claims

**1.  Introduction.**  The defendants mount a series of arguments in support of their general contention that the procedures used for the selection of the grand jury in this case violated the JSSA or this court's plan implementing the JSSA.  First, a discussion of the JSSA is in order followed by the court's analysis of each of the defendants' contentions.

The JSSA requires that federal district courts adopt a detailed procedure for selecting juries which ensures that grand and petit juries are randomly selected from a fair cross section of the community.  As noted elsewhere, the court has adopted a Plan as required by the JSSA.  The JSSA declares "that all litigants in Federal courts entitled to trial by jury shall have the right to grand and petit juries selected at random from a fair cross section of the community;" provides that "all citizens shall have the opportunity to be considered for service on grand and petit juries in the district courts of the United States, and shall have an obligation to serve as jurors when summoned for that purpose;"[42] prohibits exclusion on grounds of race, color, religion, sex, national origin, or economic status;[43] and requires federal district courts to adopt a "written plan for random selection of grand and petit jurors

---

[42]  28 U.S.C. § 1861.

[43]  28 U.S.C. § 1862.

that shall be designed to achieve the objectives of sections 1861 and 1862." 28 U.S.C. § 1863(a).

By its terms, the JSSA only provides a remedy for substantial failures to comply with its provisions. *Paradies*, 98 F.3d at 1279; *United States v. Gregory*, 730 F.2d 692, 698-700 (11th Cir. 1984).   In determining whether a violation is substantial, "the alleged violations must be weighed against the underlying principles of the Act." *Gregory*, 730 F.2d at 699. These principles are (1) random selection of jurors and (2) determination of disqualifications, excuses, exemptions, and exclusions on the basis of objective criteria only.  *Bearden*, 659 F.2d at 600-01; *Gregory*, 730 F.2d at 699.

In addition to these general principles, the JSSA provides that a potential juror may be excused or excluded from a panel on the grounds enumerated in §1863(b)(5)(A), §1863(b)(5)(B), or §1866(c)(1)-(5).  Sections §1863(b)(5)(A) and (B) permit district courts to grant excuses from jury service based on undue hardship or inconvenience to specific groups of people or persons in certain occupational classes.  In contrast, §1866(c)(1)-(5) does not limit excuses to the specific groups or occupational classes identified in §1863(b)(5)(A) and (B) but permits the district court to grant temporary excuses from jury service based upon (1) undue hardship or extreme inconvenience, (2) inability to render impartial jury service, (3) the result of a peremptory challenge or a challenge for cause, or (4) the court's determination that service as a juror would threaten the secrecy of the proceedings.

After carefully reviewing the evidence and the submissions of the parties, the court concludes that the defendants' allegations of a substantial violation of the Plan and the JSSA

lack merit.  The court will address each of the various contentions.

**2.  The Fifteen Per Cent Limitation.**[44]  In the wake of the court's decision in *Clay*, the court adopted in 2001 a new plan for selection of grand and petit jurors.  Section 14 of the Plan addresses "Individual Requests for Excuse or Deferment."  Subsection 14.d.ii. provides as follows:

> For each civil or criminal petit jury, the total number of temporarily excused or deferred jurors summoned shall not exceed fifteen percent (15%) of the total number of jurors summoned for civil or criminal petit jury service.

> Dr. Gundlach asserts in his report and his testimony confirmed his view that the

> jury system as implemented and administered by the Clerk's Office routinely violated this provision by significant percentages during the last two years of the 2001 Qualified Jury Wheel, including the time during which the Special Grand Jury was selected and returned the indictments against Richard Scrushy and his co-defendants.

Gundlach Report at 10-11.

It should be readily evident to anyone viewing the juxtaposition of these two statements that there was no substantial violation of the JSSA in selecting the grand jury for this case because, in the first place, there was no violation at all.  The fifteen percent limitation contained in this court's plan by its clear and definite terms applies only to the creation of jury pools for selection of petit juries, not grand juries.  Basic and well-known principles of statutory interpretation confirm this understanding.  The beginning point is the language itself.  *See Consumer Prod. Safety Comm'n v. GTE Sylvania*, 447 U.S. 102, 108

---

[44]  The discussion of this issue during the evidentiary hearing begins at Evid. Hr'g Tr. at 554.

(1980).  As a seminal rule of interpretation, a court must ascribe the plain meaning to the words used in the writing.  *See Consol. Bank, N.A., Hialeah, Fla. v. United States Dept. of Treasury*, 118 F.3d 1461, 1463 (11th Cir. 1997).  Thus, a court should look beyond the plain language only when that language is unclear or ambiguous, when the drafter of the language has expressed clearly an intent contrary to the plain language, or when absurd results would follow from implementing the plain language interpretation. *See Alacare Home Health Servs., Inc. v. Sullivan*, 891 F.2d 850, 856 (11th Cir. 1990).

The plain, unambiguous language of the section of the Plan establishing the fifteen percent limitation unequivocally applies the percentage limitation only to jury pools for selection of petit juries.[45]  Notwithstanding this limiting language, the defendants argue that the court should read grand jury selection into the limitation because of the Plan's "declaration of policy that it is a policy of this District and this plan to implement the JSSA." (Evid. Hr'g Tr. at 844-45).  A review of the JSSA provisions relating to the use of deferred or excused jurors quickly exposes the flaw in the defendants' argument.  In pertinent part, 28 U.S.C. § 1866(c) provides that if a person is excused

> upon a showing of undue hardship or inconvenience, for such period as the court deems necessary, at the conclusion of which such person either shall be summoned again for jury service . . . or, if the court jury selection plan so provides, the name of such person shall be reinserted into the qualified jury wheel . . .

---

[45]The other two reasons for looking beyond the plain language set forth in *Alacare Home Health Servs., Inc. v. Sullivan*, 891 F.2d 850 (11th Cir. 1990), obviously do not apply in this case.

With respect to grand juries, therefore, there is nothing inconsistent with the JSSA in the court's use of any number of deferred or excused jurors being selected to serve on a grand jury at the conclusion of the deferment so long as they are selected on a pure random basis.[46] In short, the defendants' assertion through Dr. Gundlach that 34% of the jurors summoned for service on the grand jury in this case is a violation of the 15% limitation is simply wrong because the limitation does not apply to the grand jury selection process. Thus, there was not a violation, much less a substantial violation, of the JSSA or the court's Plan implementing the statute.

The defendants also argue that the 15% limitation should apply to grand juries because the Plan's purpose is to implement the act and also to "ameliorate the problems that the Court identified in *Clay*." This argument misses the mark. The 15% limitation was a remedial measure which arose in the context of problems relating to jury pools from which criminal petit juries were drawn, not grand juries. Therefore, there is nothing inherent in the policies underlying the Plan's remedial purpose which dictates application of the limitation to grand juries.

With respect to the jury pool drawn in this case from the 2005 QJW for selection of the petit jury, the defendants presented no evidence that the Plan's 15% limitation was violated. In fact, the evidence shows that for jury pools selected from the 2005 QJW, the

---

[46] The defendants presented no evidence to challenge any of the computerized random selection processes used by the court to select grand or petit jurors. As noted elsewhere, the court has chosen to use the JMS software and the randomization processes of that software have been certified by the National Institute of Standards and Technology.

jury administrator set the JMS program to use no more than 10% deferred jurors for a criminal jury pool.  (Evid. Hr'g Tr. at 269). With regard to the 2001 QJW and selection of jury pools for petit juries, both Judge Boyd and Judge Thompson concluded that any violation did not violate the randomness requirement of the JSSA.  The court fully concurs with that conclusion as well as the analysis of Judge Boyd as refined by Judge Thompson.[47]

   **3. The "Scattering" Violation.**  Section 14.d.iii. of the court's jury Plan provides as follows:

> The methods employed to comply with the requirement that temporarily excused of deferred jurors are summoned for jury service at the end of the period of excuse or deferment shall insure that these person are not given preference over any other person with respect to the final compilation of the lists from which jurors will be selected for service on a civil or criminal petit jury.

   In his report and during his testimony Dr. Gundlach asserted on behalf of the defendants that in compiling the list of persons from which the members of the special grand jury in this case would be chosen the Clerk violated this provision of the plan through what he characterized as a "scattering violation."  The purpose underlying  Section 14.d.iii. of the Plan is readily found in the *Clay* decision.

---

   [47] Judge Thompson found that it was undisputed that jury administrators violated the remedy imposed after *Clay* limiting the percentage of previously deferred jurors in any given pool to not more than 15%.  However, he also found that the defendants had incorrectly inflated the number of deferred jurors for many of the jury pools at issue because the defendants' expert assumed that once deferred, a juror maintained that status even though that person may later actually serve on a jury.  He concluded that for all of the district wide pools, the magnitude of the violation was not as great as the defendants contended.  Because there was no preferential grouping of previously deferred jurors, Judge Thompson concluded that there was no substantial violation of the JSSA.

> The practice of almost always granting temporary deferrals and then, upon expiration of the deferrals, constructing venire lists in such a way as to prefer the previously deferred jurors over those who were drawn directly from the qualified wheel was a substantial violation of the JSSA.

*United States v. Clay*, 159 F.Supp.2d at 1364.  The more precise reason for the court's conclusion was that

> the combined practice of placing K jurors[48] en masse at the top of the summons list, while striking excess jurors from the bottom of the list was not a legally random manner of compiling Clay's summons list, and that it presented a real and substantial opportunity for discriminatory treatment of jurors and of criminal defendants, which is forbidden by the JSSA.

159 F.Supp.2d at 1366.

Thus, the plan's non-preference language was designed to insure that previously deferred or excused jurors would not have a greater chance than any other juror of being selected because of their placement on the list of persons from which a petit jury would be drawn.

Judge Boyd and Judge Thompson generally accepted the expert's opinion that previously deferred jurors were not randomly dispersed throughout the jury pool lists.  "The court has no reason not to accept the expert opinion that the configurations of previously deferred jurors seen in the jury pools is highly unlikely to result from a statistically random dispersal of those jurors."[49]  *United States v. Carmichael*, 467 F.Supp.2d at 1302.  Nonetheless, both Judge Boyd and Judge Thompson concluded that the scattering violation

---

[48]Previously deferred or excuse jurors.

[49]This is doubtless because the government did not challenge the conclusion.

35

did not constitute a substantial violation of the JSSA's randomness principle or in any other way. *Id.* at 1303.

On this issue, the court departs from Judge Boyd and Judge Thompson at least to the extent that they accepted the view that any violation of the Plan took place. As the court will explain, there was no violation of Section 14.d.iii. of the court's jury Plan. Dr. Gundlach's scattering violation analysis is academically interesting only. He opines that "previously deferred jurors have an unexpectedly high chance of following other previously deferred jurors." (Def. Ex. 1 at 13)

> There were 91 District-wide pools selected from the 2001 Qualified Jury Wheel. Of the 13,006 jurors summoned in these pools, 1,840 had been deferred from a previous pool. If the jurors were placed on the lists in a random manner, I would expect 14.15 percent of the deferred jurors to immediately follow another deferred juror. However, on the lists, the chance that a previously deferred juror immediately follows a previously deferred juror is 21.86 percent. If previously deferred jurors were placed on a random basis, I would not expect there to be a difference in these chances. A binomial test of the hypothesis that the observed rate is significantly higher than the expected rate is significant, with a value $p \geq .0001$. This means that I can conclude that the placement of previously deferred jurors is not random.

*Id.*

This analysis is of only academic interest because Dr. Gundlach has again overlooked that the limiting, non-preference language of section 14.d.iii. of the Plan is applicable only to petit juries. Thus, the so-called "scattering" violation is not applicable to grand juries. But even were this not so, the court still would not find any violation, much less a substantial violation, of the JSSA. The reason is fairly straightforward and is made evident by Dr. Gundlach's testimony at the hearing.

36

Q.  You were involved in the Clay litigation and just to save some time there was a question there about previously deferred being put in the block at the front of the pools;  correct?

A.  Yes.

Q.  Have you found that pattern in this case?

A.  No.

Q.   Okay. Have you found any pattern that indicates any nonrandom placement of previously deferred jurors within the individual jury pools of the 2001 Qualified Jury Wheel?

A.  Yes. I tested for random placement for all the pools, and each individual pool, and while I did not find the stacking at the top that was in Clay I found that the randomization called for in the plan is incompletely implemented.

Q.  And what do you base that opinion on?

A.  That I employed one of several tests to test for random placement on a list and it (sic) found that there was a significant difference in the placement of the previously deferred on the list as a whole as well as nine individual summons lists.

Q.  What -- can you have -- as simply as possible for non-statisticians, can you tell us how you -- what you examined and how you conducted that test.

A.   Okay. I chose one of several tests for randomness that was easiest to explain because of that. If you have a random distribution of a sub-population, say the deferred, that constitutes let's say 25 percent of the total population, you would expect no more than 25 percent of those cases to be immediately following another one of their same kind on the list. And so testing against that model allowed me to test for any significant clustering. And there was significant clustering within the entire list of all the venire -- or not venire but summons list as a whole . . .

(Evid. Hr'g Tr. at 593-594).

The vice exposed in *Clay* was that previously deferred or excused jurors were given

37

preference over newly summoned jurors in the manner in which they were listed on the final list from which a petit jury was to be drawn.   The literal goal of the limitation established in the District's Plan was to ensure that *no* juror was preferred over another.  Put another way, the goal was to insure that each summoned juror had an equal chance of being selected as a member of a petit jury.  That is exactly what the language of the Plan mandates – that no person will be "given preference over any other person with respect to the final compilation of the lists from which jurors will be selected "  Dr. Gundlach's scattering violation analysis is premised on treating deferred or excused jurors differently from other jurors.  In other words, the "incompletely implemented" randomization he criticized is observable only if jurors are separated into the sub-populations he described.  But that separation and differential treatment is precisely what *Clay* decried and what the Court's Plan seeks to prohibit.

The Plan requires that the list of jurors from which the petit jury will be selected be generated in such a manner that each *and every* juror have an equal chance of achieving a place on the list.  The defendants did not adduce any evidence from which the court could find that the venire list from which the grand jury was drawn was created in a nonrandom manner or that the manner of its creation gave preferential treatment to any person.  The evidence shows that the JMS was used to create the list, and the defendants have not shown that this computer program does not randomize the list. The court concludes there was no violation at all of the JSSA or the court's Plan by the placement of persons on the jury pool lists from which juries were selected.

**4. The Liberal Deferral Practices.**  Pursuant to its statutory authority and consistent with the Plan, the court has delegated to the Clerk the authority to grant temporary excuses from jury service for "undue hardship or extreme inconvenience."  The JSSA defines undue hardship or extreme inconvenience as:

> great distance, either in miles or travel time, from the place of holding court, grave illness in the family or any other emergency which outweighs in immediacy and urgency the obligation to serve as a juror when summoned, or any other factor which the court determines to constitute an undue hardship or to create an extreme inconvenience to the juror; and in addition, in situations where it is anticipated that a trial or grand jury proceeding may require more than thirty days of service, the court may consider, as a further basis for temporary excuse, severe economic hardship to an employer which would result from the absence of a key employee during the period of such service.

28 U.S.C. § 1869(j).

The evidence shows that virtually 100% of the requests for temporary excuses are granted by the Clerk.  The evidence further shows that white jurors request temporary excuses at a rate of approximately twice that of black jurors.[50]  Dr. Gundlach observed that the Clerk is granting multiple deferrals to the same persons "without making any effort to track jurors who receive multiple deferrals  . . . " (Def. Ex. 1 at 14).  In addition, Dr. Gundlach opines that "a review of the reasons for which jurors are granted deferrals demonstrates that the Clerk is making no effort to apply the statutory requirements for a showing of 'undue hardship or extreme inconvenience,' and is, in numerous cases, clearly

---

[50] On several different occasions Dr. Gundlach stated that the Clerk granted deferrals for white persons at a rate approximately twice that of black persons.  That is not correct. The rate of *requests* by white persons was approximately twice that of black persons.  The Clerk's rate of *granting deferrals* is essentially the same for all persons, regardless of race.

ignoring this standard."  As already noted, the court does not give any credence to Dr. Gundlach's "opinion" about whether the Clerk is complying with statutory requirements.  That opinion about compliance with statutory requirements is purely gratuitous and a patent example of overreaching as well as inadmissible under FED. R. EVID. 702.[51]

Regardless of whether the deferral practices of the court comply with the statute, there is no real dispute about whether the practices are liberal.  *See Carmichael*, 467 F.Supp.2d at 1295.  The defendants argue that the Clerk's liberal practice of granting deferrals surrenders control over jury service to the persons summoned because they effectively can determine whether they want to serve on juries.  Additionally, the defendants argue that the degree of control is such that a person can effectively increase their chances of serving on a particular jury.  These arguments suggest that the jury selection system for this court is a voluntary system and, therefore, inconsistent with the JSSA and the court's Plan.  In *United States v. Clay*, *supra*, the court considered and rejected the arguments that these policies and practices violated the JSSA.

However, even if this practice introduced a non-random element, the practice, standing alone, frustrated none of the purposes of the JSSA.  There is no

---

[51] In his report, the expert also contends that the liberal deferral policy creates significant deficiencies in the random selection of jury pools in part because "since White jurors are almost twice as likely to request [and be granted] deferrals as African-Americans . . . the pool of previously deferred jurors becomes increasingly White over time." (Gundlach Report at 14).  Even assuming that this conclusion about the racial make-up of the deferred maintenance pool is correct, it is unclear and no explanation is provided about how this affects the randomness of the selection process.  There is no evidence that jurors selected from the deferred maintenance pool for inclusion in a jury pool are selected from that pool on anything other than a random basis.

> evidence that, by itself, it caused juries to consist of something other than a fair cross-section of the community, or that it provided opportunity to discriminate against any cognizable group or any individuals in the selection process.   By itself, then, the clerk's policy of granting deferrals was not a substantial violation of the JSSA.

*Id.* at 1368.

Judge Boyd concluded that the voluntary jury argument of the defendants lacked merit because "it is grounded solely on speculation and conjecture rather than evidence that any, most, or all of the beneficiaries of the liberal deferral practice had notice of their likely success in avoiding jury service, temporarily or altogether, in response to a jury summons from the Middle District."  (Boyd Rec. at 47).  Judge Thompson concluded that because the clerk's granting of almost all deferral requests was "definitionally objective," the defendants failed to meet "their burden of showing that the district's liberal deferral standard, as implemented, violates the requirement that jurors be excluded only on the basis of objective criteria."  467 F.Supp.2d at 1294.  The court fully agrees with these conclusions.

As a final observation about the implementation of deferral practices, Judge Thompson said the following:

> Inevitably, because fallible humans must decide who is, and is not, to get a deferment, some valid requests will be denied, and invalid ones granted.  The clerk must be wary of excluding jurors for reasons that do not rise to the level of undue hardship or extreme inconvenience, while also guarding against inconsistency in the granting of exclusions, which could lead to the perception or reality of non-objectivity.   In guiding the clerk's practices between these two dangers, the court must be vigilant not to prescribe a course of permissible action so narrow as to be unnavigable.

*Carmichael*, 467 F.Supp.2d at 1296.

41

The court could not agree more and nothing more need be said.[52]

**5. Returned or Undelivered Jury Summons.**  The court also can quickly dispose

---

[52]Actually something more can be said, and it was said by the defendants' expert when he was explaining how he arrived at his conclusion that the relevant population for determining the absolute disparity in the QJW between white persons and African-American persons.  In essence he shows that we must do the best we can with what we have, an approach which apparently the defendants do not espouse when the jury selection process is involved.

THE WITNESS: . . .

Statistics are tools that are used to summarize the data to reach a conclusion with the information provided. The problem is that none of the data available to measure the population we are interested in perfectly matches the definition of the population we are really interested in looking at

THE COURT:  Okay

THE WITNESS:  So what we have is a system of looking at the alternative ways of measuring things, and of the ways of measuring what we are interested in that are available deciding which one produces the least measurement error, knowing that we are never going to eliminate all the measurement error. And once we have an idea of what the population looks like we know that in the process of selecting juries we then go through and ask questions to qualify and disqualify based upon those processes. But we never have a perfect picture of the population out there that these people are to be drawn from.

THE COURT:  Now that's true with any human endeavor.  So methodologically you are saying we do the best we can with the data we have got.

THE WITNESS:  We do the best we can and the criteria we use to decide the best we can is we try to measure the measurement error in the different alternatives that are available.

(Evid. Hr'g Tr. at 498)

of the defendants' allegations of a substantial violation of the JSSA and the Plan resulting from what they characterize as the Clerk's failure to obtain valid addresses for returned or undeliverable jury summons. It is undisputed that the Clerk's office does not take affirmative steps to seek valid addresses for persons whose preliminary juror qualification questionnaires are returned to the Clerk's office or are otherwise undeliverable. However, neither the JSSA nor the Plan expressly provides that any action be taken when questionnaires are returned or not deliverable. Furthermore, the defendants have not presented, and the court has not found, any authority which indicates that the failure in this regard is a substantial violation of the JSSA or the Plan.[53] Given this lack of authority, the court concludes that this practice is not a substantial violation of the JSSA or the Plan.[54]

This legal conclusion is not the end of the matter, and regarding the 2005 QJW a prudential observation or two is appropriate at this juncture. After attempts at discovery about the jury questionnaires mailed in conjunction with building the 2005 QJW, and counsel determined that some data were corrupted, the parties entered into the following stipulation:

> In March of 2005, the Middle District Clerk's Office, through a third party private contractor, began the process of mailing out 40,000 jury questionnaires

---

[53] In *United States v. Rioux*, 97 F.3d 648, 658 (2nd Cir. 1996), the court held that failure to follow-up on returned or undelivered questionnaires standing alone was not evidence of systematic exclusion.

[54] Judge Boyd concluded likewise that the failure to follow-up on undelivered or nonresponding questionnaires is not a substantial violation of the JSSA or caused a significant underrepresentation of African-Americans in the QJW. (Boyd Rec. at 35). Judge Thompson considered this issue also and found no substantial JSSA violation. *Carmichael*, 467 F.Supp.2d at 1298.

to build the 2005 Qualified Jury Wheel. Thereafter, beginning in September of 2005, the Clerk's Office mailed out an additional 25,000 juror questionnaires to supplement the 2005 Qualified Jury Wheel.

Based on inquires with Affiliated Computer Services ("ACS"), the Clerk has determined that the Jury Management System ("JMS") computer located in the Clerk's Office in Montgomery did not record the code used to identify the individuals on the 2005 Master Jury Wheel who were selected to receive one of the 40,000 initial questionnaires. The Clerk's Office has retained a copy of the file identifying the 40,000 individuals that was sent to the third party private contractor which was hired to mail out the questionnaires.

ACS has determined that this information can not be loaded into JMS retroactively.

Records regarding the response to the 40,000 juror questionnaires do exist on the JMS. These records reflect that 36,137 of the original 40,000 juror questionnaires are accounted for as follows: 17,637 were determined to be qualified and were placed in the 2005 Qualified Jury Wheel; 8,752 were determined to be excused, and were not placed in the 2005 Qualified Jury Wheel; and 9,748 questionnaires were returned by the Post Office as undeliverable. The remaining 3,863 questionnaires were not returned.

The magnitude of the undelivered and non-returned questionnaires, 34%, is regrettable at the least.  During his testimony, the defendants' expert testified that it is possible at little cost to outsource obtaining better addresses for persons to whom questionnaires were not delivered or not returned.  While not required by the JSSA or the District's Plan, securing or at least attempting to secure those addresses is wholly consistent with providing "all citizens . . . the opportunity to be considered for service on grand and petit juries . . . [as well as enabling them to fulfill their] obligation to serve as jurors when summoned  . . . "  28 U.S.C. § 1861.  The court should establish an internal policy which will insure that reasonable measures are undertaken to insure that to the extent practicable

the jury questionnaires are delivered to the citizens of this District.

   **6. Treatment of Deferred Jurors.** The defendants contend that the District's Plan and therefore the JSSA were violated by the manner in which some deferred jurors were treated. Section 14.d.i. of the Plan requires that "[t]emporarily excused or deferred jurors whose period excuse or deferment has expired shall be summoned on a pure, random basis for service on a civil or criminal petit jury." This issue, which relates only to the 2001 QJW and has nothing directly to do with grand juries, is exhaustively considered both factually and legally by Judge Boyd in her recommendation. (Boyd Rec. at 61-62). The gravamen of the contention is that the jury administrator, noticing that the deferred maintenance pool contained a large number of jurors who were not being used because of the 15% limitation, decided to return these jurors to the Master Wheel so they might have a chance to serve. However, the administrator selected a function in the JMS which returned these jurors to the QJW instead.[55] A total of 1093 jurors were transferred back to the QJW in this manner. The defendants' analysis suggests that these improper transfers were directly related to those jury pools which were made up of more than 15% of deferred jurors in violation of Section 14.d.ii. of the Plan. The defendants contend this process shows that the randomness requirement of the JSSA was violated.

   Judge Boyd concluded as follows:

_____

   [55]At the end of the life of the 2001 QJW, the administrator transferred 1080 jurors from the deferred maintenance pool to the QJW. The defendants admit that this did not affect their analysis in any way. (Evid. Hr'g Tr. at 586).

45

> The evidence does not establish that these Plan violations frustrated the statutory goal of randomness, and the second principle of objectivity is not implicated. No evidence establishes that Robinson – who did have an awareness of her affirmative actions in transferring jurors from the DMP– or Myers – who did not attempt to transfer more than the prescribed limit of deferred jurors – handpicked these jurors or otherwise manipulated their transfers in a manner which even allowed for nonrandomness. The undisputed evidence is that both made transfers by using a JMS function which identified deferred jurors only by participant numbers. Nor does the evidence suggest any impermissible motivations by either.

(Boyd Rec. at 69).

The court agrees with Judge Boyd.  More importantly, all of the complaints about the improper transfer of jurors is simply not applicable to this case.  The defendants' grand jury was drawn from the 2001 QJW.  Sections 14.d.i. & ii. are applicable only to a "civil or criminal petit jury.[56]  There is no evidence that any improper transfer occurred in the operation of the 2005 QJW from which the defendants' petit jury was drawn.

In paragraph IV.B.8 of this recommendation, the court discusses the defendants' contentions about the failure to completely empty the 2001 QJW.  In the evidentiary submission on that issue, the defendants, through their expert, further attack the manner in which the jury administrator handled deferred jurors.  In his report, the defendants' expert contrasts the jury pool in this case with another pool. He observes that the other pool contained only four previously deferred jurors or 2% of the pool whereas the jury pool in this case contained 29 previously deferred jurors or 9.667% of the pool.

---

[56]The court is aware that much of the improper transfer contention is a prelude to the larger claim that the deferral process resulted in non-representative juries.  That claim will be addressed in the court's discussion of the Sixth Amendment Fair-Cross Section claim.

In my opinion, this demonstrates that the Jury Administrator's discretionary decision as to what percentage of previously deferred jurors will be included in a particular jury pool continues to have an impact on the under-representation of African-Americans in the jury pools.    In the Siegelman/Scrushy jury pool (Pool 2010600403) of the 29 jurors selected from the Deferred Maintenance Pool, only three (3) jurors (10.345%) were African-American.  Out of the 271 jurors drawn from the random selection portion of the QJW, 54 jurors (19.926%) were African-American.  This demonstrates that the pattern of white jurors requesting and obtaining deferrals at a significantly higher rate than African-American jurors continues.[57]  More importantly, this demonstrates that the inclusion of almost 10% previously deferred jurors on the Siegelman/Scrushy jury pool, among whom African-Americans are represented at about half the rate they are represented in the 2005 QJW, resulted in an increase in the underrepresentation of African-Americans, increasing the absolute disparity of under-representation of African-Americans by slightly more than 0.9% (0.926%) . . . This demonstrates that the continued non-random and preferential treatment of the previously deferred jurors by the Jury Administrator's actions in both choosing to include nearly 10% previosuly deferred jurors on the Siegelman/Scrushy pool, while selecting only 2% previously deferred jurors for Pool 201060405, and in administering the previously deferred jurors in a manner that insures that they are summoned more frequently than other members of the QJW has consistently reduced the presence of African-Americans on District-wide jury panels . . .

The court takes no issue with Dr. Gundlach's calculation, but that is about the only thing with which the court can agree.  Dr. Gundlach describes the inclusion of 29 deferred jurors in this case's jury pool as a discretionary decision.   No evidence supports this supposition.  Moreover, even were it true that the jury administrator had exercised some discretion, it was entirely consistent with the Plan.  Section 14.d.i. of the Plan states that

---

[57]Dr. Gundlach continues to make the same mistake when he refers to the rate of granting deferrals.  While it is correct that white jurors request deferral at a rate twice that of African-Americans (a matter over which the court has no control), it is not correct that the rate of "obtaining" those deferrals is any different.  The evidence shows that the rate of *granting* deferrals is the same regardless of race.

"deferred jurors whose period of excuse or deferment has expired shall be summoned on a pure, random basis for service on a civil or criminal petit jury."   The next section of the Plan which contains the now infamous 15% limitation says that the total number of those jurors included on a jury pool "shall not exceed fifteen percent (15%) of the total number of jurors summoned . . . "   The defendants have slavishly insisted on absolute compliance with the Plan's requirement about everything else; they ought to be satisfied when compliance is achieved as here where the jury administrator did include deferred jurors but did not exceed 15%.[58]

Dr. Gundlach seems to suggest that the different rate of including deferred jurors on the jury panel in this case as compared to one other panel which included only 2% deferred jurors is somehow improper.   The inference is that the disparity in treatment was for the purpose of decreasing the number of African-Americans on this case's jury pool.   Of course, as a matter of law the mere fact of a disparity is not unconstitutional.

> [O]fficial action will not be held unconstitutional solely because it results in a racially disproportionate impact. . . .   Proof of racially discriminatory intent or purpose is required to show a violation of the Equal Protection Clause. Discriminatory purpose . . . implies more than intent as volition or intent as awareness of consequences.   It implies that the decisionmaker . . . selected . . . a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group.

*Hernandez v. New York*, 500 U.S. 352, 359 (1991)(citations omitted).

---

[58]Moreover, the jury administrator did exactly what she said she did when she testified at the evidentiary hearing that for the 2005 QJW no more than 10% of the deferred jurors were used.  (Evid. Hr'g Tr. at 269-270).

With regard to the jury administrator's inclusion of deferred jurors on this case's jury pool, the defendants present no evidence of a discriminatory purpose. And, as the government suggests, it is more likely that the state of the deferred maintenance pool was such that at the time the other jury pool was created there were insufficient jurors in the deferred maintenance pool to make up more than the 2% which were included. But, there is no need for the court to make this determination.

What is important for the court to address is the contention that the jury administrator continued to treat previously deferred jurors in a "non-random and preferential" manner. Again, there is absolutely no evidence which supports this assertion. The evidence before the court does show that jurors pulled from the deferred maintenance pool were selected from that pool by the JMS program and there is no evidence that this selection process is anything but random. The "preferential" treatment contention likewise has no anchor in the facts. In fact, it is not at all clear what the defendants mean by this contention. If they mean that the percentage of deferred jurors varied from pool to pool, the characterization is wrong. That is differential treatment, not preferential. If the defendants are alluding to the scattering violation contention earlier addressed by the court, they again are wrong for the reasons already stated. If they mean something else, the meaning escapes the court.

In Dr. Gundlach's first report he lamented that "it is highly likely that a majority of the jury pools selected from the 2005 Qualified Wheel over the next year will have an absolute disparity of more than ten percent as to African-Americans in comparison with their percentage in the District." Gundlach Report at 10. In the evidentiary submission containing

Dr. Gundlach's conclusion about the presence of 2001 QJW jurors in the 2005 QJW, he bemoans that this "trend" towards underrepresentation continues because "six of thirteen juries selected from the 2005 QJW have had an absolute disparity in excess of 10% as to underrepresentation of African-Americans." (Doc. # 392-2 at 1).

It bears repetition that all the parties agree that African-Americans are represented in the 2005 QJW with an absolute disparity of less than 10%. The evidence shows that the jury selection process is random. That said, it is difficult to find the "trend" that Dr. Gundlach observes when more than 50% of the criminal juries selected from the 2005 QJW have an absolute disparity of less than 10%.

In any event, these additional contentions about the use of deferred jurors in the 2005 QJW do not change the court's conclusions. There was no substantial violation of the JSSA.

**7. Cut-Off Jurors**. As the beginning date of a trial term draws closer cases set on the term settle or are resolved without the need for trial. Thus, less jurors than the number originally summoned are needed for a term. The jury administrator determines the number of jurors needed and beginning at the bottom of the list of jurors notifies those jurors they will not be needed for service. The defendants refer to this process as "cutting-off" jurors. They contend that this process

> in combination with the excessive number of previously deferred jurors on the last 44 pools of the 2001 Qualified Jury Wheel . . . and the non-random placement of deferred jurors on the summons lists . . . has an impact on the racial composition of the jury pools . . . [and has] the effect of reducing the number of African-Americans in the jury pools.

(Gundlach Report at 26).

50

The defendants' argument hinges on two core assertions.  First, the last 44 jury pools from the 2001 QJW included an "excessive" number of previously deferred jurors. Secondly, the deferred jurors were not randomly scattered through the summons lists but tended to be "clumped" towards the top and bottom of the lists.  The defendants specifically identify this case's grand jury pool as one in which this non-scattering and clumping phenomenon occurs.

With respect to the scattering problem, the court previously has considered and rejected the defendants' argument that any violation occurred at all.  With regard to the so-called "clumping" of previously deferred jurors, two observations are appropriate and dispositive of this contention.

Judge Thompson addressed the "excessive" number of deferred jurors issue.

 The defendants' expert now agrees that, in his testimony before the magistrate judge, he incorrectly inflated the number of deferred jurors for many of the 44 pools at issue because he incorrectly assumed that any juror that had been deferred earlier was still deferred when considered later.   As the government expert correctly explains, if a juror is deferred, then later is selected as part of the 15%, serves on a jury, and then selected for another pool after two years, that juror is no longer deferred.   If these jurors are deleted, the 44 pools averaged only 17.81% deferral participants, and thus exceed the 15% limit by only 2.81%, and, if all 91 pools are included (only 91 of the 92 pools are relevant because there could be no impact on the first pool), the average of the percentage of deferrals (even with the jury administrators' violations of the 15% limit) is 13%, two points below the limit.   In addition, as a result, 88 of the 99 pools met the 15% limit.

*Carmichael*, 467 F.Supp.2d at 1303-1304.

Secondly, with regard to the grand jury pool, there is no evidence that any cut-off procedure took place.  Unlike petit jury terms, when a grand jury is empaneled, there are no

51

trials which can settle or be resolved prior to the grand jury's first session.   Rather, FED.R.CRIM.P. 6(a)(1) requires that when a grand jury is summoned, it "must have 16 to 23 members, and the court must order that enough legally qualified persons be summoned to meet this requirement."   The evidence shows that 100[59] persons were summoned for the selection of the grand jury in this case; no evidence shows that any of these persons were "cut-off."  This lack of evidence combined with Judge Thompson's determination that the defendants' claim of the use of "excessive" numbers of deferred jurors was overstated undercuts the claim of the defendants.  Moreover, were that not enough, the evidence also shows that the grand jury empaneled in this case was comprised of 73 white persons (73%) and 24 African-American persons (24%).  Indeed, of the seven grand juries drawn from the 2001 QJW, the pools averaged 23% African-American with one pool having 36.7% African-American.  Four of the seven pools had a absolute disparity between white and African-American persons of less than 10%.  For all these reasons, the court concludes that there was no substantial violation of the JSSA.

**8.  Failure to Empty the Qualified Jury Wheels**.  Section 9.a. of the District's Plan requires that the Master Wheel "shall be emptied and refilled every four years not later than the first of September of the year following a general presidential election year.  Once the Master Wheel has been refilled, the Qualified Jury Wheel shall also be emptied and refilled with those qualified jurors from the newly filled Master Wheel."  The evidence shows that

---

[59]For the other grand juries drawn during the life of the QJW, the Clerk summoned between 50 and 60 persons.

some persons who were placed in the 1997 QJW were somehow transferred to the 2001

QJW.  This is Judge Boyd's brief and correct discussion and analysis of that problem which

she characterizes as a "technical deviation" from the Plan.

> During the course of discovery on this jury challenge, the Clerk identified "approximately five or six people" with apparent activity in both the 1997 QJW and the 2001 QJW; because records confirmed that "they never sat on a jury", this deviation from Section 9(a) of the Plan and Section 1863(b)(4) of the JSSA is harmless error. Carmichael notes correctly that these jurors did not get randomly selected from the 2001 MJW, but he cannot demonstrate that the improper placements on the 2001 QJW destroyed the randomization process for selections from the QJW. Indeed, the evidence does not establish even their selection onto a jury pool, and given the unrebutted evidence that they never served as jurors, the mistake yielded no harm.

(Boyd Rec. at 33-34) (footnote omitted).

No evidence was presented at the hearing showing that any of these 1997 QJW jurors

were selected for this case's grand jury pool.  During the evidentiary hearing a question arose

about whether a "bleed-over" of persons in the 2001 QJW to the 2005 QJW occurred.  (Evid.

Hr'g Tr. at 303).  At the time the jury administrator created the first jury pool from the 2005

QJW, she deleted all 2001 QJW deferred jurors who remained in the deferred maintenance

pool.  (Evid. Hr'g Tr. at 311-313).  At the hearing the defendants' counsel conceded that

none of the 2001 QJW jurors were present in the 2005 QJW.  (Evid. Hr'g Tr. at 317).  As it

turns out, he was wrong.  Subsequent filings and evidentiary submissions[60] to the court show

---

[60]The government strenuously objected to these materials on a number of grounds. Because the court concludes that there was no substantial violation of the JSSA because any error was harmless, the court pretermits resolution of those objections.

that 10 jurors selected for the 2001 QJW were transferred to the 2005 QJW.[61]

Of these 10 jurors, who are identified only by there participant number, one of them was selected as one of the 300 persons summoned for jury service in the jury pool from which the jury in this case was selected.  That juror is participant no. 100084263 who was juror number 267 on the jury list.  The records of this court show that during jury selection 20 jurors were excused for cause or other reasons, and the parties peremptorily struck 18 jurors.  The court can take notice of its own procedures, and the striking process proceeds from the top of the list with no back strikes.  Given the numbers of challenged, excused and peremptory struck jurors, it is obvious that participant no. 100084263 who was juror number 267 had no influence on the petit jury selection process at all.  He did not serve on the petit jury in this case.

Thus, any error with respect to the inclusion of a 2001 QJW juror in the jury pool for this case was harmless error and does not constitute a substantial violation of the JSSA.  With respect to the other nine 2001 QJW jurors who were present in the 2005 QJW, the defendants present no evidence to show that they were selected for jury service or in any detrimental way affected any jury selection process.  There was no substantial violation of the JSSA.

**9.  The Combined Effect Contention.**  In a final thrust to spear the JSSA, the defendants launch through their expert the following general contentions which they argue

---

[61]After the presence of these 10 jurors in the 2005 QJW was discovered, the court allowed the parties additional discovery to determine if other 2001 QJW jurors had been transferred to the 2005 QJW.  No other improper transfers were found.

cumulatively show a substantial violation of the JSSA:

> a. the substantial flaws in the JMS computer software designed by ACS, especially when the software interfaces with the Middle District of Alabama July Plan's provisions relating to previously deferred jurors;

> b. the deficiencies in the training of the Jury Administrator Melissa Myers;

> c. the complete absence of quality controls or verification procedures to confirm that the jury pools selected by the JMS are in compliance with the Jury Plan; and

> d. a continued pattern of systematic over-inclusion of previously deferred jurors which has the troubling effect of reducing the number of African-Americans that are chosen to serve on District-wide jury pools.

Judge Thompson addressed the first three of these contentions in his opinion, and the

court cannot improve on what he said.

> Specifically, the defendants allege that the jury management software used to select jurors in the Middle District of Alabama is not specifically configured to prohibit practices, including the use of deferred jurors in numbers constituting more than 15% of any given jury pool, that are disallowed in this district. It is undisputed that the software, which is a nationwide program deployed in 88 district courts, is not custom-designed for each district's particular jury plan. It is also undisputed that the company that designed and installed the software was not notified of the changes to this district's plan after Clay. The defendants concede that the software permits for the proper implementation of the district's plan, and complain only that it "leaves the door open" to violations by not rendering impossible the violations alleged in this litigation.

> The defendants also allege, accurately, that there were serious deficiencies in the training of the jury administrators, including the failure to instruct them about the requirements of Clay. In fact, it appears that in the context of recalling jurors summoned for a pool but not needed for a petit jury, one administrator was affirmatively trained to violate the jury plan by excusing such jurors for two years, rather than one, as called for by the plan. Finally, the defendants complain that an absence of quality control resulted in a situation in which no one ever checked the jury pools for potential errors-for

example, the inclusion of previously deferred jurors in excess of 15% or the inclusion of the correct percentage of jurors from each of the district's three divisions.

The defendants concede, however, that, while the three alleged management and supervision failings contributed to violations of the district's plan and the JSSA, they are not themselves direct violations, and do not independently support a basis for relief. The court therefore has no difficulty in adopting the magistrate judge's conclusion that these three allegations do not violate the JSSA, whether in the context of random selection of jurors or otherwise.

*Carmichael*, 467 F.Supp.2d at 1296-1297 (footnotes omitted).

With regard to the last contention concerning the effect of "over-inclusion" of deferred jurors, the court will fully address this effects argument in its discussion of the Sixth Amendment claims.

**10. Conclusion.** There should be no confusion about what the court has concluded. The administration of the District Plan For The Random Selection of Grand and Petit Jurors was not perfect, but none of the mistakes amounted either singly or in combination to a substantial violation of the JSSA.

## C. Sixth Amendment - Fair Cross Section Claims

**1. Introduction.** The Sixth Amendment[62] requires that the jury pool from which grand and petit juries are selected represents a "fair cross-section" of the community. *Taylor v. Louisiana*, 419 U.S. 522, 527-531 (1975). To establish a prima facie case of a violation of the Sixth Amendment's fair cross-section requirement, a defendant must demonstrate *each*

---

[62]Const. Amend. VI states in relevant part, "In all criminal prosecutions, the accused shall enjoy the right to a . . . trial . . . by an impartial jury of the State and district wherein the crime shall have been committed"

of the following elements of the claim: (1) the group alleged to be excluded is a distinctive group in the community; (2) the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of persons in the community; and (3) this under-representation is due to systematic exclusion of the group in the jury selection process. *Duren v. Missouri*, 439 U.S. at 364.[63] Failure to establish any one of these elements is fatal to the claim. *United States v. Pepe*, 747 F.2d 632, 648 (11th Cir. 1984).

**2. The Distinctive Group Requirement.** The defendants contend that African-Americans are the excluded group. All agree that African-Americans are a distinctive group in the relevant community which is the Middle District of Alabama. The defendants meet this requirement.

**3. The Fair and Reasonable Representation Requirement.** The second prong of the *Duren* test instead focuses on whether the representation of African-Americans in the challenged jury pool was fair and reasonable in relation to the number of African-Americans in the relevant community. Before determining whether representation was fair and reasonable, the court must determine the nature of the relevant community, a question strongly contested by the parties.

**a. The Community.** In *Brown v. Allen*, 344 U.S. 443, 474 (1953),[64] the Court

---

[63]Thus, proof of intentional discrimination is not required to succeed on a Sixth Amendment fair cross section claim. *Duren v. Missouri*, 439 U.S. 357, 368 n. 26 (1979).

[64]*Brown v. Allen,* 344 U.S. 443, 474 (1953) has been at least partially abrogated by 28 U.S.C. § § 2254(d) and *Williams v. Taylor*, 529 U.S. 362 (2000).

stated that a jury list must reasonably reflect "a cross-section of the population suitable in character and intelligence for that civic duty."  In this circuit "[t]he relevant comparison for sixth amendment fair cross-section purposes is the comparison between the percentage of the 'distinctive group' on the qualified wheel and the percentage of the 'distinctive group' among the population eligible for jury service."  *United States v. Pepe,* 747 F.2d at 649.

The defendants, relying on the 2000 Census data determined that African-Americans comprise 30.466% of the voting age citizens living in the Middle District of Alabama.  The government argues that the relevant community should be the voter registration list, and the government calculated absolute disparity on that basis.  Judge Boyd concluded that the appropriate "relevant community" for comparison purposes is general population data, age 18 and over.  (Boyd Rec. At 83-84).  Judge Thompson agreed, but refined the definition to include both age and citizenship requirements.  *Carmichael*, 467 F.Supp.2d at 1307-08.  The court agrees with their conclusions and adds the following.

The voter registration list is not an acceptable measure of the relevant community. "[T]he fair cross-section requirement involves a comparison of the makeup of the jury venires or other sources from which jurors are drawn with the makeup of the community, not of voter registration lists."  *Duren*, 439 U.S. at 365 n. 23.  In this circuit the "community" is the population eligible for jury service.  *United States v. Grisham*, 63 F.3d 1074, 1078 (11th Cir. 1995). While the cases otherwise do not define with precision the relevant comparison group, it ought at the very least be fairly *inclusive* because of the Sixth Amendment and the JSSA's fair representation requirement.  The court can confidently assume that use of the

voter registration lists would necessarily exclude citizens who are over 18 and eligible to vote, but who for whatever reason choose not to register to vote.  In other words, the court can confidently assume that the voter registration lists would exclude some persons who are fully eligible.  In turn, this would understate the absolute disparity.  The court can equally be confident that use of the age 18 and over citizen census data will include some persons who are not eligible to vote.  Use of that data doubtless results in overstating the absolute disparity.

Both the Constitution and the JSSA are concerned with fair representation and to reach that goal prohibit systematic exclusion.  While use of the census data may be over inclusive, use of the voter registration list is surely under inclusive and for that reason is inconsistent with the underlying goal of the law.  The best comparison data would be the total population of persons eligible to vote and who are otherwise qualified for jury service.  That information is not available.  Consequently, the court should use the data which is most inclusive.  For these reasons, the court concludes that the proper community is the age 18 and over community of citizens.[65]

**b.  Representativeness of the Distinctive Group.[66]**  The court now turns to

_____

[65]Judge Boyd cogently points out in her recommendation that the Administrative Office of the United States Courts requires that court officials make statistical comparison using "general population data, age 18 or over  . . . " (Boyd Rec. at 83).

[66]To the extent that the defendants assert that relative disparity is the proper approach to measuring the representativeness of the distinctive group, the court cannot improve on Judge Boyd's extended discussion of this issue.  Boyd Rec. at 86-88.  The court fully agrees with her recommendation to the extent that she concludes that in this circuit the proper

the second aspect of *Duren's* second prong which requires the defendants to show that the

distinctive group is underrepresented in the jury pool "in relation to the number of such

persons in the community." *Duren*, 439 U.S. at 364.

> Assessing the fairness and reasonableness of a group's representation requires
> a comparison between the percentage of the "distinctive group" on the
> qualified jury wheel and the percentage of the group among the population
> eligible for jury service in the division. *United States v. Pepe*, 747 F.2d 632,
> 649 (11th Cir.1984). Although precise mathematical standards are not
> possible, this circuit has consistently found that a prima facie case of
> underrepresentation has not been made where the absolute disparity between
> these percentages does not exceed ten percent. *United States v. Tuttle*, 729
> F.2d 1325, 1327 (11th Cir.1984), cert. denied,469 U.S. 1192, 105 S.Ct. 968,
> 83 L.Ed.2d 972 (1985); *United States v. Butler*, 611 F.2d 1066, 1069-70 (5th
> Cir.), cert. denied,449 U.S. 830, 101 S.Ct. 97, 66 L.Ed.2d 35 (1980); *United
> States v. Maskeny*, 609 F.2d 183, 190 (5th Cir.), cert. denied, 447 U.S. 921,
> 100 S.Ct. 3010, 65 L.Ed.2d 1112 (1980).

*United States v. Rodriguez,* 776 F.2d 1509, 1511 (11th Cir. 1985) (footnote omitted).

In this case, the court must make this assessment with respect to both the 2001 QJW

from which the grand jury was drawn and the 2005 QJW from which the petit jury was

drawn.  The court will begin with the 2005 QJW simply because that assessment requires

little or no discussion.  The defendants' own analysis shows that when measured on February

15, 2006, the 2005 QJW was comprised of 21.184%[67] African-Americans resulting in an

---

measure is absolute disparity.  Likewise, Judge Thompson, even though recognizing
academic criticism of the rule, finds that it is the "bright-line" test in this circuit.
*Carmichael*, 467 F.Supp.2d at 1310.

[67]In making this calculation, Dr. Gundlach made the same arithmetic mistake he made
with regard to the 2001 QJW.  He excluded from the number of African-Americans any of
the 552 persons whose race was not known but included the 552 in the total he used to
calculate the percent of African-American and white persons.

absolute disparity of 9.281% between the percentage of white persons in the QJW.  On this basis, the defendants fail to meet the second prong of the *Duren* test.  The defendants advance another methodology for measuring the absolute disparity.  They aggregated each of the twelve district-wide jury pools which had been drawn from the 2005 QJW.  Treating this sample as a representative sample of the entire QJW, they found that this sample was comprised of 20.554% African-Americans and that there the resulting absolute disparity was 9.912% which is as the defendants' expert put it "just within" ten percent absolute disparity.  Thus, under either approach, the defendants fail to meet their burden of proof with respect to the 2005 QJW.[68]

With respect to the 2001 QJW, Judge Boyd concluded in the *Carmichael* case that it was "more probative to compare the relevant African-American community to their representation in jury pools generated from the 2001 QJW. While the experts' statistics on the racial composition of these pools differ in degrees, there is sufficient consistency in key areas.  Both measured the percentage of African-Americans in all the jury pools drawn from the 2001 wheel, in only the last 44 pools, and in the Carmichael pool."  (Boyd Rec. at 90).  Judge Thompson did not accept this conclusion.  The court will quote from his opinion at length because it exposes an error in the approach used by the defendants.

As has been noted, the parties agreed that the total number of

---

[68]Dr. Gundlach opines that "it is highly likely that a majority of the jury pools selected from the Qualified Wheel over the next year will have an absolute disparity of more than 10 percent as to African-Americans . . . " This opinion which is founded on no data is pure speculation.

African-Americans summoned to the 92 jury pools drawn from the 2001 wheel is 19.988% of the total number of jurors summoned.   If this percentage is compared to the 30.466% African-American representation in the relevant benchmark community-individuals age- and citizenship-qualified for jury service in the 2000 census-then the underrepresentation of African-Americans in the venires is 10.478%, above the 10% threshold, and, indeed, the magistrate so found.

However, this calculation by the parties and the magistrate judge depends upon a fundamental and impermissible assumption.   Among the jurors summoned to the jury pools are 546 who did not report their race. In determining the percentage of African-Americans summoned to the pools, the defendants' expert divided the number of self-identified black jurors (the numerator-2615, in his count) by the number of all jurors (the denominator-13,097, again in his count), including those who did not report race.   In other words, the expert treated all racially non-identifying jurors as if they were not black in order to find an absolute disparity of over 10% in the representation of African-Americans.

If the court does not assume that all non-identifying jurors are not black, there will be an absolute disparity of over 10% in the representation of African-Americans in the jury pools only if 65 or fewer of the 546 non-identifying jurors are black.   The court calculates this figure in the following way.   If the representation in the benchmark community is 30.466%, then the representation in the jury pools must be less than 20.466% to show an absolute disparity of over 10%. 20.466% of 13,097 (the total number of jurors summoned) is 2,680.43.   Therefore, no more than 2,680 jurors (rounded down, since the number represents individuals) can be black for absolute disparity over 10% to be shown. 2,615 jurors identified themselves as black. 2,615 subtracted from 2,680 is 65. Of the non-identifying jurors, then, if more than 65 are black, the defendants cannot show more than 10% absolute disparity in the representation of African-Americans in the jury pools.

The court appointed an expert to address what assumptions, if any, might be made about the race of the non-identifying jurors.   One option is simply not to include the non-identifying jurors in the disparity calculation. If this is done, then the total number of jurors is reduced to 12,551.   Using this number as the denominator, the percentage of black jurors (2,615 total) in the pools is 20.83%, slightly less than 10% absolute disparity when compared to the benchmark population.   Another option would be to apply the percentages

representing the racial makeup of the identifying jurors to the non-identifying jurors. Even assuming that the correct percentage of African-Americans among the identifying jurors is 19.966% (a figure calculated by assuming the non-identifying jurors are not black), when this percentage is applied to the non-identifying jurors it indicates that 109 of the non-identifying jurors might be expected to be black (19.966% of the 546 non-identifying jurors is 109). Again this number reduces the absolute disparity to below 10%.

However, the court-appointed expert cautioned that neither of these methods of estimating the number of blacks among the non-identifying 546 jurors would lead to a statistically defensible result. Instead, he suggested two options: the first option would be simply to contact the non-identifying jurors and ask them their race, and the second option would be to obtain census-tract data and deduce the race of the non-identifying jurors from the racial makeup of the neighborhoods in which they live. However, it is now far too late to go and gather new evidence in this case.

The question then is, What to do? The law is clear that the defendants bear the burden of establishing a prima-facie case, *Duren*, 439 U.S. at 364, 99 S.Ct. 664, and without clarification of the racial makeup of the non-identifying jurors, the defendants cannot meet their burden.

*Carmichael*, 467 F.Supp.2d at 1308-1310 (footnotes omitted).

On this basis, Judge Thompson concluded in *Carmichael* that the defendants had failed to meet the second prong of *Duren* and, therefore, failed to establish a *prima facie* case. The court fully agrees with this conclusion and likewise concludes that the defendants in this case have failed to establish their *prima facie* case.

It is tempting to leave it at that and move on to the next issue, but after careful consideration, the court concludes it must resist that temptation and expand its analysis and consideration of the reliability of the methodology used by the defendants' expert to determine the racial composition of the 2005 QJW. Dr. Gundlach concluded that the one time measurement of the composition of the 2001 QJW reflected on the JS-12 as being

20.74% African-American was not reliable because the data necessary to determine the accuracy of the calculation was not maintained.  He further stated that the one-time JS-12 calculation was not a reliable measure because "record-keeping procedures . . . preclude[d] anyone from determining the effect on the racial composition of the Qualified Jury Wheel from subsequent supplementations.  In other words, if the subsequent supplementations further reduced the percentage of African-Americans . . . the manner in which . . . the records . . . [are maintained make] it impossible to prove such an effect." (Gundlach Report at 5-6). He described his preferred  "indicator of representativeness" as "the racial composition of the population actually summoned to the 91 District-wide pools."[69]  (Gundlach Report at 6). The expert gave four reasons why he concluded that aggregating the District-wide pools was more reliable than measuring the actual composition of the pool at a particular time.

> First, each draw is a random sample of the population actually available. Second, these samples were drawn over the life of the wheel that changed rather than at one point in time . . .  The need to take this measurement over the life of the wheel rather than on a single day is critical, since more than half of the total members of the 2001 Qualified Jury Wheel were added[70] after the JS-12 sample[71] was taken . . .  Third, the pools in effect quota-sample the Qualified Jury Wheel by division by drawing a predetermined percent of the

[69]As we know this statement is wrong because Dr. Gundlach did not account for the race of the 546  persons whose race was missing, and, therefore, his calculation does not accurately reflect the racial composition.

[70]Dr. Gundlach testified that during the life of the 2001 QJW a total of 47,229 questionnaires were mailed; 25,000 of them were mailed prior to the creation of the JS-12. (Evid. Hr'g Tr. at 523).

[71]As earlier noted the characterization of the JS-12 measurement as a "sample" is not correct.  It was a measure of the racial composition of the entire 2001 QJW, not a sampling of the wheel.

wheel for each division.  If the total qualified wheel was not proportional to the size of the population in each division, the JS-12 would not accurately represent the pools drawn from it.  And, finally, the 91 pools reflect the fact that the deferred are more likely to be summoned than others in the Qualified Jury Wheel . . .

(Gundlach Report at 6).

The methodology of aggregating the District-wide pools suffers from several deficiencies which call into question its reliability.  First, as Dr. Gundlach points out, it is a longitudinal sampling.  Implicit in that approach is a claim that throughout its life a QJW must be maintained in a state where the absolute disparity between the percentage of African-Americans and whites is less than 10%.  It is questionable whether this is attainable in the real world.  But beyond that, the implicit claim raises serious practical and legal issues.  As a practical matter, it is not at all clear how the requisite absolute disparity, once achieved, could be maintained without contravening the randomness requirement of the JSSA.  As a legal issue, this non-remedial, seemingly race conscious approach raises serious, complex questions.  *See e.g., Powers v. Ohio*, 499 U.S. 400, 416 (1991) ("[R]ace neutrality in jury selection [is] a visible, and inevitable, measure of the judicial system's own commitment to the commands of the Constitution") And it is not at all certain that absent some official action causing a QJW to lose its representativeness any tinkering with the QJW is consistent with the Constitution.  *Cf. Pasadena City Bd. Of Educ. v. Spangler*, 427 U.S. 424 (1976) (Once race neutral student assignment achieved, court could not mandate annual readjustment to maintain a particular racial balance).  These initial questions admittedly do not question the accuracy of the statistical approach; rather, these questions weigh on whether the longitudinal

approach is legally permissible.

Aside from those issues, the reliability of the aggregating approach is called into question by Dr. Gundlach's own investigation of the effect of the use of the deferred maintenance pool. As described earlier, Dr. Gundlach asserts that the manner in which deferred jurors are used in the constitution of District-wide jury pools from the 2001 QJW "reduces the percentage of African-Americans in pools that would otherwise be drawn randomly from the 2001 Qualified Jury Wheel." (Gundlach Report at 24). In short, Dr. Gundlach asserts that the deferral practices of the court cause "under-representation of African-American on the summons lists." (Gundlach Report at 25). Seemingly oblivious to this claim, Dr. Gundlach asserts that aggregating those jury pools is a reliable measure of the actual composition of the QJW. But if the composition of each the jury pools is skewed by the use of deferred jurors in a manner causing underrepresentation, it must follow that the aggregation of those pools is equally affected by this underrepresentation. It follows from this that the aggregation of the jury pools cannot result in a reliable measure of the racial composition of the 2001 QJW.

A second problem affects the reliability of the defendants' methodology used to determine the composition of the 2001 QJW. During the hearing, Dr. Gundlach discussed the 2005 QJW from which at that time only 12 District-wide jury pools had been created. He testified how he determined in his report that the percentage of African-Americans was 20.554%, "just within the ten percent absolute disparity from the 30.466 percentage of African-Americans in the District." (Gundlach Report at 10); (Evid. Hr'g Tr. at 543).

During the hearing the following colloquy ensued.

THE COURT:  Now I will ask you a question. On page nine of your report you have the actual count from the 2005 Qualified Wheel, do you not?

THE WITNESS:  Yes.

THE COURT:   And that shows percentage of African-Americans in the pool 21.184.

THE WITNESS:  Yes.

THE COURT:  Well within -- well, within the ten percent disparity.

THE WITNESS:  Yes.  That's well within the ten percent.

THE COURT:  And when you used the methodology of counting the pools you come out with a lower percentage, why is that?

THE WITNESS:  I think it ties back to lack of divisional representation in the qualified pool.

THE COURT:  All right.  Now, I am glad you said that because I am not sure I fully understand what you have said about lack of divisional representation. Go over that for me again.

THE WITNESS:  Okay. When they draw the pools they draw them by a proportion that's based upon the proportion of the population in each --

THE COURT:  I understand.

THE WITNESS:   -- division. When they draw the original Master Wheel it is drawn in that same proportion.

THE COURT:  Okay.

THE WITNESS:  When they mailed --

THE COURT:  You don't have any difficulty with that process, that methodology?

THE WITNESS:  No. They do that, everything checks on that, that looks good.

THE COURT:  Okay.

THE WITNESS:  We get a big drop off when we go through the mailing process.  And my feeling is -- and again, I -- you know, I just didn't get time to do everything I wanted to. My feeling is that it's divisional differences in  returned and response rates that result in the Qualified Wheel being disproportionate to what is drawn from it.

THE COURT:  In what way?

THE WITNESS:  Well, I know that towards the end of the pool in 2001 the portion of the pool available from division two was almost completely empty.

THE COURT:  Could that be influenced by the fact that the majority of juries selected in this District come from the northern division, division two?

THE WITNESS:  The divisional -- the District-wide pools should not affect that. But if the --

THE COURT:  But you realize that we also have juries that come just from the divisions.

THE WITNESS:  From the division, yes.

THE COURT:  In fact, all civil juries come only from the division. I can tell you that because the Court can take judicial notice of its own function.

THE WITNESS:  Yes.

THE COURT:  So would that not affect the composition of the pools?

THE WITNESS:  If there's a divisional difference in  civil cases it could.

THE COURT:  I don't understand what you mean by that.

THE WITNESS:  If one division has proportionately more cases that are just division-wide rather than District-wide, and that could put more of a stress on that part of the pool.

THE COURT:  Does your data account for that?

THE WITNESS:  Again, I only looked at the divisional, I did not account for -- but I think there's something about the process of divisional differences and demands on the pool and composition of the pool that's creating some of this difference I am seeing here. And I haven't had --

THE COURT:  If more jurors on a divisional basis are drawn from the northern division would that account for the differences that you are seeing in the data when you look at the District-wide pools?

THE WITNESS:  I can see how it could, but I can't say that it is.

THE COURT:  All right. And your data does not account for any possible effect of northern division civil juries being the majority of civil juries drawn in this District.

THE WITNESS:  No, it does not.

(Evid. Hr'g Tr. at 545‑548).

Aside from the court's own knowledge of its procedures, the evidence shows that the Middle District of Alabama has three divisions and that civil petit juries are drawn only from the division QJW.  (Evid. Hr'g Tr. at 74).  As the court's questions above indicate, the majority of civil trials in this District occur in the Northern Division.  Dr. Gundlach admits that the juries drawn for civil trials could affect his calculations but he did not account for it.  His failure to account for this affect further demonstrates that the aggregating approach

69

is not a reliable measure of the racial composition of the 2001 QJW.

For all these reasons, the court concludes that the defendants have failed to demonstrate that they meet the requirements of the second prong of *Duren*. They fail to make out a prima facie case.

**4. Systematic Exclusion.** In *Taylor v. Louisiana, supra*, the court dealt with a challenge to Louisiana's jury selection system under which a woman should not be selected for jury service unless she had previously filed a written declaration of her desire to be subject to jury service. "The Louisiana jury-selection system does not disqualify women from jury service, but in operation its conceded systematic impact is that only a very few women, grossly disproportionate to the number of eligible women in the community, are called for jury service." *Id.* at 525.

> The States are free to grant exemptions from jury service to individuals in case of special hardship or incapacity and to those engaged in particular occupations the uninterrupted performance of which is critical to the community's welfare. *Rawlins v. Georgia*, 201 U.S. 638, 26 S.Ct. 560, 50 L.Ed. 899 (1906). It would not appear that such exemptions would pose substantial threats that the remaining pool of jurors would not be representative of the community. A *system excluding all women*, however, is a wholly different matter. It is untenable to suggest these days that it would be a special hardship for each and every woman to perform jury service or that society cannot spare any women from their present duties.  This may be the case with many, and it may be burdensome to sort out those who should be exempted from those who should serve. But that task is performed in the case of men, and the administrative convenience in dealing with women as a class is insufficient justification for diluting the quality of community judgment represented by the jury in criminal trials.

419 U.S. at 534-535 (emphasis added) (footnote omitted).

*Taylor*'s language is instructive because it equates "systematic" with the exclusion of

70

"all women" and "each and every woman."  And again, in *Duren v. Missouri. supra*, the court equated a "systematic" approach as one resulting in both a disproportionate and consistent exclusion.

> [D]isproportionate and consistent exclusion of women from the jury wheel and at the venire stage was quite obviously due to the system by which juries were selected. Petitioner demonstrated that the underrepresentation of women in the final pool of prospective jurors was due to the operation of Missouri's exemption criteria-whether the automatic exemption for women or other statutory exemptions-as implemented in Jackson County. Women were therefore systematically underrepresented within the meaning of *Taylor*.

*Id.* at 367.

In *Eubanks v. State of La.,* 356 U.S. 584 (1958), the Court confronted a grand jury system in a parish in which black persons made up about one-third of the population but only one black person had ever been selected for grand jury duty.[72]

> In *Patton v. State of Mississippi*, 332 U.S. 463, 469, 68 S.Ct. 184, 187, 92 L.Ed. 76, this Court declared, in a unanimous opinion, that "When a jury selection plan, whatever it is, operates in such way as always to result in the complete and long-continued exclusion of any representative at all from a large group of Negroes, or any other racial group, indictments and verdicts returned against them by juries thus selected cannot stand." This is essentially the situation here.

---

[72]"Although Negroes comprise about one-third of the population of the parish, the uncontradicted testimony of various witnesses established that only one Negro had been picked for grand jury duty within memory. And this lone exception apparently resulted from the mistaken impression that the juror was white. From 1936, when the Commission first began to include Negroes in the pool of potential jurors, until 1954, when petitioner was indicted, 36 grand juries were selected in the parish. Six or more Negroes were included in each list submitted to the local judges. Yet out of the 432 jurors selected only the single Negro was chosen." *Eubanks v. State of La.,* 356 U.S. 584, 586-587 (1958).

*Id.* at 586.

Again, the language used by the court cannot be ignored.  The court characterized the exclusion as "complete," "uniform" and "long-standing."   The critical inquiry of *Duren* 's third prong is whether the underrepresentation of the distinctive group is systematic, that is an underrepresentation which is "inherent in the particular jury-selection process utilized." *Duren*, 439 U.S. at 366.

There is no need to belabor the legal analysis about the 2001 QJW.  Judge Boyd and Judge Thompson concluded that with respect to the 2001 QJW, the defendants failed to demonstrate systematic exclusion.  *Carmichael*, 467 F.Supp.2d at 1314; Boyd Rec. at 95-96. The court fully agrees with their conclusions and has only this to add.  The recommendation and memorandum opinion in *Carmichael* addressed the petit jury for that case.  This case concerns the grand jury selected from the 2001 QJW.  While the court has recounted the facts about grand juries earlier, they bear repetition here.  The grand jury empaneled in this case was comprised of 73 white persons (73%) and 24 African-American persons (24%).  Of the seven grand juries drawn from the 2001 QJW, the pools averaged 23% African-American with one pool having 36.7% African-American.  Four of the seven pools had a absolute disparity between the percentage of white and African-American persons of less than 10%. These statistics do not evince a process which inherently underrepresents any distinctive group.  There was no systematic exclusion.  The defendants have failed to demonstrate the existence of a prima facie case with regard to the 2001 QJW.

This leaves the 2005 QJW from which the petit jury in this case was drawn.  The

percent of African-Americans in the jury pool from which the petit jury was drawn was 19%. Of the 13 jury pools that were created from the 2005 QJW at the time the experts rendered their opinions, seven (7) had an absolute disparity of less than 10% between the percentages of whites and African-Americans.  It requires no extended analysis to conclude that a system which produces a majority of jury pools like these cannot be said to result in "complete" exclusion over time.  Obviously this is not in the language of *Duren* a "disproportionate and consistent exclusion." *Duren*, 439 U.S. at 367.  The court concludes that the defendants have failed to establish the third prong of *Duren* with respect to the 2005 QJW and their *prima facie* case fails.

### D.  Fifth Amendment Claims

**1.  Equal Protection.**  Both Judge Boyd and Judge Thompson address the legal requirements necessary to establish a violation of the Equal Protection Clause. *Carmichael*, 467 F.Supp.2d at 1324-15; Boyd Rec. at 96-97.  As is true for any Equal Protection claim, the defendants have the burden of showing intentional discrimination.  The proof in this regard utterly fails.  There was no evidence of intentional discrimination on the part of any official involved with the jury selection system used in the Middle District of Alabama.  The court finds that there was no intentional discrimination in the operation of the jury selection system, and this claim fails.

**2.  Due Process.**  The defendants contend that the Middle District's jury selection process violates their Due Process Clause rights as protected in the Fifth Amendment.  *See Peters v. Kiff*, *supra*.  The court cannot improve on what Judge Thompson said about this

issue.

In *Peters*, the Supreme Court analyzed a state jury system alleged to exclude systematically African-Americans under the due process guarantee of the Fourteenth Amendment.   There, the defendant's trial had taken place before the Sixth Amendment's right to a petit jury was made applicable to the States in *Duncan v. Louisiana*, 391 U.S. 145, 88 S.Ct. 1444, 20 L.Ed.2d 491 (1968).

Precedent exists suggesting that a due process challenge may still be brought to a jury-selection process.  *United States v. Maldonado,* 849 F.2d 522, 523 (11th Cir.1988) ("A claim of denial of this due process right requires a showing that the jury selection process tended to exclude or underrepresent some discernible class of persons and consequently to defeat a fair possibility for obtaining a truly representative cross section." (quoting *Kennedy*, 548 F.2d at 614));  *see also United States v. Hawkins,* 566 F.2d 1006, 1014-15 (5th Cir.1978).   Arguably, though, challenges to alleged systematic exclusion in a jury-selection process, whether state or federal, are now properly brought under the more precise doctrinal framework of the sixth amendment.

*Carmichael*, 467 F.Supp.2d at 1315.

Thus, for the same reasons that the defendants' Sixth Amendment claim failed, this claim also fails.

## V.  Conclusion

When any large and identifiable segment of the community is excluded from jury service, the effect is to remove from the jury room qualities of human nature and varieties of human experience, the range of which is unknown and perhaps unknowable. It is not necessary to assume that the excluded group will consistently vote as a class in order to conclude, as we do, that its exclusion deprives the jury of a  perspective on human events that may have unsuspected importance in any case that may be presented.

*Peters v. Kiff,* 407 U.S. at 503-504 (opinion of Marshall, J.).

While the court has concluded that this did not happen in this case, this court has a duty to vigilantly insure that its system of jury selection is consistent with the strong statutory

and constitutional policies prohibiting discrimination in the selection of jurors.  *Powers v. Ohio*, 499 U.S. at 416.  To fulfill that duty, the court, as it did following the decision in *Clay* should undertake a close review of that system to insure that the rights of the people of this District  are protected.

Accordingly, it is the RECOMMENDATION of the Magistrate Judge that

(1) defendant Scrushy's First Motion to Dismiss and Challenge to the Composition of Petit Jury Pool (doc. # 104) be DENIED;

(2) defendant Siegelman's  Motion to Dismiss and Challenge to the Composition of Petit Jury Pools in the Middle District of Alabama (doc. # 110) be DENIED.  It is further

ORDERED  that  the  parties  are  DIRECTED  to  file  any  objections  to  the  said Recommendation **on or before May 14, 2007**.  Any objections filed must specifically identify the findings in the Magistrate Judge's Recommendation objected to.  Frivolous, conclusive or general objections will not be considered by the District Court.  The parties are advised that this Recommendation is not a final order of the court and, therefore, it is not appealable.

Failure to file written objections to the proposed findings and recommendations in the Magistrate Judge's report shall bar the party from a *de novo* determination by the District Court of issues covered in the report and shall bar the party from attacking on appeal factual findings in the report accepted or adopted by the District Court except upon grounds of plain error or manifest injustice.  *Nettles v. Wainwright*, 677 F.2d 404 (5th Cir. 1982).  *See Stein v. Reynolds Securities, Inc.*, 667 F.2d 33 (11th  Cir. 1982).  *See also Bonner v. City of*

75

*Prichard*, 661 F.2d 1206 (11th Cir. 1981, *en banc*), adopting as binding precedent all of the decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981.

Done this 1st day of May, 2007.

_____/s/Charles S. Coody_____
CHARLES S. COODY
CHIEF UNITED STATES MAGISTRATE JUDGE