IN THE UNITED STATES DISTRICT COURT FOR
THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CRIMINAL NO. 2:05-CR-119-MEF |
| | ) | |
| DON EUGENE SIEGELMAN | ) | |

## UNITED STATES' SENTENCING MEMORANDUM AS TO DEFENDANT SIEGELMAN

COMES NOW the United States of America, by and through Louis V. Franklin, Sr., Acting

United States Attorney for the Middle District of Alabama, and William M. Welch, II, Chief of the

Public Integrity Section of the Criminal Division of the United States Department of Justice, and

hereby files its sentencing memorandum in the above-styled case.  Based on the arguments and

authorities cited herein and in the motions for upward departure submitted to the Court herewith, the

government asserts that Defendant Siegelman is deserving of and should receive a sentence of thirty

years for the criminal conduct for which he was convicted, and that such a sentence is reasonable

under Title 18, United States Code, Section 3553(a).  In this sentencing memorandum, the United

States sets forth its objections to certain portions of the presentence report and provides further

information and argument to support its position.

I.      **The Applicable Standards for Determining a Sentence Post-Booker**.

After the United States Supreme Court's decision in United States v. Booker, 543 U.S. 220

(2005), a district court is required to impose a "reasonable" sentence after considering the now-

advisory United States Sentencing Guidelines and the factors delineated in Title 18, United States

Code, Section 3553(a).  See United States v. Thomas, 446 F.3d 1348, 1356-57 (11th Cir. 2006)

(upholding the district court's sentence imposed after considering the advisory Guidelines and the

factors in Section 3553(a)).  Importantly, Title 18, United States Code, Section 3661 "remains intact post-<u>Booker</u>."  <u>United States v. Faust</u>, 456 F.3d 1342, 1348 (11th Cir. 2006).  Accordingly, "[n]o limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence."  18 U.S.C. § 3661.  This information includes facts related to conduct for which the defendant was acquitted provided that the facts are proved by a preponderance of the evidence, and the sentence imposed does not exceed the statutory maximum authorized by the jury's verdict.  <u>Faust</u>, 456 F.3d at 1348.

Thus, as long as the Guidelines are applied in an advisory manner, "nothing in <u>Booker</u> prohibits district courts from making, under a preponderance-of-the-evidence standard, additional factual findings" that enhance a defendant's sentence up to the statutory maximum.  <u>United States v. Smith</u>, 480 F.3d 1277, 1281 (11th Cir. 2007).  "The district court's factual findings for purposes of sentencing may be based on, among other things, evidence heard during trial, undisputed statements in the PSI, or evidence presented during the sentencing hearing."  <u>Id.</u> (citations and quotations omitted).  Consequently, this Court has the authority to make factual findings proved to it by a preponderance of the evidence, including proof by evidence introduced at trial, and, after consulting the advisory Guidelines, sentence Defendant Siegelman up to the statutory maximum for each offense of conviction.  The United States asserts that thirty years imprisonment,[1] a fine of

---

[1]Based on its calculation of the applicable advisory Guidelines in conjunction with its motion for upward departure, the United States asserts that the relevant offense level and Guideline range for Defendant Siegelman is offense level 42 and a range of 360 months to Life. The United States notes that the statutory maximum for each offense in Counts 6-9 is 20 years, for the offense in Count 3 is 10 years, for the offense in Count 5 is 5 years, and for the offense in Count 17 is 10 years.  The Court may impose a sentence within the 360 months to Life guideline range by sentencing Defendant Siegelman to consecutive sentences for his multiple counts of

$1,000,000, and an order of restitution of $5,239,495 is the most appropriate sentence in this case.

**II.    The Presentence Report Understates the Value of the Payments, the Benefit Received or to be Received in return for the Payments, or the Loss to the Government from Defendant Siegelman's Criminal Activity under Section 2C1.1(b)(2)(A), and Thereby Fails to Increase Defendant Siegelman's Offense Level by Twenty Levels under Section 2B1.1(b)(1)(K).**

**A.    Counts 3, 5, 6-9, and 17 Should be Grouped Together Under Section 3D1.2.**

The United States agrees with the PSR that in calculating Defendant Siegelman's offense level the Court should group Counts 3, 5, 6-9 and 17 together and then calculate Defendant Siegelman's offense level under Section 2C1.1(b)(2)(A)[2] based on the greater of (1) the value of the payments, (2) the benefit received or to be received in return for the payments, or (3) the loss to the government from the offense.  PSR at ¶ 39.[3]  As the Probation Officer correctly noted, id., Section 3D1.2 mandates the grouping of counts "involving substantially the same harm," U.S.S.G. § 3D1.2, which is manifest "[w]hen counts involve the same victim and two or more acts or transactions connected by a common criminal objective or constituting part of a common scheme or plan," U.S.S.G. § 3D1.2(b), or "[w]hen the offense level is determined largely on the basis of the total amount of harm or loss."  U.S.S.G. § 3D1.2(d).

The Probation Officer correctly observed that "[e]ach of [Defendant Siegelman's] counts of conviction represent essentially one composite harm" – namely, the harm to the citizens of Alabama from Defendant Siegelman's criminal activity while Lieutenant Governor and Governor, including,

---

conviction as permitted under 18 U.S.C. § 3584 and U.S.S.G. § 5G1.2.

[2]All references are to the 2002 edition of the United States Sentencing Guidelines.

[3]The PSR referenced is the one issued on April 9, 2007, the only one available prior to the Court's deadline of May 29, 2007, for the filing of sentencing memoranda.

but not limited to, his acceptance of bribes from Defendant Scrushy, his planning and execution of a criminal conspiracy and honest services fraud scheme involving Defendant Scrushy and other members of the CON Board (e.g., Tim Adams), his planning and execution of a honest services fraud scheme involving Lanny Young, and his obstruction of justice during the investigation of these public corruption offenses. Defendant Siegelman's counts of conviction involve the same victim (e.g., the citizens of Alabama) and are connected by a common criminal objective – Defendant Siegelman's intent and desire to obtain power, money, and property for himself and others through the illegal use of his official position as Lieutenant Governor and Governor. Consequently, grouping of Counts 3, 5, 6-9, and 17 is proper under Section 3D1.2(b).

In addition, Defendant Siegelman's counts of conviction are also properly grouped under Section 3D1.2(d) because the offense level for Defendant Siegelman's counts is "determined largely on the basis of the total amount of harm or loss." U.S.S.G. § 3D1.2(d). See United States v. Tolbert, 306 F.3d 244, 247-48 (5th Cir. 2002) (ruling that § 3D1.2(d) mandates the grouping of offenses for which the offense level is determined based on the amount of harm or loss even though they are not grouped under § 3D1.2(b)). The offense level for Counts 3, 5, and 6-9 is largely based on the total amount of harm or loss under Section 2C1.1(b)(2)(A),[4] which directs the Court to the table in Section 2B1.1. The offense level for Count 17 is largely based on the total amount of harm or loss under Section 2C1.7(b)(1)(A),[5] which also directs the Court to the same table in Section 2B1.1.

---

[4]Appendix A to the Guidelines provides that the appropriate guideline for Count 3 (18 U.S.C. § 666(a)(1)(B)) is § 2C1.1, Count 5 (18 U.S.C. § 371) is § 2X1.1, which leads to the application of § 2C1.7, and Counts 6-9 (18 U.S.C. §§ 1341 &1346) is § 2C1.7. Section 3D1.2(d) expressly mandates the grouping of offenses covered by Sections 2C1.1 and 2C1.7.

[5]Appendix A to the Guidelines provides that the appropriate guideline for Count 17 (18 U.S.C. § 1512(b)(3)) is § 2J1.2, which provides a cross-reference to § 2X3.1 since Defendant

Section 3D1.2(d) mandates the grouping of offenses covered by Section 2B1.1. See Tolbert, 306 F.3d at 247 (grouping offenses whose offense level was determined on the basis of the table in Section 2F1.1, which is closely akin to the table in Section 2B1.1). Thus, Defendant Siegelman's counts of conviction in Counts 3, 5, and 6-9 are of the same general type as Defendant Siegelman's count of conviction in Count 17 because the offense levels for all of the counts is determined by the amount of loss or harm under the table in Section 2B1.1 and they all involve Defendant Siegelman's engaging in public corruption while Lieutenant Governor and Governor.[6]

The commentary to Section 3D1.2 supports the grouping of Defendant Siegelman's counts of conviction.

> Subsection (d) likely will be used with the greatest frequency. . . . Counts involving offenses to which different offense guidelines apply are grouped together under subsection (d) if the offenses are of the same general type and otherwise meet the criteria for grouping under this subsection. In such cases, the offense guideline that results in the highest offense level is used. . . . The "same general type" of offense is to be construed broadly. Examples: . . . (3) The defendant is convicted of five counts of mail fraud and ten counts of wire fraud. Although the counts arise from various schemes, each involves a monetary objective. All fifteen counts are to be grouped together.

U.S.S.G. § 3D1.2 cmt. 6. See Tolbert, 306 F.3d at 247 n.3 (construing § 3D1.2(d) in light of

_____

Siegelman's obstruction of justice offense involved obstructing the investigation and prosecution of the public corruption offenses occurring while he was Lieutenant Governor and Governor, including, but not limited to, the honest services mail fraud scheme involving Defendant Siegelman and Young. Section 2X3.1(a) directs the Court to apply § 2C1.7 – the guideline for honest services mail fraud.

[6]Defendant Siegelman's obstructive conduct which formed the basis of Count 17 was aimed at the entire investigation of public corruption offenses during his gubernatorial administration. Defendant Siegelman's obstructive conduct was designed to thwart the investigation into his criminal conduct, and, if successful, would have precluded the prosecution of not only himself, but also Bailey. The successful prosecution of Bailey led to his cooperation with the government, and thereafter to the successful prosecution and conviction of Defendants Siegelman and Scrushy.

application note 6).  Based on this explication of Section 3D1.2, Defendant Siegelman's counts of

conviction are to be grouped together since each count involves Defendant Siegelman's commission

of public corruption offenses and the offense level is largely based on the amount of harm or loss

from these offenses as determined under the table in Section 2B1.1.  See also Tolbert, 306 F.3d at

247 (holding that § 3D1.2(d) "allows for grouping of factually unrelated counts").

> **B.    Defendant Siegelman's Offense Level Should be Increased by Twenty Levels under Section 2B1.1(b)(1)(K) Based on the Aggregate Quantity of the Value of the Payments, the Benefits Received or to be Received in Return for the Payments, or the Loss to the Government from Defendant Siegelman's Criminal Activity.**

Section 3D1.3 provides that  "[i]n the case of counts grouped together pursuant to §

3D1.2(d), the offense level applicable to a Group is the offense level corresponding to the aggregated

quantity, determined in accordance with Chapter Two."  U.S.S.G. § 3D1.3(b).  See  Tolbert, 306

F.3d at 248 (applying § 3D1.3(b)).  The United States agrees with the PSR that Defendant

Siegelman's offense level should be calculated under Section 2C1.1.  PSR at ¶ 40. Under Section

2C1.1(b)(2)(A), Defendant Siegelman's offense level is increased based on the greater of (1) the

value of the payments, (2) the benefit received or to be received in return for the payments, or (3)

the loss to the government from the offense.  The United States submits that the category of "benefit

received or to be received in return for the payments" produces the greatest sum, and should be used

to determine the increase in Defendant Siegelman's offense level pursuant to the table in Section

2B1.1(b)(1).

The benefit received in return for the illegal payments is calculated as follows:  Defendant

Siegelman received **$500,000** in benefit from Defendant Scrushy since Defendant Siegelman used

that amount to pay off a debt for which he was personally liable.   Tim Adams received at least

**$11,000** in benefit from Defendant Scrushy in the form of two bribes of $8,000, and $3,000, respectively.[7] Integrated Health Services received **$17,000** in benefit from UBS Warburg for issuing the $250,000 check that Defendant Scrushy used to bribe Defendant Siegelman since UBS Warburg forgave $267,000 of indebtedness owed to it by IHS. HealthSouth received approximately **$3,109,054.62** in benefit from the construction and operation of the Phenix City hospital – a project that the CON Board approved in furtherance of the conspiracy and honest services fraud scheme executed by Defendants Siegelman and Scrushy for which they were convicted in Counts 5, and 6-9, respectively. Defendant Siegelman received at least **$400,000** from Young in the form of cash, property (e.g., four-wheeler), campaign contributions in the form of cash and property (e.g., shirts, hats, signs), and airplane rides.[8] Defendant Siegelman received **$50,000** from Waste Management after he had the Department of Revenue change the assessment of fees for Chemical Waste Management at the waste disposal facility at Emelle, Alabama pursuant to the honest services fraud scheme he had with Young. Waste Management received at least **$4,200,000** in benefit from the reduction of fees at the waste disposal facility at Emelle, AL. See United States v. Ziglin, 964 F.2d 756, 758 (8th Cir. 1992) (finding that "the value of the action received in return for the bribe offered by [the defendant] is equal to the tax liability he sought to eliminate," even if the taxes were of a

---

[7]This amount does not include the value of other benefits Defendant Scrushy gave Adams (e.g., helicopter rides to and from CON Board meeting, travel on HealthSouth aircraft to the Oshkosh Airshow in Oshkosh, Wisconsin, and a job offer at HealthSouth) pursuant to the conspiracy and honest services fraud scheme for which Defendants Siegelman and Scrushy were convicted in Counts 5, and Counts 6-9, respectively.

[8]This amount is a conservative estimate based on the government's recollection of the evidence at trial. See also United States v. Munoz, 430 F.3d 1357, 1371 n.13 (11th Cir. 2005) (noting that a calculation of value based on a defendant's gain ordinarily underestimates the loss from the defendant's criminal conduct).

third party and not of the defendant) (citations and quotations omitted). Paul Hamrick received at least **$50,000** from Young in the form of cash, property (e.g., NASCAR tickets, airplane tickets), and airplane rides.[9] Bailey received at least **$62,000** from Young in the form of cash and property. Young, d/b/a AWDS, received **$3,000,000** from Waste Management for the Cherokee County Commission enlarging the service area and lowering the royalty fees at the Three Corners Landfill, which action was performed as part of the honest services fraud scheme between Defendant Siegelman and Young. Young, d/b/a GH Construction, LL.C., received **$411,495** from ADECA as part of the GH Project, which was part of the honest services fraud scheme between Defendant Siegelman and Young. Young received **$35,000** from Bill Blount as part of the illegal agreement and honest services fraud scheme he had with Defendant Siegelman. Young received at least **$50,000** in fees from consulting contracts he received through Austin Young Capital Resources because of the illegal agreement and honest services fraud scheme he had with Defendant Siegelman. In sum, a conservative account of the total benefit received from the payments is **$11,895,549.62**.

Based on the table in Section 2B1.1(b)(1)(K), Defendant Siegelman's offense level should be increased by 20 levels. See Munoz, 430 F.3d at 1374 ("[T]he law is quite clear that for sentencing purposes all losses caused by fraud or deceit may be imputed to a defendant who was a member of the conspiracy which caused those losses.") (citations and quotations omitted). The United States thus objects to the PSR because it understates the amount of benefit received and only increases Defendant Siegelman's offense level by 18 levels under the table in Section 2B1.1 pursuant to Section 2C1.1(b)(2)(A).

---

[9]This amount does not include the value to Hamrick from being a member of Young's stock car racing team.

### III.    The PSR Incorrectly States the Maximum Fine Available Against Defendant Siegelman Under Title 18, United States Code, Section 3571(d).

Based on the above calculation that the total benefit received from the payments is $11,895,549.62, the statutory fine range in the PSR should be adjusted upward to $23,791,099.24 in light of 18 U.S.C. § 3571(d), which provides "[i]f any person derives pecuniary gain from the offense … results in pecuniary loss to a person other than the defendant, the defendant may be fined not more than twice the gross gain or twice the gross loss … ."

In light of § 3571(d) increasing the fine range by statute, the Guidelines range should therefore also be adjusted upward to $23,791,099.24 under Guidelines § 5E1.2(c)(4), which provides, "Subsection (c)(2), limiting the maximum fine, does not apply if the defendant is convicted under a statute authorizing (A) a maximum fine greater than $250,000 … . In such cases, the court may impose a fine up to the maximum authorized by the statute."[10]

Defendant Siegelman should be fined $1,000,000. As discussed supra, the total loss figure caused by his having run the government of the State of Alabama like a grocery store is much higher than $1,000,000. Nevertheless $1,000,000 is a fair and reasonable amount based on Defendant Siegelman's ability to pay. This sum will also have the effect of divesting him of approximately $1,000,000 that he received at or near the time of the settlement of the State of Alabama's interest in a national lawsuit against tobacco companies, while he was the Governor of Alabama, from a law firm with which he had formerly been associated.

---

[10]In the alternative, should the Court ultimately find that the Guidelines range is limited by Guidelines § 5E1.2(c)(2), the government submits that a Guidelines departure under § 5K2.0 is appropriate and necessary to effect the purpose of the required considerations in 18 U.S.C. §§ 3553(a) and 3572, and especially to achieve any meaningful "deterrence to criminal conduct," § 3553(a)(2)(B), in light of Defendant Siegelman's "income, earning capacity, and financial resources." 18 U.S.C. § 3572(a)(1).

The law firm which paid this money to Defendant Siegelman received a share of the legal fees paid to lawyers who were allowed to represent the State of Alabama in the tobacco litigation. Defendant Siegelman, while not technically receiving any of the tobacco legal fees, received almost all of the fees (approximately $1,000,000) for the firm from a related case. The percentage of Defendant Siegelman's fee from that litigation was far in excess of that normally allocated to him by the firm and far in excess of the amount commonly shared with associates or for that matter partners. (Defendant Siegelman was not a partner in the firm.) Moreover, the fee constituted an unearned windfall obtained under questionable circumstances considering Defendant Siegelman's ability at the time to refuse to approve the tobacco settlement. Regardless, since Defendant Siegelman has the ability to pay with money closely connected to his actions while Governor, and since his wrongdoing while Governor resulted in a much greater loss to the State of Alabama, he should be fined the amount of $1,000,000. A fine in this amount will both best punish Defendant Siegelman and deter him and others from engaging in misconduct of this nature in the future.

On information and belief, the United States avers that Defendant Siegelman has purchased annuities with this money which are reflected in the PSR. The United States has subpoenaed records for the sentencing hearing which will establish whether this money was used to purchase the annuities and will establish if this purchase was made in an effort to insulate these monies from being recovered as restitution or a fine in anticipation of same becoming an issue at sentencing.

**IV.    The Presentence Investigation Report Fails to Increase Defendant Siegelman's Offense Level by Four Points for Aggravated Role under U.S.S.G. § 3B1.1(a) Because He was an Organizer and/or Leader of the Criminal Activity for which He was Convicted.**

Under Section 3B1.1(a), a defendant's offense level is increased by four levels "[i]f the defendant was an organizer or leader of a criminal activity that involved five or more participants

or was otherwise extensive."[11]   In determining whether a defendant is an organizer or leader, "[f]actors the court should consider include the exercise of decision making authority, the nature of the participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others."  U.S.S.G. § 3B1.1 cmt. 4.  See United States v. Revel, 971 F.2d 656, 659-60 (11th Cir. 1992) (discussing the qualifications for organizer/leader under Section 3B1.1).  Based on these factors, Defendant Siegelman qualifies for this four-level enhancement because he was an organizer and/or leader of the criminal activity for which he was convicted in Counts 3, 5, and 6-9 (the "CON Board criminal activity"), and Count 17 (the "obstruction criminal activity") of the second superseding indictment.

The CON Board criminal activity involved five or more participants, including Defendant Siegelman, Defendant Scrushy, Nick Bailey, Mike Martin, Eric Hanson, and Tim Adams.  The evidence adduced at trial established that Defendant Siegelman exercised decision-making authority throughout the execution of this criminal activity (e.g., he made the decision to appoint Defendant Scrushy to the CON Board), that his leadership and participation was vital to the execution of the criminal activity, that he recruited others to participate in the criminal activity (e.g., Nick Bailey), that the $500,000 he received from the criminal activity was used to pay off a liability for which he was personally liable, that he and Defendant Scrushy were intimately involved in the planning and organizing of the criminal activity, that this criminal activity pervaded the highest levels of State

---

[11]Comment 1 to Section 3B1.1(a) defines "participant" as "a person who is criminally responsible for the commission of the offense, but need not have been convicted."

government and involved many knowing and unwitting participants, and that Defendant Siegelman controlled and had authority over the actions of others (e.g., Bailey, Darrin Cline, Josh Hayes, Raymond Bell, Margie Sellers) involved with the criminal activity.

Defendant Siegelman should receive the four-level enhancement even though Defendant Scrushy is due to receive it as well, for more than one participant can be an organizer or leader of any given criminal activity. See Revel, 971 F.2d at 660 ("In order to be considered an organizer or leader within the meaning of the Guidelines, the defendant need not be the sole leader or a kingpin of the conspiracy."). Moreover, Defendant Siegelman qualifies for the enhancement even if fewer than five of the participants actually reported to him. See United States v. Kamoga, 177 F.3d 617, 621 (7th Cir. 1999) ("Section 3B1.1(a) does not require that a defendant know of all of the other participants in the criminal activity."). The enhancement applies because Defendant Siegelman organized and/or led the CON Board criminal activity and it involved four other participants. See id.

Defendant Siegelman also qualifies for the organizer/leader enhancement because the CON Board criminal activity was "otherwise extensive" under Section 3B1.1(a). See United States v. Rodriguez, 981 F.2d 1199, 1200 (11th Cir. 1993) (finding that the organizer/leader enhancement applied "even if fewer than five people were involved, [because] the criminal activity was 'otherwise extensive'") (quoting Section 3B1.1(a)). "In assessing whether an organization is 'otherwise extensive,' all persons involved during the course of the entire offense are to be considered." Section 3B1.1 cmt. 3. See Rodriguez, 981 F.2d at 1200 (quoting Section 3B1.1 cmt. 3). The extensive involvement of unwitting or unsuspecting accomplices in the defendant's criminal activity is a significant factor in determining whether the criminal activity was "otherwise extensive." See

United States v. Fullwood, 342 F.3d 409, 415 (5th Cir. 2003) (upholding the district court's application of Section 3B1.1(a) because of the defendant's extensive use of unknowing participants). The CON Board criminal activity was certainly otherwise extensive given that it involved numerous corporations, professionals, government offices, and individuals, including many unsuspecting accomplices, (e.g., numerous personnel from Integrated Health Services, HealthSouth, UBS Warburg, First Commercial Bank, and the Alabama Secretary of State's Office).

Defendant Siegelman further qualifies for the organizer/leader enhancement for the obstruction criminal activity for which he was convicted in Count 17. This criminal activity was "otherwise extensive" though it only involved three "participants" – Defendant Siegelman, Young, and Bailey. The criminal activity that was the subject of Count 17 involved Defendant Siegelman causing Bailey to give him a check for $2,973.35 on or about October 16, 2001. Defendant Siegelman planned and executed this transaction, which was designed to cover up the public corruption offenses Defendant Siegelman had committed while Governor and Lieutenant Governor and thwart the FBI's investigation into Defendant Siegelman's criminal activities, including those involving Bailey and Young. Defendant Siegelman was the mastermind behind this sham transaction and criminal activity, and he recruited the involvement of his attorney, Bailey, and Bailey's attorney in the transaction to enhance its obstructive effect. Since Defendant Siegelman designed, planned, organized, led, and executed the obstruction criminal activity, which involved numerous unsuspecting participants, he deserves the four-point enhancement under Section 3B1.1(a). See United States v. Suarez, 313 F.3d 1287, 1294 (11th Cir. 2002) (affirming organizer/leader enhancement because the defendant "had decision-making authority and exercised control").

Finally, this Court applied the organizer/leader enhancement under Section 3B1.1(a) when

sentencing Bailey and Young. Since Defendant Siegelman organized, controlled, and directed the actions of Bailey and Young in the criminal activity for which Defendant Siegelman was convicted, the organizer/leader enhancement applies a fortiori to Defendant Siegelman.

**V.      Defendant Siegelman's Offense Level Should be Increased by Two Levels for Obstruction of Justice under Section 3C1.1.**

The PSR errs by not increasing Defendant Siegelman's offense level by two levels for obstruction of justice under Section 3C1.1. PSR at ¶ 36. An enhancement for obstruction of justice is required where "(A) the defendant willfully obstructed or impeded . . . the administration of justice during the course of the investigation, prosecution, or sentencing of the instant offense of conviction, and (B) the obstructive conduct related to (I) the defendant's offense of conviction and any relevant conduct; or (ii) a closely related offense." U.S.S.G. § 3C1.1. The government assumes that the PSR omits the two-level enhancement because Defendant Siegelman was convicted of obstruction of justice in Count 17, namely, a violation of Title 18, United States Code, Section 1512(b)(3), and the commentary to Section 3C1.1 states that this adjustment is not applied where the defendant is convicted of an offense covered by Section 2J1.2, the offense guideline for obstruction of justice offenses. U.S.S.G. § 3C1.1 cmt. 7. This rationale, however, is erroneous because it misapplies Section 3C1.1 as defined in the commentary to that guideline, and fails to reflect Defendant Siegelman's obstructive criminal conduct in his sentence.

Application note 7 to Section 3C1.1 must be read in conjunction with application note 8, which provides for the two-level adjustment to apply where the defendant is convicted of an obstruction offense and an underlying offense which are grouped together under Section 3D1.2. In such a situation, "[t]he offense level for that group of closely related counts will be the offense level

-14-

for the underlying offense increased by the 2-level adjustment specified by this section." U.S.S.G. § 3C1.1 cmt. 8. In this case, as discussed <u>supra</u>, Defendant Siegelman's counts of conviction are properly grouped together under Section 3D1.2, including Count 17, the obstruction of justice count. Consequently, the commentary to Section 3C1.1 requires the application of the two-level adjustment for obstruction of justice. The United States objects, therefore, to the PSR's failure to apply this two-level adjustment.

Increasing Defendant Siegelman's offense level by two-levels under Section 3C1.1 is necessary for his sentence to reflect his obstruction offense. <u>See</u> <u>United States v. Fiore</u>, 381 F.3d 89, 96 (2d Cir. 2004) ("Absent the two-level obstruction enhancement, the sentence would not have reflected [the defendant's] perjury."). In <u>Fiore</u>, the appellate court noted that "the district court properly grouped the underlying (fraud) and obstruction (perjury) offenses under Section 3D1.2(c), applied the appropriate offense level for fraud, and adjusted upward by two levels for the perjury." <u>Id</u>. Similarly, in this case, Defendant Siegelman's obstruction of justice offense is properly grouped with his bribery, conspiracy, and honest services mail fraud offenses, the offense level is calculated based on the aggregate harm or loss from Defendant Siegelman's criminal activity, and then the two-level adjustment is applied for the obstruction of justice.

Defendant Siegelman cannot complain that application of the obstruction adjustment is impermissible double-counting because "[a]n enhancement for obstruction of justice constitutes impermissible double-counting only when the conduct giving rise to the enhancement is identical to the conduct giving rise to the underlying conviction." <u>United States v. Hughes</u>, 401 F.3d 540, 558 (4th Cir. 2005). In <u>Hughes</u>, the defendant was convicted of three counts of bankruptcy fraud and two counts of perjury. <u>Id</u>. at 558. The "district court grouped the offenses together [under Section

3D1.2], imposed one sentence for the bankruptcy fraud offenses, and accounted for the perjury offenses by applying a two-level enhancement to the bankruptcy fraud offense level." Id. (finding that the district court's application of the Guidelines comported with Section 3C1.1 cmt. 8). The Fourth Circuit affirmed the district court's application of Section 3C1.1 because the "conduct giving rise to Hughes' bankruptcy fraud convictions was not identical to that giving rise to the obstruction enhancement," namely, perjury before the bankruptcy court. Id. at 558-59. See United States v. Sabino, 307 F.3d 446, 451 (6th Cir. 2002) ("[T]he relevant inquiry for purposes of identifying whether impermissible double counting would result from enhancing the defendants' sentences for obstruction of justice is whether precisely the same aspect of the defendants' conduct would be relied upon to determine the defendants' respective base offense levels, and to support the sentencing enhancement.") (emphasis in original).

Enhancing Defendant Siegelman's offense level by two levels for obstruction of justice under Section 2C1.1 does not constitute impermissible double counting because the conduct giving rise to the obstruction enhancement is not identical to, or precisely the same aspect of, the conduct giving rise to his base offense levels. The conduct relied upon to determine Defendant Siegelman's base offense levels pertains to his accepting bribes from Defendant Scrushy, conspiring with Defendant Scrushy, engaging in an honest services fraud mail fraud scheme with Defendant Scrushy, and engaging in an honest services fraud scheme with Young, and is determined largely based upon the benefit received by various individuals as a result of Defendant Siegelman's criminal conduct. See supra. This conduct is not identical to Defendant Siegelman's conduct giving rise to the obstruction enhancement, namely his engaging in a sham transaction with Bailey to cover up his public corruption offenses after learning of the joint federal/state investigation into his gubernatorial

administration.

Appellate courts have affirmed the application of Section 3C1.1 in contexts exactly like the one present in this case. See Hughes, 401 F.3d at 558-59; United States v. Frank, 354 F.3d 910, 924-25 (8th Cir. 2004) (upholding the application of the obstruction enhancement based on comment eight to § 3C1.1 where the trial court grouped the defendant's forty-nine counts of conviction, including two counts of obstruction of justice, because the district court "expressly identified obstructive conduct unrelated to the conduct underlying the money-laundering convictions"); Sabino, 307 F.3d at 451.

Based on the foregoing, the United States objects to the PSR's failure to adjust upward Defendant Siegelman's offense level by two levels for obstruction of justice under Section 3C1.1.

## VI.     Defendant Siegelman's Offense Level Should be Increased by Two Levels Under Section 2C1.1(b)(1) Because the Counts of Conviction Involved More than One Bribe.

The United States agrees with the PSR that Defendant Siegelman's offense level should be increased by two levels because the offenses for which he was convicted "involved more than one bribe." U.S.S.G. § 2C1.1(b)(1); PSR at ¶ 41. Though in agreement with the PSR, the government addresses the various bribes involved with Defendant Siegelman's criminal conduct because this issue arose during the objections conference. As the government stated during the objections conference, Defendant Siegelman's criminal conduct involved at a minimum (1) the $500,000 bribe paid to him by Defendant Scrushy as charged in Count 3, (2) the bribes Defendant Scrushy paid to CON Board member Tim Adams (e.g., $8,000 bribe paid in February 2002, and $3,000 bribe paid in July 2002) as part of the conspiracy and honest services fraud scheme charged in Count 5, and Counts 6-9, respectively, and (3) the bribes paid to Defendant Siegelman, Hamrick, and Bailey by

Lanny Young, which were part of the honest services fraud scheme and public corruption offenses that Defendant Siegelman sought to cover up by his obstructive conduct for which he was convicted in Count 17.

The bribes identified above involving the CON Board criminal activity are offense conduct specifically identified in the indictment. Defendant Scrushy's bribe payment to defendant Siegelman is specifically charged in Count 3, which states that "defendant DON EUGENE SIEGELMAN . . . corruptly solicited, demanded, accepted, and agreed to accept $500,000 from defendant RICHARD SCRUSHY, intending to be influenced and rewarded in connection with the appointment of defendant RICHARD SCRUSHY . . . to the CON Board." The jury found Defendant Siegelman guilty of Count 3.

The $500,000 bribe in Count 3, together with further, different bribes, are all charged as integral parts of Count 5. Count 5 charges a mail fraud conspiracy to deprive the State of Alabama of the honest services of both Defendant Siegelman "as well as other members of the CON Board." Count 5 goes on to specifically state as one manner and means of the conspiracy the same bribe identified in Count 3 (i.e., that "RICHARD M. SCRUSHY would and did pay $500,000 to DON EUGENE SIEGELMAN …"). Indictment at ¶ 55a. Count 5, however, goes on to specifically state as a separate manner and means of the conspiracy that "RICHARD M. SCRUSHY would and did offer things of value to another CON Board member…" Id. at ¶ 55e. Moreover, the indictment specifically charged two payments to the "CON Board Member," separate and apart from the $500,000 paid to Defendant Siegelman. In particular, ¶ 56 charges as one overt act a "payment of $3,000" on August 2, 2002, for creating a CON Board quorum for action on a proposed hospital. Further, ¶ 56 charges a February 6, 2002, "payment of $8,000" concerning a certain PET scan

application as another overt act. At trial, the testimony of Loree Skelton both identified Timothy Adams as the CON Board member receiving these two separate payments, and highlighted their separation from the $500,000 bribe to Defendant Siegelman, of which she had no knowledge. The jury found Defendant Siegelman guilty of Count 5 as they found him to be part of the charged conspiracy and liable for the criminal actions of his co-conspirators (e.g., Defendant Scrushy) which were reasonably foreseeable to him.

Further, all of the same bribes identified in the Count 5 conspiracy were also charged as substantive mail fraud in Counts 6 through 9. Specifically, Counts 6 through 9 charged the very same manner and means as Count 5, i.e., that "RICHARD M. SCRUSHY would and did pay $500,000 to DON EUGENE SIEGELMAN …", id. at ¶ 59a, and that "RICHARD M. SCRUSHY would and did offer things of value to another CON Board member…" Id. at ¶ 59e. Moreover, and more importantly, Counts 6 through 9 proceed to charge aspects of all the various bribes as separate mailings in furtherance of the scheme. Specifically, Counts Six and Seven charge mailings of CON Board appointment letters that furthered the $500,000 bribe of Defendant Siegelman by giving HealthSouth membership on and influence over the CON Board. Count 8, in contrast with Counts 6 and 7, charges a mailing in furtherance of the $3,000 bribe to Timothy Adams to facilitate a Certificate of Need for a HealthSouth hospital in Phenix City, Alabama. Count Nine, in further contrast with Counts 6 through 8, charges a mailing that furthered the $8,000 bribe in connection with the PET scanner application. The jury found Defendant Siegelman guilty of each of Counts 6 through 9, thereby specifically finding that each of the multiple bribes at issue did occur and that he was criminally liable for them.

Additionally, the bribes involved with the obstructive criminal conduct were particularly charged in Count 2 of the indictment as part of the substantive RICO offense and in Counts 10-14 as parts of the manner and means of the honest services fraud schemes involving Defendant Siegelman, Hamrick, Bailey, and Young.  In particular, ¶ 30 delineates particular bribes that Young made to Defendant Siegelman, Hamrick, and Bailey as part of their "pay for play" agreement. Though the jury found Defendant Siegelman not guilty on the RICO Counts and Counts 10-14, the United States submits that the evidence at trial established by a preponderance of the evidence that Young paid these bribes and justifies this Court's making factual findings of the same.  See Faust, 456 F.3d at 1348 (authorizing post-Booker the district courts to make factual findings by a preponderance of the evidence standard, even for acquitted conduct).

Accordingly, Defendant Siegelman's offense conduct in this case includes at least two separate acts of bribery, and he should receive a two-level increase under Section 2C1.1(b)(1).

**VII.    The PSR Fails to Recognize Identifiable Victims of Defendant Siegelman's Criminal Activity.**

The PSR states that "[t]here is no identifiable victim who incurred a . . . financial loss as a result of the counts of conviction." PSR at ¶ 35.  The United States objects to this statement because HealthSouth, UBS Warburg, Brookwood Hospital, and the State of Alabama are identifiable victims of the criminal conduct for which Defendant Siegelman was convicted.  In particular, as part of the CON Board criminal activity, UBS Warburg lost at least $267,000 by forgiving that amount in indebtedness to Integrated Health Services, which gave a $250,000 check to Defendant Scrushy as part of Defendant Scrushy's $500,000 bribe to Defendant Siegelman.  Similarly, Defendant Scrushy illegally expended at least $261,000 of funds from HealthSouth as part of his paying bribes to

-20-

Defendant Siegelman and Tim Adams. Brookwood Hospital lost at least $100,000 in expenses and income associated with the CON Board's denial of its application for a MRI at its meeting in January 2001 – the night before which Defendant Scrushy improperly contacted Margie Sellers, Chairperson of the CON Board, at home and ex parte to criticize Brookwood's proposal.

The Alabama Department of Revenue lost at least $4,200,000 from Defendant Siegelman's actions causing it to reduce the assessment of fees on Chemical Waste Management at the waste disposal facility in Emelle, Alabama, as part of his illegal agreement with Young, which Defendant Siegelman sought to cover up by his obstructive conduct charged in Count 17. Moreover, ADECA lost $411,495 from payments it made to GH Construction, LL.C. as part of the GH Project, which was part of the illegal agreement and scheme between Defendant Siegelman and Young.

The United States asserts that Defendant Siegelman should therefore be ordered to pay restitution as follows: $261,000 to HealthSouth, $267,000 to UBS Warburg, at least $100,000 to Brookwood,[12] $4,200,000 to the Alabama Department of Revenue, and $411,495 to ADECA, for a total amount of restitution of $5,239,495.

## VIII.   Conclusion.

Based on the foregoing objections, the United States contends that the PSR miscalculates Defendant Siegelman's guideline range and appropriate sentence. The correct application of the Guidelines is as follows:

Base Offense Level =                      10 (§ 2C1.1(a))

Specific Offense Characteristic =         2 (§ 2C1.1(b)(1))

---

[12]At the sentencing hearing, the United States intends to present evidence to establish a more accurate figure of the loss to Brookwood Hospital. The government was awaiting receipt of this information from Brookwood at the time of this writing.

| | |
|---|---|
| Specific Offense Characteristic = | 20 (§ 2C1.1(b)(2)(A)) |
| Adjustment for Role in Offense = | 4 (§ 3B1.1(a)) |
| Adjustment for Obstruction of Justice = | 2 (§ 3C1.1) |
| Offense Level Prior to Upward Departure= | 38 |
| Guideline Range (CHC = 1) = | 235-293 |
| Upward Departure for Systematic and Pervasive Government Corruption= | 4 (§ 2C1.1 cmt. 5) |
| Offense Level After Upward Departure= | 42 |
| Guideline Range After Upward Departure= | 360-Life |
| Fine Range = | $0 - $23,791,099.24 |
| Restitution = | $5,239,495 |

Based on this correct calculation under the Guidelines, consideration of the factors set forth in Title 18, United States Code, Section 3553(a), and the government's motion for upward departure filed herewith,[13] the United States asserts that Defendant Siegelman should receive a sentence of 360 months, or 30 years, a fine of $1,000,000, and an order to pay restitution of $5,239,495 for the offenses for which the jury convicted him.  A sentence of 30 years is a reasonable sentence given that the jury convicted Defendant Siegelman for public corruption offenses that spanned at least a four-year time frame while he was Governor, involved his abuse of a plethora of State government agencies and personnel, and caused a heightened distrust of State government.  If ever a defendant was deserving of being held accountable to the maximum extent for his criminal wrongdoing,

---

[13]The United States has moved for an upward departure pursuant to § 2C1.1, cmt. 5, because Defendant Siegelman's criminal conduct was part of systematic and pervasive corruption of State government that may have caused a loss of public confidence in government.

Defendant Siegelman is that defendant, especially given the complete lack of remorse and acceptance of responsibility he has shown for his crimes, his continued proclamation of innocence despite the jury's verdict and claims that the prosecution against him is politically motivated.[14]   The United States, therefore, respectfully urges this Court to punish Defendant Siegelman to the fullest extent permitted under the law.

---

[14]See United States v. Gutman, 95 F. Supp. 2d 1337, 1351 n.17 (S.D. Fla. 2000) (imposing an upward departure on the defendant because of his callous disregard of public trust manifested by, inter alia, his steadfast declaration of innocence, even after executing a plea agreement, his blaming the government for false charges, his public lies about the case against him, and his claims that the prosecution was politically motivated).

Respectfully submitted this the 25th day of May, 2007.

LOUIS V. FRANKLIN, SR.                        WILLIAM M. WELCH, II
ACTING UNITED STATES ATTORNEY        CHIEF, PUBLIC INTEGRITY SECTION

/s/ Louis V. Franklin, Sr.                          /s/Richard C. Pilger
Acting United States Attorney                 Department of Justice, Criminal Division
One Court Square, Suite 201                   Public Integrity Section
Montgomery, AL 36104                           10th & Constitution Ave, NW
Phone: (334)223-7280                              Bond Building - 12th Floor
Fax:     (334)223-7560                              Washington, DC 20530
Email: louis.franklin@usdoj.gov            Phone: (202)514-1412
                                                              Fax:     (202)514-3003
/s/ J.B. Perrine                                        Email: richard.pilger@usdoj.gov
Assistant United States Attorney
One Court Square, Suite 201
Montgomery, AL 36104
Phone: (334)223-7280
Fax:     (334)223-7135
Email: jb.perrine@usdoj.gov
ASB-9077-E31J

/s/ Stephen P. Feaga
Assistant United States Attorney
One Court Square, Suite 201
Montgomery, AL 36104
Phone: (334)223-7280
Fax:     (334)223-7560
Email: steve.feaga@usdoj.gov
ASB-7374A60S

/s/ Joseph L. Fitzpatrick, Jr.
Special Assistant United States Attorney
Assistant Attorney General
Office of the Attorney General
11 S. Union
Montgomery, AL 36130
Phone: (334)353-4839
Fax:     (334)242-4890
Email: j.fitzpatrick@ago.al.state.us

**IN THE UNITED STATES DISTRICT COURT FOR
THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | **)** | |
| | **)** | |
| **v.** | **)** | **CRIMINAL NO. 2:05-CR-119-MEF** |
| | **)** | |
| **DON EUGENE SIEGELMAN** | **)** | |
| | **)** | |

**CERTIFICATE OF SERVICE**

I hereby certify that on May 25, 2007, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to all counsel of record.

Respectfully submitted,

LOUIS V. FRANKLIN, SR.
ACTING UNITED STATES ATTORNEY

/s/ Louis V. Franklin, Sr.
LOUIS V. FRANKLIN, SR.
Acting United States Attorney
Post Office Box 197
Montgomery, Alabama 36101-0197
(334) 223-7280
(334) 223-7135 fax
louis.franklin@usdoj.gov