IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

RECEIVED
2007 MAY 29  P 4: 19

UNITED STATES OF AMERICA,        *
                                 *
    PLAINTIFF,                   *
                                 *
v.                               * CASE NO.  2:05cr119-MEF-001
                                 *
DON E. SIEGELMAN[1]              *
    DEFENDANT.                   *

## NOTICE OF
## SIEGELMAN'S UNRESOLVED OBJECTIONS TO PRESENTENCE REPORT AND
## REQUEST FOR DOWNWARD DEPARTURE AND VARIANCE

Comes now Don Siegelman, by and through undersigned Counsel, and files these his

unresolved objections to the presentence report in this case and request for downward departure

and variance and in support thereof states the following:

**Objection 1- Part A - The Offense, Federal Funds, Bribery, Honest Services, Mail
Fraud and Conspiracy.  The CON Board.**

It is apparent that this section of the presentence report was prepared as a result of

information supplied to the Probation Officer by the Government.  The Probation Officer did not

attend the trial nor has the trial transcript been completed.  In order to balance the reported

offense facts counsel requests that the Probation Officer consider and include in the presentence

report the defendant's summary of the evidence prepared by David McDonald (Exhibit 1).

**Objection 2 - Paragraph 33**

Paragraph 33 contains the statement "Bailey wrote a check from his personal checking

account to Lori Allen, maiden name of Siegelman's wife.  The personal check to Lori Allen was

deposited into Siegelman's expense account from which he had drawn the $12,173.35 check to

purchase the motorcycle on December 6, 1999."

---

[1] The Presentence Report should be corrected on page 3, True Name: Donald Eugene
Siegelman, Alias Don Siegelman.  The Governor's true birth name is Don Eugene Siegelman.
Therefore, he does not have an alias.

The Government's case tried to show something sinister about the check being written to Lori Allen. Lori Allen never changed her name to Siegelman and therefore Lori Allen is her correct name. **Proof of this will be provided the Probation Officer at the Probation Conference.**

Lori Allen was a name commonly appearing on bank accounts and brokerage accounts. It was easier for Lori to do her work as a counselor to sexual assault victims without using the Siegelman name. A check in her maiden and correct name was nothing out of the ordinary. Nick Bailey of all people knew this. There is no way Governor Siegelman would have involved his wife in anything illegal. She lost an eye in a life threatening automobile accident involving a drunk driver. Governor Siegelman would never have involved his wife in a petty motorcycle bribery scheme when they both went through so much to save her life.

### Objection 3 - Paragraph 37 - Adjustment for Acceptance of Responsibility

Defendant objects to the Probation Officer's failure to recommend a two level 3C1.1 downward adjustment for acceptance of responsibility.

Siegelman was charged in a second superceding indictment in 34 counts. Only 32 went to the jury. The jury acquitted him on all but seven of the counts. (Effectively over 94% of the allegations) Counts one and two were RICO conspiracy and the RICO. The RICO alleged 70 racketeering acts. The jury found that Governor Siegelman had committed none of these 70 alleged racketeering acts. In fact the jury made a determination on 101 separate counts and racketeering charges and acquitted him on 94 of them.

He never denied the conduct relating to the Scrushy counts of conviction or the obstruction count but argued there was no Quid Pro Quo as to the Scrushy counts and no criminal intent on the obstruction count.

As noted in U.S.S.G. §3E1.1 Application Notes, (2) "Conviction by trial, however, does not automatically preclude a defendant from consideration for such a reduction. In rare situations a defendant may clearly demonstrate an acceptance of responsibility for his criminal conduct even

though he exercises his constitutional right at trial."

In this case the defendant exercised his right to a jury trial and was vindicated on 25 of the 32 counts including all 70 alleged racketeering charges. This alone was sufficient reason to proceed to trial. As to the Scrushy counts of conviction there is a significant dispute over the law[2] and how it was applied in this case. That fact alone takes this situation out of the "heartland" of cases where defendants are denied acceptance of responsibility after putting the Government to trial.

The real issue is whether it was illegal to accept a contribution[3] and turn around and reward the contributor a position or other benefits. If there is an agreement to do so a crime is committed. If there is no agreement no crime is committed. Nick Bailey testified that Siegelman pulled a $250,000 check out of his coat pocket after Scrushy left and in answer to the question "What in the world is he going to want for this, Siegelman replied, "The CON Board." There was no proof whatsoever in that testimony that the two of them had made a Quid Pro Quo deal in the private meeting. Siegelman admits that he and Scrushy met and he asked for a $500,000 contribution to the lottery. He admits he appointed Scrushy to the CON Board. He only denies that there was a crime committed because there was no Quid Pro Quo agreement. He states that even if Bailey correctly described the events outside the Governor's office, it does not describe a crime committed by a Quid Pro Quo agreement.

Siegelman argues that he should receive a two level 3E1.1 acceptance of responsibility downward adjustment of two levels.

### Objection 4 - Paragraph 39

Defendant objects to the Probation Officer's assessment "Each of the defendant's counts

---

[2] Valid arguments exist that the statute of limitations had expired on the alleged bribery and mail fraud counts and application of the law as cited in the *McCormick* case, 550 U.S. 257, 27-73 (1991) regarding the essential elements of a Quid Pro Quo.

[3] A contribution or an expenditure involves, with certain exceptions, anything of value made for the purpose of influencing the result of an election. (FCPA Code of Alabama §17-22A-2(a)(3)(a); *Richey v. Tyson*, 120 F. Supp. 2d 1298 (So. Dist. AL 2002).

of conviction represents essentially one composite harm." Siegelman argues the Scrushy counts of conviction and the obstruction count are unrelated and represent two harms.[4]

### Objection 5 – Paragraph 41 – Specific Offense Characteristics

Defendant objects to the suggested 2C1.1(b)(1) enhancement of two levels based on the offense conduct allegedly involving more than one bribe. This will be clear after consideration of the defense theory on guideline calculations.

### Objection 6 – Paragraph 42 – Specific Offense Characteristics

### (A) SIXTH AMENDMENT RIGHT TO JURY TRIAL

Defendant objects to this paragraph for several reasons. First, he argues that inclusion of acquitted conduct is a violation of his Sixth Amendment right to have a jury determine guilt beyond a reasonable doubt on any enhancement that increases punishment.

The Supreme Court in *Blakely v. Washington*, 542 U.S. __, 124 S.Ct. 2531, 159 L.Ed. 2d 403 (2004) clarified the statutory maximum issue addressed in *Apprendi v. New Jersey* 530 U.S. 466, 120 S.Ct. 2348 (2000) holding "In other words, the relevant "statutory maximum" is not the maximum sentence a judge may impose after finding additional facts, but the maximum he may impose without any additional findings. When a judge inflicts punishment that the jury's verdict alone does not allow, the jury has not found all the facts "which the law makes essential to the punishment", *Bishop, supra*, §87, at 55, and the judge exceeds his proper authority."

In this instance Defendant was acquitted on the RICO counts and the jury never made a reasonable doubt finding on any monetary amount contained within paragraph 42. The Probation Officer is using these monetary amounts to calculate the guidelines. Further, by its verdict the jury spoke that there was only one bribe.

---

[4]For purposes of these objections counsel will use terminology consistent with the terminology used by the Probation Officer and the Government. This should in no way be considered a concession by the defense. Use of the terminology makes the objections more understandable.

4

The United States Supreme Court in *Watts*, 519 U.S. 148, 154, 117 S.Ct. 633, 636, 136 L.Ed.2d 554 (1997) and the Eleventh Circuit in *United States v. Barakat*, 130 F.3d 1448, 1452 (1997) held that relevant conduct of which a defendant was acquitted nonetheless may be taken into account in sentencing for the offense conviction, as long as the Government proves the acquitted conduct relied upon by a preponderance of the evidence. Siegelman argues that the Government failed to prove the acquitted conduct by a preponderance of the evidence. (See Exhibit 1 and Objection 6, Paragraph B, Pages 7-12)

The Eleventh Circuit in *United States v. Faust*, 456 F.3d 1342 (2006) held that *Watts* survives *Booker*. For purposes of Siegelman's argument that acquitted conduct should not be used (post *Booker*) he relies on Judge Barkett's specially concurring opinion in *Faust*. (Exhibit 2) Siegelman argues, as did Judge Barkett, that the use of sentencing enhancements based on acquitted conduct is unconstitutional under the Sixth Amendment and the Due Process Clause of the Fifth Amendment. In sum Justice Barkett's position is noted in the first paragraph of her opinion: "I join the majority in affirming Faust's conviction, but concur in its sentencing decision only because I am bound by Circuit precedent. Although United States v. Duncan, 400 F.3d 1297 (11th Cir.), cert. denied, __U.S.__, 126 S.Ct. 432, 163 L.Ed.2d 329 (2005), expressly authorized the district court to enhance Faust's sentence for conduct of which a jury found him innocent, I strongly believe this precedent is incorrect, and that sentence enhancements based on acquitted conduct are unconstitutional under the Sixth Amendment, as well as the Due Process Clause of the Fifth Amendment."

B. Fletcher, Circuit Judge, in a dissenting opinion in *United States v. Mercado*, 2007 U.S.C.A. 05-60624 (9th Cir. January 22, 2007) stated: "I respectfully dissent from the majority's holding that district courts can rely on acquitted conduct when sentencing criminal defendants. Although the majority holds that *United States v. Watts*, 519 U.S. 148 (1997) (per curiam), presents a "complete answer to the issue before us," maj. Op. At 861, the Supreme Court has concluded otherwise, as do I. *United States v. Booker*, 543 U.S. 200 (2005). In *Booker*, the

Court explained that *Watts* addressed only a "very narrow" Fifth Amendment issue unrelated to the Sixth Amendment question then before the Court. Id. At 240 & n.4. As the Court emphasized, *Watts* did not consider, let alone decide, whether the Sixth Amendment was violated by reliance on acquitted conduct at sentencing...When a jury refuses to convict defendants of several counts, but the trial court nonetheless relies on that same acquitted conduct to increase the defendants sentences sevenfold, the jury has not authorized the resulting sentences in any meaningful sense.

Reliance on acquitted conduct in sentencing diminishes the jury's role and dramatically undermines the protections enshrined in the Sixth Amendment. Both *Booker* and the clear import of the Sixth Amendment prohibit such a result.

...By considering acquitted conduct, a judge thwarts the express will of the jury - as opposed to the implicit or imputed will of the legislature that is thwarted by a sentence above the statutory maximum - and imposes a punishment based on conduct for which the government tried, but failed, to get a conviction. Such a sentence has little relation to the actual conviction, and is based on an accusation that failed to receive confirmation from the defendant's equals and neighbors...By allowing judges to consider conduct rejected by the jury, the court allows the jury's role to be circumvented by the prosecutor and usurped by the judge - two of the primary entities against whom the jury is supposed to protect the defendant....**The jury simply cannot protect a defendant against the overzealous prosecutor or the compliant, biased, or eccentric judge, if those same individuals have the authority to ignore the jury's verdict**. To reiterate, the consideration of acquitted conduct severs the connection between verdict and sentence." (emphasis added)

The Second Circuit in *United States v. Vaughan*, 430 F.3d 518 (2005) held "While the District Courts may take into account acquitted conduct in calculating a defendant's guidelines range, they are not required to do so. **Rather, District Courts should consider the jury's acquittal when assessing the weight and quality of the evidence presented by the**

**prosecution and determining a reasonable sentence.** (emphasis added)  See *Cordoba-Murgas*, 233 F.3d at 708 (acknowledging that enhancements based on relevant conduct may be excessive when imposed "without regard to the weight of the evidence proving the relevant conduct") (citation omitted); *United States v. Gigantea*, 94 F.3d 53, 56 (2d Cir. 1996) (holding that, for sentencing purposes, "the preponderance standard is no more than a threshold basis for adjustments and departures, and the weight of the evidence, at some point along a continuum of sentence severity, should be considered")

"Certain facts like the amount of loss continue to assume inordinate importance in the sentencing outcome.  So long as they do, they should be tested by our highest standard of proof. Due process requires procedural safeguards and a heightened standard of proof, namely, proof beyond a reasonable doubt".  *United States v. Pimental*, 367 F.Supp. 2d 143 (District of Massachusetts 2005)

The Guidelines admonish that, although the sentencing court may rely on evidence that would be inadmissible at trial, the evidence must nonetheless have "sufficient indicia of reliability to support its probable accuracy."  U.S.S.G. §6A1.3.

In *United States v. Wendelsdorf*, 423 F. Supp. 2d 927 (Northern District of Iowa, 2006) an opinion from the Eastern District of New York was quoted:  " Judge Block recognized confusion regarding the distinction between uncharged and acquitted conduct.  Judge Block believed that where acquitted conduct produces the same sentencing results as if the defendant had been convicted of that conduct, or significantly increases the guidelines range, downward departure is invariably warranted.  Where, however, relevant uncharged conduct is entailed, the authority to depart downward would continue to be governed by the non exclusive factors set forth in *Cordoba-Murgas*.  The extent of all departures in either situation will vary with the particular set of circumstances of each case and, as in all departure scenarios, would be largely left to the sentencing court's discretion" (quoting *United States v. Koczuk*, 166 F.Supp. 2d 757, 762-63 (E.D.N.Y. 2001) (quoting *Cordoba-Murgas*, 233 F.3d at 709).

7

**(B)  RELEVANT CONDUCT MONETARY AMOUNTS NOT COUNTABLE AS THEY DO NOT REFLECT CRIMINAL CONDUCT ATTRIBUTABLE TO SIEGELMAN NOR PROVEN BY A PREPONDERANCE**

### (a)  ALLEGED RELEVANT CONDUCT

(1) **$500,000** Scrushy payment.  This payment was not illegal as argued at trial because there was no Quid Pro Quo and Siegelman did not financially benefit.

(2) **$9,200** motorcycle transaction.  As outlined in cross examination at trial this transaction was not illegal rather it was money Bailey paid Siegelman as the first installment on the purchase of the Siegelman motorcycle  and therefore the amount should not be included for guideline purposes.

The $9,200 is being calculated as relevant conduct and it is also the basis for the obstruction count.  Therefore, the $9,200 amount should not be included under relevant conduct.  To do so would constitute **double counting**.

(3) **Young Money** (PSI-Paragraph 32) $53,000 Bailey debt; $19,000 Bailey living expenses; $25,000 Hamrick BMW; $500,000 Waste Management Fee; $3,000,000 price from sale of Cherokee County landfill.  Siegelman had no knowledge of any of these monetary transactions.

### $3 Million Young Landfill Sale

Young admitted that he bribed Phillip Jordan, the Probate Judge and the chairman of the Cherokee County Commission to get County Commission approval of a landfill permit.  Jordan had known Siegelman before, since he was a Probate Judge.  Siegelman called him and said in an off handed way, they had a mutual friend (meaning Lanny Young) who had a project in Cherokee County and if there was anything he could do to help, he would appreciate it.  Jordan's Grand Jury testimony at pages 26-27 to a question about whether or not Jordan knew any other mutual friend up there other than Lanny Young was as follows:

A.      Not that I could think of.  He never mentioned a name.  That was the obvious one.  He never mentioned a name.  I didn't either.  And he didn't mention a project and neither did I.  That's the way I

8

took it, that he was speaking of Mr. Young. (Exhibit 3)

Jordan specifically denied in Grand Jury testimony at page 30 that Siegelman asked Lanny Young to pony up any money. (At pages 30-31, Exhibit 4).

> Q.     Okay. Were there ever any occasions where you remember asking either Mr.
>         Siegelman or Mr. Hamrick to help you get Lanny to pony up?
>
> A.      Well, the answer to Siegelman is **absolutely not**. (emphasis added)

In fact, in Jordan's Grand Jury testimony at page 15, he categorically denied using any influence whatsoever to get the landfill approved.

> Q.     I see. So what you're saying is he made this offer to you and you agreed to do it,
>         and your view of it is that it would have happened anyway.
>
> A.      Knowing that I was not going to have to exert any influence **and never did**.
>         (emphasis added) (Exhibit 5)

The jury did not believe that was the case and found Governor Siegelman innocent. Jordan did not testify that the $3 million Young money from the sale of the landfill was based on a telephone call from Governor Siegelman. The jury did not believe that it was based on such a telephone call. The jury certainly believed, and it was absolutely true, that Young bribed Jordan. In closing to the jury it was argued that if a man (Young) would bribe a Probate Judge (Jordan), he could not be believed on **any subject**. The jury agreed with this argument and did not believe Young at all **on any subject**.

The sale of the landfill was unrelated to the generic phone call to Jordan from Siegelman. Jordan did not testify to this. There is no evidence supporting the basis of Young's profit on the sale of the landfill, we do not know the cost basis in the landfill, nor do we know what it would have been worth without a favorable commission ruling. Young testified in substance at the trial that a Tillman owned 20% to 25% of the landfill and that there were 8 to 10 other owners. This fact alone supports the argument that $3 million should not be attributed under relevant conduct. He further testified that Hamrick, Scrushy, nor Siegelman had anything to do with bribing the

9

Judge.

Jordan testified he had nothing to do with the vote. In fact as chairman, Jordan could not vote. As chairman, Jordan could not vote except to break a tie. Jordan's actions would have been no different absent the Young bribe. *(See United States v. Griffin*, 324 F.3d 330 (5th Cir. 2003)

In a somewhat analogous situation the Fifth Circuit Court in *Griffin* held that a land sale having nothing to do with a bribe should not have been included in the monetary calculations for guideline purposes. The Court held that the defendant's making a profit off his business partner may have been unethical and possibly actionable in a civil lawsuit but not a crime. The landfill profit to Young should not come in under a relevant conduct theory.

**Waste Management Fee**

The $500,000 fee to Young may have been unethical but not a crime.

Government Exhibit 132 is Young's June 29, 1999 Term Sheet whereby he was to be paid $500,000 if the State Department of Revenue gave Chemical Waste Management a favorable revenue ruling. (See Exhibit 6) The fee paid Young involved payment for legitimate work done. In an analogous situation it has been held that "[l]oss cannot include the value of services a defendant legitimately performed for the victims of his fraud. *United States v. Vivit*, 214 F.3d 908, 915 (7th Cir. 2000) as cited in *United States v. Swanson*, 05-4432 (April 20, 2007, 7th Cir.)

**(4) Revenue Ruling** $1,000,000 Loss to State

Siegelman contends the State gained, not lost, as a result of this ruling and that this amount is not attributable to him. He contends this position was supported by the trial evidence. Even Lanny Young admitted at trial that he had no evidence that the revenue ruling was immoral or illegal. The acquitted conduct was not proved by a preponderance of the evidence.

First, the revenue ruling was the correct legal ruling. Also a March 26, 1997 letter from Thomas R. DeBray to Wade Hope, Esq. (Def. Ex 62) set forth the correct legal arguments that Chemical Waste Management was not subject to be taxed. (Exhibit 7) The legal distinction that

10

Mr. DeBray drew is that the tax was not due since the waste was treated outside rather than inside the Emelle Facility.

In addition, when the favorable revenue ruling was issued, Chemical Waste Management agreed to drop a $4.622 million Petition for Refund (Def's Ex 64). (Exhibit 8)    This Petition for Refund was well taken. Thus, (a) there was no loss to the State and (b) the State picked up $4,622 million, plus interest or well over $5 million. Jim Hayes who was ready to testify on this matter would have been a very powerful witness, but as it turned out, the defense did not need him to win this particular charge.

### (5) $50,000 AELF CONTRIBUTION BY WASTE MANAGEMENT

There is sworn testimony from William Thomas Harrington before the Grand Jury that when Chemical Waste hired Lanny Young there was no discussion about Chemical Waste contributing to the lottery (Grand Jury Testimony, pp. 20-21) (Exhibit 9) Mr. Harrington was the Regional Vice President for Waste Management. There was never any suggestion that a lottery contribution would cause the Department of Revenue to make a favorable decision. At page 21, Harrington testified.

Q.    Never suggested that to you?

A.    No, not at all. Never.

Mr. Matthew J. Miller, the Southeast Regional Vice President for Waste Management testified before the Grand Jury that the lottery contribution by Waste Management was not a bribe and that there was no agreement made regarding it. In his Grand Jury testimony at page 12, he testified that he spoke to Siegelman, and after Siegelman explained that the lottery was to benefit education in Alabama, he agreed to make the contribution. He stated at page 12.

A.    And once I grasped - I had an identity with it - because in Georgia, we have a lottery system there that resulted in what they call the HOPE Scholarship; and that's all as a result of the lottery system there. So I - you know - I could identify from Georgia with what Alabama was going to do and - you know, certainly.

11

Q.   Okay.  So there was a conversation that went on.

A.   Yeah.

Q.   But at some point in time, did you agree that Waste Management would make a
     contribution?

A.   Yes.  (Exhibit 10)

Finally, Young's testimony was merely that he was present when Waste Management presented the check.  There was nothing unusual about the scenario and absolutely nothing illegal.

This contribution was not illegal and not attributable under a relevant conduct theory.

### (6) $411.495/G.H. CONSTRUCTION

There was uncontroverted testimony that the G. H. Construction project would have been good for the State.  That is exactly why Dr. Henry Mabry, Director of Finance for the State of Alabama, endorsed the project before sending it to the Governor.  The Governor, in reliance of Dr. Mabry's conservative approach to the expenditure of State money, also endorsed the project. It was Nick Bailey, working without the Finance Director or Siegelman's knowledge, and Lanny Young who caused the $411,495 loss to the taxpayers of this State.  The Government conceded in open court that constructing warehouses was a good idea that would have saved Alabama taxpayers money.

Governor Siegelman had no knowledge of this conduct.  Even Lanny Young testified that Paul Hamrick was not involved.

This amount is not remotely connected to improper or illegal actions on the part of Governor Siegelman.

Some of the "[factors relevant to foreseeability include whether the defendant benefitted from his co-conspirator's activities and whether he demonstrated a substantial level of commitment to the [conspiracy]." *United States v. Bad Wound*, 203 F.3d 1072, 1076 (8th Cir. 2000)

### (b) GUIDELINE CALCULATION IS WRONG BASED ON APPLICATION OF U.S.S.G. 2B1.1(B)(1)(J) AND RELEVANT CONDUCT THEORY.

#### (1) COUNTS OF CONVICTION CAN BE DIVIDED

The jury in this case rejected the Government's RICO public corruption theory as evidenced by its verdict. The Government's anticipated suggestion that the jury had to have accepted its theory in its entirety (as alleged in the indictment) in order to convict on the Scrushy counts is erroneous. Common sense and logic divides the bribery count from the counts of acquittal. See *Pimental,* supra.

#### (c) CONDUCT DOES NOT MEET ELEMENTS OF U.S.S.G. §1B1.3(a)(2)

The Seventh Circuit Court of Appeals in *United States v. Arroyo,* 406 F.3d 881 (2005) addressed U.S.S.G. §1B1.3(a)(2). The section by definition requires common victims, accomplices, purpose, and modus operandi. The Scrushy/RICO/Young, Hamrick, and Bailey allegations are separate under this definition. The *Arroyo* Court held "section 1B1.3(a)(2) must not be read to encompass any offense that is similar in kind to the offense of conviction but that does not bear the required relationship to that offense." Id at 719-20. In assessing whether there is a strong relationship between the uncharged conduct and the convicted offense, courts should consider whether the government has demonstrated a significant similarity, regularity, and temporal proximity. Id. At 719.

In a drug case the Seventh Circuit in *United States v. Johnson,* 324 F.3d 875 (2003) upheld the district court's determination that sufficient differences existed between defendant's state-law drug conviction and his federal charge of distributing crack cocaine to preclude the state offense conduct from being considered relevant to the federal offense. Id. At 879. In that case, the district court found that the two criminal enterprises lacked temporal proximity because more than one year elapsed between the offense. Id. Furthermore, the offenses differed in that the state law offense involved a conspiracy to distribute large quantities of powder cocaine while the federal offense charged defendant with acting alone to make an individual sale of crack cocaine.

13

Id.  At 879-80.  The Scrushy/RICO Young, Bailey, Hamrick conduct has sufficient differences, lacked temporal proximity, and involved totally different offense conduct.

It is obvious Siegelman did not benefit from the lavish lifestyle enjoyed by Young, Hamrick's BMW,  and Bailey's addiction to extortion or the money Bailey received.  He did not participate and the evidence supported the fact he was kept in the dark.  (See Exhibit 1)

### (d)  TWO SEPARATE HARMS

The Probation Officer as noted in paragraph 39, has calculated the guidelines on the basis that **"Each of the defendant's counts of conviction represent essentially one composite harm."**  (emphasis added)  Paragraphs 41 and 42 follow this reasoning.

Without waiving any of the aforestated arguments, the defendant submits that the convicted conduct does not represent "one composite harm."

Siegelman was convicted of the following:

(a) Count 3ss, Bribery and Aiding and Abetting (Scrushy)

(b) Count 5ss - Conspiracy to Commit Mail Fraud (Scrushy)

(c) (3) Count 6ss - Mail Fraud and Aiding and Abetting (Scrushy)

(d) Count 7ss - Mail Fraud and Aiding and Abetting (Scrushy)

(e) Count 8ss - Mail Fraud and Aiding and Abetting (Scrushy)

(f) Count 9ss - Mail Fraud and Aiding and Abetting (Scrushy)

(g) Count 17ss - Obstruction of Justice (Young, Hamrick, Bailey)[5]

It is crystal clear from the trial testimony that there was absolutely no connection between counts 3,5,6,7,8, 9 (Scrushy) and count 17 (Young, Hamrick, Bailey).

If the Government's theory is followed (arguendo) the conduct of Young, Hamrick, and

---

[5]Siegelman uses the names (Young, Hamrick, Bailey) as a category to simplify the argument.  It should not be construed in any manner that he concedes that the Young, Bailey, Hamrick conduct addressed in Paragraphs 32 and 42 of the Presentence Report should be attributable to him in any fashion.  In fact there was no testimony whatsoever that Hamrick was in anyway involved with the motorcycle sale.  Therefore, Hamrick's BMW money should not be included at all, either in the first harm or the second.

14

Bailey was illegal and foreseeable to Siegelman.  The RICO count, although rejected by the jury, outlined the Government's theory.  The indictment supports Siegelman's argument that the alleged Scrushy bribe was not part of the RICO allegations involving Young, Hamrick and Bailey. The Scrushy conduct was charged separately from the RICO counts charged in counts one and two of the second superseding indictment.

Plainly put, U.S.S.G. §1B1.3 Relevant Conduct (B) criminal plan, scheme, endeavor, or enterprises, by definition, excludes the alleged Scrushy bribery and mail fraud counts from the acquitted RICO (Young, Hamrick, Bailey) counts.  As such the two separate categories the defendant was convicted of represent two separate harms.

The Probation Officer, in calculating the guidelines, has presumed that Siegelman was involved in a criminal plan, scheme, endeavor, or enterprise with Young, Hamrick, and Bailey. (PSI - Paragraph 42) This is evidenced under the relevant conduct theory which resulted in the suggested  four level increase from the $500,000 amount attributed as a result of the Scrushy related convictions.  (1B1.1 +14 vs.  1B1.1 + 18)

**Without waiving all of the above arguments, the error of the Probation Officer results from the composite harm theory and the attachment of the relevant conduct to the Scrushy counts of conviction rather than the obstruction of justice count of conviction.**

Siegelman argues that the Scrushy allegations and the Young, Hamrick, and Bailey allegations represent two harms for guideline purposes.  Under this calculation the following would apply:

**(1)  SEPARATE HARMS/GROUPING/WITHOUT CROSS REFERENCE**

Counts 3,4,6,7,,8,9 Bribery, Mail Fraud (Scrushy)

**2C1.1 Offering, Giving, Soliciting or Receiving a Bribe; Extortion Under Color of Official Right.**

(a)  Base Level              10 (Scrushy)

(2)(A) (See 1B1.1)            +14

15

Base Level                    24

### Count 17 - Obstruction of Justice (Young, Hamrick, Bailey)

### §2J1.1 Obstruction of Justice

(a)  Base Level                12

(c)  Cross Reference[6]

(1) If the offense involved obstructing the investigation or prosecution of a criminal offense, apply 2X3.1 (Accessory After The Fact) in respect to that criminal offense, if the resulting offense level is greater than that determined above.

The cross reference to §2X3.1, Accessory After The Fact (a) states: "Base Offense Level: 6 levels lower than the offense level for the underlying offense, but in no event less than 4 or more than 30..."

Underlying offense is defined as the offense the defendant was convicted of being an accessory.  In this case defendant submits that the cross reference pursuant to §2J1.2(c) is inapplicable because the Scrushy counts of conviction do not fit the definition of the underlying offense found in 2X3.1, application notes(1).  Additionally, defendant submits that neither the facts nor the evidence support the Government's theory of an overall public corruption offense as the "underlying offense".  The jury rejected the Government's broad corruption theory.

In this case we have 2C1.1 and 2J1.2 conduct.  Given the Government's RICO theory (Young, Hamrick, Bailey) the underlying offense for 2X3.1 purposes would be the obstruction of justice conviction.  It is axiomatic that the "Accessory after the Fact" adjustment would not relate to the "underlying conviction" for obstruction of justice.  This cross reference contemplates the obstruction facilitating the other count of conviction.[7]  The facts of this case scream the opposite.

---

[6]The Probation Officer and the Government will likely argue that under this theory a cross reference should apply based on the underlying offense being overall public corruption. Defendant disagrees, however, he will provide a guideline calculation using a cross reference to U.S.S.G. §2C1.2.

[7]The defendant makes the argument that "underlying offense" for the purpose of this guideline calculation must be a count of conviction not relevant conduct.  (Sixth

There is no argument that can be made to suggest that the $9,200 motorcycle transaction is the offense the defendant is convicted of having materially supported after its commission. (See 2X3.1, Application Note 1)

Therefore, for purposes of this argument the obstruction guidelines would be calculated on the basis of §2J1.2 Obstruction of Justice (a) Base Offense Level: 12. This would call for guidelines of 10 to 16 months.

Given that the relevant conduct addressed by the Probation Officer would relate to the obstruction count, there is no correlating monetary amount to be factored into the guidelines. As such the monetary amounts in Paragraph 42 would not apply.

Based on the above defense sentencing theory U.S.S.G. §3D1.4, Determining the Combined Offense Level, must be consulted.

Further, there is no additional bribe as a result of the above argument.[8]

Under §3D1.4 the group with the highest offense level would be 2C1.1, level 24. The obstruction count would be a base level of 12. There is a 12 level difference in the groups. Pursuant to U.S.S.G. §3D1.4(a) one level would attach. Pursuant to §3D1.4(c) the 12 level difference is to be disregarded. One unit pursuant to §3D1.4(a) does not cause an increase in the offense level. As a result the base offense level remains at 24 for guideline purposes.

The guidelines would be calculated with a base level 24, Criminal History Score I, and guidelines of 51 to 63 months.

---

Amendment/*Blakely/Apprendi*)

[8]Even if the Court were to disagree with this argument regarding an alleged additional bribe, it is clear that none of the relevant conduct referenced in Paragraph 42 meets the definition of a bribe. At most the Young to Hamrick and Bailey payments would constitute gratuities pursuant to §2C1.2 Offering, Giving, Soliciting or Receiving a Gratuity. Congress has recognized the difference in a bribe and a gratuity as evidenced by the Sentencing Commissions' different treatment of the two under guideline sections 2C1.1 and 2C1.2. Further, the $500,000 fee to Young from Waste Management did not constitute a bribe or gratuity nor did the $3,000,000 amount from the sale of a landfill, or the alleged $1.0 million loss to the State. The Waste Management $50,000 donation to the AELF was not a bribe or gratuity. Neither was the G & H Construction payment from Bailey to Young.

### (2) SEPARATE HARMS/GROUPING/WITH CROSS REFERENCE

If defendant prevails on the two separate harms theory and the Government prevails on the underlying offense theory of public corruption a cross reference would apply.[9]  If so, the following would apply:

**Counts 2,3,4,6,7,8,9 (Bribery, Mail Fraud (Scrushy)**

**2C1.1 Offering, Giving, Soliciting or Receiving a Bribe, Extortion Under Color of Official Right.**

(a) Base Level        10   (Scrushy)

(2)(A) (See 1B1.1) +  14

                            24

**Count 17 – Obstruction of Justice (Young, Hamick, Bailey)**

2J1.1 Obstruction of Justice

(a) Base Level        12

(c) Cross Reference

Cross Reference on a Government corruption theory would take us to §2C1.2

**2C1.2 Offering, Giving, Soliciting, or Receiving a Gratuity**

(a) Base Level        7

(b) Specific Offense Characteristics

(1) If the offense involved more than one gratuity, increase by 2 levels.

(2) (If more than one applies, use the greater):

(A) If the value of the gratuity (1) exceeded $2,000 but did not exceed $5,000 increase by one level; or exceeded $5,000 increase by  the number of levels from the table in §2B1.1 (Theft, Property Destruction, and Fraud) corresponding to that amount.

2C1.2(a)        Base Level     7

---

[9]Defendant does not waive his objection that the underlying offense must be a count of conviction pursuant to his Sixth Amendment Right to a Jury Trial.

2C1.2(b)(1)                    +2

2C1.2(2)(A)[10]                +8   (more than $70,000) ($53,000 to Bailey, $19,000 to

                                    Bailey, $25,000 to Hamrick).

Total Base Level              17

Given that this is a cross reference to 2X3.1 a six level downward adjustment is made.

                              17

                              -6   2X3.12

Total Base Level              11

Based on the above defense sentencing theory U.S.S.G. §3D1.4, Determining the

Combined Offense Level, must be consulted.

Under §3D1.4 the group with the highest offense level would be 2C1.1, level 24. The

obstruction count would be a base level of 11. There is a 13 level difference in the groups.

Pursuant to U.S.S.G. §3D1.4(a) one level would attach. This would not increase the offense

level. Pursuant to §3D1.4(c) if a group is 9 or more levels less serious than the group with the

highest offense level no increase results and the guidelines are calculated on the base offense level

of 24, Criminal History Score I, and guidelines 51 to 63 months.

**Objection 7 - Paragraph 46 - Adjusted Offense Level - 30**

Defendant objects based on the arguments above.

**Objection 8 - Paragraph 47 - Adjustment for Acceptance**

---

[10]This figure does not include the total amount addressed by the Probation Officer in paragraph 42. The defendant takes the position that none of the (Young, Hamrick, Bailey) conduct should be counted. However, it is being used for this guideline calculation for purposes of this calculation. The $50,000 AELF contribution, $3,000,000 landfill sale, and the $500,000 Waste Management fee are not countable as gratuities under any theory. The evidence simply does not support use of the $411,495 as relevant conduct of Siegelman. If the $411,495 were added to the $25,000 (Hamrick), $19,000 (Bailey), and $53,000 (Bailey) the total would be $508,495. This amount would call for a 2C1.1(2)(A) enhancement of 14. When 14 is added to the 9 levels the base level would be 23 minus 6 would be 17. Based on the seven level difference in the two groups pursuant to 3D1.4, 1 ½ units would be added and the base level would increase by one, resulting in a base level of 25. Guidelines 57 to 71 months. A two level 3E1.1 adjustment would call for guidelines of 46 to 57 months.

Defendant objects based on the arguments above.

**Objection 9 - Paragraph 49 - Total Offense Level - 30**

Defendant objects based on the arguments above.

**Objection 10 - Paragraph 55**

Based on the argument and response contained in Objection 2 Siegelman seeks to correct this paragraph where a reference is made to "Mrs. Siegelman is a licensed Social Worker; however, she last worked in 2003." It should read "Mr. Siegelman's wife, Lori Allen."

**Objection 11 - Paragraph 73 - Total Offense Level 30 - Guidelines of 97 to 121**

Defendant objects based on the arguments above.

**Part E - FACTORS THAT MAY WARRANT DEPARTURE**

**Objection 12 - Paragraph 85**

Siegelman argues that there are numerous reasons a departure from the suggested guidelines is warranted. These include, but are not limited to the following:

**(1) UNIQUE COMBINATION OF FACTORS**

Under U.S.S.G. §5K2.01, Comment, the sentencing commission does not foreclose the possibility of an extraordinary case that, because of a combination of such characteristics or circumstances, differs significantly from the "heartland" cases covered by the guidelines in a way that is important to the statutory purposes of sentencing, even though none of the characteristics or circumstances individually distinguishes the case.

**(2) ACQUITTED CONDUCT**

In the instant case the Probation Officer has recommended that the sentence be increased based on a relevant conduct theory using acquitted conduct. This has caused a four level increase pursuant to §2B1.1 J-K of the sentencing guidelines. If the Court agrees and adopts the probation recommendation a departure from the suggested guidelines is warranted. The relevant conduct increase is causing an extraordinary increase in the sentence based on acquitted conduct. *United States v. Monk*, 15 F.3d 25 (2d Cir. 1994); *United States v. Concepcion*, 953 F.2d 369 (2d

Cir. 1992).

*Concepcion* held that "the district court retains discretion to downwardly depart where the sentence would be dramatically increased by reason of the unconvicted relevant conduct."

### (3) POLITICAL MOTIVATION FOR PROSECUTION/CONFLICT OF INTEREST

When considering a combination of factors supporting a departure in this case pursuant to U.S.S.G. §5K2.01 one need look no further that the political origins of this case that were advanced by former Siegelman counsel David Cromwell Johnson, now deceased. (Exhibit 11)

Johnson accused U. S. Attorney Leura Garrett Canary of advancing a political investigation for the benefit of her husband's clients and political allies. Siegelman realizes this argument was barred at trial but may now be considered under Title 18 U.S.C. §3661.

The issue for trial may well be whether the accused is guilty or not guilty *(United States v. McVeigh*, 153 F.3d 1166, 1192 (10th Cir. 1998). However, no such limitation exists for purposes of sentencing. "Following Congress' lead, the Sentencing Guidelines state that, "[I]n determining the relevant facts, sentencing judges are not restricted to information that would be admissible at trial." U.S.S.G. §6A1.3. United States v. Bras, 05-3190 (District of Columbia, April 20, 2007).

In its Motion in Limine to Bar Defendant's From Presenting Testimony, Evidence or Argument Concerning Alleged Political Motivation for the Prosecution, the Government acknowledged the political overtures in this case by referencing Siegelman's attempt to obtain information pursuant to the Freedom of Information Act.

The United States Attorney, in a press release, advised that she was removing herself from the case. (Exhibit 12) Yet, the case was still prosecuted by her subordinates. Siegelman, through other counsel, has diligently tried to obtain through the Freedom of Information Act evidence that further documents and supports his contentions. Despite his request well over a year ago the material which has been deemed disclosable by the Department of Justice has not been provided.

(Exhibit 13)

Siegelman plans to advance more on this argument at sentencing.

### (4) BUSINESS DESTRUCTION

The defendant is a licensed attorney. He has been a public servant for 30 years. His only ability to now earn income is as a licensed attorney. The Court should consider a downward departure from the guidelines on equitable grounds given that he will lose his license to practice law.

### (5) CHARITABLE WORKS

Effective November 1, 1994 U.S.S.G. §Ch. 5. Pt. H intro, comment, added language regarding civil, charitable, and public service to state that although these factors are not ordinarily relevant to the determination of whether a sentence should be outside the applicable guideline range, they **may be relevant to this determination in exceptional cases.** (emphasis added) In a sentencing memorandum Siegelman intends to further substantiate this claim. Evidence on this point will be presented at sentencing. (See Exhibit 14)

### (6) DEFENDANT IS VULNERABLE AND WILL HAVE DIFFICULTY IN PRISON

As noted in the Presentence report Don Siegelman has held public offices in the State of Alabama for over 20 years. Two of these positions, Attorney General and Governor, place him at great risk if incarcerated. As Attorney General the defendant was the number one prosecutor in the State and was involved in high profile criminal cases. As a result of his efforts countless individuals went to prison and/or were kept in prison. This fact is well known. Governor Siegelman implemented numerous tough on violent crime initiatives. These included, but were not limited to, more limitations on work release, more restrictions on violent offenders, and personal intervention in certain high profile cases before the Alabama Board of Pardons and Parole.

22

The climate in the prison system is anti-Don Siegelman.  Even though the above involved State of Alabama inmates there are numerous state inmates with federal detainers who have or will enter the federal prison system.

Defendant reserves the right to raise additional departure arguments in a sentencing memorandum and at sentencing.

### (7) AGE/LIFE SENTENCE

The defendant is presently 61years old.  Life insurance actuaries project his life expectancy to be between 72 and 75 years old.  If the Court imposes the prison term suggested by the guidelines it will be equivalent to a life sentence.

### (8) MONETARY AMOUNT OVERSTATES THE SERIOUSNESS OF THE CONDUCT

2B1.1 does not speak to the possibility that the monetary amount used for guideline purposes may overstate the seriousness of the offense conduct.

However, Application Note 10 to U.S.S.G. §2F1.1n6, does address the issue.

Monetary amount overstates seriousness of his conduct - no personal benefit.  The amount overstates the defendants culpability whether considered under the guidelines or in light of the 18 U.S.S.G. §3553(a) factors.  *United States v. Pimental*, 367 F.Supp.  2d143 (District of Massachusetts 2005).

### (9) BRIBERY AND MAIL FRAUD CONVICTIONS ATYPICAL

The defendants bribery conviction is atypical and outside the "heartland" of normal bribery cases.  There was no financial benefit to the defendant and Richard Scrushy did not deprive the citizens of the State of Alabama of anything.  He served on the CON Board and provided benefits to the citizens just like he had done for former Alabama Governors Guy Hunt, Jim Folsom, and Fob James.

The monetary amount used for guideline calculation purposes is excessive and the Court should consider departing because there is too little relationship between the defendant's role and

23

the conduct used to determine the monetary amount. *United States v. Stuart*, 22 F.3d 76 (3rd Cir. 1994).

Defendant faces the same sentence as if he had personally benefitted. A departure is appropriate under these circumstances. *United States v. Takai*, 941 F.2d 738 W.L. 16709 (9th Cir. 1993); and *United States v. Burns*, No. 90-30002 - FCD. Mass. 3/21/90).

### Paragraph E - VARIANCES THAT MAY BE CONSIDERED

### Paragraph 86

Once the District Court determines the advisory guideline range it must then consider whether a variance from the range is appropriate. In doing so the Court must determine what sentence comports with the sentencing factors of 18 U.S.C. §3553(a). Siegelman submits the following factors warrant a variance from the advisory guidelines to a sentence of probation. As pointed out in the Presentence Report, Paragraph 78, **the defendant is statutorily eligible for a sentence of probation pursuant to 18 U.S.S.C. §3561(a)**.

### 18 U.S.C. §3553(a) FACTORS

### (1) NATURE AND CIRCUMSTANCES OF THE OFFENSE AND THE HISTORY AND CHARACTERISTICS OF THE DEFENDANT.

The Government's effort to paint and prove a massive public corruption case failed. The jury, after close to two weeks of deliberation rejected the RICO counts and disregarded in total the testimony of Lanny Young and Nick Bailey. **The Hamrick acquittal represents what the jury thought of the Government's RICO case.** It is clear the jury knew of Richard Scrushy's Health South acquittal. The jury could not convict Scrushy without convicting Siegelman as the Scrushy counts on the $500,000 contribution mirrored Siegelman's. Siegelman received no personal benefit from the Scrushy donation and in fact used the Alabama Education Lottery Fund for the benefit of Alabama children. Therefore, the offense conduct is far less serious than the counts of conviction reflect.

24

The Government has made much out of the fact that the Scrushy contribution to the Alabama Education Lottery Foundation was disclosed late. **This Court should take judicial notice** of the fact that late and amended reports are common. An inquiry with the Alabama Secretary of State will reveal the same. After the election the AELF's purpose and focus changed. It was no longer election focused. Pursuant to the *Richey v. Tyson*, 120 F. Supp. 2d 1298 (So. Dist. AL (2000), and by extension., the Alabama Education Lottery Foundation, a 501(C)(4), nonprofit entity was actually under no obligation to report contributions at all. Bob Riley, the Governor of the State of Alabama, received contributions that have been traced to Mississippi Indian Gambling Casinos. An amended late return was filed.

It appears from a December 2002 email from Jack Abramoff to Mike Scanlon that they were working with someone who wanted Governor Riley to shut down the Alabama Porch Creek operation and describes their involvement in Alabama politics . After all it states, "if you had not done what you did in Alabama, [she] would have to spend millions over the next four years." The logical inference is that the unidentified "her" was using Abramoff and Scanlon to try to influence Riley [Governor?] to assist with stopping gambling in Alabama. The conclusion is for the benefit of Mississippi Gambling factions. (Exhibit 15) (This was part of Senator McCain's Report)"[11]

To be sure that the late filing regarding the Scrushy donation was not evidence of a crime was the testimony of Ed Packard, an employee of the Alabama Secretary of State, where he acknowledged that to hide the source of a contribution it could have eastily been broken down into several PACS making it less easily identified.

---

[11]Ralph Reed, Michael Scanlon and Jack Abramoff funneled 13 million dollars of Indian Casino money into Alabama from 1998-2002 to defeat Democratic Lt. Gov. Siegelman who was running on a pro eduction lottery platform against incumbent Republican Gov. Fob James. Siegelman wins. Reed losses then writes Abramoff, "We lost Fob in Alabama", see Senate Indian Affairs Committee Report 6/6/06. (The Senate Indian Affairs Committee report quotes William Worfel, vice chairman of the Coushatta Tribe of Louisiana, as saying that Abramoff told him that Mississippi Choctaw Chief Phillip Martin had spent $13 million in Alabama "to get governor of Alabama elected to keep gaming out of Alabama so it wouldn't hurt...his market in Mississippi.") (Data compiled from public records including the McCain Report)

Don Siegelman served our state as Secretary of State twice, Attorney General, Lt. Governor and Governor, for a period spanning nearly 30 years. The IRS, FBI, and state investigators subpoenaed all financial records of Don Siegelman, his wife, Lori Allen, and his two children, Dana and Joseph, for the period beginning December 1994 through February 2004, including all checks written, all deposits made, and all investments. If Governor Siegelman had been involved in bribery or peddling influence for his own personal benefit, surely, one of these agencies would have charged him with a crime. They did not. In fact, the only charge of bribery that has been made doesn't even allege that Governor Siegelman benefitted.

It is clear that Governor Siegelman did far more good for the State of Alabama, than any harm that the Government alleged. (See Exhibit 14)

**(2) NEED FOR SENTENCE TO BE IMPOSED**

A variance from the guidelines to a term of probation would still reflect (a) the seriousness of the offense - Governor Siegelman will still have a felony conviction, will lose his license to practice law, has ended a life time successful political career, he, his wife, and children suffered embarrassment and degradation, and financial hardship; (b) deterrence - these factors above are adequate for deterrence purposes; (c) protection of the public from further crimes. There is no possibility of recidivism; (d) needed educational, vocational, medical, or correctional treatment - none of these sentencing objectives are necessary in the instant case.

**(3) KINDS OF SENTENCES AVAILABLE - Probation** is available as are **Home Confinement and Community Corrections**.

**(4) THE NEED TO AVOID UNWARRANTED SENTENCE DISPARITIES AMONG DEFENDANTS WITH SIMILAR RECORDS WHO HAVE BEEN FOUND GUILTY OF SIMILAR CONDUCT.**

The kind of disparity with which §3553(a)(6) is concerned with is an unjustified difference across judges rather than among defendants to a single case. *United States v. Boscarino*, 437 F.3d 634, 638 (7th Cir. 2006). The Court can look at what variances were given co-defendants.

26

*United States v. Pyles*, 0604522, 4th Cir., April 11, 2007.

The 24 month sentence for Young[12], the 18 month sentence for Bailey, and the acquittal of Hamrick support a variance in this case. In the instant case a downward variance sentence would better serve the competing interests of §3553(a) than a guideline sentence would.

Additional in a sentencing memorandum and at sentencing the defendant plans to present evidence of nationwide disparity among similar situated offenders with similar offenses who received substantially less time than suggested by the guidelines contained within the Presentence Report.

### (5) NO BENEFIT TO THE DEFENDANT

Certain trial facts clearly support the defendant's position that he received no personal benefit from the Scrushy contribution of $500,000 to the AELF. Todd Beard an employee of First Commercial Bank where the loan was secured testified that the $730,000 loan was to the Alabama Education Foundation not a loan to Nabors or Siegelman. At that time Nabors had pledged $29 million in stock to First Commercial.

The Presentence Report finds that Siegelman "benefitted" from the AELF paying off its loan, for which he was "jointly and personally liable." (PSI, Page 8, Paragraph 21-22) Siegelman did not sign the note jointly with the AELF; he was not primarily liable; he was only a guarantor. Thus, his liability was not absolute, but contingent, a distinction with a hoary pedigree in Alabama law. See *Lawson v. Townes Oliver & Co.*, 2 Ala 373, 374 (Ala 1891).

Consequently, his liability would not have become absolute until and unless the primary obligator (AELF) defaulted, but it never did. Thus, Siegelman and Nabors did not "benefit" when the AELF paid off the loan. If Siegelman and Merv Nabors had benefitted from the payoff and they did not include the income on their tax returns, they would also have been charged with tax

---

[12]Young was charged with separate crimes in the Northern District of Alabama. He was an unindicted co-conspirator in the Middle District of Alabama case. Young's Northern District case was transferred to the Middle District pursuant to Rule 20. This enabled Young to avoid separate punishment for separate crimes. Further, it gave the Siegelman prosecutors great leverage in securing Young's testimony against Siegelman.

evasion. This is a clear indicator that neither Siegelman nor Merv Nabors "benefitted" from the discharge.

Even in doing a substance/form analysis, that is, while the form of the transaction was a loan to the AELF, the substance of the transaction was a loan to Siegelman and Nabors, the result is the same. The testimony was that the bank was not looking to Siegelman (he did not even file an asset report with the application for the loan), but to Nabors, who was a millionaire and a substantial depositor with the bank. See generally, *Selfe v. United States*, 778 F.2d 769, 772 (11th Cir. 1985) (look to the substance to determine the tax consequences of loan forgiveness); accord, *Dept. of Revenue v. Acker*, 663 So.2d 470, 473 (Ala. Ct. of App. 1994).

If the Foundation had defaulted and Merv Nabors refused to pay and if Siegelman had been asked to pay, Siegelman at that time had over $2 million dollars in his campaign account and could have simply written a check from the "Siegelman For Governor" account to pay the debt. Therefore, there was never any threat of personal liability.

Further, Application Note 10 to U.S.S.G. §2F1.1n6[13],   Monetary amount overstates seriousness of his conduct - no personal benefit.  The amount overstates the defendants culpability whether considered under the guidelines or in light of the 18 U.S.S.G. §3553(a) factors. *United States v. Pimental*, 367 F.Supp.  2d 143 (District of Massachusetts 2005).

## (7) GUIDELINE SENTENCE WILL CREATE EIGHTH AMENDMENT AND EQUAL PROTECTION VIOLATION

Siegelman argues that the suggested guideline sentence and anything short of probation will violate his Eighth Amendment protection against cruel and unusual punishment.  In the sentencing memorandum and at sentencing Siegelman plans to argue that other similarly situated individuals with similar charges received substantially less punishment.  Further the counts of conviction given the uncontroverted facts do not warrant such a draconian sentence.

---

[13]Defendant concedes this language is not contained in 2B1.1 which was used in this case. However, he argues that consideration of the 2F1.1 language would be appropriate in this case.

Additionally, other Governors, including Bob Riley, have received campaign contributions from individuals they have subsequently placed on the CON Board. This was done in the case of Dr. Swaid Swaid who was appointed chairman by Bob Riley after having contributed to the Riley campaign.

## CONCLUSION

Based on all of the above arguments the guidelines would be calculated using a base level of 24. A 2 level 3E1.1 downward adjustment would result in a base level of 22. Based on a Criminal History Score of I, the suggested guidelines would be 41 to 51 months. However, defendant seeks a departure from the guidelines and a variance to probation.

Respectfully submitted this 29th day of May 2007.

Susan G. James (JAM012)

Address of Counsel:
Law Office of
Susan G. James & Associates
600 S. McDonough St.
Montgomery, AL 36104
(334) 269-3330

## CERTIFICATE OF SERVICE

I hereby certify that a true and complete copy of the foregoing was served by first class mail on Louis Franklin, Assistant United States Attorney, P. O. Box 197, Montgomery, Alabama 36101, 36104 this 29th day of May 2007.

of Counsel

29