# EXHIBIT 1

# KILBORN
# ROEBUCK &
# McDONALD
### ATTORNEYS AT LAW

| VINCENT F. KILBORN, III | M. LLOYD ROEBUCK | DAVID A. MCDONALD | W. PERRY HALL |

Writer's Direct:
Post Office Box 832
Mobile, Alabama 36601
(251) 434-0045 (office)
(251) 434-0047 (fax)

February 19, 2007

**VIA FACSIMILE: (334) 954-3230**

Honorable Jacquelyn P. Caple
Senior U.S. Probation Officer
Frank M. Johnson Federal Courthouse
One Church Street
Montgomery, Alabama 36104

     RE:   *Don Siegelman*

Dear Jackie:

     It was a pleasure meeting with you last week. Thank you for giving me the opportunity to be heard regarding this very important issue. I am very concerned that the Government will try to enhance Governor Siegelman's sentence based on the numerous and frivolous claims on which Governor Siegelman was acquitted.

     I spoke with the trial court reporter, and an official transcript will not be completed for several months. However, I do have transcripts for the Government's primary witnesses, Nick Bailey and Lanny Young, and I will refer to portions of the transcripts in this letter. The rest will be from my memory, but I have a fairly clear recollection of what transpired at trial.

     With one exception, the jury convicted Governor Siegelman only on the counts related to Scrushy's appointment to the CON Board. I believe we will

Ms. Caple
February 19, 2007
Page -2-

receive a new trial on these counts because the Government did not prove (and the Court did not require the jury to find) that there was an explicit *quid pro quo* of Scrushy giving $500,000 to the Alabama Education Foundation *in exchange for* an appointment to the CON Board. The law regarding campaign contributions is very clear that a *quid pro quo* is required.

This case will also be overturned on appeal because evidence surfaced after the trial indicating that the verdict was orchestrated by two jurors who misled the Defendants during jury selection, repeatedly violated the Court's orders against pre-deliberations, brought outside information into jury deliberations, and otherwise manipulated the other ten jurors into a guilty verdict. For these reasons, I hope that you will support our application for bail pending appeal.

The Government alleged that Governor Siegleman and his Chief of Staff, Paul Hamrick, engaged in a massive RICO conspiracy involving hundreds of millions of dollars in State funds. The Government tried to portray Governor Siegelman (who has held public offices for 20 years and has been elected to more constitutional offices than any other person in Alabama's history) as a greedy, scheming, manipulative politician whose sole ambition was to profit from the citizens of Alabama. However, **during the entire six weeks of trial, the Government failed to prove a single instance in which Governor Siegelman personally profited from his political office.**

The Government's key witnesses, Bailey and Young, had previously admitted to engaging in numerous bribery schemes, were facing decades in prison, and had been allowed to plead guilty to fairly minor infractions in exchange for their testimony. The jury rejected Bailey and Young's testimony for good reason: neither provided testimony that made any sense other than to underscore their own obvious greed and self-serving acts. Bailey and Young were forced to admit that they both profited enormously from their illegal relationship: Young bribed Bailey, and Bailey used his political influence to steer state contracts to Young. However, neither Young, Bailey, nor the Government ever demonstrated how Governor Siegelman profited from this relationship or any other illegal acts that Governor Siegelman was accused of committing.

Ms. Caple
February 19, 2007
Page -3-

---

### Nick Bailey

Bailey's father was the Chairman of the Cullman County Democratic Party for quite some time. In late 1993 (when Siegelman was running for Lt. Governor), Bailey was 25 years old, a recent graduate from the University of Alabama, and a bank loan officer making $25,000 a year. Bailey wanted to get involved in politics so his father introduced him to Siegelman. Bailey offered to work on Siegelman's campaign for Lt. Governor as an unpaid volunteer.

Bailey served as a gopher during this campaign: he chauffeured Siegelman to speeches, made arrangements for hotel rooms, ordered lunch, and otherwise assisted in coordinating the minutia of the campaign. After Siegelman became Lt. Governor, he hired Bailey as an assistant. Bailey was extremely bright and energetic, and the longer he served as Siegelman's assistant, the more responsibilities he acquired. Bailey was a young man with unlimited potential whom the Governor liked, trusted, and hoped to groom for a future in politics. But, Bailey never served as Siegelman's Chief Advisor, Chief of Staff, or right-hand man.

Bailey had a dark side that he did not disclose to the Governor. By 1993, **when he was just 25 years old, Bailey had already gotten himself $55,000 in debt because of failed investments in cattle futures.** Without his parents' knowledge or permission, Bailey mortgaged his parents' home to cover his losses. Siegelman had no idea that the young man he had taken under his wing was so deeply in debt he couldn't even afford to make interest payments on the loans he had taken out to cover his investment debts. After Bailey became Siegelman's assistant, his addiction to gambling with high risk investments made him vulnerable to unscrupulous people (like Young) who capitalized on his close proximity to Siegelman. For example, **Bailey took over $100,000 in bribes from Young. He took more than $250,000 in bribes in the six short years that he served as Siegelman's assistant. Bailey admitted that Siegelman didn't know any of this was going on.** I believe Bailey took even more bribes than he admitted to, but I had to quit asking him questions about bribes because I wore the jury out.

Ms. Caple
February 19, 2007
Page -4-

_____

None of Bailey's bribes benefitted Siegelman:

Q:    And not one red cent of that over **$100,000** that Lanny Young
      gave to you went in Governor Siegelman's pocket?

A:    That's correct.

                              * * *

Q:    Not one red cent of that **$50,000** you took from Anthony Fant
      ever went in Governor Siegelman's pocket?

A:    That's correct.

                              * * *

Q:    Governor Siegelman didn't get one red cent of that **$21,000**
      you took from Curtis Kirsch?

A:    That's correct.

                              * * *

Q:    He [Governor Siegelman] didn't benefit one bit from **$17,000**
      worth of work from all these workmen [in kind bribes from
      Curtis Kirsch] working on your house?

A:    That's correct.

                              * * *

Ms. Caple
February 19, 2007
Page -5-

Q:    One more. And I hope I don't lose the jury. Jim Lane,
      **$30,000.** While you were taking money as an employee from
      the citizens of Alabama to do your job, you never told
      Governor Siegelman that you took $30,000 from Jim Lane?

A:    That's correct.

Q:    And Governor Siegelman didn't get one red cent of that
      $30,000?

A:    That's correct.

Q:    **$20,000** [a second bribe that Bailey called a "loan" but had no
      evidence he had ever repaid] from Jim Lane. You never told
      Governor Siegelman you were getting 30 - $20,000 from Jim
      Lane?

A:    That's correct.

Q:    And Governor Siegelman didn't get one cent of that $20,000?

A:    That's correct.

[05/03/06 transcript (Nick Bailey), pp 70-73] [Emphasis added]

**The Government's claim that Siegelman used his political offices to line
his own pockets never got any traction because even Bailey, the Government's
star witness, couldn't cite a single incident in which Siegelman accepted a
bribe.** Bailey talked about Young's alleged campaign contributions and the
motorcycle and four-wheeler that I'll discuss below, but if Siegelman were the
crook that the Government claimed he was, and his *assistant* received about
$288,000 in bribes, one would expect that Siegelman also received a considerable
sum. The Government made no such showing because Governor Siegelman never
took a bribe.

Ms. Caple
February 19, 2007
Page -6-

---

## Lanny Young

The Government tried to compensate for the gaping hole in its case by assuring the jury (during opening statements) that it would prove Young gave "hundreds of thousands of dollars" to Governor Siegelman's political campaigns in exchange for favors:

> Now, with regard to Mr. Siegelman, he also got both campaign cash, hundreds of thousands of dollars the evidence will establish, he also got personal things when he wanted.

[Feaga Opening Statement, pp 40-42]

The prosecutors never came close to making such a showing. At some point, the prosecutors realized that they couldn't support the Indictment or their claims in opening statements that Young gave cash bribes to Governor Siegelman. So, they regrouped and claimed that Young provided "in kind" contributions in the form of hats and t-shirts that totaled hundreds of thousands of dollars.

The prosecutors couldn't support this allegation either. We joked that Siegelman could have given every voter in Alabama a hat and t-shirt (or two) if Young had really donated hundreds of thousands of dollars worth of clothes to Siegelman's campaign. **This would have been the largest contribution of its kind in the history of Alabama politics—no campaign has ever spent hundreds of thousands of dollars on t-shirts and hats.** It never happened.

During cross-examination, my partner, Vince Kilborn, proved that whether categorized as cash or "in kind" contributions, Young wasn't capable of contributing "hundreds of thousands of dollars" to Siegelman's campaign for Lt. Governor because during this same period, Young filed two bankruptcies. In 1994 (the critical period in which the massive RICO conspiracy was alleged to have been formed between Young, Bailey, and Siegelman), **Young's bankruptcy files revealed that his total income after expenses and taxes was $15,000.** [05/18/06 transcript (Lanny Young), pp 158-165]

Ms. Caple
February 19, 2007
Page -7-

_____

The longer my partner cross-examined Young, the clearer the picture became: **Young is a blowhard/con artist who has made and lost fortunes based upon gross exaggerations regarding his personal wealth, his past accomplishments, and his relationship with persons in authority.**

As despicable as Young is, his testimony is almost understandable given the ammunition the Government used against him. Young admitted to bribing two probate judges, county commissioners, Bailey, and others holding political office. After he pled guilty to bribery charges and agreed to cooperate in an ongoing investigation, the Government found Young had lied to them and covered up several bribery schemes. He was indicted a second time.

Also, Young was arrested for DUI–a violation of his probation which ordered he not consume any alcohol (given his history of alcohol abuse and DUI arrests, it was critical that Young abide by the terms of his probation). If Young didn't come up with a bigger fish quick, he was looking at decades, if not life, in prison. In exchange for testifying against Siegelman, Young was offered a sweetheart deal of pleading guilty to one count. [05/18/06 transcript (Lanny Young), pp 137-139] He was recently sentenced to two years in prison.

About the only thing that Young testified to truthfully is that he bought coffee mugs for the Governor to hand out as gifts to guests visiting the Governor's Mansion during the Christmas holidays. Ironically, Young did the same thing for Attorney General Bill Pryor, but there was no similar investigation or prosecution of Pryor for this.

### The RICO Conspiracy

There was a conspiracy during the Siegelman administration to exchange political favors for money, but this scheme was between Young and Bailey. **It did not involve Siegelman.** Both Young and Bailey were programed to testify that beginning in 1994, Young, Bailey, Hamrick, and Siegelman had an "absolute" or a

Ms. Caple
February 19, 2007
Page -8-

_____

"very absolute" agreement to help each other out. I call this the "Three Musketeers" agreement: one for all and all for one. But, beyond being certain that such an agreement existed, Bailey and Young were very sketchy on specifics. For example, I wanted to know whether this agreement, whatever they called it, involved Siegelman agreeing to do anything *illegal*. Bailey admitted that it did not:

> Q:    Did you, Nick Bailey, in 1994, during all this period you and I have been talking about, ever reach an agreement with this man [Governor Siegelman], whom you say you still love and respect, that **if he got elected to office, that he and you would in any way use that office in an illegal manner, illegal as you understand the term to be**?
>
> A:    **No.**

[05/03/06 transcript (Nick Bailey), pp 95-96] [Emphasis added]

### Summary of Charges Against Siegelman

The Government claimed that Governor Siegelman engaged in various crimes by:

a)    accepting $500,000 for the Alabama Education Foundation (AEF) that promoted a lottery as a way to fund the education system in Alabama that was (and is) in desperate need of money. In addition to providing critical funds to elementary and secondary education, the Education Lottery would have provided high school graduates with the opportunity to attend state college for free;

b)    influencing a change in the categorization of certain hazardous waste being disposed of at the Emelle Landfill;

Ms. Caple
February 19, 2007
Page -9-

———————————

c)    influencing legislation that would allow the sale of alcoholic
        beverages on Sunday at Talladega;

d)    accepting bribes from Young in the form of a four-wheeler and part
        of a motorcycle;

e)    obstructing justice regarding the Government's investigation of the
        motorcycle;

f)    influencing the Cherokee County Commission to favor Young's
        business interests;

g)    influencing the award of a state contract to Young (GH Construction)
        to build warehouses for state agencies;

h)    accepting $40,000 from Jimmy Allen in exchange for Allen's right to
        appoint the next director of the Alabama Department of
        Transportation (ALDOT);

i)    threatening Forrest "Mac" Marcato that if he didn't contribute
        $250,000 to Siegelman's campaign, Siegelman would cause
        economic harm to Marcato's business interests (Rainline);

j)    influencing ALDOT to purchase Rainline; and

k)    influencing ALDOT (through co-defendant, Mack Roberts) to
        facilitate Allen's business interests (Mitt-Lary Road).

### a)    Scrushy's $500,000 Contribution

The Government contends that Scrushy paid $500,000 to the AEF in
exchange for being appointed to the CON Board.  As we discussed in your office,
the Government didn't call a single person who witnessed Siegelman and Scrushy

Ms. Caple
February 19, 2007
Page -10-

_____

discussing any such thing. In fact, Elmer Harris, former CEO of Alabama Power, testified that Scrushy sought his advice because Siegelman was pressuring Scrushy to serve on the CON Board, and Scrushy did not want to serve. Instead, Scrushy wanted Siegelman to appoint Thomas Carmen, a HealthSouth employee. Siegelman insisted that either Scrushy would serve on the Board or no one from HealthSouth would serve.

  The highwater mark of the Government's case against Governor Siegelman was Bailey's testimony:

> Q: Okay. Now, when the Governor showed you the check, what, if anything, did he say to you?
>
> A: He made a comment referring to Mr. Scrushy's commitment to give 500,000 and he's halfway there.
>
> Q: Okay. And what, if anything, did you say to him?
>
> A: I said – I responded by saying, **what in the world is [he] going to want for that**; and his response was the CON Board or the C-O-N Board.

[05/02/06 transcript (Nick Bailey), p 137] [Emphasis added]

  Even if accurate, Bailey's recollection of this conversation with Governor Siegelman is not evidence that Siegelman committed any crime in appointing Scrushy to the CON Board. It is not a crime to accept money from a contributor even if the politician knows the contributor wants something specific. In fact, it would be quite naive for any politician to believe that *any* contribution is made with no self-interest involved. The U.S. Supreme Court, itself, has widely recognized that it would be naive to assume there is no self-interest associated with contributions. This is exactly why the Courts have required there to be an

Ms. Caple
February 19, 2007
Page -11-

_____

explicit *quid pro quo* that contributions are made in exchange for ***specific official acts*** so that we don't criminalize the entire political process by which we have been governed since our Nation's founding. **It is only a crime for a politician to accept money *in exchange for* a specific act. Bailey's testimony did not meet this standard, and this will be one of many issues on appeal.**

This point is critical because, **through Bailey's eyes (and following the Government's argument in this case to its logical conclusion), every political contribution is a bribe.** For example, when I asked Bailey how many of the nine CON Board members "bribed" their way onto the Board, he said "probably all of them" because they all contributed to Governor Siegelman's campaign. [05/03/06 transcript (Nick Bailey), pp 190-193] This is why appeal of this case is so important to anyone interested in running for public office.

Bailey also testified that Governor Siegelman did not, personally, in any way benefit from what the Government calls a bribe:

Q:    Would you mind reading that [the Indictment regarding the $500,000] to me, Mr. Bailey?

A:    Richard M. Scrushy would and did pay $500,000 to Don Siegelman in two disguised and concealed payments of 250,000.

Q:    Mr. Bailey, do you have any evidence that any check that Richard Scrushy ever wrote ever put a penny in this man's pocket?

A:    These campaign checks were written to the Alabama Campaign Lottery, not for Don Siegelman.

Q:    Correct. **Don Siegelman personally didn't benefit one red cent from $500,000 paid by Richard Scrushy, did he?**

Ms. Caple
February 19, 2007
Page -12-

---

A:    **Not that I'm aware of.**

[05/03/06 transcript (Nick Bailey), p 183] [Emphasis added]

The Government argued that Governor Siegelman personally benefitted from the $500,000 contribution to the AEF because Siegelman *later* agreed to be personally liable for the AEF's debt. The Government's argument wasn't logical because Governor Siegelman did not agree to be personally liable for the AEF's debt until almost a year *after* Scrushy committed to raising the $500,000. More importantly, Siegelman had no legal obligation to personally retire the AEF's debt. He personally took on the AEF's debt after the lottery measure failed at the polls to demonstrate to everyone his complete commitment to funding education in Alabama.

I suspect the jury did not like the manner in which Scrushy went about raising the $500,000 he had committed to the AEF. Rather than having HealthSouth pay the entire $500,000, Scrushy, through HealthSouth's investment bankers, pressured a firm that had made millions of dollars off of HealthSouth to contribute $250,000. The Government lingered for days over the manner in which Scrushy bullied those with whom he did business. They paraded several businessmen into the courtroom to whine about Scrushy's audacity in demanding a $250,000 contribution to the AEF and the vulgarity with which he made such a demand.

While this didn't place Scrushy in the most endearing light, it wasn't a crime for him to lean on people who had made millions of dollars off HealthSouth to fund education for Alabama children. More importantly, **there is no evidence that Siegelman was in any way involved in or aware of the manner in which Scrushy raised the $500,000.** Nor was there any evidence or testimony that Siegelman was involved in or aware of Scrushy's practices after he was appointed to the CON Board.

Ms. Caple
February 19, 2007
Page -13-

---

The Government called several HealthSouth employees to testify about their "understanding" as to why Scrushy contributed $500,000 to the Alabama Education Foundation and to discuss Scrushy's questionable conduct after he was appointed to the Board. However, none of these witnesses were present at the meeting between Scrushy and Siegelman, none knew Governor Siegelman's mental operations as to why he appointed Scrushy to the CON Board, and none claimed that Siegelman had any idea as to how Scrushy conducted himself after he was appointed to the Board.

I believe Governor Siegelman should be given credit for acceptance of responsibility on these Counts. Governor Siegelman has never denied that Scrushy agreed to raise $500,000 for the Alabama Education Foundation; that this contribution was not timely reported; that he appointed Scrushy to the CON Board; or that some of Scrushy's conduct after being appointed to the Board was questionable. **The only significant factual dispute is that Governor Siegelman denies appointing Scrushy to the CON Board *in exchange for* Scrushy's $500,000 contribution.**

### b) Emelle Landfill

This was one of the more difficult allegations to follow. Hazardous waste dumped at the Emelle Landfill is taxed based upon its hazardous waste classification. Waste Management had, for years, a running dispute with the Alabama Department of Revenue over the classification of certain hazardous waste dumped at Emelle. It literally came down to *when* the waste got classified for tax purposes because Waste Management would drive its trucks through the gates at Emelle, "clean" or treat the waste materials once inside the gates, and then dump it. The Department of Revenue was taxing the hazardous waste based on its classification when it was outside the gate; Waste Management contended that it should be taxed based on the waste's classification *after* it was treated and before it was actually dumped in the landfill. The dispute involved millions of dollars.

Ms. Caple
February 19, 2007
Page -14-

_____

Waste Management was on good grounds. Either Mississippi or Georgia or both calculated taxes on hazardous waste the way Waste Management argued it should be calculated. Waste Management threatened to stop using the Emelle Landfill altogether and dump its hazardous waste in either Georgia or Mississippi. Although this dispute between Waste Management and the Department of Revenue had been ongoing for a number of years, it came to a head during Governor Siegelman's administration because the handling and dumping of hazardous waste was no longer the cash cow for the Landfill or the State that it had been in previous years.

Waste Management hired Lanny Young as its lobbyist to get the tax changed once and for all. Young testified that he relied on Bailey to pressure the Department of Revenue to make the change. The Government called the Department of Revenue employee, Wade Hope, who testified he disagreed with the change in classification. Regardless, the decision was a discretionary one made by the Commissioner of Revenue, Jim Hayes.

Even by the Government's theory, Governor Siegelman was, at best, tangentially involved in the decision. Bailey called Hayes and asked him to meet with Young. Bailey's testimony regarding Governor Siegelman's involvement in the Emelle Landfill issue hardly describes a crime:

Q:    Now, did there ever come an occasion when you were in the offices of the State of Alabama when you had an occasion to talk with the Governor about the revenue ruling that Lanny was looking for?

A:    **The governor approached Jim Hayes and I at a senior staff cabinet meeting one morning and asked what we were discussing, and I told him it was Lanny's request for Waste Management. And I was discussing it with Jim Hayes. And he reiterated to help him if I can.**

Ms. Caple
February 19, 2007
Page -15-

_____

Q:    Okay.  **Who reiterated to help him if you can?**

A:    **The governor said that to me and Jim Hayes.**

Q:    And did you do that?

A:    I did.

Q:    And did Lanny get his revenue ruling?

A:    He did.

[05/02/06 transcript (Nick Bailey), p 55] [Emphasis added]

We were prepared to call Jim Hayes as a defense witness, but we didn't need to because the Government didn't put on any evidence that really implicated Governor Siegelman. Hayes would have testified that Bailey asked him to meet with Young and that Bailey's request was unnecessary because he would have met with Young *without* Bailey's intervention. Hayes prided himself on being accessible to all taxpayers. After he met with Young and discussed Waste Management's complaint, Hayes sent Wade Hope to the Emelle facility to investigate the claim, and, after consulting with Hope and the Department's in-house counsel, Hayes concluded that Waste Management was right and granted them the reclassification.

Hayes recalls discussing the Waste Management issue with Bailey following a cabinet meeting, that Governor Siegelman asked them what they were talking about, and that after Bailey explained the situation to the Governor, the Governor said something to the effect of "help them if you can." Hayes didn't take the Governor's statement at anything more than face value, and he didn't do anything for Waste Management that he wouldn't have done without the Governor's comment.

Ms. Caple
February 19, 2007
Page -16-

c)  **Talladega**

While Lt. Governor, Siegelman, as part of his duties, assigned to a Committee a bill that would allow Talladega to sell beer on Sundays.  This bill was critical to Talladega's continued growth because other racetracks across the country allowed alcohol sales on Sunday.  **The bill had overwhelming support in the legislature, and Siegelman did not even vote on this bill.  He merely assigned it to the Committee that ultimately voted to send the bill to the full House of Representatives for a vote.**  Even Young couldn't explain what the crime was:

> Q:  Well, what – what **did Governor Siegelman do illegal to get this thing** [the Talladega bill] **passed**?
>
> A:  **I asked Governor Siegelman.**  I spoke with Paul, and I spoke with Nick.  And **I asked him to set up a meeting to find out a way to get this done.**

[05/18/06 transcript (Lanny Young), p 241] [Emphasis added]

The Government brought these charges solely because Young was claiming credit for getting this legislation passed.  I think even some members of the prosecution team were embarrassed for bringing this Count.

d)  **Four-Wheeler and Motorcycle**

Young delivered a four-wheeler to the Governor's Mansion.  Bailey, not Siegelman, asked Young to buy the four-wheeler for Siegelman's son to ride. Siegelman never asked Young to buy him a four-wheeler, did not know that Young had titled the four-wheeler in his name, and wouldn't have accepted the four-wheeler had he known that Young intended it to be a personal gift to him. Through the Government's own witnesses, we proved that Siegelman had the four-wheeler added to the Mansion's inventory along with other gifts he received as Governor (such as cars from Mercedes).

Ms. Caple
February 19, 2007
Page -17-

_____

The Government tried to criticize Siegelman for not adding the four-wheeler to the inventory *sooner*, but they didn't and couldn't show that the practice by the Siegelman administration of adding items to the inventory at the end of the term was any different than the established practice of every preceding administration. It is not a crime for Alabama citizens or companies doing business in Alabama to give gifts for the Governor to use while he is Governor. There are hundreds of examples of paintings, treadmills, televisions, and other items given as gifts over the years to sitting governors that have been placed on the Mansion's inventory. If this were a crime, every governor in Alabama's history would be in prison.

The Government also claimed that Young bribed Governor Siegelman with money laundered through Bailey that (depending on the day of the trial and which prosecuting attorney was talking) Governor Siegelman either used to pay his taxes or to purchase a motorcycle. Both allegations are false  While visiting Japan to promote Alabama as a site for additional car manufacturing plants, Honda invited Governor Siegelman to a function that showcased their newest motorcycles. Governor Siegelman loves motorcycles.

**When Honda executives saw Governor Siegelman admiring a particular model, they offered to give him the motorcycle. Governor Siegelman declined.** Governor Siegelman told the Honda executives that he would prefer to buy his own motorcycle. When he returned to the United States, Siegelman decided (without consulting with his wife) that he would buy the motorcycle. **Siegelman bought the motorcycle using his own money. We introduced Governor Siegelman's check into evidence.**

Before he told his wife about the motorcycle, Governor Siegelman and his wife had an argument over several personal expenses that Lori had incurred as a direct result of the election campaign, the inaugural ball, and the move to the Governor's Mansion. The next day, Siegelman lamented to Bailey that when his wife finds out that he bought a motorcycle, she was going to be very upset.

Ms. Caple
February 19, 2007
Page -18-

_____

**The issue wasn't that the Siegelman's couldn't afford a motorcycle—we placed into evidence Governor Siegelman's financial records that showed he had over $1 million in the bank.** The issue was that Lori, who, like her husband, did not live lavishly, continued to incur personal expenses that she never would have had to incur if Siegelman had not run for Governor. Lori was growing frustrated with what she considered to be unnecessary expenses. And, Governor Siegelman did not want to confess to his wife that he had bought a motorcycle right on the heels of this argument. Bailey suggested that Governor Siegelman sell the motorcycle to him, but Siegelman didn't want to sell the motorcycle to Bailey.

So, Bailey suggested that he and Siegelman agree for Bailey to buy a half ownership in the motorcycle for $9,200, and for Bailey to buy the remaining half in the future for about $3,000.[1] The idea was that if Governor Siegelman announced he had only a partial ownership in the motorcycle, and, at the same time, had Bailey pay the $9,200 directly to Lori, it would calm her down. It worked.

Governor Siegelman and Bailey had Gina Friday, one of the Governor's secretaries, prepare a written Bill of Sale contemporaneous with this transaction which specifically sets out Bailey's purchase of 50% interest in the motorcycle for $9,200. We introduced this Bill of Sale into evidence. [Siegelman Exhibit 46] There was absolutely no effort to hide this transaction. It was a perfectly legitimate deal that the Government tried to manipulate into some complex money laundering scheme.

### e) Obstruction of Justice Regarding the Motorcycle

The jury convicted Governor Siegelman for obstructing justice because he later sold the remaining 50% of the motorcycle to Bailey. While I expect to overturn this conviction on appeal, I am puzzled by the jury's decision. I can only

_____

[1]The motorcycle was probably worth $15,000 or more, but Governor Siegelman paid $12,173.35 because Honda gave him the same discount that they give to employees.

Ms. Caple
February 19, 2007
Page -19-

_____

attribute it to the conduct of the two jurors discussed above and the fact that in his final closing, Mr. Franklin asked the jury to ask themselves if they had ever used two lawyers to buy a car or motorcycle. Franklin further stated something to the effect that anyone who needs two lawyers to sell a vehicle must be guilty of something.

Of course, this wasn't at all fair. When Governor Siegelman completed the sale of the remaining 50% of the motorcycle to Bailey, it was clear that Bailey was under investigation. Siegelman did not then know the full extent of Bailey's misconduct, but there was enough evidence at the time that Governor Siegelman wanted any further transactions with Bailey to be handled carefully so as to protect himself as well as Bailey. So, Governor Siegelman made sure that he and Bailey each had attorneys present to ensure that the purpose and form of this transaction was clear and supervised by competent counsel.

Regardless, this claim should be reversed on appeal because to be guilty on this Count as charged in the Indictment, Governor Siegelman needed to have misled either Bailey or Bailey's counsel. Governor Siegelman didn't mislead either one. Instead, he completed the legitimate transaction that had been contemplated by Bailey and Siegelman when they first arranged for Bailey to buy an interest in the motorcycle.

#### f) Influencing Cherokee County Commission

Young brought tragedy on just about everyone who knew him. One of the two judges he bribed went to prison; the other "fell" off a cliff under mysterious circumstances a few days after talking to the FBI. [05/18/06 transcript (Lanny Young), pp 180-182] During plea negotiations, Young made outlandish allegations (see my discussion of Talladega above) about his influence over Governor Siegelman and/or Governor Siegelman's participation in Young's business endeavors.

Ms. Caple
February 19, 2007
Page -20-

_____

Young's exaggerations became evident on cross-examination when my partner pressed him for specifics. For example, Young claimed that then Lt. Governor Siegelman used his power and influence to make sure the Cherokee County Commission voted in favor of a landfill that Young was trying to get approved. This claim didn't make sense because Young admitted to bribing the Cherokee County Probate Judge, Phillip Jordan,[2] who sat as Chairman of the County Commission. Young already had the Cherokee County Commission "in the bag" without Siegelman's help.

Young claims that Siegelman, at his request, influenced the Cherokee County vote, but **he doesn't know who Siegelman called, what was said, or when the call was supposed to have been made. In fact, Young isn't sure that Siegelman made a single telephone call before the vote:**

> Q:     And Governor Don Siegelman, then Lieutenant Governor Don Siegelman, didn't have anything to do with influencing Cherokee County Commission on that vote, did he?
>
> A:     He had made some calls up there on my behalf.
>
> Q:     **In April?**
>
> A:     **I don't know what – at what time exactly.**
>
> * * *
>
> Q:     All right. Well, are you going to tell me he made some calls to influence this vote?

_____

[2]Jordan pled guilty to accepting bribes from Young and is currently serving a prison sentence. Jordan testified at this trial, but the only thing I recall him saying was that during a telephone conversation he had with Siegelman about other matters, he briefly discussed the Cherokee County Landfill with Siegelman. Jordan didn't support the Government's claim that Siegelman did anything illegal to influence his vote.

Ms. Caple
February 19, 2007
Page -21-

_____

A:    I'm going to tell you that Governor Siegelman called the Cherokee County commission.

Q:    **Did he call to influence this vote?**

A:    **He called up there at my request.**

Q:    This vote, April 13?

A:    **I don't know the exact dates he called.**

Q:    Well, do you know – **are you testifying to this jury that he called and influenced this vote?**

A:    **I don't know if this is this vote or the one in –**

\* \* \*

A:    **I don't know what dates** that Governor – or Lieutenant Governor Siegelman spoke to members either in person or on the telephone. **I can't speak for him or for these commissioners.**

[05/18/06 transcript (Lanny Young), pp 191-192] [Emphasis added]

### g)  GH Construction

The State was spending a considerable fortune leasing warehouse facilities from various landlords, including the Aaronovs. By all accounts, these warehouses were run down and in dire need of repair. Bailey (who, at the time, was the Acting Director of Economic Development and Community Affairs

Ms. Caple
February 19, 2007
Page -22-

_____

(ADECA))[3] and his brother, Shane, came up with the idea that the State should buy property and build its own warehouses. **According to a report prepared by Dr. Henry Mabry, the Director of Finance, this new warehouse project would save the State nearly $20 million.** Governor Siegelman signed off on the idea–even though the Aaronov family were longtime friends, substantially supported Siegelman's campaigns, and even though this would cost the Aaronovs a lot of money. **The Government conceded in open court the concept was a great idea.**

The warehouse project was funded through ADECA and overseen by Dr. Mabry. Because the project was funded through ADECA, Bailey was involved. And, because he was consumed with much more significant financial issues (such as the possibility of proration), Dr. Mabry did not provide much supervision over the warehouse project. However, Mabry should not be faulted. No one knew that Bailey was drowning in debt, and certainly no one knew that Bailey had been taking bribes. Bailey was innovative and bright, and overseeing construction of metal warehouses was not rocket science.

However, Bailey immediately began involving those who had been offsetting his investment losses. Bailey involved Young who set up a construction company using bogus information regarding credentials and creditworthiness. Bailey also involved Curtis Kirsch (an architect who had been bribing Bailey with cash and in-kind contracting services).

Bailey admitted to signing Siegelman's name to contracts with these entities. Since the Governor's signature ultimately ends up on many state contracts, it's not all that uncommon for a contract bearing the Governor's signature to have not actually been signed by the Governor. However, in this case, that point was important because Siegelman wasn't involved in the GH Construction matter. **The only involvement that Governor Siegelman had in**

_____

[3]The Director, Dewayne Freeman, had recently resigned. Governor Siegelman put Bailey in this position temporarily until he could appoint someone else.

Ms. Caple
February 19, 2007
Page -23-

_____

**this debacle was his approval of a construction program that even the Government concedes if it had been operated properly would have saved the State nearly $20 million.**

### h)  Allen's $40,000 Campaign Contribution

Allen is a prominent toll bridge builder who came under federal and state scrutiny a few years ago because it appeared that he was improperly influencing county commission votes regarding projects that affected him and because he, on more than one occasion, initiated negotiations to purchase land or right-of-ways from private citizens by misrepresenting that he was negotiating on behalf of the State when, in fact, he was working for his own private benefit.

The Government did not allege that Siegelman had anything to do with Allen's misconduct described above, but the Government did negotiate an agreement with Allen whereby Allen would not be prosecuted for *any crimes* so long as he paid a fine to the State and provided testimony in this case.  Allen testified that he had supported Fob James in the 1998 gubernatorial race but that a few days before the election, Siegelman told him if he would contribute $40,000, Siegelman would let him select the next director of ALDOT.  The Director of ALDOT is appointed by the Governor and is one of the most powerful officials in Alabama.  The Director oversees a billion dollar budget.  **The running joke at trial was that if Siegelman sold the selection of the ALDOT Director for $40,000, he is the stupidest politician on earth because the power to select the ALDOT Director would be worth millions of dollars.**

Aside from just not making sense, the primary problem with Allen's story is that **Siegelman appointed Mack Roberts–the one person that Allen did not want to be ALDOT Director**.  Roberts worked for ALDOT for 30 or 40 years and had been appointed ALDOT Director on several occasions by both Democratic and Republican governors.  Roberts retired from ALDOT and went to work for Allen supervising the construction of toll bridges.

Ms. Caple
February 19, 2007
Page -24-

_____

But, Roberts had helped campaign for Siegelman, and after Siegelman was elected, Roberts helped Siegelman organize the Senate. The more Roberts got back involved in politics, the more he became interested in returning to the Highway Department. So, over his wife's objections, Roberts returned to the Highway Department when Siegelman asked him to serve as Director. Roberts had nearly unanimous support in the legislature. Lowell Barron, the President *pro tem* of the Senate, testified that he and other senators urged Governor Siegelman to name Roberts as ALDOT Director. Moreover, every ALDOT employee that the Government called testified Roberts was the most qualified for this position.

However, Roberts was invaluable to Allen. **Allen did not want Roberts to return to ALDOT because Allen was afraid the disruption caused by Roberts' departure would delay construction of four bridges that Roberts had been supervising.** Allen didn't pay Roberts a substantial base salary, but he had promised Roberts that if he completed construction of the four bridges within a very aggressive time deadline, Allen would pay him a $1 million bonus–$250,000 for each bridge. When Roberts heeded Siegelman's call, Allen and Roberts negotiated a departure package which included a bonus of around $130,000 (these figures are off the top of my head), and acquiring a house. The Government called this a bribe, but it was clear that this was minimal compensation for what Roberts had accomplished while working for Allen.

During his initial interviews with the Government, Allen stressed that he did not want to lose Roberts. Further, there was independent evidence (and Allen admitted) that Allen had supported a different candidate for ALDOT Director. Allen claims that when Siegelman called him and told him that, **over his (Allen) vigorous objections**, Siegelman intended to appoint Roberts as the next ALDOT Director, this "confirmed" the existence of an agreement for Allen to appoint the next ALDOT Director. Even as I write this, it sounds utterly ridiculous, but that was the evidence presented at trial.

### i) Siegelman's "Threat" Against Marcato

Mac Marcato, the inventor of Rainline, testified near the end of trial. The

Ms. Caple
February 19, 2007
Page -25-

---

Government's case was unraveling, but the Government (in a hearing outside the presence of the jury) hyped Marcato's testimony as evidence of the worst political shakedown in Alabama's history. I seem to recall that at some point during the argument over Marcato's testimony, the Government even compared Governor Siegelman to Tony Soprano or some other Mafia boss extorting money from a hapless businessman.

Marcato's testimony did not support the Government's hyperbole. Marcato testified that during Siegelman's gubernatorial campaign against Fob James, Siegelman called him, indicated a familiarity with Rainline, and asked for a $250,000 campaign contribution. Marcato was shocked by the amount of money that Siegelman requested but denied that Siegelman threatened him. More importantly, Marcato suffered no repercussions for refusing Siegelman's request for $250,000. Quite the contrary, during Siegelman's administration, ALDOT used Rainline more than ever. We proved, through ALDOT's own records, that this was because Roberts believed in and supported Rainline, and that Roberts reached his conclusions about Rainline years before Siegelman appointed him to be ALDOT's Director. ALDOT had several internal memos that were written long before Siegelman became Governor which confirmed this.

The Government became extremely aggravated during its examination of Marcato because he would not go where they tried to lead him. Marcato's testimony was simply that he (like every other citizen) did not appreciate a politician calling him and asking for a specific sum of money. Siegelman was proved to be an aggressive fundraiser: an annoyance, but not a crime.

On cross-examination, Marcato testified that he had hired Jim Allen to promote Rainline, that he thought Allen was a crook, and that if Allen's lips were moving, he was lying. Marcato came across as very credible, entertaining, and if we needed any help undermining Allen's credibility, Marcato put a nail in his coffin. In fact, the Marcatos were so opposed to how the Government handled this case, Marcato's daughter testified as a defense witness.

Ms. Caple
February 19, 2007
Page -26-

_____

### j)  Rainline

Marcato invented Rainline, a product that is applied on the edge of roads in place of a simple white stripe.  Rainline contains beads of glass so that it is highly reflective; it is applied with ridges so that it sheds water easily; and makes a noise to alert drivers to the fact that they are about to run off the road.  Rainline is sold throughout the Southeast, the Southwest, Canada, California, Alaska, and some parts of the Caribbean.  Because it is manufactured in Alabama, Rainline was sold to ALDOT for a cheaper rate than it was sold anywhere else.  Nevertheless, the Government contends that Rainline was a scam that Roberts had ALDOT purchase because Allen (Roberts' former employer), at one time, had a contract to market Rainline.  According to the Government, Allen bribed Roberts to use Rainline, and because Siegelman appointed Roberts, this was all part of a conspiracy.  We pointed our numerous problems with this theory including:

1)    the Government never showed that Allen bribed Roberts;

2)    ALDOT internal memos reflected that Roberts supported the use of Rainline years before Siegelman became Governor and appointed Roberts Director of ALDOT;

3)    Allen and Siegelman never discussed Rainline when Allen made his contribution to Siegelman's campaign;

4)    Marcato never bribed Siegelman; and

5)    Rainline is a product used extensively by many other states.

The Government relied almost exclusively on a report drafted by a University of Alabama professor designed to test the effectiveness of Rainline.  This report concluded that Rainline was not worth its costs, but it did not conclude that Rainline was in any way, shape, or form a scam or ineffective product.  **Incredibly, this report was *commissioned* by Roberts because, although he**

Ms. Caple
February 19, 2007
Page -27-

---

**believed in Rainline, he wanted to independently test its effectiveness.**
However, the report wasn't *completed* until after Roberts retired from office.[4]
Even so, we demonstrated through Marcato and his daughter that there were major
flaws in this report. So many flaws, in fact, that other states have increased their
use of Rainline.

### k)  Mitt Lary Road

The Government's case plodded to an end with a tortured discussion of the
Mitt Lary Road project. The Mitt Lary Road project was a road that was built to
ease traffic congestion in Tuscaloosa by directing cars over the Black Warrior toll
bridge. Allen built the Black Warrior toll bridge. The Government's theory was
that Roberts, as ALDOT Director, supported the road project that directs traffic to
Allen's toll bridge as repayment to his former boss for a bribe. The Government
went after Governor Siegelman because he signed off on the funds used to build
Mitt Lary Road. However, the Governor signs every contract to build every road
built by the State. The Governor's signature on contracts related to the Mitt Lary
Road project didn't have any more significance than whoever signed as Secretary
of Treasury the dollar bill that's in your wallet.

Regardless, we demonstrated that the citizens of Tuscaloosa had been
lobbying for the Mitt Lary Road project for decades. Allen built the Black
Warrior toll bridge because the citizens of Tuscaloosa begged him to after they
concluded it would take too long to apply for and receive state funding for a
bridge. But, Allen agreed to build the bridge only after Tuscaloosa officials
assured him that they would build a road to the bridge (it doesn't make any sense
to build a major toll bridge in the middle of nowhere—there has to be plans to

---

[4]In fact, we demonstrated that the report still isn't actually complete. The
Government built its case on preliminary findings. We don't know why the Government
stopped the final report from being prepared, but we suspect that someone on the
Government's team recognized the material defects in this preliminary report and did not
want to have to deal with an updated version that corrected these mistakes.

Ms. Caple
February 19, 2007
Page -28-

_____

utilize it).  The citizens of Tuscaloosa were committed to using city and county
funds to build the Mitt Lary Road if they couldn't get help from ALDOT.
However, ALDOT saw the importance of the Mitt Lary Road project—particularly
since the State had lobbied so hard for the Mercedes plant located near
Tuscaloosa.

    We had several witnesses lined up to testify on the Governor's behalf
including Judge Hardy McCullum and Farrington Snipes.  Judge McCullum was
prepared to testify that ALDOT basically owed Tuscaloosa the Mitt Lary Road
project as compensation for funds that Tuscaloosa County and the local
municipalities expended in meeting demands for the new Mercedes plant.  Snipes,
Tuscaloosa County's Planning Director, had specific information about
Tuscaloosa's history in trying to fund the critically necessary bypass that
ultimately became known as Mitt Lary Road.  We didn't need to call these
witnesses because the Government's case on this issue, as on the other Counts,
was so weak.  Further, Mack Roberts called several witnesses that completely
debunked the Government's claims.

### Conclusion

    I hope this summary helps.  It was very difficult to summarize such a
lengthy trial that contained so many issues.  In short, there is absolutely no basis
for increasing Governor Siegelman's sentence based on the charges for which he
was acquitted.  Further, Governor Siegelman should be given credit for acceptance
of responsibility on the Counts for which he was convicted.  And, given the very
close questions of fact and law involved in this case, I hope that the Court will
grant Governor Siegelman bond pending appeal.

                              Very truly yours,


                              David A. McDonald

DAM/cbp
Enclosures

Ms. Caple
February 19, 2007
Page -29-

_____

cc:    Vincent F. Kilborn, III, Esquire
        Susan G. James, Esquire