IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | * | |
| | * | |
| **PLAINTIFF,** | * | |
| | * | |
| v. | * | CASE NO. 2:05cr119-MEF-001 |
| | * | |
| **DON E. SIEGELMAN** | * | |
| **DEFENDANT.** | * | |

## NOTICE OF
## SIEGELMAN'S SUPPLEMENTARY STATEMENTS IN SUPPORT OF UNRESOLVED PRESENTENCE REPORT OBJECTIONS

Governor Siegelman incorporates by reference as if fully set forth herein the objections to the Presentence Report filed simultaneous to this filing.

### I. BRIBE v. GRATUITY AS RELATES TO THE RELEVANT CONDUCT

The Government has made clear that it considers any money paid in this case to be bribes and the Government limited its charges in the indictment to bribery charges rather than gratuity charges. The defense understands the Government will make this claim as to the Scrushy money, but the defense argues that the relevant conduct does not constitute bribery. The defense argues that the relevant conduct regarding the Government's claims as to any money paid by Young to Hamrick and Bailey does not constitute bribery type conduct, but rather is, at most, gratuity type conduct. The testimony as to any money paid by Young to Hamrick and Bailey was not that any money was paid in exchange for a specific official act; the repeated testimony that was not tied to any specific official act was "you help us, we will help you". It may be helpful in assessing the invalidity of the Government's position as relates to the relevant conduct to consider some case law on the subject. This particular response relates only to the relevant conduct.

It is clear that the primary distinction is that a bribe includes a quid pro quo element and the payment of any unlawful gratuity does not. The Government's only attempt to prove bribes relates to the Schrusy counts of conviction. There is no way to stretch any other payments of money into bribes. It is ridiculous to attribute the $500,000 donation as a bribe. Richard Scrushy served on the CON Board for Governors Hunt, Folsom, and James. Scrushy had recently resigned from the Board to which he had been appointed by James. Scrushy had contributed handsomely to all of their campaigns and Fob James' debt of $205,593 was paid off after the election on January 18, 1995. (See Secretary of State Campaign Finance Disclosure Records, 1994-1995) Governor Riley received money from Dr. Swaid Swaid who was subsequently appointed by Riley as Chairman of the CON Board. Those contributions were closer to a personal benefit since they were campaign contributions to the candidate as opposed to a contribution to a 501(c)4 non-profit foundation, the purpose of which was to educate Alabama's children.

The Government's attempt to label Lanny Young's activities as bribes does not reveal the evidence as it was but only as the Government wishes it to be.

"The bribery provision, 18 U.S.C. §201(b)(1)(A), renders it unlawful for any person to "directly or indirectly, corruptly give[], offer[] or promise[] anything of value to any public official...with intent...to influence any official act." [1] The payment of an unlawful gratuity involves an act where a person "directly or indirectly gives, offers, or promises anything of value to any public official...for or because of any official act performed or to be performed." 18 U.S.C. §201(c)(1)(A). Bribery therefore requires that the payer intend "to influence" an official act "corruptly" **while the payment of an unlawful gratuity requires only that the payment be "for or because of an official act.** See *United States v. Sun-Diamond Growers of California*, 526 U.S. 398, 404, 119 S.Ct. 1402 L.Ed.2d 576 (1999); *United States v. Crozier*, 987 F.2d 893, 899 (2nd Cir. 1993); see also *United States v. Biaggi*, 909 F.2d 662, 684 (2nd Cir. 1990).

---

[1] The intent in this case would refer to Scrushy's intent, as there was never any evidence or testimony that Governor Siegelman had any corrupt intent.

2

(emphasis added) The Lanny Young money that went to Bailey and Hamrick went to state employees not elected officials. There was no evidence of testimony that Governor Siegelman has any knowledge of money going to either Bailey or Hamrick.

"The "corrupt" intent to a bribery conviction is in the nature of a quid pro quo requirement; that is, there must be a "specific intent to give...something of value in exchange for an official act." ... The element of a quid pro quo or a direct exchange is absent from the offense of paying an unlawful gratuity. To commit that offense, it is enough that the payment be a reward for a past official act or made in the hope of obtaining general good will in the payee's performance of official acts off in the future." (See *Sun Diamond Growers, supra*)

The Government's "stream of pay for participation" theory articulated at the probation conference ignores the very clear distinction between a bribe and gratuity. Even Congress and the Sentencing Commission recognized the difference.

U.S.S.G. §2C1.2 offering, giving, soliciting, or receiving a gratuity, application notes: 3., states, "In some cases, the public official is the instigator of the offense. In others, a private citizen who is attempting to ingratiate himself or his business with the public official may be the initiator. **This factor may appropriately be considered in determining the placement of the sentence within the applicable guideline range.**" (emphasis added) Once again there was no evidence or testimony that Governor Siegelman asked Nick Bailey to solicit anything from Lanny Young. In fact the testimony from Bailey was that he solicited Young both for the 4-wheeler and the $9,200 that Bailey used to buy the motorcycle from Governor Siegelman.

It is clear that the Government's evidence fell short of establishing that anyone other than Lanny Young or Nick Bailey were the initiators.

## II. RELEVANT CONDUCT

The Government seeks a 20 level increase pursuant to U.S.S.G. §2C1.1(b)(2)(A). The Probation Officer in the initial pre-sentence report suggested an 18 level increase.

As previously argued, Governor Siegelman disagrees with both of the above suggestions.

3

Without rehashing the arguments already advanced the following is provided as additional support for Governor Siegelman's position on monetary amounts used for guideline purposes.

### A. $3,000,000 LANNY YOUNG LANDFILL.

The Government has the burden of proving the application of guidelines that enhance a defendant's offense level. *United States v. Cataldo*, 171 F.3d 1316, 1321 (11th Cir. 1999).

When a defendant challenges a factual basis of his sentence, the Government has the burden of establishing the disputed fact by a preponderance of the evidence.[2] The District Court's factual findings for purposes of sentencing may be based on, among other things, evidence heard during trial, undisputed statements in the PSI, or evidence presented during the sentencing hearing. *United States v. Polar*, 369 F.3d 1248, 1255 (11th Cir. 2004)

Governor Siegelman heard something at the probation conference about this money. Yet nothing has been provided to explain how this figure was determined much less what supports its inclusion in the guideline calculations. The Probation Officer should demand strict proof of how the Government arrived at this figure and a breakdown of what went to Young, to others, the cost basis of the landfill and the value, if any, of the favorable ruling Young received from the Cherokee County Commissioners involving the landfill. Again, there was no evidence or testimony that Don Siegelman's phone call to the Probate Judge made any difference whatsoever. In fact, the testimony was contrary.

The only argument the Government made was that Young deposited $3,000,000 into his bank account in increments of $1,000,000, and $2,000,000. This explanation hardly supports inclusion of this amount in the guideline calculations to Governor Siegelman under any theory. This is yet another example of the Government's "throw-it-all-against-the-wall-and-see-what-sticks."[3]

---

[2]This argument does not waive Governor Siegelman's position that all sentencing factors must be proven to a jury beyond a reasonable doubt or admitted by the defendant.

[3]This very same United State's Attorney's Office was previously criticized by the Eleventh Circuit Court of Appeals for using a similar tactic in a prosecution where the defendant received

4

## B. G. H. CONSTRUCTION

There was no evidence or testimony that Governor Siegelman had any knowledge that Nick Bailey was paying Lanny Young for work that had not been performed.

The Government has suggested that Governor Siegelman should also be penalized for $411,495 dollars Bailey paid to Young related to the building of warehouses for the State. The Government argues that this was a loss to the State and that Governor Siegelman, who did not profit one penny nor had knowledge Young was paid for work he did not do, should be held accountable.

It is interesting that the Government's accountability argument blows with the wind dependent upon who you are. The Associated Press on May 8, 2007 reported that Lanny Young had entered a restitution agreement with the Government including $202,456 to the Internal Revenue Service and $181,325 representing money paid to G. H. Construction. The article quotes AUSA Steve Feaga as saying that the $181,325 is money that was **not used for a legitimate purpose**. (Exhibit B) (emphasis added) That position clearly reveals that the Government believes that the balance of the $411,495 payment, **$230,170 was for legitimate purposes**.

To date, the defense has heard not one word from the Government that the $411,495 figure should be reduced a penny based on the position it took in Young's case. This is yet another example of disparate treatment by the Government involving Young and Governor Siegelman.

Young is going to pay the IRS $202,456 and Bailey is to pay the IRS $28,359. (See

---

life without parole, later reversed, and sentenced to 188 months on remand. The Eleventh Circuit stated: [Starks] has a better argument on the second prong, given that the Government's conduct in trying this case and in briefing the defendants' appeal to this Court indicates a "throw-it-all-to-the-wall-and-see-what-sticks" strategy that appears specifically designed to unfairly prejudice the defendants. *United States v. Talley*, 273 F.3d 396 (11th Cir. 2001) (unpublished - Exhibit A)

Exhibit B)  These figures clearly represent concessions by the Government in favor of Bailey and Young.  The trial evidence made clear that both Young and Bailey had personally benefitted substantially more from their greed and dishonesty than their sentences and/or restitution reflects.

Governor Siegelman and his family on the other hand were scrutinized by the IRS for years and he was not prosecuted for any tax related matter.  He does not owe a dime as a result of any of the Government's erroneous allegations of corruption.

When the currency for freedom is testimony for the Government it is not surprising Young and Bailey would say anything that would curry favor with the Government.

## C. REVENUE RULING

The Probation Officer has suggested that $1,000,000 be used in the guideline calculation as a loss to the State based on the Emile Revenue Ruling.  The Government asks that the amount be increased to at least $4,000,000.  Both positions are wrong.  There was testimony and evidence showing that the revenue ruling was not only correct but was in the state's best interest.  Lanny Young was paid handsomely for his efforts on this front but it is obvious he wasn't really needed nor was there any evidence or testimony to even suggest that Governor Siegelman was aware of Lanny Young's financial arrangements with Waste Management.  Waste Management was represented by extremely competent counsel.  The Government has not, nor could it, attempt to impugn the character of the Honorable Thomas R. DeBray and C. Ellis Brazell, III, the lawyers that advanced the arguments in support of the ruling.

Litigation was underway against the State for a refund directly related to the decharacterization waste at the landfill.  In exchange for dismissal of the litigation the State changed the ruling.  (Exhibit C)

Lanny Young's self-anointed intrinsic value to making this ruling happen is belied by the true facts. Waste Management had a team of competent lawyers mounting a serious case against the State.

Lanny Young taking credit for this ruling is yet another example of his manipulative behavior to increase his value to the Government in this prosecution. It obviously worked given the two year sentence imposed on a man that used our State political system to personally benefit millions of undeserved dollars as compensation for influence he didn't have to exert.

It is somewhat amusing that Young, the major manipulator was manipulated in the same manner by Probate Judge Jordan. Young bribed Jordan for influence that he never exerted or planned to exert regarding the Cherokee County Landfill vote.

On page 6 of the Government's objections dated April 20, 2007 the Government states:

"Similarly, the evidence at trial established that the reduction in fees by the Department of Revenue at the waste disposal facility at Emelle, Alabama, saved Chemical Waste Management, and caused the State of Alabama to **suffer a loss** of, at least $4 million."

This is untrue. In support please find an excerpt of the Grand Jury testimony of Kathye Howard. Howard testified that in 1999 the total amount paid by Chemical Waste Management to the State of Alabama was $3,188,000. In 2000 after the ruling, they paid $3,152,000. There was only a minor drop of $36,000. The new fee structure started in August 1999 and continue

7

through December 2000. (Exhibit D)

The point is that there was no testimony that the change in tax caused any effect whatsoever to the State. The Government is only assuming it did because the tax went down. Any loss could have been caused by (1) a general market decline, (2) a general decline in toxic waste creation and therefore, toxic waste disposal, or (3) with the tax reduced, Chemical Management's argument was that the volume would increase. The small drop at first bears this out.

Attached is Government Exhibit 138 which is a July 15, 1999 agreement between the State of Alabama and Chemical Waste Management Incorporated in a "Memorandum of Understanding" which shows that in exchange for the change in tax status (which was entirely legal) the $4.62 million petition for refund by Chemical Waste Management was dismissed. (See Exhibit C)

Also attached is an excerpt from Susan Kennedy's Grand Jury testimony. She was the Department of Revenue's General Counsel at that time. Her testimony totally backed up the legality of the ruling and the fact that no pressure was exerted. In her Grand Jury testimony at pages 31 and 32, she insists that (a) she "wasn't pressured" and (b) she was just trying to do a good job."

Q. So I want to be real clear. Your testimony to this grand jury is that you were not pressured by anyone to get this change made.

A. I wasn't pressured by anyone to get the change made. I was - I was trying to do a good job in the first week with a new boss.

Q. And that leaves a little window open.

A. It's not - it's not like they said, you've got to get this change done. I mean,

nobody said that to me. I don't ever recall anybody saying, you've got to get this through; but I did want to -

Q. The question isn't did someone tell you you had to do it. The question is, did you feel like you were being pressured to make this happen?

A. For a particular outcome to happen?

Q. Yes, ma'am.

**A. No. I don't - I don't - I wasn't - I did not feel pressured to make a particular outcome happened.**

Q. Okay. And did you in any way pressure Mr. Hope to come up with a way to make this happen?

A. I do not believe that I did. I don't - I don't know whether he felt pressure or not, but I don't believe that I pressured him. (emphasis added) (Exhibit E)

### D. FIRST COMMERCIAL BANK LOAN (FBC)

As noted in the FBI 302 regarding Todd Beard, the Senior Vice President of First Commercial Bank (FCB) it shows that the Alabama Education Foundation (AEF) originally had a loan with FCB guaranteed by 12 prominent Democrats, including J. Merv Nabors. (Exhibit F) This was the typical way in which political campaigns borrow money and the banks receive loan guarantees by various supporters of the political movement or candidate. As indicated, the Alabama Education Lottery Foundation (ADP) on November 5, 1999 paid off the original Colonial Bank loan of the Alabama Democratic Party. An AEF checking account, was set up on November 5, 1999. Eight checks were placed into the AEF checking account, including the Integrated Health Services (IHS) $250,000 check dated November 5, 1999.

A second FCB loan was made to the AEF on March 9, 2000 in the amount of $730,780.29. None of the original 12 guarantors of the first loan were on the second AEF loan

9

with the exception of Merv Nabors, a very wealthy supporter. Governor Siegelman and Merv Nabors signed as guarantors of the second note. Nick Bailey handled all the transactions at FCB.

On March 9, 2000 $730,749 from the second loan was distributed to Colonial Bank for the credit on the original ADP loan. Eventually the loan was paid off. It is very important to note that the loan was originated by the ADP at Colonial Bank. This was money borrowed by the ADP to "Get Out the Vote" (GOTV) on the lottery campaign. The Governor was not legally obligated to help the ADP pay off its debt. The whole point is that (1) the debt was originally an ADP debt (not a Governor Siegelman debt) and (2) the loan at the FCB, into which the $250,000 IHS check was placed, was to pay off the ADP debt. While it is true that Governor Governor Siegelman guaranteed the second note along with Merv Nabors he (1) **never got any money** and (2) only guaranteed the note because he was the titular head of the party, not because he was worth the money or that it was his debt. FCB would have looked to **Nabors** according to trial testimony, who had plenty of money. More importantly, under Alabama Law, neither Merv Nabors or Governor Siegelman were personally liable for the debt unless the Foundation defaulted. In this case neither Nabors nor Siegelman were ever called upon to pay off the loan. So neither benefitted.

A July 9, 2002 letter from the State Democratic Executive Committee signed by Redding Pitt and John Haley (of the Hare, Wynn firm) amended the 45 day pre-primary report for 2000 reporting that a "**a loan received by the Alabama Democratic Party** in 1999 was repaid on March 9, 2000 by the Alabama Education Foundation." This proves that the money was a **Democratic Party Debt**, not a Governor Siegelman debt. March 9, 2000 is the same date as the second FCB loan that the Government is saying "**benefitted**" the Governor. It "benefitted" the ADP. (Exhibit G)

The June 21, 2004 Grand Jury testimony of David Kassouf, who was an accountant for the AELF is provided in part. Kassouf was not called as a trial witness. He gave a good scenario

10

as to why the money was not originally reported by the AELF. This is a typical scenario that happens in campaigns, which is that when you lose, **everybody scatters and nobody wants to do the cleanup paperwork.** At page 10 of his Grand Jury testimony, Kassouf states:

> Q. Can you give us an approximate length of time that it took you? You said some time.
>
> A. Months.
>
> Q. Months. Okay.
>
> A. I - I can't tell you precisely.
>
> Q. I understand.
>
> A. But it was not within weeks. It was maybe six, eight months later on that we got the details on this bank account.
>
> Q. Did you feel like you had been stonewalled?
>
> A. I got the impression that - and not knowing anything more than I knew, I got the impression that this was a failed lottery foundation; it was a failed political issue; and at this point in time, **people want to just move on and get beyond it**; and that the people who were originally involved in it couldn't - **they couldn't be located and we didn't know where the records were.** (emphasis added) (Exhibit H)

Also attached is an opinion letter marked Exhibit 48 (Exhibit I) from Maynard, Cooper to Ted Hosp and Nick Bailey opining that the AELF, whose Articles of Incorporation had been amended from the AELF (the name changed as well), would not even have to report the AELF debt payoff.

The Amendment to the Articles of Incorporation shows the name change. Richard

Dorman, a well know and respected member of the Cunningham, Bounds firm in Mobile was the President of the AEF/AELF. He, like Bobby Segal, would not have been associated with some scam to benefit the Governor.

### E. MOTORCYCLE

As to the obstruction count, you cannot obstruct an innocent act. Gerald Smith, the manager of Montgomery Honda Yamaha, the company that sold the motorcycle to the Governor verified that American Honda head-quartered in Torrence, California telephoned him to tell Montgomery Honda Yamaha to sell the Governor the motorcycle for the "invoice price". Smith verified that "during the telephone conversation, he indicated that American Honda wanted to give the motorcycle to the Governor, but the Governor wanted to pay something for it." (See FBI - 302 - Exhibit J)

Why would Governor Siegelman take money from Nick Bailey or Lanny Young as a bribe to buy a motorcycle when the manufacturer had just offered to give one to him? What happened was Governor Siegelman bought the motorcycle from Montgomery Honda on December 7, 1999, Don Governor Siegelman expense account check 1080 for $12,173.35. When Bailey paid Governor Siegelman with a check in the name of "Lori Allen" and later got a second check for $2,973.35 from Bailey dated October 16, 2001, the Government's theory was this was a bribe by Lanny Young. Why would Governor Siegelman accept a bribe in the amount of the cost of the motorcycle when he could have obtained one free from American Honda without a bribe. It simply doesn't make sense.

Attached is a copy of the original Bill of Sale that Governor Siegelman gave Nick Bailey for the motorcycle for $9,200 which was changed in handwriting to the total price of $12,173.35. The Bill of Sale was in fact drawn up on February 17, 2000 contemporaneously with the check. The check for $9,200 is dated January 20, 2000 and the Bill of Sale was typed February 17, 2000,

12

28 days later. (Exhibit K) This proves that, in fact, the original transaction whereby Bailey paid part of the price for the motorcycle was confirmed by the Bill of Sale. The motorcycle was a legitimate transaction whereby Governor Siegelman bought the motorcycle and resold an interest in it to Bailey and gave him a Bill of Sale. There is no point obstructing an innocent act.

### III. OBSTRUCTION OF JUSTICE U.S.S.G. 3C1.1

The Government argues that the Probation Officers omission of a U.S.S.G. 3C1.1 enhancement results from a misapplication of 3C1.1. The Government argues that 3C1.1 application note seven must be read in conjunction with application note 8. Specifically, the Government argues that the 3C1.1 enhancement is appropriate because the counts of conviction should be grouped together and that failure to apply the 3C1.1 enhancement will inadequately punish the defendant for his obstructive conduct.

Defendant totally disagrees. The Government elected to charge the defendant with obstruction of justice. The obstruction of justice charge in the indictment related solely to Nick Bailey's second payment to complete the purchase of the motorcycle. Now the Government wants to expand the language of the indictment so that it becomes a fishing net to capture all of what they consider to be "relevant conduct", i.e., the charges of which the Governor was found not guilty/acquitted.

The jury, in a compromise verdict, convicted on the obstruction count. As a result what would have been a simple base level of 12 ( see U.S.S.G. §2J1) has now turned into a suggested base level of 38 because of the inclusion of relevant conduct. To suggest that the defendant is in

some way escaping accountability for the "obstructive conduct" is absurd. To be sure that the Government's position is wrong and at the least would create a double counting scenario, one need look no further than to the United States Supreme Court holding in *Blakely v. Washington*, 542 U.S. _, 124 S.Ct. 2531, 159 L.Ed. 2d 403 (2004). The Court addressed the obvious Sixth Amendment violation in charging an obstruction offense and a situation where a District Judge makes a preponderance of the evidence finding on an obstruction enhancement. In this case the Government elected to charge the obstruction as a count in the indictment. The Government should not benefit from using the same set of facts for double punishment.

Further, contrary to the Government's argument (Government Objection, Page 8) The obstruction conduct for which Governor Siegelman was convicted and that which the Government seeks the 3C1.1 enhancement is identical. If not the Government would have surely made any additional "obstructive conduct" part of the indictment. There is no additional obstructive conduct to which the Government can credibly point unrelated to the motorcycle transaction.

The Court must expressly identify the obstructive conduct unrelated to the conduct underlying the conviction. *United States v. Frank*, 354 F.3d 910 (8th Cir. 2004)

## IV. ROLE IN OFFENSE

### A. U.S.S.G. §3B1.1(a) LEADERSHIP ROLE

The Appellate Courts have addressed numerous factors that support aggravating role enhancements pursuant to U.S.S.G. §3B1.1. Some of these are noted below and it is argued they are not present in this case. All persons receiving aggravating role organizer or leader must exercise some control over others. *United States v. Quigley*, 373 F.3d 133, 362, United States App. DC 124 (2004).

There is no evidence that Governor Siegelman played a leadership role in this case. Therefore, the leadership role is not overwhelming or uncontroverted. *United States v. Burren*,

190 Fed App 257 (4th Cir. 2006).

Governor Siegelman argues, as with all of the suggested sentencing enhancements, each should be charged in the indictment and proven to a jury beyond a reasonable doubt. *Blakely v. Washington*, 542 U.S. _, 124 S.Ct. 2531, 159 L.Ed. 2d 403 (2004); and *Apprendi v. New Jersey* 530 U.S. 466, 120 S.Ct. 2348 (2000).

In this case, as to the suggested relevant conduct, all of which produced not guilty verdicts/acquittals, Lanny Young was the principal architect. *United States v. Murphy*, 156 Fed Appx 90 (10th Cir. 2004). There is no evidence there were meetings to establish terms or determine details on logistics. *United States v. Skoczeav*, 405 F.3d 577 (7th Cir. 2005) Governor Governor Siegelman did not devise any scheme. *United States v. Singer*, 152 Fed. App. 869, Opinion Supplemented 176 Fed. Appx. 66, cert denied 1227 S.Ct. 175 (11th Cir. 2005). There is no way to say Governor Siegelman controlled any one much less everyone, of the participants. *United States v. Mandhai*, 375 F.3d 1243 (11th Cir. 2004); *United States v. Plancarte-Vasquez*, 450 F.3d 848 (8th Cir. 2007) In fact he controlled none. Even Bailey during cross examination testified that Governor Siegelman didn't know what he was up to, didn't get any of the money. In fact even the Government concedes that all payments went to either Nick Bailey or Paul Hamrick, not Governor Siegelman.

U.S.S.G. §3B1.1 Aggravating Role. Application Notes, Background provides the rationale for this adjustment. In part it addresses relative responsibilities. It also notes that it is likely that persons who exercise a supervisory or managerial role in the commission of an offense had to profit more from it. Such is not so in this case. It was Young and Bailey who profifted.

There was no evidence Governor Siegelman ever gave directions, monitored the process, or received a greater portion of the proceeds. *United States v. Shallal*, 420 F.3d 434 (8th Cir. 2005); *United States v. Sheikh*, 367 F.3d 683 (7th Cir. 2004)

In distinguishing a leadership or organizational role from one of mere management or supervision titles such as "kingpin" or "boss" are not controlling. Factors the Court should consider include (1) the exercise of decision making authority, (2) the nature of the participation in the commission of the offense, (3) the recruitment of accomplices, (4) the claimed right to a larger share of the fruits of the crime (5) the degree of participation in planning or organization of the offense, (6) the nature and scope of the illegal activity, and (7) the degree of control and authority exercised over others. *United States v. Quigley*, 373 F.3d 133 (D.C. Cir. 2004). The title of "Governor" is no more controlling than the title of "kingpin" or "boss".

The District of Columbia Circuit in *United States v. Graban*, 162 F.3d 1180, 1185 (1998) recognized that all persons receiving an enhancement under 3B1.1 must exercise some control over others.

The purpose of the aggravating role enhancement is to penalize more heavily those defendants who bear greater responsibility for crimes involving many individuals, both to reflect their greater degree of culpability and in recognition that such individuals are likely to profit more from the crime and pose a greater danger to the community and risk of recidivism. See §3B1.1, comment. (background) *United States v. Wasz*, 450 F.3d 720 (7th Cir. 2006).

A defendant's role as an organizer or leader is a factual finding that is reviewed for clear error to determine if the enhancement under §3B1.1 is applied appropriately. *United States v. Ramirez*, 426 F.3d 1344 (11th Cir. 2005)

The facts, the evidence and testimony in this case would suggest that Governor Siegelman was a person whose position was used by Nick Bailey and Lanny Young to make money for themselves and do not in any way support any aggravating role enhancement.

### B. U.S.S.G. §3B1.2 MINIMAL ROLE

Governor Siegelman continues to deny any criminal wrong doing. He understands the jury verdict and strenuously disagrees. He is, however, mindful that the Court accepts the verdict

and will sentence accordingly. He is also aware of the fact that the Government seeks a 3B1.1 aggravating role enhancement he contends is unfounded. He also argues he should not receive any aggravating role enhancement.

Given that the Government seeks an aggravating role enhancement, Governor Siegelman necessarily argues, without conceding any guilt, that in computing the advisory sentencing guidelines the Probation Officer and the Court should apply a U.S.S.G. §3B1.2 downward adjustment for minimal role.

In determining a defendant's qualification for a role reduction, the sentencing court must compare the defendant's role in the offense with relevant conduct attributed to him in calculating his base offense level. The Court may compare the defendant's conduct to that of other participants involved in the offense. *United States v. Alvarez-Coria*, 447 F.3d 1340 (11th Cir. 2006)

To determine whether a reduction in sentence for mitigating role is appropriate, the Court compares the acts of each participant in relation to the relevant conduct for which the participant is held accountable and measures each participant's individual acts and relative culpability against the elements of the offense. *United States v. Denton*, 434 F.3d 1104, (8th Cir. 2006) rehearing and rehearing denied.

A defendant is eligible for a mitigating role reduction if the defendant's role is relatively minor compared to the role of other participants. *United States v. Jackson*, 419 F.3d 839 (8th Cir. 2005) cert. denied. 126 S.Ct. 841, 163 L.Ed 2d 716.

A minor role decrease was warranted in a mail fraud case. In the case the evidence showed that the scheme was the co-defendant's idea and that the co-defendant made the arrangements. *United States v. Martin*, 369 F.3d 1046 (8th Cir. 2004)

The defendant must be plainly a peripheral player to justify his classification as a minimal participant for purposes of a downward sentencing adjustment. *United States v. Santos*, 357

17

F.3d 136 (1st Cir. 2004)

A 3B1.2 downward adjustment should apply in this case.

### V. U.S.S.G. 1B1.4 SUPPORTS GUIDELINE DEPARTURE

U.S.S.G. §1B1.4 information to be used in imposing sentence (selections a point within the guideline range or departing from the guidelines) states: "In determining the sentence to impose within the guideline range, or whether a departure from the guideline is warranted, or whether a departure from the guideline is warranted, the Court may consider, without limitation, any information concerning the defendant, unless otherwise prohibited by law." (See 18 U.S.C. §3661.) Governor Siegelman argues that use of the acquited charges overstates the seriousness of the conduct used for punishment purposes. As such a downward departure is warranted.

### VI. ACCEPTANCE OF RESPONSIBILITY

A conviction alone does not automatically preclude a 3E1.1 acceptance of responsibility adjustment. In rare situations a defendant may clearly demonstrate acceptance of responsibility for his criminal conduct even though he exercises his constitutional right to trial. *United States v. Dabney*, 367 F.3d 1040 (8th Cir. 2004); United States v. Brown, 367 F.3d 549 (6th Cir. 2004)

### VII. CONCLUSION

Based on all of the above arguments the guidelines would be calculated using a base level of 24. A 2 level 3E1.1 downward adjustment would result in a base level of 22. A four level 3B1.2 adjustment would result in a base level of 18. Based on a Criminal History Score of I, the suggested guidelines would be 27 to 33 months. However, defendant seeks a departure from the guidelines and a variance to probation.

Respectfully submitted this 29th day of May 2007.

_____
Susan G. James (JAM012)

18

Address of Counsel:
Law Office of
Susan G. James & Associates
600 S. McDonough St.
Montgomery, AL 36104
(334) 269-3330

## CERTIFICATE OF SERVICE

I hereby certify that a true and complete copy of the foregoing was served by first class mail on Louis Franklin, Assistant United States Attorney, P. O. Box 197, Montgomery, Alabama 36101, 36104 this 29th day of May 2007.

_____
of Counsel