### IN THE DISTRICT COURT OF THE UNITED STATES
### FOR THE MIDDLE DISTRICT OF ALABAMA
### NORTHERN DIVISION

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | * |
| | * |
| **PLAINTIFF,** | * |
| | * |
| **v.** | * **CASE NO.  2:05cr119** |
| | * |
| **DON SIEGELMAN, ET AL** | * |
| **DEFENDANT.** | * |

### DEFENDANT DON SIEGELMAN'S REPLY TO THE GOVERNMENT'S SENTENCING MEMORANDUM AND MOTION FOR UPWARD DEPARTURE

Comes now Don Siegelman by and through undersigned counsel and files this response to the Government's Motion for Upward Departure and Sentencing Memorandum.  Governor Siegelman requests that the Court consider as incorporated by reference as if fully set forth herein documents 595 and 596 filed as objections to the Presentence Report on May 29, 2007.  The previously filed pleadings contain legal arguments and case citations in response to all the issues raised in the Government's Sentencing Memorandum.  This additional response is merely to answer any new twists the Government uses to spin the facts.

The Government, in arguing for an upward departure and inappropriate guideline enhancements, repeatedly contends that the Siegelman and Scrushy alleged conduct "may have certainly caused a loss of public confidence in government."  The requested 30 year sentence the Government urges for Governor Siegelman is even making non-Siegelman advocates lose confidence in Government.

**UPWARD DEPARTURE**

The Government's motion for upward departure based on systemic and pervasive Government corruption, page 6, II Conclusion, states if a case ever deserved a departure this one does because of the "tremendously harmful effect upon public perception of and confidence in Alabama state government from Defendant Siegelman's criminal behavior." The Government's position, however, ignores the fact that the jury disagreed as noted by **not guilty verdicts on 94%** of the Government's case.

The Government went further to state that the offense conduct in this case demonstrates a sweeping corruption of Alabama State Government at all levels, and particularly of the Office of Governor and Lieutenant Governor, and justifies an upward departure of four levels from the guideline range. Again, the Government's recitation of the evidence fails to acknowledge that the jury rejected the Government's RICO case only finding the defendant guilty of the $500,000 Scrushy contribution and the sale of a motorcycle he could have obtained free.

**30 YEAR SENTENCE**

The Government Sentencing Memorandum, page 2, footnote 1 suggests a guideline range of level 42, **360 months to life**. This sentence is equivalent to sentences imposed each day throughout the country in state court systems for individuals convicted of heinous murders, rape, sodomy, terrorism, and sexual torture. The Government unsurprisingly suggests the Court can impose the outrageous and unreasonable sentence based on using a consecutive sentence

2

application, which is rarely used in the federal system, even for the more serious and dangerous federal offenders.

**ROLE ENHANCEMENT**

Governor Siegelman has objected to a suggested role enhancement. The Government's motion asking for Scrushy to receive an upward departure for systematic and pervasive Government corruption page 3 states "**Scrushy** not only abused his own political position as a core Board member, but also **corrupted** the Office of Governor and the CON Board as a whole." (emphasis added) The Government by these comments makes the argument for Governor Siegelman that he was not a planner or leader.

The Scrushy motion goes further: "Defendant **Scrushy corrupted** the highest executive office in State Government. Namely, the Governor, by purchasing from then Governor Defendant Siegelman's membership on, representation at, and influence over the CON Board." (emphasis added) While Governor Siegelman disagrees with this proposition, it is still telling that the Government assigns the blame to Scrushy as the initiator.

Page 4 of the Government's Siegelman Sentencing Memorandum erroneously states that Governor Siegelman planned the Scrushy and Lanny Young alleged conduct. There was no trial evidence to support this argument. As noted above the Government as much as says so.

The Government further states, ... "Defendant Siegelman's intent and desire to obtain power, money, and property for himself and others through the illegal use

3

of his official position as Lieutenant Governor and Governor." This erroneous statement is belied by the record as Siegelman gained nothing personally as a result of the alleged conduct and was not involved in a common criminal objective. Furthermore, the record clearly shows the Governor, without fanfare or publicity, voluntarily cut his own salary while serving as Governor and Secretary of State. As Governor he cut his salary 6.2% to comport with an Education budget cut and 10% while serving as Secretary of State to free up funds to hire an extra employee. If it was all about money Governor Siegelman would have never done this nor given up a lucrative law practice. These monetary sacrifices far out weigh a $9,200 alleged benefit over the sale of a motorcycle he could have had for free.

In support of this requested role enhancement the Government reminds the Court (Government Sentencing Memorandum, page 14) that organizer/leader enhancements pursuant to U.S.S.G. §3B1.1(a) were applied to Young and Bailey. It is clear from the evidence they should have been. The Government espouses a fiction in stating that Governor Siegelman organized, controlled, and directed the actions of Bailey and Young in the criminal activity for which Defendant Siegelman was convicted.

**OBSTRUCTION OF JUSTICE**

The Government's Sentencing Memorandum, page 5, footnote 6, in an effort to salvage an otherwise unfathomable obstruction enhancement of two levels, argues that Count 17 was intended to cover "the entire investigation of public corruption offenses during his gubernatorial administration." Yet, Count 17 of the indictment

4

for which Siegelman was convicted states:

"68.  On or about October 16, 2001, in the Middle District of Alabama, the defendant DON EUGENE SIEGELMAN, aided and abetted by others known and unknown to the Grand Jury, did knowingly corruptly persuade and attempt to knowingly corruptly persuade another person, and did engage in misleading conduct toward another person, with intent to hinder, delay, and prevent the communication to a law enforcement office of the United States of information relating to the commission of a federal offense, to wit, defendant Don Eugene Siegelman did cause Nicholas D.  Bailey to provide him with a check in the amount of $2,973.35 with the notation "balance due on m/c" with intent to hinder, delay, and prevent communication to the Federal Bureau of Investigation by Clayton "Lanny" Young and Nicholas D.  Bailey, and by counsel for Nicholas D.  Bailey, of information concerning federal offenses related to $9,200 that Clayton "Lanny" Young gave to Don Eugene Siegelman on January 20, 2000."

It is a bit disingenuous for the Government to now say this count in the indictment covers all of the other obstruction conduct it suggested should be used for the 2C1.1 enhancement.  The language of count 17 is unambiguous and addresses the motorcycle only.  The case law prohibits double counting when the conduct supporting the conviction is identical to that used for the enhancement.

The Government is yet again attempting to stretch the limits of fairness.  The Government as noted below has an obligation to be fair.

As noted by Justice Sutherland of the United States Supreme Court in *Berger v. United States*, 295 U.S. 78, 88-89 (1935)

The United States is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest therefore, in a criminal prosecution is not that it shall win a case but that justice shall be done. As such, he is in a peculiar and very definite sense the servant of the law; the two-fold aim of which is that guilt shall not escape or innocence suffer.

He may prosecute with earnestness and vigor indeed he should do so. But while he may strike hard blows, he is not at liberty to strike foul ones. It is as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one.

This position should be no less applicable to a wrongful sentence. The Government's desperation to make this case something it is not is all too clear in the sentence recommendation and the twisting of facts in an effort to apply sentencing enhancements without support.

The Government Sentencing Memorandum, page 13, erroneously states: "Defendant Siegelman was the mastermind behind this sham transaction (motorcycle) and criminal activity, and he recruited the involvement of his attorney, Bailey, and Bailey's attorney in the transaction to enhance its obstruction effect." There is no evidence to support this and Governor Siegelman maintains that the transaction was not a sham. Why would two highly respected Alabama lawyers have participated in a sham transaction.

The Government's argument that the Probation Officer's omission of a U.S.S.G. 3C1.1 enhancement results from a misapplication of 3C1.1. and 3C1.1 application note

6

seven must be read in conjunction with application note 8.   Specifically, the Government argues that the 3C1.1 enhancement is appropriate because the counts of conviction should be grouped together and that failure to apply the 3C1.1 enhancement will inadequately punish the defendant for his obstructive conduct.

Defendant totally disagrees.  The Government elected to charge the defendant with obstruction of justice.  The obstruction of justice charge in the indictment related solely to Nick Bailey's second payment to complete the purchase of the motorcycle.  Now the Government wants to expand the language of the indictment so that it becomes a fishing net to capture all of what it considers to be "relevant conduct", i.e., the charges of which the Governor was found not guilty/acquitted.

The jury, in a compromise verdict, convicted on the obstruction count.  As a result what would have been a simple base level of 12  ( see U.S.S.G. §2J1) has now turned into a suggested base level of 38 because of the inclusion  of relevant conduct.  To suggest that the defendant is in some way escaping accountability for the  "obstructive conduct" is absurd.  To be sure that the Government's position is wrong and at the least would create a double counting scenario, one need look no further than to the United States Supreme Court holding in *Blakely v. Washington*,542 U.S. _, 124 S.Ct. 2531, 159 L.Ed. 2d 403 (2004).   The Court

addressed the obvious Sixth Amendment violation in charging an obstruction offense and a situation where a District Judge makes a preponderance of the evidence finding on an obstruction enhancement. In this case the Government elected to charge the obstruction as a count in the indictment. The Government should not benefit from using the same set of facts for double punishment.

Further, the obstruction conduct for which Governor Siegelman was convicted and that which the Government seeks the 3C1.1 enhancement is identical. If not the Government would have surely made any additional "obstructive conduct" part of the indictment. There is no additional obstructive conduct to which the Government can credibly point unrelated to the motorcycle transaction.

Regardless of how the Government argues the facts it is true that this effort for a two level 3C1.1 enhancement constitutes impermissible double counting. The conduct upon which the Government relies is identical to the conduct giving rise to the underlying obstruction of justice conviction.

The Government suggests the obstruction count should apply to the bribery grouping. Yet, the Government fails to articulate any conduct constituting the obstruction enhancement other than that constituting the obstruction count.

**VALUE OF BENEFITS**

The Government Sentencing Memorandum, page 6, Section B, regarding Value of Payments or Benefits attempts to attribute to Governor

Siegelman dollar amounts[1] not even suggested by the Probation Officer and certainly not established by the evidence.  These are as follows:

        Tim Adams - $11,000

        IHS - $17,000

        HealthSouth - $3,109,054.62

        Lanny Young[2] - $400,000

        Waste Management Tax Benefit - $$4,200,000

        Hamrick - $50,000 from Young[3]

        Bailey - $62,000 from Young

        Young - $3,000,000 - Waste Management Payment For Landfill

        Young - $35,000 from Bill Blunt

        Young - $50,000 in fees from Austin Young Capital Resources

        TOTAL - $11,895,549.62

**FINE**

The Government's Sentencing Memorandum, page 9 addresses the request for a fine.  The Government incorrectly urges an increased fine pursuant to 18 U.S.C. §3571(d) alleging that Governor Siegelman derived pecuniary gain from

---

[1] It should be noted that Siegelman does not agree with any of the monetary amounts in the Presentence Report suggested by the Probation Officer.  Arguably the only that could have a place in the report based on the counts of conviction are the $500,000 and the $9,200 motorcycle amounts.

[2] At the same time Lanny Young is reported to have been paying Siegelman in cash and gifts he was reportedly broke and in bankruptcy.

[3] The Government contends this form of cash and property involved NASCAR tickets and airplane tickets.  The Government probably mean airplane rides.

the offense.  There was simply no evidence that the Governor personally benefitted at all from the conduct for which he was charged and found not guilty or the conduct for which he was convicted.

Governor Siegelman disagrees with any fine being based on $11,895,549.62 in alleged illegal payments and the suggested $23,791,079.24 based on 18 U.S.C. §3571(d).  The Governments suggestion that Governor Siegelman should be fined $1,000,000 based on the above is yet another example of overreach to destroy the defendant.  There was no gain to him as a result of the convicted or acquitted conduct.  The Court should reject the Government's request and not impose a fine.

The Government's suggestion that Governor Siegelman should be divested of $1 million he received from a law firm at or about the time of the tobacco settlement is not supported by the record.  (Government Sentencing Memorandum, page 10)

The remoteness of any  connection between these baseless allegations is revealed in the Government's Sentencing Memorandum, page 10, wherein the Government concedes "Moreover, the fee constituted an unearned windfall obtained under questionable circumstances considering Defendant Siegelman's ability at the time to refuse to approve the tobacco settlement.  **Regardless since Defendant Siegelman has the ability to pay with money closely connected** to his actions while Governor, and since his wrongdoing while Governor resulted in a

much greater loss to the State of Alabama, he should be fined the amount of $1,000,000."

Further, evidence of the Government's speculation and fishing expedition is reflected in the Sentencing Memorandum, page 10, where the Government concedes it has subpoenaed records for sentencing which will establish **whether** money contributed to Siegelman annuities was funded by questionable money related to the tobacco settlement and insulated from the Government's reach. The flaw in the Government's intrusive conduct and theory is evidenced by its statement, page 10, that subpoenaed records "will establish **whether** the money was used to purchase the annuities". (emphasis added) This is clear and unequivocal evidence that the Government does not have a clue that the Governor received a dime from the tobacco settlements or any improper money from any law firm related thereto.

Governor Siegelman, while serving as Lieutenant Governor, worked for the private law firm of Cherry and Givens. The windfall referenced by the Government in the Sentencing Memorandum was earned legal fees and proper. This entire matter was the subject of a State ethics complaint. The complaint was dismissed in Governor Siegelman's favor. It should also be noted the tobacco settlement was approved by Attorney General Bill Pryor.

Additionally, the annuities referenced by the Government as possibly funded by improper gains is another hoax. United States Probation Officer Jacquelyn Caple conducted a thorough investigation into Governor Siegelman's background

11

and finances.  In the Presentence Report, page 17, paragraph 70, Note B,  it is clear
that the Annuities referenced are for his wife (50%) and children (25% each).  The
Probation Officer found nothing questionable about this annuity nor should the
Court.  This money is being used to sustain the Governor's family and for legal
expenses.

**MORE THAN ONE BRIBE**

First Governor Siegelman responds that the alleged bribes referenced by the
Government (Sentencing Memorandum, pages 17-20) should not be used against
him, based on the same argument he has repeatedly made that the trial testimony
did not support attribution of the monetary amounts to him other than the $500,000
and $9,200.  In keeping with this argument the trial testimony does not support
using these instances, tied to monetary amounts, as other "bribes".

The fact that Governor Siegelman was convicted of counts making reference
to some of Scrushy's activity while on the CON Board does not make Scrushy's
acts attributable to Governor Siegelman.  Governor Siegelman was apparently
convicted because he received a $500,000 contribution to the Alabama Education
Lottery and afterwards Richard Scrushy was placed on the  Board.  He was not
convicted of acts of Richard Scrushy over which he had no control.

As to the Government's suggestion that Governor Siegelman should be held
accountable for acquitted Rico conduct where Hamrick, Young and Bailey received
money, he disagrees.

**IDENTIFIABLE VICTIMS**

12

Governor Siegelman argues that he should not be held accountable for Richard Scrushy's actions in securing the money for the $500,000 contribution. This same argument applies as relates to Scrushy's use of HealthSouth money and losses to third parties as a result of Scrushy's actions.

**RESTITUTION**

The Government seeks $5,239,495 million in restitution when it never proved Governor Siegelman benefitted a penny from the alleged conduct. Young benefitted millions and was only asked to pay restitution in the amount of $181,325 to the State and $202,456 to the Internal Revenue Service. Bailey who benefitted hundred of thousands of dollars, was ordered to pay $50,000 to the State in restitution and $28,359 to the Internal Revenue Service. This fact alone shows the Government overreach and blindness to justice. The American people are agreeing. It is clear that cooperation by criminal defendants aids the Government and benefits the cooperator. However, for the Government to urge a sentence **28 years longer** for Governor Siegelman than Lanny Young, even though a cooperating defendant, is just plain wrong. The disproportionate restitution request is further telling of the degree the Government will go to obtain convictions by bartering with informants for testimony.

The Government's restitution request is patently absurd.

**POLITICAL MOTIVATION**

The Government's Sentencing Memorandum, page 23 suggests that Governor Siegelman should be severely punished for his lack of remorse,

continued proclamation of innocence, and claims of the prosecution against him being politically motivated. The Government's position ignores several obvious facts. First, Governor Siegelman, as does any other criminal defendant, has a right to protest his innocence and a constitutional protection that he should not be penalized for exercising a constitutional right (appealing his conviction).

Secondly, the Government's position regarding Governor Siegelman's political prosecution theory is curious. The Government previously (Document 348) filed a motion to preclude references at trial to any political motivation for Governor Siegelman's prosecution. The Government in its motion made much of the fact that Governor Siegelman had not filed a selective prosecution motion and could not meet the heavy burden of proving selective prosecution.

The Government should be collaterally estopped from advancing this tongue- in-check vacilating position. The Government (Document 348) criticizes the Governor for failing to file a selective prosecution motion while at the same time refusing to release requested freedom of information material that would support a motion. As noted in the first notice of objection pleading filed, Governor Siegelman has diligently sought freedom of information material in support of his position of political motivation which has been deemed discloseable but not yet provided.

The Government's motion (Document 348) correctly notes that discovery from the Government on the issue of selective prosecution is permissible if proof

is presented to show the existence of the essential elements of the defense. *United States v. Quinn*, 123 F.3d 1415 (11th Cir. 1997).

To penalize Governor Siegelman for exercising his First Amendment right to freedom of speech and his advancement of a legal theory would trample on the basic fundamental tenants of our constitution. To do so would be the most egregious deprivation of rights for any citizen.

### SUGGESTED GUIDELINE AND SENTENCE

Governor Siegelman disagrees with the Government's suggested guideline calculations (Government's Sentencing Memorandum, pages 21-21).

The suggested 30 year sentence exemplifies the Government's efforts to punish Governor Siegelman for conduct it could not prove at trial and is overkill for anything else it can think of by manipulating the United States Sentencing Guidelines to produce an unjust result.

Although the Sentencing Guidelines are now used in an advisory manner, as per *United States v. Booker*, 543 U.S. 220, 125 S.Ct. 738, 160 L.Ed.2d 621 (2005), the district court must still correctly calculate the sentencing range prescribed by the guidelines. *United States v. Crawford*, 407 F.3d 1174, 1178 (11th Cir. 2005). "A district court's determination regarding the amount of loss for sentencing purposes is reviewed for clear error." *United States v. Nostari-Shampoo*, 255 F.3d 1290, 1291 (11th Cir. 2001); *United States v. Cabrera*, 172 F.3d 1287, 1292 (11th Cir. 1999). See also U.S.S.G. §2B1.1, comment (n.3(C)) (stating that because "[t]he sentencing judge is in a unique position to assess the

evidence and estimate the loss based upon that evidence...the court's loss

determination is entitled to appropriate deference.")

Respectfully submitted,

s/Susan G. James
SUSAN G. JAMES
Attorney at Law
600 South McDonough Street
Montgomery, Alabama 36104
Phone: (334) 269-3330
Fax: (334) 834-0353
E-mail: sgjamesandassoc@aol.com
Bar No: JAM012

## CERTIFICATE OF SERVICE

I hereby certify that on June 12, 2007 I electronically filed the foregoing with the Clerk of Court using the CM/ECF system which will send notification of such filing to the following:

Louis Franklin, AUSA
U. S. Attorney's Office
P. O. Box 197
Montgomery, AL 36101

Respectfully submitted,

s/Susan G. James
SUSAN G. JAMES
Attorney at Law
600 South McDonough Street
Montgomery, Alabama 36104
Phone: (334) 269-3330

16

Fax: (334) 834-0353
E-mail: sgjamesandassoc@aol.com
Bar No: JAM012