**IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION**

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | * |
| | * |
| **PLAINTIFF,** | * |
| | * |
| **v.** | * **CASE NO.  2:05cr119** |
| | * |
| **DON SIEGELMAN, ET AL** | * |
| **DEFENDANT.** | * |

**SENTENCING MEMORANDUM**

Comes now Don Siegelman by and through undersigned counsel and files this

Sentencing Memorandum and in support thereof states the following:

**I.  ARGUMENT**

**A.  Introduction**

[E]very lawyer engaged in defending criminal cases knows that often a finding of guilt is a

foregone conclusion[1] and that the real issue centers about the severity of the punishment.  *Smith v.*

*United States,* 223 F.2d 750, 751 (5th Cir. 1955).  Governor Siegelman argues in this case that the

suggested punishment is too severe.

The *Booker* decision has two parts. In the first part, the Court held that the Federal

Sentencing Guidelines, promulgated pursuant to the Sentencing Reform Act of 1984, 18 U.S.C.

§ 3551 *et seq.*, violated a defendant's right to a jury trial under the Sixth Amendment. This was

so because the Guidelines required a judge to find facts that can increase a defendant's sentence

beyond what could be imposed solely based on the jury's verdict. As a remedy, in the second

part, a different majority of the Court severed two parts of the Act, 18 U.S.C. § 3553(b)(1),

which made the guidelines mandatory, and 18 U.S.C. §3742(e), which mandated a *de novo*

standard of review. With these modifications, the Court noted that "the Federal Sentencing Act . .

. makes the Guidelines effectively advisory." *Booker*, 125 S. Ct. at 757.

---

[1]Counsel for Governor Siegelman does not want to suggest that a conviction was a
foregone conclusion in this case but offers the Smith comments to highlight the importance of the
sentencing.

The return to the exercise of true judicial discretion in sentencing is explained in these words of the Supreme Court:

> We have never doubted the authority of a judge to exercise broad discretion in imposing a sentence within a statutory range. Indeed, everyone agrees that the constitutional issue presented by these cases would have been avoided entirely if Congress had omitted from the SRA the provisions that make the Guidelines binding on district judges . . . For when a trial judge exercises his discretion to select a specific sentence within a defined range, the defendant has no right to a jury determination of the facts that the judge deems relevant.

Booker, 125 S. Ct. at 750 (citations omitted).

With the decision by the United States Supreme Court that the Federal Sentencing Guidelines were unconstitutional, its Booker decision holds that a defendant's Sixth Amendment rights are violated where the mandatory guidelines required judges to find facts resulting in specific sentencing consequences having the effect of increasing a defendant's sentence beyond that range which would apply either by a jury's verdict or by a plea of guilty by the defendant. The Court, in a separate majority opinion, which has been described as the "remedial" opinion, deemed that the guidelines are now merely "advisory" and that district judges are to "consider" the guideline ranges presented in the sentencing context while having the discretion to form a sentence in light of other statutory concerns, specifically those presented in 18 U.S.C. §3553(a). Id.

As of this filing the United States Probation Officer has not resolved Defendant's Objections to the Pre-Sentence Report (hereafter PSR).  The original report recommended a guideline sentence of 97 to 121 months[2] based on advisory sentencing guidelines.  The Government's Sentencing Memorandum recommends a sentence of **30 years**.  Both the United States Probation Officer and the United States Government are relying in large part on acquitted

---

[2]As argued in the previously filed objections to the PSR the driving force behind such incredibly high sentencing guidelines in the improper and constitutionally violative use of acquitted conduct.  Governor Siegelman argues that using conduct for which he was found not guilty and that which was not supported by the record violates the Sixth Amendment.

conduct to fashion a suggested "reasonable sentence." There is absolutely nothing "reasonable" about a sentence anywhere close to those suggested above. A prison sentence in this case is not necessary and would serve no stated penological purpose.

### B. What Must Be Considered In Post-Booker Sentencing

Post-Booker the guidelines become but one of several factors to be considered by the court in the sentencing process. First, the guideline range, including policy statements are to be considered under 18 U.S.C. § 3553(a)(4) and (5) as an advisory guide. Applicable departures under the guidelines are also to be considered. Now the courts must also consider the statutory directives presented in other parts of § 3553(a) as well as the Congressional directive that "No limitation shall be placed on the information concerning the background, character and conduct of" the defendant in the course of the sentencing process. 18 U.S.C. § 3661. In other words the courts are free to sentence just like pre-November 1987.

Departures under § 5H1 which, by the Sentencing Commission's policy statements, had all but become mandatorily inapplicable to defendants and their personal circumstances, are no longer outside the scope of a sentencing court's assessment of a reasonable sentence.

Section 3553(a)(1) specifically directs that the court shall consider during the sentencing process "the history and characteristics of the defendant". Therefore, such matters as age, employment, family ties, good deeds, and community ties, for instance, can and should be considered by this Court in fashioning a reasonable sentence. Under the same subsection of §3553, the Court is directed to consider the "nature and circumstances of the offense" without the mandatory directives of the now advisory guidelines. The Court is directed in §3553(a)(2)(A) to fashion a sentence "to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; [and] (C) to protect the public from further crimes of the defendant; . . . ." Under *Booker*, each of these factors is to be separately considered by a court as part of the entire sentencing process.

Further, § 3553(a)(6) directs the sentencing court to consider "the need to avoid

3

unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct . . ..." That certainly means more than calculating each defendant's guidelines and simply imposing the mandated sentence. Finally, under § 3553(a)(7), the Court shall consider "the need to provide restitution to any victims of the offense." The Court must now analyze whether a deviation from the "advisory" guideline range is appropriate giving due consideration to each of the factors enumerated. The former mandatory nature of the guidelines and decisions supporting the policies of the Sentencing Commission omitted consideration of personal and historical characteristics.

At sentencing Governor Siegelman must be granted the opportunity to present any relevant evidence about his personal history and characteristics as required by § 3553(a) and 3661 and present argument about the role that each subsection of 3553(a) should play in the sentencing process. The Court must ultimately analyze whether a sentence of 97 to 121 months incarceration reflects the seriousness of these offenses, is required for deterrence of similar criminal conduct, is necessary to protect the public, and, more importantly, represents a disparate sentence in comparison to the sentences imposed on others in similar circumstances.

### C. Consideration of the 3553(a) Factors In This Case

The Court should consider the need for the sentence to reflect the seriousness of the offense and the need to deter Governor Siegelman[3] and others from committing further crime. *See* §3553(a)(2). Governor Siegelman adopts and reargues by reference as if fully incorporated herein all of the mitigation and sentencing objections raised as the objections to the PSR already filed. (Documents 595 and 596) Further, the court can and should consider the panolopy of other mitigating arguments now permissible under *Booker*.

This Court should consider the need to avoid unwarranted sentencing disparities. *See* §

---

[3]Governor Siegelman by this statement does not concede guilt but instead phrases the sentence with recognition that the Court accepts the jury verdict.

3553(a)(6). To be sure, uniformity in sentencing is important. However, under the circumstances of this particular case, for the reasons stated herein, any prison sentence is greater than necessary to satisfy the purposes of sentencing set forth in § 3553(a). In other words, while this sentence may be disparate from the sentence given to other defendants who are "found guilty of similar conduct", given the particular circumstances of this case – Governor Siegelman's lack of the likelihood of recidivism , his strong family ties, his charitable past, and his public service warrant a reduction in sentence.   18 U.S.C. § 3553(a)(6).

### D.  *Blakely/*Sixth Amendment

Governor Siegelman argues that the remedial opinion *Booker,* Part II does not comport with the plain language of the Sixth Amendment.  Any sentencing enhancements used to enhance the sentence, or in this case even as a starting frame of reference, should be charged in the indictment and proven to the jury beyond a reasonable doubt.  If so, the base offense level would not have exceeded 10 U.S.S.G. §2C1.1(a)  and the guidelines would not have exceeded 6 to 12 months.

### E.  Disparity

The Sentencing Reform Act of 1984 was designed in large part to eliminate disparity among similarly situated offenders, with similar backgrounds, convicted of the same crimes.  In fact, the United States Sentencing Guideline Manual, §1A1.1, The Basic Approach (Policy Statement) addresses the need to avoid unwarranted sentencing disparity wherein it is stated: ... "Second, Congress sought reasonable uniformity in sentencing by narrowing the wide disparity in sentences imposed for similar criminal offenses committed by similar offenders.  Third, Congress sought proportionately in sentencing through a system that imposes appropriately different sentences for criminal conduct of differing severity."

It is difficult to contrast and compare Governor Siegelman with other similarly situated defendants with the exception of his being an elected public official.  In almost all other comparable cases the other public officials convicted have personally gained from their crimes.  In

the Siegelman case the evidence, when considered in the strained light most favorable to the Government, is that the Alabama Education Lottery received a $500,000 contribution from Richard Scrushy who was later appointed to the CON Board. As previously stated, Scrushy had served three other governors, all to whom he had made contributions.

For purposes of this sentencing memorandum counsel for Governor Siegelman will attempt to highlight other cases with far more egregious facts[4] where defendants have received less or disproportionate time than suggested in this case under either the mandatory or advisory United States Sentencing Guidelines or pre-guideline sentences (pre-November 1, 1987).

**EXAMPLES**

**John Walter Lindh** - Terrorist, **a 25 year sentence** for supplying services to the Taliban.

**Lewis Libby - the former Chief of Staff to Vice President Dick Cheney**, charged with two counts of making false statements to the FBI, two counts of perjury, and one count of obstructing justice. The Government's theory was that Libby was **engaged in a persistent, deliberate, and long running campaign to spread misinformation**. Libby was in a high government position and entrusted with our nation's most sensitive secrets. Libby's sentencing Judge, Reggie B. Walton, stated: "People who occupy these type of positions, where they have the welfare and security of the nation in their hands, have a special obligation to not do anything that might create a problem." Libby received a **30 month sentence**. President Bush was reported to have expressed sympathy to Libby's family.

The irony of the 30 month sentence imposed in the Libby case and the 30 year sentence requested by the Government in this case is that Libby's case involved a matter directly affecting **national security** and the Iraq war and Governor Siegelman's case involved raising money to promote an education lottery to benefit the children of the State of Alabama.

**George Ryan - former Governor of Illinois**. He received a **six year and one-half year**

---

[4]Counsel realizes that some of these examples outline cases dissimilar to Siegelman. They are included to show the Court that it would be wrong to punish Governor Siegelman as much or more severely.

**sentence**.  The Government had recommended 10 years.  Ryan was convicted of racketeering, conspiracy, fraud and other offenses for **taking payoffs** from political insiders in exchange for state business while he was Illinois Secretary of State from 1991 to 1999.  Additionally, Ryan was convicted of using state money and workers for his campaign.

**John G.  Rowland, Former Connecticut Governor**, received a year and a day in prison in 2005 based on a felony conspiracy charge involving his **acceptance of $107,000 in gifts** he did not pay taxes on.  The sentence was below the suggested guidelines of 15 to 21.  Rowland acknowledged that he had accepted free vacations and cottage renovation paid for by a contractor who made millions in state business.  He admitted approving state contracts that helped the contractor.

**Joseph Santopietro -**  a **Connecticut Mayor**,  received five years probation in Federal Court after pleading guilty to a **mob related trash hauling racketeering conspiracy**.  The guidelines were 12 to 18 months in prison.   He had previously been convicted of embezzling federal funds, band fraud, and tax evasion.  He served over six years.

**Guy Hunt - former Alabama Governor - convicted for ethic violations**.  He was removed from office after having been found guilty of using money donated for innaguration ceremonies (charitable contributions) for personal use.  He was sentenced to five years of probation and ordered to pay a fine, restitution of $212,350.

**Ray Blanton, former Governor of Tennessee**, received **three years in federal prison for involvement in selling paroles**.

**Richard Scrushy** - the Government seeks only a 25 year sentence for Scrushy.  Scrushy was found **not guilty** on 56 counts in a case the Northern District of Alabama.  The Government contended that Scrushy as CEO of HealthSouth was the leader of a **$2.7 billion fraud** that enriched him millions of dollars.

## II. REASONS IN SUPPORT OF DEPARTURE

### (A) Unique Combination of Factors

Under U.S.S.G. §5K2.01, Comment, the Sentencing Commission does not foreclose the possibility of an extraordinary case that, because of a combination of such characteristics or circumstances, differs significantly from the "heartland" cases covered by the guidelines in a way that is important to the statutory purposes of sentencing, even though none of the characteristics or circumstances individually distinguishes the case.

### (B) Acquitted Conduct

In the instant case the Probation Officer has recommended that the sentence be increased based on a relevant conduct theory using acquitted conduct. This has caused a four level increase pursuant to §2B1.1 J-K of the sentencing guidelines. The Government using the same theory seeks a larger enhancement. If the Court agrees and adopts the probation recommendation or the Government's recommendation a departure from the suggested guidelines is warranted. The relevant conduct increase is causing an extraordinary increase in the sentence based on acquitted conduct. *United States v. Monk*, 15 F.3d 25 (2d Cir. 1994); *United States v. Concepcion*, 953 F.2d 369 (2d Cir. 1992).

*Concepcion* held that "the district court retains discretion to downwardly depart where the sentence would be dramatically increased by reason of the unconvicted relevant conduct."

The sentencing factors set forth by the Government are so severe that they become the tail wagging the dog of a substantive offense. *United States v. Townley*, 929 F.2d 365, 369 (8th Cir. 1991).

### (C) Political Motivation for Prosecution/Conflict of Interest

When considering a combination of factors supporting a departure in this case pursuant to U.S.S.G. §5K2.01 one need look no further that the political origins of this case that were advanced by former Siegelman counsel David Cromwell Johnson, now deceased.

Johnson accused U. S. Attorney Leura Garrett Canary of advancing a political

8

investigation for the benefit of her husband's clients and political allies. Siegelman realizes this argument was barred at trial but may now be considered under Title 18 U.S.C. §3661.

The issue for trial may well be whether the accused is guilty or not guilty *(United States v. McVeigh*, 153 F.3d 1166, 1192 (10th Cir. 1998). However, no such limitation exists for purposes of sentencing. "Following Congress' lead, the Sentencing Guidelines state that, "[I]n determining the relevant facts, sentencing judges are not restricted to information that would be admissible at trial." U.S.S.G. §6A1.3. *United States v. Bras*, 05-3190 (District of Columbia, April 20, 2007).

In its Motion in Limine to Bar Defendant's From Presenting Testimony, Evidence or Argument Concerning Alleged Political Motivation for the Prosecution, the Government acknowledged the political overtures in this case by referencing Siegelman's attempt to obtain information pursuant to the Freedom of Information Act.

The United States Attorney, in a press release, advised that she was removing herself from the case. Yet, the case was still prosecuted by her subordinates. Siegelman, through other counsel, has diligently tried to obtain through the Freedom of Information Act evidence that further documents and supports his contentions. Despite his request well over a year ago the material which has been deemed disclosable by the Department of Justice has not been provided.

Siegelman plans to advance more on this argument at sentencing.

**(D) Business Destruction**

The defendant is a licensed attorney. He has been a public servant for 30 years. His only ability to now earn income is as a licensed attorney. The Court should consider a downward departure from the guidelines on equitable grounds given that he will lose his license to practice law. Governor Siegelman's future employment opportunities are slim. As such a downward departure is appropriate. See *United States v. Jones*, 158 F.3d 492, 499 (10th Cir. 1998) The collateral employment consequences will suffer.

**(E)  Charitable Works**

Effective November 1, 1994 U.S.S.G. §Ch. 5. Pt. H intro, comment, added language regarding civil, charitable, and public service to state that although these factors are not ordinarily relevant to the determination of whether a sentence should be outside the applicable guideline range, they **may be relevant to this determination in exceptional cases.**  (emphasis added) Governor Siegelman's public service may now be considered under the advisory guideline system.  Evidence of this will be presented at sentencing and is also before the Court in the many letters submitted on the Governor's behalf.

Governor Siegelman's distinguished public service for over two decades is a mitigating factor which presents to an exceptional degree "a reason for a downward departure." *United States v.  Canova*, 412 F.3d 331, 358, 359 (2nd Cir.  2005) In the *Conova* case the District Court departed downward for extraordinary public service and good works.  See also *United States v. Rioux*, 97 F.3d 648, 663 (2nd Cir.  1996).  In *Rioux* the downward departure was based on the defendant's charitable and civic "good deeds."

A federal judge in New York just sentenced Douglas Jemal to probation for felony fraud in large part because of extensive contributions to the betterment of the community.  See Carol D. Leonnig, Jemal's Good Works Pay Rich Dividends, WASH POST, April 22, 2007.  The judge noted that his supporters and testimony showcased a lifetime of good deeds.

Don Siegelman, as Secretary of State for eight years, relentlessly worked to improve the Alabama Election Laws to ensure fair and honest elections.  His family experienced a tragedy when his wife was nearly killed and suffered the loss of her left eye, half of her teeth and a serious head injury by a habitual criminal and  a drunk driver. With this personal tragedy, Don Siegelman's focus and direction changed and he sought and was successful in securing the job of Alabama's Attorney General.  As Alabama's Attorney General, Siegelman worked closely with victims of crime and was successful in establishing the first national sexual assault protocol. He became a friend and leader on local, state, and national levels with Mothers Against Drunk

Drivers.  His leadership skills and passion for the MADD cause engulfed youth throughout the state to participate in Students Against Drunk Drivers.  Attorney General Siegelman made sure that Alabama law enforcement officers were equipped with necessary tools, training, and equipment to enforce laws against drunk drivers and violent and dangerous criminals.

Attorney General Siegelman worked with the Honorable Ed Carnes, Former Assistant Attorney General and now distinguished Judge on the Eleventh Circuit Court of Appeals, to write and pass more anti-crime legislation than any other Attorney General in the history of the State of Alabama.

As Lieutenant Governor, Don Siegelman utilized that office to help promote positive changes in the State Ethics Laws and laws relating to women who suffered as victims of domestic violence.  He also led the fight for insurance companies to cover the costs of reconstructive surgery for females with breast cancer.

Don Siegelman was drawn to public service and charity based on experiences during the time he was a high school student. He worked with the Red Cross, the March of Dimes, and children with physical disabilities. During his high school years he actually went into homes and assisted parents with therapy involving deformed and disabled children.

The skills and ability that lead Don Siegelman to hold more constitutional offices than any person in the state's history can now be utilized as punishment for him and a positive gain for the people of Alabama. Governor Siegelman will no longer be Governor – rather, stripped of his title, dignity, and ability to earn a living as a lawyer. He has been humbled and humiliated. Yet, his skills can be put to use as an asset through an alternative sentence that would require the defendant to spend his days again with underprivileged children in Boys or Girls Clubs, in high schools or junior high school giving talks on life skills, focuses on leadership skills giving children self-confidence and practical skills that can help them in life.

Don Siegelman's life as a public servant began at a very young age. As a very young man, he displayed a spirit of compassion and willingness to help those less fortunate.  He is a bright and

articulate lawyer who could have used his skills for personal financial gain, but instead decided to devote his life to public service. The Government suggests that he should be penalized because of his years of service.  This only raises the question as to why he should be more severely penalized than others who have never lifted a hand to help another instead reaping benefits and self indulgence. We understand that the court must impose a sentence that punishes the defendant. Yet that sentence may also be one that serves a positive public purpose. Sentencing the defendant to serve underprivileged students and citizens by teaching leadership skills would serve both to punish and to promote a positive public service.

Don Siegelman has never committed a crime of violence.  Instead he devoted his career to trying to protect the citizens of Alabama from violent and dangerous offenders. Further, he did everything possible to try to improve things for Alabama citizens.  For the Government to suggest otherwise ignores all of the positive things Governor Siegelman tried to do and did for this State. If there ever was a case where one's life works should be measured against the purported harm he did to the State it is clear that incarceration is not necessary.

### (F)  Defendant Is Vulnerable and Will Have Difficulty in Prison

As noted in the Pre Sentence report Don Siegelman has held public offices in the State of Alabama for over 20 years.  Two of these positions, Attorney General and Governor, place him at great risk if incarcerated.  As Attorney General the defendant was the number one prosecutor in the State and was involved in high profile criminal cases.  As a result of his efforts countless individuals went to prison and/or were kept in prison.  This fact is well known.  Governor Siegelman implemented numerous tough on violent crime initiatives.  These included, but were not limited to, more limitations on work release, more restrictions on violent offenders, and personal  intervention in certain high profile cases before the Alabama Board of Pardons and Parole.

The climate in the prison system is anti-Don Siegelman.  Even though the above involved State of Alabama inmates there are numerous state inmates with federal detainers who have or

12

will enter the federal prison system.

Additionally, should the Court impose either the sentence suggested by the Probation Officer or the Government, Governor Siegelman will be ineligible for placement in a prison camp and be required to serve the sentence in a more restrictive higher security prison with hardened and career criminals.

### (F) Age/life Sentence

The defendant is presently 61 years old.  Life insurance actuaries project his life expectancy to be between 72 and 75 years old.  If the Court imposes the prison term suggested by the guidelines or the Government it will be a life sentence**.**

### (G) Monetary Amount Overstates the Seriousness of the Conduct

2B1.1 does not speak to the possibility that the monetary amount used for guideline purposes may overstate the seriousness of the offense conduct.

However, Application Note 10 to U.S.S.G. §2F1.1n6, does address the issue.

Monetary amount overstates seriousness of his conduct - no personal benefit.  The amount overstates the defendants culpability whether considered under the guidelines or in light of the 18 U.S.S.G. §3553(a) factors.  *United States v.  Pimental*, 367 F.Supp.  2d143 (District of Massachusetts 2005).

### (H) Bribery and Mail Fraud Convictions Atypical

The defendants bribery conviction is atypical and outside the "heartland" of normal bribery cases falling under guideline sentencing.  There was no financial benefit to the defendant and Richard Scrushy did not deprive the citizens of the State of Alabama of anything.  He served on the CON Board and provided benefits to the citizens just like he  had done for former Alabama Governors Guy Hunt, Jim Folsom, and Fob James.

The monetary amount used for guideline calculation purposes is excessive and the Court should consider departing because there is too little relationship between the defendant's role and the conduct used to determine the monetary amount.  *United States v.  Stuart*, 22 F.3d 76 (3rd Cir.

1994).

Defendant faces the same sentence as if he had personally benefitted. A departure is appropriate under these circumstances. *United States v. Takai*, 941 F.2d 738 W.L. 16709 (9th Cir. 1993); and *United States v. Burns*, No. 90-30002 - FCD. Mass. 3/21/90).

**(I)  U.S.S.G. §3B1.2 Minimal Role**

Governor Siegelman continues to deny any criminal wrong doing. He understands the jury verdict and strenuously disagrees. He is, however, mindful that the Court accepts the verdict and will sentence accordingly. He is also aware of the fact that the Government seeks a 3B1.1 aggravating role enhancement he contends is unfounded. He also argues he should not receive any aggravating role enhancement.

Given that the Government seeks an aggravating role enhancement, Governor Siegelman necessarily argues, without conceding any guilt, that in computing the advisory sentencing guidelines the Probation Officer and the Court should apply a U.S.S.G. §3B1.2 downward adjustment for minimal role.

In determining a defendant's qualification for a role reduction, the sentencing court must compare the defendant's role in the offense with relevant conduct attributed to him in calculating his base offense level. The Court may compare the defendant's conduct to that of other participants involved in the offense. *United States v. Alvarez-Coria*, 447 F.3d 1340 (11th Cir. 2006)

To determine whether a reduction in sentence for mitigating role is appropriate, the Court compares the acts of each participant in relation to the relevant conduct for which the participant is held accountable and measures each participant's individual acts and relative culpability against the elements of the offense. *United States v. Denton*, 434 F.3d 1104, (8th Cir. 2006) rehearing and rehearing denied.

A defendant is eligible for a mitigating role reduction if the defendant's role is relatively minor compared to the role of other participants. *United States v. Jackson*, 419 F.3d 839 (8th

Cir. 2005) cert. denied. 126 S.Ct. 841, 163 L.Ed 2d 716.

A minor role decrease was warranted in a mail fraud case. In the case the evidence showed that the scheme was the co-defendant's idea and that the co-defendant made the arrangements. *United States v. Martin*, 369 F.3d 1046 (8th Cir. 2004)

The defendant must be plainly a peripheral player to justify his classification as a minimal participant for purposes of a downward sentencing adjustment. *United States v. Santos*, 357 F.3d 136 (1st Cir. 2004)

A 3B1.2 downward adjustment should apply in this case.

**(J)  U.S.S.G. 1B1.4 Supports Guideline Departure**

U.S.S.G. §1B1.4 information to be used in imposing sentence (selections a point within the guideline range or departing from the guidelines) states: "In determining the sentence to impose within the guideline range, or whether a departure from the guideline is warranted, or whether a departure from the guideline is warranted, the Court may consider, without limitation, any information concerning the defendant, unless otherwise prohibited by law." (See 18 U.S.C. §3661.) Governor Siegelman argues that use of the acquited charges overstates the seriousness of the conduct used for punishment purposes. As such a downward departure is warranted.

**(K)  Acceptance of Responsibility**

A conviction alone does not automatically preclude a 3E1.1 acceptance of responsibility adjustment. In rare situations a defendant may clearly demonstrate acceptance of responsibility for his criminal conduct even though he exercises his constitutional right to trial. *United States v. Dabney*, 367 F.3d 1040 (8th Cir. 2004); United States v. Brown, 367 F.3d 549 (6th Cir. 2004)

### III.  VARIANCES THAT MAY BE CONSIDERED

**(A)  Eligible for Probation**

Once the District Court determines the advisory guideline range it must then consider whether a variance from the range is appropriate. In doing so the Court must determine what sentence comports with the sentencing factors of 18 U.S.C. §3553(a). Siegelman submits the

following factors warrant a variance from the advisory guidelines to a sentence of probation.  As pointed out in the Presentence Report, Paragraph 78, **the defendant is statutorily eligible for a sentence of probation pursuant to 18 U.S.S.C. §3561(a)**.

**(B)  18 U.S.C. §3553(a) FACTORS**

**(1) Nature and Circumstances of the Offense and the History and Characteristics of the Defendant.**

The Government's effort to paint and prove a massive public corruption case failed.  The jury, after close to two weeks of  deliberation rejected the RICO counts and disregarded in total the testimony of Lanny Young and Nick Bailey.  **The Hamrick acquittal represents what the jury thought of the Government's RICO case.**  It is clear the jury knew of Richard Scrushy's Health South acquittal.  The jury could not convict Scrushy without convicting Siegelman as the Scrushy counts on the $500,000 contribution mirrored Siegelman's.  Siegelman received no personal benefit from the Scrushy donation and in fact used the Alabama Education Lottery Fund for the benefit of Alabama children.  Therefore, the offense conduct is far less serious than the counts of conviction reflect.

The Government has made much out of the fact that the Scrushy contribution to the Alabama Education Lottery Foundation  was disclosed late.  **This Court should take judicial notice** of the fact that late and amended reports are common.  An inquiry with the Alabama Secretary of State will reveal the same.  After the election the AELF's purpose and focus changed.  It was no longer election focused.  Pursuant to the *Richey v. Tyson*, 120 F.  Supp.  2d 1298 (So.  Dist.  AL (2000), and by extension., the Alabama Education Lottery Foundation, a 501(C)(4), nonprofit entity was actually under no obligation to report contributions at all.

To be sure that the late filing regarding the Scrushy donation was not evidence of a crime was the testimony of Ed Packard, an employee of the Alabama Secretary of State, where he acknowledged that to hide the source of a contribution it could have eastily been broken down into several PACS  making it less easily identified.

16

Don Siegelman served our state as Secretary of State twice, Attorney General, Lt. Governor and Governor, for a period spanning nearly 30 years. The IRS, FBI, and state investigators subpoenaed all financial records of Don Siegelman, his wife, Lori Allen, and his two children, Dana and Joseph, for the period beginning December 1994 through February 2004, including all checks written, all deposits made, and all investments. If Governor Siegelman had been involved in bribery or peddling influence for his own personal benefit, surely, one of these agencies would have charged him with a crime. They did not. In fact, the only charge of bribery that has been made doesn't even allege that Governor Siegelman benefitted.

It is clear that Governor Siegelman did far more good for the State of Alabama, than any harm that the Government alleged. If Don Siegelman was the corrupt politician described by the Government, it would seem logical that the same would have surfaced much earlier in his long years in public service. The truth is he was a dedicated public servant that even took a voluntary pay cut while serving as Secretary of State. He did so to hire a new employee . As Governor he cut his own salary 6.2% in response to a cut in the Education Budget. Also, his service to his state cost him a retirement that he could have had in other jobs. There is no state retirement for a Governor.

**(2) Need for Sentence to Be Imposed**

A variance from the guidelines to a term of probation would still reflect (a) the seriousness of the offense - Governor Siegelman will still have a felony conviction, will lose his license to practice law, has ended a life time successful political career, he, his wife, and children suffered embarrassment and degradation, and financial hardship; (b) deterrence - these factors above are adequate for deterrence purposes; (c) protection of the public from further crimes. There is no possibility of recidivism; (d) needed educational, vocational, medical, or correctional treatment - none of these sentencing objectives are necessary in the instant case.

**(3) Kinds of Sentences Available - Probation** is available as are **Home Confinement** and **Community Corrections**.

**(4) The Need to Avoid Unwarranted Sentence Disparities Among Defendants with Similar Records Who Have Been Found Guilty of Similar Conduct**.

The kind of disparity with which §3553(a)(6) is concerned with is an unjustified difference across judges rather than among defendants to a single case. *United States v. Boscarino*, 437 F.3d 634, 638 (7th Cir. 2006). The Court can look at what variances were given co-defendants. *United States v. Pyles*, 0604522, 4th Cir., April 11, 2007.

The 24 month sentence for Young[5], the 18 month sentence for Bailey, and the acquittal of Hamrick support a variance in this case. In the instant case a downward variance sentence would better serve the competing interests of §3553(a) than a guideline sentence would.

**(5) No Benefit to the Defendant**

Certain trial facts clearly support the defendant's position that he received no personal benefit from the Scrushy contribution of $500,000 to the AELF. Todd Beard an employee of First Commercial Bank where the loan was secured testified that the $730,000 loan was to the Alabama Education Foundation not a loan to Nabors or Siegelman. At that time Nabors had pledged $29 million in stock to First Commercial.

The Presentence Report finds that Siegelman "benefitted" from the AELF paying off its loan, for which he was "jointly and personally liable." (PSI, Page 8, Paragraph 21-22) Siegelman did not sign the note jointly with the AELF; he was not primarily liable; he was only a guarantor. Thus, his liability was not absolute, but contingent, a distinction with a hoary pedigree in Alabama law. See *Lawson v. Townes Oliver & Co.*, 2 Ala 373, 374 (Ala 1891).

Consequently, his liability would not have become absolute until and unless the primary obligator (AELF) defaulted, but it never did. Thus, Siegelman and Nabors did not "benefit" when the AELF paid off the loan. If Siegelman and Merv Nabors had benefitted from the payoff and

---

[5]Young was charged with separate crimes in the Northern District of Alabama. He was an unindicted co-conspirator in the Middle District of Alabama case. Young's Northern District case was transferred to the Middle District pursuant to Rule 20. This enabled Young to avoid separate punishment for separate crimes. Further, it gave the Siegelman prosecutors great leverage in securing Young's testimony against Siegelman.

they did not include the income on their tax returns, they would also have been charged with tax evasion. This is a clear indicator that neither Siegelman nor Merv Nabors "benefitted" from the discharge.

Even in doing a substance/form analysis, that is, while the form of the transaction was a loan to the AELF, the substance of the transaction was a loan to Siegelman and Nabors, the result is the same. The testimony was that the bank was not looking to Siegelman (he did not even file an asset report with the application for the loan), but to Nabors, who was a millionaire and a substantial depositor with the bank. See generally, *Selfe v. United States*, 778 F.2d 769, 772 (11th Cir. 1985) (look to the substance to determine the tax consequences of loan forgiveness); accord, *Dept. of Revenue v. Acker*, 663 So.2d 470, 473 (Ala. Ct. of App. 1994).

If the Foundation had defaulted and Merv Nabors refused to pay and if Siegelman had been asked to pay, Siegelman at that time had over $2 million dollars in his campaign account and could have simply written a check from the "Siegelman For Governor" account to pay the debt. Therefore, there was never any threat of personal liability. A loan being paid off does not create a benefit to a guarantor who would never be called on to pay the debt. Governor Siegelman had sufficient funds to pay the loan if Merv Nabors had been called on to pay it and had not. Don Siegelman was never going to be called on to pay the debt.

Further, Application Note 10 to U.S.S.G. §2F1.1n6[6],   Monetary amount overstates seriousness of his conduct - no personal benefit. The amount overstates the defendants culpability whether considered under the guidelines or in light of the 18 U.S.S.G. §3553(a) factors. *United States v.  Pimental*, 367 F.Supp.  2d 143 (District of Massachusetts 2005).

**(6) Guideline Sentence Will Create Eighth Amendment and Equal Protection Violation**

Governor Siegelman argues that the suggested guideline sentence and anything short of

---

[6]Defendant concedes this language is not contained in 2B1.1 which was used in this case. However, he argues that consideration of the 2F1.1 language would be appropriate in this case.

probation will violate his Eighth Amendment protection against cruel and unusual punishment. Governor Siegelman has argued  that other similarly situated individuals with similar charges received substantially less punishment.  Further the counts of conviction given the uncontroverted facts do not warrant such a draconian sentence.  Additionally, other Governors, including Bob Riley, have received campaign contributions from individuals they have subsequently placed on the CON Board.  This was done in the case of Dr.  Swaid Swaid who was appointed chairman by Bob Riley after having contributed to the Riley campaign.

## IV.  ALTERNATIVE SENTENCING

### (A)  Probation/Community Service

In view of prison overcrowding, the ineffectiveness of prison rehabilitation programs, budgetary constraints, and the documented success of various programs, distributive justice has been applied by some sentencing courts.  This distributive justice frequently involves having the offender compensate the Government and/or victim.  In many instances, the Courts have imposed community service in conjunction with the terms of probation.  Community service is a valuable option available to the Court for use in the sentencing equation because of the benefit it produces for a nonprofit community organization in need, as well as, the accountability requirement for the offender.

Kay M. Harris, in a publication, <u>Community Service by Offenders</u>, U. S. Department of Justice, National Institute of Corrections (Washington, D.C.; U. S. Government Printing Office, 1979), p. 10, stated:

"Community service orders can serve most of the classical purposes of punishment, as well as offer additional benefits to the public.  These type of orders are intended to serve as punishment or retribution, because performing service without pay is an imposition on the time and liberty of the offender.  Although the literature on the deterrent effects of community service is limited, the research that is available suggests that social restitution does serve as a deterrent to additional offenses."

The United States Supreme Court has stated that probation is to be used "to provide an individualized program offering a young or unhardened offender an opportunity to rehabilitate [himself] without institutional confinement under the tutelage of a probation officer and under the continuing power of the Court to impose institutional punishment for [his] original offense in the event he abuses the opportunity." *Roberts v. United States*, 320 U.S. 264, 272 (1943).

The Honorable Bailey Brown, Chief Judge, U. S. District Court, Memphis, Tennessee, in "Community Service as a Condition of Probation," 1977 Federal Probation, over 30 years ago and still valid today, outlined the following as advantages of imposition of community service in conjunction with a sentence of probation:

(1) The probationer will be required to do work without pay for good cause which should, in effect, have some therapeutic outcome that would make the probationer atone for his misdeed in a concrete and constructive way.

(2) The involved public and/or charitable agencies would receive valuable services from the probationer of which they are very much in need.

(3) The imposition of the requirement of work without pay would make the probationer more acceptable to the public in that the public would be regularly at work for a designated agency which would, in turn, be in touch with his probation officer, the officer would have an additional handle on the probationer.

(4) Since the probationer would be regularly at work for a designated agency which would, in turn, be in touch with his probation officer, the officer would have an additional handle on the probationer.

The support for community corrections and alternative sentencing has become common in light of prison overcrowding and economic trends. These considerations make it more feasible to keep offenders in the community whenever possible. Clearly, in the case of Governor Siegelman and in light of prison overcrowding, there does not appear to be any reason that he is not a fit candidate for a structured term of probation with court-ordered community service.

21

Don Siegelman has excellent leadership and public speaking skills.  He is presently a convicted felon.  The Court could order that Defendant Siegelman be required to conduct leadership classes for the Boys and Girls Club to assist the children in learning skills and encouraging them to finish high school.  This would be particularly effective since Defendant Siegelman would be ordered by the Court to participate and the children would be able to see the devastation endured by one stripped of title and rights.  The children would be able to see and feel the embarrassment suffered by a former Governor made to serve as an example by this Court of one that was attempting to right the wrong sanctioned and endorsed by a jury of twelve of his peers.

Don Siegelman, if permitted to participate in this alternative sentencing plan and community service, would have been adequately punished, while at the same time providing valuable services to needy individuals in his community.

This proposal offers the Court's  consideration, sanctions which are punitive and rigorous, yet providing an alternative to traditional incarceration as the only means of insuring that justice be done.  The proposed sentencing alternative concept would allow Governor Siegelman to continue to live and work in the community as a productive citizen.

Throughout history, noted scholars and criminologists have analyzed the purposes of sentencing and punishment.  As early as 1974, Cesare  Beccarria, in his work On Crime and Punishment explored the concept of punishment by stating:

"In order for punishment not to be, in every instance, an act of violence of one of many against a private citizen, it must be essentially public, prompt, necessary, **the least possible in given circumstances, dictated by laws**."  (Emphasis added)

Beccarria went on to express his doubt about the value of the **amount of punishment** by stating that deterrence is not guaranteed by the severity of punishment, but rather the certainty and speed with which it is administered.

Historically, it has been held that prisons should be a place of last resort, a place for the

incorrigible, for those whom it has been determined are unfit candidates for probation. There is no evidence in the instant case that Governor Siegelman is a threat to the community or an unfit candidate for probation. An alternative sentencing plan would be quite appropriate in this case.

**(B) Split Sentence**

The proposed split sentence would certainly comply with the legislative intent of Public Law 85-741 (August 23, 1958) as codified in 18 U.S.C. §3651 (now repealed giving way to the Federal Sentencing Guidelines), wherein it was believed that many offenders simply needed a small taste of prison life and then a prompt return to the community so that they could continue on with a productive and law-abiding life. Essentially, it was believed that a short period of confinement followed by probation has a salutary effect upon an offender and is conducive to rehabilitation. The primary purpose of the split sentence was to enable the Judge to impose short sentences followed by probation. *United States v. Cohen*, 617 F.2d 56 (4th Cir. 1980). In the case of Governor Siegelman, it should be obvious that he does not need lengthy incarceration to be rehabilitated and, if the Court grants probation, it reserves the option to impose a custody sentence on Governor Siegelman if he breaches the trust of the Court. Split sentences were precluded under the guidelines. However, the Court could impose a split sentence post *Booker*. (See *United States of American v. Woghin*, United States District Court, Eastern District of New York, Case No. 04CR847(ILG), February 6, 2007.)

**(C)  Intermittent Confinement**

_____In the alternative, this Court could consider intermittent confinement. The United States Sentencing Commission Manual provides for intermittent confinement in certain cases as a condition of probation. U.S.S.G. §5B1.3,(e)(6). Intermittent confinement is defined as custody for intervals of time and may be ordered as a condition of probation during the first year of probation. This type punishment was adopted by Congress when the Sentencing Reform Act of 1984 was passed. It could be an appropriate sentencing alternative in the instant case if the Court is not satisfied that probation, split sentence, and community service is enough.

If this Court rejects the split sentence probation/community service option and believes traditional confinement beyond that mandated through imposition of the split sentence is warranted, it is suggested that this be accomplished through the imposition of intermittent confinement combined with probation and community service. The advantages of probation and community service have long been recognized.

It is respectfully submitted that intermittent confinement, coupled with the community service proposal would ensure the appropriate accountability under an alternative sentencing plan that would benefit the community, targeted recipients of the community service proposal, and the taxpayers. Such a program would mandate vigorous and meaningful punishment while maximizing the offender's potential through performance of the community service proposal.

## IV. PUNISHMENT HAS ALREADY BEEN SUBSTANTIAL

The **American Heritage Dictionary** refers to the word "punish" by stating, "it usually means subjecting someone to loss of freedom or money or to physical pain for some wrong doing."

It seems very clear that Governor Siegelman has been "punished" in many ways. He has suffered public embarrassment and may be known as a convicted felon for the remainder of his life. He will no longer be able to practice law. He will no longer be able to hold public office. The stigma of this alone carries great significance for Governor Siegelman.

Numerous community citizens who know Governor Siegelman have advised the Court that incarcerating him would have a detrimental effect on him.

If the Court imposed probation with a community service condition, there would be a great benefit to the targeted recipients of his community service proposal.

## V. COMMUNITY SUPPORT

Governor Siegelman has strong community ties. He is very well-known for his caring nature, as evidenced in the letters submitted previously to the Court on his behalf by his family, friends and neighbors.

The collective opinion of Governor Siegelman is positive.  He is deeply loved by his family and friends and has earned the utmost respect of those who are acquainted with him.

The consensus of individuals who know Governor Siegelman request that he be allowed to remain in and serve the community.   The "Justice Model" of probation calls for probation to be considered a sentence in and of itself.  To add to its punitive content, the "Justice Model" abandons rehabilitation as its central content and replaces it with such sanctions as restitution and community work service to be imposed in accordance with the crime's seriousness.  (Alternative Sentencing, Klein, Andrew R., Anderson Publishing Co., Cincinnati, Oh, 1988).

## VI. CONCLUSION

Guidelines sentences should not be presumed reasonable.  Instead, "[i]t has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensur." *Koon v.  United States*, 518 U.S.1 (1996)  requires nothing less.

For all of these reasons, and for the reasons to be stated on the record at the sentencing hearing, a substantial reduction from the suggested guidelines is warranted.  Additionally, counsel anticipates the need to present fact and mitigation witnesses at sentencing.  Governor Siegelman may present other matters in mitigation at sentencing not included in this memorandum.

Respectfully submitted,


s/Susan G. James

SUSAN G. JAMES

Attorney at Law

600 South McDonough Street

Montgomery, Alabama 36104

Phone: (334) 269-3330

Fax: (334) 834-0353

E-mail: sgjamesandassoc@aol.com

Bar No: JAM012


## CERTIFICATE OF SERVICE


I hereby certify that on June 12, 2007 I electronically filed the foregoing with the Clerk of Court using the CM/ECF system which will send notification of such filing to the following:


Louis Franklin, AUSA
U. S. Attorney's Office
P. O. Box 197
Montgomery, AL 36101


Respectfully submitted,

s/Susan G. James
SUSAN G. JAMES
Attorney at Law
600 South McDonough Street
Montgomery, Alabama 36104
Phone: (334) 269-3330
Fax: (334) 834-0353
E-mail: sgjamesandassoc@aol.com
Bar No: JAM012