CASE NO.  07-13163-B

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT

AUG 1 0 2007

THOMAS K. KAHN
CLERK

IN THE UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT

UNITED STATES OF AMERICA,
Plaintiff/Appellee,

vs.

DON EUGENE SIEGELMAN, et al.,
Defendants/Appellants.

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

DEFENDANT/APPELLANT, DON EUGENE SIEGELMAN'S,
MOTION FOR RELEASE PENDING APPEAL

HIRAM C. EASTLAND, JR.
Attorney for Defendant/Appellant
EASTLAND LAW OFFICES, P.L.L.C.
107 Grand Boulevard
Greenwood, Mississippi  38930
Telephone:  (662) 453-1227
Facsimile:  (662) 453-2808
Email: eastlandlaw@bellsouth.net

CASE NO.  07-13163-B

---

IN THE UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT

---

UNITED STATES OF AMERICA,
Plaintiff/Appellee,

vs.

DON EUGENE SIEGELMAN, et al.,
Defendants/Appellants.

---

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

---

DEFENDANT/APPELLANT, DON EUGENE SIEGELMAN'S,
MOTION FOR RELEASE PENDING APPEAL

---

HIRAM C. EASTLAND, JR.
Attorney for Defendant/Appellant
EASTLAND LAW OFFICES, P.L.L.C.
107 Grand Boulevard
Greenwood, Mississippi  38930
Telephone:  (662) 453-1227
Facsimile:  (662) 453-2808
Email: eastlandlaw@bellsouth.net

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE ELEVENTH CIRCUIT

UNITED STATES      \*
OF AMERICA      \*
     \*
     v.      \*      **Appeal No. 07-13163-B**
     \*
DON EUGENE SIEGELMAN      \*
     \*

## CERTIFICATE OF INTERESTED PERSONS
## AND CORPORATE DISCLOSURE STATEMENT

**Judges**:

United States Magistrate Judge Charles S. Coody (Middle District of Alabama)

United States District Court Judge Mark E. Fuller (Middle District of Alabama)

**Attorneys for Appellant**:

Hiram C. Eastland, Jr.

Hiram C. Eastland, III

Jacob K. Eastland

G. Robert Blakey

Vincent F. Kilborn

David McDonald

Charles Redding Pitt

Susan James

**Attorneys for Appellee**:

Stephen P. Feaga (Assistant United States Attorney)

Joseph L. Fitzpatrick, Jr. (Special Assistant United States Attorney)

Louis V. Franklin, Sr. (Acting United States Attorney)

Jennifer Garrett (Special Assistant United States Attorney)

Edward Nucci (Acting Chief, Public Integrity Section)

J.B. Perrine (Assistant United States Attorney)

Richard C. Pilger (Department of Justice, Criminal Division Public Integrity Section)


Respectfully submitted,

Hiram C. Eastland, Jr.
EASTLAND LAW OFFICES, PLLC
107 Grand Boulevard
Greenwood, Mississippi 38930
Telephone: 662-453-1227
Fax: 662-453-2808
Email: eastlandlaw@bellsouth.net
**ATTORNEY FOR DON EUGENE SIEGELMAN**
**APPELLANT**


### CERTIFICATE OF SERVICE


I hereby certify that a copy of the foregoing Certificate of Interested Persons and

Corporate Disclosure Statement was served upon counsel for the Appellee by First Class

Mail, pre-paid, on this the 9th day of August, 2007 to Louis V. Franklin, Sr., Acting

United States Attorney, One Court Square, Suite 201, Montgomery, Alabama 36104.

Hiram C. Eastland, Jr.

**TABLE OF CONTENTS**

Preliminary Statement, Overview And Background
For Issues In This Appeal ............................................................ 2

Profound Issues In This Appeal ................................................... 2

Facts Related To The Commonplace Issues Advocacy Campaign Contributions
Involved In This Case ................................................................. 12

The Legal Standard For Release On Bond Pending Appeal ................... 23

Argument................................................................................... 25

    I.    This Case Raises Substantial Questions That Would Likely Result In
        Reversal Or A New Trial If Resolved In Siegelman's Favor On
        Appeal................................................................................... 25

        A.    The Lower Court's Failure To Require A Finding Of An
            Express Quid Pro Quo Violated Siegelman's First Amendment
            Rights ............................................................................ 25

            1.    First Amendment Values ............................................... 25

            2.    Lack of Quid Pro Quo Proof Violates First
                Amendment ................................................................ 27

            3.    First Amendment Protects Issue Advocacy Campaign
                Contributions and Political Expression ....................... 28

        B.    The Lower Court Failed To Take Appropriate Measures to
            Protect Siegelman's First Amendment Rights ........................ 30

            1.    The Lower Court Failed to Adhere to First Amendment
                Mandates During Trial Proceedings ............................ 30

            2.    The Lower Court Failed to Adhere to First Amendment
                Mandates During Sentencing ........................................ 35

C.  The Express Quid Pro Quo Required In Federal Extortion Cases Is Required In Federal Bribery-Type Charges ........................ 38

D.  The Lower Court Failed to Require An Express Quid Pro Quo For the Bribery-Type Honest Services Charges ...................... 43

E.  The Lower Court Unconstitutionally Broadened The Indictment ............................................................................ 52

F.  The Lower Court Failed to Require An Express Quid Pro Quo For The Federal Bribery Charges ............................................ 54

G.  The Statute Of Limitations Barred The Federal Bribery Charges ................................................................................ 56

H.  The Lower Court Erred In Denying Siegelman's Rule 29 Motions For A Judgment Of Acquittal .................................... 66

I.  Governor Siegelman Was Convicted For Alleged Conduct Beyond The Scope Of The Obstruction Of Justice Statute .... 69

II.  Governor Siegelman Does Not Present A Flight Risk Or A Danger To The Community If He Is Granted Release On Bond Pending Resolution Of His Appeal ............................................................ 75

Conclusion ......................................................................................... 78

Case No. 07-13163-B

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE ELEVENTH CIRCUIT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | * | On Appeal from the United |
| | * | States District Court for the |
| Plaintiff/Appellee, | * | Middle District of Alabama, |
| | * | Northern Division |
| vs. | * | |
| | * | Case No. 2:05-cr-119-MEF |
| DON EUGENE SIEGELMAN, et al., | * | |
| | * | District Judge |
| Defendants/Appellants. | * | Hon. Mark E. Fuller |

## SIEGELMAN'S MOTION FOR RELEASE PENDING APPEAL

COMES NOW Defendant/Appellant, Governor Don Eugene Siegelman, by and through the undersigned counsel, and files this Motion for Release Pending Appeal pursuant to 18 U.S.C. § 3143(b)(1),[1] Fed. R.

---

[1] This Motion should serve as an appeal of the trial court's oral order [EXHIBIT 1] and follow-up written order [EXHIBIT 2] summarily denying bond pending appeal without written findings and without allowing his counsel to be heard, *and* as a Motion for this Court to exercise its *independent judgment* on his entitlement to bond pending appeal. This Court can exercise its discretion under Fed. R. App. P. 2 to suspend Rule 9, and proceed to hear and grant a request for bail. See *United States v. Hochevar*, 214 F.3d 342, 344 (2nd Cir. 2000). Remanding this issue to the trial court would only further delay Governor Siegelman's release, and, as such, would be inhumane.

1

App. P. 9(b)-(c) and Circuit Rule 9 and respectfully moves this Court for release pending resolution of his appeal. Presently, Governor Siegelman is incarcerated at the Satellite Prison Camp in Oakdale, Louisiana.

## PRELIMINARY STATEMENT, OVERVIEW AND BACKGROUND FOR ISSUES IN THIS APPEAL

### PROFOUND ISSUES IN THIS APPEAL

This appeal of Governor Siegelman's conviction involves fundamental "substantial questions"[2] regarding the appropriate application of criminal law and First Amendment restraints when individuals and public officials are engaged in commonplace political fundraising and political expression. The reality of the American political system and the need to assure that unrestrained prosecutors do not heedlessly criminalize commonplace legitimate political contributions requires, at the least, an exacting express quid pro quo proof mechanism to distinguish between legitimate political activity and bribery.

---

[2] 18 U.S.C. § 3143 provides for the release of a person appealing a conviction if he is not likely to flee or pose a danger to the community, the appeal is not for the purpose of delay, and raises a *substantial question* of law or fact likely to result in reversal or order for new trial. Since Governor Siegelman is not a flight risk, the central focus of this Memorandum is to demonstrate that this appeal presents "substantial questions" of law or fact that could very well result in reversal or a new trial.

As recognized by the Supreme Court in *Federal Election Commission v. Wisconsin Right to Life, Inc.*, 2007 WL 1804336, *23, 30 (S. Ct. June 25, 2007): "This Court has not hesitated to overrule decisions offensive to the First Amendment (a 'fixed star in our constellation,' if there is one)—and to do so promptly where the fundamental error was apparent."    The lower court's rulings were highly offensive to the First Amendment as well as judicial precedent recognizing the need for exacting proof of an "explicit promise" express quid pro quo to convict where, as here, the bribery-type charges involve underlying political contributions. Governor Siegelman is, therefore, entitled to release pending appeal, and his conviction must be reversed on appeal.

On June 29, 2006, the jury in this case rejected approximately 95% of the government's claims against Governor Siegelman but convicted him on seven counts.[3] Six of the seven counts of conviction relate to a $500,000.00 contribution made by co-defendant Richard Scrushy to a political campaign sponsored by Governor Siegelman.    Governor Siegelman passionately

---

[3] The seven counts of conviction include six bribery-type counts: Count Three federal bribery, 18 U.S.C. § 666(a)(1)(B) ("federal bribery"); Count Five, 18 U.S.C. § 371 (conspiracy to commit bribery-type honest services violations); and Counts Six through Nine bribery-type honest services mail fraud, 18 U.S.C. §§ 1341 and 1346 ("bribery-type honest services").
  The only non-bribery type count of conviction is the Count Seventeen obstruction of justice count, 18 U.S.C. § 1512(b)(3). ("obstruction of justice tampering statute").

3

campaigned in favor of implementing a state lottery as a way to fund free college education for Alabama students. A state lottery, however, required a referendum to change Alabama's Constitution that prohibits such lotteries.

Governor Siegelman, with the support of the Democratic Party, formed the Alabama Education Lottery Foundation (AELF)[4] to fund promotion of a state lottery. Governor Siegelman routinely asked Alabama businessmen, including Scrushy, to contribute to the AELF. In June or July of 1999, Scrushy committed to raise or contribute $500,000.00 to the AELF. The record is not clear as to the date that Scrushy made this commitment because the government's key witness, Nick Bailey, changed his story several times. At first, Bailey told investigators that Scrushy commemorated his commitment with a HealthSouth check dated July 19, 1999 that Scrushy signed and hand-delivered to the Governor at a meeting in the Governor's office.

At trial, Bailey changed his testimony because it was obvious that: a) Scrushy could not have hand-delivered the check as Bailey had previously recounted since the meeting between Scrushy and the Governor occurred *before* the check was ever written, b) the July 19, 1999 check was written by Integrated Health Systems (IHS), not HealthSouth, and c) the July 19, 1999

---

[4] Later, the AELF became the Alabama Education Foundation (AEF).

IHS check was *not* signed by Scrushy.  This is just one example of Bailey's numerous and glaring departures from his prior statements to investigators *after* he began brokering a plea agreement.

On July 26, 1999, Governor Siegelman appointed Scrushy and seven other people to the Certificate of Need (CON) Board--a volunteer review board that attempts to prevent the unnecessary duplication of healthcare services in Alabama.  Scrushy, as founder and CEO of HealthSouth, the nation's largest health services provider, had been appointed to this same board by three previous governors.  The government does not dispute that Scrushy was highly qualified to serve on the CON Board.  Instead, the government argues, based primarily upon the timing of Scrushy's contribution and his appointment to the board, that Scrushy bribed his way onto the board.

The government offered no testimony from anyone who attended a meeting or overheard a conversation between Scrushy and Governor Siegelman that would even remotely indicate that Governor Siegelman "explicitly promised," expressly agreed to appoint Scrushy to the CON Board in exchange for Scrushy's $500,000.00 contribution to the AELF.  Instead, the government based its case against Governor Siegelman upon the testimony of Nick Bailey, a disgraced former Siegelman aide who was

5

removed from office after an investigation revealed that he had, without Governor Siegelman's knowledge, extorted hundreds of thousands of dollars from various Alabama businessmen.

Bailey testified that sometime before Governor Siegelman appointed Scrushy to the CON Board on July 26, 1999, Siegelman showed Bailey a $250,000.00 check made payable to the AELF that Scrushy had raised as part of his commitment to raise or pay $500,000.00.  When Bailey asked Governor Siegelman "what in the world is he going to want for that?," Governor Siegelman allegedly responded: "the CON Board."  This was the high water mark of the government's case against Governor Siegelman. Governor Siegelman has been convicted and sentenced to prison for 7 ½ years for offhandedly musing about what might be important to a major political contributor.

Because financial contributions fuel the American political system, every political contribution implicates core First Amendment values. "Making a contribution, like joining a political party, serves to affiliate a person with a candidate…[and] it enables like-minded persons to pool their resources in furtherance of common political goals."[5]  Restrictions on free speech require a compelling governmental interest tailored to achieve such

---

[5] *Buckley v. Valeo*, 424 U.S. 1, 24 (1976).

an interest.[6] The First Amendment demands that the benefit of any doubt accrue to protecting, rather than stifling speech.[7] This conviction, if allowed to stand, will have a chilling effect on all political expression involving issues advocacy campaign contributions.

An entire body of law designed to protect legitimate political contributions and free political expression has evolved from the Supreme Court's *McCormick*[8] decision. The lower court failed throughout the trial to adhere to this body of law.

*McCormick* and its progeny now apply to any effort by government prosecutors to criminalize political contributions. The government must prove and the court must unequivocally instruct the jury that it must find an "explicit promise", an *explicit, specific quid pro quo*[9] in order to convict a politician or contributor of bribery where political contributions are involved. These restraint and proof mechanisms ensure that juries are able to

---

[6] *Compare McConnel v. Federal Election Comm'n*, 540 U.S. 93, 205 (2003) (Federal statute imposing restrictions on contributions not facially in violation of First Amendment; if it burdens free speech, it is subject to strict scrutiny) *with First Bank of Boston v. Bellotti*, 435 U.S. 765, 786 (1978) (a state statute prohibiting corporations from spending money in a referendum struck down on First Amendment grounds, because a compelling government interest not served in light of strict scrutiny).
[7] *New York Times Co. v. Sullivan*, 376 U.S. 254, 269-270 (1964).
[8] *McCormick v. United States*, 500 U.S. 257 (1991).
[9] Interchangeably referred to here and by the courts as exacting proof of an "*explicit* promise", an "*express* agreement", an "*express* quid pro quo", an "*explicit* quid pro quo" or "*specific* quid pro quo".

"distinguish" between "legitimate" "political contributions", "commonplace political activity" and criminal conduct.[10] Absent the restraint established by *McCormick,* the only legal barrier now standing between politicians, their contributors and bribery charges is the unfettered discretion of government prosecutors.[11]

The government claims that the restraints established by the *McCormick* cases apply only to the federal *extortion* statute[12] and not to cases (such as this) that involve prosecution under the federal bribery statute[13] and the honest services mail fraud statute[14] for bribery-type honest services charges. This Court has historically rejected the government's rationale. In *United States v. Martinez*, 14 F.3d 543, n.5 at 553 (11th Cir. 1994), this Court recognized that the same political realities and requisite restraint principles of the *McCormick* extortion case were applicable to Florida bribery-type charges. This Court *reversed* the lower court for *not*

---

[10] *United States v. Davis*, 967 F.3d 515, 521-22 (11th Cir. 1992) ("*Davis I*") (recognizing the importance of assuring the jury is properly instructed so it can "distinguish" between "legitimate" "political contributions", "commonplace political activity" and criminal conduct); *United States v. Davis*, 30 F.3d 108 (11th Cir. 1994) ("*Davis II*")(reversing *Davis I* for not requiring the lower court to provide a clear instruction to the jury that it must find an "explicit promise", a "specific-*quid pro quo*" to convict).

[11] *Accord, United States v. Sun-Diamond Growers*, 526 U.S. 398, 407-408 (1999).

[12] 18 U.S.C. § 1951. (extortion).

[13] 18 U.S.C. § 666(a)(1)(B). (federal bribery).

[14] 18 U.S.C. §§ 1341 and 1346. (honest services mail fraud).

requiring any "*quid pro quo* requirement under *McCormick*, because it believed that requirement was limited to instances of *extortion* involving campaign contributions."[15]

Unfortunately, from time to time, the government has pushed to criminalize political contributions and commonplace political activity despite judicially recognized political realities, First Amendment rights, and the legal requirements of an exacting express quid pro quo.[16]    The government's recent overreaching assault on public officials, political

---

[15] *Id.* at 553. (this Court also recognized the quid pro quo principles of *McCormick* even apply "outside the context of campaign contributions" for "non-campaign contribution cases" as modified by *Evans v. United States*, 504 U.S. 255 (1992) for such cases.) *Martinez*, 14 F.3d at 553.

[16] *See, e.g., McCormick*, 500 U.S., at 272; *United States v. Sun-Diamond Growers*, 526 U.S. 398 (1999) (affirmed the D.C Circuit decision reversing and remanding to the lower court, finding that but for exacting proof restraints a government prosecutor would have, as here, unbridled discretion to accuse politicians and citizens engaged in the American political process of criminal conduct for legitimate contributions and commonplace political activity, *id.* at 408; discusses the disastrous and impractical consequences to our American political system "if the government's interpretation were correct" *id.* 406; general discussion of the error in the government's overreaching statutory interpretation and prosecutorial position, *id.* at 404-408; "The government insists that its interpretation is the only one that gives effect to all of the statutory language....But we have no trouble envisioning" otherwise. *id.* 408); *United States v. Davis*, 30 F.3d 108 (11th Cir. 1994) (*Davis II*) (reversing *Davis I*) (this Court strictly required proof of an "explicit promise", a specific quid pro quo); *United States v. Martinez*, 14 F.3d 543, 553-54 (11th Cir. 1994) (this Court reversed and remanded for a new trial, rejecting the government's erroneous argument that "concede[d] that the district court [as here] failed to instruct the jury on the *quid pro quo* requirement" but nevertheless attempted to support the conviction with an alternative legal theory).

candidates, their contributors, and the First Amendment has been exceptionally vigorous.

In *United States v. Georgia Thompson*,[17] the Seventh Circuit recently rendered a reversal at oral argument, ordering the government to immediately release Wisconsin state official Georgia Thompson from prison for the government's overreaching honest services mail fraud and federal bribery statute prosecution.[18] The Seventh Circuit sent a strong message that it would not countenance claims that politically motivated decisions constitute crimes:

> The jury [as here] convicted Thompson of violating 18 U.S.C. § 666 and § 1341 [and 1346]. The *prosecution's theory* was that any politically motivated departure from state administrative rules is a federal crime, when either the mails or federal funds are involved. Thompson was sentenced to 18 months' imprisonment and compelled to begin serving that term while her appeal was pending.

---

[17] 484 F.3d 877 (7th Cir. April 20, 2006).

[18] The Seventh Circuit held that, as here, there was no "private benefit" for the alleged political misconduct for purposes of the prosecution and conviction under the § 1346 honest services statute. *Georgia Thompson*, 484 F.3d at 884. The Seventh Circuit also found, as grounds for reversal, that "no *quid pro quo* [bribery] was entailed" or charged by the government regarding the political "contributions." *Id.* at 879. The Circuit Court recognized the profound realities of our American political system throughout its opinion, including First Amendment restraints, and concluded its opinion by recognizing the crucial role of the courts to assure that overreaching prosecutions do not apply the § 1346 honest services mail fraud and § 666 federal bribery statutes too broadly to "impose high costs on people the statute[s] [were] not designed to catch." *Id.* at 879, 884.

> *After concluding that Thompson is innocent, we reversed her conviction so that she could be released.[19]*

In this case, the lower court acquiesced to the government's overreaching arguments and departed from this Circuit's Pattern Jury Instructions for honest services mail fraud charges. The court provided an instruction at the government's insistence that allowed the jury to convict Governor Siegelman for *non*-quid pro quo *gratuity*-type honest services charges as opposed to the quid pro quo *bribery*-type honest services charges in the indictment.

The lower court's jury instructions gave the jury the impression (and allowed the government to argue) that Governor Siegelman *must* have accepted a bribe *because*[20] he received Scrushy's contribution to the AELF/AEF shortly after appointing Scrushy to the CON Board.[21] Settled law recognizes that politicians at times act for constituents' benefit shortly

---

[19] *Georgia Thompson*, 484 F.3d at 878.

[20] As discussed below, the Supreme Court recognizes that receipt of alleged benefits "because of" or "as a result of" some past or anticipated future act is non-quid pro quo gratuity-type proof as opposed to quid pro quo bribery-type proof. *Sun-Diamond*, 526 U.S. at 404-405.

[21] The Seventh Circuit in *Georgia Thompson* also rightfully commented on this kind of reasoning: "*Post hoc ergo propter hoc* is the name of a logical error, not a reason to infer causation." *Georgia Thompson* 484 F.3d at 879.

11

before or after soliciting and receiving campaign contributions from those

constituents.[22]  Until now, this has never been a crime.

### FACTS RELATED TO THE COMMONPLACE ISSUES ADVOCACY CAMPAIGN CONTRIBUTIONS INVOLVED IN THIS CASE

Governor Siegelman served the state of Alabama for nearly a quarter

of a century.  He is the only person in Alabama history elected to serve in all

four of the top statewide offices: Secretary of State, Attorney General,

Lieutenant Governor and Governor.  [EXHIBIT 3, N. Bailey, 05/03/06, TR-

88; EXHIBIT 4, N. Bailey, 05/05/06, TR-26-29][23]

In 1998, Siegelman won his first bid for governor by unseating

incumbent Governor Fob James with 57% of the vote--a veritable landslide.

Pollsters estimate that Siegelman won over 90% of the African-American

electorate as well as a majority of the white vote.  This was unprecedented.

---

[22] *McCormick*, 500 U.S. at 272;  *Allen*, 10 F.3d at 411 (7th Cir. 1993) (recognizing these same political realities and requiring the express quid pro quo restraining principles of *McCormick* extortion prosecution for bribery-type charges); *United States v. Davis*, 30 F.3d 108 (11th Cir. 1994) ("*Davis II*") (citing the *Allen* case approvingly); *United States v. Martinez*, 14 F.3d 543, n.5 at 553 (11th Cir. 1994) (applying  principles to Florida bribery-type charges even in non-campaign contribution prosecution).

[23] Trial was completed over one year ago.  The Defendants immediately ordered a transcript, but the Defendants have still not received a copy of the trial transcript.  The Defendants have been advised that this is due to the illness of the very dedicated trial court reporter.  The excerpts of testimony referenced herein and attached hereto are not from the official trial transcript.  Instead, these excerpts are from a private court reporter who, at the Defendants' request, recorded portions of the trial.

Also unprecedented was Siegelman's fundraising ability.  He raised $9 to $10 million in the 1998 gubernatorial campaign—an Alabama record. [EXHIBIT 5, D. Cline, TR-60]

Siegelman's primary election platform addressed the dismal state of education in Alabama.  Every year, talented high school graduates elected not to attend college because they could not afford it.  If elected, Siegelman promised to support a state lottery that would fund free college tuition for all Alabama high school graduates who maintained a minimum grade point average.  Given his margin of victory and his broad base of support, many thought his election was a mandate for a state lottery.

Implementing a state lottery required changing the state's constitution by public referendum.   [EXHIBIT 4, N. Bailey, 05/05/06, TR-45-46; EXHIBIT 6, J. Miller, TR-213]  This referendum (that Governor Siegelman insisted be scheduled as soon as practical after his election) met fierce opposition from a variety of sources, including Mississippi casino gaming interests that stood to lose hundreds of millions of dollars if Alabama initiated its own lottery.  Those opposed to the lottery spent millions of dollars in negative campaigning and advertising.

To combat the negative campaigns and educate the public on the benefits of an education lottery, Governor Siegelman formed the

13

AELF/AEF, a non-profit organization. [EXHIBIT 5, D. Cline, TR-15-17] Governor Siegelman solicited issue advocacy campaign funds for these non-profit foundations. [EXHIBIT 5, D. Cline, TR-144-150] Also, the Alabama Democratic Party (ADP) headed by prominent Mobile attorney, Jack Miller, invested nearly one million dollars in advertising and campaigning to support Governor Siegelman's education lottery plan. [EXHIBIT 6, J. Miller, TR-211-216]

In 1998-1999, Richard Scrushy, as founder of HealthSouth, was widely known as one of the most powerful, politically connected, and philanthropic businessmen in the state. [EXHIBIT 3, N. Bailey, 05/03/06, TR-155-157; EXHIBIT 4, N. Bailey, 05/05/06, TR-23-24] Scrushy had contributed approximately $350,000 to the gubernatorial campaign of Siegelman's 1998 opponent, Fob James. Scrushy, primarily a supporter of Republicans, had never supported Siegelman's various campaigns for office, and Scrushy and Siegelman were far from political allies. [EXHIBIT 7, E. Harris, TR-39-41; EXHIBIT 3, N. Bailey, 05/03/06, TR-159-160]

Former CEO of Alabama Power Elmer Harris encouraged Siegelman and Scrushy to meet and establish some common ground for the good of the state. [EXHIBIT 7, E. Harris, TR-19-20, 41] Harris served as chairman of Siegelman's transition team; he also had an established relationship with

14

Scrushy. Harris told Scrushy that regardless of his political affiliation, as leader of one of the largest companies in Alabama, it was important for Scrushy's company, and the state of Alabama, for Scrushy to have a working relationship with the Governor. [EXHIBIT 7, E. Harris, TR-12]

Scrushy had served on the CON Board during the tenure of three governors before Siegelman. [EXHIBIT 7, E. Harris, TR-16-17]    The governor appoints CON Board members for a set term, but, regardless of the term of appointment, it is customary for each incoming Governor to appoint an entirely new Board. [EXHIBIT 8, A. Lambert, 05/01/06, TR-13-16]

Scrushy made substantial contributions to the gubernatorial campaigns of all three of Siegelman's predecessors (including the $350,000 that Scrushy contributed to Governor James's losing campaign). However, before Siegelman was even elected, Scrushy had resigned from the CON Board because he believed he was too busy to serve. Governor James appointed another HealthSouth executive, Thomas Carmen, to replace Scrushy.

During the summer of 1999, Scrushy met with Siegelman at the Governor's office. Siegelman asked Scrushy to serve on the CON Board. [EXHIBIT 7, E. Harris, TR-17-18] Records from Siegelman's appointment secretary confirm that Siegelman's short list for CON Board appointments

included HealthSouth representatives (Scrushy and Carmen) before Governor Siegelman ever met Scrushy. [EXHIBIT 9, R. Bell, TR-239-240]

Scrushy initially declined Siegelman's request for Scrushy to serve on the CON Board. Scrushy did not want to personally serve another term on the CON Board, and he suggested that Carmen, another HealthSouth executive, serve in his stead. [EXHIBIT 7, E. Harris, TR-18, 67-68]

Governor Siegelman rejected Scrushy's suggestion that he appoint Carmen as a substitute and pressured Scrushy to serve on the CON Board. Governor Siegelman also asked Scrushy to contribute to the AELF. Scrushy struggled with both issues and discussed them at length with Harris.

Harris testified he encouraged Scrushy to serve on the CON Board for the good of the State. [EXHIBIT 7, E. Harris, TR-17-18] Further, Harris told Scrushy he should contribute whatever he felt like contributing to the AELF: "you can give a dollar, you can give a million dollars, you can give whatever you want to give." [EXHIBIT 7, E. Harris, TR-23-24, 42]

Scrushy ultimately relented on both grounds. He agreed to serve on the CON Board, and he agreed to contribute or raise $250,000 in 1999 and to contribute or raise $250,000 in 2000 towards the AELF. [EXHIBIT 5, D. Cline, TR-91-93]

The government based its case against Governor Siegelman on the testimony of disgraced former Siegelman aide, Nick Bailey. While serving as Governor Siegelman's aide, Bailey, on his own, engaged in a massive extortion scheme wherein he obtained more than $200,000 from various Alabama businessmen. Bailey admitted that Governor Siegelman was unaware of and did not benefit from this misconduct. [EXHIBIT 3, N. Bailey, 05/03/06, TR-68-74]

Bailey used this money to cover his personal losses in cattle futures and other speculative investments. Governor Siegelman did not know it, but Bailey was deeply in debt. Bailey was so deeply in debt that he mortgaged one of his parents' properties, and, even then, he could not make his monthly interest-only payments. [EXHIBIT 3, N. Bailey, 05/03/06, TR-79-82]

Bailey pleaded guilty to two counts of conspiracy and one count of filing a false tax return, but the Court imposed on him a remarkably light sentence of 18 months in exchange for his testimony against Governor Siegelman.

The government's case against Governor Siegelman hinges on Bailey's testimony about what transpired at a meeting that Bailey did not attend. Bailey testified that before July 26, 1999, Governor Siegelman

showed him a check for $250,000.00 and made a comment about the check.

*This is the basis of the government's case against Governor Siegelman:*

> Q. Okay. Now, when the Governor showed you the check what, if anything, did he say to you?
>
> A. He made a comment referring to Mr. Scrushy's commitment to give 500,000 and he's halfway there.
>
> * * *
>
> Q. What did you say when you showed him the check and he said, he's halfway there?
>
> A. **I responded by, what in the world is he going to want for that? And the Governor said, the C-O-N Board or the CON Board. And I said, I wouldn't think there would be a problem with it; and he said, I wouldn't think so.**
>
> * * *
>
> Q. You said he said at the outset of that conversation, he's halfway there. Do you know what he was talking about when he said that this $250,000 was halfway there?
>
> A. He was referring to the $500,000 commitment that Mr. Scrushy had made to our lottery campaign.

[EXHIBIT 10, N. Bailey, 05/02/06, TR-134-143] [emphasis added]

Bailey did not testify that Governor Siegelman and Scrushy had an expressed explicit agreement that Siegelman would appoint Scrushy to the CON Board *in exchange* for or as a quid pro quo for Scrushy's $500,000.00

18

contribution commitment. That Scrushy made a political contribution and was subsequently appointed to the CON Board was not uncommon or illegal.

The government's own witness, Alva Lambert, testified that appointees to the CON Board, like other political appointees, usually contribute to the campaign of the governor who appoints them. Mr. Lambert unequivocally testified that this is a normal and acceptable practice:

> Q. Yes, sir. In fact, Mr. Lambert, many people who are appointed not only to boards, but also to cabinet positions, have either contributed or played significant roles in a governor's campaign?
>
> A. Yes.
>
> Q. And you would consider that the norm?
>
> A. Yes.
>
> Q. That's just Alabama politics, isn't it?
>
> A. Yes, sir.

[EXHIBIT 11, A. Lambert, 05/02/06, TR-65]

The government attempted to portray Scrushy's fundraising commitment as a clandestine, secret agreement that Governor Siegelman took great pains to hide. But, the government's own witnesses did not support this portrayal. For example, Darin Cline, who oversaw fundraising for the education lottery campaign, testified that he, and the rest of the

19

fundraising team, had documented Scrushy's $500,000.00 commitment.

[EXHIBIT 5, D. Cline, TR-91-93]

> Q. It was common knowledge -- it was shared with you and all of the members of your team and everybody that was involved in this campaign – that Mr. Scrushy had committed to raising $250,000 in 1999?
>
> A. Uh-huh.
>
> Q. That was no secret?
>
> A. Right.
>
> Q. Nobody was trying to hide the fact that Mr. Scrushy had committed to help raise $250,000 in 1999?
>
> A. Correct.
>
> Q. Nobody was trying to hide the fact that Mr. Scrushy had committed to razor [sic] pay to the Alabama Democratic Party $250,000 the next year in the year 2000?
>
> A. Correct.

[EXHIBIT 5, D. Cline, TR-92-93]

The government claims that Governor Siegelman personally benefited from Scrushy's $500,000.00 contribution to the AELF/AEF because Governor Siegelman was a personal guarantor (not a co-signor) of the AELF/AEF debt.

20

The government's theory, however, ignores the reality of time. Scrushy made his $500,000.00 commitment in June or July 1999. *At that time, Governor Siegelman was not a personal guarantor or co-signor of the AELF/AEF debt.* In fact, Governor Siegelman did not become a personal guarantor (whose liability is contingent on non-payment by those who sign primarily for the debt who are jointly and severally liable) of the AELF/AEF debt until March 9, 2000—almost a year after Scrushy committed to raise or pay $500,000.00 to the AELF.

More important, in a *campaign context,* a politician's personal guarantee of a *campaign debt* is substantially different from a guarantee of business or private debt. Politicians are often asked to sign as personal guarantors on *campaign debt* not because it is ever anticipated that they will become liable on that debt but rather to serve as motivation for candidates to encourage potential contributors to quickly pay off the debt. [EXHIBIT 6, J. Miller, TR-217-219, 224-228]

In this case, there was no question that Governor Siegelman would never *personally* be liable for any of the debt incurred by the AELF/AEF:

> Q.    And your conclusion, based on all the information you had, including the 12 years of vast experience in fundraising, was that any AELF debt could easily paid off by March or April of 2000?
>
> A. Yes.

21

> Q.  And this was after Governor Siegelman had
> already raised nine to $10 million on his
> gubernatorial campaign, after Governor Siegelman
> had already $6 million on the AELF?
>
> A.  Right.

[EXHIBIT 5, D. Cline, TR-93]

Even after setting a state record for raising between nine to $10

million in his gubernatorial campaign, Governor Siegelman was such an

effective fundraiser for the AELF/AEF, that he averaged collecting

$34,000.00 an hour just through telephone solicitations.  [EXHIBIT 5, D.

Cline, TR-96; EXHIBIT 6, J. Miller, TR-226]

Todd Beard, Senior Vice-President of First Commercial Bank (the

bank that loaned money to the AELF/AEF) testified that the bank did not

even obtain a personal financial statement from Governor Siegelman as a co-

guarantor for the AELF/AEF note.  Instead, the bank obtained a personal

financial statement from the other guarantor, Merv Nabors, a multi-

millionaire.

At sentencing, Jack Miller, a founder of Colonial Bank and Chairman

of the Alabama Democratic Party during the relevant time period, testified

that, had he wanted to, Governor Siegelman could have moved the

AELF/AEF loan to another bank and removed his personal guarantee from the loan. [EXHIBIT 6, J. Miller, TR-228]

Miller also testified that the government was "dead wrong" to prosecute Governor Siegelman for bribery for the legitimate commonplace campaign contributions and campaign loan liquidation involved in this case. He further testified that the campaign contributions and loan liquidation for the Governor's education lottery campaign were of absolutely no personal benefit to the Governor and that the IRS does not consider such political contributions and loan liquidations to constitute a personal benefit. [EXHIBIT 6, J. Miller, TR-218-228]

## The Legal Standard For Release On Bond Pending Appeal

The federal statute for release pending appeal (known as the Bail Reform Act) provides for the *mandatory* release of a person who has appealed a judgment of conviction that includes a term of imprisonment if he is not likely to flee or pose a danger to the community, and the appeal is not for the purpose of delay and raises a substantial question of law or fact likely to result in a reversal or order for new trial. *See* 18 U.S.C. § 3143(b)(1).

23

To determine that a question presented for release pending appeal is a "substantial question" the court need only decide that the question is "close", that is, "one that very well could be decided the other way." The standard does not require Governor Siegelman to establish that the lower court was in error. *United States v. Giancola*, 754 F.2d 898, 900-901 (11th Cir. 1985). Whether a question is a "substantial question" that is "likely to result in reversal or an order for a new trial" is two-fold: (1) a "substantial", "close" question "of more substance than would be necessary to a finding that it was not frivolous" that "very well could be decided the other way"[24] "defines the *level of merit* required in the question presented"[25], and (2) the likelihood of reversal "defines the *type of question* that must be presented."[26]

Governor Siegelman is *not* asking this Court to predict the outcome of the appeal or make any conclusive determination on the merits. *Giancola*, 754 F.2d at 900. It is not error for this Court to grant bond pending appeal and later rule against Governor Siegelman on the merits. Indeed, courts in

---

[24] *Giancola*, 754 F.2d at 901.
[25] *United States v. Bilanzich*, 771 F.2d 292, 299 (7th Cir. 1985) (emphasis in original).
[26] *Id.* (emphasis in original).

this jurisdiction have granted release pending appeal in cases where the conviction was ultimately affirmed on the merits.[27]

## ARGUMENT

I.     **THIS CASE RAISES SUBSTANTIAL QUESTIONS THAT WOULD LIKELY RESULT IN REVERSAL OR A NEW TRIAL IF RESOLVED IN SIEGELMAN'S FAVOR ON APPEAL**

      A.     **THE LOWER COURT'S FAILURE TO REQUIRE A FINDING OF AN EXPRESS QUID PRO QUO VIOLATED SIEGELMAN'S FIRST AMENDMENT RIGHTS**

           1.     **FIRST AMENDMENT VALUES**

The lower court, at every stage of this trial, failed to even acknowledge the "fixed star in our constellation," Governor Siegelman's First Amendment rights. The lower court gave almost no consideration to the fact that this case involves a political contribution, and the court refused to impose the requisite quid pro quo restraints that protect citizens from convictions for legitimate political activity and political

---

[27] *Compare United States v. Hicks,* 611 F. Supp. 497, 501 (S.D. Fla. 1985)(granting release pending appeal), *with United States v. Hicks*, 798 F.2d 446, 452 (11th Cir. 1986)(affirming conviction); *United States v. Giancola*, 754 F.2d 898; *Compare United States v. Hall*, 765 F. Supp. 1494, 1499 (S.D. Fla. 1991), *with United States v. Hall,* 1993 U.S. App. LEXIS 27493 (1993)(*per curiam* affirmed).

expression. This violates the undisputed mandates of *McCormick, Sun-Diamond* and their progeny.[28]

Centrally, this prosecution involved the government's unjustifiable mischaracterization of an issue advocacy campaign contribution supporting Governor Siegelman's education lottery campaign as a bribe—despite the fact that the payer paid by check, the payee publicly reported it, the government failed to offer explicit proof of an express quid pro quo agreement to pay and to receive an illicit bribe,[29] and the campaign contribution did not inure to the benefit of Governor Siegelman.

That such a prosecution implicates First Amendment values is not in doubt.[30] As previously recognized by the Supreme Court in *Buckley v. Valeo*, "[c]lose examination...is required...[for] criminal penalties in an area permeated by [First Amendment] interests...."[31]

Indeed, the Supreme Court as recently as June 25, 2007, the day before Governor Siegelman's sentencing, interpreted the "now-familiar framework" of *Buckley v. Valeo* to recognize "...that contributing money

---

[28] *McCormick*, 500 U.S. at 272-73; *Sun-Diamond*, 526 U.S. at 404-08; *Davis II*, 30 F.3d 108; *Davis I*, 967 F.2d at 521-22; *Allen*, 10 F.3d at 410-11.
[29] *Id.*
[30] *See Buckley v. Valeo*, 424 U.S. 1, 16 (1979); *McCormick*, 500 U.S. 257, 272-73 (1991).
[31] *Buckley*, 424 U.S at 16.

to, and spending money on behalf of, political candidates implicates core First Amendment protections, and that restrictions on such contributions and expenditures 'operate in an area of the most fundamental First Amendment activities.' (citing *Buckley*)." *Wisconsin Right to Life,* 2007 WL 1804336, *23 (S. Ct. June 25, 2007).

### 2.    Lack of Quid Pro Quo Proof Violates First Amendment

The Supreme Court in *Wisconsin Right to Life, Inc.* specifically recognized that the core rationale for even limiting First Amendment expression associated with political contributions is to prevent "*quid pro quo*" "*corruption*"[32]—not non-quid pro quo legitimate political activity and political expression.    As reasoned by the Supreme Court in *Wisconsin Right to Life*:

> The Court [*Buckley v. Valeo*] also recognized, however, that the government has a compelling interest in 'prevention of corruption and appearance of corruption. *Id.*, at 25, 96 S. Ct. 612. *The 'corruption' to which the Court repeatedly referred was of the 'quid pro quo' variety, whereby an individual or entity makes a contribution or expenditure in exchange for some action by an official.*

*Wisconsin Right To Life*, 2007 WL 1804336, at *23. (emphasis added).

---

[32] *Wisconsin Right to Life, Inc.*, 2007 WL 1804336 at *23. (emphasis added).

27

3.    **First Amendment Protects Issue Advocacy Campaign Contributions and Political Expression**

The very nature of the First Amendment political activities and political expression involved in this criminal prosecution are among the "most fundamental First Amendment activities" "implicat[ing] core First Amendment protections."[33]    Indeed, the Supreme Court in *Wisconsin Right To Life* recognized that where, as here, the nature of the political contributions involves political expression "issue advocacy"[34] or thus "*nonexpress* advocacy"[35], "such advocacy is 'at the heart of the First Amendment's protection' and is 'indispensable to decisionmaking in a democracy'".[36]

Non-quid pro quo "issue advocacy" is, therefore, plainly a "star" in the Supreme Court's First Amendment "constellation."[37]    The *non*-quid pro quo political contributions involved in this criminal prosecution undoubtedly supported education "issue advocacy" that is at the "heart of

---

[33] *Id.*

[34] *Id.*

[35]   *Id.* at *25. ("*nonexpress* [issue] advocacy was presumed to remain protected under *Buckley* and *Bellotti*, even when engaged in by corporations") (emphasis in original).

   As discussed by the Supreme Court, "express advocacy" type contributions "expressly advocate...the election or defeat" of an identified candidate for office. *Id.* at *23.

[36] *Id.* at *24.

[37] *Id.* at 30.

28

the First Amendment's protection." Indeed, the individuals and corporations that contributed to Governor Siegelman's AELF/AEF issue advocacy education lottery campaign believed that the education foundation promoted Governor Siegelman's strong social belief that an Alabama lottery was necessary to fund the education of *all* Alabama's children—essential for equal opportunity and the economic progress of the state.

Accordingly, the lower court's refusal to consider the core principles of the First Amendment by disallowing the imposition of requisite express quid pro quo restraints before allowing the criminalization of legitimate political activity and political expression by unrestrained prosecutors acting in the current polarized environment[38] raises a *substantial* First Amendment question highly likely to be

---

[38] That the current political environment is polarized is not essential to Governor Siegelman's First Amendment arguments, because the Founders designed the First Amendment as a curb on misguided governmental officials in good times and in bad times. *See United States v. Schwinner*, 279 U.S. 644, 654-55 (1929) (Holmes, J., dissenting) ("[I]f there is any principle of the Constitution that more imperatively calls for attachment than any other it is the principle of free thought—not free thought for those who agree with us but freedom for the thought we hate.") On the tragic scope of the "cultural wars" roiling the political processes today, *see generally*, G. Robert Blakey & Brian J. Murray, *Threats, Free Speech, and the Jurisprudence of the Federal Criminal Law*, 2002 B.Y.U.L. Rev. 829, 876 n.130 (pp. 876-80).

*reversed* on appeal—and according to the Supreme Court, reversed "promptly."[39]

### B. THE LOWER COURT FAILED TO TAKE APPROPRIATE MEASURES TO PROTECT SIEGELMAN'S FIRST AMENDMENT RIGHTS

#### 1. THE LOWER COURT FAILED TO ADHERE TO FIRST AMENDMENT MANDATES DURING TRIAL PROCEEDINGS

During the trial proceedings Governor Siegelman raised with the lower court the age-old principle *strictissimi juris*, as it applied to conduct of the court and jury in a First Amendment prosecution.[40] Governor Siegelman argued that the principle of *strictissimi juris* is uniquely applicable to his case because the underlying political activity involved in the government's charges implicates First Amendment values—and the ultimate question was whether Governor Siegelman was engaged in legitimate political activity and First Amendment expression or corruption.

As recognized in *Dellinger*:

> When the group activity out of which the *alleged offense* develops can be described as a bifarious undertaking, involving both legal and illegal

---

[39] *Wisconsin Right To Life,* at *30.

[40] *See United States v. Dellinger*, 472 F.2d 340, 392 (7th Cir. 1972) (applying the maxim in the context of the First Amendment on appeal to the Riot Act, 18 U.S.C. § 1821, prosecution of anti-war demonstrations).

purposes and conduct, and is *within the shadow of the First Amendment*, the factual issue as to the alleged criminal intent must be judged *strictissimi juris*. This is necessary to avoid punishing one who participates in such an undertaking and is in sympathy with its *legitimate aims*, but does not intend to accomplish them by unlawful means. *Specially meticulous inquiry into the sufficiency of proof is justified and required* because of the real possibility in considering group activity, characteristic of political or social movements, of an unfair imputation of the intent or acts of some participants to all others.[41]

* * *

The *strictissimi juris* doctrine emphasizes the need for care in analyzing the evidence against a particular defendant in a case of this type, *both by the jury* in its fact-finding process *and by the Court* in determining whether the evidence is capable of convincing beyond a reasonable doubt.[42]

Governor Siegelman made specific suggestions for the adoption of special procedures in the prosecution to safeguard First Amendment values. In particular, Governor Siegelman, as a matter of first impression, argued that the court should act as a "13th juror," making sure, *for itself*, not merely deferring to the jury on, for example, matters of credibility or inference, that the evidence is sufficient for conviction. If appellate judges so act in First Amendment litigation generally, and they do, why, for similar reasons,

---

[41] *Id.*

[42] *Id.* at 393. (emphasis added).

31

should not trial courts and appellate courts in the area of campaign contributions?[43]

Moreover, Governor Siegelman argued that the testimony of one conspirator against an alleged conspirator should require corroboration in a similar fashion that his or her confession, used against him or her, where the government rightly must corroborate it; thus, this Court ought to adopt a similar rule, for similar reasons, as a matter of *strictissimi juris*.[44]  Such corroboration ought *not* come from another co-conspirator, but ought to come from independent evidence (*e.g.*, a bug or another witness, not implicated in the plot), and the jury or court should operate *expressly* under

---

[43] *See, e.g., Bose v. Consumers Union*, 466 U.S. 485, 510-11 (1984) (defamation); *Jenkins v. Georgia*, 418 U.S. 153, 160 (1974) (obscenity); *Hess v. Indiana*, 414 U.S. 105, 107-09 (1973) (excitement).

[44] *See, e.g., Wong Sun v. United States*, 371 U.S. 471, 488-89 (1963) ("Where the crime involves physical damage to person or property, the prosecution must generally show that the injury for which the accused confesses responsibility did in fact occur, and that some person was criminally culpable.  A notable example is the principle that an admission of homicide must be corroborated by tangible evidence of the death of the supposed victim. ... There need in such a case be no link, outside the confession , between the injury and the accused who admits having inflicted it.  But where the crime involves no tangible *corpus delicti*, we have said that "the corroborative evidence must implicate the accused in order to show that a crime has been committed." ...Finally, we have said that one uncorroborated admission by the accused does not, standing alone, corroborate an unverified confession.") (citations omitted).

the traditional rule, *falsus in uno, falsus in omnibus*, based on Justice Story's opinion in *The Santissima Trinidad*.[45]

Additionally, where the prosecution relies, as here, on inferences drawn from circumstantial evidence in an attempt to prove an express quid pro quo agreement to bribe, as well to prove a mail fraud conspiracy and scheme to bribe, it must negate alternative hypotheses. Negating alternative hypotheses was once the general rule for proof beyond a reasonable doubt where the prosecution used circumstantial evidence.[46] While it is not the rule today, this Court ought to adopt it in the area of campaign contributions as a matter of *strictissimi juris*.

The lower court ignored these suggestions; it adopted none of its own.[47] The lower court's actions substantially threatens and chills First

---

[45] 20 U.S. (7 Wheat 28, 74) 282, 339 (1822); *accord, Kanawha & M. Ry. Co. v. Kerse*, 239 U.S. 576, 581 (1916).

[46] *See, e.g., United States v. Elliot*, 571 F.2d 880, 906 (5th Cir. 1978). *Contra, United States v. Johnson*, 730 F.2d 683, 688 (11th Cir. 1984) (citing *United States v. Bell*, 678 F.2d 547, 549 n. 3 (5th Cir. 1982) (rejecting the old rule as inconsistent with *Holland v. United States*, 348 U.S. 121, 139-40 (1954)).

[47] For example, it admitted allegedly co-conspirator testimony against Siegelman, not only without a full *James* hearing before trial, but during the trial without conducting, at that time, the full and searching *James* proceeding required by the law. F.R.Evid. 801(d)(2)(F); See *United States v. James*, 595 F.2d 575 (5th Cir. 1979) ("preferred order of proof") (en banc). While the general rule of a full pre-trial hearing is discretionary, in the First Amendment context, the Amendment itself mandates it, as a matter of *strictissimi juris*. Thus, the conduct by the lower court was the antithesis of a court sensitive to the First Amendment freedoms. Because the testimony was

Amendment freedoms and ignores the practical realities of the process by which—for good or ill—this society chooses to finance federal, state, and local elections. The Executive Branch, with the cooperation of the Judicial Branch, should not be able to achieve through litigation what the Legislative Branch cannot achieve through legislation. This is particularly true when the litigation must, of necessity, operate *ex post facto* and turn on disputed questions of fact to be resolved by lay juries; juries, too, ought not to engage in decision-making by verdict what Congress can not do by legislation.

Further, the lower court failed to instruct the jury in accord with the Supreme Court's teachings in *McCormick* and its progeny. Indeed, as a corollary, the lower court's failure to provide the requested express quid pro quo jury instruction in this area of commonplace political contributions for issue advocacy is plainly out of step with the Supreme Court's recent *Wisconsin Right To Life* decision that recognized such political expression and "advocacy is 'at the heart of the First Amendment's protection' and is 'indispensable to decisionmaking in a democracy.'"[48]

---

irremediably prejudicial, the record poses a substantial question on this appeal whether this Court ought to grant a new trial.
[48] *Wisconsin Right To Life*, 2007 WL 1804336, at *24. (also holding that the judicially recognized framework for the limited restriction of First Amendment rights is to prevent "*quid pro quo* variety" "*corruption*.", a judicially recognized proof restraint *and* First Amendment restraint the lower court ignored in this case ) *Id.* at *23.

## 2. THE LOWER COURT FAILED TO ADHERE TO FIRST AMENDMENT MANDATES DURING SENTENCING

The lower court enhanced Governor Siegelman's sentence for making out-of-court statements concerning his innocence and his belief that this prosecution stemmed from political motivation, and the White House and the Department of Justice directed it for illicit reasons. The Court cited little evidence to support the pervasive assertions the government attributed to Governor Siegelman. Instead, the court substituted any proof of the Governor's *actual* statements with the government's *representations* concerning Governor Siegelman's out-of-court statements.

Further, the court accepted, without question, the government's marked denials that this prosecution was politically motivated. And, the Court refused to allow Governor Siegelman to present the evidence he has that *supports* his out-of-court assertions that this prosecution was politically motivated.

Initially, the court assessed Siegelman's Guideline sentence at 97 to 121 months or 8.1 to 10.1 years. Based on its fundamentally flawed procedure, the court then upwardly departed, at the government's insistence, for an additional 60 months, making Governor Siegelman's guideline sentence 188 to 235 months or 15.7 to 19.6 years.

35

*That made fully one-third of Governor Siegelman's Guideline-recommended sentence a factor that squarely violated his First Amendment right to speak his mind **outside** of the courtroom.* The substantial question for this appeal is not whether Governor Siegelman's statements were true or even whether they were made in good faith. The question is whether the lower court violated Governor Siegelman's First Amendment right by punishing him for asserting his innocence and speaking his mind outside of court. That alone is a substantial question that cries out for appellate review.[49]

The lower court could *not* constitutionally impose such a sentence or follow such a procedure, if the sentence and procedure were for criminal contempt; it cannot avoid the protections of the First and Sixth Amendments by going through the backdoor and calling it "sentence enhancement."[50]

---

[49] The appeal on the merits and now on this motion is the antithesis of *United States v. Campbell*, 2007 U.S. LEXIS 16722 (11th Cir. July 13, 2007). Unlike in *Campbell* Governor Siegelman fully developed the record and his arguments in the lower court, and he will fully develop them in this Court on the merits, as he is doing it in this motion for bail. *Compare Campbell* at *13-*29 with this Memorandum point by point. They stand in stark contrast.

[50] *See Wood v. Georgia*, 370 U.S. 375, 389 (1962) ("Men are entitled to speak as they please on matters vital to them; errors in judgment or unsubstantiated opinions may be exposed, of course, but not through punishment for contempt for the expression"); ("The First Amendment envisions that persons be given the opportunity to inform the community of both sides of the issue...") *Id.* at 391-392; ("The petitioner was an elected

"The freedom of speech . . . guaranteed by the Constitution embraces at the least the liberty to discuss publicly ... matters of public concern without ... fear of subsequent punishment." *Bellotti*, 435 U.S. 756, 776 (1978) (internal quotation marks omitted); *see also Consolidated Edison Co. of N. Y.* v. *Public Serv. Comm'n of N. Y.*, 447 U.S. 530, 534-35 (1980) (corporation, a utility, possessed freedom of speech) (citing *Thornhill* v. *Alabama*, 310 U.S. 88, 101-102 (1940) and *Mills* v. *Alabama*, 384 U.S. 214, 218 (1966)).

Freedom of speech is "indispensable to the discovery and spread of political truth," *Whitney* v. *California*, 274 U.S. 357, 375 (1927) (Brandeis, J., concurring), and "the best test of truth is the power of the thought to get itself accepted in the competition of the market. . . ." *Abrams* v. *United*

___

official and had the right to enter the field of political controversy, particularly where his political life was at stake.") *Id.* at 394-395; *Craig v. Harney*, 331 U.S. 367, 372 (1947) ("the compulsion of the First Amendment... forbade the punishment by contempt for comment on pending cases in absence of a showing that the utterances created a 'clear and present danger' to the administration of justice."); *International Union, United Mine Workers of America v. Bagwell*, 512 U.S. 821, 826 (1994) ("'criminal penalties may not be imposed on someone who has not been afforded the protections that the Constitution requires of such criminal proceedings,'... "[f]or 'serious' criminal contempts involving imprisonment of more than six months, these protections include the right to jury trial."); *Codispoti v. Pennsylvania.*, 418 U.S. 506 , 513 n.4 (1974) ("imprisonment for more than six months would certainly necessitate a jury trial").

*States*, 250 U.S. 616, 630 (1919) (Holmes, J., dissenting). Thus, the First Amendment removes "governmental restraints from the arena of public discussion, putting the decision as to what views shall be voiced largely into the hands of each of us, in the hope that use of such freedom will ultimately produce a more capable citizenry and more perfect polity. . . ." *Cohen* v. *California*, 403 U.S. 15, 24 (1971).

Accordingly, this appeal raises *substantial questions* under the First and Sixth Amendments in light of the lower court's unprecedented (in modern jurisprudence) rulings. Thus, the lower court's *actions from the trial through sentencing raises substantial First Amendment and Sixth Amendment questions* on appeal that well might result in reversal or a new trial.

### C.    THE EXPRESS QUID PRO QUO REQUIRED IN FEDERAL EXTORTION CASES IS REQUIRED IN FEDERAL BRIBERY-TYPE CHARGES

A *substantial question* exists as to whether the political realities and exacting express quid pro quo proof recognized by *McCormick* and its progeny apply to other federal statutes involving bribery-type charges. Logic alone (ignoring if that were possible the First Amendment and other circuit court case law) dictates that *McCormick's* exacting express quid pro quo proof restraints *must* apply to bribery-type charges, because it is the

38

crucial way to distinguish between legitimate political contributions and bribery.

The lower court wrongly accepted the government's argument that such express quid pro quo proof restraints for political contributions and political activity are limited to the federal extortion statute addressed in *McCormick*. The lower court refused to require proof of an express "explicit promise," specific quid pro quo for the jury to convict Governor Siegelman upon the federal bribery-type honest services charges and the federal bribery charges.

The lower court erred by providing a *non*-quid pro quo *gratuities*-type jury instruction for the *bribery*-type honest services charges even though the honest services charges specifically referenced *campaign contributions*.[51] The court similarly erred in instructing the jury on the federal bribery charge. Although the court provided a simple quid pro quo jury instruction, it failed to instruct the jury that it must find exacting proof of an express *"explicit promise"*, specific quid pro quo to convict Governor

---

[51] EXHIBIT 12, District Court Jury Instructions, Document 450, at 28. (District Court's Jury Instructions for honest services charges); See EXHIBIT 13, Trial Transcript, Volume XXXI, June 14, 2006, at 64-66. (objections to jury instructions by Governor Siegelman for lower court's failure to provide express quid pro quo jury instructions for bribery-type honest services charges).

Siegelman since the conduct involved campaign contributions and commonplace political activity.[52]

Following *McCormick*, courts have recognized that the same political realities and First Amendment issues that mandated restraint in federal extortion cases require exacting express quid pro quo proof restraints in federal bribery-type cases. For example, in *United States v. Allen*, 10 F.3d 405 (7th Cir. 1993), the Seventh Circuit recognized the need *not* to make "commonly accepted political behavior criminal" and concluded that the same "concerns that led the Supreme Court to adopt the quid pro quo requirement in *McCormick*" apply equally to bribery-type charges. *Allen* at 410-411.

The *Allen* Court aptly reasoned: "As the law has evolved, extortion 'under color of official right' and bribery are really different sides of the same coin."[53] "Given the minimal difference between extortion under color of official right and bribery, it would seem that courts should exercise the same restraint in interpreting bribery statutes as the *McCormick* court did in

---

[52] EXHIBIT 12, District Court Jury Instructions, at 41. (federal bribery jury instructions); EXHIBIT 13, at 62. (objections to jury instructions by Governor Siegelman for failure of the lower court to provided express quid pro quo jury instructions for federal bribery charges).
[53] *Id.* at 411.

interpreting the "Hobbs Act".[54]  ". . . [A]ccepting a *campaign contribution* does *not equal taking a bribe unless* the payment is made *in exchange for* an *explicit promise* to perform or not perform an official act."[55]

In *United States v. Davis*, 967 F.2d 516, 522 (11th Cir. 1992) ("*Davis I*"), this Court recognized the fundamental importance of assuring that the requisite "explicit promise", specific quid pro quo is provided the jury to assure that the jury does not "convict for legitimate political activity". Nevertheless, in *United States v. Davis,* 30 F.3d 108 (11th Cir. 1994) (*Davis II*), this Court even reversed *Davis I* because it was not strict enough in assuring that the "explicit promise", specific quid pro quo instruction is unequivocally provided the jury.

Significantly, in requiring exacting government proof and jury instructions that strictly adhere to finding an express quid pro quo to convict for conduct involving political contributions and commonplace political activity, this Court specifically cited the Seventh Circuit *Allen* bribery-type case with approval.

Furthermore, this Court, in *United States v. Martinez*, 14 F.3d 543 (11th Cir. 1994), found that because bribery is "essentially the same as

---

[54] *Id.*
[55] *Id.* (emphasis added).

41

extortion under the Hobbs Act, this analysis applies equally to the district court's [Florida bribery-type] jury instructions . . ."[56]

The government's cross-examination of Jack Miller at sentencing illustrates the pressing need to require exacting proof to distinguish between legitimate political activity and bribery. A founder of Colonial Bank and Chairman of the Alabama Democratic Party during the period relevant to this case, Mr. Miller steadfastly maintained that Siegelman's "guarantee" of the AELF/AEF loans was "common practice", legitimate political activity exercised by both Democrats and Republicans throughout his 40 years of experience in Alabama politics. In fact, Miller testified the government was "dead wrong" in prosecuting Governor Siegelman for what are commonplace political campaign-type contributions and campaign loan liquidation.

Miller, a highly respected lawyer, banker, and former head of the Alabama Democratic Party looks at this case and sees a commonplace exercise of First Amendment rights through political contributions. The government views these same facts and sees a bribery scheme. This is exactly why courts, including this Court, require exacting proof of an express agreement, an "explicit promise", a specific quid pro quo so that a

---

[56] *Id.*, n.5 at 553. (applying quid pro quo requisites to Florida bribery charges).

jury can factually distinguish between legitimate political contributions, commonplace political activity and criminal conduct.[57]

**D.    THE LOWER COURT FAILED TO REQUIRE AN EXPRESS QUID PRO QUO FOR THE BRIBERY-TYPE HONEST SERVICES CHARGES**

The lower court's refusal to recognize that the bribery-type honest services charges involving campaign contributions required proof of an express agreement, an "explicit promise", a specific quid pro quo is squarely at odds with precedent and raises a *substantial question* in this appeal.[58]

At the outset, this Circuit is widely recognized for its findings in *Lopez-Lukis*[59] and *deVegter*[60] that bribery is the paradigm type of federal honest services mail fraud charge.[61]   The government charged this prosecution as a bribery-type honest services case and, citing *Lopez-Lukis* and *deVegter*, specifically described the honest services charges as such in pretrial briefing papers: "Each of the *honest service* fraud counts in which

---

[57] *See, e.g., McCormick; Sun-Diamond; Davis I; Davis II* and *Allen*.

[58] See EXHIBIT 13, at 64-66. (objections to jury instructions by Governor Siegelman for failure to require requisite exacting proof of an express quid pro quo for the bribery-type honest services charges since they involved campaign contributions).

[59] *United States v. Lopez-Lukis*, 102 F.3d 1164 (11th Cir. 1997).

[60] *United States v. deVegter*, 198 F.3d 1324 (11th Cir. 1999).

[61] *Lopez-Lukis*, 102 F.3d at 1165 n.1 ; *deVegter*, 198 F.3d at 1327-28; *see United States v. Sawyer*, 239 F.3d 31, 39 (1st Cir. 2001) (*Sawyer II*) (First Circuit quoting this Circuit's *Lopez-Lukis* case that recognizes bribery to be a typical type of honest services mail fraud case).

43

Defendant is charged arises out of a *bribery scheme* in which he participated—*the paradigm case of honest services fraud.* See *deVegter*, 198 F.3d at 1327-28 [Eleventh Circuit] (citing *Lopez-Lukis*, 102 F.3d at 1165 n. 1 [Eleventh Circuit])."[62]

Similarly, this Circuit's Pattern Jury Instructions recognize bribery as a type of federal honest services mail fraud charge.

> [Public officials and public employees inherently owe a duty to the public to act in the public's best interest. If, instead, the [official] [employee] acts or makes [his] [her] decision based on the official's own personal interest—such as *accepting a bribe . . .* the official *has defrauded the public of the official's honest services* even though the public agency involved may not suffer any monetary loss in the transaction.]

Eleventh Circuit Pattern Jury Instructions, Criminal, 50.2 at 287 (2003 Thomson-West). (emphasis added).

The government pressed the lower court into approving *non*-quid pro quo *gratuity*-type honest services jury instructions for the quid pro quo *bribery*-type charges involving campaign contributions.[63]

---

[62]    United States Response to Defendant Hamrick's Motion to Dismiss Honest Services Fraud Charges, D. Court Document, at 9. (emphasis added).
    Similarly, the underlying alleged bribery-type conduct involving issue advocacy political contributions is the same for the Counts Five through Nine bribery-type honest services charges as the Count Three federal bribery charges.

[63] Indeed, the government pressed the lower court into accepting the non-quid pro quo gratuity-type proof Counts Five through Nine of the Indictment

The lower court's *non*-quid pro quo *gratuity*-type honest services jury instructions provided, in pertinent part, that the jury could convict a public official upon finding "that they intended to alter their official actions *as a result of*[64] the receipt of *campaign contributions* or other benefits." EXHIBIT 12, at 28. (emphasis added).

In providing this non-quid pro gratuity-type proof for bribery-type honest services charges, the court deviated from this Court's Pattern Jury Instructions, implementing what became referred to as the "*Sawyer* charge."[65] In adopting the government's proposed *Sawyer* charge the lower court accepted the government's argument that the First Circuit's *Sawyer*

---

even though the bribery-type honest services charges in the Indictment involve the exact conduct underlying the federal bribery charges in Count Three of the Indictment. *Compare* Count Three federal bribery charges of the Indictment *with* Counts Five Through Nine bribery-type honest services charges of the Indictment. EXHIBIT 14. (Indictment).

[64] As discussed below, "as a result of" or "because of" is gratuity-type requisite proof, as opposed to "in exchange for" or "in return for" that is bribery-type requisite proof. *See, e.g., Sun-Diamond*, 526 U.S. at 404-405. Where political contributions are involved *McCormick* requires an even more exacting quid pro quo-type proof mechanism by requiring there be an express agreement, an "explicit promise", to engage in a specific official act or to not act "in exchange for" or "in return for" the political contribution.

[65] EXHIBIT 13, Trial Transcript, Volume XXXI, June 14, 2006, at 68. (objections to jury instructions referring to the honest services "Sawyer charge" by the lower court).

45

For the government to establish the requisite intent of a legislator's honest services, the first of the two intent requirements for honest services mail fraud, the defendant must have intended to influence that legislator in her official action. *See Sawyer*, 85 F.3d at 729. The government may demonstrate this intent in many ways: For example, a *bribery-like* corrupt intent to influence official action necessarily is an intent to deprive the public of an official's honest services. A person might not, however, give an unlawful *gratuity* with the intent to effect a *specific quid pro quo*.[69] Rather, as the government contends here, a person with continuing and long-term interests before an official might engage in a pattern of repeated, *intentional gratuity offenses* in order to coax ongoing favorable official action in derogation of the public's right to impartial official services.[70] (emphasis added).

Importantly, the lower court itself cautioned the government that it considered the non-quid pro quo gratuities-type *Sawyer* charge to the jury and express quid pro quid pro quo issue to be a close question, one that could be a substantial question subject to reversal on appeal. The trial court

---

[69] *See, e.g., United States v. Sun-Diamond Growers*, 526 U.S. 398, 404-405 (1999). (Supreme Court distinguishing between requisite quid pro quo for proof of bribery-type charges and *non*-quid pro quo gratuity-type charges).

[70] *Sawyer II*, 239 F.3d at 41. The *Sawyer* trilogy was based upon alleged very broad gratuities-type honest services charges that also violate the requisite restraint recognized by the Supreme Court in *Sun-Diamond* that requires that gratuities-type charges prove that gratuities are given because of a *specific* official act to avoid criminalizing commonplace political activity. *Compare Sun-Diamond*, 526 U.S. at 404-408 *with Sawyer II*, 239 F.3d at 40 n. 8 and 41.

expressed these precise concerns at the jury instruction conference on June 13, 2006.[71]

Indeed, the jury charge that the government pressed the lower court into accepting is at odds with the government's own characterization of *Sawyer* to courts in other prosecutions. For example, in *United States v. Potter*, 2005 WL 2367677, at *7 (D.R.I. Sept. 27, 2005), *affirmed*, *United v. Potter*, 463 F.3d 9 (1st Cir. 2006), the government itself appropriately distinguished *Sawyer I* as "an *honest services* wire fraud case dealing with *gratuities, whereas the case before the Court concerns an alleged quid pro quo bribery* scheme." (emphasis added).

Furthermore, the jury charge given in this case is squarely at odds with the requisite express, specific quid pro quo proof the district court in *United States v. Warner*, 2005 WL 2367769, *5 (N.D. Ill. Sept. 23, 2005) required the government prosecutors to prove in its honest services case against Illinois Governor Ryan. The district court held that the government must "prove an *explicit* quid pro quo" for the "honest services mail fraud" charges in "the campaign contribution context." *Warner* at 5. (emphasis added). By requiring exacting explicit quid pro quo proof for the honest

---

[71] *See also*, EXHIBIT 13, at 68, 70 (objections to jury instructions direct and indirect references to close question on quid pro quo issue and *Sawyer charge* at jury instructions conference); *see,* EXHIBIT 13, at 62, 64-66, 68 and 70 (objections to jury instructions).

services charges involving campaign contributions, the district court in effect accepted Governor Ryan's argument that the principles of restraint found in *McCormick* and *Allen* apply to honest services charges as well:

> Ryan emphasizes that 'the quid pro quo requirement should apply with equal force to an [honest services] intangible rights prosecution based on campaign contributions for the same reason it applies to bribery and extortion: without such a requirement, any campaign contribution might constitute a violation of criminal law.'(Ryan Fraud Resp., at 11.) *Cf. United States v. Allen*, 10 F.3d 405, 411 (7th Cir. 1993) ("[A]ccepting a campaign contribution does not equal taking a bribe unless the payment is made *in exchange for* an *explicit* promise to perform or not perform an official act."

*Id.* at *3.[72] (emphasis added).

The district court's ruling in *Ryan* is particularly demonstrative of the government's disingenuous overreaching in this case given the government's repeated representations to the lower court that no precedent exists for bribery-type quid pro quo honest services cases anywhere in the country. Besides *Ryan*, several other cases exist where the court has recognized requisite quid pro quo type proof for bribery-type honest services prosecutions. For example, the district court in *United States v. White*, 2004

---

[72] The Seventh Circuit reversed the district court's denial of Governor Ryan's motion for release pending appeal. (opinion not yet published). See, *United States v. Warner*, 2006 LEXIS 77228 (N.D.IL. OCT. 16, 2006) (district court decision on release pending appeal).

WL 2612017, **5-6 (E.D. Pa. Oct. 29, 2004) found that the government charged a "*Quid Pro Quo*" "*bribery theory of honest services fraud*", and "[t]he Court will determine at trial whether the government has introduced sufficient evidence of *quid pro quo bribery*, and if so, the Court will charge the jury accordingly." *United States v. White*, 2004 WL 2612017, **5-6 (E.D. Pa. Oct. 29, 2004). (emphasis added).

Most importantly, the jury instruction given in this case is contrary to the requisite quid pro quo bribery-type proof recognized by the Supreme Court in *Sun-Diamond*.[73] The Supreme Court in *Sun-Diamond* found that "for bribery there must be a *quid pro quo*—a specific intent to give or receive something of value *in exchange for* an official act."[74]   The Supreme Court thus found that "[t]he District Court's instructions in this case, in differentiating between a bribe and an illegal gratuity, correctly noted that only a bribe requires proof of a *quid pro quo*."[75]

---

[73] 526 U.S. at 404-405.
[74] *Id.* at 404. (emphasis by Supreme Court).
[75] *Id.* (emphasis by Supreme Court). Similarly, as previously discussed, the Supreme Court in *McCormick* and its progeny require even more exacting proof of an express agreement, an "explicit promise", a specific quid pro quo where, as here, the bribery charges involve political contributions and commonplace political activity.

Similar to the lower court's jury instructions for non-specific official

acts *"as a result of"* "campaign contributions",[76] the Supreme Court referred

to *non*-quid pro quo gratuity-type offenses as being *"because of"*[77], or thus

as a result of,[78] rather than as quid pro quo[79] proof "in exchange for" or "in

return for" a specific official act required to prove bribery.[80]

---

[76] EXHIBIT 12, at 28. (honest services jury instructions). The lower court's *non*-quid pro quo *gratuity*-type honest services jury instructions provide, in pertinent part, that the jury could convict a public official upon finding "that they intended to alter their official actions *as a result of* the receipt of campaign contributions or other benefits." (emphasis added). Altering *non*-specific official acts *"as a result of"* campaign contributions is *gratuity*-type conduct, rather than quid pro quo bribery-type conduct altering a specific official act "in exchange for" campaign contributions. *Sun-Diamond*, 526 U.S. at 404. (*non*-specific official act, *non*-quid pro quo *gratuity*-type benefits *"because of"* or as a result of).

Thus, the lower court's jury instruction is not even a quid pro quo type jury instruction—much less the more exacting requisite express quid pro quo proof required here by of an *"explicit promise"*, a specific quid pro quo agreement to alter a specific official act *"in exchange for"* campaign contributions to distinguish between legitimate political contributions and bribery. *McCormick*, 500 U.S. at 272 ("explicit promise" *"in return for"*); *Sun-Diamond*, 526 U.S. at 404 ("in exchange for" specific act); *Allen*,10 F.3d 410-11 ("explicit promise" "in exchange for"); *Davis II*, 30 F.3d at 108("explicit promise" "in exchange for").

[77] *Encarta World English Dictionary* defines *"because of"* as a synonym for *"as a result of."*

[78] The honest services gratuity-type jury instructions charged jury with the term *"as a result of"*, the synonym for *"because of."* EXHIBIT 12, at 28.

[79] *Encarta World English Dictionary* defines "quid pro quo" as: "**1.** something given or done *in exchange for* something else **2.** The giving of something *in return for* something else, often in the spirit of cooperation." (emphasis added).

[80] *Sun-Diamond*, 526 U.S. at 404; *Allen*, 10 F.3d at 411.

51

contributions were offered and received in exchange for official state acts. The government will have to prove a quid pro quo in connection with the alleged campaign contributions[81] and the jury will be instructed that a quid pro quo is required for conviction.")

This fundamental per se reversible error principle is repeatedly recognized by this Court:

> We have held that 'a fundamental principle stemming from the [fifth] amendment is that a defendant can only be convicted for a crime charged in the indictment.' *United States v. Keller*, 916 F.2d 628, 633 (11th Cir. 1990), *cert. denied*, 499 U.S. 978 (1991). *Per se reversible error occurs 'when the essential elements of the offense are altered to broaden the possible bases for conviction beyond what is contained in the indictment.'* *Id.* at 634. An amendment to an indictment occurs when the charging terms of the indictment are altered. *United States v. Weissman*, 899 F.2d 1111, 1114 (11th Cir. 1990). A jury instruction that constructively amends a grand jury indictment constitutes per se reversible error because such an instruction violates a defendant's constitutional right to be tried on only those charges presented in a grand jury indictment and creates the possibility that the defendant may have been convicted on grounds not alleged in the indictment. *Stirone v. United States* 361 U.S. 212, 217-18 (1960); *Weissman*, 899 F.2d at 1114.

---

[81] As previously discussed, the honest services jury instructions also reference campaign contributions without any quid pro quo, much less the express quid pro quo required by *McCormick* and its progeny, including this Court's *Davis II* decision. See EXHIBIT 12, at 28. (honest services jury instructions).

*United States v. Cancelliere*, 69 F.3d 1116, 1121 (11th Cir. 1995).

### F.  THE LOWER COURT FAILED TO REQUIRE AN EXPRESS QUID PRO QUO FOR THE FEDERAL BRIBERY CHARGES

The lower court's refusal to recognize that the federal bribery charges[82] involving campaign contributions[83] require proof of an *express* quid pro quo raises a *substantial question* in this appeal.[84]

The lower court rejected precedent of this Court such as *Davis II* that strictly required "explicit promise" specific quid pro quo jury instructions to assure that the jury distinguishes between criminal conduct and legitimate political activity.  Instead, the lower court provided a *simple* quid pro quo jury instruction, charging, in pertinent part:

> A Defendant does not commit a crime by giving
> something of value to a government official unless
> the Defendant and official *agree* that the official
> will take specific action in exchange for the thing
> of value."[85]

---

[82] 18 U.S.C. § 666(a)(1)(B).

[83] The same issues advocacy campaign contributions are involved in both the bribery charges and the honest services charges. *Compare* Count Three federal bribery charges *with* Counts Five through Nine bribery-type honest charges both of which involve the Scrushy contributions to Governor Siegelman's AELF/AEF education lottery campaign.

[84] See EXHIBIT 13, AT 62. (objections to Count Three federal bribery jury instructions by Governor Siegelman for failure to require requisite *express* quid pro quo proof for conviction since the charges involve campaign contributions).

[85] *Id.* (federal bribery jury instructions). EXHIBIT 14. (Indictment).

—

[EXHIBIT 12, at 41] (federal bribery jury instruction).

Significantly, this Court, in *Davis II* reversed *Davis I* for approving a similar jury charge.[86]   The *Davis I* panel of this Court found that the "language" of the jury instruction allowing the jury to convict for an official "taking or offering to take or *agreeing* to take or withhold official action" "was near enough to the '*explicit promise* or undertaking by the official to perform or not to perform an official act' outlined in *McCormick* that we cannot say the jury was misled."[87] This Court in *Davis II*, however, ruled that the jury instruction recognized as sufficient by *Davis I* did not require sufficient exacting quid pro quo proof of an *express* agreement; the Court in *Davis II* held the jury instruction must include language to the effect that an "*explicit promise*", a "specific quid pro quo" must be found by the jury to convict.[88]

Furthermore, in recognizing this requisite express quid pro quo proof to avoid convicting officials for legitimate campaign contributions and commonplace political activity, this Court in *Davis II* included a cite to *Allen*

---

[86] The similar *Davis I* language found to be insufficient by *Davis II* is as follows: "[T]he jury in this case was instructed that misuse of office 'by taking or offering to take or *agreeing* to take or withhold official action' constituted an offense." *Davis I*, 967 F.2d at 522.
[87] *Davis I*, 967 F.3d at 522.
[88] *Davis II*, 30 F.3d 108. (emphasis added).

for the reasons as to its ruling.[89] In *Allen*, the Seventh Circuit found that the same political reality and exacting "explicit promise", specific quid pro quo restraints of the Supreme Court's *McCormick* extortion decision apply equally to federal bribery-type charges as well to avoid federal bribery convictions for legitimate political contributions and commonplace political activity.[90]

Indeed, the Court in *Allen* applied the requisite exacting proof of an express agreement, an "explicit promise" specific quid pro quo to the 18 U.S.C. § 201 federal bribery statute,[91] the federal bribery statute the 18 U.S.C. § 666 federal bribery statute charged against Governor Siegelman is "patterned after." *United States v. Ford*, 435 F.3d 204, 210 (2nd Cir. 2006).

Accordingly, the lower court's refusal to provide an express quid pro quo for the federal bribery charges raises a *substantial question* on appeal.

### G. THE STATUTE OF LIMITATIONS BARRED THE FEDERAL BRIBERY CHARGES

The Grand Jury returned the original Indictment on May 17, 2005. Thus, the government failed to bring Count Three (the federal funds bribery count)

---

[89] *Davis II*, 30 F.3d at 108.
[90] *Allen*, 10 F.3d at 410-411.
[91] *Id.*

within the applicable five-year statute of limitations. The general statute of

limitations for non-capital federal offenses, 18 U.S.C. § 3282[92], provides:

> Except as otherwise expressly provided by law, no
> person shall be prosecuted, tried, or punished for
> any offense, not capital, unless the indictment is
> found or the information is instituted within five
> years next after such offense shall have been
> committed.

The government bears the burden of proving that a defendant

committed an alleged offense within the five-year limitations period.[93] The

government must prove this essential element beyond a reasonable doubt to

obtain a conviction.[94] Except for continuing offenses as noted in *Toussie v.*

*United States*, 397 U.S. 112 (1970), an offense is committed when it is

---

[92] *See, e.g., United States v. Yashar*, 166 F.3d 873, 875 (7th Cir. 1999);
*United States v. Rogers*, 781 F.Supp. 1181, 1190 (S.D. Miss. 1991)
(applying §3282 limitations period to § 666 bribery case); *United States v.*
*Richards*, 925 F.Supp. 1097, 1103 (D.N.J. 1996) (same).

[93] *Gruenewald v. United States,* 353 U.S. 391, 396-97 (1957); *see also, e.g.,*
*United States v. York*, 888 F.2d 1050, 1057 (5th Cir. 1989); *United States v.*
*Hankin*, 607 F.2d 611, 612-13 (3d Cir. 1979).

[94] *See, e.g., United States v. Wilson*, 249 F.3d 366, 373 (5th Cir. 2001) (citing
*United States v. York*, 888 F.2d 1050, 1057 n. 10 (5th Cir. 1989)). As this
Court and other federal courts have noted, an exception to the rule that
"proof of the specific date of [a] crime is not an essential element" is that the
government, nevertheless, must prove beyond a reasonable doubt that "the
crime . . . occurred . . . within the statute of limitations and before the
indictment." *United States v. Griffin*, 705 F.2d 434, 436 (11th Cir. 1983);
*United States v. Francisco*, 575 F.2d 815, 818 (10th Cir. 1978); *United States*
*v. Falcon*, 957 F. Supp. 1572, 1582-83 (S.D. Fla. 1997).

completed,[95] and an offense is completed when each element of the offense has occurred.[96]

The government relied on Bailey's testimony to establish the existence and date of the alleged bribery scheme between Siegelman and Scrushy. Bailey testified that sometime in June or July, 1999 (before Scrushy's July 26, 1999 appointment to the CON Board) Siegelman and Scrushy met in the Governor's office. [EXHIBIT 10, N. Bailey, 05/02/06, TR-135-140] Bailey did not attend or participate in this meeting. [EXHIBIT 15, N. Bailey, 05/04/06, TR-213]

Bailey testified that in a conversation sometime after this meeting, Siegelman indicated that Scrushy had made a "commitment" to donate or raise $500,000.00 for the AELF/AEF. [EXHIBIT 10, N. Bailey, 05/02/06, TR-134-143]    According to the government, Scrushy honored this commitment by raising $250,000.00 from Integrated Health Services (IHS), and, later, by having HealthSouth contribute $250,000.00.

---

[95] *Toussie v. United States*, 397 U.S. 112, 115 (1970); *United States v. Gilbert*, 136 F.3d 1451, 1453 (11th Cir. 1998).

[96] *See, e.g., United States v. Barefield*, 6 Fed. Appx. 351, 353, 2001 WL 300714 *1 (7th Cir. March 27, 2001); *United States v. Yashar*, 166 F.3d 873, 875 (7th Cir. 1999); *United States v. Cooper*, 283 F. Supp.2d 1215, 1229 (D. Kan. 2003); *United States v. Donne*, 2000 WL 33710849 *3 (D. Utah October 5, 2000).

Accordingly, the government failed to bring this charge within the five-year statute of limitations. In *United States v. Yashar*, 166 F.3d 873 (7th Cir. 1999), the Seventh Circuit held that a § 666 offense is not a continuing offense, that it is complete, and that the "limitations period begins to run once all elements of the offense are established, regardless of whether the defendant continues to engage in criminal conduct." *Id.*, 166 F.3d at 779-880. The *Yashar* Court further held that the elements of an offense are "established" *on the first date* that the government could have proceeded with criminal charges. Specifically, under §666, the offense is complete when the defendant's prohibited conduct *first* involves $5,000 or more (and the relevant government or agency has received $10,000 in federal funds). *Id.*

In *Yashar*, the Circuit expressly rejected the government's veiled efforts to transform §666 into a "continuing offense" similar to RICO. The government did not claim that § 666 was a "continuing offense" but rather that Yashar had engaged in a "continuing course of conduct" that straddled the limitations period. The Seventh Circuit rejected this rationale as a distinction without a difference. The *Yashar* Court compared § 666 to RICO (that criminalizes a "pattern" of activity) and noted that Congress intended the RICO statute to be a "continuing offense" statute as an *exception* to the

"normal" limitations period.   The Court reasoned that if it accepted the
government's "continuing course of conduct" argument, any statute of
limitations would become meaningless:

> *That position would undermine the purpose of the
> statute of limitations, which is "to limit exposure to
> criminal prosecution to a fixed period of time
> following the occurrence of those acts the
> legislature has decided to punish by criminal
> sanctions," to discourage prosecution based on
> facts obscured by the passage of time, and to
> encourage law enforcement officials promptly to
> investigate suspected criminal activity.*   Toussie,
> 397 U.S. at 114-15. Allowing the prosecution to
> extend the statute of limitations by charging a
> course of conduct would risk prosecutions based
> on stale facts and would not encourage prompt
> investigation and prosecution of criminal activity.
> Those goals can only be promoted by an
> interpretation that starts the limitations period
> when all elements of the crime are first present.

*Yashar at 879.* (emphasis added).

The Court continued:

> Moreover, under the government's position, *a
> prosecutorial decision regarding the scope of the
> charge would determine the running of the
> limitations period. In that manner, the statute of
> limitations, designed as a control on governmental
> action, would instead be defined by it.* Virtually
> any criminal actions that extend over time could
> fall within this expansive definition depending
> upon how a prosecutor chose to charge a case. A
> prosecutor has a great deal of discretion in
> deciding whether to charge a course of conduct as
> a single offense or as multiple offenses. *See United*

60

*States v. Berardi*, 675 F.2d 894, 898 (7th Cir. 1982). (citations omitted; emphasis added).

* * *

Under the government's argument, that charging decision could delay the running of the limitations period on the discrete offenses. For instance, a series of drug sales could be charged as a single scheme. *The government could then wait to prosecute until well beyond five years after the initial drug sales, as long as at least one overt act occurred within the last five years, and regardless of whether that one act constituted an element of the charged crime.* With this approach, the limitations period would be virtually unbounded. At oral argument, we posed a hypothetical to the government in which *a ghost payroller received $ 15,000 in salary in 1970 and, 25 years later, received $ 300 in retirement benefits attributable to that sham employment. The government declared that the limitations period might not begin to run on the 1970 conduct until after the retirement benefits were received in 1995, if the payments were deemed to be part of a single scheme. With this interpretation, the limitations period would apparently not begin to run until the person's death if that person received ongoing pension payments attributable at least in part to the ghost payrolling scheme.* That example demonstrates how the prosecutor's charging decision could dramatically impact the limitations period. *This approach would transform the limitations period from a check on governmental delay in prosecution to a function of prosecutorial discretion.* It would gain for the government the expanded statute of limitations of a conspiracy or

RICO claim, without requiring the government to prove either.[97] (citations omitted; emphasis added).

In this case, the limitations period began to run when, as charged in the Indictment, Siegelman "solicited, demanded, accepted, and agreed to accept" the $500,000 from Scrushy. This would be June or July 1999. At the very latest, the limitations period began to run when Siegelman first accepted a payment involving at least $5,000. That date, according to Bailey, was sometime *prior* to Scrushy's July 26, 1999 appointment to the CON Board. Thus, the period of limitations would unquestionably run out *after* July 26, 2004, that is, five years *after* any alleged offender committed the offense. *Because the Grand Jury returned the original Indictment on*

---

[97] The Seventh Circuit distinguished a number of cases in which, in its view, the defendant engaged in numerous acts that straddled the limitations period, but the offense could properly charge only the acts that fell within the period. 166 F.3d at 877-78 (distinguishing *United States v. Jaynes*, 75 F.3d 1493 (10th Cir. 1996); *United States v. Silkowski*, 32 F.3d 682, 689-90 (2d Cir. 1994); *United States v. Jensen*, 608 F.2d 1349, 1355 (10th Cir. 1979); *United States v. Provenzano*, 334 F.2d 678 (2d Cir. 1964); *United States v. Hedman*, 630 F.2d 1184, 1199 (7th Cir. 1980)). The Court noted that *United States v. Bustamante*, 45 F.3d 933 (5th Cir. 1994) and *United States v. DiSalvo*, 34 F.3d 1204 (3d Cir. 1994), may fall into this category as well, though "it is difficult to determine whether they involve offenses that are continuing under the *Toussie* definition, or offenses in which all elements are present within the five-year period." 166 F.3d at 878. A district court in the Fifth Circuit has noted questions about *Bustamante*'s continuing viability after *Yashar*. *United States v. Aubrey*, 53 F. Supp.2d 1355, 1356 (E.D. Tex. 1999).

May 17, 2005,[98] the § 666(a)(1)(B) charge in Count Three is barred by the five-year statute of limitations.

Any argument that the government raises to the contrary will fail the hypothetical posed by the *Yashar* Court.  For example, suppose that rather than two $250,000.00 payments, Governor Siegelman and Scrushy agreed that this alleged "bribe" could be made payable in twenty $25,000.00 annual payments.  Following the government's logic, the five-year statute would not begin to run until the twentieth payment, so that the government would have *twenty-five years* to bring its indictment rather than the five years expressly stated in the applicable statute of limitations.  This certainly is not what Congress intended.  According to the government's theory, all of the elements of a violation of 18 U.S.C. § 666(a)(1)(B) occurred on or before July 26, 1999.  But the Grand Jury returned the operative Indictment on May 17, 2005, a little less than a year too late.  Accordingly, the lower court should have acquitted Governor Siegelman on this count.

---

[98] Two views exist as to when an indictment is "found": (1) when it is returned to the magistrate, *see, e.g., United States v. Srulowitz*, 819 F.2d 37, 40 (2d Cir. 1987), and (2) when the grand jury votes to indict the defendant and the foreperson subscribes the bill as a true bill.  *United States v. Thompson*, 287 F.3d 1244 (10th Cir. 2002).  Regardless of the standard applied, the crucial date of First Indictment in this case was found on May 17, 2005. *Docs. 1,2,3.*

For similar reasons, the statute of limitations requires an acquittal for Governor Siegelman on the second $250,000.00 payment. Again, all of the elements of the "crime" alleged in Count Three (according to the government's allegations) existed on or before July 26, 1999: Scrushy's alleged offer to pay $500,000.00 in exchange for a seat on the CON Board, Siegelman's alleged acceptance of this offer, and an actual payment in excess of $5,000.00. The second $250,000.00 payment from HealthSouth dated May 18, 2000 does not extend the statute of limitations merely because *that* payment could have occurred, at least arguably, within five years of the Indictment.

*United States v. York*, 888 F2d 1050 (5th Cir. 1989) is instructive. In *York*, the Fifth Circuit reversed York's conviction on two counts of providing false information on loan applications, because, *at trial*, the government failed to meet its burden of proving that the statute of limitations did not bar the prosecution:

> York was indicted on September 16, 1987, and hence could be prosecuted...for acts occurring on our about September 16, 1982. On October 1, 1982, Lancaster First Federal Savings and Loan Association approved York's loan application based upon his March 15, 1982, financial statement, on which the jury found York had falsified information.

York was charged with submitting false financial statements; hence, the crime was completed at the time of the submission of the loan application; not at the time of the application's approval by the financial institution. At trial, the government could not produce York's loan application and adduced no evidence whatsoever to show that it was, for example, standard practice at Lancaster Savings and Loan to approve or deny loan applications within 15 days of their submission.

Therefore, there was no evidence from which a jury could conclude that the application was submitted between September 16, 1982, and October 1, 1982, rather than between March 15, 1982, and September 15, 1982. Thus, the evidence in insufficient to satisfy even a preponderance standard, so we need not give any further consideration to the degree of the government's burden.

*York* at 1057.

In this case, the government's evidence at trial proved that if a crime occurred at all, it occurred in July of 1999 – outside the statute of limitations. The evidence the government offered here does not prove that the § 666(a)(1)(B) offense occurred within the limitations period (much less constitutes such proof beyond a reasonable doubt). That failure of proof mandated Governor Siegelman's acquittal on Count Three in the lower court, and it will mandate his acquittal in this Court on the merits, easily now raising a substantial question on this motion for release pending appeal.

65

## H.    THE LOWER COURT ERRED IN DENYING SIEGELMAN'S RULE 29 MOTIONS FOR A JUDGMENT OF ACQUITTAL

This appeal raises a *substantial question* whether the lower court erred in denying Governor Siegelman's Rule 29 Motion for Judgment of Acquittal. The lower court did not review the sufficiency of the evidence to determine whether the government properly proved an expressed quid pro quo to support the bribery-type honest services and federal bribery charges. Instead, it issued a general denial of Governor Siegelman's motion.

A substantial question regarding the sufficiency of the evidence exists to establish an express quid pro quo for two primary reasons:

(1)    the government offered no direct evidence of an "explicit promise," that is, an *express* agreement of a specific quid pro quo; and

(2)    the only circumstantial evidence offered by the government does not support beyond a reasonable doubt a logical inference of an *express* agreement, much less of a quid pro quo.

The government's key witness, Bailey, presented testimony that was woefully inadequate, as a matter of law, to convict Governor Siegelman:

> Mr. Feaga:    Okay.    Now, when you saw the Governor, did he have this check in his hand?  Did he have it?
>
> Mr. Bailey:  Yes, sir.

66

Q: Okay. Now when the Governor showed you the check, what, if anything did he say to you?

A: He made a comment referring to Mr. Scrushy's commitment to give 500,000 and he's halfway there.

Q: Okay. And what, if anything, did you say to him?

A: I said—I responded by saying, what in the world is going [sic] to want for that; and his response was the CON Board or the C-O-N Board.

Q: Okay. And what did you—

A: I wouldn't think there would be a problem with it. And he said I wouldn't think so.

This testimony fails to:

(1)    establish that Bailey was in the alleged meeting with Siegelman and Scrushy;

(2)    indicate that Bailey heard any "explicit" or "express" direct statements of an agreement between Siegelman and Scrushy;

(3)    indicate the alleged source of Siegelman's belief that Scrushy might want to be appointed to the CON Board; or

(4)    indicate that the CON Board or the members to be appointed to the CON Board were even discussed by Siegelman and Scrushy at the purported June 29, 1999 meeting.

67

Bailey's testimony—the government's "most convincing proof" on this crucial point—is not even near proof of an "explicit" or "express" agreement between Siegelman and Scrushy.    Indeed, Black's Law Dictionary refers to the "unmistakable" certainty of the terms "explicit" and "express" utilized by the law for applying the express quid pro quo restraint on criminalizing such commonplace political contributions and commonplace political activity as follows:

> *Express*: Clear; definite; *explicit*; plain; direct; unmistakable; not dubious; or ambiguous. Declared in terms; set forth in words. Directly and distinctly stated. *Made known distinctly and explicitly, and not left to inference. Manifested by direct and appropriate language, as opposed to inferred from conduct. The word is contrasted with 'implied'.*

BLACK'S LAW DICTIONARY (Abridged 6th ed. 1990).[99]

A *substantial question* of fact or law exists whether the government presented sufficient evidence of an "explicit promise" or agreement between Siegelman and Scrushy in connection with the relevant political contributions and Governor Siegelman's appointment of Scrushy to the CON Board.    Accordingly, a *substantial question* exists whether the lower

---

[99] *See also* BARRON'S LAW DICTIONARY (1996 ed.): "**Express**: To be known explicitly and in declared terms.  To set forth an actual **agreement** in words, written or spoken, which unambiguously signifies intent.  As distinguished from '**implied**' the term is *not left to implication or inference from conduct or circumstances*." (citation omitted) (bold emphasis in original).

court erred in denying Governor Siegelman's Rule 29 Motion for Judgment

of Acquittal for lack of sufficiency of the evidence on this crucial point.

### I. GOVERNOR SIEGELMAN WAS CONVICTED FOR ALLEGED CONDUCT BEYOND THE SCOPE OF THE OBSTRUCTION OF JUSTICE STATUTE

The government wrongfully convinced the jury to convict Governor

Siegelman on one count of obstruction of justice for completing the sale of a

motorcycle to Bailey.    The government elected to charge Governor

Siegelman under a statute that has been narrowly interpreted.  In turn, the

government failed to present any evidence that Governor Siegelman violated

this narrowly tailored statute.  On December 7, 1999, Governor Siegelman

purchased a Honda motorcycle for $12,173.35.   Honda executives had

previously offered to *give* this motorcycle to the Governor, but he declined

and used his own money to purchase the motorcycle.   [SIEGELMAN

TRIAL EXHIBIT 32]  Shortly thereafter, Governor Siegelman sold a partial

interest in the motorcycle to Bailey for $9,200.00.  Bailey testified that the

reason he purchased a part ownership in the motorcycle was to prevent a

man by the name of Lanny Young from *giving* $9,200.00 to the Governor.

Bailey testified that he obtained the $9,200.00 used to purchase an interest in

this motorcycle from Young.

69

Governor Siegelman's sale of partial ownership in the motorcycle to Bailey was a formal transaction documented with a bill of sale. [SIEGELMAN TRIAL EXHIBIT 46]

On October 16, 2001, Governor Siegelman sold his remaining interest in the motorcycle to Bailey. This, too, was a formal transaction documented with a bill of sale. [SIEGELMAN TRIAL EXHIBIT 48] The government alleged that the completion of the sale to Bailey was an obstruction of justice because, at the time, the government had publicly announced an investigation of the Siegelman administration, including an alleged illegal relationship between Young and Governor Siegelman, and completion of the motorcycle sale to Bailey constituted a "cover up" of Young's relationship with Siegelman.

The government never logically explained how completion of the transaction between Bailey and Governor Siegelman constituted a "cover up" of any relationship between Young and Siegelman. Logically, any such "cover up" occurred in 1999 when Bailey first purchased an interest in the motorcycle. Regardless of the tenuousness of the government's claims, the seventh count of conviction cannot withstand scrutiny, because the witness tampering statute of which the jury convicted Governor Siegelman requires

evidence that Governor Siegelman tampered with or misled a witness. The government presented no such evidence.

Section 1512(b)(3) is a *tampering* statute. It prohibits one from trying to "corruptly persuade" or to "engage in misleading conduct" toward a person who communicates—or whom he believes will communicate—with federal authorities.[100] The statute does *not* address a disguise or cover up that does *not* involve tampering. The statute is *not* a general obstruction of justice statute. Thus, its precise and limiting language controls.

As originally drafted, § 1512(b)(3) might well have covered a disguise or cover-up that did not involve tampering. In fact, the original version contained a catch-all provision reaching anyone who "corruptly ...intentionally influences, obstructs, or impedes or attempts to influence, obstruct, or impede the...enforcement and prosecution of federal law." S. 2420, 97th Cong., 2d Sess., sec. 201(a), § 1512(a)(3), 128 Cong. Rec. S11, 439 (daily ed. Sept. 14, 1982). The catch-all provision aimed to "protect[]

---

[100] In relevant part, 18 U.S.C. § 1512 (b) (3) provides:

Whoever knowingly ...or *corruptly persuades* another person ... or engages in *misleading* conduct toward another person, with intent to--

\*\*\*

(3) *hinder*, *delay*, *or prevent* the communication to a law enforcement officer or judge of the United States of information relating to the commission or possible commission of a Federal offense or a violation of conditions of probation, supervised release, parole, or release pending judicial proceedings ....(emphasis added).

71

against the rare type of conduct that is the product of the inventive criminal mind and which also thwarts justice." *S. Rep. No. 532, 97th Cong., 2d Sess. At 18, reprinted in 1982 U.S. Code Cong. & Ad. News 2515, 2524.* But Congress—for good and sufficient reason—did not pass the original version of § 1512(b)(3), and the version that did pass is our lode-star. *The version that did pass omitted the catch-all provision.*[101]

As the Second Circuit held in *United States v. King*, 762 F.2d 232, 237-38 (2d Cir. 1985), the omission of the catch-all provision meant that § 1512(b)(3) did *not* cover general attempts to disguise or cover-up transactions to throw federal investigators off the trail:

> The government contends that, notwithstanding the actual language of § 1512 to reach conduct that was not misleading to the person at whom it was directed but was intended to mislead the government…. We are unpersuaded.
>
> * * *
>
> [T]he original bill that led to the enactment of the Act contained, in addition to the eventually enacted enumeration of specific types of conduct to be reached, a catchall section designed to reach any person who "corruptly, by threats of force, or

---

[101] Senator Heinz explained the omission as follows:
Subsection (3) of 1512(a) [the catchall provision] of the Senate passed bill, general obstruction of justice residual clause of the intimidation section, was taken out of the bill as beyond the legitimate scope of this protection measure. It also is probably duplicative of abstrusion [sic] of justice statutes already in the books. 128 Cong. Rec. S13063 (*daily ed.* October 1, 1982).

72

by any threatening letter or communication, intentionally influences, obstructs, or impedes or attempts to influence, obstruct, or impede the...enforcement and prosecution of federal law." S. 2420, 97th Cong., 2d Sess., sec. 201(a), § 1512(a)(3), 128 Cong. Rec. S11, 439 (daily ed. Sept. 14, *1982*). The Senate Judiciary Committee opined that the prevention of obstructions of justice could not be fully carried out by a simple enumeration of the commonly prosecuted obstruction offenses and stated that the residual [or catchall] section was not intended to be limited by the doctrine of ejusdem generis. S. Rep. No. 532, 97th Cong., 2d Sess. 18, *reprinted in* 1982 U.S. Code Cong. & Ad. News 2515, 2524. Thus, the Senate Report stated that the residual section was intended to reach, *inter alios*, "a person who induces another to remain silent or to give misleading information to a Federal law enforcement officer...irrespective of whether he employed deception, intimidation, threat, or force as to the person." *Id.* (footnote omitted). *The residual section, however, was deleted from the Act as finally passed. We agree with the courts in United States v. Lester and United States v. Beatty that the legislative history of § 1512 does not suggest that Congress intended that section, as enacted, to reach modes of conduct other than those enumerated there.*

762 F.2d at 237-38.

Other courts agree with *King's* reasoning.[102] For example, in *United States v. Davis*,[103] the Court found that "[o]ur rejection of the government's

---

[102] See, *United States v. Kulczyk*, 931 F.2d 542, 547 (9th Cir. 1991) (holding no attempt to mislead a witness where witness knew the truth).
[103] *Davis*, 183 F.3d 231, 248-49 (3rd Cir. 1999).

broad theory has a basis in the statute.  Because there is no allegation that

Davis used "misleading conduct, intimidation, physical force, or threats" the

court rejected the government's theory that Davis had engaged in misleading

conduct under § 1512.  The court further noted:

> Several courts have held that asking a witness to
> tell what he knows to be a lie is not misleading
> conduct because there is nothing misleading about
> a request to lie. See, e.g., *United States v. Kulczyk*,
> 931 F.2d 542, 546 (9th Cir. 1991); *United States v.
> King*, 762 F.2d 232 (2d Cir. 1985).  The
> government has not identified any way in which
> Davis's conduct was misleading.  Indeed, on the
> government's own theory he told the truth as he
> perceived it: Sabol was an informant.  If asking for
> a lie is not misleading to the target, surely telling
> the truth is not.

*Davis*, 183 F.3d at 248 n.4.

Accordingly, the government tried its obstruction of justice charge

against Governor Siegelman on the erroneous legal theory that § 1512

embodies a prohibition of a general attempt to disguise or cover up

transactions, when, in fact, Governor Siegelman misled no one, and

Governor Siegelman corruptly persuaded no one.

The law is well-established that "corrupt persuasion" requires the

defendant ask somebody to do something.  The defendant must exert some

sort of "non-coercive influence" to use Senator Biden's term in the legislative history.[104] As recognized by the Court in *Khatami*:

> The verb "persuade" has many definitions, but within the context of § 1512(b)(3) can be understood to mean "to coax," *Oxford English Dictionary* (2d ed. 1989); "to plead with," *Merriam Webster's Collegiate Dictionary* at 868; or "[t]o induce one by argument, entreaty, or expostulation into a determination, decision, conclusion, belief, or the like; to win over by an appeal to one's reason and feelings, as into doing something." *Black's Law Dictionary* at 1144-45.

*Khatami*, 280 F.3d at 911.

Bailey was the government's only witness on Count Seventeen. Nothing in his testimony indicates that Governor Siegelman asked him or anyone else to do anything—much less to lie, remain silent, or do anything illegal to hinder an investigation. In short, Governor Siegelman did *not* mislead or attempt to mislead the *eminently knowledgeable* Bailey, as someone dealing with federal investigators.

## II.    GOVERNOR SIEGELMAN DOES NOT PRESENT A FLIGHT RISK OR A DANGER TO THE COMMUNITY IF HE IS GRANTED RELEASE ON BOND PENDING RESOLUTION OF HIS APPEAL

---

[104] 134 Cong. Rec. S17369 (1988) (statement of Senator Biden). *See also*, *United States v. Kahatami*, 280 F.3d 907, 912 (9th Cir. 2001) (the point of the new § 1512(b)(3) was "to prohibit attempts to 'corruptly persuade' a prospective witness to engage in certain obstructive activities").

Governor Siegelman's conduct since the return of Indictment in 2005 demonstrates that (1) he is not a flight risk and that (2) he poses no danger to anyone, if he remains free pending the resolution of his appeal. *See* 18 U.S.C. § 3143(b)(1)(A). Governor Siegelman has appeared at every proceeding before the lower court when his presence was required, and he complied fully with all of the terms of his release prior to and during his trial and throughout the sentencing proceedings.

Moreover, as demonstrated at trial and in the sentencing submissions Governor Siegelman and his family have substantial life-long connections to the State of Alabama. Governor Siegelman has a deep-rooted love for the State of Alabama, and he has devoted his life to serving its citizens.

The government presented no evidence that Governor Siegelman is likely to flee or pose a danger to the community. Governor Siegelman has lived in Alabama for the vast majority of his life, and he has close family and community ties to the state. His over twenty years of public service to the State of Alabama has included service as the state's chief law enforcement officer as Attorney General; he has served as Secretary of State, and he has served as both Lieutenant Governor and Governor of the State of Alabama.

76

Governor Siegelman's peers, based upon years of witnessing his good character, testified at sentencing as to his integrity, and that he does not pose a risk of flight or a danger to the community. **Mr. Redding Pitt**, a former United States Attorney for the Middle District of Alabama, has submitted an attached Affidavit affirming that based upon his many years of personally witnessing Governor Siegelman's good character and integrity Governor Siegelman is not a flight risk or danger to the community. [EXHIBIT 16, Affidavit of Mr. Redding Pitt]

As also summarized by the attached Affidavit of Vincent F. Kilborn, III, several of Governor Siegelman's peers testified at sentencing as to his good character and that he does not pose a risk of flight or a danger to the community. [EXHIBIT 17, Affidavit of Mr. Vincent F. Kilborn, III]  These witnesses include: **Mr. Robert Abrams**, former New York Attorney General; **Major General Michael Sumrall**, Assistant to the Chairman, Joint Chiefs of Staff (General Peter Pace) for National Guard matters; **Mr. John C. Miller**, former counsel to the United States Committee on Banking, Housing and Urban Affairs, Former First Assistant to the Director of the FDIC and, subsequently, Deputy to the Chairman of the FDIC; **Mrs. Helen Vance**, widow of Judge Robert Vance, a United States Court of Appeals Judge for the Eleventh Circuit, who was tragically murdered at his home

Vince F. Kilborn, III
Kilborn, Roebuck & McDonald
P.O. Box 66710
Mobile, Alabama 36606
Phone: 251-479-9010
Fax:    251-479-6747
Email: vfk@krmlaw.com

Redding Pitt
John D. Saxon, PC
2119 Third Avenue, North
Birmingham, AL 35203
Phone:    205-324-0233
Fax:       205-324-1583
Email:   rpitt@saxonattorneys.com

ATTORNEYS FOR APPELLANT
DON EUGENE SIEGELMAN

## CERTIFICATE OF SERVICE

I certify that on August 9th, 2007, I served by mail the foregoing Motion for Release Pending Appeal upon Louis V. Franklin, Sr., Acting United States Attorney, One Court Square, Suite 201, Montgomery, Alabama 36104, by First Class Mail, postage pre-paid.

Hiram Eastland
EASTLAND LAW OFFICES
MS. BAR # 5294
107 Grand Boulevard
Greenwood, Mississippi 38930
Phone: 662-453-1227
Fax: 662-453-2808
Email: eastlandlaw@bellsouth.net