# EXHIBIT 3

5-3-06 Bailey testimony.txt

1

1        IN THE UNITED STATES DISTRICT COURT

2          FOR THE MIDDLE DISTRICT OF ALABAMA

3                  NORTHERN DIVISION

4

5   UNITED STATES OF AMERICA,

6   vs.                    CASE NO: 2:05cr119-F

7   DON EUGENE SIEGELMAN,
    RICHARD M. SCRUSHY,
8   PAUL MICHAEL HAMRICK,
    and GARY MACK ROBERTS,
9

10        Defendants.

11              * * * * * * * * * *

12        EXCERPTS OF TRIAL PROCEEDINGS

13              * * * * * * * * * *

14        TESTIMONY AND PROCEEDINGS before The

15  Honorable Mark E. Fuller, United States District

16  Judge, and a jury, at the United States Federal

17  Courthouse, One Church Street, Montgomery,

18  Alabama, reported by Dee Coker, Registered

19  Professional Reporter and Commissioner for the

20  State of Alabama, commencing on Wednesday, May 3,

21  2006, commencing at approximately 9:00 a.m.

22              * * * * * * * * * *

23


                         2

1        THE COURT:  Good morning, ladies and

2                gentlemen.  Is the United States

3                prepared to continue with the

4                direct examination of this witness?

5        MR. FEAGA:  We are, Your Honor.

6        THE COURT:  You may proceed.

5-3-06 Bailey testimony.txt

4  Q.  Okay.  And that happened in Governor

5      Siegelman's case?

6  A.  Yes.

7  Q.  There were many, many people working in

8      Governor Siegelman's campaign and they were

9      not paid a dime.

10 A.  That's correct.

11 Q.  And they --

12 A.  To the best of my knowledge, that's correct.

13 Q.  And they did it for a variety of reasons we

14     don't need to go into now; but in your

15     experience in campaign is that folks on both

16     sides, Alabama's Republicans and Democrats,

17     that all volunteer their time and their sole

18     primary motivation is for good government.

19     Is that fair?

20 A.  I don't know what everybody's intentions are.

21 Q.  Well, what was your intention in 1993?

22 A.  To support Governor Siegelman.

23 Q.  To support Governor Siegelman.  Did you enter

                          88

1      that campaign in 1993 with Governor Siegelman

2      with the specific intent to line your pocket?

3  A.  No.

4  Q.  Did you enter that agreement -- that campaign

5      in 1993 with the understanding that once you

6      got close to somebody with power, you would

7      be able to extort, bribe, or otherwise accept

8      loans in the amounts of hundreds of thousands

9      of dollars from some of the most successful

10     businessmen in Alabama?

                    Page 68

5-3-06 Bailey testimony.txt

11  A.  No.

12  Q.  Okay.  Well, let's get back to our questions

13      here.  I'll put a question mark on that

14      $19,000 as it has -- as it has to do with

15      Lanny Young's contribution to your salary

16      during the campaign, and we'll debate later

17      whether Governor Siegelman had any obligation

18      to do anything with that.  But let's make

19      clear, not one red cent of that $19,000 that

20      you got from Lanny Young in 1998 went to

21      Governor Siegelman?

22  A.  Correct.

23  Q.  And I apologize if I asked you this, but I

                        89

1      want to make sure.  You've already

2      established that you never told Governor

3      Siegelman that this $55,000 in 1996 came from

4      Lanny Young.  You never told him about that

5      transaction?

6   A.  Correct.

7   Q.  And not one red cent went to Governor

8      Siegelman from that $55,000 that Lanny Young

9      gave you?

10  A.  Correct.

11  Q.  $20,000 in the year 2000 from Lanny Young.

12      You never told Governor Siegelman that Lanny

13      Young gave you $20,000?

14  A.  Correct.

15  Q.  And not one red cent went to Governor

16      Siegelman from that $20,000?

17  A.  Correct.

5-3-06 Bailey testimony.txt

18  Q.  And we have this little thing over here on

19      the side.  It's that $100,000 because we all

20      agree, even though we can't itemize it

21      today -- you've pled to it and everybody

22      knows it -- that Lane young gave you, Nick

23      Bailey, well over $100,000, right?

                        90

1   A.  Correct.

2   Q.  And of that well over $100,000 that Lanny

3       Young gave to Nick Bailey, you never told

4       Governor Siegelman about any of that money?

5   A.  Governor Siegelman was aware of the $19,000

6       for the '98 campaign.  Other than that, you

7       are correct.

8   Q.  And not one red cent of that over $100,000

9       that Lanny Young gave to you went in Governor

10      Siegelman's pocket?

11  A.  That's correct.

12  Q.  Now -- I said it again.  I'm sorry.

13          Anthony Fant.  We've already established

14      you didn't pay any taxes on that money,

15      correct?

16  A.  To the best my knowledge, no.

17  Q.  Okay.  You never told Governor Siegelman you

18      took $50,000 from Anthony Fant while you were

19      in office being paid by the citizens of

20      Alabama?

21  A.  That's correct.

22  Q.  Not one red cent of that $50,000 you took

23      from Anthony Fant ever went in Governor

                        Page 70

5-3-06 Bailey testimony.txt
91

1    Siegelman's pocket?

2  A.  That's correct.

3  Q.  Our friend Curtis Kirsch, the architect, paid

4      you $21,000.  You never paid taxes on any of

5      that money?

6  A.  To the best of my knowledge, no.

7  Q.  You never told Governor Siegelman about any

8      of that money that went to you from Curtis

9      Kirsch?

10 A.  That's correct.

11 Q.  Governor Siegelman didn't get one red cent of

12     that $21,000 you took from Curtis Kirsch.

13 A.  That's correct.

14 Q.  The $17,000 in remodeling that you got done

15     on your house, the hard work of those

16     carpenters and plumbers and anybody else who

17     was in that house, you never paid taxes on

18     those services that were given to you?

19 A.  That's correct.

20 Q.  And there wasn't a lick of work that any of

21     those workmen did on anything owned by

22     Governor Siegelman?

23 A.  That's correct.

92

1  Q.  You didn't send a plumber to fix a leaky

2      toilet in Governor Siegelman's house, did

3      you?

4  A.  Not that I recall.

5  Q.  He didn't benefit one bit from $17,000 worth

6      of work from all these workmen working on

Page 71

5-3-06 Bailey testimony.txt

7    your house?

8  A.  That's correct.

9  Q.  The $1,000 that -- that we can agree on, at

10      least, that Curtis Kirsch paid on the

11      utilities at your house because you say you

12      couldn't afford to pay your utilities, not

13      one cent went to Governor Siegelman to pay

14      his own debts?

15  A.  That's correct.

16  Q.  The over one -- the $1,000 that we agree on

17      that Curtis Kirsch paid on the mortgage on

18      your house, not one penny went to Governor

19      Siegelman?

20  A.  That's correct.

21  Q.  And you never told Governor Siegelman that

22      Curtis Kirsch was paying anything on your

23      house or covering any of your debts?

                        93

1  A.  That's correct.

2  Q.  One more.  And I hope I don't lose the jury.

3          Jim Lane, $30,000.  While you were

4      taking money as an employee from the citizens

5      of Alabama to do your job, you never told

6      Governor Siegelman that you took $30,000 from

7      Jim Lane?

8  A.  That's correct.

9  Q.  And Governor Siegelman didn't get one red

10      cent of that $30,000?

11  A.  That's correct.

12  Q.  $20,000 from Jim Lane.  You never told

13      Governor Siegelman you were getting 30 --

                        Page 72

5-3-06 Bailey testimony.txt

14      $20,000 from Jim Lane?

15  A.  That's correct.

16  Q.  And Governor Siegelman didn't get one cent of

17      that $20,000?

18  A.  That's correct.

19  Q.  The second $20,000 -- and I'm sorry for being

20      redundant, but let's be clear.  While you

21      were a citizen taking money from the citizens

22      of Alabama and you took $20,000 from Jim

23      Lane, you never told Governor Siegelman, hey,

                            94

1       Gov, I've got $20,000 from Jim Lane, did you?

2   A.  Unless we're talking about the 20 for the

3       campaign work.

4   Q.  Okay.  Unless we're talking about the 1998 --

5   A.  Other than that, you're absolutely correct.

6   Q.  Well, let's assume we are.  Well, how much of

7       that money that you got from Jim Lane went in

8       Governor Siegelman's pocket?

9   A.  None.

10  Q.  None.  And you had a conspiracy with this man

11      to defraud the citizens of Alabama and line

12      your pockets?

13          MR. FEAGA:  Your Honor, if I may

14              interpose an objection.  The jury

15              is going to decide whether there

16              was a conspiracy.  What he

17              testified to was he had an

18              agreement and an understanding.

19          THE COURT:  Sustained.

20          MR. FEAGA:  We object to the question.

                        Page 73

5-3-06 Bailey testimony.txt

21        THE COURT:  Sustained.

22  Q.  Well, maybe I need some education.  I often

23      do.  Mr. Bailey, could you tell me and the

                        95

1   members of the jury exactly what the

2   difference is between an absolute agreement

3   and a conspiracy?

4        MR. FEAGA:  Your Honor, we object.

5            It's asking him to make a

6            conclusion of law and fact that

7            the jury is going to be making in

8            this case.  And counsel knows

9            that's an improper question to be

10           asking of a lay witness.

11       MR. MCDONALD:  I'd like to respond

12           before you rule, Your Honor.  The

13           jury is somehow going to have to

14           make some jump between his word

15           "agreement" and conspiracy.  And

16           I've got to get straight what his

17           word "agreement" means, because

18           they've used that word "absolute"

19           and "very absolute agreement"

20           through their entire examination.

21           And I've got to know the

22           difference between agreement and

23           conspiracy so I know how to talk

                        96

1            to these good folks on the jury so

2            they don't get confused.

3        THE COURT:  Any further response?
                        Page 74

5-3-06 Bailey testimony.txt

7    talked a little bit about your finances, but

8    let's get a full picture.  In 1992 and 1993,

9    Mr. Bailey, you were already having financial

10    trouble.

11  A.  You may have to refresh my memory.

12  Q.  Okay.  Do you know a gentleman by the name of

13    Larry Holt?

14  A.  Yes.

15  Q.  Who is he?

16  A.  Loan officer at Regions Bank.  First Alabama

17    Bank back then.

18  Q.  First Alabama Bank.  Then it became Regions

19    Bank, right?

20  A.  That's correct.

21  Q.  You had borrowed a substantial amount of

22    money from Regions Bank beginning in 1986

23    while you were probably still in high

                                    102

1    school.

2  A.  That's correct.

3  Q.  You had done some of your own investments?

4  A.  Yes.

5  Q.  By 1992 and 1993 when you were -- help me

6    with the math again.  How old were you in '92

7    and '93?

8  A.  You help me.  I was born in '68.

9  Q.  We were born at the same time, and I'm having

10    a tough time.  Let's say 24.

11  A.  Okay.  That sounds --

12  Q.  All right.  You already had run up such a

13    debt with Mr. Holt's bank that you could not

                            Page 79

5-3-06 Bailey testimony.txt

14   pay your interest-only payments, correct?

15   A.   That sounds familiar.

16   Q.   Okay.  And let's explain to the jury, anybody

17        who's not poor like you and me, what

18        interest-only payments are.  Okay?

19        Interest-only payments are you borrow some

20        money on a credit line or whatever to buy

21        anything.  And the bank, rather than making

22        you pay principal and interest back, they

23        only charge you interest, correct?

                              103

1    A.   That's correct.

2    Q.   So what you're trying to do is get the

3         payment as low as possible.

4    A.   Yes.

5    Q.   So even though you had secured loans that

6         were the lowest payment possible, just paying

7         the interest -- and you're only paying the

8         interest on quarterly installments, right?

9    A.   That sounds right.

10   Q.   That means four times a year, you had to come

11        up with enough money to just pay the interest

12        on the money that you had borrowed?

13   A.   That sounds right.

14   Q.   You couldn't make those payments?

15   A.   I don't recall not making those payments,

16        Mr. McDonald, but that may be true.

17   Q.   Okay.  Well, do you recall Larry Holt calling

18        you daily?

19   A.   No.

20   Q.   Do you recall Larry Holt writing you letters?

5-3-06 Bailey testimony.txt

21  A.  Yes.

22  Q.  You do remember him writing you letters?

23  A.  Yes.

                              104

1   Q.  Do you need to see them?

2   A.  I don't need to see them.  I'll just take

3       your word for that.

4   Q.  All right.  You'll take my word that Larry

5       Holt wrote you a bunch of letters saying pay

6       up.

7   A.  Yeah.

8   Q.  All right.  One of the problems that you had

9       about this time, Mr. Bailey, with your

10      financial background is you think you had a

11      plan, aside from your day job, to make a

12      substantial amount of money in trading what

13      some folks might call high risk stock, right?

14  A.  That's correct.

15  Q.  What's the word?

16  A.  Futures.

17  Q.  Cattle futures?

18  A.  Cattle.

19  Q.  Before you were 25 years old, Mr. Bailey, you

20      had lost $55,000 trading cattle futures?

21  A.  At least.

22  Q.  At least.  You didn't have the money to pay

23      for it, so you put a mortgage on your own

                              105

1       parents' house?

2   A.  That's not correct.  It was on a piece of

3       family property.

                       Page 81

5-3-06 Bailey testimony.txt

4  Q.  Okay.  You put a mortgage on your family --

5      which was initiated by your parents --

6      property --

7  A.  That's correct.

8  Q.  -- to pay for debts that you had incurred in

9      cattle futures?

10  A.  Cattle trading, that's correct.

11  Q.  Okay.  Now, I promise not to go through all

12      of them, but let's just agree there's a lot

13      of mortgages in Cullman County with Nick

14      Bailey's name on them.  Can we agree on

15      that?

16  A.  I traded a lot in real estate and cattle in

17      Cullman County.

18  Q.  Yes.

19  A.  Yeah.

20  Q.  Okay.  And you were mortgaging a great deal,

21      because you did some cattle trading, but you

22      did a lot of cattle future trading?

23  A.  I traded a lot of cattle and a lot of

                      106

1      houses.  That's the reason you see a lot of

2      mortgages.

3  Q.  Yes.

4  A.  Those weren't necessarily all cattle.

5  Q.  Okay.  Now, in the bank statements that you

6      were submitting for loans, Mr. Bailey, you

7      were showing your income at the same time of

8      between 25 and $50,000, correct, right around

9      this same time?

10  A.  I'd have to see that to say absolutely

5-3-06 Bailey testimony.txt

21    And I want to make sure that we get them

22    covered.

23        MR. McDONALD:  I can do it before we

☐                    113

1            break for lunch, Your Honor.  I

2            think we've got about ten minutes

3            if that's okay.

4        THE COURT:  You may proceed.

5    Q.  I would say the second most important part of

6        your job, besides being chauffeur, in '94 was

7        this.  When Governor Siegelman would show up

8        for a campaign rally or some sort of a

9        meeting, there would be people lining up to

10       meet him, wouldn't there?

11   A.  Usually, yes.

12   Q.  He wasn't even lieutenant governor yet; but

13       he was a force, a political force in Alabama,

14       right?

15   A.  Yes.

16   Q.  He had already been the Attorney General,

17       right?

18   A.  That's correct.

19   Q.  He had already been the Secretary of State,

20       right?

21   A.  Right.

22   Q.  Throngs of people wanted to get to meet this

23       man, right?

☐                    114

1    A.  That's correct.

2    Q.  So one of your jobs would be there would be

3        kind of like a receiving line at a wedding,

                    Page 88

5-3-06 Bailey testimony.txt
199

1    staff?

2  A.  He might take a recommendation, but he

3      wouldn't delegate the action.

4  Q.  Governor Siegelman, in your experience, is

5      always open to an open and vigorous debate

6      amongst members of his cabinet and people

7      within his administration, correct?

8  A.  Most of the time, yes, sir.

9  Q.  But ultimately, as George Bush says it, he's

10     the decider, right?

11 A.  That is correct.

12 Q.  All right.  Now, in 1999, HealthSouth was a

13     Fortune 500 company, correct?

14 A.  I don't know.

15 Q.  Had you heard of the term "HealthSouth" in

16     Alabama in 1999?

17 A.  Yes, sir.  I knew it was a large company.  I

18     don't keep up with who's on the Fortune 500.

19 Q.  All right.  That's fair enough.  You knew

20     that HealthSouth was a -- say a

21     multi-billion-dollar company in 1999?

22 A.  That's fair.

23 Q.  And you knew that they were headquartered

                          200

1      right here in Alabama?

2  A.  Yes, sir.

3  Q.  And you know that that company was founded

4      and run by a gentleman by the name of Richard

5      Scrushy?

6  A.  That's right.

                    Page 155

5-3-06 Bailey testimony.txt

7  Q.  And you knew from your experience, or vast
8      experience by this time, in getting in and
9      around Alabama politics that Richard Scrushy
10     was a very powerful and influential man?
11 A.  That's correct.
12 Q.  And you also knew that HealthSouth and, in
13     particular, Richard Scrushy were folks who
14     were philanthropists?
15 A.  That is correct.  At least knew his name, not
16     a lot of faces.
17 Q.  Exactly.  You traveled all over the state
18     during Governor Siegelman's campaign for
19     governor; and you drove on roads named
20     Richard Scrushy; you saw libraries named
21     after him, that sort of thing?
22 A.  That's correct.
23 Q.  You knew that this gentleman had given tens

                          201
1      of millions of dollars to the people of
2      Alabama.
3  A.  I don't know how much, but a lot, yes, sir.
4  Q.  A lot of money.  A lot more money than David
5      McDonald has given?
6  A.  I don't know about that either, but a lot.
7  Q.  A lot.  Or maybe the judge might take
8      judicial notice of that.
9  A.  Okay.
10 Q.  All right.  Now, besides all of that -- well,
11     let me just jump right to the chase.  You
12     weren't involved in the health care field in
13     1999?

                     Page 156

5-3-06 Bailey testimony.txt

14  A.  I never have been.

15  Q.  Never have been.

16  A.  No.

17  Q.  Did you, Mr. Bailey, know of anybody in

18      Alabama who was more qualified to serve on

19      the Certificate of Need Board than this man

20      right here, Richard Scrushy?

21  A.  I hadn't given it any thought, Mr. McDonald.

22  Q.  Hadn't given it any thought.  Okay.  Well,

23      sitting here today, looking back in time to

                        202

1       1999, does anyone stand out in your memory in

2       Alabama as being more qualified to serve on

3       the Certificate of Need Board than this

4       gentleman here, Mr. Scrushy?

5   A.  Again, I don't know what the qualifications

6       are for the CON Board.  I'm sure he's very

7       qualified.

8   Q.  Okay.  You don't know what it takes to get on

9       the CON Board?

10  A.  Well, I do know what it takes to get on the

11      CON Board.

12  Q.  Well, give the jury some qualifications,

13      because we really haven't had a lot of

14      testimony on what it takes to get on the CON

15      Board.

16  A.  Well, one way is to make contributions.

17  Q.  They make contributions?

18  A.  One way to get on the CON Board is to make

19      contributions.

20  Q.  Okay.  Okay.  And that -- is that your

                      Page 157

5-3-06 Bailey testimony.txt

4    on this CON Board in Governor Siegelman's

5    administration paid him to be on that CON

6    Board?

7  A.  That's not my testimony at all.

8  Q.  Okay.  Do you know a lady by the name of

9    Margie Sellers?

10  A.  I do.

11  Q.  Did she pay money to get on that CON Board?

12  A.  I'm not aware of it.

13  Q.  Is she a qualified member on that CON Board?

14  A.  Again, I can't speak to the qualifications

15    what it takes to be on the CON Board or what

16    her qualifications are either.

17  Q.  Well, the reason I'm belaboring this point

18    somewhat, Mr. Bailey, didn't you spend hours

19    upon hours in those interviews with the

20    Government talking about meetings that you

21    had with Governor Siegelman about who and who

22    wouldn't be appointed to the CON Board?

23  A.  We spent some time discussing that issue,

                          205

1    yes, sir.

2  Q.  But you don't know who's qualified to serve

3    on that board today; you just testified to

4    that.

5  A.  We weren't discussing qualifications.

6  Q.  You never discussed their qualifications?

7  A.  That was not the subject of our discussions,

8    no.

9  Q.  So if Governor Siegelman made a decision to

10    appoint anybody on that CON Board, you have

                    Page 159

5-3-06 Bailey testimony.txt

11    no qualification to sit there under oath and

12    say that man or that woman was not qualified

13    to serve on the CON Board?

14  A.  I never suggested that.

15  Q.  And you never will?

16  A.  I won't.

17  Q.  Perfect.  Mr. Bailey, you were involved

18    actively in Governor Siegelman's race for

19    governor against Fob James, correct?

20  A.  That is correct.

21  Q.  You knew that Richard Scrushy supported Fob

22    James in that reelection bid?

23  A.  I had heard that a lot, yes, sir.

                            206

1  Q.  And you knew of that financial support that

2    Richard Scrushy gave to Governor Siegelman

3    during that race?

4  A.  That's correct.

5  Q.  There was -- let's put it diplomatically.

6    There was certainly no close relationship

7    between Mr. Scrushy and Governor Siegelman in

8    1999 or 1998 when he was -- the Governor was

9    re-running for office?

10  A.  That was my understanding from talking to

11    Mr. Hanson.

12  Q.  All right.  And you had an office -- after

13    the Governor was sworn in, you had an office

14    as the Governor Siegelman's assistant that

15    was on the same floor and not too far away

16    from Governor Siegelman's office?

17  A.  That's correct.

                    Page 160