# EXHIBIT 5

CLINE, BELL & HAYES.txt

14            for the record. I want to make it
15            clear one other thing, too. What
16            Mr. Bailey testified about how we
17            found out about that information
18            is absolutely accurate. I want to
19            be on the record telling the court
20            that. We did not suggest that he
21            do that.
22       THE COURT: Fin again, we are outside
23            of the presence of the hearing of

                        13
1            the jury. Let's bring the jury
2            in.
3                Ladies and gentlemen of the
4            jury, you may be seated as you
5            arrive.
6       THE CLERK: Mr. Cline to the courtroom,
7            please.
8       THE COURT: Please be seated. United
9            States may call its next witness.
10      MR. FRANKLIN: United States calls
11           Darren Cline.
12           DARREN RICHARD CLINE
13      The witness, having first been sworn to
14 speak the truth, the whole truth and nothing but
15 the truth, testified as follows:
16      THE COURT: You may proceed,
17           Mr. Franklin.
18      MR. FRANKLIN: Thank you, Your Honor.
19           DIRECT EXAMINATION
20 BY MR. FRANKLIN:

CLINE, BELL & HAYES.txt

19

1 were here in '97. How long did you
2 participate in the fundraising aspect of the
3 gubernatorial campaign?
4 A. From '97 through November of '90 -- of '98.
5 Q. And in November of '98, what happened?
6 A. Well, the -- the campaign was over at that
7 point. It went into an inaugural situation.
8 Let's see, we had an inaugural committee and
9 we had a -- we had other contracts. At that
10 time, I was promoted within my company to
11 being a partner. And I was to over see a few
12 aspects of some contracts that our company
13 had in Alabama. We had the inaugural which
14 was given to another person in our company
15 that I didn't have anything to do with. And
16 then I started overseeing debt retirement at
17 the Alabama Democratic Party. We had some
18 debt with the campaign that we also retired
19 at that time.
20 Q. Did you have an opportunity to immediately
21 after Governor Siegelman was elected to
22 office?
23 A. Yes. That was the Alabama Education Lottery

20

1 Foundation.
2 Q. Tell us what kind of foundation it was, just
3 a little bit of background on what was done
4 by the people working with you to create that
5 foundation?
6 A. Since it was not a regular campaign where you

Page 15

CLINE, BELL & HAYES.txt

```
 7       were he electing a person, we set it up
 8       because it was a referendum campaign, which
 9       means it had to be said up in a special way.
10       So we set up a 501C for, which is under the
11       IRS code, is a way to set up an entity like
12       this so that you can legally accept corporate
13       contributions as well as personal
14       contributions. And the C 4 is just an entity
15       that can be used so that people can't deduct
16       it off their taxes. Because you're not
17       allowed to use political money to deduct off
18       your taxes. So by setting up this entity, it
19       was set up in a way that we could advocate
20       for the lottery and it wasn't have any tax
21       implications.
22  Q.   Did you begin to go about what you specialize
23       in?
```

                                21

```
 1  A.   Yes.
 2  Q.   And that is fundraising; is that correct?
 3  A.   Funds raising, yes.
 4  Q.   What did you starts doing to help raise funds
 5       for the Alabama -- give us the entity. What
 6       was it called?
 7  A.   The Alabama Education Lottery Foundation.
 8       And we started raising money from a lot of
 9       the folks that had given to the gubernatorial
10       campaign folks the inaugural and people that
11       give in Alabama. We -- we ended up having
12       call time with the -- with the governor as
13       well as some of our folks doing call time on
```

Page 16

CLINE, BELL & HAYES.txt

14        their own.
15   Q.   Did you have a location -- a particular
16        location that you worked out of?
17   A.   Yeah. We started at the -- at an apartment
18        in the Montecello Apartments by the bypass,
19        and we eventually moved to a house right
20        across from the governor's mansion on the
21        corner of Perry Street and I'm not sure what
22        the cross street is.
23   Q.   Now, the Montecello Apartments location, did

                            22

1         anybody live at that particular location or
2         did you all just rent an apartment there?
3    A.   I actually lived at that location until
4         January. But we had another apartment we
5         rented there that people stayed in and then
6         we used that apartment mostly for raising
7         money.
8    Q.   What else did you use the apartment for?
9         Just making phone calls? What else --
10   A.   Making phone calls and doing follow-up to
11        folks. Because once -- once you get somebody
12        to say yes or no, there's a systemic
13        follow-up that we have where we fax a letter
14        within 15 minutes of somebody committing to
15        an amount, and -- and then we send fax
16        reminders once a week or once every ten days
17        to remind them of their commitment to give by
18        a specific deadline.
19   Q.   Do you recall in terms of the gubernatorial
20        was decided or the election was decided in

                                            Page 17

CLINE, BELL & HAYES.txt

21     representing the under dog in a political
22     campaign?
23  Q. Yes?

                         77

1   A. Yes, we do.
2   Q. In the 1998 gubernatorial campaign between
3      Governor Siegelman and Governor James, under
4      your suspicion, Governor Siegelman campaign's
5      raised somewhere between nine and $10
6      million, yes, sir. And was that some sort of
7      record in Alabama at that time?
8   A. I'm sure it was.
9   Q. Okay. You -- to put it bluntly, y'all did a
10     phenomenal job in your ability to raise money
11     for Governor Siegelman during that campaign?
12  A. Yes, sir.
13  Q. And there's not a thing that you know of
14     under your supervise vision during your
15     campaign that was inappropriate?
16  A. Not that I can think of.
17  Q. Now, a lot of fast forward now. Governor
18     Siegelman wins the election for governor,
19     correct?
20  A. Uh-huh.
21  Q. Erased nine And 10, correct. It's a record?
22         THE COURT: If you would, answer yes or
23            no.

                         78

1          THE WITNESS: Okay. Okay.
2   A. Yes.
3   Q. And I may be talking too fast. It's terribly

                     Page 60

CLINE, BELL & HAYES.txt

18  knowing what any legal obligations were, it
19  was in the best benefit for everybody to work
20  together and let's try to retire this debt as
21  quick as possible?
22  A.  Correct. Yes.
23  Q.  I want to show you the third page of the

                        117
1   exhibit.
2   A.  Okay.
3   Q.  And direct your attention to where you
4       explicitly referenced Mr. Scrushy's
5       participation in this debt retirement?
6   A.  Okay.
7   Q.  Before we get to that, first, at the top, if
8       you'll notice, it looks like you have
9       itemized all of the department that was
10      incurred by the various parties in promoting
11      the AEF, correct?
12  A.  Correct.
13  Q.  There's a total debt of 1.2 million dollars?
14  A.  Uh-huh.
15  Q.  And you had a game plan, correct?
16  A.  Yes.
17  Q.  Tell the jury just briefly how your game plan
18      was to pay off that debt and how quickly you
19      believed that debt could be paid off?
20  A.  Well, I've got to remind had myself as I'm
21      looking at this.  But we -- we had -- let's
22      see.  Okay.  We knew that we had 542,000 in
23      outstanding pledges left over from our last

CLINE, BELL & HAYES.txt

118

1 deadline for the lottery. We felt that we
2 could go back to those people that had made
3 pledges that hadn't followed through and get
4 a certain percentage of them. We knew that
5 we had a commitment from Richard Scrushy for
6 250,000 for the Alabama Democratic Party in
7 1999 and also 250,000 for the Democratic
8 Party in 2000. So we knew that that would
9 come in. And then we thought that they would
10 end up doing the Jefferson Jackson dinner or
11 some sort of large dinner. Most Democratic
12 parties refer to it as a Jefferson Jackson
13 dinner in the south. And then kind of use
14 all of that to pull everything together to
15 retire the debt.
16 Q. It was common knowledge -- it was shared with
17 you and all of the members of your team and
18 everybody that was involved in this
19 campaign -- that Mr. Scrushy had committed to
20 raising $250,000 in 1999?
21 A. Uh-huh.
22 Q. That was no secret?
23 A. Right.

119

1 Q. Nobody was trying to hide the fact that
2 Mr. Scrushy had committed to help raise
3 $250,000 in 1999?
4 A. Correct.
5 Q. Nobody was trying to hide the fact that
6 Mr. Scrushy had committed to razor pay to the

```
                              CLINE, BELL & HAYES.txt
 7        Alabama Democratic Party $250,000 the next
 8        year in the year 2000?
 9   A.   Correct.
10   Q.   And your conclusion, based on all the
11        information you had, including the 12 years
12        of vast experience in fundraising, was that
13        any AELF debt could easily paid off by March
14        or April of 2000?
15   A.   Yes.
16   Q.   And this was after Governor Siegelman had
17        already raised nine to $10 million on his
18        gubernatorial campaign, after Governor
19        Siegelman had already $6 million on the AELF?
20   A.   Right.
21   Q.   Governor Siegelman did not have trouble
22        raising money?
23   A.   No.  I don't know what you mean by that.

                            120
 1   Q.   Well, I -- what I mean by it is -- is that
 2        with your great assistance and direction,
 3        Governor Siegelman did not have to resort to
 4        any illegal or unlawful tactics to raise
 5        money for any campaign?
 6             MR. FRANKLIN:  Objection, Your Honor,
 7                  to the form of the question.
 8             THE COURT:  State grounds.
 9             MR. FRANKLIN:  He has no idea what Don
10                  Siegelman's intent was.  He can't
11                  testify to what was going on in
12                  the mental operations of Governor
13                  Siegelman when he did anything.
```

Page 93

CLINE, BELL & HAYES.txt

4   A.  Yes, sir.
5   Q.  On this top paragraph right here, you were
6       tracking Governor Siegelman's ability to
7       raise money?
8   A.  Correct.
9   Q.  And you concluded that Governor Siegelman --
10      it's not working for me today -- that
11      Governor Siegelman was able to raise through
12      telephone solicitations over $34,000 an hour?
13  A.  Yes.
14  Q.  And those telephone solicitations were done
15      under the direction and [SPHR-EUGS] if not
16      you, people that reported directly to you?
17  A.  Correct.
18  Q.  And their job was to make sure not only that
19      he was doing the things that you have to do
20      that you talked about earlier like follow-up?
21  A.  Right.
22  Q.  Get a firm commitment?
23  A.  Correct.

                              124
1   Q.  But also the other things that you talked
2       about to make sure that there was no quid pro
3       quo conversation, correct?
4   Q.  That there was no conversations that if you
5       make this is donation to me, that I'm going
6       to give you something?
7   A.  Correct.
8           MR. MCDONALD:  Your Honor, may I
9               approach.
10          THE COURT:  You may.

Page 96

```
                        CLINE, BELL & HAYES.txt
21     we want you to give that kind of money?
22  A. Yes.  It could also be from a meeting.  It
23     could also -- I mean, it doesn't have to be

                        185
 1     phone calls.
 2  Q. Right.
 3  A. But we would still use -- excuse me.  But we
 4     would still use a focus sheet to track if it
 5     was a phone call, if it was a meeting, if it
 6     was --
 7  Q. Right.  And if you get a positive response
 8     from that individual, you might also ask that
 9     individual, well, great, can you also raise
10     some money in your community?
11  A. Yeah.
12  Q. So that in and of itself -- so sometimes you
13     give, sometimes you raise money, sometimes
14     you both give and raise money?
15  A. Correct.
16  Q. Nothing unusual about that?
17  A. Not at all.
18  Q. All right, sir.  Now, why -- we band I as
19     many as large amounts of money around in the
20     courtroom, obviously, today.  Why it is in
21     your opinion necessary that political
22     campaigns and the lottery referendum
23     campaign, why do they cost so much money?

                        186
 1     Where does the money go?  And let me ask it
 2     this way because that's a broad question.
 3     Let me narrow it down.  Okay.  Explain to
                     Page 144
```

CLINE, BELL & HAYES.txt

```
 4      this jury, if you know, how much, if you do a
 5      saturation by. Well, that's my word?
 6  A.  Okay.
 7  Q.  If you buy -- I know you guys have a
 8      political term for it, but if you buy a
 9      saturation by a statewide television for a 30
10      second commercial and you want to run that
11      for a week, approximately how much money is
12      involved in that?
13  A.  What period.
14          THE COURT: What period of time,
15                  Mr. Butts, unless this is a
16                  standard rate year to year.
17  Q.  1998 gubernatorial campaign or during the
18      fundraiser for the lottery?
19  A.  During the lottery, it was different rates.
20      So -- but if you're looking at a
21      saturation -- if you want to get your name ID
22      where you have an even chance of fighting
23      something out, it's about 1 .5 million. But
```

                        187

```
 1      you probably need to spend somewhere between
 2      three and 4 million on television to keep
 3      your name up there and -- and able to
 4      convince people to vote for your referendum
 5      or to vote for you as a candidate.
 6  Q.  Right.
 7  A.  You probably need to spend more than that,
 8      because your opponents are going to be
 9      slinging mud at you, especially in Alabama.
10      But you're looking at 3 to 4 million is what
```
                        Page 145

CLINE, BELL & HAYES.txt

11      you need. But you'd like to have a lot more
12      than that.
13  Q.  Yes, sir. So if I understood what you just
14      said, to buy just a -- just a maximum
15      television buy in Alabama for the lottery
16      campaign and to do that for a week, for a 30
17      second thought?
18  A.  No. I'm sorry. I thought you said for the
19      campaign. For one week.
20  Q.  For a week?
21  A.  About 700,000, I think. It's between 5 and 7
22      at00. And you're looking, you know, we did
23      probably a six to 8 week buy. So you're

0                       188
1       looking at 3 to 4 million.
2   Q.  All right. So the point is that it costs a
3       lot of money whether you're a candidate or
4       you're spend money to try to get a lottery
5       rev rent [TKP-UPL] approved?
6   A.  Yes, it does.
7   Q.  And that's primarily concentrated on
8       television buys?
9   A.  Yeah.
10  Q.  All right. But there are other costs
11      associated with both the '98 political
12      campaign and the '99 fund raiser -- or '98 --
13      '99 money that was spent on the lottery --
14  A.  Right.
15  Q.  -- for other costs. For example, you've got
16      to pay you guys?
17  A.  Yeah. You have to pay salary, you have

Page 146

CLINE, BELL & HAYES.txt

18    direct mail pieces that you would do.
19    Telephone calls.
20 Q. Right.
21 A. And any other kind of overhead.
22 Q. All right, sir. So let me shorten this by
23    saying it this way. So the bottom line is

                            189
1     this. In the state of Alabama, if you're --
2     whether you're a candidate in 1998 or whether
3     you -- it was for the lottery referendum, it
4     takes a tremendous amount of money to get
5     your message across?
6  A. Yes, it does.
7  Q. All right, sir. So that it would be -- not
8     be -- would it be unusual, for example, I
9     believe you testified that you spent some $6
10    billion for the lottery campaign?
11 A. Yeah.
12 Q. And that is -- do you consider that a
13    significant amount of money in the extreme of
14    things?
15 A. It's a significant amount of money in the
16    state of Alabama.
17 Q. Correct. But for the amount of money that it
18    cost to get your message over, it's not
19    significant?
20 A. Yeah K 8 to 10 million is significant.
21 Q. All right, sir. Now, just -- [W-UPBL] last
22    question on this, [KWR-URPBL], bear with me
23    and then I'll move on to something else.

                         Page 147

CLINE, BELL & HAYES.txt

190

1     [FIX]?
2 Q. Just so this jury understands about the
3     relativity of how much money it costs to run
4     cam [PA-EUPBLS] and referendums. Do you know
5     in the state of Alabama approximately how
6     much it cost for a house of representative
7     seat?
8 A. I don't know. I mean, I --
9 Q. That's okay if you don't know. Do you know
10    about a [ST-EUT] Senate seat?
11 A. It depends on the state Senate seat. Some
12    costs 50, 6 [#] 0,000. Some can cost a
13    million to 1.5.
14 Q. How about a Supreme Court cost?
15 A. That could go from a million to 1.5 [#]
16    million.
17 Q. Then when you get to a governor's race, that
18    amount of money in 1998 was approximately how
19    much if you know that was spent by Governor
20    James at that time and then Governor
21    Siegelman total?
22 A. Combined total?
23 Q. Yes, sir. If you know?

191

1 A. 12, 14 million.
2 Q. All right, sir. Now, do you have any idea
3    how much governor really spent the in 2002?
4 A. I don't know -- I don't know how much he
5    spent.
6 Q. All right, sir. I'll move on. All right.

CLINE, BELL & HAYES.txt

```
 7        You made a statement in testifying Mr. Cline
 8        that Richard Scrushy wouldn't return your
 9        calls in 1998.
10   A.   Yes.
11   Q.   Was that because he had supported Fob James
12        instead of Governor Siegelman?
13   A.   I guess, you'd have to ask him.
14   Q.   All right, sir.  Was it your understanding
15        that Richard Scrushy supported Fob James in
16        the 1998 gubernatorial campaign?
17   A.   I -- I don't really know, because in my realm
18        of work, there's some people that support one
19        side and the other side and there's some
20        people that support both sides.
21   Q.   All right, sir.
22   A.   Okay, so --
23   Q.   Fair enough.  All right.  Was Richard Scrushy
```

                              192

```
 1        targeted in 1998 for the gubernatorial
 2        campaign of Governor Siegelman?
 3   A.   I know we talked about it.  We had met him
 4        one time when I first got here in '97 at the
 5        St. James hotel in Selma.  That was the only
 6        time I ever met him.  And I know that they
 7        didn't talk about money or anything else.  We
 8        just talked about building a relationship.
 9        Nothing ever came of it.
10   Q.   All right, sir.  And was he later targeted
11        for the lottery campaign?
12   A.   Later on with the lottery, yes, Governor
13        Siegelman said he would be one of the people
```

Page 149

CLINE, BELL & HAYES.txt

14      we needed to ask to help.
15  Q.  And why was the lottery in need of money?
16  A.  Because we had to raise 3 to 5 million to get
17      our message across.
18  Q.  Is it fair to say that it was always a
19      lottery debt and you were constantly trying
20      to raise money to getting the message across?
21  A.  Yes.
22  Q.  All right, sir.
23  A.  But I don't understand what you mean by

                        193
1       lottery debt.
2   Q.  Well, I'll come to that?
3   A.  Okay.
4   Q.  I'll cover that. Do you recall any other
5       major contributors to the lottery campaign?
6   A.  I'd have to look at the list again.
7   Q.  All right, sir. You mentioned that it was
8       your understanding that Alfa corporation, the
9       insurance company, gave $100,000?
10  A.  Uh-huh.
11  Q.  Do you know if they were supporting the
12      lottery?
13  A.  I have no clue if they were supporting the
14      lottery.
15  Q.  Do you know if they wanted their money
16      disguised in any way?
17  A.  No, I don't. I don't know if they wanted
18      their money disguised or -- or anything.
19  Q.  So it's fair to say, you don't know. You
20      just know that they gave?