# EXHIBIT 6

Case 2:05-cr-00119-MEF-CSC   Document 658-7   Filed 09/28/2007   Page 1 of 20

```
 1         (Direct examination by Mr. Kilborn of Jack
 2  Miller:.)
 3  Q    Mr. Miller tell us your name, where you live and
 4  what you do.
 5  A    My name is John C H Miller, Junior.  I'm a lawyer
 6  and I live in Mobile.
 7  Q    And they call you Jack Miller?
 8  A    They do.
 9  Q    And are you a lawyer and you have a law firm in
10  Mobile by the name of Miller Hamilton?
11  A    That's right.
12  Q    Does it specialize in any type of law?
13  A    Well, our major claim to fame is bank and bank
14  regulatory law firm.  We're fairly well-known around the
15  country for that.
16  Q    Give the judge a little bit of your background and
17  experience after law school and how you got into the
18  banking area.
19  A    Your Honor, I was working at the Senate banking
20  committee as counsel to the chairman, and then became
21  deputy foot chairman of the F. D. I. C..  And was in
22  Washington for a number of years and came home and
23  started the law firm thirty years ago now which
24  primarily has worked with the banking industry.
25  Q    How many years did you spend with the F. D. I. C.
```

```
 1  Q    Let's talk about your experience with political
 2  campaigns.  Do you have any experience with political
 3  campaigns?
 4  A    Yes.
 5  Q    Tell the judge what that S.
 6  A    I don't know that His Honor has that much time.  I
 7  started off with Senator Sparkman in nineteen sixty-five
 8  and six while I was in undergraduate school.  And then
 9  ran his seventy-two campaign.
10          MR. FEAGA:   , Your Honor, if it will saving
11  time I'll stipulate to he has a lot of experience in
12  campaigns.
13  A    I was involved with Governor James' campaigns until
14  he switched parties.  I served as the Alabama Democratic
15  Party from nineteen ninety-eight until two thousand.
16  Q    Are you also familiar with Governor Don Siegelman?
17  A    Yes, I am.
18  Q    Tell the Judge how you're familiar with him and
19  what connection you have with him.
20  A    I have known Governor Siegelman since he was in
21  high school.  We're both from Mobile.  He was a very
22  likely and coming young fellow and I was involved in a
23  high school organization looking for such people and we
24  met and we've been friends ever since.  I have helped
25  him in all of his campaigns for public office except for
```

```
 1  the one he shouldn't have run for, which he lost.
 2  Q    That was the last one?
 3  A    No.  I helped him in that way.  He shouldn't lost
 4  that one.
 5  Q    Okay.  So would it be their to say that you're
 6  very, very familiar not only with the Republican
 7  campaigns, democratic campaigns and specifically
 8  campaigns in Alabama including Governor Siegelman?
 9  A    That's true.
10  Q    Are you familiar with how campaigns raise money?
11  A    Yes.
12  Q    Are you familiar with political fund raising?
13  A    Yes.
14  Q    And are you familiar with the fact that political
15  entities like the Democratic Party or anybody else like
16  a candidate or any kind of political organization raised
17  money and how they handle their money?
18  A    Yes.
19  Q    And you have been personally involved in that?
20  A    Yes.
21  Q    All right.  Tell the Court back during the time you
22  were chairman of the party, about the get out the vote
23  campaign.
24  A    Well, we did two.  One for fall election in
25  nineteen ninety-eight when Governor Siegelman was at the
```

```
 1  top of the ticket and one in the fall of nineteen
 2  ninety-nine for the lottery campaign.  G. O. TV were
 3  shorthanded as I'm sure Your Honor knows is a way trying
 4  to move your base of support to the polls.
 5  Q    Now the judge has heard a lot about it, but briefly
 6  are you familiar the political issue and why the
 7  Democratic Party was trying to get out the vote?
 8  A    Am I familiar with the lottery issue?
 9  Q    Yes.
10  A    Yes.
11  Q    What was that issue?
12  A    We were trying to pass a constitutional amendment
13  that the governor had --
14            MR. FEAGA:  Judge, we would object to the
15  relevance of this testimony.
16            THE COURT:  What is the relevance?
17            MR. KILBORN:  I'm just frying to set up the
18  loan, Your Honor.  Do you know all that?
19            THE COURT:  I'm familiar with what we're
20  talking about.  I think everybody in here in both sides,
21  I think if anybody doesn't know, he can ask you.
22  Q    The lottery campaign was lost?
23  A    Correct.
24  Q    And had the democratic money spent money on that
25  campaign?
```

```
 1  A    Yes.
 2  Q    And how did it get the money that it spent?
 3  A    We borrowed -- we took out a loan in the lump sum
 4  of a million dollars from Colonial Bank. We threw do
 5  you seven hundred thousand dollars on that loan. This
 6  was a court [D] effort between the party, the
 7  administration and the people who were running the
 8  lottery campaign. Our expertise really was in G. O. TV
 9  because we had honed that in ninety-eight and I think we
10  got it down about as well as it's ever been gotten down.
11  Q    Would you describe Governor Siegelman as an
12  essentially good fund razor?
13  A    Yes.
14  Q    And who decided and how was it decided for the G.
15  O. TV loan at the Colonial Bank to be taken out at that
16  bank?
17  A    Well as I said, we were coordinating three
18  different strands together. The administration, the
19  party and the campaign. And we decided that the party,
20  which knew more about G. O. TV than anybody else, would
21  run that aspect of it. The governor committee [D] to me
22  that if we were to fund it through that line, I'll call
23  it, that he would arrange to see that it was repaid.
24  And so we did.
25  Q    Did he say how he would range how it would be paid,
```

```
 1  or did you flow?
 2  A    It is commonplace in Alabama and every other state
 3  in the union that I know, but I can speak directly to
 4  Alabama, from nineteen seventy-two to the present moment
 5  that in cash flow terms, campaigns of any sort are prone
 6  to go and borrow money from a bank and then to pay it
 7  back out of fund raising efforts either during the
 8  campaign or after the campaign.
 9  Q    And so would you say that the way this was handled
10  would be the custom at least in Alabama and as far as
11  you know in every other state in the Alabama?
12  A    I believe it to be in every other state of the
13  union, but I can't swear to that.  I don't know that.
14  Q    I believe you actually signed the note or the line
15  of credit however you want to call it, for a million
16  dollars with a named [TKPWAOEULS]?
17  A    Child.
18  Q    Were there any guarantors for that note?
19  A    There was no need for them.
20  Q    Why not?
21  A    Because we were going to get the loan paid back.  I
22  had been dealing with Governor Siegelman, I wasn't
23  concerned about his commitment.
24  Q    And as far as you were a director to it and --
25  A    Well, the bank would have certainly looked to me to
```

```
 1  take care of it, and I would have taken care of it.
 2  Q    The F. C. B., are you familiar with that bank?
 3  A    Yes.
 4  Q    And we flow that the first commercial bank lent I
 5  think somewhere around four hundred thousand dollars at
 6  a time to what we call the A. D. F. or the A. D. L. F.
 7  previously, are you familiar with that organization?
 8  A    Are you talking about the lottery foundation?
 9  Q    Yes.  I don't know much about that.
10  Q    Did there come a time when the Democratic Party got
11  their debt paid off?
12  A    Yes.
13  Q    Would you tell the judge how that happened.
14  A    We did the paperwork on the loan from nineteen
15  ninety-nine.  The election was in October and we had
16  grown the line down to seven hundred thousand.  And on
17  March the ninth colonial was paid that sum plus interest
18  thirty thousand or something like that by the proceeds
19  of the loan which I understand was made to the lottery
20  foundation which first commercial.  So the source of the
21  funds was first commercial.
22  Q    Do you know why it was that the lottery foundation
23  I'll call it borrowed the money to then pay off the
24  Democratic Party G. O. TV debt?
25  A    The main reason it did was I had been assured that
```

1  the governor would do what was necessary to see this
2  done on countless occasions when I signed notes for him
3  as many other people, and that is to raise the money to
4  pay it back.
5  Q    And was there any rhyme or reason as to why only
6  Merv Neighbors and Governor Siegelman signed as
7  guarantors to the first bank as opposed to nobody
8  signing as a guarantor or a hundred people signing as
9  guarantor or any other combination?
10 A    Well, you certainly are aware that I'm not
11 intimately familiar with the loan processes at some
12 other bank other than my own.  But I think I can say
13 that from an industry practice standpoint --
14          MR. FEAGA: Objection, Your Honor, that's not
15 responsive to the question.  And I'd like to take him on
16 voir dire briefly.
17          THE COURT: Sustained, let's moving on.
18 Q    Do you know if there was any attempt at the time as
19 to what Governor Siegelman would be liable for that
20 guarantee on that note?
21 A    You mean in his personal capacity?
22 Q    Yes.
23 A    Certainly not.
24 Q    Have you ever guaranteed notes yourself for
25 political entities?

```
 1  A    Many times.  It is common practice in this state
 2  for both Republicans and Democrats, common practice.
 3  Q    Have you been [TKPWARPB] for can other people on
 4  party coats or campaign notes?
 5  A    Yes, many times.
 6  Q    Have those notes been paid off by fund raising or
 7  some other method?
 8  A    Always.
 9  Q    Have you ever considered that you personally
10  benefitted when that note was paid off and Your Honor
11  freed from the guarantee?
12  A    I understand that question and I will answer it by
13  saying the United States government does not consider it
14  to be a benefit because it is not a taxable event.   ,
15  It's not a benefit.  That is common practice in Alabama.
16  Q    And you have personally had that happen to you?
17  A    Many times.
18  Q    Many times.  And the latest would be in what race,
19  if you recall?
20  A    It may have been the Mobile mayoralty last year.
21  If it was not, it would be the oh two campaign.
22  Q    Let's say if it was brought to your attention that
23  the Alabama education lottery did not have to pay off
24  that seven hundred thirty thousand dollar loan, how
25  would that loan have been paid off or would it have been
```

```
 1  gone into default?
 2  A   I don't believe it would go into default.  What we
 3  would always do in circumstances like that and I'm using
 4  we broadly because I wasn't part of the lottery
 5  foundation, we would have raised the necessary money
 6  through campaign registration fees for primaries, that's
 7  a quarter of a million dollars a year give or take,
 8  through fund raisers what Democrats show the Jefferson
 9  Jackson, we would have raised the money through the
10  machine that we always use.
11            hol tkaeuz sre tpaoeu
12  Q   What's been in the Harry son memo, are you familiar
13  with that?
14  A   I'm familiar with the governor's incredible ability
15  to raise money.  There has never been anyone to come
16  close to him.
17  Q   Document page thirty-nine at page six talking about
18  the benefit of five hundred thousand dollars in I'll
19  call health south slash Scrushy money paid partially to
20  pay off that seven hundred thousand dollars --
21            THE COURT:  Which exhibit are you talking
22  about?
23            MR. KILBORN:  Document five eighty-nine.  A U.
24  S. sentencing memorandum.
25            THE COURT:  And page what?
```

```
 1              MR. KILBORN:  At page six, Your Honor.
 2              THE COURT:  All right.
 3    Q    There is a contention by the Government in this
 4    case and I'll read it to you, that when when Richard
 5    Scrushy caused by some means or another five hundred
 6    thousand dollars to be contributed to the lottery
 7    foundation or the A. E. F., and that that money was then
 8    used partially to pay off that loan of seven hundred
 9    thirty thousand dollars, that that was to be charged by
10    the Court as benefit to the governor as a guarantee with
11    [PHEFRBG] be Neighbors.  The other guarantor.  Her is it
12    it said, Siegelman [TKAOEFBD] use that amount to pay off
13    a debt for which he was personally liable.  Assume that
14    Mr. Scrushy did donate five hundred thousand dollar and
15    that was paid in part to pay off the loan and the
16    governor Siegelman was free?
17              MR. FEAGA:  I object to the form of the
18    question.  It leaves out an important fact, and that is
19    that the five hundred thousand dollars was received as a
20    bribe as found by this jury.
21              THE COURT:  I'll allow you to bring that out
22    in cross if you need to.
23              You may answer.
24    A    I'm not real sure I know what the question is.  Can
25    you shorthand it?
```

```
 1  Q    Yes.  If you've got the S. C. B. loans of search
 2  hundred thirty thousand dollars, Mr. Scrushy causes five
 3  hundred thousand dollars to be donate today that
 4  foundation --
 5  A    Are we talk backs to the benefit counting?
 6       MR. FEAGA:  He's characterized it as a
 7  donation when the jury found it's a bribe.
 8  Q    Assume it's a bribe.
 9  A    I know that it wasn't a bribe.
10       MR. FEAGA:  Your Honor we object to that as
11  being non-responsive.  The Court told us all last week
12  we weren't going to retry this case.
13       THE COURT:  Sustained.  Let's keep our
14  questions and responses directed to the issues of
15  sentencing, not retrying this case.  Go ahead.
16  Q    No matter what it was, in your opinion was that a
17  benefit to government Siegelman personally?
18       MR. FEAGA:  Objection, Your Honor.  This
19  witness is not qualified to answer that question.  It's
20  a determination for the Court to make.
21       MR. KILBORN:  He not only knows the campaign,
22  he knows banking, he knows loans, he knows custom in the
23  industry, he knows just about everything you can about
24  this type of transaction and has done it personally.
25       THE COURT:  Mr. Miller let me ask you a few
```

```
 1  questions before we go on.  Are you familiar with the
 2  Alabama I had indication lottery foundation loan that
 3  was taken out with the bank First Commercial Bank.
 4  A     Yes, sir.
 5          THE COURT:  Are you familiar with the loans of
 6  that bank were used to secure that loan?
 7          MR. FEAGA:  Your Honor, when did he see them?
 8  Because I don't think he knew anything about this loan
 9  when it came on.
10          THE COURT:  Give me a chance.
11          MR. FEAGA:  Yes, sir.
12          THE COURT:  You are familiar with the fact
13  that the loan was taken out with the bank, money was
14  deposited and an account for the Alabama education and
15  the loan guaranteed by Merv Neighbors and Governor
16  Siegelman.
17  A     Yes, sir.
18          THE COURT:  When did you become aware of or
19  familiar with the loan arrangement between first
20  commercial bank and the Alabama educational --
21  A     After the fact.
22          THE COURT:  When you say after the fact,
23  before this trial or after this trial?
24          THE WITNESS:  I was aware there had been a
25  loan but I didn't know anything about the particulars.
```

```
 1  I learned the particulars since this trial L.
 2          THE COURT:  So since June twenty-nine, two
 3  thousand six have you had an opportunity to review the
 4  loan documents themselves.
 5          THE WITNESS:  Your Honor, I can't tell you
 6  June of two thousand six, but sometime in the last
 7  couple of years I saw the actual ones.  There is nothing
 8  unusual about the documents,' just a note.
 9          THE COURT:  Well I understand that, but is
10  there anything specific about the personal guarantees
11  that Mr. Neighbors and Governor Siegelman gave to First
12  Commercial Bank in in exchange for this loan.
13  A    Your Honor, I made the loan.  Just paid it off.
14  The governor wasn't on the loan that I made.  The
15  economic substance of this is that he never was a
16  guarantor on the colonial loan.
17          THE COURT:  We're talking about the loan to
18  the first commercial bank.
19  A    The proceeds went to colonial.  I just mentioned
20  that because I think it's interesting and important.
21          THE COURT:  I guess I'm not following you.  I
22  understood this to be an arms length transaction between
23  Alabama educational lobby foundation and first
24  commercial bank.
25  A    I'm sure it was.
```

```
 1            THE COURT:  And it was a loan that was secured
 2   by the personal guarantees of two individuals.
 3   A     That is correct.
 4            THE COURT:  Now because this is a loan for
 5   political purposes, is it your testimony that for some
 6   reason the personal guarantees are different from the
 7   personal guarantees on ordinary loans.
 8   A     Yes.  It certainly is.  The I. R. S. treats them
 9   completely differently.
10            THE COURT:  They treat personal guarantees --
11            THE WITNESS:  If you are relieved of an
12   obligation, the I. R. S. finds it to be taxable.  If you
13   are relieved because you raised the money to pay back
14   the loan, you're not.  That's federal tax law.
15            THE COURT:  I understand that.  But I'm saying
16   before you raise any money to pay at all, if a loan is
17   secured and say you and I secure a loan no mat are what
18   we do with it, if we go to the shopping center or design
19   a space shuttle, if we do that and we have borrowed the
20   money to do that and execute the guarantee at the bank
21   to borrow that money, is it any different legally than
22   an arragement to borrow money if you and I were to
23   borrow money nor a political candidate and guarantee
24   that note.
25   A     Leaving aside the tax issue no.  But the tax issue
```

```
 1  is extremely important.
 2          THE COURT:  I understand, because there are
 3  ways to pay it off which would alleviate the personal
 4  guarantees.
 5          THE WITNESS:  Yes.  I would just say to Your
 6  Honor that in my lifetime of the forty years doing this,
 7  I have been on maybe a dozen of these things and I have
 8  never known anyone to believe that there was any benefit
 9  to any from it.  That is simply not the way it's done.
10  That's wrong.
11  Q    Have you ever known in your forty plus years in
12  politics the guarantor of a loan like the F. C. B. loan
13  or the G. O. TV loan for that matter, to have been
14  required to pay off a defaulted loan?
15  A    No, not a defaulted loan, because that's just not
16  the way it works.  If you were to get into a situation
17  where you couldn't raise the money, you would go and get
18  the loan extended and then raise the money so it would
19  not go into default.  I have known that to happen.  But
20  no, I don't.  In forma pauperis a campaign environment.
21  Now if you're talking about in a business environment as
22  the judge suggested, yes, I have, I have been one of
23  them.
24  Q    Is it anything other than happenstance that
25  Governor Siegelman ended up being a co-guarantor with
```

```
 1  Merv Neighbors?
 2  A    In my opinion different banks do different things
 3  in different ways.  Colonial does not require any
 4  guarantor --
 5           MR. FEAGA:  Objection.  [WAOEUPBT] to him
 6  offering his opinion about the first commercial loan Fob
 7  for sure, and we object to the form of the question and
 8  the non-responsive answer as he was bringing up
 9  colonial.
10           THE COURT:  Sustained.
11  Q    Well, to answer that, do you know, because you were
12  there and the governor was the at this time [TAOU]
13  [HRAR] head, wasn't he?
14  A    Yes.
15  Q    Do you know why it was that he was asked to go on
16  the first commercial bank loan?
17           MR. FEAGA:  Objection, Your Honor, we're
18  retrying the case.  There was testimony from Mr. Todd
19  bar rid about it and he testified that he was expecting
20  him to be personally liable to repay it back.
21           THE COURT:  If he knows.
22           THE WITNESS:  We always try to put the
23  candidate on the loan because the candidate then has a
24  vested interest in paying it back.
25  Q    And do you know why was it he wasn't on with the
```

```
 1  other twelve guarantors on the first --
 2  A    No, I don't know. I can only specs late and I
 3  don't want to do that. It's up to the bank. You can't
 4  generalize.
 5  Q    And while you were head of the Democratic Party
 6  involved in fund raising and involved in the loans and
 7  to the extent you've told us about the acknowledge of
 8  the first commercial bank loan, did you ever observe --
 9           MR. FEAGA:  Objection to the question Your
10  Honor. The testimony was he didn't have any firsthand
11  knowledge of the first commercial loan and only learned
12  about it after it surfaced as a part of this case.
13           THE COURT:  Where are we going with this Mr.
14  kill burning? What is it you want to bring out?
15           MR. KILBORN:  I'm trying to bring out Your
16  Honor the fact that this was customary, common practice
17  in Alabama politics with nothing underhanded, immoral,
18  illegal the way it was handled with this loan being paid
19  off. In other words that plus --
20           THE COURT:  Other than the means of the funds
21  that were used to pay it off?
22           MR. KILBORN:  Yes. Exactly. Plus the fact
23  that I want to establish that it is untrue that there
24  was a five hundred thousand dollars benefit. And that's
25  what I want to show.
```

```
 1              THE COURT:  All right.  That is something I'm
 2  interested in hearing about.
 3  Q    In your opinion knowing what you know about that S.
 4  C. B. loan is it untrue that there was a five hundred
 5  thousand dollar benefit to governor Siegelman here when
 6  it was paid off?
 7  A    So we can get behind this let me just answer it in
 8  one sentence.  Okay?  Any bank has its own standards
 9  about who is on what loan.  Could that loan have been
10  moved from first commercial to another bank without
11  Siegelman's guarantee?  Yes, absolutely.
12  Q    It could have moved back to colonial?
13  A    I'm not trying to commit colonial, but any of the
14  larger banks in the state of Alabama know the same thing
15  in Alabama.  They're in the business of making loans,
16  that's what they do for a living.
17           MR. FEAGA:  We object to the relevance of
18  this.  We have the testimony of what their expectations
19  were --
20           THE COURT:  Yes, I recall that.  So let's move
21  on.
22  Q    And they like to make these kind of loans, don't
23  they?
24  A    That's correct.  They like to make any kind of loan
25  that will be paid back.
```