# EXHIBIT 7

1

        **ELMER D. HARRIS**, witness for the Defendant, having been duly sworn or affirmed, testified as follows:

                      DIRECT EXAMINATION

BY MR. HELMSING:

        THE COURT: Mr. Harris, you are kind of tall like me so be careful when you sit down, there's a speaker underneath that podium. Be mindful of that. And you can adjust yourself so you can speak clearly into the microphone without injuring yourself. Mr. Helmsing, you may proceed.

Q. Would you state your full name, please.

A. Elmer D. Harris.

Q. And how do you spell your last name?

A. H-A-R-R-I-S.

Q. Mr. Harris, I would like to begin by giving the jury some of your background. Can you tell us first, did you go to college?

A. I did. I went to Auburn University the first time, the second time, and the third time.

Q. Well, what did you get a degree in the first time?

A. Well, the first time was electrical engineering and the second time was a Master's in electrical engineering, and the third time was associated with the Air Command and Staff College where I got the Master's in business administration.

Q. And what time frame was this?

A. Well, the first time was '58 to '62, and then the '68 to '70 time frame, and then about 1970, '71 time frame.

1  they had so much influence on what goes on within Alabama Power.
2  Q. All right, sir. And when Governor Siegelman was successful
3  in the '98 election did he ask you to play a role in his
4  transition team?
5  A. Yes, he did. He called me up on the telephone one day and
6  he said I would like for you to serve as chairman of the
7  transition team. And I simply said well, governor, I have got
8  to check with one of my lawyers and see if there's any potential
9  violation of the Holding Company Act or any other statutes,
10 federal or state. I checked in, the lawyer told me there's no
11 issue relative to that, I called Governor Siegelman back
12 immediately and said I will be glad to assist you as chairman of
13 the transition team.
14 Q. And what are the duties of the transition team?
15 A. Well, I made it very simple. I don't like to make things
16 complex. I boiled it down to three, I guess, main activities.
17 One is the inaugural activities itself. And I put David Cooper
18 down in Mobile as the chairman of the inaugural activities. And
19 the second one is the departmental reviews. Go in and look at
20 every department, find out the substantive areas that Governor
21 Siegelman and his incoming team need to know to address either
22 immediately or later, go in and talk about and look at all of
23 those departments that you and the governor want. And that
24 transition group went in and did certain of those departments
25 that they were interested in. And the third leg is what I

16

his team, so start putting some names down. Put them down so you are ready to evaluate these various board positions. They are not all put together yet but they will be shortly, so I said to him.

Q. And Raymond Bell, what was his position in the administration?

A. He was going to be the appointment secretary as soon as they took office.

Q. All right. And did you give him Richard's -- Richard Scrushy's --

MR. FEAGA: Objection, Your Honor, to the leading. He is suggesting an answer with his question.

MR. HELMSING: I haven't even goten the question out.

THE COURT: Overruled. Ask your question.

Q. Did you give Raymond Bell Richard Scrushy's --

MR. FEAGA: Objection, Your Honor.

THE COURT: Overruled.

Q. -- name as a possible candidate of the -- for the CON Board?

A. I did not get into the specific names on the CON Board.

Q. All right. Now, are you aware of any prior service by Richard Scrushy on the CON Board?

A. Sure. He had served several terms prior to Governor Siegelman coming into office.

Q. And under what governors did he serve, that you recall?

A. Well, if I sit here and recall it's probably Folsom and

                                                                    17

1  James and then probably went back to Hunt, would be my guess.
2  Q. Now, did you have a discussion with Richard Scrushy with
3  regard to his serving on the CON Board in the Siegelman
4  administration?
5  A. I did.
6  Q. And where did that discussion take place?
7  A. One of our breakfast meetings.
8  Q. And what did you -- did Richard Scrushy want to serve on the
9  board?
10 A. Well, when I walked in that morning --
11         MR. FEAGA: Objection, Your Honor, to anything that
12 Mr. Scrushy said to him.
13         THE COURT: Sustained.
14 Q. Well, I am not asking you what he said to you, but did he
15 want to serve on the CON Board?
16         MR. FEAGA: Objection, Your Honor. He can't answer
17 that question without testifying to what Scrushy said to him.
18         THE COURT: Sustained.
19 Q. What did you tell Mr. Scrushy at that meeting with regard to
20 the CON Board? What you told him, not what Mr. Scrushy said.
21 A. I told Mr. Scrushy that if you do not want to serve on the
22 CON Board, and you can find another person that can do a good,
23 effective job on the CON Board, then you go down there and sit
24 down in Governor Siegelman's office and tell him that. If you
25 can't find somebody else that can do a good job, Richard, I

think you ought to evaluate that and take the board position yourself. It's tough to get good people down there, I have to go down there from time to time, and you ought not to hesitate to do that either.

Q. What was your impression as to whether Mr. Scrushy wanted to serve on the CON Board?

MR. FEAGA: Object, Your Honor.

THE COURT: Overruled.

A. He did not want to serve on the CON Board. He did not -- he wasn't going to serve on the CON Board. He was going to go tell Don Siegelman he wasn't going to do it.

THE COURT: Let's don't say what he said. Let's move on.

THE WITNESS: Yes, sir.

Q. Now, were you aware -- or do you know how long that Richard Scrushy served on the CON Board during the James administration?

A. I do not.

Q. Did -- do you know whether Richard Scrushy supported Governor Siegelman in the '98 election?

A. He supported Fob James.

Q. You knew that?

A. Yes.

Q. Did you have any discussion with him with regard to the relationship of him and HealthSouth to the Siegelman administration?

A. Well, along about the time we were raising the money for the inaugural activities, well over a million dollars, not even related to raising the money because I did that, Governor Siegelman came in one day and I said I am going to ask --

THE COURT: Don't tell us what Governor Siegelman said but you can tell us what you said.

THE WITNESS: What I said to --

THE COURT: You can say in this Court what you said to either Governor Siegelman or Mr. Hamrick or Mr. Scrushy or Mr. Roberts, but don't tell us what any of them said to you.

A. I said to Governor Siegelman that I am going to get some funds from HealthSouth, for example, for the inaugural activities. And I believe it is absolutely essential that you and Richard Scrushy get on the same wavelength. There's going to come a lot of things during this administration in which you need the support of all the business people, not selective business people. So why don't you, Governor Siegelman, talk to Richard Scrushy and see if y'all can't work out whatever differences you have.

Q. Now, did you have a conversation with Richard Scrushy about the same matter?

A. I did.

Q. And what did you tell him?

A. I told him essentially the same thing. When we were talking about giving some contributions to the inaugural activities,

1  you, Richard Scrushy, supported Fob James. Fob James lost the
2  election. It's my assumption all the time that I am going to
3  support whoever is in office. Don Siegelman is in office, I
4  don't care whether you like him or you don't like him, you need
5  to sit down with him and talk about whatever differences y'all
6  have, solve them, get them out of the way so both of y'all can
7  be helpful to each other.
8  Q. And why is it important for there to be good relations
9  between HealthSouth on the one hand and the state and the
10 governor on the other hand?
11 A. Well, it doesn't matter whether it's HealthSouth or an
12 insurance company or a bank or utility, all of us have interests
13 in Montgomery, Alabama as well as many of us have interests in
14 Washington, D.C. And sometimes the governor is going to have
15 small things that they will want you to do. And you need to
16 be -- you need to know each another, you need to have confidence
17 in each other, you need to trust each other. At the current
18 time I am helping Governor Riley and Patsy with the Helen Keller
19 fun raiser, where we are going to put Helen Keller up in the
20 Halls of Congress, her statue. He asked me to do that and I'll
21 do it. And we all ought to be doing that kind of thing to help
22 our state better.
23 Q. Did Governor Wallace have a political position with regard
24 to people who did not support him in an election?
25 A. He did. Governor Wallace was the first governor I really

```
                                                                23
 1  enacted a lottery for education purposes in 1999?
 2  A.  Sure.
 3  Q.  And are you aware that the -- that there was a foundation
 4  formed in order to get-out-the-vote and to support the passage
 5  of that lottery in a referendum?
 6  A.  Yes.
 7  Q.  All right.  And are you aware that at -- after that
 8  referendum was unsuccessful and the people of Alabama rejected
 9  the lottery, that there was debt owed --
10  A.  Yes.
11  Q.  -- in the efforts to get-out-the-vote?
12  A.  Yes.
13  Q.  Now, did you have occasion to discuss that debt with Richard
14  Scrushy?
15  A.  I told Richard Scrushy that I was not going to personally
16  make a contribution to the lottery foundation, nor was I going
17  to permit Alabama Power to make a contribution to the lottery
18  foundation, very simply because we had a million three hundred
19  thousand customers and about 50 percent of them were for that
20  lottery and about 50 percent of them was against it, and I am
21  not about to irritate 50 percent of our customers.
22  Q.  All right.  Now, can you put a time frame on that?  Would it
23  have been in the spring of 2000?
24  A.  Probably sometime during the second quarter.
25  Q.  Of 2000?
```

24

1  A.   Yeah.

2  Q.   All right.  Now, where did the discussion occur?

3  A.   Occurred at one of our breakfast meetings.

4  Q.   And did you make a recommendation at that time to
5  Mr. Scrushy?

6  A.   I told him that you are different from the issues that I
7  face at Alabama Power.  You have got a totally different
8  customer base.  A lot of your customers are outside of Alabama.
9  If you want to make a contribution to the lottery foundation you
10 should do so.  My only suggestion to you is to look at the
11 lottery foundation itself, I hadn't looked at it lately, make
12 sure it's set up properly, which I think it is, so I told him,
13 because it was worked up by a major law firm in Birmingham.  And
14 there's an unlimited amount in Alabama that anybody can give,
15 doesn't matter whether it's an individual or a corporation.  You
16 can give a dollar, you can give a million dollars, you can give
17 whatever you want to give.

18 Q.   All right.  Now, did you -- in that discussion did you tell
19 Richard Scrushy -- let me ask you -- strike that out.  First of
20 all did you --

21        MR. FEAGA:  Object, Your Honor, to him leading.  He's
22 asking him did you tell him X.

23        THE COURT:  He struck the question.

24        MR. HELMSING:  I struck the question because I knew you
25 were going to object.

39

```
 1  it would have the same sort of importance to a company like
 2  HealthSouth, wouldn't it?  Wouldn't it be fair to say there's a
 3  comparison there?
 4  A.  It would be very important to the health company.  Just like
 5  banking, the banking commissioner would be very important to the
 6  banks.  And I can't tell you the number of calls I got on the
 7  banking commissioner.
 8  Q.  Yes, sir.  And the insurance commission.  And so
 9  companies --
10  A.  Everybody supports their own needs, consistent with statutes
11  of the State of Alabama and America.
12  Q.  Yes, sir.  And so my point is that as the CEO of HealthSouth
13  Corporation Richard Scrushy would quite naturally have a strong
14  interest in what happens at the Alabama Certificate of Need and
15  Review Board and other Certificate of Need Review --
16  A.  He should have an interest, either himself or recommend
17  somebody else, or make sure that there's good people on that
18  board that will do an objective job.
19  Q.  I understand.  So, it would be fair for someone if they did
20  choose to do so to believe that he would have an interest in who
21  served on that board and what went on at that board.
22  A.  He should have an interest, just like I have an interest in
23  who the Public Service Commissioners are.
24  Q.  Yes, sir.  I understand.  Now, you were talking about
25  Richard Scrushy and Don Siegelman.  And you said that Richard
```

40

1  Scrushy had actually backed Fob James when Fob James ran for
2  governor against Governor Siegelman in 1998; is that right?
3  A.  He did.
4  Q.  And have you -- during any of the breakfast meetings with
5  him did he ever discuss with you how much he had contributed or
6  seen to it that was contributed to Fob James?
7  A.  He did not.
8  Q.  Would it surprise you if the figure was -- or someone that
9  represented him said that the figure was in the neighborhood of
10 three hundred and 50 thousand dollars?
11 A.  No, that wouldn't surprise me.
12 Q.  Okay.  Now, do you remember -- or isn't it true that at some
13 point that Scrushy, he was actively backing Fob James; isn't
14 that right?
15 A.  Sure, he was backing Fob James.  He wanted Fob James elected
16 and not Don Siegelman.
17 Q.  Do you remember it being reported -- do you remember a point
18 in time when he referred to Governor Siegelman as a Communist
19 while he was campaigning?
20 A.  I am familiar with that.
21         MR. HELMSING:  Objection, Your Honor.
22 Q.  The only reason I bring that up --
23         THE COURT:  Is there an objection?
24         MR. HELMSING:  Yes, sir, relevancy.
25         MR. KILBORN:  We do not object to that question, Judge.

                                                                      41

1   Q.  The reason I bring it up, sir --
2           THE COURT:  Overruled.  Ask your next question.
3   Q.  The reason I bring it up is they didn't like each other, did
4   they?
5   A.  I don't know whether they liked each other or not.  I took
6   it that they had some major issues that they needed to solve.
7   Q.  Yes, sir.  And believe me, sir, I in no way, shape or form
8   mean to show any disrespect for your efforts to bring the state
9   together, and I don't by my question mean to imply that, but
10  what I am asking, you were there, and I think you just answered
11  my question, these two guys had some significant differences at
12  the point in time that you got involved in this transition team,
13  didn't they?
14  A.  They had some differences, I don't know how you would
15  characterize it.  But they had some differences and I was going
16  to do my best to get them together, because whoever the governor
17  is, every citizen of the State of Alabama needs to support that
18  governor, just like the President of the United States, and
19  unfortunately that's not always done in this country.
20  Q.  Right, sir.  And in this instance Richard Scrushy certainly
21  didn't support this governor when he was running for governor.
22  A.  I told you he opposed Governor Siegelman.
23  Q.  Yes, sir.  And --
24  A.  And he supported Fob James.
25  Q.  Yes, sir.  And now let me move on to that.  Then we come

42

1 forward and we have this lottery referendum that took place in
2 the state.
3 A. Yeah.
4 Q. Now, Alabama Power did not support that effort, right?
5 A. We didn't support it because I was not about to irritate 50
6 percent of my customers.
7 Q. I understand. But my point being, you didn't support it.
8 A. I did not support it.
9 Q. All right. And HealthSouth, do you know whether or not they
10 did?
11 A. I have read in the papers where they did.
12 Q. Yes, sir. But at the time that this was going on and you
13 were having these conversations with Mr. Scrushy you never
14 solicited anybody to make any donation to the Alabama Education
15 Lottery Foundation, did you?
16 A. I told Richard Scrushy your company is different from mine
17 and if you want to give to the lottery foundation you have a
18 perfect right to do that.
19 Q. Yes, sir.
20 A. There are no restrictions, you can give any amount of money
21 you want to, if you want to give it. Governor Siegelman would
22 like for you to do that. I am not going to do that because of
23 the customer base I have, but you don't have that problem. If
24 you want to give a dollar, give a dollar. If you want to give a
25 million dollars, give a million dollars.

67

1  observed him going to federal.
2  Q.  Let me ask you, if he was working -- you testified a lot
3  about your experience and how things are supposed to work and
4  how they work and what your expectations are, and you have
5  talked about your broad base of experience, what I wondering is
6  if Ms. Skelton was in charge of keeping up with contributions,
7  political contributions that were being made by HealthSouth, and
8  if Mr. Waggoner was in charge of governmental relations for
9  HealthSouth, would you find it odd that they wouldn't know about
10 a five hundred thousand dollar contribution that was made by
11 Richard Scrushy to Governor Siegelman's lottery?
12 A.  I don't know those people so I can't answer that question.
13 Q.  All right, sir.  And earlier you were talking about the fact
14 that you had had some conversations with Mr. Scrushy about the
15 Certificate of Need Review Board and Don Siegelman, generally,
16 is that --
17 A.  Yes.
18 Q.  You said that Richard Scrushy had told -- had indicated to
19 you or your impression was that he wasn't interested in being on
20 the CON Board; do you remember that?
21 A.  He didn't want to be on the board.
22 Q.  Right.  But now, that doesn't relate to the fact that he
23 wouldn't have had an interest in who was on the board, right?
24 A.  I would think he should be interested in who was on the
25 board.  That's why I told him if you don't want to serve go find

68

somebody else that you believe can do a good job and go down there and tell the governor you are not going to serve and recommend somebody.

Q. Okay. And so, of course, the person that he would recommend would be somebody that he would think would act in a manner and in a fashion that was consistent with the best interests of HealthSouth and/or the best interest of health care in the state, right?

A. I think he would do what was in the best interest of the state and his business.

Q. There you go. And as CEO of HealthSouth he would certainly have an obligation and responsibility --

A. He has an obligation on both fronts, protect his business and do what is best for the State of Alabama.

Q. Okay. And so it wouldn't be unusual for him to want one of his employees at the company to be on the CON Board.

A. Absolutely not.

Q. Okay. So then if -- you talked earlier about a memorandum that Mr. Raymond Bell had done, I think you talked about telling him they needed to go out and get the best people they could and make up a list.

A. Sure.

Q. So it wouldn't surprise you to find that Richard Scrushy is on such a list. It's been entered into evidence, I think it's Government's Exhibit 30 in this case.