IN THE
UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT

AUG 2 4 2007

THOMAS K. KAHN
CLERK

APPEAL NO. 07-13163-B

UNITED STATES OF AMERICA,
Plaintiff-Appellee,

vs.

Don Eugene Siegelman,
Defendant-Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

UNITED STATES' RESPONSE TO DEFENDANT SIEGELMAN'S
MOTION FOR RELEASE PENDING APPEAL

LOUIS V. FRANKLIN, SR.
Acting United States Attorney
Middle District of Alabama

STEPHEN P. FEAGA
J.B. PERRINE
Assistant United States Attorneys
Middle District of Alabama

JOSEPH L. FITZPATRICK, JR.
Special Assistant U.S. Attorney

WILLIAM M. WELCH, II
Chief
RICHARD C. PILGER
Trial Attorney
Public Integrity Section
Criminal Division
Department of Justice

JOHN-ALEX ROMANO
Appellate Section, Criminal Division
Department of Justice
950 Pennsylvania Ave, NW
Room 1264
Washington, DC 20530
Phone: (202) 353-0249
Fax: (202) 305-2121

United States v. Don Eugene Siegelman

Appeal No. 07-13163-B

## CERTIFICATE OF INTERESTED PERSONS

## AND CORPORATE DISCLOSURE STATEMENT

In compliance with Fed. R. App. P. 26.1 and 11th Cir. R. 26.1-1
and 26.1-3, the undersigned hereby certifies that the following persons and/or
entities have an interest in the outcome of this case:

1.    Adams, Richard Martin

2.    Blakey, Robert G.

3.    Coody, Charles, Magistrate Judge

4.    Eastland, Hiram Chester, Jr.

5.    Feaga, Stephen P.

6.    Fitzpatrick, Joseph L., Jr.

7.    Franklin, Louis V., Sr.

8.    Fuller, Mark, United States Chief District Judge

9.    Helmsing, Frederick G.

10.    Hernandez, Carmen D.

11.    James, Susan Graham

12.    Jenkins, James K.

13.    Jones, Michael E.

14. Kilborn, Vincent F., III

15. Leach, Arthur W.

16. Maloy, W. Bruce

17. McDonald, David Allen

18. Moore, Leslie V.

19. Parkman, James W., III

20. Perrine, James B.

21. Pilger, Richard C.

22. Pitt, Redding

23. Romano, John-Alex

24. Scrushy, Richard M.

25. Siegelman, Don Eugene

26. UBS AG (UBS)

27. Welch, William M., II

28. White, William C., II

# TABLE OF CONTENTS

**Page**

STATEMENT

    A. Case Overview ........................................................................ 2

    B. Legal Standards ....................................................................... 3

ARGUMENT

I.    Defendant Has Not Presented A Substantial Question As To
His Conspiracy And Obstruction Of Justice Convictions. ............................ 5

    A.    Factual Basis For Defendant's Obstruction
of Justice Conviction. ................................................................ 7

    B.    Defendant's Conduct Falls Within the
Parameters of § 1512(b)(3). ...................................................... 10

II.    Defendant Has Not Presented A Substantial Question With Regard
To His Convictions For Bribery And Honest Services Fraud. .................. 13

    A.    The Jury Instructions Do Not Present A Substantial Question. ........ 13

        1.    Section 666 Bribery Does Not Require
An Explicit Quid Pro Quo. ................................................. 14

        2.    In Any Event, The Jury Received A Quid
Pro Quo Instruction ......................................................... 19

        3.    Honest Services Mail Fraud Does Not
Require An Explicit Quid Pro Quo. ....................................... 20

    B.    The Sufficiency Of The Evidence On The Bribery And Mail
Fraud Counts Does Not Present A Substantial Question. ................ 26

C.   <u>The Doctrine of Strictissimi Juris Does Not
      Present A Substantial Question</u>. ....................................... 32

D.   <u>The Statute Of Limitations On The Bribery Count
      Does Not Present A Substantial Question</u>. ....................................... 35

III.  Defendant Siegelman's Sentence Does Not
      Raise A Substantial Question ....................................... 37

CONCLUSION ....................................... 41

CERTIFICATE OF SERVICE ....................................... 42

ii

# TABLE OF AUTHORITIES

## CASES

Arthur Anderson v. United States,
    544 U.S. 696 (2005) ................................................................. 16

Capone v. Aderhold,
    65 F.2d 130 (5th Cir. 1933) .................................................... 36

Evans v. United States,
    504 U.S. 255 (1992) ................................................................. 15

FEC v. Wisconsin Right to Life,
    127 S. Ct. 2652 (2007) ............................................................ 18

McCormick v. United States,
    500 U.S. 257 (1991) ............................................................ 14,15

Morison v. United States,
    486 U.S. 1306 (1988) ................................................................ 5

United States v. Agostino,
    132 F.3d 1183 (7th Cir. 1997) ................................................ 16

United States v. Allen,
    10 F.3d 405 (7th Cir. 1993) .................................................... 18

United States v. Arky,
    938 F.2d 579 (5th Cir. 1991) ............................................... 36,37

United States v. Bilanzich,
    771 F.2d 292 (7th Cir. 1985) .................................................... 4

United States v. Campbell,
    491 F.3d 1306 (11th Cir. 2007) .............................................. 40

United States v. Carpenter,
      961 F.2d 824 (9th Cir. 1992) ................................................. 27,33

United States v. Castro,
      89 F.3d 1443 (11th Cir. 1996) .............................................. 17

United States v. Cerilli,
      603 F.2d 415 (3d Cir. 1979) ................................................. 33,34

United States v. Davis,
      30 F.3d 108 (11th Cir. 1994) ............................................... 18

United States v. deVegter,
      198 F.3d 1324 (11th Cir. 1999) ........................................... 22

United States v. Dean,
      487 F.3d 840 (11th Cir. 2007) ............................................. 19

United States v. Dellinger,
      472 F.2d 340 (7th Cir. 1972) .............................................. 33,34,35

United States v. Fernandez,
      No. 87-0217-CR-NESBITT, 1988 WL 34941 (S.D. Fla. May 13, 1988) .... 6

United States v. Gee,
      432 F.3d 713 (7th Cir. 2005) ............................................... 16

United States v. Giancola,
      754 F.2d 898 (11th Cir. 1985) ............................................. 4,6,26

United States v. Greenough,
      609 F. Supp. 1090 (S.D. Ala. 1985) ..................................... 6

United States v. Gutnam,
      95 F. Supp. 2d 1337 (S.D. Fla. 2000) ................................... 39,40

United States v. Hasner,
      340 F.3d 1261 (11th Cir. 2003) ........................................... 20,23

iv

United States v. Lopez-Lukis,
        102 F.3d 1164 (11th Cir. 1997) ......................................... 20,21,22

United States v. Martinez,
        14 F.3d 543 (11th Cir. 1994) ........................................ 18

United States v. Massey,
        89 F.3d 1433 (11th Cir. 1996) ................................. 26,27

United States v. Miller,
        753 F.2d 19 (3d Cir. 1985) ...................................... 4,5

United States v. Montour,
        944 F.2d 1019 (2d Cir. 1991) ................................. 33,34

United States v. Najjar,
        283 F.3d 1306 (11th Cir. 2002) ................................. 36

United States v. Paradies,
        98 F.3d 1266 (11th Cir. 1996) ......................... 16,17,19

United States v. Puche,
        350 F.3d 1137 (11th Cir. 2003) .............................. 14

United States v. Ramirez,
        324 F.3d 1225 (11th Cir. 2003) ............................. 36

United States v. Ronda,
        455 F.3d 1273 (11th Cir. 2006) ......................... 6,10,11

United States v. Sanders,
        211 F.3d 711 (2d Cir. 2000) ................................. 34

United States v. Sawyer,
        85 F.3d 713 (1st Cir. 1996) .................................. 24

United States v. Sawyer,
     239 F.3d 31 (1st Cir. 2001) ........................................................ 24

United States v. Shenberg,
     89 F.3d 1461 (11th Cir. 1996) .................................................... 39

United States v. Shotts,
     145 F.3d 1289 (11th Cir. 1998) ................................................ 6,12

United States v. Sun-Diamond Growers of California,
     526 U.S. 398 (1999) ................................................................. 18

United States v. Tampas,
     __ F.3d __, 2007 WL 2126807 (11th Cir. July 26, 2007) .................... 22,23

United States v. Veal,
     153 F.3d 1233 (11th Cir. 1998) ........................................ 6,10,11,13

United States v. Warner, 2005 WL 2367769 ........................................ 25

United States v. Waymer,
     55 F.3d 564 (11th Cir. 1995) ...................................................... 22

United States v. White, 2004 WL 2612017 ........................................ 25

United States v. Yashar,
     166 F.3d 873 (7th Cir. 1999) ..................................................... 37

## STATUTES and RULES

2 U.S.C. § 441b(b)(2) ................................................................. 18

18 U.S.C. § 201 ...................................................................... 24

18 U.S.C. § 371 ....................................................................... 2

vi

18 U.S.C. § 1341 ........................................................................... 13

18 U.S.C. § 1346 ........................................................................... 2

18 U.S.C. § 1512(b)(3) ................................................................. 2

18 U.S.C. § 1515(a)(3) ................................................................. 11

18 U.S.C. § 1951(b)(2) ................................................................. 14,15

18 U.S.C. § 2385 ........................................................................... 33

18 U.S.C. § 3143 ........................................................................... 3

18 U.S.C. § 3143(b)(1)(B) ........................................................... 1

18 U.S.C. § 3143(b)(1)(B)(iv) ..................................................... 38,39

18 U.S.C. § 666 ............................................................................. 13,15

18 U.S.C. § 666(a)(1)(B) .............................................................. 2,15

Fed. R. Crim. P. 12 ....................................................................... 36

U.S.S.G. § 2C1.1, cmt. 5 .............................................................. 38

U.S.S.G. § 2C1.1, cmt. 7 (2006) ................................................. 39

IN THE UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT

UNITED STATES OF AMERICA,        :
      Plaintiff-Appellee,        :
                       :        APPEAL NO.  07-13163-B
v.        :
                       :
Don Eugene Siegelman,        :
      Defendant-Appellant.        :

## UNITED STATES' RESPONSE TO DEFENDANT SIEGELMAN'S MOTION FOR RELEASE PENDING APPEAL

The United States of America, through the undersigned counsel, hereby responds to Defendant Siegelman's Motion for Release Pending Appeal (the "bail motion").[1]

Defendant has not carried his burden under 18 U.S.C. § 3143(b)(1)(B) of raising a substantial question of law or fact likely to result in reversal, an order for a new trial, or a reduced sentence to a term of imprisonment less than the total time he has already served plus the expected duration of the appeal process. Even a cursory review of defendant's arguments shows that he has not raised a substantial question regarding his conviction for obstruction of justice, but merely contends that the

---

[1] Defendant's bail motion is 78 pages long. On August 17, 2007, the government filed an opposition to defendant's motion to exceed the 20-page limitation applicable to his bail motion, and also filed a motion to stay the briefing schedule pending the Court's resolution of the page-limitation motion. As of the date of this Response, the Court has not ruled on either the government's motion to stay or defendant's page-limitation motion.

evidence was insufficient to support the jury's verdict. Moreover, despite his attempt to cloak his arguments in the language of First Amendment protections, defendant has not presented a substantial question regarding his convictions for bribery and honest services mail fraud. Contrary to his primary argument, the bribery and honest services fraud statutes do not require the district court to give an express quid pro quo instruction akin to that required under the Hobbs Act for an extortion offense. Nor do any of the other miscellaneous arguments made by defendant regarding his conviction and sentence come close to presenting a substantial question. Accordingly, the Court should deny his motion.

## STATEMENT

A. <u>Case Overview</u>

On June 28, 2007, the district court sentenced defendant, following his conviction by a jury, to 88 months' imprisonment for bribery in violation of 18 U.S.C. § 666(a)(1)(B) (Count 3), honest services mail fraud in violation of 18 U.S.C. §§ 1341 & 1346 (Counts 6-9), and obstruction of justice in violation of 18 U.S.C. § 1512(b)(3) (Count 17), and sentenced him to 60 months' imprisonment for his conviction on one count of conspiracy to commit honest service mail fraud in violation of 18 U.S.C. § 371 (Count 5), all terms to run concurrently.[2] Doc. #

---

[2] Defendant's claim that the jury rejected 95% of the charges against him is disingenuous at best. Mot. for Release at 3. The jury convicted defendant of 7 of

2

634 (Amended Judgment). The factual basis supporting defendant's convictions on the bribery and honest services counts (Counts 3 and 5-9) is distinct from that underlying his obstruction-of-justice conviction (Count 17). The former counts pertain to his agreement with defendant Richard Scrushy, Chief Executive Officer of HealthSouth Corporation, pursuant to which defendant Siegelman, then-Governor of Alabama, would and did appoint Scrushy to a state review Board (the "CON Board") in return for a $500,000 bribe, which Siegelman used to pay down a state lottery campaign debt for which he was personally liable. His conviction on Count 17 resulted from his unlawful efforts to thwart the federal investigation into his corrupt activities while he was Governor and Lieutenant Governor.

B. Legal Standards

Under the Bail Reform Act of 1984, codified at 18 U.S.C. § 3143, a convicted defendant shall be detained pending appeal unless this Court finds:

> (1) that the defendant is not likely to flee or pose a danger to the safety of any other person or the community if released;
> (2) that the appeal is not for purpose of delay;
> (3) that the appeal raises a substantial question of law or fact; and
> (4) that if that substantial question is determined favorably to defendant on appeal, that decision is likely to result in reversal or an order for a new trial of all counts on which imprisonment has been imposed.

---

the 33 counts in which he was named in the second superseding indictment. Doc. # 634 (Amended Judgment).

United States v. Giancola, 754 F.2d 898, 901 (11th Cir. 1985) (emphasis added).

Since his conviction is presumed to be correct, the defendant has the burden to

establish each of these factors. Id. See United States v. Miller, 753 F.2d 19, 22 (3d

Cir. 1985) (noting that "release of a criminal defendant into the community, even

after conviction, destroys whatever deterrent effect remains in the criminal law").

The government does not contend that defendant is a flight-risk or a danger to

the community. The relevant inquiry is whether defendant has raised a substantial

question of law or fact that is likely to result in reversal or an order for a new trial of

all counts on which imprisonment has been imposed. This Court has held that a

"'substantial question' . . . is a 'close' question or one that very well could be decided

the other way." Giancola, 754 F.2d at 901. The phrase "likely to result in reversal

or an order for a new trial" goes "to the significance of the substantial issue to the

ultimate disposition of the appeal." Id. at 900 (quoting Miller, 753 F.2d at 23).

> A court may find that reversal or a new trial is 'likely' only if it
> concludes that the question is so integral to the merits of the conviction
> on which defendant is to be imprisoned that a contrary appellate holding
> is likely to require reversal of the conviction or a new trial.

Id. (quoting Miller, 753 F.2d at 23). "[H]armless errors, errors that have no

prejudicial effect, or errors that have been insufficiently preserved," which would not

result in reversal or a new trial, do not satisfy the applicable standard. United States

v. Bilanzich, 771 F.2d 292, 299 (7th Cir. 1985).

"Obviously, if the question deemed substantial is not related to all of the counts [for which defendant is imprisoned], then the statutory criteria for bail pending appeal would not be met as to the unaffected counts, and bail may be denied." Miller, 753 F.2d at 24; see also Morison v. United States, 486 U.S. 1306, 1306-07 (1988) (denying petitioner's request for bond because he had not shown that his appeal is "'likely to result in reversal' with respect to all the counts for which imprisonment was imposed") (Rehnquist, C.J.). As set forth below, defendant has not carried his weighty burden to justify his release pending appeal.

## ARGUMENT

I.     **Defendant Has Not Presented A Substantial Question As To His Conspiracy And Obstruction Of Justice Convictions.**

Defendant's bail motion primarily attacks the legality of his convictions on Counts 3 (bribery) and 6-9 (honest services fraud). Nowhere does he assert that a substantial question is present as to his conviction on Count 5 (conspiracy). That failure alone justifies denial of his bail motion since he has not carried his burden to show a substantial question as to that count, for which he was sentenced to 60 months imprisonment.

Defendant's claim as to his conviction on Count 17 (obstruction of justice) is that he was convicted for conduct outside the scope of § 1512(b)(3). Mot. for Release at 69. At base, his claim is that the evidence was insufficient to support his

5

conviction, <u>see</u> Mot. for Release at 69, but such claims generally are not favored in a post-judgment bail motion. <u>See, e.g.</u>, <u>United States</u> v. <u>Fernandez</u>, No. 87-0217-CR-NESBITT, 1988 WL 34941 at *2 (S.D. Fla. May 13, 1988) ("Ordinarily, the sufficiency of the evidence  as distinguished from a total lack of evidence does not in itself establish a substantial question"); <u>United States v. Greenough</u>, 609 F. Supp. 1090, 1094 n.1 (S.D. Ala. 1985) (similar).  Moreover, in making his sufficiency challenge, defendant not only misrepresents and omits important facts supporting his conviction for obstruction of justice, but also fails to discuss controlling Eleventh Circuit precedent construing § 1512(b)(3), despite this Court's exegesis of that statute on more than one occasion.  <u>See</u> <u>United States</u> v. <u>Ronda</u>, 455 F.3d 1273 (11th Cir. 2006); <u>United States</u> v. <u>Veal</u>, 153 F.3d 1233 (11th Cir. 1998); <u>United States</u> v. <u>Shotts</u>, 145 F.3d 1289 (11th Cir. 1998).  Defendant's unwillingness to rely on Eleventh Circuit precedent is understandable, as this Court's prior decisions conclusively establish that defendant was convicted for conduct well within the parameters of § 1512(b)(3).  Defendant's failure to carry his burden as to Count 17 should lead this Court to deny his bail motion without further analysis of his other claims.  <u>See</u> <u>Giancola</u>, 754 F.2d at 901 (noting that, to warrant release, a defendant must carry his burden as to *all* counts on which he was imprisoned).

6

A.     Factual Basis For Defendant's Obstruction of Justice Conviction.[3]

As he did at trial through cross-examination of the government's witnesses, defendant asserts that the transfer of a check for $2973.35 from Nick Bailey, his confidential assistant, to him on October 16, 2001, was part of a legitimate transaction whereby Bailey completed his purchase of defendant's motorcycle – a transaction that ostensibly began on January 20, 2000. The testimony of Bailey and Lanny Young, however, refutes defendant's assertion. Rather than accepting defendant's version of the events, the jury believed Bailey and Young that the transaction on October 16, 2001, was an effort by defendant to thwart the federal investigation into his public corruption offenses.

Young and Bailey both testified at trial that defendant, Paul Hamrick, and Bailey had for many years an "absolute pay-for-play" agreement with Young, whereby Young would give them things of value and in exchange defendant would exercise official discretion to benefit Young's business interests.[4] In May 2001, the Attorney General of Alabama announced a joint federal and state criminal

---

[3] Because the official trial transcript has not yet been completed, see Mot. for Release at 12 n.23, the government, in good faith, recounts the evidence presented at trial based on information and belief.

[4] In his bail motion, defendant misstates Bailey's testimony as to the events surrounding the payment of $9,200 from Young to defendant on January 20, 2000, as well as the reasons for Bailey's transfer of the check to defendant on October 16, 2001.

7

investigation into defendant's gubernatorial administration for the commission of public corruption offenses, including crimes arising out of defendant's dealings with Young. Bailey testified that, on or before the date of this announcement, defendant was aware of the criminal investigation and the FBI's role in it.

Bailey further testified that on October 16, 2001, defendant caused Bailey to write and give him a check for $2,973.95 with the notation "balance due on m/c." Defendant had Bailey give him this check in the presence of defendant's attorney and Bailey's attorney. At the same time, defendant gave Bailey a bill of sale for defendant's motorcycle, which defendant purchased in December 1999. Rather than being a legitimate transaction whereby Bailey purchased a remaining interest in defendant's motorcycle, Bailey testified that the October 16, 2001, transaction was part of the cover story defendant and Bailey created to disguise the payment of $9,200 to defendant by Young on January 20, 2000 – which payment was part of the pay-for-play scheme between defendant and Young and was needed by defendant to cover two checks he had written on his checking account for fourth quarter taxes.[5] Young

---

[5] The payment of $9,200 by Young to defendant on January 20, 2000, was also structured to disguise the pay-for-play agreement between defendant and Young. Young testified that on that date defendant asked him for $9,200 and Young agreed to give it to him as part of their agreement. Bailey, to cover up the unlawful agreement between defendant and Young, then had Young purchase an official check for $9,200, dated January 20, 2000, payable to Bailey. Bailey deposited this check into his personal checking account, and then wrote a $9,200 check payable to Lori Allen, defendant's wife's maiden name, dated January 20,

testified that he never intended to and did not purchase an interest in defendant's motorcycle with the $9,200 payment.

The October 16, 2001 transaction followed a June 5, 2001 transaction whereby defendant, after learning of the investigation by the FBI, caused Bailey to write a check in the amount of $10,503.39 to Young with the notation "repayment of loan plus interest." The purpose of this transaction was to make it appear that the $9,200 payment from Young to defendant on January 20, 2000, was a loan from Young to Bailey for Bailey to buy a partial interest in defendant's motorcycle. Bailey testified that the June and October 2001 transactions were both part of the cover story defendant and he were using to hide defendant's unlawful agreement with Young and protect themselves from the federal investigation.

Bailey testified that when state and federal law enforcement agents first questioned him about the January 20, 2000 transactions involving the $9,200 payment by Young, and the October 16, 2001 transaction between defendant and him, he (Bailey) lied to the agents about these transactions and did so as part of his and defendant's cover-up plan. Bailey testified that he lied to the agents to protect himself and defendant. Bailey further testified that the October 16, 2001 transaction

---

2000. The check to Allen was then deposited into the bank account of defendant that would have otherwise been overdrawn because of checks defendant wrote to pay his fourth quarter taxes.

was a sham to hide the truth from the investigators about the $9,200 payment from Young to defendant on January 20, 2000.

**B.    Defendant's Conduct Falls Within the Parameters of § 1512(b)(3).**

A conviction under § 1512(b)(3) requires proof beyond a reasonable doubt that the defendant knowingly and willfully (1) corruptly persuaded, attempted to corruptly persuade, or engaged in misleading conduct toward another person, (2) with the intent to hinder, delay or prevent the communication of information to a federal law enforcement officer or federal judge, (3) about the commission or possible commission of a federal crime. Veal, 153 F.3d at 1253. Defendant argues that reversal of his conviction on Count 17 is likely because § 1512(b)(3) "does *not* address a disguise or cover up that does *not* involve tampering." Mot. for Release at 71. This Court's jurisprudence flatly contradicts his assertion. See Veal, 153 F.3d at 1254 (noting that the defendants' obstructionist conduct included their meeting together for the purpose of crafting a cover-up story); id. at 1245-46 (describing § 1512(b)(3) as a "broad" statute).

Rather than being outside the scope of § 1512(b)(3), defendant's conduct in this case is closely akin to the cover-up activities for which the defendants in Veal, 153 F.3d1233, and Ronda, 455 F.3d 1273, were convicted. In this case, defendant, manufactured "conduits to create false and misleading evidence" about his criminal

10

activities. Veal, 153 F.3d at 1247. That is, defendant acted to create witnesses (e.g., Bailey and Bailey's counsel), and documentary evidence (e.g., a check for $2,973.95 and a bill of sale) as "part of a cover-up and [used] unwitting third parties or entities to deflect the efforts of law enforcement agents in discovering the truth." Id.

Defendant engaged in misleading conduct in a number of ways through the October 16, 2001, transaction. For example, he knowingly made a false statement by having Bailey write the check to him for "balance due on m/c" when, in truth and fact, Bailey was not purchasing an interest in defendant's motorcycle; he knowingly invited reliance on this check and the bill of sale with an intent to mislead; and he knowingly used the motorcycle purchase scheme to throw investigators off the trail of his public corruption offenses, including his unlawful dealings with Young. See 18 U.S.C. § 1515(a)(3) (defining "misleading conduct"); Ronda, 455 F.3d at 1290 (noting that the "fabrication of evidence to mislead federal investigators violates § 1512(b)(3)"). Defendant engaged in this misleading conduct toward Bailey and Bailey's counsel, who was present on October 16, 2001, when defendant caused Bailey to give him the check, and was falsely told by defendant and Bailey that this transaction was part of a legitimate transfer of defendant's motorcycle.

In addition, defendant was Bailey's supervisor and Bailey testified that he was executing defendant's commands by engaging in the October 16, 2001 transaction.

11

By instructing Bailey to participate in the cover-up story, defendant knowingly corruptly persuaded him with the intent to hinder, delay, or prevent the communication to a law enforcement officer of information relating to the commission or possible commission of a federal offense. Defendant knew the wrongfulness of his actions and was motivated by an improper purpose in planning and executing the October 16, 2001 transaction. See Shotts, 145 F.3d at 1301 (defining "corruptly persuades" to mean "motivated by an improper purpose"). Defendant participated in the October 16, 2001, transaction knowing that the FBI was investigating his relationship with Young and sought to cover-up his receipt of the $9,200 payment from Young on January 20, 2000.

Defendant's argument that he cannot be guilty of violating § 1512(b)(3) because he did not tamper with a witness is both factually and legally incorrect. Mot. for Release at 71. First, Bailey was a trial witness and testified that he initially lied to investigators about the purpose of the October 16, 2001 transaction to thwart the investigation and protect himself and defendant from criminal liability. Defendant, therefore, did tamper with a witness during the investigation into his criminal conduct. Second, this Court has held that § 1512(b)(3) covers misleading conduct toward "*any* person, regardless of whether he possessed knowledge of the commission or possible commission of a federal crime." Veal, 153 F.3d at 1245.

12

Bailey testified that neither he nor defendant informed Bailey's counsel that the October 16, 2001 transaction was a sham designed to cover up defendant's pay-for-play scheme with Young. The jury was, therefore, free to find that defendant had engaged in misleading conduct toward Bailey's counsel.

Simply stated, defendant cannot claim that his conduct falls outside the purview of § 1512(b)(3). Defendant's transaction of October 16, 2001, is well within the "broad language of § 1512(b)(3)," Veal, 153 F.3d at 1246, because on that date there was "the *possible* existence of a federal crime and [] defendant's intention to thwart an inquiry into that crime," id. at 1250. Defendant, therefore, has not raised a substantial question as to his conviction on Count 17.

## II.    Defendant Has Not Presented A Substantial Question With Regard To His Convictions For Bribery And Honest Services Fraud.

### A.    The Jury Instructions Do Not Present A Substantial Question.

Setting aside defendant's hollow charges of prosecutorial overreaching and a government assault on First Amendment values, see, e.g., Mot. for Release at 9-10, his primary argument as to Counts 3 and Counts 6-9 is that the district court erred by not instructing the jury that, in order to convict him of bribery (18 U.S.C. § 666) or honest services mail fraud (18 U.S.C. §§ 1341, 1346), it had to find the existence of an *explicit* quid pro quo between himself and defendant Scrushy. Mot. for Release at 27-28, 38-52, 54-56. This Court applies "a deferential standard of review to a trial

13

court's jury instructions," reversing only if the Court is left with a "substantial and eradicable doubt" as to whether the instructions properly guided the jury in its deliberations.  United States v. Puche, 350 F.3d 1137, 1148 (11th Cir. 2003). Defendant cannot carry his burden of establishing that the jury instructions present a close issue such as to constitute a substantial question under the Bail Reform Act.

      1. Section 666 Bribery Does Not Require An Explicit Quid Pro Quo.

Defendant's argument that the court erred by not instructing the jury on an explicit quid pro quo requirement on the bribery count is based on McCormick v. United States, 500 U.S. 257 (1991).  In that case, a state legislator was prosecuted for extortion under the Hobbs Act based on the legislator's acceptance of a campaign contribution in exchange for support on legislation.  The Supreme Court held that "[t]he receipt of such contributions is * * * vulnerable under the Act as having been taken under color of official right, [see 18 U.S.C. § 1951(b)(2),] but only if the payments are made *in return for an explicit promise or undertaking* by the official to perform or not perform an official act." 500 U.S. at 273 (emphasis added).  The Court was concerned that "[t]o hold otherwise would open to prosecution not only conduct that has long been thought to be well within the law but also conduct that in a very real sense is unavoidable so long as election campaigns are financed by private

14

contributions or expenditures, as they have been from the beginning of the Nation." Id. at 272.[6]

Unlike McCormick, the contributions underlying defendant's bribery convictions were purported contributions to a state lottery campaign, not to his political campaign. In any event, there is no warrant for applying McCormick's explicit quid pro quo requirement to a bribery prosecution under 18 U.S.C. § 666. McCormick construed the "under color of official right" language in the Hobbs Act. See 18 U.S.C. § 1951(b)(2) (defining extortion as "the obtaining of property of another, with his consent, * * * under color of official right"). No such language appears in the bribery statute, which contains its own requirements that the public official act corruptly and with intent to be influenced or rewarded "in connection with" any business or transactions of the State government.[7] Moreover, "[a]n act is

---

[6] In Evans v. United States, 504 U.S. 255 (1992), the Court rejected the argument that a public official must actively induce the offering of a benefit to commit extortion, holding that "the Government need only show that a public official has obtained a payment to which he was not entitled, *knowing* that the payment was made in return for official acts." Id. at 258-259, 268 (emphasis added).

[7] See 18 U.S.C. 666(a)(1)(B) (making it a crime for a public official to "*corruptly* solicit[] or demand[] for the benefit of any person, or accept[] or agree[] to accept, anything of value from any person, *intending to be influenced or rewarded in connection with* any business, transaction, or series of transaction of such [State government] involving any thing of value of $5,000 or more") (emphasis added).

15

done 'corruptly' if it is performed voluntarily, deliberately and dishonestly for the purpose of *either* accomplishing an unlawful end or result *or* of accomplishing some otherwise lawful end or lawful result by any unlawful method or means." 11th Cir. Criminal Instruction 24 (2003); see also Arthur Anderson v. United States, 544 U.S. 696, 705 (2005) (finding that "'corrupt' and 'corruptly' are normally associated with wrongful, immoral, depraved, or evil"). The scienter requirements of § 666, therefore, prevent the federal bribery statute from reaching innocent conduct, and effectively mitigate the concerns expressed in McCormick over criminalizing legitimate campaign contributions. There is no need to engraft an explicit quid pro quo requirement onto § 666.

The Seventh Circuit has specifically rejected the argument that the absence of a quid pro quo prevents conviction under § 666. See United States v. Gee, 432 F.3d 713, 714 (7th Cir. 2005) (Easterbrook, J.) ("A *quid pro quo* of money for a specific legislative act is *sufficient* to violate the statute, but it is not *necessary*."); United States v. Agostino, 132 F.3d 1183, 1190 (7th Cir. 1997) ("declin[ing] to import an additional specific *quid pro quo* requirement into the elements of § 666(a)(2)"). Moreover, this Court has never held that bribery requires proof of an explicit quid pro quo. In United States v. Paradies, 98 F.3d 1266 (11th Cir. 1996), the Court assumed *arguendo* that § 666 requires a quid pro quo in finding evidence that the defendant

16

had accepted payments for his votes and influence on City Council was sufficient to establish a quid pro quo. Id. at 1289. But the Court went on to hold that the district court's failure to give a quid pro quo instruction to the jury on the § 666 count was not plain error. Id. And, in United States v. Castro, 89 F.3d 1443, 1454 (11th Cir. 1996), the Court rejected an argument by the defendants, who had been convicted under § 666 of bribing a state court judge to appoint them to be special assistant public defenders ("SAPDs"), that "the government had to show a direct *quid pro quo* relationship between them and an agent of the agency receiving federal funds," *i.e.*, the county finance office that would issue them compensation checks for serving as SAPDs. Id. at 1454. The Court reasoned that such a "narrow reading of the bribery statute would belie the statute's purpose 'to protect the integrity of the vast sums of money distributed through federal programs from theft, fraud, and undue influence by bribery.'" Id. (quoting S. Rep. No. 225, 98th Cong., 2d Sess. 369-370 (1984), reprinted in 1984 U.S.C.C.A.N. 3182, 3510-11). The same logic applies here – to require an explicit quid pro quo under § 666, which already requires that the public official act corruptly and with intent to be influenced or rewarded in connection with business and transactions of State government, would unduly narrow, and belie the central purpose of, that statute.

17

Defendant does not cite a single case holding that a bribery prosecution under § 666 – whether or not involving campaign contributions – requires an explicit quid pro quo. To mask that deficiency, he refers and cites repeatedly to Hobbs Act cases and "bribery-type" cases, see, e.g., Mot. for Release at 8, 40-42, but those cases do not arise under § 666. See United States v. Davis, 30 F.3d 108, 109 (11th Cir. 1994) (applying explicit quid pro quo requirement to Hobbs Act offense); United States v. Martinez, 14 F.3d 543, 553 & n.5 (11th Cir. 1994) (applying quid pro quo requirement to non-campaign contribution, Hobbs Act extortion and to Florida law that is essentially identical to Hobbs Act); United States v. Allen, 10 F.3d 405, 411-12 (7th Cir. 1993) (discussing in dictum whether McCormick applied to Indiana bribery statute, and holding that defendant suffered no harm from district court's refusal to give McCormick instruction because defendant not convicted of bribery or RICO charge). Defendant also relies generally on Supreme Court cases other than McCormick, none of which construe § 666. See, e.g., FEC v. Wisconsin Right to Life, 127 S. Ct. 2652, 2658-59 (2007) (ruling on challenge to Section 203 of the Bipartisan Campaign Reform Act, 2 U.S.C. § 441b(b)(2)); United States v. Sun-Diamond Growers of California, 526 U.S. 398, 400, 404-06 (1999) (interpreting and applying illegal gratuities statute, 18 U.S.C. § 201(c)(1)(A)). Defendant, of course, is free to argue on appeal that this Court should extend McCormick's requirements

18

to the bribery statute based on those precedents. But for purposes of his bail motion, the absence of authority requiring an explicit quid pro quo under the bribery statute, the decisions of this Court and the Seventh Circuit under § 666, and the different statutory terms used in § 666 and § 1951 fatally undermine his contention that the jury instruction on the bribery count presents a substantial question likely to result in a new trial or reversal of his conviction.

2. In Any Event, The Jury Received A Quid Pro Quo Instruction.

In any event, assuming *arguendo* that the district court erred in not instructing the jury that bribery required an *explicit* quid pro quo, that error was harmless. The failure to give a requested instruction is reversible error only if, *inter alia*, "'its subject matter was not substantially covered by other instructions.'" United States v. Dean, 487 F.3d 840, 847 (11th Cir. 2007) (quoting Paradies, 98 F.3d at 1286). Here, the district court not only instructed the jury on the bribery count against defendant in accordance with this circuit's pattern § 666 instruction, but also instructed the jury that "[a] Defendant does not commit a crime by giving something of value to a government official unless the Defendant and official *agree* that the official will take *specific action* in exchange for the thing of value." Revised Jury Charge at 41 (attached hereto) (emphasis added). Thus, even if defendant's proffered instruction on an explicit quid pro quo requirement was a correct statement of the

19

law, it was "substantially covered" by the district court's instruction because the jury had to find the existence of an agreement covering specific action between defendants Siegelman and Scrushy.

### 3. Honest Services Mail Fraud Does Not Require An Explicit Quid Pro Quo.

Defendant's claim (Mot. for Release at 43-52) that the district court erred by not instructing the jury that a conviction for honest services mail fraud (Counts 6-9) requires proof of an express quid pro quo suffers from the same deficiencies as his claim under the bribery statute. Critically, defendant ignores the differences in the text of the Hobbs Act and the honest services mail fraud statute. Nowhere in §§ 1341 and 1346 does the "under color of official right" language construed by the Supreme Court in McCormick appear. To establish honest services mail fraud, the government must prove that the defendants devised a "scheme or artifice to defraud" – defined broadly to include a "scheme or artifice to deprive another of the intangible right of honest services" – and used the mails in furtherance thereof. See United States v. Hasner, 340 F.3d 1261, 1269-71 (11th Cir. 2003); United States v. Lopez-Lukis, 102 F.3d 1164, 1168 (11th Cir. 1997).

In accordance with those statutory elements and Eleventh Circuit Criminal Instruction 50.2 (2003), the district court here instructed the jury that it was required to find beyond a reasonable doubt: (1) "[t]hat the Defendant knowingly devised or

participated in a scheme to fraudulently deprive the public of the intangible right of honest services, as charged"; (2) "[t]hat the Defendant did so willfully with an intent to defraud"; and (3) that he used the mails "for the purpose of executing the scheme to defraud." Revised Charge at 26-27 (attached hereto). After expanding on that instruction, the court went on to state: "You are further instructed as to the honest services mail and wire fraud counts that you must find *not only* that the Defendants intended to deprive the public of their honest services *but also* that they intended to deceive the public *and* that they intended to alter their official actions as a result of the receipt of campaign contributions or other benefits." Id. at 28. As with the bribery statute, the scienter requirements for proving honest services mail fraud – including that the defendant intend both to defraud the public of their right to honest services and to deceive the public – mitigate the concerns expressed in McCormick over criminalizing legitimate campaign conduct, and obviated any need to engraft an explicit quid pro quo requirement onto §§ 1341 and 1346.

Defendant's bail motion misconstrues the scope of § 1346 by equating honest services mail fraud exclusively with bribery. See, e.g., Mot. for Release at 43-45. This Court has held that honest services fraud is not so limited:

> The crux of this [honest services fraud] theory is that when a political official uses his office for personal gain, he deprives his constituents of their right to have him perform his official duties in their best interest. Elected officials generally owe a fiduciary duty to the electorate. When

21

a government officer decides how to proceed in an official endeavor –
as when a legislator decides how to vote on an issue – his constituents
have a right to have their best interests form the basis of that decision.
If the official instead secretly makes his decision based on his own
personal interests – as when an official accepts a bribe or personally
benefits from an undisclosed conflict of interest – the official has
defrauded the public of his honest services.

Lopez-Lukis, 102 F.3d at 1169. Thus, while bribery may be a common example of

honest services fraud, see United States v. deVegter, 198 F.3d 1324, 1327-28 (11th

Cir. 1999), it is not the only example. See also United States v. Waymer, 55 F.3d

564, 571 (11th Cir. 1995) ("A defendant's breach of a fiduciary duty may be a

predicate for a violation of the mail fraud statute where the breach entails the

violation of a duty to disclose material information.").

This Court has approved the theory of honest services fraud charged in this

case. Contrary to defendant's claim (Mot. for Release at 52), the indictment did not

charge defendants with "specific quid pro quo bribery-type honest services" fraud.

Rather, Counts 6-9 charged defendant with devising a scheme and artifice to defraud

the State of Alabama of his "honest and faithful services * * * as Governor * * *

performed free from deceit, favoritism, bias, self-enrichment, self-dealing, and

conflict of interest * * *." Mot. for Release, Ex. 14, at 34.[8] The purpose of the

---

[8] In this regard, defendant's constructive amendment claim (Def. Mot. for
Release at 52-54) lacks merit. Nowhere do Counts 6-9 use the terms "quid pro
quo" or language connoting a quid pro quo. "A constructive amendment occurs
when the essential elements of the offense as alleged in the indictment are altered

22

charged scheme was to "give HealthSouth official membership on, representation at, and influence over the CON Board by means of hidden payments and financial relationships, and to conceal these activities." Id. In Hasner, the Court found sufficient evidence to support an honest services mail fraud conviction where the public official took official action without disclosing his financial agreement with a co-schemer to receive a referral fee related to the taking of that official action, and where the official and his co-schemer took steps to conceal their financial relationship. 340 F.3d at 1270-73. To be sure, Hasner did not involve a campaign contribution, but the payments in this case were not veritable campaign contributions either: defendant's Scrushy's payment of two $250,000 checks to the state lottery campaign benefitted defendant Siegelman financially because Siegelman used the $500,000 to pay down campaign debt, for which he was personally liable as a

---

to broaden the potential bases for conviction beyond what the indictment contains." United States v. Tampas, __ F.3d __, 2007 WL 2126807, * 7 (11th Cir. July 26, 2007). The essential elements of the offense charged in Counts 6-9 were that defendants Siegelman and Scrushy knowingly and willfully devised or participated in a scheme to defraud the state of Alabama of its right to honest services, and used the mails in furtherance of that scheme. Mot. for Release, Ex. 14 at 34-36. The district court's instructions tracked those essential elements. Revised Charge at 26-27. Moreover, the court went on to instruct the jury that the scheme to defraud had to be "substantially the same as the one alleged in the indictment." Id. at 29. Defendant's constructive amendment claim does not present a substantial question.

23

guarantor. In light of the similarities between Hasner and the scheme charged in this case, there was no need for a quid pro quo instruction.

Further, the First Circuit has held that § 1346 does not require a connection between payments to a public official and official acts. In United States v. Sawyer, 239 F.3d 31 (1st Cir. 2001) (Sawyer II), the defendant, a lobbyist convicted of honest services mail fraud in connection with a pay-for-play scheme to influence legislators with gratuities, sought to have his conviction vacated based on the alleged lack of proof of a linkage between the illegal gratuities and specific acts. 239 F.3d at 34-35, 38-39. The First Circuit held that such a linkage was not required under §1346. Id. at 39. In doing so, the court noted Congress's expansive intent in enacting § 1346, and rejected an analogy between §§ 1346 and 18 U.S.C. § 201 – the narrow statute covering bribery and illegal gratuities interpreted by the Supreme Court in Sun-Diamond. Id. at 39-40 & n. 8. Quoting language from this Court's opinion in Lopez-Lukis, the First Circuit stated that "[t]heft of honest services occurs when a public official strays from [his] duty" of honesty and loyalty to the citizens by making a decision on an official endeavor based on his own personal interests. Id.; see also United States v. Sawyer, 85 F.3d 713, 730 (1st Cir. 1996) (Sawyer I) (noting that intent to commit honest services fraud may be proven "in a number of ways"; "while Sawyer may not have provided the legislators with direct kickbacks or commissions

24

arising out of the specific official action, he may have intended the legislators generally to treat preferentially Hancock's interests, knowing that the free meals, entertainment, and golf would continue so long as favorable official acts were, at some point, taken.").

Defendant cites no case from this or any other circuit requiring a specific quid pro quo instruction in a § 1346 prosecution. He seeks to rely (Mot. for Release at 48-50) on two district court cases to support his theory of honest services fraud, but even those cases are of no assistance to him. Contrary to his claim, the court in United States v. Warner, 2005 WL 2367769 (N.D. Ill. Sept. 23, 2005), did not hold that "the government must 'prove an explicit quid pro quo' for the 'honest services mail fraud' charges in 'the campaign contribution context.'" Mot. for Release at 48. The court simply held that non-campaign contribution violations have no quid pro quo element under § 1346. 2005 WL 2367769, at *5. United States v. White, 2004 WL 2612017 (E.D. Pa. Oct. 29, 2004), is equally inapposite. There, the government charged a quid pro quo theory of bribery in the honest services fraud count; the district court simply stated that if the government presented enough evidence of quid pro quo bribery at trial, it would instruct the jury accordingly. Id. at *5-6. As noted, here, the government did not charge quid pro quo bribery in the honest services mail fraud counts.

25

In short, the absence of precedent requiring an explicit quid pro quo to prove honest services mail fraud, and the differences in the statutory language of the Hobbs Act and §§ 1341 and 1346, preclude defendant from meeting his burden of showing that the jury instructions on Counts 6-9 present "a 'close' question or one that very well could be decided the other way." Giancola, 754 F.2d at 901.

> B.      The Sufficiency Of The Evidence On The Bribery And Mail Fraud
>         Counts Does Not Present A Substantial Question.

Defendant contends that the district court erred in denying his Rule 29 motions because (1) "the government offered no direct evidence of an . . . express agreement of a specific quid pro quo; and (2) the only circumstantial evidence offered by the government does not support beyond a reasonable doubt a logical inference of an express agreement, much less of a quid pro quo." Mot. for Release at 60. Of course, defendant's entire argument is premised on a misstatement of the law – i.e., that an express quid pro quo is required under § 666 or §§ 1341 and 1346. In any event, defendant cannot carry his burden of showing a substantial question because the evidence adduced at trial amply demonstrated an explicit quid pro quo.

Defendant erroneously argues that direct evidence of an express quid pro quo is necessary to affirm his convictions for bribery and honest services mail fraud. In United States v. Massey, 89 F.3d 1433 (11th Cir. 1996), this Court, in rejecting a sufficiency challenge for a conviction under § 666(a)(2), noted that the defendant

26

incorrectly assumed "that the government must produce direct evidence of a verbal or written agreement in order for this court to sustain the bribery conviction." <u>Id</u>. at 1439. The Court continued:

> Direct evidence of an agreement, however, is unnecessary: proof of such an agreement may rest upon inferences drawn from relevant and competent circumstantial evidence. To hold otherwise would allow defendants to escape liability with winks and nods, even when the evidence as a whole proves that there has been a meeting of the minds to exchange official action for money.

<u>Id</u>. (citations and quotations omitted). Moreover, in <u>United States v. Carpenter</u>, 961 F.2d 824, 827 (9th Cir. 1992), the court noted that, even under the strict quid pro quo review required for Hobbs Act cases involving true campaign contributions, the "understanding need not be verbally explicit." Thus, as <u>Massey</u> and <u>Carpenter</u> explain, the surrounding facts and circumstances can demonstrate a quid pro quo agreement.

Even assuming <u>arguendo</u> that defendant is correct about the need for proof of an express quid pro quo, the evidence at trial was overwhelming that defendant and defendant Scrushy had an express agreement, namely that defendant Scrushy would pay $500,000 to defendant and defendant would provide HealthSouth membership on, representation at, and influence over the CON Board. Not surprisingly, defendant fails to discuss this evidence.

27

Nick Bailey testified that he was defendant's confidential assistant and executive secretary during the time of the offenses. Bailey testified that defendant Scrushy had supported defendant's opponent during the 1998 gubernatorial election in the amount of $350,000, and that defendants Siegelman and Scrushy were not great friends. Bailey testified that after defendant was sworn in as governor, but before he had made any appointments to the CON Board, Bailey overheard a conversation between defendant and his long-time friend, Eric Hanson, who was also defendant Scrushy's outside corporate lobbyist. During this conversation, defendant told Hanson that defendant Scrushy had given $350,000 to defendant's opponent and that given that amount with interest, it would take $500,000 for defendant Scrushy to get right with him.

Bailey further testified that he subsequently became aware of one and possibly two meetings between Siegelman and Scrushy. On or about July 19, 1999, he saw defendant in the governor's office holding a check in the amount of $250,000 drawn on the account of Integrated Health Services (IHS), a Maryland corporation. Referring to the IHS check and to Scrushy, defendant told Bailey "he's halfway there." Bailey then asked "what in the world is he going to want for that." Defendant responded "the CON Board." Bailey said "that won't be a problem, will it" and defendant replied "I wouldn't think so." On July 26, 1999, defendant appointed

28

defendant Scrushy to the CON Board. Defendant Scrushy remained on the Board until on or about January 17, 2001, when he resigned. The day after defendant Scrushy's resignation, defendant appointed Thom Carmen, then-Vice President for Corporate Development at HealthSouth, to replace him on the Board.

Prior to the first meeting of the CON Board in or about August 1999, defendant had Bailey call the chairperson of the CON Board and inform her that defendant wanted defendant Scrushy named vice-chair of the Board. Though the chairperson had already decided to nominate another Board member for that position, she ensured that defendant Scrushy was elected vice-chair at the first Board meeting pursuant to defendant's instructions. Bailey also testified that he talked to defendant about his reasons for appointing defendant Scrushy to, and making him vice-chair of, the CON Board and that defendant stated the basis for these officials actions by him were the conversations he and Bailey had with Hanson during which Hanson told them what defendant Scrushy wanted in exchange for the $500,000 payment to defendant.

Mike Martin corroborated Bailey's testimony about the agreement between defendants (*i.e.*, that defendant Scrushy pay $500,000 to defendant and in return defendant would give HealthSouth membership on, representation at, and influence over the CON Board). Martin testified that he was the Chief Financial Officer of HealthSouth and that defendant Scrushy involved him in obtaining the money from

29

IHS that was to be paid to defendant. Defendant Scrushy told Martin that obtaining the money from IHS was time sensitive and that he (Scrushy) needed to hand deliver the check to defendant immediately upon receiving it. Martin further testified that defendant Scrushy told him to ensure that his (defendant Scrushy's) fingerprints were not on the check, and that it was his understanding that defendant Scrushy personally delivered the IHS check to defendant. Martin also testified that Hanson later bragged that he was able to get HealthSouth representation on the CON Board via the IHS check. Martin stated flatly that based on his conversations with defendant Scrushy and Hanson he knew that the IHS check given by defendant Scrushy to defendant was in exchange for HealthSouth having a spot on the CON Board. Martin testified that defendant Scrushy told him that if they got the money to give to defendant, then defendant had assured them a seat on the CON Board.

Lori Skelton was the HealthSouth lawyer who had responsibility for CON Board matters and also was the key person for managing political contributions by HealthSouth. Skelton testified that defendant Scrushy never informed her about either $250,000 payment that he made to defendant. Skelton also testified that having representation on the CON Board was important to HealthSouth because of the effect the CON Board had on healthcare providers in the State of Alabama.[9]

_____

[9] In his bail motion, like at trial, defendant bases his insufficiency argument on the premise that the HealthSouth flight logs ostensibly establish that June 29,

30

The evidence at trial clearly established the agreement between defendants for HealthSouth to have membership on, representation at, and influence over the CON Board in exchange for defendant Scrushy's payment of money to defendant. Without question, defendant Scrushy was responsible for the circuitous, somewhat bizarre, extortionate, and completely nefarious, manner in which the $250,000 IHS check was generated and for the second non-disclosed installment of $250,000 from HealthSouth. The IHS check was delivered from defendant Scrushy to defendant as they agreed, and within days of such delivery defendant appointed defendant Scrushy to the CON Board. Testimony at trial showed that defendant went to extraordinary efforts to hide from the public his receipt of the IHS and HealthSouth checks by violating Alabama's Fair Campaign Practices Act. Defendant never reported his receipt of the monies he received from defendant Scrushy until contacted by the Alabama Attorney General's Office more than two years after such reports were required by law. Defendant further showed his criminal intent and guilt by lying to

---

1999, was the only day on which defendant Scrushy could have delivered the IHS check to him. Though he clings to his theory of the case, the jury could have easily, and did, reject defendant's version of the facts. The jury could have reasonably found that defendant Scrushy met with defendant on more than one occasion, and/or that defendant Scrushy did not fly on the HealthSouth helicopter when Bailey saw defendant Scrushy at the governor's office, and/or that Bailey saw defendant Scrushy at the governor's office earlier than the date of the delivery of the IHS check and that a person other than defendant Scrushy delivered the IHS check between July 19, 1999, the date of the IHS check, and June 26, 1999, the date defendant appointed defendant Scrushy to the CON Board.

Cline, his legitimate fundraising chairman, when he told Cline that he was going to

return the IHS check to its issuer and not use it; in fact, defendant took the IHS check

and deposited it in a secret bank account in another city before ultimately using it to

pay off a loan for which he was personally liable as a guarantor. Defendant's efforts

to conceal and disguise the payment of $500,000 from defendant Scrushy are

compelling evidence of criminal intent.

Even this abbreviated rendition of the trial testimony shows that the evidence

was more than sufficient to convict defendant of bribery and honest services mail

fraud. Though not required under § 666 or § 1346, the proof adduced at trial

established beyond a reasonable doubt that defendant and defendant Scrushy had an

express agreement whereby defendant would give HealthSouth membership on,

representation at, and influence over the CON Board in exchange for $500,000 from

defendant Scrushy. Therefore, defendant's challenges to the district court's denial

of his Rule 29 motions do not raise a substantial question likely to result in reversal

or an order for a new trial.

C.    The Doctrine of Strictissimi Juris Does Not Present A Substantial
       Question.

Invoking the doctrine of *strictissimi juris*, defendant contends (Mot. for

Release at 30-35) that, because this case purportedly targeted underlying political

activity, he was entitled to special procedures during his trial, such as having the

32

court act as a "13th juror," requiring that the testimony of one conspirator against another be corroborated by independent evidence, and requiring the prosecution to "negate alternative hypotheses" insofar as it relied on circumstantial evidence of guilt. But defendant himself concedes that the procedures he advocates do not reflect the state of the law. See Mot. for Release at 31 (characterizing 13th juror argument "as a matter of first impression"); id. at 32 (explaining why Court *ought to* adopt independent corroboration rule for co-conspirator testimony); id. at 33 (recognizing that negating-alternative-hypotheses requirement "is not the rule today"). Moreover, the purported basis for applying these procedures – *strictissimi juris* – is used "only under very special circumstances." United States v. Montour, 944 F.2d 1019, 1024 (2d Cir. 1991). Defendant does not cite any case applying that doctrine to a bribery prosecution. These factors alone should lead the Court to conclude that defendant has not presented a substantial question for purposes of his bail motion.

In any event, the doctrine of *strictissimi juris* is inapplicable to this case. Literally translated to mean "of the strictest right," the doctrine arose out of prosecutions based on group membership under the Smith Act, 18 U.S.C. § 2385. See United States v. Cerilli, 603 F.2d 415, 421 (3d Cir. 1979) (discussing background of doctrine); United States v. Dellinger, 472 F.2d 340, 392-93 (7th Cir. 1972) (same). It applies only "[w]hen the group activity out of which the alleged offense develops

33

can be described as a bifarious undertaking, involving both legal and illegal purposes and conduct, and is within the shadow of the first amendment." <u>Dellinger</u>, 472 F.2d at 392. In such circumstances, "a court must satisfy itself that there is sufficient direct or circumstantial evidence of the defendant's own advocacy of and participation in the illegal goals of the conspiracy and may not impute the illegal intent of alleged co-conspirators to the actions of the defendant." <u>Montour</u>, 944 F.2d at 1024; <u>accord</u> <u>Dellinger</u>, 472 F.2d at 392.

Defendant was not indicted for his membership in a particular group or political party. <u>See</u> <u>Cerilli</u>, 603 F.3d at 422 (rejecting application of *strictissimi juris* to Hobbs Act prosecution based on alleged political contributions, and noting that defendants "have not been indicted for membership in a political party nor have they been indicted for their personal political preferences"). Nor is there any question here of imputing the intent or acts of others to defendant to establish his participation in the crimes for which he was convicted. <u>See</u> <u>United States</u> v. <u>Sanders</u>, 211 F.3d 711, 723 (2d Cir. 2000) (rejecting application of *strictissimi juris* because, *inter alia*, there was no danger of imputing intent to defendant). To convict him of bribery (Count 3), the jury had to find that defendant Siegelman acted corruptly and with the intent to be influenced or rewarded in connection with business or a transaction of the State. <u>See</u> Revised Charge at 40-41 (attached hereto). To convict him of honest services

34

mail fraud (Counts 6-9), the jury had to find that defendant Siegelman knowingly

devised or participated in a scheme to defraud and that he acted willfully. See id. at

26-27 (attached hereto).  Likewise, there is no danger of imputing intent with respect

to the conspiracy charge (Count 5); the court's instructions required the jury to find

that defendant Siegelman knew of the unlawful purpose of the plan to defraud the

citizens of Alabama of their right to honest services, and that he willfully joined it.

See Revised Charge at 44-45 (attached hereto).  Because the jury convicted defendant

based on his own conduct and intent, not that of any group, there is no basis for

applying the doctrine of *strictissimi juris* in this case.[10]

> D.    The Statute Of Limitations On The Bribery Count Does Not Present A
>       Substantial Question.

Defendant's contention (Mot. for Release at 56-65) that the statute of

limitations bars his conviction for bribery is disingenuous.  Nowhere in his ten-page

argument does he advise this Court that he did not raise the statute-of-limitations

issue until *after* trial was concluded, and accordingly, that his claim is waived under

---

[10] Even if *strictissimi juris* were somehow applicable, it is easily satisfied
here.  The doctrine does not "requir[e] evidence of unlawful intent so compelling
that a verdict of not guilty would be perverse," and does not "wholly depriv[e] the
jury of its customary function in interpreting ambiguous statements in the light of
circumstances and choosing among reasonable inferences."  Dellinger, 472 F.2d at
393.  As discussed, see supra pp. 27-32, the evidence amply demonstrated
defendant's culpability on both the bribery and honest services counts and,
therefore, would survive *strictissimi juris* review.

35

controlling precedent. Defendant was certainly on notice of the waiver issue. In opposing his post-verdict, Rule 29 motion in the district court – the first place where defendant raised the statute of limitations issue – the government argued that defendant had waived his claim. See Doc. #459 at 18-20.

This Court has already held that "the statute of limitations is a matter of defense that must be asserted at trial by the defendant," and that the defendant's failure to do so results in a waiver of that defense. United States v. Najjar, 283 F.3d 1306, 1308 (11th Cir. 2002) (citing Capone v. Aderhold, 65 F.2d 130, 131 (5th Cir. 1933)); see also United States v. Ramirez, 324 F.3d 1225, 1227-28 (11th Cir. 2003) (holding that limitations defense, raised for first time in Rule 29 motion after opening statements, was effectively a challenge to sufficiency of the indictment that could and should have been raised in motion under Fed. R. Crim. P. 12). The Court in Najjar also noted that "every other circuit to have considered [the issue] has likewise concluded that the expiration of the statute of limitations does not divest a district court of subject matter jurisdiction, but rather constitutes an affirmative defense, which the defendant can waive." Id. at 1308-09 (citing cases).

In United States v. Arky, 938 F.2d 579 (5th Cir. 1991), the Fifth Circuit declined to consider the merits of the defendant's claim that the evidence was insufficient to prove that an overt act in furtherance of the conspiracy had taken place

36

within the limitations period, finding that defendant had waived that defense by not affirmatively asserting it at trial. Id. at 581-82. Explaining the basis for its holding, the court stated that "[l]ogic as well as authority supports this position: if the limitations defense is not jurisdictional, as we [previously] held * * *, then it is difficult to conceive why it alone, of all the defendant's affirmative defenses, should not be waived if not asserted at trial." Id. at 582.

Because defendant did not assert a limitations defense at trial, he has waived that claim and cannot now argue that his waived claim presents a substantial question for purposes of his bail motion.[11]

## III.    Defendant Siegelman's Sentence Does Not Raise A Substantial Question.

Finally, defendant contends that a substantial question exists as to whether the district court violated the First Amendment by enhancing his "sentence for making out-of-court statements concerning his innocence and his belief that this prosecution stemmed from political motivation, and the White House and the Department of Justice directed it for illicit reasons." Mot. for Release at 35. That claim is factually and legally flawed.

---

[11] In United States v. Yashar, 166 F.3d 873 (7th Cir. 1999), the case on which defendant principally relies, the defendant properly raised the limitations defense in a pretrial motion to dismiss the indictment. Id. at 875.

37

Nevertheless, the Court need not even reach the merits of defendant's sentencing claim because, even if meritorious, it will not likely result in a "reduced sentence to a term of imprisonment less than the total of the time already served plus the expected duration of the appeal process." 18 U.S.C. § 3143(b)(1)(B)(iv). The district court initially calculated an advisory Guidelines range of 121 to 151 months imprisonment. The court then granted an upward departure equivalent to four offense levels pursuant to former U.S.S.G. § 2C1.1 cmt. 5, which produced an advisory Guidelines range of 188 to 235 months. The court, however, sentenced defendant well below that range to 88 months,    see Def. Mot. to Release, Ex. 2 at 2,   and defendant has only recently started serving that sentence. [12] Even if defendant is correct that the court erred in granting the upward departure, there is no reason to believe − assuming this Court would find such a sentencing error to be reversible − that the district court would resentence him to less than 88 months imprisonment, as the sentence imposed was substantially below the *pre-departure* range of 121-151 months. In any event, given his conviction on multiple counts, the district court almost certainly would not sentence him to as little as 24 months − an estimation of

---

[12] According to the Bureau of Prisons, defendant's expected release date is November 15, 2013.

the duration of the appeals process in this case.[13] Thus, because defendant cannot show that he is likely to win a reduction in his sentence "to a term of imprisonment less than the total of the time already served plus the expected duration of the appeal process," 18 U.S.C. § 3143(b)(1)(B)(iv), whether his sentencing claim presents a substantial question is irrelevant.

Regardless, defendant does not raise a substantial question. The Sentencing Guidelines provide for an upward departure where "the court finds that the defendant's conduct was part of a systematic or pervasive corruption of a governmental function, process, or office that may cause loss of public confidence in government." U.S.S.G. § 2C1.1, cmt. 7 (2006). Defendant focuses on his out-of-court statements protesting his purported innocence, but the government's motion for an upward departure focused exclusively on the pervasiveness of his corruption and the harmful effect of that conduct on the public's perception of and confidence in Alabama state government. See Doc. # 591. This Court has previously upheld a five-level upward departure on such grounds. See United States v. Shenberg, 89 F.3d 1461, 1476-77 (11th Cir. 1996). To be sure, here, the government argued at the sentencing hearing that such a departure was further warranted in light of defendant's

---

[13] Defendant attributes one third of his post-departure Guidelines range to the upward departure. Def. Mot. for Release at 36. Even if we assume that the court would resentence him to one third less than his original 88-month sentence, defendant would still face a sentence of almost 60 months.

39

unsubstantiated, public attacks on the integrity of the judicial process. And, in granting the upward departure, the district court stated that it was following <u>United States</u> v. <u>Gutnam</u>, 95 F. Supp. 2d 1337 (S.D. Fla. 2000), a case where the court departed upward because the defendant – a state legislator – had breached the public trust by, *inter alia*, engaging in a five-year effort to obstruct justice while in office and, once indicted, by proclaiming his innocence and blaming the government for false charges. <u>Id.</u> at 1350-52. We do not concede that the district court committed error by taking into account defendant's statements publicly attacking this prosecution. <u>See</u>, <u>e.g.</u>, <u>United States</u> v. <u>Campbell</u>, 491 F.3d 1306 (11th Cir. 2007) (holding 30-month sentence on tax charges was substantively reasonable in part because defendant, former Atlanta mayor, "fail[ed] or refus[ed] to seriously acknowledge his wrongdoing or the potential consequences arising therefrom, not only to himself but also to the people of the City of Atlanta"). But the fact that the pervasiveness of defendant's corruption was alone a sufficient basis for the departure (a basis not attacked by defendant here), and the fact that defendant was sentenced to 100 months below his post-departure Guidelines range, show that he is unlikely to prevail on his claim of sentencing error.

40

# CONCLUSION

For the foregoing reasons, defendant's Motion for Release Pending Appeal

should be denied.

Respectfully submitted this 23rd day of August, 2007.

LOUIS V. FRANKLIN, SR.
Acting United States Attorney

J.B. PERRINE
STEPHEN P. FEAGA
Assistant United States Attorney
Middle District of Alabama
131 Clayton Street
Montgomery, AL 36104
Phone: 334-223-7280
Fax:  334-223-7135

JOSEPH L. FITZPATRICK, JR.
Special Assistant U.S. Attorney
Assistant Attorney General
Office of the Attorney General
11 S. Union
Montgomery, AL 36130
Phone: (334)353-4839
Fax:    (334)242-4890

WILLIAM M. WELCH, II
Chief, Public Integrity Section

RICHARD C. PILGER
Trial Attorney
Department of Justice
Criminal Division
Public Integrity Section
950 Constitution Ave, NW
Bond Building - 12th Floor
Washington, DC 20530
Phone: (202)514-1412
Fax:    (202)514-3003


JOHN-ALEX ROMANO
Attorney, Appellate Section
Criminal Division
Department of Justice
950 Pennsylvania Ave, NW
Room 1264
Washington, DC 20530
Phone: (202) 353-0249
Fax: (202) 305-2121
John-Alex.Romano@usdoj.gov

41

IN THE
UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT

UNITED STATES OF AMERICA,   )
   )
   )
        vs.   )       APPEAL NO. 07-13163-B
   )
DON EUGENE SIEGELMAN   )

**CERTIFICATE OF SERVICE**

I hereby certify that on  August 23, 2007, I caused a copy of the foregoing Motion
to be sent via express mail, overnight delivery, to the following counsel for
Defendant Siegelman:

Hiram Chester Eastland, Jr.          G. Robert Blakey
Eastland Law Offices, P.L.L.C.     Notre Dame Law School
107 Grand Blvd.                   Kresge Law Library
Greenwood, MS 38930-3562       326 Law School
(Tel.) 662-453-1227             Notre Dame, IN 46556
                               (Tel.) 574-631-5717

Vincent F. Kilborn
David A. McDonald
Kilborn, Roebuck & McDonald
1810 Old Government Street
Mobile, AL 36660
(Tel.) 251-479-9010

JOHN-ALEX ROMANO

# ATTACHMENT

Excerpts, <u>Revised Jury Charge</u>, Doc. # 450, pp. 1, 26-29, 40-41,43-46

**REVISED VERSION**

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

UNITED STATES OF AMERICA )
)
v. ) Case No. 2:05-cr-119-MEF
)
DON EUGENE SIEGELMAN )
PAUL MICHAEL HAMRICK )
GARY MACK ROBERTS )
RICHARD M. SCRUSHY )

Members of the Jury:

It is now my duty to instruct you on the rules of law that you must follow

and apply in deciding this case.  When I have finished the attorneys will

present their closing arguments, then you will go to the jury room and begin

your discussions - - what we call your deliberations.

It will be your duty to decide whether the Government has proved

beyond a reasonable doubt the specific facts necessary to find each

Defendant guilty of the crimes charged in the indictment.

### Duty to Follow Instructions Presumption of Innocence (When Any Defendant Does Not Testify)

You must make your decision only on the basis of the testimony and

other evidence presented here during the trial; and you must not be

influenced in any way by either sympathy or prejudice for or against the

legislators and judges and any person or agency participating as an adviser, consultant or otherwise in performing a governmental function.

### Mail Fraud
### Depriving Another Of Intangible Right
### Of Honest Services
### 18 USC §§ 1341 and 1346

Racketeering Acts 1(c)-(d) and 5(ee)-(kk) charge Governor Siegelman with honest services mail fraud in violation of 18 U.S.C. §§ 1341 and 1346. Counts Six through Nine charge Defendants Governor Siegelman and Scrushy with the same offense. Racketeering Acts 2(c)-(g) and Counts Ten through Twelve charge Defendants Governor Siegelman and Hamrick with the same offense. Counts Eighteen through Thirty-Three charge Defendants Governor Siegelman and Roberts with the same offense.

Title 18, United States Code, Sections 1341 and 1346, make it a Federal crime or offense for anyone to use the United States mails or transmit something by private or commercial interstate carrier in carrying out a scheme to fraudulently deprive another of an intangible right of honest services.

The Defendant can be found guilty of that offense only if all of the following facts are proved beyond a reasonable doubt:

First:    That the Defendant knowingly devised or participated in a scheme to fraudulently deprive the public of the intangible right of

26

honest services, as charged;

Second:    That the Defendant did so willfully with an intent to defraud; and

Third:    That the Defendant used the United States Postal Service by mailing or by causing to be mailed or a private or commercial interstate carrier by depositing or causing to be deposited with such carrier some matter or thing for the purpose of executing the scheme to defraud.

A "private or commercial interstate carrier" includes any business engaged in the transmission, transportation or delivery of messages or other articles in interstate commerce, that is, from any place in one state to any place in another state. If a message or other article is deposited with such a carrier it need not be proved that the message or article thereafter moved in interstate commerce from one state to another.

The word "scheme" includes any plan or course of action intended to deceive or cheat someone; and to act with "intent to defraud" means to act knowingly and with the specific intent to deceive someone, ordinarily for the purpose of causing some financial loss to another or bringing about some financial gain to one's self.

To "deprive another of the intangible right of honest services" means to

27

violate, or to cause a public official or employee to violate, the official's or employee's duty to provide honest services to the employer.

Public officials and public employees inherently owe a duty to the public to act in the public's best interest. If, instead, the official or employee acts or makes his decision based on the official's own personal interests - - such as accepting a bribe or receiving personal benefit from an undisclosed conflict of interest - - the official has defrauded the public of the official's honest services even though the public agency involved may not suffer any monetary loss in the transaction.

You are further instructed as to the honest services mail and wire fraud counts that you must find <u>not only</u> that the Defendants intended to deprive the public of their honest services <u>but also</u> that they intended to deceive the public <u>and</u> that they intended to alter their official actions as a result of the receipt of campaign contributions or other benefits.

Moreover, payments for entertainment, lodging, sports events, and the like would not constitute violations of the honest services mail and wire fraud statutes if the intent of the Defendants were simply to cultivate a business or political friendship.

It is not necessary that the Government prove all of the details alleged

in the indictment concerning the precise nature and purpose of the scheme; or that the material mailed or deposited with an interstate carrier was itself false or fraudulent; or that the alleged scheme actually succeeded in defrauding anyone; or that the use of the mail or the interstate carrier was intended as the specific or exclusive means of accomplishing the alleged fraud; or that the Defendant did the actual mailing or depositing.

What must be proved beyond a reasonable doubt is that the Defendant, with the specific intent to defraud, knowingly devised, intended to devise, or participated in, a scheme to defraud substantially the same as the one alleged in the indictment; and that the use of the United States mail or the interstate carrier was closely related to the scheme because the Defendant either mailed or deposited something or caused it to be mailed or deposited in an attempt to execute or carry out the scheme.

To "cause" the mails or an interstate carrier to be used is to do an act with knowledge that the use of the mails or an interstate carrier will follow in the ordinary course of business or where such use can reasonably be foreseen.

Each separate use of the mails or an interstate carrier in furtherance of a scheme to defraud constitutes a separate offense.

29

**Bribery Concerning Program Receiving Federal Funds**
**18 USC § 666(a)(1)(B)**

Count Three charges Governor Siegelman with Federal Funds Bribery in violation of 18 U.S.C. § 666(a)(1)(B).

Title 18 of the United States Code, Section 666, makes it a Federal crime or offense for anyone who is an agent of an organization, local government or local governmental agency receiving significant benefits under a Federal assistance program, corruptly to accept (or agree to accept) anything of value from any person intending to be influenced or rewarded in connection with certain transactions of such organization, government or agency.

Governor Siegelman can be found guilty of that offense only if all of the following facts are proved beyond a reasonable doubt:

First:         That Governor Siegelman was an agent
               of the State of Alabama, as charged.

Second:        That during a one year period the State of
               Alabama received benefits in excess of
               $10,000 under a Federal program
               involving some form of Federal
               assistance;

Third:         That during such one year period
               Governor Siegelman knowingly accepted
               or agreed to accept a thing of value, that
               is, approximately $500,000 from

40

Defendant Scrushy, as charged;

Fourth:     That by such acceptance or agreement Governor Siegelman intended to be rewarded in connection with a transaction or series of transactions of the State of Alabama, which transaction or series of transactions involved something of value of $5,000 or more; and

Fifth:     That in so doing the Governor Siegelman acted corruptly.

An act is done "corruptly" if it is performed voluntarily, deliberately and dishonestly for the purpose of either accomplishing an unlawful end or result or of accomplishing some otherwise lawful end or lawful result by any unlawful method or means. A Defendant does not commit a crime by giving something of value to a government official unless the Defendant and official agree that the official will take specific action in exchange for the thing of value.

The term "agent" as relevant to this case means any employee, officer or director of the State of Alabama.

## Theft or Bribery Concerning Programs Receiving Federal Funds
## 18 USC § 666(a)(2)

Count Four charges Defendant Scrushy with Federal Funds Bribery in violation of 18 U.S.C. § 666(a)(2).

Title 18 of the United States Code, Section 666, makes it a Federal

41

Alabama, which business, transaction involved something of value of $5,000 or more, that is, Defendant Scrushy's appointment to the CON Board; and

Fifth:    That in so doing Defendant Scrushy acted corruptly.

An act is done "corruptly" if it is performed voluntarily, deliberately and dishonestly for the purpose of either accomplishing an unlawful end or result or of accomplishing some otherwise lawful end or lawful result by any unlawful method or means. A Defendant does not commit a crime by giving something of value to a government official unless the Defendant and official agree that the official will take specific action in exchange for the thing of value.

The term "agent" as relevant to this case means any employee, officer or director of the State of Alabama.

## General Conspiracy Charge
## 18 USC §371

Count Five charges Defendants Governor Siegelman and Scrushy with conspiracy in violation of 18 U.S.C. § 371. The definition of conspiracy below pertains only to Count Five and not to the conspiracies charged in Count One and Racketeering Act 2(a).

Title 18, United States Code, Section 371, makes it a separate Federal crime or offense for anyone to conspire or agree with someone else to do

43

something which, if actually carried out, would amount to another Federal crime or offense. So, under this law, a "conspiracy" is an agreement or a kind of "partnership" in criminal purposes in which each member becomes the agent or partner of every other member.

In order to establish a conspiracy offense it is <u>not</u> necessary for the Government to prove that all of the people named in the indictment were members of the scheme; <u>or</u> that those who <u>were</u> members had entered into any formal type of agreement; <u>or</u> that the members had planned together <u>all</u> of the details of the scheme or the "overt acts" that the indictment charges would be carried out in an effort to commit the intended crime.

Also, because the essence of a conspiracy offense is the making of the agreement itself (followed by the commission of any overt act), it is not necessary for the Government to prove that the conspirators actually succeeded in accomplishing their unlawful plan.

What the evidence in the case <u>must</u> show beyond a reasonable doubt is:

First:    That two or more persons, in some way or manner, came to a mutual understanding to try to accomplish a common and unlawful plan, as charged in the indictment;

44

Second:    That the Defendant, knowing the unlawful purpose of the plan, willfully joined in it;

Third:    That one of the conspirators during the existence of the conspiracy knowingly committed at least one of the methods (or "overt acts") described in the indictment; and

Fourth:    That such "overt act" was knowingly committed at or about the time alleged in an effort to carry out or accomplish some object of the conspiracy.

An "overt act" is any transaction or event, even one which may be entirely innocent when considered alone, but which is knowingly committed by a conspirator in an effort to accomplish some object of the conspiracy.

A person may become a member of a conspiracy without knowing all of the details of the unlawful scheme, and without knowing who all of the other members are. So, if a Defendant has a general understanding of the unlawful purpose of the plan and knowingly and willfully joins in that plan on one occasion, that is sufficient to convict that Defendant for conspiracy even though the Defendant did not participate before, and even though the Defendant played only a minor part.

Of course, mere presence at the scene of a transaction or event, or the mere fact that certain persons may have associated with each other, and may

have assembled together and discussed common aims and interests, does not, standing alone, establish proof of a conspiracy. Also, a person who has no knowledge of a conspiracy, but who happens to act in a way which advances some purpose of one, does not thereby become a conspirator.

## Multiple Conspiracies
### (For Use With General Conspiracy Charge)
### 18 USC § 371
### 18 USC § 1962(d)

You are further instructed, with regard to the conspiracy offenses alleged in Counts One and Five, that proof of several separate conspiracies is not proof of the single, overall conspiracy charged in the indictment unless one of the several conspiracies which is proved is the single conspiracy which the indictment charges.

What you must do is determine whether the single conspiracy charged in the indictment existed between two or more conspirators. If you find that no such conspiracy existed, then you must acquit the Defendants of that charge. However, if you decide that such a conspiracy did exist, you must then determine who the members were; and, if you should find that a particular Defendant was a member of some other conspiracy, not the one charged in the indictment, then you must acquit that Defendant.

In other words, to find a Defendant guilty you must unanimously find that

46