IN THE UNITED STATES DISTRICT COURT FOR
THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| v. | ) | CASE NO. 2:05-cr-119 MEF |
| | ) | |
| DON EUGENE SIEGELMAN, | ) | (WO-Not Recommended for Publication) |
| | ) | |

## MEMORANDUM OPINION

This matter is before the Court on a limited remand from the United States Court of Appeals for the Eleventh Circuit. On October 4, 2007, this Court denied Defendant/Appellant Don Eugene Siegelman's ("Siegelman") Motion for Release Pending Appeal (Doc # 657) pursuant to 18 U.S.C. § 3143(b)(1) because Siegelman failed to identify a substantial question likely to result in reversal or a new trial. *See* Doc. # 661. On November 7, 2007, the Eleventh Circuit asked for a more detailed explanation of this Court's reasoning on this issue, which the Court provides in this Memorandum Opinion.

### PROCEDURAL HISTORY AND FACTS

**A.    The Original Indictment**

On May 17, 2005, a grand jury in the United States District Court for the Middle District of Alabama returned a three count indictment against Siegelman, the former Governor of the State of Alabama and Richard Scrushy ("Scrushy"), the former Chief Executive Officer of HealthSouth, Inc. ("HealthSouth"). This indictment alleged violations of 18 U.S.C. § 371 (Count One), 18 U.S.C. § 666(a)(1)(B) (Count Two), and 18 U.S.C. §666(a)(2) (Count Three). Siegelman was served with a copy of the Indictment along with

the Summons that issued in October of 2005.

The May 17, 2005 indictment alleged that from November of 1998 through May of 2000, Siegelman and Scrushy conspired and agreed to commit a violation of 18 U.S.C. § 666(a)(1)(B) in that they agreed that Siegelman would accept $500,000 from Scrushy to be influenced and rewarded in connection with official acts concerning the membership and business of the Alabama Certificate of Need Review Board (CON Board).[1]  (Doc. # 3-2 at ¶¶ 1-7).  The May 17, 2005 indictment further alleged that Siegelman and Scrushy conspired and agreed to commit a violation of 18 U.S.C. § 1956(a)(1)(B)(i) in that they agreed to conduct financial transactions involving the use of a financial institution which is engaged in, and the activities of which affect, interstate or foreign commerce, and which financial transactions involved the proceeds of specified unlawful activity, that is bribery concerning programs receiving Federal funds in violation of 18 U.S.C. § 666(a).  *Id.* at ¶ 9.  It was alleged that the purpose of the conspiracy was for Siegelman to obtain $500,000 from Scrushy to influence and reward Siegelman in connection with official acts concerning membership and business of the CON Board.  *Id.* at ¶ 10.  The May 17, 2005 indictment clearly indicated that the $500,000 was made payable to either the Alabama Education Lottery Foundation or the Alabama Education Foundation.[2]  *Id.* at ¶¶ 9, 14, 15-25.  The May

---

[1]  The CON Board was a part of the executive branch of the State of Alabama with authority over the provision of healthcare services in the State of Alabama.  The Governor of the State of Alabama has the sole authority to appoint the members of the CON Board.

[2]  The Alabama Education Lottery Foundation, which was later known as the Alabama Education Foundation, was a non-profit organization incorporated under the laws of the State

17, 2005 indictment alleged that it was part of the conspiracy that Scrushy would and did pay $500,000 to Siegelman in two installments of $250,000 each: one installment paid before Siegelman appointed Scrushy to the CON Board and one installment paid after the appointment. *Id.* at ¶ 13. The May 17, 2005 indictment alleged that Siegelman and Scrushy reached their illegal agreement regarding the payment of $500,000 between November 8, 1998 and July 26, 1999. *Id.* at ¶ 15. The May 17, 2005 indictment alleged that Scrushy gave the check from IHS for $250,000[3] to Siegelman between July 19, 1999 and July 26, 1999. It is further alleged that Siegelman caused a new checking account to be opened in the name of Alabama Education Foundation and caused the IHS check made payable to the Alabama Education Lottery Foundation to be deposited in that account on November 5, 1999. *Id.* at ¶ 20. Siegelman appointed Scrushy to the CON Board on July 26, 1999. *Id.* at ¶ 19.

According to the May 17, 2005 indictment, on March 9, 2000, Siegelman executed a personal guarantee for a loan to the Alabama Education Foundation in the amount of $730,000, and the proceeds of that loan were used to satisfy an indebtedness of approximately the same amount incurred by the Alabama Democratic Party to finance support of the lottery referendum which had been held on October 12, 1999. *Id.* at ¶ 22. On

_____

of Alabama for the purpose of raising and spending funds to promote the passage of a statewide referendum to establish a lottery. As Governor, Siegelman sought passage of this lottery referendum.

[3] It is alleged that Scrushy caused an investment bank to forgive indebtedness of Integrated Health Services, Inc. ("IHS") and then IHS issued a check for $250,000 to Alabama Education Lottery Foundation. Doc. # 3-2 at ¶ 16.

March 13, 2000, Siegelman caused the $250,000 from the check from the IHS check to be used to reduce the amount of the lottery-related debt for which he was personally liable. *Id.* at ¶ 23. Between May 18, 2000 and May 23, 2000, Scrushy and Siegelman met, and Scrushy gave Siegelman a second $250,000 in the form of a check in that amount drawn on a HealthSouth bank account and made payable to Alabama Education Foundation. *Id.* at ¶ 24. Like the first $250,000, this check was used to reduce the amount of lottery-related debt for which Siegelman was personally liable. *Id.* at ¶ 25.

**B.    Superceding Indictments**

On October 26, 2005, the grand jury returned a superseding indictment (Doc. # 9) against Siegelman and Scrushy. The superseding indictment also named as defendants Paul Michael Hamrick ("Hamrick") and Gary Mack Roberts ("Roberts"). During the relevant time periods, Hamrick was employed in the Lieutenant Governor's Office of the State of Alabama and later as Chief of Staff to the Governor. Siegelman appointed Roberts to serve as the Director of the Alabama Department of Transportation.[4]  Additionally, the superseding indictment added allegations of a RICO Conspiracy in violation of 18 U.S.C. § 1962(d). Siegelman was served with a copy of the superseding indictment along with a Summons issued in October of 2005.

On December 12, 2005, the Grand Jury returned the second superseding indictment

---

[4] Prior to his appointment, Roberts was employed by a business which had substantial dealings with the Alabama Department of Transportation.

4

(Doc. # 61), the version of the charges on which this case was tried. Before discussing the legal issues before it, the Court will briefly summarize the allegations of the second superseding indictment.

Count One of the second superseding indictment alleged that Siegelman and Hamrick engaged in a RICO conspiracy in violation of 18 U.S.C. § 1962(d).[5] With respect to the "enterprise" requirement of the RICO statutes, the indictment alleged that the "enterprise" is the "Executive Department of the State of Alabama . . . whose members functioned as a continuing unit for a common purpose of achieving the objectives of the enterprise." The alleged broad purpose of the racketeering conspiracy alleged in Count One was "to give or withhold official governmental acts and influence . . . in exchange for money and property to which the participants in the conspiracy were not entitled," and "to deprive the State of Alabama of its right to the honest services of its public officials and employees in exchange for money and property" and "to conceal and otherwise protect the conspiracy and its participants from detection and prosecution." (Doc. # 61 at ¶ 5).

Count Two of the second superseding indictment alleged a substantive RICO count charging a violation of 18 U.S.C. § 1962(c) which provides as follows:

> It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs

---

[5] This section of the statute provides that it is "unlawful for any person to conspire to violate any of the provisions" of the first three subsections of 18 U.S.C. § 1962.

through a pattern of racketeering activity or collection of unlawful debt.

Count Two of the indictment alleged that Defendants Siegelman and Hamrick "unlawfully and knowingly conducted and participated . . . in the conduct of the affairs of the enterprise through a pattern of racketeering activity" as further set out in the indictment. Count Two set forth a number of separate racketeering acts.

Counts Three and Four of the second superseding indictment, in which Siegelman and Scrushy were originally named, charged them with federal funds bribery and aiding and abetting each other "in connection with the appointment of Richard Scrushy to the CON Board," all in violation of 18 U.S.C. §§ 2 & 666(a)(1)(B). (Doc. # 61 at ¶¶ 49-51).

Count Five, in which Siegelman and Scrushy were named, charged them with conspiracy to "defraud and deprive the State of Alabama of its right to the honest and faithful services" of Siegelman as Governor and Scrushy as a member of the CON board, in violation of 18 U.S.C. § 371. (Doc. # 61 at ¶¶ 52-66)

Counts Six through Nine, in which Siegelman and Scrushy were named, charged them with aiding and abetting each other to commit honest services mail fraud as part of their scheme to defraud and deprive the State of Alabama of its right to honest services of Siegelman and Scrushy in connection with the CON board, in violation of 18 U.S.C. §§ 2, 1341, & 1346. (Doc. # 61 at ¶¶ 57-60).

Counts Ten through Twelve, in which Siegelman and Hamrick were named, charged them with aiding and abetting each other to commit honest services mail fraud as part of their

scheme to defraud and deprive the State of Alabama of its right to honest services from themselves as public officials in connection with governmental regulation of specified activities, allocation of bond funding and construction contracting, in violation of 18 U.S.C. §§ 2, 1341, & 1346. (Doc. # 61 at ¶¶ 61- 63).

Counts Thirteen and Fourteen, in which Siegelman and Hamrick were named, charged them with aiding and abetting each other to commit honest services mail fraud concerning performance bonds on a construction contract as part of their scheme to defraud and deprive the State of Alabama of its right to honest services from themselves as public officials, in violation of 18 U.S.C. §§ 2, 1343 & 1346. (Doc. # 61at ¶¶ 64- 65).

Count Fifteen, in which Hamrick was charged, and Counts Sixteen and Seventeen, in which Siegelman was named, charged them with obstruction of justice, in violation of 18 U.S.C. §§ 1512(b)(3) & 2. (Doc. # 61at ¶¶ 64-68).

Counts Eighteen through Thirty-Three, in which Siegelman and Roberts were named, charged them with aiding and abetting each other to commit honest services mail fraud as part of their scheme to defraud and deprive the State of Alabama of its right to honest and faithful services from themselves as public officials in connection with functions of the Alabama Department of Transportation, in violation of 18 U.S.C. §§ 2, 1341, & 1346. (Doc. # 61at ¶¶ 69-71).

Finally, Count Thirty-Four, in which Siegelman was named, charged him with extortion under color of official right and by fear of economic harm, in violation of 18 U.S.C.

§ 1951.  (Doc. # 61 at ¶ 72).

**C.    Brief Summary of Evidence Presented at Trial Relevant to Issues Currently Before the Court**

At trial the jury heard testimony from a large number of witnesses and received numerous documentary exhibits in evidence.  It is unnecessary to provide a comprehensive and detailed recitation of all the evidence offered at trial.   Nevertheless, the Court will briefly summarize the evidence relevant to the issues Siegelman has identified in his motion.

**1.  Factual Predicate for the Counts 3, 5, and 6-9**

While a candidate for the position of Governor of the State of Alabama, Siegelman's campaign platform included a state lottery intended to generate revenue for certain education initiatives.  Scrushy supported Siegelman's Republican opponent, Fob James ("James") and donated $350,000 to James' election campaign.  This fact was known to Siegelman.  Siegelman was elected Governor of Alabama in 1998.

After Siegelman was sworn in as Governor, Scrushy conveyed to Siegelman through Eric Hanson ("Hanson"), then the primary government affairs consultant/lobbyist for HealthSouth, that he wanted membership on, representation at, and influence over the CON Board.[6]  Siegelman stated that it would take $500,000 for Scrushy to "get right with" him,

---

[6]  Scrushy founded HealthSouth, a business established to sell medical products and services.  While HealthSouth began in Alabama, it grew into a Fortune 500 company with operations in many states in addition to Alabama.  At all times relevant to the issues in this case, Scrushy was the Chairman and Chief Executive Officer of HealthSouth.  Due to the nature of HealthSouth's operations in Alabama, it was regulated by the CON Board.

that sum roughly representing the amount Scrushy gave to James plus interest.

Scrushy contacted Mike Martin ("Martin"), then Executive Vice-President and Chief Financial Officer of HealthSouth, and told him that HealthSouth needed to contribute to the Alabama Education Lottery Foundation.[7]  Scrushy told Martin to contact HealthSouth's investment banker with UBS Warburg, William McGahan ("McGahan") and to request that McGahan make the payment to the Alabama Education Lottery Foundation from UBS Warburg.  After Martin called and made the request, Scrushy also called McGahan and threatened to fire him and UBS Warburg if the payment was not made to the Alabama Education Lottery Foundation.  McGahan at UBS Warburg could not comply.  Hanson then proposed that UBS Warburg agree to reduce a debt owed by IHS to UBS Warburg by $267,000 and in return IHS would make a payment of $250,000 to the Alabama Education Lottery Foundation.  Hanson, McGahan and an executive at IHS eventually worked out the details of this deal.  IHS presented the $250,000 check made payable to the Alabama Education Lottery Foundation to a HealthSouth employee who thereafter delivered it to Martin who personally delivered it to Scrushy in July of 1999.

---

[7]  This was the campaign fund used to pay for the 1999 statewide campaign to authorize an education lottery.  Despite having been elected Governor, Siegelman's plan for an education lottery was dependent on passage of a statewide referendum authorizing his plan.  Siegelman raised millions of dollars to fund the campaign leading up to an October 1999 statewide referendum on the lottery.  In February of 1999, Siegelman supporters incorporated the Alabama Education Lottery Foundation which was to serve as the campaign fund.  In July of 1999, the name of the foundation was changed to the Alabama Education Foundation.  The lottery referendum was voted down in October of 1999.

In July of 1999, Scrushy met with Siegelman.  Immediately after the meeting, Siegelman showed his confidential assistant and executive secretary, Nick Bailey ("Bailey") a check from IHS to the Alabama Education Lottery Foundation for $250,000.[8]  Referring to the check and to Scrushy, Siegelman announced that Scrushy was halfway there.  Bailey asked Siegelman what Scrushy wanted for the check.  Siegelman replied "the CON Board."[9]  Bailey said "that won't be a problem, will it?"  Siegelman responded "I wouldn't think so."

About a week later, Siegelman appointed Scrushy to the CON Board.  After appointing Scrushy, but before the first meeting of the CON Board, Siegelman required Bailey to call the chairperson of the CON Board and to inform her that Siegelman wanted Scrushy named vice-chair of the CON Board.  Bailey did this.  Although the chairperson of the CON Board had another nominee in mind for vice-chair, she acceded to Siegelman's demand and ensured that Scrushy was made vice-chair of the CON Board.

In November of 1999, Scrushy discovered that the $250,000 check had not yet been

---

[8]  This check was from a company called IHS.  According to Martin's testimony, Scrushy was in a hurry to obtain this check because he needed to hand deliver it to Siegelman and Scrushy wanted to obtain this check in a way that would conceal Scrushy's association with it.  Furthermore, the attorney at Scrushy's company who had responsibility for managing political contributions by the company testified that she was not aware of either $250,000 payment.

[9]  The CON Board approves applications from health care providers in the State of Alabama.  For example, if a hospital is proposed for a certain location, it must first be approved by the CON Board.  The Governor of Alabama appoints the members of the CON Board.  Scrushy had served as a member of the CON Board in the past having been appointed by prior Governors.  At the time of these events, Scrushy was head of HealthSouth, a major healthcare corporation in Alabama.

cashed and that IHS was soon to be insolvent. On November 5, 1999, Bailey took the IHS check and opened a checking account at First Commercial Bank in the name of Alabama Education Foundation. Bailey deposited the IHS check made payable to the Alabama Education Lottery Foundation into that account.

In February of 2000, the Alabama Education Foundation obtained a loan from First Commercial Bank in the amount of nearly $731,000. Siegelman and a man named Merv Nabors personally guaranteed the loan. Under the terms of the personal guarantee, Siegelman obligated himself to satisfy this loan if the Alabama Education Foundation did not do so. The proceeds of this loan were applied to satisfy the nearly $731,000 debt of the Alabama Democratic Party to Colonial Bank. In March of 2000, Siegelman directed Bailey to pay $440,000 on the First Commercial Bank loan on which Siegelman was a guarantor by transferring monies from the Alabama Education Foundation checking account into which the IHS check had earlier been deposited.

In May of 2000, Siegelman and Bailey met with Scrushy at the HealthSouth offices in Birmingham. Following the meeting, Siegelman gave Bailey a check dated May 18, 2000, in the amount of $250,000 made payable to the Alabama Education Foundation. On May 23, 2000, the proceeds of the check from HealthSouth were used to reduce the indebtedness on the loan to the Alabama Education Foundation which Siegelman had personally guaranteed. The Alabama Education Foundation loan was completely paid off in January of 2001.

Siegelman made efforts to hide the receipt of these two checks and in so doing

11

violated Alabama's Fair Campaign Practices Act. He did not report the receipt of the monies until contacted by the Alabama Attorney General's Office more than two years after the reports were required by law. Furthermore, Siegelman told his fundraising chairman that he was going to return the IHS check, but instead he deposited it in another secret bank account in another city.

Scrushy remained on the CON Board until January of 2001. When he resigned, Siegelman replaced Scrushy on the CON Board with the man who was then Vice President for Corporate Development at Scrushy's company. The jury heard a significant amount of testimony concerning Scrushy's use of his position on the CON Board to benefit his company or hinder his competitors.

## 2. Factual Predicate for Count Seventeen

According to the testimony at trial from Bailey and Clayton L. Young ("Young"), Young financially contributed or otherwise provided favors for Siegelman, Bailey and Hamrick and, in return, Young obtained certain political favors that benefitted his business interests from or through the influence of the Siegelman administration. In December of 1999, Siegelman purchased a $12,173.35 motorcycle with a check written from his expense account. On January 20, 2000, Siegelman met with Young and asked Young for $9,200. Young paid the $9,200 to Bailey who then wrote a $9,200 check to "Lori Allen."[10] Bailey's check was then deposited into the account from which Siegelman had written the check for

---

[10] Siegelman's wife's maiden name is Lori Allen.

the motorcycle. Bailey and Young testified that these transactions were part of an attempt to cover up Young's payment to Siegelman.

After the public disclosure of the public corruption investigation of the Siegelman administration, Bailey borrowed money and wrote a check to Young in the amount of $10,503.39. In the memo portion of the check, Bailey wrote "repayment of loan + interest." Siegelman caused Bailey to write and give him a check for $2,973.95 with the notation "balance due on m/c." Siegelman had Bailey give him this check in the presence of two attorneys. At the same time, Siegelman gave Bailey a bill of sale for Siegelman's motorcycle. Rather than a legitimate transaction, Bailey testified that this transaction was part of a cover story Siegelman and Bailey created to disguise Young's payment of $9,200 to Siegelman in January of 2000. When first questioned by law enforcement about the $9,200, Bailey lied to agents and did so as part of Siegelman's and Bailey's efforts to obstruct justice.

D.    **Disposition of Counts**

Prior to trial, the Court had addressed the issue of whether Counts 3 and 4 were multiplicitous in conjunction with its ruling on motions to dismiss filed by Scrushy and Siegelman. In an Order dated March 22, 2006 (Doc. # 254), the Court ruled that as drafted Counts 3 and 4 were multiplicitous and that rather than dismissing the indictment, it would instead require the Government to elect, at an appropriate time prior to submission of the case to the jury, on which counts it would proceed before sending the case to the jury. On June 12, 2006, the Government filed a motion to reconsider that ruling (Doc. # 422). On

June 13, 2006, the Court denied the Government's motion to reconsider and made it clear that either under its March 22, 2006 ruling or based on a ruling partially granting Defendants' Rule 29 motions, it was requiring the Government to elect how to redact the Second Superseding Indictment to address the multiplicity in Counts 3 and 4. At that time, the Government announced its intention to redact the Second Superseding Indictment by removing Scrushy's name from Count 3 and Siegelman's name from Count 4.

All other counts were submitted to the jury. On June 29, 2006, the jury returned unanimous verdicts. The jury found Defendants Hamrick and Roberts not guilty on all counts. The jury found Scrushy guilty on Counts Four (18 U.S.C. § 666(a)(1)(B)) and Counts Five, Six, Seven, Eight, and Nine (18 U.S.C. §§ 1341, 1346). The jury convicted Siegelman of one count of federal funds bribery (Count Three - 18 U.S.C. § 666(a)(1)(B)), four counts of honest services fraud (Counts Six, Seven, Eight and Nine - 18 U.S.C. §§ 1341, 1346), one count of conspiracy to commit mail fraud (Count Five - 18 U.S.C. § 371), and one count of obstruction of justice (Count Seventeen - 18 U.S.C. § 1512(b)(3)). The jury found Siegelman not guilty on Counts One, Two, Ten, Eleven, Twelve, Thirteen, Fourteen, Sixteen, Eighteen, Nineteen, Twenty, Twenty-One, Twenty-Two, Twenty-Three, Twenty-Four, Twenty-Five, Twenty-Six, Twenty-Seven, Twenty-Eight, Twenty-Nine, Thirty, Thirty-One, Thirty-Two, Thirty-Three, and Thirty-Four.

After receiving the jury's verdicts, the Court set deadlines for the submission of supplemental briefs on motions pursuant to Federal Rule of Criminal Procedure 29 and for

filing of motions pursuant to Federal Rule of Criminal Procedure 33. Both Scrushy and Siegelman filed written supplemental briefs in support of their motions for judgment of acquittal. Both Scrushy and Siegelman also filed Rule 33 motions for new trial. The Government vigorously opposed these post trial motions. After careful consideration, the Court denied the motions.

**E. Sentencing and Subsequent Procedural History**

On June 28, 2007, this Court sentenced Siegelman to 88 months of incarceration and other punishment.[11] At sentencing, Siegelman asked for release on bond pending appeal. The Court denied this request. Siegelman was taken into custody at the sentencing hearing and remains in federal custody as of the date of this Memorandum Opinion.

On August 10, 2007, Siegelman filed a motion for release pending appeal with the Eleventh Circuit, asking it to suspend Federal Rule of Appellate Procedure 9 and to rule on his motion directly. On September 27, 2007, the Eleventh Circuit remanded the motion back to this Court. After carefully considering the relevant case law and all submissions in

---

[11] The 88 months consisted of 88 months on Count 3, 60 months on Count 5, 88 months on Counts 6 through 9, and 88 months on Count 17, all such terms to run concurrently. The Court also sentenced Siegelman to three years of supervised release on each count, all such terms to run concurrently. The Court imposed a special condition of supervised release which will require Siegelman to complete 500 hours of community service while on supervised release. The Court imposed a $700 special assessment, a $50,000 fine and ordered restitution of $ 181,325 to be paid. After the Judgment was entered, Siegelman filed a motion arguing that the imposition of the requirement that he pay restitution was improper. Upon reconsideration, the Court agreed and amended its judgment to remove the order that Siegelman pay $181,325 in restitution.

15

support of and in opposition to the motion, the Court entered a Memorandum Opinion and

Order denying the motion on October 4, 2007.  On November 7, 2007, the Eleventh Circuit

Court of Appeals again remanded on a limited basis asking this Court to provide a more

detailed explanation of the reasons for which the Motion for Release Pending Appeal was

denied.  This Memorandum Opinion is the Court's response to the second limited remand.

## DISCUSSION

Having been convicted of several violations of federal law, Siegelman seeks release

on bond pending the resolution of his appeal.  Pursuant to 18 U.S.C. § 3143, a defendant

convicted of a crime shall be detained pending his appeal unless a court finds:

> (1) that the defendant is not likely to flee or pose a danger to the safety of any
> other person or the community if released;
> (2) that the appeal is not for purpose of delay;
> (3) that the appeal raises a substantial question of law or fact; and
> (4) that if that substantial question is determined favorably to defendant on
> appeal, that decision is likely to result in reversal or an order for a new trial of
> all counts on which imprisonment has been imposed, a sentence that does not
> include a term of imprisonment, or a reduced sentence to a term of
> imprisonment less than the total of the time already served plus the expected
> duration of the appeal process.

18 U.S.C. § 3143(b)(1); *See also United States v. Giancola*, 754 F.2d 898, 901 (11th Cir.

1985).  Moreover, the defendant has the burden to prove each of these four factors.  *Id.*  In

this case, the government does not contest either of the first two factors.[12]  Therefore, the

---

[12]     The Government conceded, and this Court finds, that Siegelman has presented
sufficient evidence that he is not likely to flee or pose a danger to the safety of others.

question presented to this Court is whether Siegelman has satisfied his burden of establishing

that his appeal raises substantial questions of law or fact likely to result in reversal or an

order for a new trial of all counts on which imprisonment has been imposed, or a reduced

sentence that is less than the expected duration of the appeal process.

A defendant has presented a "substantial question" if the issue is "one of more

substance than would be necessary to a finding that it was not frivolous.  It is a 'close'

question or one that very well could be decided the other way." *Giancola*, 754 F.2d at 901.

Furthermore, the phrase "likely to result in reversal or an order for a new trial" means that

"the question is so integral to the merits of the conviction on which defendant is to be

imprisoned that a contrary appellate holding is likely to require reversal of the conviction or

a new trial." *Giancola*, 754 F.2d at 900 (quoting *United States v. Miller*, 753 F.2d 19 (3rd

Cir. 1985)).  In other words, harmless errors, errors that have no prejudicial effect, or errors

that have been insufficiently preserved, which would not result in reversal or a new trial, do

not satisfy this standard.  *Id.*  In order for this Court to grant Siegelman's motion, it would

have to hold that he has raised a substantial question that would be likely to result in reversal

or a new trial on *all* of the counts of which he was convicted, or likely to result in a term of

imprisonment less than the expected duration of the appeal.  *Giancola*, 754 F.2d at 900-01.

For the reasons set forth below, the Court does not find that the issues Siegelman identified

---

Resolution of the second factor, whether the appeal is for the purpose of delay, is mooted by
this Court's decision on the third and fourth factors.

satisfy the standard established by 18 U.S.C. § 3143(b) as interpreted by the Eleventh Circuit Court of Appeals, and therefore Siegelman failed to meet his burden. Consequently, this Court was without authority to grant him the relief he sought in his motion.

**A.    Siegelman's Arguments Regarding the Obstruction of Justice Count Did Not Present A Substantial Question**

With respect to Siegelman's conviction on Count Seventeen of the second superseding indictment,[13] Siegelman argued that a substantial question exists concerning whether he was convicted for conduct beyond the scope of the obstruction of justice statute. In this Court's view, Siegelman's argument on this count did not constitute a substantial question warranting an appeal bond. Indeed, Siegelman's articulation of this argument misrepresented both the relevant facts and the relevant law.

---

[13] Count Seventeen of the Second Superseding Indictment charged Siegelman with a violation of 18 U.S.C. §§ 2 and 1512(b)(3). Specifically, it charged that Siegelman

> did knowingly corruptly persuade and attempt to knowingly corruptly persuade another person, and did engage in misleading conduct toward another person, with intent to hinder, delay, and prevent the communication to a law enforcement officer of the United States of information relating to the commission of a federal offense and a possible commission of a federal offense, to wit defendant DON EUGENE SIEGELMAN did cause Nicholas D. Bailey to write a check in the amount of $10,503.39 to Clayton "Lanny" Young with the notation "repayment of loan plus interest" with intent to hinder, delay, and prevent communication to the Federal Bureau of Investigation by Clayton "Lanny" Young and Nicholas D. Bailey of information concerning federal offenses related to $9,200 that Clayton "Lanny" Young gave to DON EUGENE SIEGELMAN on January 20, 2000.

Doc. # 61 at ¶ 67.

18

Despite Siegelman's attempts to present this issue as a legal question concerning the scope of the statute, the crux of the argument was a contention that the United States offered insufficient evidence to support his conviction on this count. Such arguments are not a favored basis upon which to seek an appeal bond. *See, e.g., United States v. Fernandez*, No. 87-0217-CR-NESBITT, 1988 WL 34941, at *2 (S.D. Fla. 1988) ( "Ordinarily, the sufficiency of the evidence as distinguished from a total lack of evidence does not in itself establish a substantial question: if that were the standard, every case raising this common ground would entitle the defendant to bond pending appeal."); *United States v. Greenough*, 609 F. Supp. 1090, 1094 n.1 (S.D. Ala. 1985) (while a clear showing of a lack of any evidence on an element of an offense or some similar fault might support a finding of a "substantial question" sufficient to warrant an appeal bond, an argument that the evidence was insufficient does not establish substantial question sufficient to warrant appeal bond).

Even if the argument was construed to be something other than an attack on the sufficiency of the evidence, the Court was still not persuaded that the scope of § 1512(b)(3) was exceeded. Section 1512(b)(3) provides that

> Whoever knowingly uses intimidation, threatens, or corruptly persuades another person, or attempts to do so, or engages in misleading conduct toward another person, with intent to--
>
> (3) hinder, delay, or prevent the communication to a law enforcement officer or judge of the United States of information relating to the commission or possible commission of a Federal offense or a violation of conditions of probation supervised release, parole, or release pending judicial proceedings;
>
> shall be fined under this title or imprisoned not more than ten years, or both.

18 U.S.C. § 1512(b)(3).  The Eleventh Circuit has addressed the scope of § 1512 on several occasions.  *See, e.g., United States v. Ronda,* 455 F.3d 1273 (11th Cir. 2006); *United States v. Veal*, 153 F.3d 1233 (11th Cir. 1998); *United States v. Shotts*, 145 F.3d 1289 (11th Cir. 1998).  A review of these cases is essential to an understanding of the error of Siegelman's argument on this issue.

In *United States v. Shotts*, 145 F.3d 1289, 1299 (11th Cir. 1998), it held that the "corruptly persuade" language added to § 1512(b) in 1988, encompasses non-coercive attempts to tamper with witnesses.  More specifically, the Eleventh Circuit held in *Shotts* that a defendant's attempts to persuade his secretary not to speak with FBI agents were sufficiently culpable to sustain a conviction under § 1512(b).  145 F.3d at 1301.  In reaching this holding, the Eleventh Circuit explicitly rejected the argument that the "corruptly persuade" language of § 1512(b) was vague, and it rejected the approach to interpreting this language taken by the Third Circuit in *United States v. Farrell*, 126 F.3d 484 (3rd Cir. 1997).  *Id.* at 1300-01.[14]  The Eleventh Circuit held that with or "motivated by improper purpose" is the definition of "corruptly" in § 1512(b).  *Id.*  The Eleventh Circuit further held that the government had presented sufficient evidence that the defendant in *Shotts* had corruptly persuaded his secretary not to talk to law enforcement agents because of testimony that when she asked him about the FBI's investigation of judge Shotts being accused of being involed

---

[14]  The Third Circuit had imposed a requirement for an additional level of culpability on § 1512(b).

in a bribery scheme, Shotts responded by saying just not to say anything and she wouldn't be bothered. *Id.* at 1301. The Eleventh Circuit explained that the jury was correctly charged that they must find that Shotts acted "knowingly and dishonestly with the specific intent to subvert or undermine the integrity or truth-seeking ability of an investigation by a federal law enforcement officer" and that the secretary's testimony was sufficient to support a reasonable inference that Shotts was attempting with an improper motive to persuade his secretary not to talk to the FBI. *Id.* For this reason, Shotts' conviction under § 1512(b) was affirmed. *Id.*

Both *Veal* and *Ronda* addressed convictions under § 1512(b) under a slightly different theory. Those cases arose out of police attempts to cover up civil rights violations by police officers and addressed violations of § 1512(b) by in the context of defendants engaging in misleading conduct. *See Ronda*, 455 F.3d at 1276-81 & 1284; *Veal*, 153 F.3d at 1236 & 1253. Not every aspect of these cases perfectly applies to the instant case. For example, some of the defendants in *Veal* had given false statements to investigators both about the underlying incident and about whether they had participated in an meeting to plan a cover up. However, it is clear that these cases also stand for the proposition that deliberately creating altered or misleading physical evidence can constitute a violation of § 1512(b)(3). *See Ronda*, 455 F.3d at 1290 ("fabrication of evidence to mislead federal investigators violates § 1512(b)(3)"); *Veal*, 153 F.3d at 1254-55 (discussing one defendant's fabrication of physical evidence supporting his exculpatory cover story and finding the jury could have

21

reasonably and logically inferred that this conduct constituted a violation of § 1512(b)(3)).

The evidence presented at trial established that, knowing the FBI and others were conducting a criminal investigation, Siegelman and Bailey engaged in a series of actions which a reasonable jury could easily have found constituted a scheme intended to cover up the fact that Young had paid a bribe to Siegelman. The evidence at trial established that Bailey initially lied to agents about the certain transactions to protect himself and Siegelman. Based on the evidence presented at trial, a reasonable jury could easily have found that Siegelman knowingly corruptly persuaded Bailey to participate in the cover story with the intent to hinder, delay, or prevent the communication by Bailey to a law enforcement officer of information relating to the commission or possible commission of a federal offense. Furthermore, the evidence presented to the jury at trial could have led a reasonable jury to infer that Siegelman manufactured conduits to create false and misleading evidence just as was done in *Veal*. 153 F.3d at 1247. Siegelman's actions created witnesses and evidence as part of a cover-up in an effort to prevent federal law enforcement agents from discovering the truth. Thus, in this Court's view Siegelman's argument that there is a substantial question as to his conviction on Count Seventeen is without merit.

Siegelman's reliance on *Untied States v. King*, 762 F.2d 232 (2nd Cir. 1985) and *United States v. Kulczyck*, 931 F.2d 542 (9th Cir. 1991) is misplaced for at least two important reasons. First, *King* and *Kulczyck* interpreted an earlier version of 18 U.S.C. § 1512(b)(3) which did not include language making it a violation of the statute to "corruptly

persuade another person." *See United States v. Khatami*, 280 F.3d 907, 912 (9th Cir. 2002) (explaining the holdings of *King* and *Kulczyck* in the context of the 1988 amendment of the § 1512); *United States v. Kulczyck*, 931 F.2d at 544 n.2; *United States v. King*, 762 F.2d at 236. Thus, to the extent that these cases discuss the narrow contours of the statute, they discuss a statute that was later significantly revised to broaden its scope. Second, the reliance on *King* ignores Eleventh Circuit precedent which has taken a significantly less restrictive view of the statute itself.

Siegelman's reliance on *United States v. Davis*, 183 F.3d 231 (3rd Cir. 1999) is no more persuasive. First, and most importantly, its facts are completely distinguishable from those in this case. Second, *Davis* relies on an earlier case from the Third Circuit, *United States v. Farrell*, 126 F.3d 484 (3rd Cir. 1997), which the Eleventh Circuit has explicitly rejected. *See United States v. Shotts*, 145 F.3d at 1301. Finally, Siegelman relies on a footnote in *Davis* which is arguably *dicta*.

Based on the foregoing, the Court was not persuaded that Siegelman's arguments concerning his conviction on the charges contained in Count Seventeen in any way presented a "substantial question" of law or fact likely to result in reversal or an order for a new trial of all counts on which imprisonment has been imposed, or a reduced sentence that is less than the expected duration of the appeal process.

## B.    Siegelman's Statute of Limitations Argument on Count Three Did Not Raise A Substantial Question

Siegelman argued that a substantial question exists regarding to his conviction on

23

Count Three of the Second Superceding Indictment, which charged Siegelman with federal funds bribery in violation of 18 U.S.C. §§ 2 & 666(a)(1)(B).  Siegelman claimed that if a crime occurred at all, it occurred outside the statute of limitations, and consequently, he was entitled to a judgment of acquittal.  The United States argued that the statute of limitations issue on Count Three did not present a substantial issue because Siegelman waived this defense by failing to timely assert it.  After a careful review of the applicable precedents and the arguments of the parties, this Court found that Siegelman waived this affirmative defense by failing to timely raise it.  For that reason, the Court did not find that a substantial question existed relating to whether the statute of limitations barred his conviction on Count Three of the second superceding indictment, which charged Siegelman with federal funds bribery in violation of 18 U.S.C. §§ 2 & 666(a)(1)(B).

The binding precedents of this circuit have long made clear that a statute of limitations defense is an affirmative defense that must be timely raised.  *See, e.g., United States v. Ramirez*, 324 F.3d 1225, 1228 (11th Cir. 2003) (holding that "when a statute of limitations defense is clear on the face of the indictment and requires no further development of facts at trial, a defendant waives his right to raise that defense by failing to raise it in a pretrial motion."); *Capone v. Aderhold*, 65 F.2d 130, 131 (5th Cir. 1933)[15] (holding that "the bar of the statute is a matter of defense" that cannot be raised so late in the case that it deprives the

---

[15]  In *Bonner v. City of Prichard*, *Ala.*, 661 F.2d 1206, 1209 (11th Cir. Nov. 3, 1981) (*en banc*), the Eleventh Circuit adopted as binding precedent all Fifth Circuit decisions handed down prior to the close of business on September 30, 1981.

prosecution of an opportunity to introduce evidence in rebuttal at trial).[16]  In addition to these published opinions, a number of unpublished decisions from the Eleventh Circuit have also held that a defendant's failure to raise the affirmative defense of statute of limitations until after trial constituted waiver of the issue.  *See, e.g., United States v. Jockisch*, 159 Fed. Appx. 145, 2005 WL 3445579, at * 148-49 (11th Cir. Dec. 16, 2005) (holding that defendant could not litigate statute of limitations defense raised for the first time on appeal because the issue had been waived); *United States v. Daniels*, 135 Fed. Appx. 305, 2005 WL 1395065 (11th Cir. June 14, 2005) (emphasizing that *Najar* required the statute of limitations affirmative defense to be asserted *at trial* and holding that failure to raise the issue until a post-trial motion for new trial constituted waiver of the issue).  This line of cases is consistent with the approach taken by other circuit courts of appeals.  *See, e.g., United States v. Najar*, 283 F.3d at 1309 (collecting cases from other circuits); *United States v. Mulderig*, 120 F.3d 534, 540 (5th Cir. 1997) (defendant found to have waived the statute of limitations defense because he did not assert it until he filed a motion for judgment of acquittal after the trial had

---

[16] In 2002, the Eleventh Circuit reaffirmed the vitality of *Capone* as binding precedent in this Circuit.  In *United States v. Najar*, 283 F.3d 1306, 1308 (11th Cir. 2002), the Eleventh Circuit held that the statute of limitations in a criminal case is not a jurisdictional bar to prosecution.  Specifically relying on *Capone*, the Eleventh Circuit explained that "pursuant to binding precedent, the statute of limitations is a matter of defense that must be asserted *at trial* by the defendant."  283 F.3d at 1308 (emphasis added).  The Eleventh Circuit then held that "the expiration of the statute of limitations does not divest a district court of subject matter jurisdiction, but rather constitutes an affirmative defense, which the defendant can waive."  283 F.3d at 1309.  While the *Najar* case dealt with the issue of a defendant's explicit waiver by a plea agreement, it nevertheless set the stage for later cases like *Ramirez* which found waiver by failure to timely raise the issue.

concluded); *United States v. Arky*, 938 F.2d 579, 582 (5th Cir. 1991), *cert. denied,* 503 U.S. 908 (1992) (holding that "the defendant must affirmatively assert a limitations defense at trial to preserve it for appeal.").

Despite the very specific allegations in the initial indictment regarding the factual predicate underlying what ultimately became Count Three of the Superceding Indictment, including the specific dates of key events, Siegelman failed to file a motion to dismiss[17] raising the statute of limitations argument. In this important respect, his case is completely distinguishable from *United States v. Yashar*, 166 F.3d 873 (7th Cir. 1998), the case on which he primarily bases his argument on this issue. Indeed, under *Ramirez*, this failure to raise the issue before trial constituted a waiver of the issue. Siegelman's contention that, due to artful pleading by the United States in the second superseding indictment which contains fewer specific details of the predicate for this Count, he could not discern that such a defense was available to him is simply not plausible given the specificity of the initial indictment (Doc. # 3). Even if the Court was to accept Siegelman's implausible contention that he could not tell from the indictments in this case that this defense was available to him, it should have been quite apparent at the close of the United States' case. While Siegelman made lengthy arguments at that time for judgment of acquittal, he did not raise the statute of limitations as part of his argument. The first time that Siegelman argued that the statute of limitations

---

[17] It is noteworthy that Siegelman filed a significant number of pretrial motions, including motions to dismiss on bases other than statute of limitations.

barred Count Three of the Second Superceding Indictment was in a brief filed on August 4, 2006, weeks after the June 29, 2006 verdict.[18]  In this Court's view, the holding of *Capone* and its progeny required a finding that Siegelman's delay in raising the issue until after the verdict constituted a waiver of the issue.  Siegelman's reliance on the general language in Federal Rule of Criminal Procedure 29(c)(3) is insufficient in the face of specific binding precedent on the waiver issue.[19]

**C.     Siegelman Failed To Identify A Substantial Question With His Arguments Relating To The Whether Bribery-Type Convictions On Campaign Contributions Require An Express *Quid Pro Quo***

In his motion for an appeal bond, Siegelman reasserted an argument made throughout the case, that because Scrushy's payments took the form of campaign contributions, albeit

---

[18]  By written Order (Doc. # 443), Siegelman was allowed until August 4, 2006 to file a supplemental brief on his Rule 29 motion for judgment of acquittal.  On August 4, 2006, Siegelman filed a "Renewed Motion for Judgment of Acquittal Pursuant to Fed. R. Crim. P. 29 on Count Seventeen – 18 U.S.C. § 1512(b)(3) Obstruction of Justice" (Doc. # 453).  This motion was directed solely at Count Seventeen of the Second Superceding Indictment and it made no mention of either Count Three or any statute of limitations argument.  On August 4, 2006, Siegelman also filed a "Renewed Motion for Judgment of Acquittal Pursuant to Fed. R. Crim. P. 29 on Counts Three, Five, Six, Seven, Eight,, and Nine – The § 371, § 666(a)(1)(B), and Honest Services Charges" (Doc.# 455).  It was in this second motion that Siegelman *first* raised his contention that Count Three was barred by the applicable statute of limitations.  Despite the designation of the motion as a "renewed" one, it was not renewing any prior argument with respect to this issue.

[19]  Additionally, the Court was not persuaded by Siegelman's contention that *United States v. Lewis*, 492 F.3d 1219 (11th Cir. 2007) compels a different conclusion.  That case discusses the difference between waiver and forfeiture of a constitutional right.  Siegelman's statute of limitation defense was not predicated on any constitutional right and the argument could be waived in a way that constitutional rights cannot.

campaign contributions that were used to retire a debt for which Siegelman would have ultimately been personally responsible, the First Amendment is implicated and special consideration must be given to certain issues. This argument takes a variety of forms, but none of Siegelman's arguments presented a 'close' question or one that very well could have been decided the other way. For this reason, Siegelman did not demonstrate that the substantial question required by *Giancola* existed with respect to these issues and he was not entitled to be released on bond pending the resolution of his appeal.

The cases on which Siegelman relied do not establish that a conviction under either 18 U.S.C. § 666 (bribery) or 18 U.S.C. §§ 1341, 1346 (honest services mail fraud) must be predicated on an explicit *quid pro quo*. In this Court's view, Siegelman's argument overstated or mischaracterized the holdings of the cases on which he relied.[20] *McCormick v. United States*, 500 U.S. 257 (1991) and its progeny do not attach an explicit *quid pro quo* requirement to the statutes at issue in this case: bribery and honest services mail fraud.[21] *See, e.g., United States v. Gee*, 432 F.3d 713, 714 (7th Cir. 2005); *United States v. Agostino*, 132 F.3d 1183, 1190 (7th Cir. 1997). In this Court's view, there was not a substantial question likely to result in reversal or an order for a new trial of all counts on which imprisonment has

---

[20] The Government's brief does a thorough job of identifying the specific problems with Siegelman's citation of authority on this issue. The Court will not belabor the point by repeating that critique again in this opinion.

[21] It is important to remember that these cases were interpreting specific language found in the Hobbs Act which language is not present in the statutes under which Siegelman was convicted.

been imposed, or a reduced sentence that is less than the expected duration of the appeal process as to this issue.

In the alternative, even assuming *arguendo* that Siegelman is correct and such a requirement exists, this Court's instructions to the jury in this case sufficiently apprised the jury of that requirement and the United States presented evidence from which a reasonable jury could find that such a requirement was satisfied. In view of both the instructions to the jury and the sufficiency of the evidence, the Court was not persuaded that this issue presents a substantial question of the sort required for an appeal bond to be granted.

Finally, the Court did not consider Siegelman's argument concerning the applicability of *strictissimi juris* to be one that presented a substantial question for purposes of an appeal bond under the precedents which bind this Court.

## D.    Siegelman's Sentence Did Not Raise A Substantial Question

In reaching this sentence, this Court initially calculated an advisory sentencing range under the United States Sentencing Guidelines of 121 to 141 month of imprisonment. Based on the information before the Court and certain legal precedents urged by the United States, the Court then granted an upward departure equivalent to four offense levels which resulted in an advisory sentencing range under the Guidelines of 188 to 235 months. Despite initial range and the range after the upward departure, the Court found after considering the factors set forth in 18 U.S.C. § 3553, a reasonable sentence for Siegelman was 88 months imprisonment and imposed that sentence. While this was far less time than the United States

sought, it was the length of imprisonment the Court considered reasonable.

The upward departure applied in calculating Siegelman's sentence was supported by an appropriate factual and legal precedent.[22]  More importantly for purposes of the appeal bond motion, however, this issue did not constitute a substantial question for purposes of 18 U.S.C. § 3143 because the Court sentenced Siegelman well below the pre-upward departure advisory guideline range and well below the statutory maximums.  The sentence Siegelman received was the sentence this Court deemed reasonable after a careful consideration of the factors set forth in 18 U.S.C. § 3553(a).  The Court would not have given Siegelman a lesser sentence if it had denied the Government's request for an upward departure.

## CONCLUSION

For the reasons set forth above, this Court ORDERED that Defendant/Appellant, Don Eugene Siegelman's Motion for Release Pending Appeal (Doc # 657) be DENIED and this Order supplement this Court's Memorandum Opinion and Order dated October 4, 2007.

DONE this the 2nd day of January, 2008.

_____
/s/ Mark E. Fuller
CHIEF UNITED STATES DISTRICT JUDGE

---

[22] This Court remains persuaded that the upward departure in calculating the guideline sentence was appropriate under *United States v. Shenberg*, 89 F.3d 1461 (11th Cir. 1996) and *United States v. Gutman*, 95 F. Supp. 2d 1337 (S.D. Fla. 2000).