# IN THE UNITED STATES DISTRICT COURT FOR THE
## MIDDLE DISTRICT OF ALABAMA
## NORTHERN DIVISION

UNITED STATES OF AMERICA

v.                                                    CASE NO.  2:05cr119-RH

DON EUGENE SIEGELMAN and
RICHARD M. SCRUSHY,

      Defendants.

_____/

## <u>ORDER DENYING MOTIONS TO RECUSE</u>

A jury convicted the defendants on multiple counts.  The district judge

sentenced them.  The defendants appealed.  The Eleventh Circuit upheld the

convictions in substantial part, the Supreme Court vacated and remanded, and the

Eleventh Circuit again upheld the convictions in substantial part.  The case is back

in the district court for resentencing.  Also pending in the district court are motions

for a new trial based on newly discovered evidence and motions to recuse the

district judge who presided over the trial and imposed the original sentences.  The

motions to recuse attack the judge's receipt of extrinsic information about emails

purportedly exchanged by some of the jurors.  As allowed by the law of the circuit,

the district judge determined that the motions to recuse should be decided by a

different district judge.  The acting chief judge of the Eleventh Circuit appointed

me.  I now deny the motions to recuse.

I

On June 29, 2006—after nearly six weeks of trial and nine days of

deliberations—the jury returned a verdict convicting the defendants Don Eugene

Siegelman and Richard M. Scrushy of bribery, multiple counts of honest-services

mail fraud, and conspiracy.  The jury also convicted Mr. Siegelman of obstructing

justice.  The jury acquitted Mr. Siegelman on other counts and acquitted two other

defendants on all charges.

The court extended the deadline for new-trial motions to September 29,

2006.  ECF No. 443.  Shortly before that deadline, someone anonymously mailed

to the defendants' attorneys and to Mr. Scrushy himself copies of purported emails

among three jurors.  *See* ECF No. 467 at 8.  The emails, on their face, seemed more

likely amateurish fakes than authentic.  Thus, for example, one purported to be a

screen shot from an email page with a link allowing the receiving party to "Report

As Seem" rather than to "Report as Spam."  ECF No. 467-14 at 2.  But if authentic,

the emails indicated that two jurors communicated with one another and perhaps

with other jurors about the merits before the trial was completed, that two jurors

communicated with one another by email over a weekend after deliberations were

in progress, and that one juror considered the possible penalties in the case too

severe, thus suggesting the juror knew the possible penalties—information that could only have come from a source other than the evidence presented at trial. *See* ECF Nos. 467-12, 467-13, 467-14 & 467-15.

On September 29, 2006, the defendants moved for a new trial. ECF No. 467. One ground was juror misconduct: that some of the jurors deliberated prematurely and without all the jurors participating, as purportedly shown by the emails, and improperly considered extrinsic information, as shown by the emails and other sources, including media accounts of post-verdict interviews with jurors. The defendants asked for leave to contact the jurors to investigate; they could not do so without leave because a local rule prohibits the parties and attorneys from contacting the jurors after a trial and the court had entered an order in this case explicitly confirming the ban. *See* N.D. Ala. Loc. R. 47.1; ECF No. 255 at 3. The defendants also asked for entry of an order initiating a broader investigation: requiring all 12 jurors to list their email and text-message providers; allowing the defendants to subpoena the providers; and requiring two of the jurors to preserve their computers without deleting any information. ECF No. 467 at 13-15. Mr. Siegelman separately moved for entry of an order requiring the two jurors to preserve all their emails and text messages. ECF No. 469. The defendants later asked for an order requiring the two jurors to turn over their computers so that a forensic examination could be conducted. ECF Nos. 496, 506.

On October 11, 2006, Mr. Siegelman moved to supplement the record with another anonymously-provided email.  ECF No. 473.  The email was dated over the same weekend after deliberations began and purported to show an additional communication between two jurors—one of the same jurors involved in the earlier emails and now an additional juror.  *See* ECF No. 473-1.

On October 31 and November 17, 2006, the court conducted evidentiary hearings addressing some of the juror-misconduct issues raised in the new-trial motion.  At the November 17 hearing, each juror testified in response to questions by the court.  The parties were not allowed to inquire.  The court asked each juror whether the juror or, to the juror's knowledge, any other juror had been exposed to or considered extrinsic information.  The court did not otherwise inquire about the jurors' deliberative process.  *See* ECF No. 505.

The jurors' testimony revealed that jurors had been exposed to extrinsic information in three ways only.  First, a juror obtained from the court's website, and briefly discussed with the other jurors during deliberations, educational material on jury service that encouraged full participation in deliberations by all jurors.  Second, two jurors obtained from the court's website an unredacted copy of the charging document—the second superseding indictment—that was different from the redacted copy provided to the jury for its use in deliberations only in respects that made no real difference.  And third, some jurors were inadvertently

exposed to snippets of the extensive media coverage of the trial.  There was no evidence that any juror was exposed to extrinsic information about the possible penalties in the case.  The court did not ask about the emails themselves.  *See id*.

The court set a deadline of December 1, 2006, for the parties to file further briefs addressing the evidence and its legal effect.  ECF No. 503.  The parties filed extensive briefs.  ECF Nos. 514, 515.

On December 13, 2006, the court denied the motion for a new trial in a comprehensive, 57-page opinion.  ECF No. 518.  The court found that the jurors had limited exposure to extrinsic information but that it made no difference in the fairness or result of the trial.  The court concluded that the evidence did not warrant a further investigation or interrogation of the jurors.  The court denied the defendants' request for leave to contact the jurors.

On December 20, 2006, someone anonymously mailed copies of more purported emails between two of the same jurors.  *See* ECF Nos. 520 at 4, 520-1. This time the copies were mailed not only to the defendants' attorneys and Mr. Scrushy but also to coworkers of the two jurors, *see* ECF No. 953-27 at 3, and at least one reporter, *see* ECF No. 520 at 5 n.2.  Unlike the original emails, the new emails suggested that the jurors had considered extrinsic information on the merits. Thus they included references to the jurors' exchange of "articles" and "links." ECF No. 520-1 at 1, 2.  But like the earlier emails, the new ones seemed on their

face more likely amateurish fakes than authentic.

The coworkers told the jurors about the emails.  *See* ECF No. 953-27 at 3.
One juror reported this to the United States Marshals Service.  *See id.*  The other
juror reported it to someone at the court—the record does not indicate whether in
the clerk's office or in chambers—and was in turn referred to the Marshals Service.
*See id.*  The Marshals Service notified Chief Judge Mark E. Fuller, who was both
the district's chief judge and the judge who had presided over this case from the
outset.  Chief Judge Fuller asked the Marshals Service to investigate any attempt to
influence, coerce, or intimidate a juror.  *See* ECF No. 1006 at 3.  The Marshals
Service contacted the acting United States Attorney—who had participated fully in
the prosecution of this case—who in turn asked the United States Postal Inspection
Service to investigate.  *See* ECF No. 953-27 at 3.  Shortly after doing so, the acting
United States Attorney assigned the matter to an Assistant United States Attorney
not involved in this case.  *See id.*

On December 28, 2006, Mr. Scrushy and Mr. Siegelman filed separate
motions to reconsider the November 17 order denying the motion for a new trial.
ECF Nos. 519, 520.  The basis was again juror misconduct, this time as
purportedly shown by the new emails.  The defendants again asked for an
extraordinarily intrusive investigation of two jurors; among the requests was that
the jurors' computers be seized so that a forensic examination could be conducted.

*See* ECF No. 519 at 19; ECF No. 520 at 7.

Without telling the defendants, the Postal Inspection Service began an investigation, though one not nearly so intrusive as suggested by the defendants. *See* ECF No. 953-27 at 3.  A postal inspector interviewed the two jurors and some of the coworkers and looked at test emails sent to and from the jurors' computers. *See id.*  A coworker of one juror told the inspector that the coworker had monitored the juror's email while the juror was away and had not seen the emails purportedly sent by the other juror.  *See id.*

In early April 2007, while the motion to reconsider was pending, representatives of the Postal Inspection Service and Marshals Service briefed Chief Judge Fuller on the investigation of the emails.  *See* ECF No. 953-27 at 3-4; ECF No. 1006 at 3.  A postal inspector or deputy marshal reported—without being asked to do so by Chief Judge Fuller—that the postal inspectors had concluded that the emails were not authentic but that the postal inspectors had been unable to determine who mailed them.  *See* ECF No. 953-27 at 3; ECF No. 1006 at 3.

The defendants and their attorneys were not aware at that time that there had been an investigation or a meeting with the judge.  The government's attorneys knew an investigation had begun, but the record does not indicate whether they knew at that time the status of the investigation or that a meeting with the judge had occurred.  At some point they learned.  But they did not notify the defense.

Nor did Chief Judge Fuller.

On April 18, 2007, Mr. Scrushy moved to recuse Chief Judge Fuller on unrelated grounds: his ownership of shares in corporations that do business with the government—business that has nothing to do with the judiciary or this case. *See* ECF No. 550.  On April 26, 2007, the judge denied the motion.  *See* ECF No. 567.

On June 22, 2007, the court denied the motions to reconsider the December 13, 2006 order—the order that denied the motion for a new trial based on juror misconduct.  *See* ECF No. 611.  The court said it had properly resolved the juror-misconduct issues in the December 13 order and that a further, intrusive investigation of the jurors was not warranted.  The court noted the "unanimous sworn testimony of the jurors" that they were not exposed to extrinsic information, with the limited exceptions set out above, and concluded that the new emails did not cast doubt on that testimony.  ECF No. 611 at 4 n.9.  The court also said that any doubt about the authenticity of the emails "has not influenced [the court's] ruling on the matters before it."  *Id.*

On June 28, 2007, the court sentenced the defendants to terms in the Bureau of Prisons.

The defendants appealed.  Mr. Scrushy's initial brief—adopted in relevant respects by Mr. Siegelman—asserted that the court improperly denied the motion

for a new trial based on juror misconduct, improperly denied the motion to reconsider that ruling, and improperly denied the defendants an opportunity to fully investigate the emails.  The brief quoted the emails—including those received after the November 17 hearing—and fully addressed the court's handling of them. Mr. Scrushy also filed a motion in the Eleventh Circuit asking the court to subpoena records relating to the emails, appoint a special master with subpoena power, or authorize Mr. Scrushy to subpoena the records.  Neither the additional brief nor the motion addressed the April 2007 meeting between the judge and the representatives of the Postal Inspection Service and Marshals Service; the defendants still did not know of that meeting or the investigation that led to it.  The defendants' initial briefs also raised other issues, including the judge's failure to recuse himself based on his ownership of stock in corporations that did business with the government and the bias allegedly shown by the order denying the motion to reconsider.  The defendants asked that any remand be to a different district judge.

In the course of preparing the government's brief in response, the chief of the Department of Justice criminal division appellate section became aware of the April 2007 meeting with Chief Judge Fuller.  On July 8, 2008, she wrote a letter to the defense attorneys reporting the meeting.  *See* ECF No. 953-27.  She copied the district court and the Eleventh Circuit.

Mr. Scrushy's reply brief fully addressed the April 2007 meeting, the appellate section chief's letter reporting it to the defense, and the failure of the court or the government to report it earlier.  The reply brief again addressed the emails themselves and asserted they warranted either a new trial or at least a further investigation.  Still pending was the motion asking the Eleventh Circuit to subpoena relevant records, appoint a special master, or authorize Mr. Scrushy to subpoena the records.

The Eleventh Circuit squarely rejected the defendants' assertions on this issue.  *See United States v. Siegelman*, 561 F.3d 1215 (11th Cir. 2009) ("*Siegelman I*"), *vacated on other grounds*, 130 S. Ct. 3541, 3542 (2010).  The circuit affirmed Mr. Scrushy's convictions and sentence and affirmed Mr. Siegelman's convictions on all but two counts.  The circuit denied the separate motion to issue or authorize subpoenas or appoint a special master.  *Id.* at 1237 n.26.  The court remanded Mr. Siegelman's case for resentencing but rejected the defendants' assertion that the remand should be to a different district judge.  The circuit denied panel and en banc rehearing on May 14, 2009.

On June 26, 2009, back in the district court, Mr. Scrushy moved for a new trial based on newly discovered evidence.  ECF No. 953.  First, he asserted selective prosecution for political purposes; when the charges were brought, Mr. Siegelman—a Democrat and a former Governor of Alabama—was running for

Governor again, this time against a Republican incumbent, and there was new evidence of political motivations in the United States Department of Justice. Second, Mr. Scrushy asserted judicial misconduct: the judge's April 2007 meeting with representatives of the Postal Inspection Service and Marshals Service.  Third, Mr. Scrushy asserted the United States Attorney had properly announced her recusal—her husband was allegedly a paid consultant to the Republican incumbent—but had improperly continued to be involved in the case.  Fourth, Mr. Scrushy asserted a range of prosecutorial misconduct, including the failure to advise the defense of the April 2007 meeting.  And fifth, Mr. Scrushy asserted the government had failed to disclose exculpatory and impeaching information and to correct false testimony of a key witness.  Mr. Siegelman filed a motion raising the same issues.  ECF No. 960.

Also on June 26, 2009, Mr. Scrushy moved for Chief Judge Fuller to recuse himself based on the April 2007 meeting and the failure to disclose it.   ECF No. 954.  Alternatively, Mr. Scrushy asserted that Chief Judge Fuller should refer the recusal issue to a different district judge.  *Id.*  Mr. Siegelman later joined in the motion, *see* ECF Nos. 991, 994, and still later filed an additional recusal motion of his own.  ECF No. 1009.

On May 14, 2010, Chief Judge Fuller entered an order concluding that the recusal issue should be decided by a different district judge.  ECF No. 1006.  On

May 19, 2010, the Eleventh Circuit's acting chief judge entered an order

authorizing me to serve in the Middle District of Alabama in this case. ECF No.

1007. The order in effect authorizes me to decide the recusal issue and to proceed

further if the recusal motion is granted.

On June 29, 2010, the United States Supreme Court granted *certiorari*,

vacated the Eleventh Circuit's decision on the merits, and remanded for further

consideration in light of *Skilling v. United States*, 561 U.S. __, 130 S. Ct. 2896,

177 L. Ed. 2d 619 (2010). *See Siegelman v. United States*, __ U.S. __, 130 S. Ct.

3542, 177 L. Ed. 2d 1120 (2010); *Scrushy v. United States*, __ U.S. __, 130 S. Ct.

3541, 177 L. Ed. 2d 1120 (2010). *Skilling* addressed the law governing honest-

services fraud, a concept central to at least some of the counts on which the jury

convicted these defendants. I deferred a ruling on the motion to recuse pending a

final decision on appeal; an Eleventh Circuit ruling entirely in the defendants'

favor would have mooted the issue, and in any event the appellate decision seemed

likely to affect the issues as presented in this court. On November 17, 2010, I

entered an order deferring a ruling and announcing my intent to set an oral

argument after the appeal was resolved. ECF No. 1013.

On May 10, 2011, the Eleventh Circuit issued an opinion affirming each

defendant's convictions on all but two counts and remanding for resentencing.

*United States v. Siegelman*, 640 F.3d 1159 (11th Cir. 2011) ("*Siegelman II*"). The

court again denied the separate motion to issue or authorize subpoenas or appoint a special master. *Id*. at 1181 n.29. Mr. Siegelman filed a petition for panel or en banc rehearing; Mr. Scrushy did not. Mr. Scrushy's mandate issued on June 10, 2011. ECF No. 1018. Mr. Siegelman's mandate has not issued; his petition for rehearing is still pending. But issuance of this order need not be further delayed.

## II

Having reviewed the relevant portions of the record and the briefs on appeal, as well as the Eleventh Circuit's opinion rejecting the defendants' email claims, I now have determined—contrary to my initial view when the November 17, 2010 order was entered—that oral argument would serve no purpose. The defendants have briefed the recusal issue thoroughly and well; they have been fully heard. The recusal motions fail on their merits.

Section III of this order addresses the substance of the emails—what they would prove if authentic. Section IV addresses the court's handling of the emails in this litigation, including the refusal to make further inquiries of the jurors and refusal to conduct, or allow the defendants to conduct, a broader investigation. Section V addresses the propriety of the Postal Inspection Service's investigation. Section VI addresses the propriety of the court's referral of the matter to the Marshals Service and receipt of information from the Postal Inspection Service and Marshals Service. Section VII addresses recusal. Section VIII concludes.

### III

For purposes of this order the emails can be divided into two groups: those received before the November 17, 2006 hearing, and those received later.

### A

The emails received before the hearing, if authentic, would show at most that some jurors communicated with one another about the merits too soon, that some jurors communicated with one another about the merits separately from the other jurors, and that one juror received extrinsic information about the possible penalties and considered them too severe.  If any of this occurred, it was improper. But none of this is anywhere near as calamitous as the defendants suggest.

Thus, for example, we routinely tell jurors to keep an open mind during a trial and to reserve their judgment until they have heard all the evidence, the closing arguments, and the court's instructions on the law.  *See*, *e.g.*, Eleventh Circuit Pattern Jury Instructions (Criminal Cases), Trial Instruction 2.1 (West 2003).  In order to make it more likely that the jurors will indeed reserve their judgment, we tell them not to discuss the case with one another until the trial is over and they retire to deliberate.  *See id*.   The court gave these instructions in this case.  ECF No. 670 at 24.

But these practices are not ends in themselves.  What is important is that the jurors decide the case based on the evidence presented during the trial, giving the

same careful consideration to all the evidence and not giving greater weight to the government's evidence just because it came first. The instructions do not mean that jurors should not think about the case as it proceeds. To the contrary, we *want* the jurors to pay attention and to think, right from the outset; we just don't want them to close their minds. When a district judge presides over a bench trial, the judge thinks about the case as it goes along, but at the end the judge is still able to consider all the evidence and to render a fair decision. When an appellate judge reads the first brief, the judge thinks about the case, right from the start, but at the end—after reading all the briefs and hearing any oral argument—the judge is still able to consider both sides' points and to render a fair decision. And so it is with jurors. If some of these jurors began thinking about the case before it was submitted, and even if some communicated with one another, it does not suggest that the verdict was anything other than the collective decision of all 12 jurors based on their full and fair consideration of all the evidence.

Similarly, if a juror somehow learned the maximum sentence, that does not undermine confidence in the verdict. For one thing, any prejudice would have cut against the government; the email, if authentic, indicated that a juror thought the possible penalties were too severe. A juror who thinks a penalty is too severe might ignore the point—as the juror should—and thus be equally likely to convict. Or the juror might be less likely to convict because the juror does not wish to

subject the defendant to a too-harsh penalty.  But the juror plainly would not be *more* likely to convict.  More fundamentally, the risk of prejudice from a juror learning the maximum penalty is not great.  Federal jurors ordinarily do not learn the maximum sentence, because it is irrelevant to guilt or innocence and there might be some slight risk of prejudice.  But it happens with some frequency that jurors *do* learn the maximum sentence.  This happens when a codefendant pleads guilty to the same charge the defendant faces, testifies, and is cross-examined about the maximum sentence—cross-examination that is proper because it shows the witness's motive to cooperate with the government.  In most if not all death cases, prospective jurors are "death qualified" and thus learn the maximum sentence during voir dire.  Even in noncapital cases, in some states jurors determine not just guilt or innocence but also the sentence, and the jurors thus learn the maximum sentence.  *See*, *e.g.*, *Lawson v. Commonwealth*, 53 S.W.3d 534, 544 (Ky. 2001).  In all these instances, learning the possible penalty does not prevent jurors from properly determining guilt or innocence.

In sum, the emails received before the November 17 hearing, even if authentic, would cast no doubt on the validity of this verdict.

### B

The emails received *after* the November 17, 2006 hearing would, if authentic, show juror misconduct of a far more serious nature.  The emails

included references to the jurors' exchange of "articles" and "links."  ECF No.

520-1 at 1, 2.  If authentic, the emails would support an inference that two jurors

consulted materials—articles or other materials available through an internet

link—bearing on the merits.  If this occurred, and if it could be proven without

unduly intruding on the legitimate interests of the jurors and the jury system, I

readily assume that a new trial would be required.  *See*, *e.g.*, *United States v. Rowe*,

906 F.2d 654, 656 (11th Cir. 1990) (setting out the standards that determine

whether a jury's exposure to extrinsic information requires a new trial).  Further, if

authentic, the emails would support an inference that these two jurors gave false

testimony at the November 17 hearing.  This, too, might warrant appropriate relief,

if it could be proven without unduly intruding on the legitimate interests of the

jurors and the jury system.

IV

So the chronology was this.  A jury heard weeks of evidence on multiple

charges against four defendants, deliberated for many days, and returned a mixed

verdict, convicting one defendant of all charges, acquitting two others of all

charges, and convicting the final defendant of some charges while acquitting him

of others.  Nothing about the trial itself or the verdict suggests that the jurors did

anything other than return the verdict the jurors collectively thought proper based

on the evidence as admitted during the trial and the law as set out in the jury

instructions.  But after the verdict, anonymous emails showed up purporting to depict juror misconduct.  The court conducted a hearing at which each juror testified, and the court issued a comprehensive opinion explaining why the emails, even if authentic, did not undermine confidence in the verdict or entitle the defendants to a new trial.  At that point more emails showed up that some might think were designed to cure the deficiencies in the earlier emails as identified in the court's comprehensive opinion.  The new emails, if authentic, would be far more troublesome than the earlier ones.  The court did not conduct a further evidentiary hearing and did not authorize the defendants to undertake the intrusive investigation of the jurors that the defendants asked for leave to conduct.  To the contrary, the court adhered to a long-standing local rule—and to the court's earlier explicit order in this case—prohibiting the attorneys from contacting the jurors. *See* M.D. Ala. Loc. R. 47.1; ECF No. 255 at 3.

A theme that runs through the defendants' motion to recuse is that the court handled the issue improperly—that it should have granted a new trial or at least conducted or authorized a broader investigation.  I disagree.  And more importantly, the Eleventh Circuit has now disagreed.  *See Siegelman II*, 640 F.3d at 1187 (11th Cir. 2011).  The importance of this cannot be overemphasized: the Eleventh Circuit has squarely rejected the defendants' position that the district court should have granted a new trial or at least conducted or authorized a broader

investigation.

To be sure, the Eleventh Circuit did not explicitly address each of the defendants' assertions.  The Eleventh Circuit explicitly addressed and rejected the claim based on alleged premature deliberations and deliberations by fewer than all jurors, *see Siegelman II*, 640 F.3d at 1187, and explicitly addressed and rejected the claim based on the extrinsic evidence disclosed at the November 17 hearing: the juror handbook, the unredacted charging document, and the snippets of media coverage.  *See id*. at 1185.  The Eleventh Circuit did not explicitly address the "articles" or "links" mentioned in the purported emails received *after* the November 17 hearing.  But the defendants had fully briefed this issue and had filed a separate motion addressing it.  All the evidence now before this court also was before the Eleventh Circuit.  In reaching its decision affirming the defendants' convictions on all but two counts, and in denying the separate motion, the Eleventh Circuit necessarily rejected the defendants' claim that the post-November 17 emails called for a broader investigation or a different result.

Moreover, the Eleventh Circuit's opinion explained the reason for disapproving a broader investigation of the alleged juror misconduct.  Addressing the allegation of premature deliberations and deliberations among fewer than all jurors, the Eleventh Circuit noted a principle equally applicable—or perhaps more applicable—to the kind of intrusive investigation the defendants proposed in

response to the post-November 17 emails.  Quoting the Supreme Court, the

Eleventh Circuit said:

> There is little doubt that postverdict investigation into juror misconduct would in some instances lead to the invalidation of verdicts reached after irresponsible or improper juror behavior. It is not at all clear, however, that the jury system could survive such efforts to perfect it. Allegations of juror misconduct, incompetency, or inattentiveness, raised for the first time days, weeks, or months after the verdict, seriously disrupt the finality of the process. Moreover, full and frank discussions in the jury room, jurors' willingness to return an unpopular verdict, and the community's trust in a system that relies on the decisions of laypeople would all be undermined by a barrage of postverdict scrutiny of juror conduct .

*Siegelman II*, 640 F.3d at 1185 (quoting *Tanner v. United States*, 483 U.S. 107,

120-21, 107 S. Ct. 2739, 97 L. Ed. 2d 90 (1987)) (internal citations omitted by the

Eleventh Circuit).

In this case the jurors served for nearly two months.  They incurred a

substantial burden.  The defendants now propose an intrusive investigation

including subpoenas to their cellular and internet service providers and a review of

their text messages and emails.  The defendants propose seizing the jurors'

computers for a forensic examination.  This kind of treatment sometimes befalls a

person accused of a crime or even someone involved in substantial civil litigation.

To visit it upon a juror, based on nothing more than anonymously provided emails

that bear no indicia of authenticity and that conveniently showed up just after the

court issued a comprehensive opinion explaining why earlier emails were

insufficient to warrant relief, would inflict an indefensible additional burden on these jurors. Treating jurors this way would make future jurors understandably reluctant to serve.

We ask much of jurors. But not this much.

In sum, the defendants were not entitled to a new trial based on the emails and were not entitled to conduct a broader investigation than the district court authorized. The district court handled these issues properly. The Eleventh Circuit has so ruled.

V

The investigation by the Postal Inspection Service raises a different issue entirely. We prohibit the attorneys from contacting jurors after they have served; we do so in order to protect the jurors from an unwelcome and unnecessary burden and to stave off unwarranted attacks on verdicts. But a law enforcement agency is free to conduct an investigation of a possible crime within its jurisdiction and, as part of the investigation, to contact a person with relevant knowledge, even if the person is a former juror.

If someone prepared a phony email and sent it through the United States Postal Service to a party, attorney, or someone else, in the expectation that it would reach the court for consideration in connection with a motion for a new trial, it was a crime, or so a reasonable person might conclude. Similarly, if someone sent a

phony email to a juror's coworker in an effort to harass or intimidate the juror, a

reasonable person might conclude it was a crime.

The United States Attorney thus had every right to refer these purported

emails to the Marshals Service, which has jurisdiction over crimes directed at

jurors, or the Postal Inspection Service, which has jurisdiction over crimes

involving the mails.  The agencies had every right to investigate.  They had the

right to investigate not for the purpose of supporting the government in the

Siegelman and Scrushy case but for the purpose of determining whether a new

crime had been committed and, if so, who committed it.  The defendants'

suggestion that there was something wrong with this is plainly incorrect.

It was prudent, and perhaps even required, for the acting United States

Attorney to assign the new investigation to an assistant not involved in the

Siegelman and Scrushy prosecution.  And it was prudent for the Marshals Service

to let the Postal Inspection Service spearhead the investigation.  None of this casts

doubt on the propriety of the investigation that the Postal Inspection Service

conducted.

## VI

That brings us to the defendants' allegations of improper *ex parte* contacts

with Chief Judge Fuller.  The judge of course reviewed the parties' filings,

conducted the hearings at which the jurors testified, and issued the orders

announcing his rulings.  The defendants take issue with the judge's decisions but make no allegation that he should not have done these things.  He did them in his capacity as the judge properly assigned to preside over the case, much as the presiding judge in any case reviews the parties' filings, conducts any hearings, and issues orders announcing any rulings.

But Chief Judge Fuller also received information on two other occasions.

First, soon after two jurors' coworkers received copies of purported emails in December 2006, the United States Marshals Service learned that the coworkers had received the emails and so advised Chief Judge Fuller.  *See* ECF No. 1006 at 3. The judge told the Marshals Service to investigate.  *See id.*  The defendants and their attorneys did not know this occurred.  The record does not indicate whether the government's attorneys knew this occurred.

Second, in April 2007 representatives of the Postal Inspection Service and Marshals Service reported to Chief Judge Fuller that an investigation was in progress, that the investigating postal inspector had determined that the purported emails were fake, and that the inspector had been unable to determine who mailed them.  The defendants and their attorneys did not know this occurred.  The government's attorneys may not have known contemporaneously, but they learned at some point.  For present purposes I assume they knew contemporaneously.

These are communications of a kind that sometimes come to a judge,

particularly a chief judge, separate and apart from any pending case.  Thus, for example, had all the defendants been acquitted, so that this case was over, and had the Marshals Service learned that two jurors' coworkers had received copies of purported emails of the same kind now at issue, one might well have expected the Marshals Service to so advise the district's chief judge.  One of a chief judge's many roles, after all, is considering the district's jury procedures.  If there are circumstances that might lead a chief judge to consider procedures that could make jurors less vulnerable—redoubling efforts to avoid the improper disclosure of a juror's physical or email address, for example—a chief judge should be made aware of the circumstances.  And the Marshals Service might so advise not just the chief judge but also the presiding judge in the case.  A district judge who is not a chief also has an interest in the well-being of the jurors who serve in the judge's court, even after they are discharged.

Similarly, one might well expect a chief judge or other judge who receives a report of possible harassment of a juror to ask the Marshals Service to investigate. A judge is not a law enforcement officer or prosecutor and has no proper role in bringing criminal charges.  But when information about a possible crime comes to a judge—as sometimes happens—a judge may properly forward the information for consideration by a prosecutor or law enforcement officer, while being careful not to advise or suggest that charges be brought.  This was not a case where the

trial was still in progress and there was a concern that an investigation of the jurors might affect their deliberations or verdict.  *See Remmer v. United States*, 347 U.S. 227, 74 S. Ct. 450, 98 L. Ed. 654 (1954).  Nor was it a case where one side but not the other knew of an investigation and communicated with the judge while the jurors were deliberating.  *See United States v. Barnwell*, 477 F.3d 844 (6th Cir. 2007).

The difficulty here is not that the Marshals Service told Chief Judge Fuller about the coworkers' receipt of emails, that the judge asked the Marshals Service to investigate, or that the Postal Inspection Service advised the judge of the status of the investigation.  The difficulty is that the motion for reconsideration was pending and the emails were at the heart of the motion.  It plainly would have been better had these communications with the judge not occurred.

Still, it bears noting that there is not a hint of bad faith in any of this.  It would have been better had the Marshals Service not told the judge of the emails, but the Marshals Service probably did not know that a motion for reconsideration was or would be pending, and the Marshals Service should perhaps be forgiven for erring on the side of keeping the district's chief judge informed.  The judge should perhaps have blocked the communications from the Marshals Service and later from the Postal Inspection Service, but before one receives a communication it sometimes is difficult to know what it will be about.  In any event, the

communications occurred.  The issue now is not so much whether this should have happened, but what to do about it.

## VII

The defendants assert that the communications with Chief Judge Fuller call for his recusal.  This section addresses the assertion.  Subsection A deals generally with a judge's receipt of extrinsic information—information that may be relevant to a case but that is not received in the ordinary course of the proceedings in the case itself with notice to both sides.  Subsection B sets out the law of the circuit on the consequences of a judge's receipt of extrinsic information.  And subsection C addresses four other issues raised by the defendants.

## A

Due process demands that a party—especially a criminal defendant—must know and have an opportunity to contest or rebut the information that will be considered on an issue in a case.  A party that wishes for the judge to consider information must not provide it *ex parte*—that is, without notice to the other side.  Our adversary system of justice knows no more fundamental principle.

But judges routinely receive extrinsic information from other sources for other reasons.  A judge should minimize, but cannot wholly avoid, such occurrences.

Every judge lives in a community and presides over multiple cases.  That a

judge might receive information in connection with the judge's other duties, without the parties' knowledge, should come as no shock.  Nor should it come as a shock that the information will sometimes be relevant to an issue in a case.  When this occurs, the judge must decide the issue without considering the extrinsic information in any way.  Doing this is second nature to any judge who has long served.  Examples are legion.

A judge presides over a trial in a personal-injury case arising from a wreck at a given intersection.  There is testimony about the intersection, including elevations, signs, and sight lines.  Two months later there is another trial arising from another wreck at the same intersection.  Must the judge recuse or at least tell the attorneys everything said during the prior trial?  Of course not.  We rely on the judge to decide the second case based on the evidence presented in the second trial. We rely on the judge to ignore the extrinsic information that came to the judge in a capacity other than as the presiding judge in the second case.  *See*, *e.g.*, *Town of Norfolk v. U.S. Army Corps of Eng'rs*, 968 F.2d 1438, 1462 (1st Cir. 1992) (upholding a judge's refusal to recuse himself and noting that a "judge cannot be replaced every time a case presents an issue with which the judge's prior official decisions and positions may have a connection"; "'[o]ur system of justice[] does not require that judges be empty vessels, wholly ignorant of all of the antecedents of a case.'") (quoting *Camacho v. Autoridad de Teléfonos de Puerto Rico*, 868

F.2d 482, 490 (1st Cir.1989)).

The same is true in successive employment-discrimination trials involving the same employer.  Or successive prison-condition trials involving the same facility.  Or successive product-liability trials, perhaps involving the same pharmaceutical product.  Would anyone really contend that a judge who has presided over one tobacco or asbestos case cannot preside over another?

Even more common examples include successive drug-conspiracy trials involving successive indictments arising from the same conspiracy.  Or separate trials of defendants named in the same indictment.  Or separate sentencing proceedings for different defendants convicted under the same indictment.  Or a trial or other proceeding in a criminal case assigned to the same judge who earlier issued a search warrant or authorized a wiretap based on hearsay or other inadmissible evidence.  Or an equal-protection challenge to a jury venire assembled under a plan the judge voted to approve or whose implementation the judge considered in a prior case.

These situations arise with some frequency.  When they do, the judge considers the evidence in the pending proceeding and ignores the extrinsic information that came to the judge from a different source.

Chief Judge Fuller did that here.  The record contains not a hint to the contrary.

To be sure, Chief Judge Fuller expressed doubt about the authenticity of the emails.  But he said his doubt was not a factor in the decision to deny relief.  *See* ECF No. 1006 at 2.  I also doubt the authenticity of the emails, for reasons having nothing to do with the Postal Inspection Service's investigation or the report to Chief Judge Fuller.  My doubt springs from my review of the emails and my commonsense analysis of the circumstances.  My conclusion, like Chief Judge Fuller's, is that for reasons having nothing to do with the Postal Inspection Service's investigation or report, the defendants are not entitled to relief or to conduct their requested further, intrusive investigation of the jurors.  The Eleventh Circuit has definitively upheld this position.

So here, just as occurs with some frequency in situations like those listed above, extrinsic information came to the judge for reasons unrelated to a pending motion, and the judge decided the motion based on the record properly before him, ignoring the extrinsic information.  And here, as also happens with some frequency, the judge's ruling was correct.

B

The law of the circuit as set out in three decisions makes clear that under these circumstances, the judge's receipt of the extrinsic information entitles the defendants to neither a new trial nor recusal of the judge.

In *United States v. Simms*, 385 F.3d 1347 (11th Cir. 2004), the district judge

presiding over a criminal case had an *ex parte* discussion with the government's attorney on the first day of the trial. A subject was the government's obligation to disclose material under *Brady v. Maryland*, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963). The defendant did not object to the *ex parte* discussion on this subject. But without the defendant's knowledge, the discussion improperly extended into other subjects, including the defendant's theory of the case. The defendant learned of the improper discussion only upon later review of the transcript. The Eleventh Circuit said the government had the burden of showing that any improper *ex parte* communication did not prejudice the defendant, and that the burden was "a heavy one." *Simms*, 385 F.3d at 1352 (quoting *United States v. Minsky*, 963 F.2d 870, 874 (6th Cir. 1992)). But the Eleventh Circuit said the *ex parte* discussion did not prejudice the defendant or deprive him of a fair tribunal. *Simms*, 385 F.3d at 1352-53. The Eleventh Circuit upheld the conviction and the sentence as imposed by the same judge who participated in the improper *ex parte* discussion.

The Eleventh Circuit thus squarely held in *Simms* that a district judge can preside over a trial and sentence the defendant after having an improper *ex parte* discussion with the government's attorney about the merits of the case, so long as the substance of the discussion did not deprive the defendant of a fair tribunal or prejudice the defendant.

Here the judge had a discussion after the trial with law enforcement officers, not with the government's attorney as in *Simms*, and here there was a reason for the discussion—the court's interest in protecting jurors—unrelated to any issue pending before the court. More significantly, here, as in *Simms*, there was no prejudice to the defendants; the Eleventh Circuit's decision upholding the convictions on all but two counts conclusively establishes this. If, as the Eleventh Circuit held in *Simms*, it was proper for the district judge to remain in the case there, it was and is proper for the district judge to remain in the case here.

Similarly, in *United States v. Adams*, 785 F.2d 917 (11th Cir. 1986), the district judge presiding over a two-defendant criminal trial met with the government's attorney and a witness during the trial. The subject was the witness's fear for his life. One defendant's attorney was present for part of the meeting, and the judge told the other attorney the next day—when the witness testified—that the meeting had occurred. But neither attorney learned until later—upon review of transcript—that two things occurred during the meeting that the Eleventh Circuit said were "disturbing." *Id*. at 920. First, the government's attorney coached the witness in the judge's presence; the Eleventh Circuit said the judge should have ended the meeting immediately when this began to occur. Second, when the witness testified, the defendants asked the government's attorney and the witness what the government's attorney had agreed to do for the witness.

The government's attorney and the witness gave incomplete answers, and the judge knew it. The Eleventh Circuit said these circumstances created an "appearance of impropriety." *Id*. at 921. But the Eleventh Circuit concluded that the defendants suffered no prejudice, and it affirmed the convictions.

The Eleventh Circuit thus squarely held in *Adams* that a district judge can conduct a trial and sentence a defendant after having an improper *ex parte* discussion with the government's attorney—even when the circumstances create an appearance of impropriety—so long as the defendant suffers no prejudice. In *Adams* the judge acted improperly, allowing the government's attorney to coach a witness in the judge's presence. Here, in contrast, the judge had a discussion with law enforcement officers about possible harassment of jurors, and the discussion had no effect on any proceeding or ruling in the case. If, as the Eleventh Circuit held, it was proper for the district judge to remain in the case in *Adams*, it was and is proper for the district judge to remain in the case here.

To be sure, in *Simms* and *Adams* there were no motions to recuse, presumably because by the time the defendants knew of the improper *ex parte* communications, the cases were over in the district court. But the defendants attacked the *ex parte* communications on appeal. Had the Eleventh Circuit thought the district judges were obligated to recuse themselves, it would not have affirmed the convictions and sentences. After all, the obligation to recuse when the

circumstances require it falls on the judge, with or without a motion from a party.

The third case setting out the law of the circuit is *United States v. Phillips*, 664 F.2d 971 (5th Cir. Unit B 1981), *overruled in other respects based on a rule amendment*, *United States v. Huntress*, 956 F.2d 1309 (5th Cir. 1992).  Fifth Circuit Unit B cases are of course binding precedent in the Eleventh Circuit.  *See Stein v. Reynolds Securities, Inc.*, 667 F.2d 33, 34 (11th Cir.1982).  In *Phillips*, government attorneys had a series of *ex parte* discussions with the judge presiding over a criminal trial.  Some—apparently all—of the government attorneys who participated in the discussions were not otherwise involved in the criminal trial.  After receiving the chief judge's permission to contact the judge presiding over the trial, the attorneys told the judge on successive occasions that the defendants intended to obtain false passports and flee, to intimidate or eliminate witnesses, and to kill the judge.  After the allegation that the defendants intended to flee, the judge immediately revoked their bonds, only later holding a bond hearing and advising the defendants of the *ex parte* allegation.  After the allegation of an intent to kill the judge, the judge told the government attorneys that they could continue to investigate.

The defendants moved to recuse the judge in the case that was pending and later in a new case charging the defendants with obstruction of justice.  As grounds for recusal, the defendants cited the *ex parte* contacts and the judge's comments

about the threats on his life, including his comment that the resulting security measures had left him a "virtual prisoner."  *Id*. at 1004 n.42.  The judge denied the motion to recuse, and the Eleventh Circuit affirmed.  The Eleventh Circuit said there were "indisputably proper purposes" for the *ex parte* communications: avoiding the defendants' plans to flee or disrupt the proceedings.  *Id*. at 1003.  And the Eleventh Circuit said the district judge's comments were made in a judicial setting, did not stem from an extrajudicial source, and did not reflect "the 'pervasive bias and prejudice' that must be shown in order for a judge to be disqualified for remarks or behavior which takes place in a judicial context."  *Id*. at 1004 (quoting earlier authorities).

The *ex parte* communications in *Phillips*, like those at issue here, involved allegations of misconduct directed toward participants in the case—there witnesses and the judge, here jurors.  There the communications came from government attorneys not involved in the underlying case; here the communications came from law enforcement officers not involved in the underlying case.  There the judge expressed dissatisfaction with the results for him personally, saying he had become a virtual prisoner; here the judge has shown impeccable demeanor and has given not a hint of any personal reaction to the information he received.  The allegations there involved a threat of extraordinarily serious future misconduct, including killing witnesses and the judge, while the inquiry here was into serious—but not

nearly *as* serious—possible intimidation of jurors.  And significantly, there the threat was ongoing, while here the threat might already have passed before the *ex parte* communications occurred.  So the Eleventh Circuit's conclusion in *Phillips* that the *ex parte* communications were proper does not mean the communications were proper here.  Still, the Eleventh Circuit held that the district judge in *Phillips* could put aside the extrinsic information and preside impartially over the remainder of the case.  If the judge could do that in *Phillips*, the district judge plainly can do that here.

In sum, a judge who obtains extrinsic information for proper purposes unrelated to a case cannot consider the information in deciding an issue in the case. But the judge ordinarily can continue to preside over the case, deciding each issue based on the evidence properly in the record while ignoring the extrinsic information.  Based on this principle and the law of the circuit as established by *Simms*, *Adams*, and *Phillips*, the defendants' motions to recuse are unfounded. Chief Judge Fuller can properly preside over the remainder of this case.

## C

Four other points deserve mention.

First, the discussion to this point addresses the defendants' assertion that recusal is required because Chief Judge Fuller's "impartiality might reasonably be questioned."  28 U.S.C. § 455(a); *see also* Federal Judicial Center, *Judicial*

*Disqualification: An Analysis of Federal Law* 17-22 (2d ed. 2010) (collecting cases holding that the governing standard is objective: whether a reasonable person fully informed of the facts would question the judge's impartiality). The defendants also assert that recusal is required because Chief Judge Fuller has "personal knowledge of disputed evidentiary facts," 28 U.S.C. § 455(b)(1), and is a "material witness." *Id*. § 455(b)(5)(iv). The defendants say there is a dispute about precisely what was said during the April 2007 meeting and that as a participant in the meeting, Chief Judge Fuller has personal knowledge of what was said and is a witness on that subject. The answer is this. In light of the Eleventh Circuit's decision on appeal and the analysis set out above, what was said in the April 2007 meeting does not matter; it is not a disputed issue. The judge properly decided all issues presented after the meeting, and will properly decide all further issues, without considering what was said in the April 2007 meeting in any way. End of story.

Second, the defendants complain that they have no transcript of the April 2007 meeting, apparently because no court reporter attended. The better practice is for any discussion in a criminal case to be on the record, not because something improper will be said, but because when no record is made, someone may later *claim* that something improper was said, even if it was not. But a deputy marshal or court security officer often approaches a judge with a routine security or administrative issue without a court reporter in attendance. This meeting was not

routine, but neither was it part of a court proceeding.  In any event, the answer is again that the judge did not consider what was said in the April 2007 meeting in any way.  Had there been a court reporter, we would know more precisely what didn't matter.  But it still wouldn't matter.

Third, the defendants complain that neither the judge nor the government promptly told them about the April 2007 meeting.  The defendants learned of the meeting over a year later, after they had submitted their initial brief on appeal.  Had the meeting dealt with the case, and had the judge considered the information in deciding an issue in the case, it would have been inexcusable, with or without notice to the defense.  A failure to provide notice under those circumstances would have made it worse.  But the judge did not consider the information in deciding any issue, and the information dealt with an ongoing criminal investigation.  Preparing fake emails—if they were fake—and sending copies through the mails, with the intent either to affect a court ruling or harass a juror, was a crime, or at least so a reasonable person might conclude.  The officers apparently had no reason to believe a defendant, or a defendant's friend or associate, sent the copies.  But the officers had been unable to determine *who* sent the copies and thus apparently had exonerated nobody.  A law enforcement officer ordinarily does not report the status of a criminal investigation to a person with a motive to commit the crime.  Nor does a chief judge who learns of the investigation.

Fourth, the defendants emphasize that doubts about recusal must be resolved in favor of recusal. Indeed they must. *See*, *e.g.*, *Potashnick v. Port City Constr. Co.*, 609 F.2d 1101, 1112 (5th Cir. 1980). This does not mean, though, that an unfounded recusal motion must be granted. When a judge has worked on a case as long and hard as Chief Judge Fuller worked on this one, and has gotten the case this far, a litigant dissatisfied with the rulings ought not be able to obtain a new judge just by invoking the doubt principle. These recusal motions are unfounded and should be denied.

## VIII

This was a hard-fought case. The Eleventh Circuit described the evidence of guilt as "substantial." *Siegelman II*, 640 F.3d at 1184. But the defendants had much to say; a conviction was hardly a foregone conclusion. When the tide turned in the government's favor, the defendants did not roll over. They fought on, with vigor. They literally pursued the case all the way to the Supreme Court and back.

One of the post-verdict attacks was on the judge's continued participation in the case. Mr. Scrushy moved to recuse the judge because he owns stock in corporations that do business with the government—business having nothing to do with the judiciary, let alone with this case or any case like it. The defendants asserted on appeal, even before they knew of the *ex parte* communications now at issue, that any remand should be to a different district judge. The Eleventh Circuit

rejected the arguments, saying the recusal motion had "all the earmarks of an eleventh-hour ploy based upon . . . dissatisfaction with the jury's verdict and the judge's post-trial rulings." *Siegelman II*, 640 F.3d at 1188.

The new motions to recuse based on *ex parte* communications were filed soon after the defendants learned of the communications. The motions raise substantial issues; it would be unfair to call them another eleventh-hour ploy. But the motions are unfounded. Information came to Chief Judge Fuller of a kind that sometimes comes to a chief judge separate and apart from a pending case. In his rulings in the case, the judge considered the information not at all. The Eleventh Circuit upheld every ruling the judge made on this subject after he received the information. The judge's handling of this issue would not lead a reasonable person to doubt the judge's impartiality.

For these reasons,

IT IS ORDERED:

Mr. Scrushy's motion for recusal, ECF No. 954, as joined by Mr. Siegelman,

ECF Nos. 991, 994, and Mr. Siegelman's second motion for recusal, ECF No.

1009, are DENIED.

SO ORDERED on June 29 , 2011.

s/Robert L. Hinkle
United States District Judge